PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein
John A. Morris
Jason H. Rosell
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone: 212-561-7700
Facsimile:  212-561-7777

*Co-counsel to the Official*
*Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------------------ x | : | |
| In re: | : | |
| | : | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | : | Case No. 12-12020 (MG) |
| | : | Jointly Administered |
| Debtors. | : | |
| ------------------------------------------------------------------------ x | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS, on behalf of the estates of the Debtors, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adversary Proceeding |
| | : | No. 13-_____ |
| UMB BANK, N.A., as successor indenture trustee under that | : | |
| certain Indenture, dated as of June 6, 2008; and WELLS | : | |
| FARGO BANK, N.A., third priority collateral agent and | : | |
| collateral control agent under that certain Amended and | : | |
| Restated Third Priority Pledge and Security Agreement and | : | |
| Irrevocable Proxy, dated as of December 30, 2009, | : | |
| | : | |
| Defendants. | : | |
| ------------------------------------------------------------------------ x | | |

**ADVERSARY COMPLAINT FOR DECLARATORY JUDGMENT,**
**AVOIDANCE OF LIENS, AND DISALLOWANCE OF CLAIMS**

Plaintiff Official Committee of Unsecured Creditors (the "**Committee**") of Residential

Capital, LLC, a Delaware limited liability company ("**ResCap**") and its affiliated debtors

(collectively, the "**Debtors**"), by and through its undersigned counsel, on behalf of and as the

representative of the Debtors' estates, and based upon knowledge, information, belief, and the results of its investigation to date, alleges as follows:

## NATURE OF ACTION

1.      This adversary proceeding seeks: (i) a declaratory judgment that certain property of the Debtors is not subject to liens or security interests asserted by the Collateral Agent (defined below) for the benefit of the Indenture Trustee (defined below) and the Junior Secured Noteholders (defined below, collectively, the "**Secured Parties**"); (ii) a declaratory judgment that certain liens or security interests asserted by the Secured Parties on property of the Debtors are unperfected; (iii) an order avoiding the Secured Parties' unperfected liens on or security interests in certain property under sections 544, 550, and 551 of the Bankruptcy Code; (iv) an order avoiding certain liens or security interests asserted by the Secured Parties on the Preference Assets (defined below), or recovering the value of such assets, as preferential transfers under sections 547, 550, and 551 of the Bankruptcy Code; (v) an order recharacterizing postpetition payments to the Secured Parties' professionals as payments of principal; (vi) an order clarifying the priority of the Secured Parties' liens; (vii) an order disallowing the Secured Parties' claims pending final resolution of the claims in this adversary complaint; and (viii) an order disallowing the Secured Parties' claims to the extent such claims include unmatured interest.

## JURISDICTION AND VENUE

2.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and (e).

- 1 -

4.     This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (F), (K), (M), and (O).

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     Pursuant to Local Rule 7008-1, Plaintiff consents to entry of final orders and judgments by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## CASE BACKGROUND

7.     On May 14, 2012 (the "**Petition Date**"), ResCap and 50 of its subsidiaries filed voluntary petitions in this Court for bankruptcy protection under chapter 11 of title 11 (the "**Chapter 11 Cases**") of the United States Code (the "**Bankruptcy Code**").

8.     The Debtors are among the largest servicers and, together with Ally Bank, originators of residential mortgage loans in the United States.

## PARTIES

9.     The Committee is an official committee of unsecured creditors appointed in these cases by the United States Trustee for the Southern District of New York on May 16, 2012, under section 1102 of the Bankruptcy Code.

10.     The Committee is vested with, among other things, the powers described in section 1103 of the Bankruptcy Code, including the power to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors.

11.     The Committee brings this action on behalf of the estates of each of the Debtors, including, without limitation, EPRE LLC, a Delaware limited liability company, ETS of Virginia, Inc., a Virginia corporation, ETS of Washington, Inc., a Washington corporation,

GMAC Mortgage, LLC, a Delaware limited liability company ("**GMACM**"), GMAC Mortgage USA Corporation, a Delaware corporation, GMAC-RFC Holding Company, LLC, a Delaware limited liability company, Homecomings Financial, LLC, a Delaware limited liability company, ResCap, Residential Funding Company, LLC, a Delaware limited liability company ("**RFC**"), Residential Consumer Services, LLC, a Delaware limited liability company, and Residential Funding Mortgage Exchange, LLC, a Delaware limited liability company.

12.     Defendant UMB Bank, N.A. ("**UMB Bank**" or the "**Indenture Trustee**") is the successor indenture trustee under that certain Indenture, dated as of June 6, 2008 (the "**Junior Secured Notes Indenture**"), among ResCap, as issuer, certain other Debtors, as guarantors, and U.S. Bank, National Association ("**U.S. Bank**"), as the predecessor indenture trustee to UMB Bank, pursuant to which certain 9.625% junior secured notes due 2015 were issued.

13.     Defendant Wells Fargo Bank, N.A. ("**Wells Fargo**") serves as third priority collateral agent and collateral control agent (collectively, the "**Collateral Agent**") under an Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009 (the "**Notes Security Agreement**").

## FACTUAL BACKGROUND

**The Committee's Investigation**

14.     On the Petition Date, the Debtors filed a motion seeking authority to enter into a postpetition financing facility with Ally Financial, Inc. (f/k/a GMAC, LLC) ("**AFI**") and to use the cash collateral of AFI and the Secured Parties (the "**AFI DIP Motion**").

15.     On June 25, 2012, the Court entered an Order [Docket No. 491] granting final approval of the AFI DIP Motion (the "**AFI DIP Order**").

16.     In the AFI DIP Order, the Debtors agreed to a series of stipulations concerning the liens and security interests granted under the Notes Security Agreement (collectively, the "**Stipulations**"), as described in more detail below in paragraph 70.

17.     Among other things, the Stipulations provide that the Debtors have released the Secured Parties from all causes of action in connection with the Junior Secured Notes (as defined below) and acknowledged the Secured Parties' liens on and security interests in the Notes Collateral (as defined below). *See* AFI DIP Order ¶ 5(k).

18.     The AFI DIP Order provides that the Stipulations became binding on the Debtors upon entry of the AFI DIP Order, and become binding on all parties in interest, including the Committee, unless objected to by September 24, 2012 (the "**Challenge Deadline**"). *See* AFI DIP Order ¶ 28.

19.     The AFI DIP Order tolls the Challenge Deadline pending the adjudication of a motion seeking standing to bring causes of action against the Secured Parties. *See* AFI DIP Order ¶ 28.

20.     Following entry of the AFI DIP Order, the Committee commenced an investigation of the claims and liens of the Secured Parties, including whether the Debtors waived any valid estate claims against the Secured Parties.

21.     The Committee's investigation soon focused on a $1.1 billion discrepancy in the Debtors' prepetition and postpetition disclosures concerning the Notes Collateral.

22.     The Debtors' audited financial statements for the year ended December 31, 2011, and unaudited financial statements for the quarter ended March 31, 2012 (the most recent statements prior to the Petition Date), describe the Junior Secured Notes as secured by the same $1.3 billion in collateral that purportedly secures the AFI Revolver (as defined below).

23.     According to the Stipulations, the Notes Collateral includes $1.3 billion of assets identified under the column labeled "Ally Revolver" and an additional $1.1 billion of assets identified under the column labeled "Blanket" on <u>Exhibit A</u> to the AFI DIP Order.

24.     Upon information and belief, prior to the Petition Date, the Debtors' internal collateral tracking database identified only approximately $1.3 billion in collateral securing the Junior Secured Notes and the AFI Revolver.

25.     Upon information and belief, prior to the Petition Date, the Debtors' internal database identified nearly all of the "Blanket" collateral as "Unpledged."

26.     Upon information and belief, prior to agreeing to the Stipulations, the Debtors failed to independently verify whether the Secured Parties had perfected liens, or any liens at all, on the assets that comprise "Blanket" property or whether any such assets constitute Excluded Assets under (and as defined in) the Notes Security Agreement.

27.     The Debtors provided the Committee with supporting information concerning the identification of assets listed in the "Ally Revolver" and "Blanket" columns on <u>Exhibit A</u> to the AFI DIP Order.

28.     Notwithstanding the Stipulations, there are substantial, valuable assets of the Debtors that either are not subject to liens in favor of the Secured Parties or are subject to unperfected liens that may be avoided, among other challenges to the Stipulations.

29.     On September 24, 2012, the Committee filed a motion seeking standing to pursue the claims in this adversary complaint [Docket No. 1563].

30.     By order dated December 26, 2012, the Court granted the Committee standing to commence, prosecute, and settle the claims set forth in this adversary complaint [Docket No. 2518] (the "**<u>Standing Order</u>**").

DOCS_NY:29156.3

31.     The Committee's claims as against the defendants are set forth below.

**The Junior Secured Notes**

32.     Before the Petition Date, the Debtors entered into numerous financing transactions.

33.     On or about June 6, 2008, ResCap, as issuer, GMAC-RFC Holding Company, LLC, GMACM, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, and RFC, as guarantors, and U.S. Bank, as indenture trustee, entered into the Junior Secured Notes Indenture.

34.     A true and correct copy of the Junior Secured Notes Indenture, as supplemented, is attached hereto as **Exhibit A**.

35.     Also on or about June 6, 2008, ResCap issued approximately $4 billion of 9.625% Junior Secured Guaranteed Notes Due 2015 (such notes, the "**Junior Secured Notes**", and the holders of the Junior Secured Notes, the "**Junior Secured Noteholders**") under the Junior Secured Notes Indenture.

36.     The Junior Secured Notes were issued, together with cash paid under a tender offer, in exchange for approximately $6 billion of the Debtors' then-outstanding unsecured notes maturing in 2010-15 (the "**Old Notes**"), as described in the Form 8-K filed by ResCap on or about June 12, 2008 (the "**ResCap Exchange Offer 8-K**").

37.     A true and correct copy of the ResCap Exchange Offer 8-K is attached hereto as **Exhibit B**.

38.     Upon information and belief, each holder that tendered Old Notes in the exchange offer received $800 of Junior Secured Notes in exchange for $1,000 face amount of Old Notes.

39.     Holders of the Old Notes had the opportunity to elect to receive cash in lieu of Junior Secured Notes that they otherwise would have received pursuant to a "modified Dutch

auction" process described in the offering memorandum for the Junior Secured Notes. *See* ResCap Exchange Offer 8-K.

40.    The clearing price in the auction was $650 per $1,000 face amount of the Junior Secured Notes.

41.    Upon information and belief, the exchange of the Junior Secured Notes resulted in original issue discount of at least $1.548 billion, which was to accrete over the life of the Junior Secured Notes.

42.    Upon information and belief, as of the Petition Date, the outstanding face amount of Junior Secured Notes was approximately $2.12 billion.

43.    Upon information and belief, as of the Petition Date, the remaining amount of unaccreted original issue discount was at least $377 million.

44.    On or about June 6, 2008, certain Debtors[1] entered into a Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "**Original Notes Security Agreement**") with the Indenture Trustee and the Collateral Agent.

45.    On or about December 30, 2009, the Original Notes Security Agreement was amended and restated in its entirety by the Notes Security Agreement.

46.    A true and correct copy of the Notes Security Agreement, as amended, is attached hereto as **Exhibit C**.

47.    In the Notes Security Agreement, certain Debtors[2] granted the Collateral Agent liens on and security interests in certain of their assets (collectively, the "**Notes Collateral**") to

---

[1]    Specifically, Debtors ResCap, RFC, GMACM, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, Residential Mortgage Real Estate Holdings, LLC, Equity Investment I, LLC, and Homecomings Financial Real Estate Holdings, LLC were party to the Original Notes Security Agreement. Non-Debtors GMAC Model Home Finance, LLC, Developers of Hidden Springs, LLC, and Residential Funding Real Estate Holdings, LLC were also party to the Original Notes Security Agreement.

secure payment of the obligations under the Junior Secured Notes Indenture and the Junior Secured Notes (the "**Notes Obligations**").

48.     In Section 2 of the Notes Security Agreement, certain Debtors (collectively, the "**Recourse Obligors**") granted the Collateral Agent liens on and security interests in certain servicer advances, mortgage loans, trading securities, accounts receivable, chattel paper, computer hardware, software and related rights/licenses, deposit accounts, securities accounts, instruments, investment property, documents, general intangibles, goods, equipment, fixtures, intellectual property, equity interests, promissory notes, and all other personal assets and property of any kind or description.  *See* Notes Security Agreement § 2(a)-(u).

49.     The Recourse Obligors consist of the following Debtors: GMAC-RFC Holding Company, LLC; GMACM; GMAC Residential Holding Company, LLC; Homecomings Financial, LLC; ResCap; and RFC.

50.     In Section 4 of the Notes Security Agreement, certain other Debtors (the "**FABS Grantors**") granted the Collateral Agent liens on and security interests in certain of their financial assets, trading securities, deposit accounts, investment property, instruments, cash delivered in respect of and collateral securing any financial assets, related documents, accounts receivable, general intangibles, supporting assets, and proceeds.  *See* Notes Security Agreement § 4 (a)-(e).

---

[2]     Specifically, Debtors ResCap, RFC, GMACM, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, Residential Mortgage Real Estate Holdings, LLC, Homecomings Financial Real Estate Holdings, LLC, DOA Holding Properties, LLC, GMAC Model Home Finance I, LLC, RFC Construction Funding, LLC, Ditech, LLC, GMAC Mortgage USA Corporation, GMACR Mortgage Products, LLC, Home Connects Lending Services, LLC, Homecomings Financial Real Estate Holdings, LLC, RCSFJV2004, LLC, Residential Consumer Services, LLC, Residential Funding Mortgage Securities I, Inc., Residential Funding Real Estate Holdings, LLC, Residential Mortgage Real Estate Holdings, LLC, Equity Investment I, LLC, and RFC SFJV-2002, LLC were party to the Notes Security Agreement.  Non-Debtors GMAC Model Home Finance, LLC, Developers of Hidden Springs, LLC, Residential Funding Real Estate Holdings, LLC, Ameriland, LLC, and REG-PFH, LLC were also party to the Notes Security Agreement.

DOCS_NY:29156.3

51.     The FABS Grantors consist of the following Debtors: Passive Asset Transactions, LLC; and RFC Asset Holdings II, LLC.

52.     In Section 5 of the Notes Security Agreement, certain other Debtors (collectively, the "**Additional Account Parties**") granted the Collateral Agent liens on and security interests in certain deposit accounts and related proceeds.  *See* Notes Security Agreement § 5 (a) and (b).

53.     The Additional Account Parties consist of the following Debtors: Ditech, LLC; GMAC Mortgage USA Corporation; GMACR Mortgage Products, LLC; Home Connects Lending Services, LLC; Homecomings Financial Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Consumer Services, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; and RFC SFJV-2002, LLC.

54.     Under Sections 2 through 5 of the Notes Security Agreement (the "**Granting Clauses**"), Defendant Wells Fargo, in its capacities as third priority collateral agent and collateral control agent (to the extent any of the Notes Collateral constitutes "Controlled Collateral," as defined in the Notes Security Agreement) as applicable, holds liens and security interests for the benefit of the Junior Secured Noteholders and the Indenture Trustee.[3]

55.     Each Granting Clause provides that "notwithstanding the foregoing, the [Notes Collateral] described in [such Granting Clause] shall not include Excluded Assets."  Notes Security Agreement §§ 2-5.

---

[3]     In Section 3 of the Notes Security Agreement, certain other Debtors granted liens on and security interests in certain equity interests and certain notes.

**Liens Senior to the Defendants' Liens**

56.     On or about June 4, 2008, certain of the Debtors[4] entered into a Loan Agreement with AFI, as agent and lender (the "**Original Loan Agreement**").

57.     On or about December 30, 2009, the same Debtors and other parties[5] entered into an Amended and Restated Loan Agreement with AFI (the "**AFI Revolver**"), amending and restating the Original Loan Agreement.

58.     A true and correct copy of the AFI Revolver, as amended, is attached hereto as **Exhibit D**.

59.     AFI made certain loans to the Debtors (the "**AFI Revolver Obligations**") pursuant to and in accordance with the terms and conditions of the AFI Revolver.

60.     Upon information and belief, the outstanding principal balance due under the AFI Revolver as of the Petition Date was approximately $747 million.

61.     On or about June 4, 2008, the Debtors and the Collateral Agent entered into a First Priority Pledge and Security Agreement and Irrevocable Proxy (the "**Original Revolver Security Agreement**").

62.     On or about December 30, 2009, the Original Revolver Security Agreement was amended and restated (the "**Revolver Security Agreement**").

---

[4]     Specifically, such Debtors consist of the following: (i) RFC and GMACM as borrowers; (ii) ResCap, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, and Homecomings Financial, LLC, as guarantors; and (iii) Residential Mortgage Real Estate Holdings, LLC, Residential Funding Real Estate Holdings, LLC, Homecomings Financial Real Estate Holdings, LLC, and Equity Investment I, LLC, as other obligors.

[5]     Specifically, RFC and GMACM were borrowers under the AFI Revolver.  With the exception of Debtor Executive Trustee Services, LLC, the other obligors were the same as under the Notes Security Agreement. *See* footnote 2 *supra*.  Debtor Executive Trustee Services, LLC became a guarantor under the AFI Revolver, but not the Junior Secured Notes, in February 2011.

- 10 -

63.     By its terms, the Revolver Security Agreement grants the Collateral Agent liens on and security interests in the Notes Collateral to secure the AFI Revolver Obligations.

**The Intercreditor Agreement**

64.     On or about June 6, 2008, U.S. Bank, as indenture trustee (predecessor to Defendant UMB Bank), Defendant Wells Fargo, as Collateral Agent and in other capacities, AFI, as lender agent, and certain Debtors[6] entered into an intercreditor agreement (as amended, the "**Intercreditor Agreement**").

65.     A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit E**.

66.     Section 2.1(b) of the Intercreditor Agreement provides that the liens and security interests granted under the Revolver Security Agreement are first priority liens and security interests senior to the liens and security interests granted under the Notes Security Agreement.

67.     At the time the parties entered into the Intercreditor Agreement, certain other obligations of the Debtors were secured by second priority liens on and security interests in the Notes Collateral (the "**Original Second Lien Obligations**").

68.     Upon information and belief, before the Petition Date, the Original Second Lien Obligations were repaid and retired in full.

69.     Upon information and belief, upon the repayment and retirement of the Original Second Lien Obligations, the liens on and security interests in the Notes Collateral became second priority liens and security interests.

---

[6]     The Debtors party to the Intercreditor Agreement are the same as the Debtors party to the Notes Security Agreement.  Certain additional affiliates, including Debtor DOA Properties IX (Lots-Other), LLC, were also party to the Intercreditor Agreement.

DOCS_NY:29156.3

**The Debtors' Stipulations under the AFI DIP Order Concerning the Notes Collateral**

70.    The Stipulations made by the Debtors in the AFI DIP Order included the concessions that: (i) the aggregate principal amount outstanding under the Junior Secured Notes as of the Petition Date is at least $2,120,452,000, plus accrued and unpaid interest and reimbursable expenses and fees (AFI DIP Order ¶ 5(b)(iii)); (ii) the Debtors' obligations under the Junior Secured Notes are legal, valid, and binding and are not subject to avoidance (AFI DIP Order ¶¶ 5(c) and (d)); (iii) the liens and security interests granted to the Secured Parties on the Notes Collateral are first priority, valid, binding, perfected, and enforceable (AFI DIP Order ¶ 5(g)); (iv) the Notes Collateral includes the "Pre-Petition Ally Repo Facility" and any residual value therefrom (AFI DIP Order ¶ 5(h)); and (v) the Notes Collateral includes the assets listed in the columns labeled "Ally Revolver" and "Blanket" on Exhibit A to the AFI DIP Order (AFI DIP Order ¶ 5(h)).

71.    The Stipulations also provide that the Debtors have released the Secured Parties from all causes of action in connection with the Junior Secured Notes and the Secured Parties' liens on and security interests in the Notes Collateral.  See AFI DIP Order ¶ 5(k).

72.    The Debtors' Stipulations, if not challenged, provide for the allowance of the Notes Obligations and excuse the filing of a proof of claim.  See AFI DIP Order ¶¶ 5(c) and (d), 31.

73.    Under the AFI DIP Order, the Secured Parties were granted several forms of adequate protection, including replacement liens and administrative expense claims to the extent of the diminution in value of the Secured Parties' interest in the Notes Collateral.  See AFI DIP Order ¶ 16(c).

74.    In particular, the Secured Parties were granted liens as adequate protection on the equity interests of the Barclays DIP Borrowers (as defined in the AFI DIP Order), but only to the

DOCS_NY:29156.3

extent that such parties' liens on the BMMZ Facility (defined below) or any residual value therefrom were valid.  *See* AFI DIP Order ¶ 16(c)(iii).

75.    Finally, the Secured Parties were granted adequate protection in the form of payment of professional fees of the Indenture Trustee and the Ad Hoc Group of Holders of Junior Secured Notes (as defined in the AFI DIP Order).  *See* AFI DIP Order ¶ 16(c)(v).

## COUNT I

### DECLARATORY JUDGMENT CONCERNING
### "RELEASED BILATERAL FACILITIES COLLATERAL"
### (28 U.S.C. §§ 2201, 2202)

76.    The Committee restates and realleges the allegations contained in paragraphs 1 through 75 above, as if fully set forth herein.

77.    The Notes Security Agreement specifically excludes "Excluded Assets" (as defined in the Notes Security Agreement) from the Notes Collateral.  *See* Notes Security Agreement §§ 2-5.

78.    Accordingly, under the Notes Security Agreement, none of the Debtors granted the Collateral Agent any liens on or security interests in the Excluded Assets.

79.    The Notes Security Agreement defines Excluded Assets to include assets pledged by the Debtors under any "Bilateral Facility," if the Bilateral Facility prohibits the Debtors from granting the Secured Parties a lien on or security interest in such assets.

80.    In particular, the Notes Security Agreement defines "Excluded Assets" to include:

> (c)      *any asset*, including any account, note contract, lease, financing, arrangement, general intangible, equity investment, interest in joint ventures or other agreement *to the extent that the grant of a security interest therein would violate applicable Requirements of Law, result in the invalidation thereof or provide any party thereto with a right of termination or default* with respect thereto or *with respect to any Bilateral Facility to which*

- 13 -

*such asset is subject as of the Issue Date* (in each case, after giving effect to the applicable provisions of the UCC and other applicable Requirements of Law and principles of equity); . . .

(e)    proceeds and products of any and all of the foregoing excluded assets described in <u>clause (a)</u> through <u>(d)</u> above only to the extent such proceeds and products would constitute property or assets of the type described in <u>clause (a)</u> through <u>(d)</u> above . . . .

Notes Security Agreement, definition of "Excluded Assets" (emphasis added).

81.    The Notes Security Agreement defines the term "Bilateral Facility" to mean approximately 53 financing arrangements to which certain Debtors or their affiliates were party as of June 6, 2008, and were listed on Schedule 7.01(t) to the Original Loan Agreement (the "**Bilateral Facilities**").

82.    Upon information and belief, the Debtors pledged certain of their assets to other creditors under the Bilateral Facilities (the "**Bilateral Facilities Collateral**").

83.    Upon information and belief, certain of the Bilateral Facilities Collateral was subsequently released from the liens or security interests granted pursuant to one or more of the Bilateral Facilities and remained property of the estates as of the Petition Date (such collateral and the proceeds thereof, the "**Released Bilateral Facilities Collateral**").

84.    Upon information and belief, after the Released Bilateral Facilities Collateral was released from the liens or security interests granted pursuant to one or more of the Bilateral Facilities, the Debtors did not separately grant to the Secured Parties, and the Secured Parties did not separately perfect, liens on or security interests in any of the Released Bilateral Facilities Collateral.

85.    The Released Bilateral Facilities Collateral includes the assets listed on the attached **Schedule 1**.

86.    Discovery may reveal additional Released Bilateral Facilities Collateral.

87.     In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on and security interests in the Notes Collateral and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

88.     Upon information and belief, the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order include the Released Bilateral Facilities Collateral.

89.     The Committee disputes the Stipulations as they relate to the Released Bilateral Facilities Collateral.

90.     The Secured Parties do not have security interests in or liens (either perfected or unperfected) on the Released Bilateral Facilities Collateral because those assets are expressly excluded from the property on which liens or security interests are granted in the Notes Security Agreement, and there have been no subsequent grants of liens on or security interests in such assets.

91.     Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the Released Bilateral Facilities Collateral.

92.     Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Released Bilateral Facilities Collateral.

DOCS_NY:29156.3

## COUNT II

### DECLARATORY JUDGMENT CONCERNING
### "UNENCUMBERED REAL PROPERTY"
### (28 U.S.C. §§ 2201, 2202)

93.    The Committee restates and realleges the allegations contained in paragraphs 1 through 92 above, as if fully set forth herein.

94.    As a part of their mortgage loan business, the Debtors regularly foreclose on defaulted mortgages.

95.    On information and belief, as a result of these foreclosures, GMACM, RFC, and Homecomings Financial, LLC have acquired title to certain residential real estate (the "**REO Properties**").

96.    GMACM, RFC, Homecomings Financial, LLC, EPRE LLC, ETS of Washington, Inc., GMAC-RFC Holding Company, LLC, and/or ETS of Virginia, Inc. (collectively, the "**Property Owners**") also own approximately $9 million of real property, and additional real property leasehold interests (collectively with the REO Properties, the "**Unencumbered Real Property**").

97.    On the Petition Date, the Unencumbered Real Property included those properties listed on the attached **Schedule 2**.

98.    Discovery may reveal additional Unencumbered Real Property.

99.    Upon information and belief, none of the Property Owners has granted or signed any mortgage or deed of trust in respect of any of the Unencumbered Real Property.

100.   Upon information and belief, the Secured Parties have not recorded a mortgage or deed of trust in respect of any Unencumbered Real Property in the appropriate office of the recorder of deeds for the jurisdiction in which a given property is located.

DOCS_NY:29156.3

101.   The Secured Parties do not have a valid lien on or security interest in the Unencumbered Real Property.

102.   In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

103.   Upon information and belief, the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order include the Unencumbered Real Property.

104.   The Committee disputes the Stipulations as they relate to the Unencumbered Real Property.

105.   The Secured Parties do not have a security interest in or liens (either perfected or unperfected) on the Unencumbered Real Property because no mortgages or deeds of trust were granted to the Secured Parties by the Notes Security Agreement or any other agreement, and the Secured Parties have not recorded any such mortgages or deeds of trust.

106.   Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the Unencumbered Real Property.

107.   Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Unencumbered Real Property.

DOCS_NY:29156.3

## COUNT III

### DECLARATORY JUDGMENT CONCERNING
### "ASSETS OF NON-OBLIGOR DEBTORS"
### (28 U.S.C. §§ 2201, 2202)

108.    The Committee restates and realleges the allegations contained in paragraphs 1 through 107 above, as if fully set forth herein.

109.    In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

110.    Upon information and belief, the rows entitled "Cash and Cash Equivalents" and "Other Assets" in the "Blanket" column on Exhibit A to the AFI DIP Order include assets owned by Debtors that have not guaranteed the Junior Secured Notes, have not granted any liens or security interests to the Secured Parties, and are not otherwise obligated under the Junior Secured Notes Indenture or the Junior Secured Notes (collectively, the "**Non-Obligor Debtors**").

111.    The Non-Obligor Debtors consist of EPRE LLC, ETS of Washington, Inc., and Residential Funding Mortgage Exchange, LLC, among other Debtors.

112.    Discovery may reveal additional assets of the Non-Obligor Debtors that are purportedly included in the Notes Collateral.

113.    The Committee disputes the Stipulations as they relate to the assets of Non-Obligor Debtors.

114.    The Secured Parties do not have a security interest in or liens (either perfected or unperfected) on any assets of the Non-Obligor Debtors because none of the Non-Obligor Debtors is

an obligor under the Notes Security Agreement, and such entities did not otherwise grant security interests or liens in favor of the Secured Parties.

115.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the assets of the Non-Obligor Debtors.

116.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any assets of the Non-Obligor Debtors.

<u>**COUNT IV**</u>

**DECLARATORY JUDGMENT CONCERNING
"RELEASED MORTGAGE LOANS"
(28 U.S.C. §§ 2201, 2202)**

117.    The Committee restates and realleges the allegations contained in paragraphs 1 through 116 above, as if fully set forth herein.

118.    ResCap, RFC, and/or GMACM own certain mortgage loans that were pledged to Citibank or Goldman Sachs under May 2010 facilities with such parties (the "**<u>Released Mortgage Loans</u>**").

119.    Before May 2010, the Released Mortgage Loans that were not otherwise Excluded Assets may have been subject to the liens or security interests of the Secured Parties as collateral for the Notes Obligations.

120.    On May 17, 2010, the Collateral Agent signed a Partial Release of Collateral, dated as of May 17, 2010 (the "**<u>Pledge Release</u>**").

121.    A true and correct copy of the Pledge Release is attached hereto as **Exhibit F**.

122.    The Pledge Release released the Secured Parties' liens on the Released Mortgage Loans.

123.    On or about May 17, 2010, the Collateral Agent also filed UCC-3 termination statements (the "**Termination Statements**") causing any prior financing statements to cease to be effective for the Released Mortgage Loans.

124.    True and correct copies of the Termination Statements are attached hereto as **Exhibit G**.

125.    Upon information and belief, the Debtors did not subsequently grant the Secured Parties any lien on or security interest in any of the Released Mortgage Loans.

126.    In the absence of a separate lien or security interest grant and perfection, the Released Mortgage Loans are not encumbered by any liens or security interests of the Secured Parties.

127.    A list of Released Mortgage Loans is attached hereto as **Schedule 3**.

128.    Discovery may reveal additional Released Mortgage Loans.

129.    In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

130.    Upon information and belief, the assets listed in the "Ally Revolver" and/or "Blanket" columns on Exhibit A to the AFI DIP Order include the Released Mortgage Loans.

131.    The Committee disputes the Debtors' Stipulations as they relate to the Released Mortgage Loans.

132.   The Secured Parties do not have a security interest in or liens (either perfected or unperfected) on the Released Mortgage Loans because any such liens or security interests were released through the Pledge Release and the filing of the Termination Statements, and no subsequent liens or security interests were ever granted or perfected.

133.   Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the Released Mortgage Loans.

134.   Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Released Mortgage Loans.

<u>**COUNT V**</u>

**DECLARATORY JUDGMENT CONCERNING
"CHARACTERIZATION OF THE BMMZ FACILITY"
(28 U.S.C. §§ 2201, 2202)**

135.   The Committee restates and realleges the allegations contained in paragraphs 1 through 134 above, as if fully set forth herein.

136.   BMMZ Holdings LLC ("**BMMZ**"), ResCap, GMACM, and RFC are parties to a Master Repurchase Agreement dated as of December 21, 2011 (the "**BMMZ Agreement**").

137.   ResCap and BMMZ are also parties to a Master Guarantee dated as of December 21, 2011 (together with the BMMZ Agreement, as each may have been amended or supplemented, the "**BMMZ Facility**").

138.   Under the BMMZ Facility, GMACM and RFC purported to "sell" mortgage loans with a book value of $371 million as of the Petition Date (excluding the Released Mortgage Loans, the "**BMMZ Mortgage Loans**") to BMMZ for the aggregate "purchase price" of

- 21 -

$250 million, and agreed to "repurchase" the same loans for an amount generally equal to the purchase price plus a Price Differential (as defined in the BMMZ Facility) equal to LIBOR plus 4.75%. *See* Barclays DIP Order [Docket No. 490] ¶ 7(d).

139.   A list of the BMMZ Mortgage Loans is attached hereto as **Schedule 4**.

140.   Discovery may reveal additional BMMZ Mortgage Loans.

141.   Although the BMMZ Facility was styled as a "sale" and "repurchase" of mortgage loans, the provisions of that facility demonstrate that it was, in substance, a secured financing, and should properly be characterized as such.

142.   Among other things, the terms of the BMMZ Facility establish that the Debtors continued to bear the risks and benefits of ownership of the BMMZ Mortgage Loans, despite their purported sale to BMMZ.

143.   Upon information and belief, under the BMMZ Facility, the "purchase price" for each subject loan was significantly discounted from the fair market value of each loan.

144.   The BMMZ Facility computes the repurchase price for the subject loans based on the original purchase price plus a LIBOR-based rate, rather than the market value of those loans.

145.   The Debtors' actions also demonstrate that they considered the BMMZ Facility a secured financing.

146.   The Debtors retained significant economic rights in the BMMZ Mortgage Loans they had purported to "sell" following the purported transfer to BMMZ, including the right to excess cash flow from the "transferred" assets.

147.   The Debtors' prepetition balance sheet in their consolidated quarterly financial statements categorized the BMMZ Facility as "debt" and the BMMZ Mortgage Loans as "collateral."

DOCS_NY:29156.3

148.   Because the BMMZ Facility, properly characterized, is a secured loan facility, the BMMZ Mortgage Loans were at all times property of RFC and GMACM, as applicable.

149.   The Secured Parties released any liens or security interests they had on the BMMZ Mortgage Loans pursuant to the Pledge Release and the filing of the related Termination Statements.

150.   The Secured Parties therefore have no lien or security interests on the BMMZ Mortgage Loans.

151.   Even if such liens or security interests had not been released by the Pledge Release and the filing of the related Termination Statements, certain of the BMMZ Mortgage Loans would otherwise constitute Released Bilateral Facilities Collateral because, upon information and belief, they were previously pledged to secure the Debtors' obligations under Bilateral Facilities that were subsequently terminated.

152.   The Secured Parties also have no lien on or security interest in ResCap's, RFC's, or GMACM's purported right to "repurchase" the BMMZ Mortgage Loans under the BMMZ Facility, because the BMMZ Mortgage Loans were at all times the property of ResCap, RFC, or GMACM, as the case may be.

153.   The Secured Parties therefore could not have held a lien on or security interest in the residual value of the BMMZ Mortgage Loans through the right to repurchase such loans at a discount because such right did not exist.

154.   In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral and (ii) the Notes Collateral includes the BMMZ Facility and any residual value therefrom.

155.    The Committee disputes the Stipulations as they relate to the BMMZ Mortgage Loans, the BMMZ Facility, or the residual value therefrom.

156.    Because the BMMZ Facility should properly be characterized as a secured financing, at all relevant times, RFC and GMACM owned the BMMZ Mortgage Loans and did not have a contractual right to "repurchase" those loans or any "residual value" from the BMMZ Facility.

157.    Without any liens on or security interests in (i) the BMMZ Mortgage Loans, (ii) any right to "repurchase" those loans, or (iii) any "residual value" from the BMMZ Facility, the Secured Parties are not entitled to an Adequate Protection Lien (as defined in the AFI DIP Order) on the equity interests of the Barclays DIP Borrowers for any diminution in value in their purported prepetition interests in such property.

158.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the BMMZ Mortgage Loans or the BMMZ Facility or the residual value therefrom.

159.    Such controversy is sufficient to warrant the issuance of a declaratory judgment that, among other things, and notwithstanding the Debtors' Stipulations to the contrary: (a) the BMMZ Facility was a secured financing for purposes of determining the enforceability of any liens or security interests in favor of the Secured Parties in the BMMZ Facility, in the residual value under the BMMZ Facility or the Debtors' rights in the BMMZ Mortgage Loans; (b) the Debtors did not have any right to "residual value" under the BMMZ Facility that could have been pledged to the Secured Parties; (c) at all relevant times, the Debtors owned the BMMZ Mortgage Loans; (d) any liens or security interests held by the Secured Parties on the BMMZ

DOCS_NY:29156.3

Mortgage Loans were either excluded or released before the Petition Date; and (e) the Secured

Parties are not entitled to Adequate Protection Liens on the equity of Barclays DIP Borrowers

on account of their asserted interest in the BMMZ Facility and any residual value therefrom.

**COUNT VI**

**DECLARATORY JUDGMENT CONCERNING
THE "DEPOSIT ACCOUNTS"
(28 U.S.C. §§ 2201, 2202)**

160.    The Committee restates and realleges the allegations contained in paragraphs 1

through 159 above, as if fully set forth herein.

161.    The Notes Security Agreement purports to grant the Collateral Agent a lien on

and security interests in "Deposit Accounts" of the Guarantors, the FABS Grantors, and the

Additional Account Parties.

162.    The Notes Security Agreement defines "Deposit Accounts" to have the meaning

set forth in Article 9 of the UCC.

163.    A list of deposit accounts owned by one of ResCap, RFC, GMAC Mortgage USA

Corporation, GMACM, Residential Consumer Services, LLC, ETS of Washington, Inc., or

Residential Funding Mortgage Exchange, LLC is attached hereto as **Schedule 5** (the "**Deposit**

**Accounts**").

164.    Discovery may reveal additional Deposit Accounts that are not subject to

perfected liens.

165.    In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have

valid, perfected, binding, and enforceable liens on and security interests in the Notes Collateral

and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and

"Blanket" columns on Exhibit A to the AFI DIP Order.

- 25 -

166.    Upon information and belief, the assets listed in the "Ally Revolver" or "Blanket" columns on Exhibit A to the AFI DIP Order include the Deposit Accounts.

167.    The Deposit Accounts are deposit accounts within the meaning of the UCC.

168.    Upon information and belief, the Debtors and the Secured Parties have not executed control agreements with the institutions where the Deposit Accounts are located under which the institutions agreed to follow instructions originated by the secured party without obtaining consent from the debtor-depositor.

169.    Upon information and belief, the Secured Parties have not established control over the Deposit Accounts.

170.    The Committee disputes the Debtors' Stipulations as they relate to the Deposit Accounts.

171.    The Secured Parties failed to properly perfect their purported liens on and security interests in the Deposit Accounts and do not hold a perfected lien on or security interest in the Deposit Accounts.

172.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid and/or perfected liens on or security interests in the Deposit Accounts.

173.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Deposit Accounts.

- 26 -

## COUNT VII

### DECLARATORY JUDGMENT CONCERNING
### "PRIORITY OF LIENS OF NOTES COLLATERAL"
### (28 U.S.C. §§ 2201, 2202)

174.   The Committee restates and realleges the allegations contained in paragraphs 1 through 173 above, as if fully set forth herein.

175.   The Debtors have stipulated that the Secured Parties' liens on and security interests in the Notes Collateral are "first priority" and, at the same time, subject to and subordinate to other liens.

176.   The Committee disputes such Stipulation as it relates to the priority of any liens on or security interests in the Notes Collateral.

177.   The Intercreditor Agreement provides that any such liens on and security interests in the Notes Collateral are junior to the liens and security interests securing the AFI Revolver, among other liens.

178.   Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether any of the Secured Parties' liens on and security interests in the Notes Collateral are first priority.

179.   Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, the liens and security interests securing the Notes Obligations are not first priority.

DOCS_NY:29156.3

<u>**COUNT VIII**</u>

**DECLARATORY JUDGMENT CONCERNING
"COMMERCIAL TORT CLAIMS"
(28 U.S.C. §§ 2201, 2202)**

180.    The Committee restates and realleges the allegations contained in paragraphs 1 through 179 above, as if fully set forth herein.

181.    The Committee is currently investigating whether any of the Debtors possess causes of action for breaches of fiduciary duty, conversion or fraudulent conveyance.

182.    Upon information and belief, certain of those causes of action constitute commercial tort claims (the "**Commercial Tort Claims**") under section 9-102(a)(13) of the Uniform Commercial Code (the "**UCC**").

183.    Discovery may reveal additional Commercial Tort Claims.

184.    In the AFI DIP Order, the Debtors stipulated that the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral, and the Notes Collateral was identified by reference to the defined term "Collateral" under the Notes Security Agreement.

185.    Upon information and belief, such Stipulation covers the Commercial Tort Claims.

186.    The Committee disputes the Stipulations as they relate to the Commercial Tort Claims.

187.    Section 2(g) of the Notes Security Agreement purports to grant a lien or security interest to the Secured Parties on the commercial tort claims described on <u>Schedule V</u> thereto as such schedule may be supplemented.

188.    <u>Schedule V</u> to the Notes Security Agreement indicates that no commercial tort claims are subject to the liens or security interests granted by Section 2(g) of the Notes Security Agreement.

- 28 -

189.    The Secured Parties do not have a security interest in or liens (either perfected or unperfected) on the Commercial Tort Claims because no such claims were described in the Notes Security Agreement.

190.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the Commercial Tort Claims.

191.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Commercial Tort Claims.

## COUNT IX

### AVOIDANCE OF UNPERFECTED LIENS
### WITH RESPECT TO DEPOSIT ACCOUNTS
### (11 U.S.C. §§ 544, 550, and 551)

192.    The Committee restates and realleges the allegations contained in paragraphs 1 through 191 above, as if fully set forth herein.

193.    The Secured Parties failed to properly perfect their purported liens on and security interests in the Deposit Accounts because they did not obtain requisite control over such accounts.

194.    Pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code and/or the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) have the rights and powers of (as of the commencement of these chapter 11 cases and without regard to any knowledge of the Debtors, any trustee, or any other creditors), or may avoid any transfer of property of the Debtors or any obligation incurred by the Debtors that is voidable by:

- 29 -

- A creditor that extends credit to a debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; or

- A creditor that extends credit to a debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against a Debtor that is returned unsatisfied at such time, whether or not such a creditor exists.

195.   In this case, the Secured Parties failed to properly perfect their purported liens on and security interests in the Deposit Accounts in compliance with the UCC.  UCC §§ 9-104, 9-304, and 9-314.  Any security interests of the Secured Parties in the Deposit Accounts as of the Petition Date are avoidable pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code.

196.   Because the Secured Parties do not have properly perfected liens on or security interests in the Deposit Accounts, any and all liens on and security interests in the Deposit Accounts asserted by the Secured Parties should be avoided pursuant to section 544(a) of the Bankruptcy Code, and such property or the value of such property, if previously transferred, should be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## COUNT X

### AVOIDANCE OF UNPERFECTED LIENS
### WITH RESPECT TO OTHER PROPERTY
### (11 U.S.C. §§ 544, 550, and 551)

197.   The Committee restates and realleges the allegations contained in paragraphs 1 through 196 above, as if fully set forth herein.

198.   To the extent that Secured Parties' purported liens on and security interests in the Unencumbered Real Property, the Commercial Tort Claims, the assets of Non-Obligor Debtors,

the Released Mortgage Loans, and the BMMZ Mortgage Loans attached, such liens and security interests should be avoided because they were unperfected.

199.    Upon information and belief, the Secured Parties failed to properly perfect their purported liens on and security interests in the Unencumbered Real Property because they did not file a mortgage or deed of trust in the appropriate office of the recorder of deeds for the jurisdiction in which each property is located.

200.    Upon information and belief, the Secured Parties failed to properly perfect their purported liens on and security interests in the Commercial Tort Claims because they did not file a UCC-1 financing statement that sufficiently describes such claims.

201.    Upon information and belief, the Secured Parties failed to properly perfect their purported liens on and security interests in the assets of Non-Obligor Debtors because they did not file any UCC-1 financing statements against such Debtors in the appropriate offices or otherwise take actions to perfect against such Debtors' property that may be perfected by other means.

202.    Upon information and belief, the Secured Parties failed to properly perfect their purported liens on and security interests in the Released Mortgage Loans and the BMMZ Mortgage Loans because they filed the Termination Statements, which caused any prior financing statements to cease to be effective.

203.    Pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code and/or the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) have the rights and powers of (as of the commencement of these chapter 11 cases and without regard to any knowledge of the Debtors, any trustee, or any other creditors), or may

avoid any transfer of property of the Debtors or any obligation incurred by, the Debtors that is voidable by:

- A creditor that extends credit to a debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; or

- A creditor that extends credit to a debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against a Debtor that is returned unsatisfied at such time, whether or not such a creditor exists.

204.    Any security interests or liens of the Secured Parties in the Unencumbered Real Property, the Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released Mortgage Loans, or the BMMZ Mortgage Loans as of the Petition Date are unperfected for the reasons explained above and are avoidable pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code.

205.    Because the Secured Parties do not have properly perfected liens on or security interests in the Unencumbered Real Property, the Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released Mortgage Loans, or the BMMZ Mortgage Loans, any and all liens on and security interests in such property asserted by the Secured Parties should be avoided pursuant to section 544(a) of the Bankruptcy Code, and such property or the value of such property, if previously transferred, should be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

DOCS_NY:29156.3

## COUNT XI

## AVOIDANCE OF
## PREFERENTIAL TRANSFERS
### (11 U.S.C. §§ 547, 550, and 551)

206.    The Committee restates and realleges the allegations contained in paragraphs 1 through 205 above, as if fully set forth herein.

207.    Upon information and belief, at least $350 million of assets, including mortgage loans, REO Property, and governmental insurance claims (collectively, the "**Preference Assets**") were added to the Notes Collateral during the 90 days before the Petition Date.

208.    A list of the Preference Assets is attached hereto as **Schedule 6**.

209.    Discovery may reveal additional Preference Assets.

210.    Section 547(b) of the Bankruptcy Code permits a debtor to avoid a transfer of an interest in property of the debtor's estate if the following conditions have been met:  (a) the transfer was made to or for the benefit of a creditor; (b) the transfer was for or on account of an antecedent debt; (c) the transfer was made while the debtor was insolvent; (d) the transfer was made within the 90 days prior to the petition date; and (e) the transfer enabled the creditor to receive more in a chapter 7 liquidation than it would receive had the transfer not been made.

211.    The Preference Assets were added to the Notes Collateral for the benefit of the Secured Parties on account of the Notes Obligations.

212.    Upon information and belief, the Preference Assets were added to the Notes Collateral at a time when the Debtors were insolvent.

213.    Upon information and belief, addition of the Preference Assets to the Notes Collateral reduced the amount by which the Notes Obligations were undersecured, thereby allowing the Secured Parties to receive more than they would in a hypothetical chapter 7 liquidation had the Preference Assets not been added to the Notes Collateral.

- 33 -

214.    Each addition of the Preference Assets to the Notes Collateral was a transfer for the benefit of the Secured Parties (the "**Preferential Transfers**").

215.    Each of the Preferential Transfers was a transfer made on or within 90 days before the Petition Date.

216.    Each of the Preferential Transfers was a transfer made for or on account of the Notes Obligations.

217.    The Debtors were insolvent when they made each of the Preferential Transfers.

218.    The liens on and security interests in the Preferential Transfers should be avoided pursuant to section 547 of the Bankruptcy Code, and such property or the value of such property if previously transferred should be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## COUNT XII

### OBJECTION TO ALLOWANCE OF CLAIMS
### DUE TO PENDING AVOIDANCE ACTIONS
### (11 U.S.C. §§ 105, 502, 506, 544, 547, and 551 and Rules 3007, 3012, and 7001
### of the Federal Rules of Bankruptcy Procedure)

219.    The Committee restates and realleges the allegations contained in paragraphs 1 through 218 above, as if fully set forth herein.

220.    Under the AFI DIP Order, the Notes Obligations, if not challenged, will be allowed and deemed secured by valid or properly perfected security interests in the Released Bilateral Facilities Collateral, the Unencumbered Real Property, the Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released Mortgage Loans, the BMMZ Facility (including the residual value of the BMMZ Facility), the BMMZ Mortgage Loans, the Deposit Accounts, and the Preference Assets (collectively, the "**Challenged Property**").

- 34 -

221.    Under the AFI DIP Order, the Secured Parties have been excused from filing proofs of claim for the Notes Obligations because the Debtors' Stipulations are deemed to constitute a properly filed proof of claim.

222.    The Committee hereby objects, pursuant to sections 105, 502, 506, 544, 547 and 551 of the Bankruptcy Code, to the allowance of the Notes Obligations.

223.    Pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012 and 7001, each of the Secured Parties' claims should be disallowed until such time as the Committee's claims herein have been finally resolved.

## COUNT XIII

### OBJECTION TO ALLOWANCE OF CLAIMS
### DUE TO INCLUSION OF UNMATURED INTEREST
### (11 U.S.C. §§ 105, 502, and 506 and Rules 3007, 3012, and 7001
### of the Federal Rules of Bankruptcy Procedure)

224.    The Committee restates and realleges the allegations contained in paragraphs 1 through 223 above, as if fully set forth herein.

225.    Under the AFI DIP Order, the Debtors have stipulated that the aggregate principal amount outstanding under the Junior Secured Notes and Notes Obligations as of the Petition Date is at least $2,120,452,000.

226.    The Committee disputes such Stipulation to the extent claims for unmatured interest are included within the principal amount of the Notes Obligations.

227.    Upon information and belief, the stipulated face amount outstanding of the Junior Secured Notes and, thus, the Notes Obligations include at least $377 million of claims for unaccreted original issue discount.

DOCS_NY:29156.3

228.    Such unaccreted original issue discount constitutes "unmatured interest" under section 502(b)(2) of the Bankruptcy Code.

229.    The Secured Parties were undersecured on the Petition Date because the aggregate amount of the Notes Obligations exceeded the value of the Notes Collateral securing such claims.

230.    Under section 506(b) of the Bankruptcy Code, because the Secured Parties were undersecured, the unmatured interest ceases to accrue as of the Petition Date.

231.    Under section 502(b)(2) of the Bankruptcy Code, if an objection is made to a claim, "the court, after notice and a hearing, shall determine the amount of such claim . . .  as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . (2) such claim is for unmatured interest."

232.    The Committee hereby objects, pursuant to sections 105, 502, and 506 of the Bankruptcy Code, to the allowance of the Notes Obligations to the extent such claims include unmatured interest.

233.    Pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Bankruptcy Rules 3007, 3012, and 7001, each of the claims of the Secured Parties' should be disallowed to the extent such claims include unmatured interest.

<u>COUNT XIV</u>

**RECHARACTERIZATION OF
PAYMENT OF FEES, COSTS, AND EXPENSES
(11 U.S.C. § 506(b))**

234.    The Committee restates and realleges the allegations contained in paragraphs 1 through 233 above, as if fully set forth herein.

235.    Under section 506(b) of the Bankruptcy Code, "[t]o the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim,

there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

236.   Only oversecured creditors, and not undersecured creditors, are entitled to receive such costs, fees and related payments.

237.   The Secured Parties were undersecured on the Petition Date because the aggregate amount of the Notes Obligations greatly exceeded the value of the Notes Collateral securing such claims.

238.   Under the AFI Final DIP Order, the right to recharacterize postpetition payments to the Secured Parties' professionals was preserved.

239.   All postpetition payments of fees, costs, and expenses made to date to, or incurred for the benefit of, the Secured Parties, as undersecured creditors, on account of the Notes Obligations, must be applied against the principal amount of the Notes Obligations.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an order:

(1)   declaring that the Released Bilateral Facilities Collateral, Unencumbered Real Property, Commercial Tort Claims, assets of Non-Obligor Debtors and Released Mortgage Loans are not subject to any liens (perfected or unperfected) or security interests of the Secured Parties, and such property does not constitute security for the Notes Obligations;

(2)   declaring that (a) the BMMZ Facility was a secured financing for purposes of determining the enforceability of any liens or security interests in favor of the Secured Parties in the residual value of the BMMZ Facility and/or the Debtors' rights in the BMMZ Mortgage Loans, (b) the Debtors did not have any right to "residual value" under the BMMZ Facility that could have been pledged to the Secured Parties, (c) at all relevant times, the Debtors owned the BMMZ Mortgage Loans, (d) any liens and security interests held by the Secured Parties on the BMMZ Mortgage Loans were released before the Petition Date and (e) the Secured Parties are not entitled to Adequate Protection Liens (as defined in the AFI DIP Order) on the equity of Barclays DIP Borrowers on account of their asserted interest

in the BMMZ Facility or any residual value therefrom;

(3)     declaring that any liens or security interests asserted by the Secured
Parties on the Deposit Accounts are unperfected, and such property does
not constitute security for the Notes Obligations;

(4)     declaring that any liens or security interests asserted by the Secured
Parties, to the extent valid and perfected, are not first priority;

(5)     avoiding the Secured Parties' unperfected liens on or security interests in
the Deposit Accounts pursuant to 11 U.S.C. § 544, and transferring to the
Debtors' estates pursuant to 11 U.S.C. § 550(a) and/or automatically
preserving the avoided liens on or security interests in the Deposit
Accounts or the value of such transfers for the benefit of the Debtors'
estates pursuant to 11 U.S.C. § 551;

(6)     avoiding the Secured Parties' unperfected liens on or security interests in
(to the extent they exist) the Unencumbered Real Property, the
Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released
Mortgage Loans, and the BMMZ Mortgage Loans pursuant to 11 U.S.C. §
544, and transferring to the Debtors' estates pursuant to 11 U.S.C. §
550(a) and/or automatically preserving the avoided liens thereon or
security interests therein or the value of such transfers for the benefit of
the Debtors' estates pursuant to 11 U.S.C. § 551;

(7)     avoiding the Preferential Transfers pursuant to 11 U.S.C. § 547, and
transferring to the Debtors' estates pursuant to 11 U.S.C. § 550(a) and/or
automatically preserving the avoided Preferential Transfers, or the value
of such transfers, for the benefit of the Debtors' estates pursuant to 11
U.S.C. § 551;

(8)     disallowing the Notes Obligations pursuant to 11 U.S.C. § 502 pending
final resolution of the Committee's claims;

(9)     disallowing the Notes Obligations claims pursuant to 11 U.S.C. § 502 to
the extent they include unmatured interest;

(10)    recharacterizing any postpetition payments made to the Secured Parties'
professionals as payments of principal on the Notes Obligations; and

(11)    granting the Committee such other and further relief as the Court deems
just, proper and equitable, including the costs and expenses of this action.

DOCS_NY:29156.3

Dated: February 28, 2013
New York, New York

PACHULSKI STANG ZIEHL & JONES LLP

/s/ *Robert J. Feinstein*

Robert J. Feinstein
John A. Morris
Jason H. Rosell
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:  (212) 561-7700
Facsimile:  (212) 561-7777

*Co-counsel to the Official Committee of
Unsecured Creditors*

DOCS_NY:29156.3

# **<u>EXHIBITS</u>**

# EXHIBIT A

**Junior Secured Notes Indenture**

EX-4.4 5 c26768exv4w4.htm INDENTURE

**Exhibit 4.4**

RESIDENTIAL CAPITAL, LLC

AND EACH OF THE GUARANTORS FROM TIME TO TIME PARTY HERETO

9.625% JUNIOR SECURED GUARANTEED NOTES DUE 2015

INDENTURE

Dated as of June 6, 2008

U.S. Bank National Association

Trustee

Confidential

# CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310 (a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 12.03 |
| (c) | 12.03 |
| 313(a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06; 7.07 |
| (c) | 7.06; 12.02 |
| (d) | 7.06 |
| 314(a) | 4.03;12.02; 12.05 |
| (b) | N.A |
| (c)(1) | 12.04 |
| (c)(2) | 12.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 12.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05; 12.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 2.12 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 12.01 |
| (b) | N.A. |
| (c) | 12.01 |

N.A. means not applicable.

\*     This Cross Reference Table is not part of the Indenture.

**TABLE OF CONTENTS**

                                                                              **Page**

ARTICLE I
DEFINITIONS AND INCORPORATION
BY REFERENCE

Section 1.01 Definitions                                                          1
Section 1.02 Other Definitions                                                   19
Section 1.03 Incorporation by Reference of Trust Indenture Act                   19
Section 1.04 Rules of Construction                                               20
Section 1.05 Retroactive Effect of Indenture with respect to Certain Transactions  20

ARTICLE II
THE NOTES

Section 2.01 Form and Dating                                                     20
Section 2.02 Execution and Authentication                                        21
Section 2.03 Registrar and Paying Agent                                          22
Section 2.04 Paying Agent to Hold Money in Trust                                 22
Section 2.05 Holder Lists                                                        22
Section 2.06 Transfer and Exchange                                               23
Section 2.07 Replacement Notes                                                   37
Section 2.08 Outstanding Notes                                                   37
Section 2.09 Treasury Notes                                                      37
Section 2.10 Temporary Notes                                                     38
Section 2.11 Cancellation                                                        38
Section 2.12 Defaulted Interest                                                  38
Section 2.13 Withholding Taxes                                                   38

ARTICLE III
REDEMPTION AND PREPAYMENT

Section 3.01 Notices to Trustee                                                  39
Section 3.02 Selection of Notes to Be Redeemed                                   39
Section 3.03 Notice of Redemption                                                40
Section 3.04 Effect of Notice of Redemption                                      40
Section 3.05 Deposit of Redemption                                               41
Section 3.06 Notes Redeemed in Part                                              41
Section 3.07 Optional Redemption                                                 41
Section 3.08 Offer to Purchase by Application of Excess Proceeds                 42
Section 3.09 Mandatory Redemption                                                44

-i-

**Page**

ARTICLE IV
COVENANTS

| | |
|---|---|
| Section 4.01 Payment of Notes | 44 |
| Section 4.02 Maintenance of Office or Agency | 44 |
| Section 4.03 Reports | 45 |
| Section 4.04 Compliance Certificate | 46 |
| Section 4.05 Taxes | 46 |
| Section 4.06 Stay, Extension and Usury Laws | 46 |
| Section 4.07 Restricted Payments | 47 |
| Section 4.08 [Reserved] | 48 |
| Section 4.09 Incurrence of Indebtedness | 48 |
| Section 4.10 Asset Sales | 49 |
| Section 4.11 Transactions with Affiliates | 50 |
| Section 4.12 Liens | 51 |
| Section 4.13 Maintenance of the Company as a Holding Company | 52 |
| Section 4.14 Corporate Existence | 52 |
| Section 4.15 [Reserved] | 52 |
| Section 4.16 [Reserved] | 52 |
| Section 4.17 Future Guarantors | 52 |

ARTICLE V
SUCCESSORS

| | |
|---|---|
| Section 5.01 Merger, Consolidation, or Sale of Assets | 53 |
| Section 5.02 Successor Corporation Substituted | 54 |

ARTICLE VI
DEFAULTS AND REMEDIES

| | |
|---|---|
| Section 6.01 Events of Default | 54 |
| Section 6.02 Acceleration | 56 |
| Section 6.03 Other Remedies | 56 |
| Section 6.04 Waiver of Past Defaults | 56 |
| Section 6.05 Control by Majority | 57 |
| Section 6.06 Limitation on Suits | 57 |
| Section 6.07 Rights of Holders of Notes to Receive Payment | 57 |
| Section 6.08 Collection Suit by Trustee | 58 |
| Section 6.09 Trustee May File Proofs of Claim | 58 |
| Section 6.10 Priorities | 58 |
| Section 6.11 Undertaking for Costs | 59 |

ARTICLE VII
TRUSTEE

| | |
|---|---|
| Section 7.01 Duties of Trustee | 59 |

-ii-

Confidential

                                                                              **Page**

Section 7.02 Rights of Trustee                                                    60
Section 7.03 Individual Rights of Trustee                                         61
Section 7.04 Trustee's Disclaimer                                                62
Section 7.05 Notice of Defaults                                                  62
Section 7.06 Reports by Trustee to Holders of the Notes                          62
Section 7.07 Compensation and Indemnity                                          62
Section 7.08 Replacement of Trustee                                              64
Section 7.09 Successor Trustee by Merger, etc                                    65
Section 7.10 Eligibility; Disqualification                                       65
Section 7.11 Preferential Collection of Claims Against Company                   65
Section 7.12 Patriot Act                                                         65
Section 7.13 Payment of Additional Interest                                      65


                              ARTICLE VIII
                               COLLATERAL

Section 8.01 Security Documents                                                  66
Section 8.02 Agents                                                              66
Section 8.03 Authorization of Actions to Be Taken                                66
Section 8.04 Release of Collateral                                               67
Section 8.05 Filing, Recording and Opinions                                      68
Section 8.06 Powers Exercisable by Receiver or Trustee                           69
Section 8.07 Release upon Termination of the Company's Obligations               69


                              ARTICLE IX
                  AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01 Without Consent of Holders of Notes                                 69
Section 9.02 With Consent of Holders of Notes                                    70
Section 9.03 Compliance with Trust Indenture Act                                 71
Section 9.04 Revocation and Effect of Consents                                   72
Section 9.05 Notation on or Exchange of Notes                                    72
Section 9.06 Trustee to Sign Amendments, etc                                     72


                               ARTICLE X
                              GUARANTEES

Section 10.01 Guarantee                                                          72
Section 10.02 Limitation on Guarantor Liability                                  73
Section 10.03 Execution and Delivery of Guarantee                                74
Section 10.04 Guarantors May Consolidate, etc., on Certain Terms                 74
Section 10.05 Releases                                                           75

                                   -iii-

                                                                                        **Page**

ARTICLE XI
SATISFACTION AND DISCHARGE

Section 11.01 Satisfaction and Discharge                                                    75
Section 11.02 Application of Trust Money                                                    76


ARTICLE XII
MISCELLANEOUS

Section 12.01 Trust Indenture Act Controls                                                 77
Section 12.02 Notices                                                                      77
Section 12.03 Communication by Holders of Notes with Other Holders of Notes                78
Section 12.04 Certificate and Opinion as to Conditions Precedent                           78
Section 12.05 Statements Required in Certificate or Opinion                                79
Section 12.06 Rules by Trustee and Agents                                                  79
Section 12.07 No Personal Liability of Directors, Officers, Employees and Stockholders     79
Section 12.08 Governing Law                                                                79
Section 12.09 No Adverse Interpretation of Other Agreements                                80
Section 12.10 Successors                                                                   80
Section 12.11 Severability                                                                 80
Section 12.12 Counterpart Originals                                                        80
Section 12.13 Table of Contents, Headings, etc                                            80
Section 12.14 Third-Party Beneficiaries                                                    80


ARTICLE XIII

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 13.01 Option to Effect Legal Defeasance or Covenant Defeasance                     80
Section 13.02 Legal Defeasance and Discharge                                               80
Section 13.03 Covenant Defeasance                                                          81
Section 13.04 Conditions to Legal or Covenant Defeasance                                   82
Section 13.05 Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous
   Provisions                                                                              83
Section 13.06 Repayment to the Company                                                     84
Section 13.07 Reinstatement                                                                84


EXHIBITS
Exhibit A FORM OF NOTE
Exhibit B FORM OF CERTIFICATE OF TRANSFER
Exhibit C FORM OF CERTIFICATE OF EXCHANGE
Exhibit D FORM OF NOTATION OF GUARANTEE
Exhibit E FORM OF SUPPLEMENTAL INDENTURE
Exhibit F FORM OF OFFICERS' CERTIFICATE FOR RELEASE OF COLLATERAL
Exhibit G FORM OF OPINION OF COUNSEL FOR RELEASE OF COLLATERAL

-iv-

Confidential

INDENTURE dated as of June 6, 2008 among Residential Capital, LLC, a Delaware corporation, each of the Guarantors and U.S. Bank National Association, a national banking association, as Trustee.

The Company and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined) of the 9.625% Junior Secured Guaranteed Notes due 2015 (the "*Notes*"):

**ARTICLE I**
**DEFINITIONS AND INCORPORATION**
**BY REFERENCE**

Section 1.01 *Definitions*.

"*144A Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee.

"*Acquired Indebtedness*" means Indebtedness of a Person existing at the time such Person becomes a Subsidiary or assumed in connection with the acquisition of assets from such Person.

"*Additional Interest*" has the meaning given to such term in the Registration Rights Agreement.

"*Additional Notes*" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with Sections 2.02 and 4.09 hereof, as part of the same series as the Initial Notes.

"*Affiliates*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control," as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Agent*" means any Registrar, Collateral Agent, co-registrar, Paying Agent or additional paying agent.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary that apply to such transfer or exchange.

"*Asset Sale*" means any sale, securitization financing, exchange or other disposition by the Company or any Subsidiary of any Collateral or Supporting Assets to any Person (collectively, for purposes of this definition, a "transfer"), *provided* that if any such transaction constitutes part of a series of related transactions, all of the transactions in such series shall

Confidential

constitute a single transfer. For purposes of this definition, the term "Asset Sale" shall not include:

(a) transfers of cash or cash equivalents representing payments received in the ordinary course of business from any obligor under such Collateral;

(b) the write-off or forgiveness of investments in the ordinary course of business;

(c) the creation of any Lien permitted under this Indenture; and

(d) any transfer of assets of Model Home or its Subsidiaries (other than any Collateral or Supporting Assets with respect to which the Company has relied on clause (3) of the second paragraph of Section 4.10) other than to the Company or a Subsidiary (other than a Financing SPV).

"*Bankruptcy Law*" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time. The terms "*Beneficially Owns*" and "*Beneficially Owned*" have a corresponding meaning.

"*Board of Directors*" means:

(1) with respect to a corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2) with respect to a partnership, the board of directors of the general partner of the partnership;

(3) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof; and

(4) with respect to any other Person, the board or committee of such Person serving a similar function.

"*Broker-Dealer*" has the meaning set forth in the Registration Rights Agreement.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which commercial banking institutions are authorized or required by law to close in New York City or the State of Minnesota.

-2-

Confidential

"*Capital Lease*" means, with respect to any Subsidiary, any lease of (or other agreement conveying the right to use) any real or personal property by such Subsidiary that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Subsidiary.

"*Capital Stock*" means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Collateral*" means all of the existing and after-acquired collateral described in the Security Documents; *provided* that for purposes of Sections 4.10 and 4.12 the "Collateral" shall include only *Primary Collateral* (as defined in the Security Agreement).

"*Collateral Agent*" means Wells Fargo Bank, N.A. in its capacity as Third Priority Collateral Agent under the Security Documents.

"*Collateral Control Agent*" has the meaning set forth in the Intercreditor Agreement.

"*Company*" means Residential Capital, LLC and any and all successors thereto.

"*Consolidated Net Income*" for any period means the net income (or loss) of the Company and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

(a) the net income (or loss) of any Person that is not a Subsidiary, except to the extent that cash in an amount equal to any such income has actually been received by the Company or, subject to clause (c) below, any Subsidiary during such period;

(b) except to the extent includible in the consolidated net income of the Company pursuant to the foregoing clause (a), the net income (or loss) of any Person that accrued prior to the date that (i) such Person becomes a Subsidiary or is merged into or consolidated with the Company or any Subsidiary or (ii) the assets of such Person are acquired by the Company or any Subsidiary;

-3-

Confidential

(c) the net income of any Subsidiary during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of that income is not permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary during such period, except that the Company's equity in a net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income;

(d) in the case of a successor to the Company by consolidation, merger or transfer of its assets, any income (or loss) of the successor prior to such merger, consolidation or transfer of assets; and

(e) without duplication of amounts otherwise deducted in determining Consolidated Net Income, the amount of Permitted Tax Distributions for such period.

"*Corporate Trust Office of the Trustee*" means a principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at U.S. Bank National Association, 60 Livingston Avenue, EP-MN-WS3C, St. Paul, MN 55107-2292, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"*corporation*" means a corporation, limited liability company, statutory trust, limited partnership or similar limited liability entity.

"*Custodian*" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"*Dealer Managers*" means Banc of America Securities LLC, Citigroup Global Markets, Inc., Barclays Capital Inc., Deutsche Bank Securities Inc. and Lehman Brothers Inc.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06 hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, DTC, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Disqualified Equity Interests*" means any class of Equity Interests of the Company or such Subsidiary that, by its terms, or by the terms of any related agreement or of any security into which it is convertible, puttable or exchangeable, is, or upon the happening of any event or the passage of time would be, required to be redeemed by the Company or such Subsidiary,

-4-

Confidential

whether or not at the option of the holder thereof, or matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, in whole or in part, on or prior to the date which is 91 days after the final maturity date of the Notes.

"*Equity Interests*" of any Person means (1) any and all shares or other equity interests (including common stock, preferred stock, limited liability company interests and partnership interests) in such Person and (2) all rights to purchase, warrants or options (whether or not currently exercisable), participations or other equivalents of or interests in (however designated) such shares or other interests in such Person.

"*Event of Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an event of Event of Default.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exchange Offer*" has the meaning set forth in the Registration Rights Agreement.

"*Exchange Offer Registration Statement*" has the meaning set forth in the Registration Rights Agreement.

"*Exchange Securities*" has the meaning given such term by the Registration Rights Agreement.

"*Excluded Subsidiary*" means (i) GMAC Bank, (ii) a Foreign Subsidiary, (iii) any Subsidiary that is effectively restricted from guaranteeing the Notes by law or regulation, (iv) any Financing SPV or (v) any Subsidiary that is effectively restricted from guaranteeing the Notes by its charter, so long as such Subsidiary referred to in this clause (v) is required to make dividends of all cash legally available therefor that is not required to pay current obligations of such Subsidiary; *provided*, that (x) no Subsidiary under (i), (ii), (iii) or (v) above shall be deemed an Excluded Subsidiary if it guarantees any Indebtedness of the Company or any unsecured Indebtedness of any Guarantor for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments and (y) no Subsidiary the Equity Interests of which are directly owned by the Company shall be an Excluded Subsidiary.

"*Existing Notes*" means any series of the Company's existing senior and senior subordinated notes which were the subject of the exchange offers contemplated by the Offering Memorandum.

"*Fair Value*" means, with respect to any Collateral or Supporting Assets at any time, the fair market value of such Collateral or Supporting Assets at such time (taking into account, among other things, current market conditions and whether such Collateral or Supporting Assets are subject to senior claims or set-off rights).

"*Financing Assets*" means whole loan mortgages, residual interests, securities (including Equity Interests or Indebtedness of Subsidiaries that are Financing SPVs but excluding Equity Interests of other Subsidiaries) and other financial assets or any related assets, rights or property or the proceeds therefrom.

-5-

Confidential

"*Financing SPV*" means a special purpose vehicle formed for financing purposes by the Company or any Subsidiary in accordance with past practice of the Company (or any reasonable extension or modification of such past practice including for purposes of financing other types of financial assets) that does not guarantee any Indebtedness of the Company or any Subsidiary other than Indebtedness of another Financing SPV and substantially all of the assets of which consist of Financing Assets.

"*First Priority Collateral Agent*" means Wells Fargo Bank, N.A., in its capacity as collateral agent for the holder of Permitted First Lien Indebtedness.

"*Foreign Subsidiary*" means (x) a Subsidiary that is not organized within one of the 50 states of the United States of America or any jurisdiction that hereafter becomes a state and (y) any Subsidiary of a Subsidiary referred to in clause (x) above.

"*GAAP*" means United States generally accepted accounting principles as in effect from time to time and as applied by the Company in the preparation of its financial statements.

"*Global Note Legend*" means the legend set forth in Section 2.06(g)(2) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes registered in the name of the Depositary or its nominee, deposited with the Trustee, as custodian for the Depositary substantially in the form of Exhibit A hereto and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01, 2.06(b)(3), 2.06(b)(4), 2.06(d)(2) or 2.06(f) hereof.

"*GMAC*" means GMAC LLC, a Delaware Limited Liability company.

"*GMAC Bank*" means GMAC Bank IB, an industrial bank corporation chartered by the State of Utah.

"*GMAC Parties*" means GMAC (and its successors) and its Affiliates (other than the Company and the Company's Subsidiaries and IB Finance).

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States pledges its full faith and credit.

"*Guarantee*" means the full and unconditional guarantee of the payment of principal, interest and premium, if any, on the Notes as set forth in this Indenture.

"*guarantee*" means a guarantee other than by endorsement of negotiable instruments for collection in the ordinary course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of credit or reimbursement agreements in respect thereof, of all or any part of any Indebtedness (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to

-6-

Confidential

take or pay or to maintain financial statement conditions or otherwise); and when used as a verb, "guarantee" and conjugations thereof shall have correlative meanings.

"*Guarantor*" means (i) each of the Subsidiaries of the Company that is a party to this Indenture, and (ii) any other Subsidiary that executes a supplemental indenture in accordance with the provisions of this Indenture.

"*Holder*" means the Person in whose name a Note is registered on the registration books kept for that purpose in accordance with Section 2.03.

"*IB Finance*" means IB Finance Holding Company, LLC, a Delaware limited liability company.

"*Indebtedness*" means, with respect to any Person, without duplication: (i) all indebtedness of such Person for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments; (ii) all obligations of such Person as lessee under Capital Leases that have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP and all obligations of such Person as lessee under any so-called synthetic, off-balance sheet or tax retention lease; (iii) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business); (iv) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person; (v) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit and banker's acceptances issued for the account of such Person; (vi) all Disqualified Equity Interests of such Person; (vii) all Suretyship Liabilities of such Person in respect of obligations of others of the type described in clauses (i) through (vi) above; and (viii) all indebtedness of any partnership of which such Person is a general partner, to the extent of such liability; provided, that Indebtedness shall not include (x) obligations arising from agreements of the Company or a Subsidiary providing for indemnification, contribution, earnout, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business, assets or Equity Interests of a Subsidiary otherwise permitted under this Indenture and not required to be reflected as a liability on a consolidated balance sheet of the Company; or (y) obligations arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" means $4,010,280,000 aggregate principal amount of Notes issued under this Indenture on the Issue Date.

"*Intercreditor Agreement*" means the intercreditor agreement, dated as of the Issue Date, by and between the Company, the Guarantors, the subsidiaries of the Company party thereto, the

-7-

Collateral Agent, the First Priority Collateral Agent, the Second Priority Collateral Agent and the Collateral Control Agent party thereto and the other parties thereof, as the same may be amended, amended and restated or otherwise supplemented in accordance with the terms hereof and thereof.

"*Investments*" of any Person means:

(a) all direct or indirect investments by such Person in any other Person in the form of loans, advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commission, travel and similar advances to officers, directors and employees) or other credit extensions constituting Indebtedness of such other Person, and any guarantee of Indebtedness of any other Person;

(b) all purchases (or other acquisitions for consideration) by such Person of Indebtedness, Equity Interests or other securities of any other Person (other than any such purchase that constitutes a Restricted Payment of the type described in clause (b) of the definition thereof); and

(c) all other items that would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP (including, if required by GAAP, purchases of assets outside the ordinary course of business).

Except as otherwise expressly specified in this definition, the amount of any Investment (other than an Investment made in cash) shall be the fair market value thereof on the date such Investment is made.

"*Issue Date*" means June 6, 2008.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions in the City of New York or at a place of payment are authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, payment may be made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue on such payment for the intervening period.

"*Letter of Transmittal*" means the letter of transmittal to be prepared by the Company and sent to all Holders of the Notes for use by such Holders in connection with the Exchange Offer.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction.

"*Model Home*" means GMAC Model Home Finance, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of Residential Funding Capital, LLC, and its successors and assigns (including its successor or assign formed as a result of a transaction in

-8-

which GMAC Model Home Finance, LLC becomes a wholly-owned Subsidiary of a holding company that is a wholly-owned Subsidiary of Residential Funding Capital, LLC).

"*Net Cash Proceeds*" means, with respect to any Asset Sale of Collateral, the proceeds thereof in the form of cash or cash equivalents, net of:

(a) brokerage commissions and other fees and expenses (including fees, discounts and expenses of legal counsel, accountants and investment banks, consultants and placement agents) of such Asset Sale;

(b) provisions for taxes payable as a result of such Asset Sale (after taking into account any available tax credits or deductions and any tax sharing arrangements);

(c) amounts required to be paid to any Person (other than the Company or any Subsidiary) owning a beneficial interest in the assets subject to the Asset Sale or having a Lien thereon (excluding the Senior Secured Credit Facility, the Notes and the Senior Secured Notes);

(d) payments of unassumed liabilities (not constituting Indebtedness) relating to the assets sold at the time of, or within 30 days after the date of, such Asset Sale; and

(e) appropriate amounts to be provided by the Company or any Subsidiary, as the case may be, as a reserve required in accordance with GAAP against any adjustment in the sale price of such asset or assets or liabilities associated with such Asset Sale and retained by the Company or any Subsidiary, as the case may be, after such Asset Sale, including pensions and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as reflected in an Officers' Certificate delivered to the Trustee.

"*Non-U.S. Person*" means a Person who is not a U.S. Person.

"*Notes*" has the meaning assigned to it in the preamble to this Indenture. The Initial Notes and the Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"*obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages, guarantees and other liabilities payable under the documentation governing any debt, in each case, whether now or hereafter existing, renewed or restructured, whether or not from time to time decreased or extinguished and later increased, created or incurred, whether or not arising on or after the commencement of a case under Title 11, U.S. Code or any similar federal or state law for the relief of debtors (including post-petition interest) and whether or not allowed or allowable as a claim in any such case.

"*Offering Memorandum*" means the confidential offering memorandum and consent solicitation statement dated May 5, 2008, as amended and supplemented by Supplement No. 1 dated May 14, 2008 and Supplement No. 2 dated May 29, 2008.

-9-

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Operating Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary, any Assistant Secretary or any Vice-President of such Person.

"*Officers' Certificate*" means a certificate signed on behalf of the Company by two Officers of the Company, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Company, that meets the requirements of Section 12.05 hereof.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requirements of Section 12.05 hereof. The counsel may be an employee of or counsel to the Company, any Subsidiary of the Company or the Trustee.

"*Pari Passu Third Lien Indebtedness*" means Permitted Refinancing Indebtedness of the type described in clause (v) of the definition of Permitted Refinancing Indebtedness that is secured by a Lien on the Collateral ranking *pari passu* with the Notes.

"*Participant*" means, with respect to the Depositary, a Person who has an account with the Depositary.

"*Permitted Consideration*" means, with respect to an Asset Sale, cash, cash equivalents and/or assets that, concurrently with such Asset Sale, become Collateral or Supporting Assets for Collateral.

"*Permitted First Lien Indebtedness*" means Indebtedness under the Senior Secured Credit Facility permitted by Section 4.09(b)(1).

"*Permitted Funding Indebtedness*" means Indebtedness incurred in the ordinary course through financing, securitization and hedging activities, including customary lines of credit, repurchase transactions or warehouse financings involving residential mortgage loans, home equity loans or second lien loans (including any reasonable extension or evolution of such activities including for purposes of financing other types of financial assets) and other Indebtedness on terms at least as favorable to the Company or the applicable Subsidiary than would be available on an arms-length basis.

"*Permitted Liens*" means:

(a) Liens existing at the Issue Date;

(b) Liens that secure Obligations incurred pursuant to Section 4.09(b)(1); *provided* that such Liens are subject to the provisions of the Intercreditor Agreement;

(c) any Lien for taxes or assessments or other governmental charges or levies not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such taxes are owed or the third party obligated to pay such taxes and for which adequate reserves are being maintained, to the extent required by GAAP and such

-10-

Confidential

proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien);

(d) any warehousemen's, materialmen's, landlord's or other similar Liens arising by law for sums not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such sums are owed or the third party obligated to pay such sums and with respect to which adequate reserves are being maintained, to the extent required by GAAP and such proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien);

(e) survey exceptions, encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other similar restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not individually or in the aggregate materially adversely affect the value of the Company and its Subsidiaries or materially impair the operation of the business of such Person;

(f) pledges or deposits (i) in connection with workers' compensation, unemployment insurance and other types of statutory obligations or the requirements of any official body, or (ii) to secure the performance of tenders, bids, surety or performance bonds, leases, purchase, construction, sales or servicing contracts and other similar obligations incurred in the normal course of business consistent with industry practice or (iii) to obtain or secure obligations with respect to letters of credit, guarantees, bonds or other sureties or assurances given in connection with the activities described in clauses (i) and (ii) above, in each case not incurred or made in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of property or services or imposed by ERISA or the Internal Revenue Code of 1986, as amended, in connection with a "plan" (as defined in ERISA) or (iv) arising in connection with any attachment unless such Liens shall not be satisfied or discharged or stayed pending appeal within 60 days after the entry thereof or the expiration of any such stay;

(g) Liens securing Indebtedness of the Company or a Subsidiary to the extent such secured Indebtedness is pledged as Collateral;

(h) Liens to secure any Permitted Refinancing Indebtedness secured by Liens referred to in clause (a) above; *provided* that such Liens do not extend to any other property or assets and the principal amount of the obligations secured by such Liens is not increased;

(i) licenses of intellectual property granted in the ordinary course of business;

(j) Liens (i) that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of the Company or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations and other cash management activities incurred in the ordinary course of business of the Company and / or any of its

-11-

Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of the Company or any of its Subsidiaries in the ordinary course of business and (ii) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (Y) encumbering reasonable customary initial deposits and margin deposits and attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business, and (Z) in favor of banking institutions arising as a matter of law or pursuant to customary account agreements encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(k) Deposits made in the ordinary course of business to secure liability to insurance carriers;

(l) leases, subleases, licenses or sublicenses granted to others in the ordinary course of business so long as such leases, subleases, licenses or sublicenses are subordinate in all respects to the Liens granted and evidenced by the Security Documents and which do not materially interfere with the ordinary conduct of the business of the Company or any Subsidiaries and do not secure any Indebtedness;

(m) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company or any Subsidiary in the ordinary course of business;

(n) Liens on the assets (other than any Primary Collateral (as defined in the Security Agreement) or Supporting Assets (as defined in the Security Agreement) with respect to Primary Collateral) of a Subsidiary that is not a Guarantor securing Indebtedness and other obligations of such Subsidiary incurred in compliance with this Indenture;

(o) Liens on the Collateral granted under the Security Documents and the Second Priority Security Documents in favor of the Collateral Agent and the Second Priority Collateral Agent to secure the Notes and the Senior Secured Notes, the Guarantees and any Pari Passu Third Lien Indebtedness; *provided* that such Liens are subject to the terms of the Intercreditor Agreement;

(p) Liens on Financing Assets securing Permitted Funding Indebtedness; provided that such Liens on Financing Assets shall be deemed to be a sale of such Financing Assets for all purposes of this Indenture, including without limitation, Section 4.10 and Section 8.04 and, in the case of Primary Collateral (including any required replacement thereof), shall be permitted only to the extent that such sale and the use of proceeds thereof would comply with Section 4.10; and

(q) any extensions, substitutions, replacements or renewals of the foregoing.

"*Permitted Refinancing Indebtedness*" means Indebtedness that refunds, refinances, renews, replaces or extends any Indebtedness permitted to be incurred by the Company or any Subsidiary pursuant to the terms of this Indenture, whether involving the same or any other lender or creditor or group of lenders or creditors, but only to the extent that:

-12-

Confidential

(i) the Permitted Refinancing Indebtedness is scheduled to mature either (a) no earlier than the Indebtedness being refunded, refinanced or extended or (b) at least 91 days after the maturity date of the Notes,

(ii) the Permitted Refinancing Indebtedness has a weighted average life to maturity that is equal to or greater than the remaining weighted average life to maturity of the Indebtedness being refunded, refinanced, renewed, replaced or extended,

(iii) such Permitted Refinancing Indebtedness is in an aggregate principal amount that is less than or equal to the sum of (a) the aggregate principal or accreted amount (in the case of any Indebtedness issued with original issue discount, as such) then outstanding under the Indebtedness being refunded, refinanced, renewed, replaced or extended, (b) the amount of accrued and unpaid interest, if any, and premiums owed, if any, not in excess of preexisting prepayment provisions on such Indebtedness being refunded, refinanced, renewed, replaced or extended and (c) the amount of reasonable and customary fees, expenses and costs related to the incurrence of such Permitted Refinancing Indebtedness,

(iv) such Permitted Refinancing Indebtedness is incurred by the same Person (or its successor) that initially incurred the Indebtedness being refunded, refinanced, renewed, replaced or extended or by the Company or a Guarantor; and

(v) if the Indebtedness is Additional Notes or is unsecured such Refinancing Indebtedness is either unsecured or is in the form of Notes or Indebtedness ranking pari passu with the Notes.

"*Permitted Tax Distributions*" means, with respect to any period during which the Company is treated as a disregarded entity or partnership for U.S. federal, state and/or local income tax purposes, distributions to the Company's direct owner(s) (whether pursuant to a tax sharing agreement or otherwise) to fund the income tax liabilities of such owner(s) (or, if a direct owner is a pass-through entity, of an indirect owner) resulting from the Company being a partnership or disregarded entity for federal, state and/or local income tax purposes, in an aggregate amount not to exceed the product of (i) the net taxable income of the Company for such period, calculated in accordance with applicable law, reduced by any cumulative net taxable loss with respect to all prior post-closing periods (determined as if all such periods were one period) to the extent such cumulative net taxable loss is of a character (ordinary or capital) that would permit such loss to be deducted against the income of the current period and (ii) the highest combined marginal federal, state and/or local income tax rate (taking into account the deductibility of state and local income taxes for federal income tax purposes and the character of the taxable income in question (i.e., long term capital gain, qualified dividend income, etc.)) applicable to any such direct or indirect owner of the Company. Permitted Tax Distributions may be made quarterly based on the Company's good faith estimate of its taxable income, with appropriate adjustments to be made on an annual basis based upon the determination of the Company's actual taxable income.

-13-

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"*Preferred Units*" means the non-cumulative, non-participating, perpetual preferred membership interests of the Company, the designation of which is as set forth in the Amended and Restated Operating Agreement of the Company.

"*Private Placement Legend*" means the legend set forth in Section 2.06(g)(1) hereof to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Qualified Equity Interests*" means Equity Interests of the Company other than Disqualified Equity Interests.

"*Redemption Date*" means the applicable date on which Notes are to be redeemed pursuant to Section 3.07 or Section 3.09.

"*Registration Rights Agreement*" means the registration rights agreement relating to the Notes entered into by the Company and the Trustee.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee.

"*Responsible Officer,*" when used with respect to the Trustee, means any officer within the Corporate Trust Services of the Trustee (or any successor group of the Trustee), including any vice president, assistant treasurer or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"*Restricted Definitive Note*" means a Definitive Note that is a Restricted Note.

"*Restricted Global Note*" means a Global Note that is a Restricted Note.

"*Restricted Note*" has the meaning set forth in Rule 144(a)(3) under the Securities Act for the term "restricted securities"; *provided, however,* that the Trustee shall be entitled to request and conclusively rely upon an Opinion of Counsel with respect to whether any Note is a Restricted Note. Restricted Notes are required to bear the Private Placement Legend.

-14-

Confidential

"*Restricted Payment*" is defined to mean any of the following:

(a) any dividend or other distribution declared and paid on the Equity Interests of the Company or on the Equity Interests in any Subsidiary of the Company that are held by, or declared and paid to, any Person other than the Company or a Subsidiary of the Company other than

(i) dividends, distributions or payments made solely in Qualified Equity Interests of the Company); and

(ii) dividends or distributions payable to the Company or a Subsidiary of the Company or to other holders of Equity Interests of a Subsidiary (other than the GMAC Parties) on a *pro rata* basis;

(b) any payment made by the Company or any of its Subsidiaries to purchase, redeem, acquire or retire any Equity Interests in the Company or any of its Subsidiaries (including any issuance of Indebtedness in exchange for such Equity Interests or the conversion or exchange of such Equity Interests into or for Indebtedness) other than any such Equity Interests owned by the Company or any Subsidiary and other than the redemption of Equity Interests of IB Finance for up to the fair market value thereof at the time of redemption (it being understood that any excess over such fair market value which is paid shall be deemed to be a Restricted Payment and shall be permitted to be paid to the extent otherwise in compliance with Section 4.07);

(c) any payment made by the Company or any of its Subsidiaries (other than payments out of the proceeds of, or in exchange for, Notes, Senior Secured Notes or Permitted Refinancing Indebtedness) to redeem, repurchase, defease (including an in substance or legal defeasance) or otherwise acquire or retire for value (including pursuant to mandatory repurchase covenants), prior to any scheduled maturity, scheduled sinking fund or mandatory redemption payment, Existing Notes, unsecured Permitted Refinancing Indebtedness of the Existing Notes or subordinated Indebtedness of the Company or any Guarantor except, in each case, payments of principal required in order to satisfy a scheduled maturity date on the date such payment is due; and

(d) any Investment by the Company or any of its Subsidiaries in any GMAC Party.

"*Restricted Period*" means the 40-day distribution compliance period as defined in Regulation S.

"*Retained Proceeds*" means Net Cash Proceeds in an aggregate amount of $450 million in the aggregate following the Issue Date which the Company elects to treat as Retained Proceeds.

"*Rule 144*" means Rule 144 promulgated under the Securities Act.

"*Rule 144A*" means Rule 144A promulgated under the Securities Act.

"*Rule 405*" means Rule 405 promulgated under the Securities Act.

-15-

"*Rule 903*" means Rule 903 promulgated under the Securities Act.

"*Rule 904*" means Rule 904 promulgated under the Securities Act.

"*SEC*" means the Securities and Exchange Commission.

"*Second Priority Collateral Agent*" means Wells Fargo Bank, N.A., in its capacity as collateral agent under the Second Priority Security Documents.

"*Second Priority Security Documents*" means the Second Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of the Issue Date, by and among the Company, the Guarantors, the other Subsidiaries of the Company party thereto and the Second Priority Collateral Agent, any mortgages, the Intercreditor Agreement and all of the security agreements, pledges, collateral assignments, mortgages, deeds of trust, trust deeds or other instruments evidencing or creating or purporting to create any security interests in favor of the Second Priority Collateral Agent or the Collateral Control Agent for its benefit and for the benefit of the trustee under the Senior Secured Notes Indenture and the holders of the Senior Secured Notes.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Security Agreement*" means the Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of the Issue Date, by and among the Company, the Guarantors, the other subsidiaries of the Company party thereto and the Collateral Agent.

"*Security Documents*" means the Security Agreement, any mortgages, the Intercreditor Agreement and all of the security agreements, pledges, collateral assignments, mortgages, deeds of trust, trust deeds or other instruments evidencing or creating or purporting to create any security interests in favor of the Collateral Agent or the Collateral Control Agent for its benefit and for the benefit of the Trustee and the Holders of the Notes.

"*Senior Secured Credit Facility*" means the senior secured credit facility dated as of June 4, 2008 by and among the Company, GMAC and the Guarantors as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time.

"*Senior Secured Notes*" means the senior secured guaranteed notes issued pursuant to an indenture dated as of the Issue Date by and among the Company, the Guarantors and U.S. Bank National Association as Trustee.

"*Senior Secured Notes Indenture*" means the indenture, dated the Issue Date, governing the Senior Secured Notes.

-16-

"*Shelf Registration Statement*" means the Shelf Registration Statement as defined in the Registration Rights Agreement.

"*Significant Subsidiary*" means any Subsidiary of the Company (or group of Subsidiaries as to which a specified condition applies) which meets any of the following conditions:

(1) the Company's and its other Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of the Subsidiary exceeds 10 percent of the total assets of the Company and its Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or

(2) the Subsidiary's income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle exceeds 10 percent of such income of the Company and its Subsidiaries on a consolidated basis for the most recently completed fiscal year.

For purposes of this definition, a Subsidiary shall mean a Person that is controlled by the Company directly or indirectly through one or more intermediaries. For purposes of making any determination or calculations, this definition shall be interpreted in accordance with the rules and instructions of Rule 1-02 of Regulation S-X under the Securities Act as in effect on the Issue Date.

"*Subsidiary*" means any corporation, partnership, limited liability company, association or other entity of which at least a majority of the outstanding stock or other interest having by its terms ordinary voting power to elect a majority of the board of directors, managers or trustees of such corporation, partnership, limited liability company, association or other entity (irrespective of whether or not at the time stock or other interest of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time owned by the Company, or owned by one or more Subsidiaries, or owned by the Company and one or more Subsidiaries (it being understood that GMAC Bank is not a Subsidiary).

"*Supporting Assets*": With respect to any Collateral (a "*Subject Asset*") means:

(i) if such Subject Asset consists of an Equity Interest in any Person, the assets of such Person;

(ii) if such Subject Asset consists of a note or other security backed by financial assets and related property, such assets and property; and

(iii) with respect to any Subject Asset, any other asset or claim that constitutes a primary source of the funds expected to repay the investment in, and return on, such Subject Asset.

"*Suretyship Liability*" means any agreement, undertaking or arrangement by which any Subsidiary guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to or otherwise to invest in a debtor, or otherwise to assure a creditor against loss) any Indebtedness,

-17-

obligation or other liability of any other Subsidiary (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the shares of any other Subsidiary. The amount of any Subsidiary's obligation in respect of any Suretyship Liability shall (subject to any limitation set forth therein) be deemed to be the principal amount of the debt, obligation or other liability supported thereby.

"*TIA*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Treasury Yield*" means, with respect to any Notes being redeemed, the yield to maturity implied by (i) the yields reported as of the second Business Day prior to the Redemption Date, on (a) the Bloomberg Financial Markets News screen PX1 or the equivalent screen provided by Bloomberg Financial Markets News, or (b) if such on-line market data is not at that time provided by Bloomberg Financial Markets News, on the display designated as "Page 500" on the Moneyline Telerate service (or such other display as may replace Page 500 on the Moneyline Telerate service), in any case for actively traded U.S. Treasury securities having a maturity equal to May 15, 2010, or (ii) if such yields are not reported at that time or the yields reported as of that time are not ascertainable (including by way of interpolation), the Treasury Constant Maturity Series yields reported, for the latest day for which such yields have been so reported at that time, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity equal to May 15, 2010. Such implied yield will be determined, if necessary, by (x) converting U.S. Treasury bill quotations to bond-equivalent yields in accordance with accepted financial practice and (y) interpolating linearly between (1) the actively traded U.S. Treasury security with a maturity closest to and greater than May 15, 2010 and (2) the actively traded U.S. Treasury security with a maturity closest to and less than May 15, 2010.

"*Trustee*" means U.S. Bank National Association until a successor replaces it in accordance with Section 7.08 and Section 7.09 and thereafter means the successor serving hereunder.

"*Unrestricted Definitive Note*" means a Definitive Note that is an Unrestricted Note.

"*Unrestricted Global Note*" means a Global Note that is an Unrestricted Note.

"*Unrestricted Notes*" means one or more Notes that do not and are not required to bear the Private Placement Legend including, without limitation, the Exchange Securities, any Notes sold in connection with an effective Shelf Registration Statement pursuant to the Registration Rights Agreement, any Notes from which the Private Placement Legend has been removed in accordance with Sections 2.07(g) and, with respect to Unrestricted Global Notes, Notes in which a Holder acquires an interest pursuant to Section 2.07(j).

"*U.S. Person*" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

"*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

-18-

Confidential

Section 1.02 *Other Definitions*.

| Term | Defined in Section |
|---|---|
| "*Affiliate Transaction*". | 4.11 |
| "*Asset Sale Offer*" | 3.08 |
| "*Authentication Order*" | 2.02 |
| "*Covenant Defeasance*" | 13.03 |
| "*DTC*" | 2.03 |
| "*Event of Default*" | 6.01 |
| "*Excess Proceeds*" | 4.10 |
| "*Legal Defeasance*" | 13.02 |
| "*Offer Amount*" | 3.08 |
| "*Offer Period*" | 3.08 |
| "*Paying Agent*" | 2.03 |
| "*Permitted Indebtedness*" | 4.09 |
| "*Primary Collateral*" | definition of "*Collateral*" |
| "*Purchase Date*" | 3.08 |
| "*Registrar*" | 2.03 |
| "*Subject Asset*" | definition of "*Supporting Assets*" |

Section 1.03 *Incorporation by Reference of Trust Indenture Act*.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"*indenture securities*" means the Notes;

"*indenture security Holder*" means a Holder of a Note;

"*indenture to be qualified*" means this Indenture;

"*indenture trustee*" or "*institutional trustee*" means the Trustee; and

"*obligor*" on the Notes and the Guarantees means the Company and the Guarantors, respectively, and any successor obligor upon the Notes and the Guarantees, respectively.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings so assigned to them.

-19-

Confidential

Section 1.04 *Rules of Construction*.

Unless the context otherwise requires:

(1) a term has the meaning assigned to it;

(2) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3) "or" is not exclusive;

(4) words in the singular include the plural, and in the plural include the singular;

(5) "will" shall be interpreted to express a command;

(6) provisions apply to successive events and transactions; and

(7) references to sections of or rules under the Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

Section 1.05 *Retroactive Effect of Indenture with respect to Certain Transactions*.

Solely with respect to any transaction described in Item 1.01 or clauses (a) through (d) of Item 8.01 of the Company's Form 8-K filed with the Securities and Exchange Commission June 3, 2008 and consummated prior to the Issue Date, this Indenture shall be deemed to have been in effect prior to the Issue Date or the consummation of any such transaction (except that any documents required to be delivered to the Trustee pursuant to Section 4.11 of this Indenture may be delivered within 15 days following the Issue Date). For the avoidance of doubt the Trustee shall not have any obligations under this Indenture prior to the date of this Indenture.

## ARTICLE II
## THE NOTES

Section 2.01 *Form and Dating*.

(a) *General*. The Notes and the Trustee's certificate of authentication will be substantially in the form of Exhibit A hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note will be dated the date of its authentication. The Notes shall be in initial denominations of $2,000 and integral multiples thereof.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

-20-

Confidential

However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b) *Global Notes*. Notes offered and sold in reliance on Rule 144A shall be issued initially in the form of one or more permanent Restricted Global Notes. Notes in global form will be substantially in the form of Exhibit A hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes initially issued to or transferred to affiliates (as defined in Rule 144) of the Company shall only be issued in definitive form and shall be substantially in the form of Exhibit A hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof. Unless and until exchanged for an Exchange Note or sold in connection with an effective Shelf Registration Statement pursuant to the Registration Rights Agreement, affiliates of the Company may only hold an interest in Notes in the form of Definitive Notes and are prohibited from taking a beneficial interest in one or more Global Notes.

Section 2.02 *Execution and Authentication*.

At least one Officer must sign the Notes for the Company by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of a written order of the Company signed by at least two Officers (an "*Authentication Order*"), authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes. The Authentication Order shall set forth the number of separate Notes certificates, the principal amount of each of the Notes to be authenticated, the date on which the Notes are to be authenticated, the registered holder of each of the Notes and instructions as to where such Notes shall be delivered. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Company pursuant to one or more Authentication Orders, except as provided in Section 2.07 hereof.

The Trustee may appoint an authenticating agent acceptable to the Company to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may

-21-

do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Company.

Section 2.03 *Registrar and Paying Agent*.

The Company will maintain an office or agency where Notes shall be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*"). The Registrar will keep a register of the Notes and of their transfer and exchange. The Company may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company will notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Company fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such. The Company or any of its Subsidiaries may act as Paying Agent or Registrar.

The Company initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

The Company initially appoints the Trustee to act as the Registrar and Paying Agent and to act as Custodian with respect to the Global Notes.

Section 2.04 *Paying Agent to Hold Money in Trust*.

The Company will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium or Additional Interest, if any, or interest on the Notes, and will notify the Trustee of any default by the Company in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Company at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Company or a Subsidiary) will have no further liability for the money. If the Company or a Subsidiary acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee will serve as Paying Agent for the Notes.

Section 2.05 *Holder Lists*.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar, the Company will furnish to the Trustee at least seven Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Company shall otherwise comply with TIA § 312(a).

-22-

Confidential

Section 2.06 *Transfer and Exchange*.

(a) *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Company for Definitive Notes if:

(1) the Company delivers to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Company within 90 days after the date of such notice from the Depositary; or

(2) there has occurred and is continuing a Default with respect to the Notes and any Holder so requests.

Upon the occurrence of either of the preceding events in (1) or (2) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof.

(b) *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act. Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1) *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; *provided, however*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser). Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

(2) *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the Registrar either:

-23-

(A) both:

(i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii) instructions from the Depositary given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

(B) both:

(i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and

(ii) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above.

Upon consummation of an Exchange Offer by the Company in accordance with Section 2.06(f) hereof, the requirements of this Section 2.06(b)(2) shall be deemed to have been satisfied upon receipt by the Registrar of the instructions contained in the Letter of Transmittal delivered by the Holder of such beneficial interests in the Restricted Global Notes. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(h) hereof.

 (3) *Transfer of Beneficial Interests to Another Restricted Global Note*. A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A) if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B) if the transferee will take delivery in the form of a beneficial interest in the Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

-24-

Confidential

(4) *Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note*. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(2) above and:

(A) such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of the beneficial interest to be transferred, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Securities or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C) such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(ii) if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in a form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to subparagraph (B) or (D) above at a time when an Unrestricted Global Note has not yet been issued, the Company shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate

-25-

Confidential

one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c) *Transfer or Exchange of Beneficial Interests for Definitive Notes.*

(1) *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes.* If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of written instructions from the Depositary, including registration instructions and the following documentation:

(A) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(B) if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C) if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D) if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E) if such beneficial interest is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F) if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Company shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered

-26-

in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(1) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(2) *Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes*. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if:

(A) such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of such beneficial interest, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Securities or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C) such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(ii) if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in a form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

-27-

Confidential

(3) *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes*. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(2) hereof, the Trustee will cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Company will execute and the Trustee will authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Registrar from or through the Depositary and the Participant or Indirect Participant. The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(3) will not bear the Private Placement Legend.

(d) *Transfer and Exchange of Definitive Notes for Beneficial Interests*.

(1) *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes*. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A) if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B) if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C) if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

(D) if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E) if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

-28-

(F) if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee will, upon surrender of the Restricted Definitive Note, cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, and in the case of clause (C) above, the Regulation S Global Note.

(2) *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

(A) such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Securities or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C) such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

(ii) if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Opinion of Counsel in a form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

-29-

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(2) and surrender of the Definitive Notes to the Trustee, the Trustee will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(3) *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes*. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer and surrender of such Unrestricted Definitive Note, the Trustee will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (2)(B), (2)(D) or (3) above at a time when an Unrestricted Global Note has not yet been issued, the Company will issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e) *Transfer and Exchange of Definitive Notes for Definitive Notes*. Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in a form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(1) *Restricted Definitive Notes to Restricted Definitive Notes*. Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A) if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B) if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; and

(C) if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver

-30-

Confidential

a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(2) *Restricted Definitive Notes to Unrestricted Definitive Notes*. Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if:

(A) such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Securities or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) any such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C) any such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(ii) if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests, an Opinion of Counsel in a form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3) *Unrestricted Definitive Notes to Unrestricted Definitive Notes*. A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

-31-

Confidential

(f) *Exchange Offer*. Upon the occurrence of the Exchange Offer in accordance with the Registration Rights Agreement, the Company will issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee will authenticate:

(1) one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of the beneficial interests in the Restricted Global Notes accepted for exchange in the Exchange Offer by Persons that certify in the applicable Letters of Transmittal that (A) they are not Broker-Dealers, (B) they are not participating in a distribution of the Exchange Securities and (C) they are not affiliates (as defined in Rule 144) of the Company; and

(2) Unrestricted Definitive Notes in an aggregate principal amount equal to the principal amount of the Restricted Definitive Notes accepted for exchange in the Exchange Offer by Persons that certify in the applicable Letters of Transmittal that (A) they are not Broker-Dealers, (B) they are not participating in a distribution of the Exchange Securities and (C) they are not affiliates (as defined in Rule 144) of the Company.

Concurrently with the issuance of such Notes, the Trustee will cause the aggregate principal amount of the applicable Restricted Global Notes to be reduced accordingly, and the Company will execute and the Trustee will authenticate and deliver to the Persons designated by the Holders of Definitive Notes so accepted Unrestricted Definitive Notes not bearing the Private Placement Legend in the appropriate principal amount.

(g) *Legends*. The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1) *Private Placement Legend*.

(A) Unless and until (x) a Note is exchanged for an Exchange Note or sold in connection with an effective Shelf Registration Statement pursuant to the Registration Rights Agreement, (y) with respect to a Restricted Global Note, all of the beneficial interests in such Restricted Global Note have been exchanged for beneficial interests in the Unrestricted Global Note in accordance with Section 2.06(j) or the Private Placement Legend has been removed from such Restricted Global Note in accordance with Section 2.06(b)(4), 2.06(c)(2), 2.06(d)(2) or 2.06(e)(2), or (z) the Company determines and there is delivered to the Trustee an Opinion of Counsel reasonably satisfactory to the Trustee and a letter of representation of the Company reasonably satisfactory to the Trustee to the effect that the following legend and the related restrictions on transfer are not required in order to maintain compliance with the provisions of the Securities Act, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT")

-32-

AND, ACCORDINGLY, MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS SET FORTH IN THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE HOLDER:

(1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) (A "QIB") OR (B) IT IS NOT A U.S. PERSON, IS NOT ACQUIRING THIS SECURITY FOR THE ACCOUNT OR BENEFIT OF A U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH REGULATION S UNDER THE SECURITIES ACT,

(2) AGREES THAT IT WILL NOT RESELL OR OTHERWISE TRANSFER THIS SECURITY EXCEPT (A) TO THE ISSUER OR ANY SUBSIDIARY THEREOF, (B) TO A PERSON WHOM THE HOLDER REASONABLY BELIEVES IS A QIB PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB, IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, (C) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 904 UNDER THE SECURITIES ACT, (D) PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE) OR (E) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND, IN EACH CASE, IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS, AND

(3) AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS SECURITY OR AN INTEREST HEREIN IS TRANSFERRED (OTHER THAN A TRANSFER PURSUANT TO CLAUSE (2)(D) OR 2 (E) ABOVE) A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

IN CONNECTION WITH ANY TRANSFER OF THIS SECURITY OR ANY INTEREST HEREIN WITHIN THE TIME PERIOD REFERRED TO ABOVE, THE HOLDER MUST CHECK THE APPROPRIATE BOX SET FORTH ON THE REVERSE HEREOF RELATING TO THE MANNER OF SUCH TRANSFER AND SUBMIT THIS CERTIFICATE TO THE TRUSTEE. AS USED HEREIN, THE TERMS "OFFSHORE TRANSACTION," "UNITED STATES" AND "U.S. PERSON" HAVE THE MEANINGS GIVEN TO THEM BY RULE 902 OF REGULATION S UNDER THE SECURITIES ACT."

(B) Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(4), (c) (2), (c)(3), (d)(2), (d)(3), (e)(2), (e)(3) or (f) of this

-33-

Confidential

Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

(2) *Global Note Legend*. Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ('*DTC*'), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(h) *Cancellation and/or Adjustment of Global Notes*. At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellation, if any beneficial interest in a Global

-34-

Confidential

Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(i) *General Provisions Relating to Transfers and Exchanges*.

(1) To permit registrations of transfers and exchanges, the Company will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(2) No service charge will be made to a Holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Company may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 3.08, 4.10 and 9.05 hereof).

(3) The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4) All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5) Neither the Registrar nor the Company will be required:

(A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection;

(B) to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(C) to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

-35-

Confidential

(6) Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Company may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Company shall be affected by notice to the contrary.

(7) The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(8) All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(j) *Automatic Exchange from Restricted Global Note to Unrestricted Global Note.* Upon compliance with the following procedures, all of the beneficial interests in a Restricted Global Note shall be exchanged for beneficial interests in the Unrestricted Global Note. In order to effect such exchange, the Issuer shall provide written notice to the Trustee instructing the Trustee to (i) direct the Depositary to transfer all of the outstanding beneficial interests in a particular Restricted Global Note to the Unrestricted Global Note and provide the Depositary with all such information as is necessary for the Depositary to appropriately credit and debit the relevant Holder accounts and (ii) provide prior written notice to all Holders of such exchange, which notice must include the date such exchange is to occur, the CUSIP number of the relevant Restricted Global Note and the CUSIP number of the Unrestricted Global Note into which such Holders' beneficial interests will be exchanged. As a condition to any such exchange pursuant to this Section 2.06(j), the Trustee shall be entitled to receive from the Issuer, and rely conclusively without any liability, upon an Officers' Certificate and an Opinion of Counsel to the Issuer, in form and in substance reasonably satisfactory to the Trustee, to the effect that such transfer of beneficial interests to the Unrestricted Global Note shall be effected in compliance with the Securities Act. Upon such exchange of beneficial interests pursuant to this Section 2.06(j), the Registrar shall endorse Schedule A to the relevant Notes and reflect on its books and records the date of such transfer and a decrease and increase, respectively, in the principal amount of the applicable Restricted Global Note(s) and the Unrestricted Global Note, respectively, equal to the principal amount of beneficial interests transferred. Following any such transfer pursuant to this Section 2.06(k), the relevant Restricted Global Note shall be cancelled.

(k) <u>Transfers of Notes Held by Affiliates</u>. Any certificate (i) evidencing a Note that has been transferred to an affiliate (as defined in Rule 405) of an Issuer within one year after the Issue Date, as evidenced by a notation on the assignment form for such transfer or in the representation letter delivered in respect thereof or (ii) evidencing a Note that has been acquired from an affiliate (other than by an affiliate) in a transaction or a chain of transactions not involving any public offering, shall, until one year after the last date on which either the Issuer or any affiliate of the Issuer was an owner of such Note, in each case, be in the form of a permanent Definitive Note and bear the Private Placement Legend subject to the restrictions in Section 2.06(g). The Registrar shall retain copies of all letters, notices and other written communications received pursuant to this Section 2.06. The Issuer, at its sole cost and expense,

-36-

Confidential

shall have the right to inspect and make copies of all such letters, notices or other written communications at any reasonable time upon the giving of reasonable written notice to the Registrar.

Section 2.07 *Replacement Notes.*

If any mutilated Note is surrendered to the Trustee or the Company and the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Company will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's requirements are met. If required by the Trustee or the Company, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee and the Company to protect the Company, the Trustee, any Agent and any authenticating agent from any loss or liability that any of them may suffer if a Note is replaced and subsequently presented or claimed for payment. The Company may charge for its expenses in replacing a Note.

Every replacement Note is an additional obligation of the Company and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08 *Outstanding Notes.*

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, it will be deemed outstanding only if the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser within the meaning of Section 8-303 of the New York Uniform Commercial Code.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Company, a Subsidiary or an Affiliate of any thereof) holds, on a Redemption Date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09 *Treasury Notes.*

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Company or any Guarantor, or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company or any Guarantor, will be considered as though not

-37-

outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee knows are so owned will be so disregarded.

Section 2.10 *Temporary Notes*.

Until certificates representing Notes are ready for delivery, the Company may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Company considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without unreasonable delay, the Company will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

Section 2.11 *Cancellation*.

The Company at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of canceled Notes in accordance with its customary procedures (subject to the record retention requirement of the Exchange Act). The Company may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12 *Defaulted Interest*.

If the Company defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof. The Company will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Company will fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Company (or, upon the written request of the Company, the Trustee in the name and at the expense of the Company) will mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

Section 2.13 *Withholding Taxes*.

The right of any Holder to receive interest on or principal of any Note shall be subject to any applicable withholding or deduction imposed pursuant to the Internal Revenue Code of 1986, as amended, or other applicable tax law, including foreign withholding and deduction. Any amounts properly so withheld or deducted shall be treated as actually paid to the appropriate Holder.

-38-

## ARTICLE III
## REDEMPTION AND PREPAYMENT

Section 3.01 *Notices to Trustee*.

If the Company elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07 or Section 3.09 hereof, it must furnish to the Trustee, at least 35 days but not more than 60 days before a Redemption Date (or such shorter period as may be agreed between the Company and the Trustee), an Officers' Certificate setting forth:

(1) the provision of this Indenture pursuant to which the redemption shall occur;

(2) the Redemption Date;

(3) the principal amount of Notes to be redeemed; and

(4) the redemption price.

Section 3.02 *Selection of Notes to Be Redeemed*.

If less than all of the Notes are to be redeemed at any time, the Trustee will select Notes for redemption *pro rata*, by lot or by such other method in accordance with the procedures of the Depositary except:

(1) if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed; or

(2) if otherwise required by law.

In the event of partial redemption, the particular Notes to be redeemed will be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the Redemption Date by the Trustee from the outstanding Notes not previously called for redemption.

The Trustee will promptly notify the Company in writing of the Notes selected for redemption and, in the case of any Note selected for partial redemption, the principal amount thereof to be redeemed. Notes and portions of Notes selected will be in amounts of $1,000 or whole multiples of $1,000; except that if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed. Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption also apply to portions of Notes called for redemption.

-39-

Section 3.03 *Notice of Redemption*.

Subject to the provisions of Section 3.08 hereof, at least 30 days but not more than 60 days before a Redemption Date, the Company will mail a notice of redemption to the Depositary and to each Holder whose Notes are to be redeemed at their registered address. The Company will not provide notice of redemption to any party other than the Depositary and the Holders. Any notice of redemption provided to Participants or Indirect Participants will be provided at the discretion of the Depositary and pursuant to the Depositary's internal policies.

The notice will identify the Notes to be redeemed (including the CUSIP number) and will state:

(1) the Redemption Date;

(2) the redemption price;

(3) if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note; and

(4) the name and address of the Paying Agent;

(5) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(6) that, unless the Company defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

(7) the paragraph of the Notes and/or section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(8) that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or printed on the Notes.

At the Company's request, the Trustee will give the notice of redemption in the Company's name and at its expense; *provided*, *however*, that the Company has delivered to the Trustee, at least 35 days prior to the Redemption Date (or such shorter period as may be agreed between the Company and the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.04 *Effect of Notice of Redemption*.

Once notice of redemption is mailed in accordance with Section 3.03 hereof, the Notes or portions of Notes called for redemption will become due and payable on the date and at the place

-40-

of payment stated in the notice at the applicable redemption price, together with interest, if any, accrued to the date fixed for redemption.

Section 3.05 *Deposit of Redemption*.

One Business Day prior to the Redemption Date, the Company will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption price of and accrued interest and Additional Interest, if any, on all Notes to be redeemed on that date. The Trustee or the Paying Agent will promptly return to the Company any money deposited with the Trustee or the Paying Agent by the Company in excess of the amounts necessary to pay the redemption price of, and accrued interest and Additional Interest, if any, on, all Notes to be redeemed.

If the Company complies with the provisions of the preceding paragraph, on and after the Redemption Date, interest will cease to accrue on the Notes or the portions of Notes called for redemption. If a Note is redeemed on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption is not so paid upon surrender for redemption because of the failure of the Company to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the Redemption Date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06 *Notes Redeemed in Part*.

Upon surrender and cancellation of a Note that is redeemed in part, the Company will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Company a new Note in a principal amount equal to the unredeemed portion of the Note surrendered and cancelled.

Section 3.07 *Optional Redemption*.

(a) The Company may redeem the Notes at any time, in whole or in part, at a redemption price equal to the greater of:

(1) 100% of the principal amount of the Notes being redeemed, or

(2) the present value of the sum of (A) the redemption price of the Notes on May 15, 2010 (such redemption price being as set forth in the table in clause (b) below) and (B) all remaining scheduled payments of interest on the Notes being redeemed through May 15, 2010 (excluding accrued interest through the Redemption Date), in each case, discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) at a rate equal to the Treasury Yield plus 50 basis points,

-41-

plus, in either case, accrued and unpaid interest, if any, to the Redemption Date on the principal amount of the Notes being redeemed (subject to the right of Holders on the relevant regular record date to receive interest due on an interest payment date).

(b) The Company may redeem the Notes in whole or in part, at any time on or after May 15, 2010, upon not less than 30 nor more than 60 days' notice at the redemption prices (expressed as percentages of the principal amount to be redeemed) set forth below, plus accrued and unpaid interest, if any, to, but not including, the Redemption Date (subject to the right of Holders on the relevant regular record date to receive interest due on an interest payment date), if redeemed during the 12-month period beginning on May 15 of the years indicated:

| Year | Redemption Price |
| --- | --- |
| 2010 | 104.813% |
| 2011 | 102.407% |
| 2012 and thereafter | 100.000% |

Section 3.08 *Offer to Purchase by Application of Excess Proceeds.*

In the event that, pursuant to Section 4.10 hereof, the Company is required to commence an offer to all Holders to purchase Notes (an "*Asset Sale Offer*"), it will follow the procedures specified below.

The Asset Sale Offer shall be made to all Holders and will remain open for a period of at least 20 Business Days following its commencement and not more than 30 Business Days, except to the extent that a longer period is required by applicable law (the "*Offer Period*"). No later than three Business Days after the termination of the Offer Period (the "*Purchase Date*"), the Company will apply all Excess Proceeds (the "*Offer Amount*") to the purchase of Notes (on a *pro rata* basis, if applicable) or, if less than the Offer Amount has been tendered, all Notes tendered in response to the Asset Sale Offer. Payment for any Notes so purchased will be made in the same manner as interest payments are made.

If the Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued and unpaid interest and Additional Interest, if any, will be paid to the Person in whose name a Note is registered at the close of business on such record date, and no Additional Interest will be payable to Holders who tender Notes pursuant to the Asset Sale Offer.

Upon the commencement of an Asset Sale Offer, the Company will send, by first class mail, a notice to the Trustee, the Depositary and each of the Holders. The notice will contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset Sale Offer. The notice, which will govern the terms of the Asset Sale Offer, will state:

(1) that the Asset Sale Offer is being made pursuant to this Section 3.08 and Section 4.10 hereof and the length of time the Asset Sale Offer will remain open;

(2) the Offer Amount, the purchase price and the Purchase Date;

-42-

(3) that any Note not tendered or accepted for payment will continue to accrue interest;

(4) that, unless the Company defaults in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer will cease to accrue interest after the Purchase Date;

(5) that Holders electing to have less than all of its Note purchased pursuant to an Asset Sale Offer may elect to have Notes purchased in integral multiples of $1,000 only;

(6) that Holders electing to have Notes purchased pursuant to any Asset Sale Offer will be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Company, a Depositary, if appointed by the Company, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(7) that Holders will be entitled to withdraw their election if the Company, the Depositary or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a telegram, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have such Note purchased;

(8) that, if the aggregate principal amount of Notes surrendered by Holders thereof exceeds the Offer Amount, the Company will select the Notes to be purchased on a *pro rata* basis based on the principal amount of Notes surrendered (with such adjustments as may be deemed appropriate by the Company so that only Notes in denominations of $1,000 or integral multiples thereof, will be purchased unless all of a Holder's Note is being purchased); and

(9) that Holders whose Notes were purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer).

On or before the Purchase Date, the Company will, to the extent lawful, accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof tendered pursuant to the Asset Sale Offer, or if less than the Offer Amount has been tendered, all Notes tendered, and will deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating that such Notes or portions thereof were accepted for payment by the Company in accordance with the terms of this Section 3.08. The Company, the Depositary or the Paying Agent, as the case may be, will promptly (but in any case not later than five days after the Purchase Date) mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes tendered by such Holder and accepted by the Company for purchase, and the Company will promptly issue a new Note, and the Trustee, upon written request from the Company, will authenticate and mail or deliver (or cause to be transferred by book entry) such new Note to such Holder, in a principal amount equal to

-43-

Confidential

any unpurchased portion of the Note surrendered. Any Note not so accepted shall be promptly mailed or delivered by the Company to the Holder thereof. The Company will publicly announce the results of the Asset Sale Offer on the Purchase Date.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the Asset Sale provisions of this Indenture, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Asset Sale provisions of this Indenture by virtue of such compliance.

Section 3.09 *Mandatory Redemption*.

The Company will mandatorily redeem one-third of the principal amount of each Note originally issued (or, if less, the entire then remaining principal amount of Notes) on each of May 15, 2013, May 15, 2014 and May 15, 2015 at a redemption price equal to the principal amount thereof plus accrued interest to the Redemption Date (subject to the right of Holders on the relevant regular record date to receive interest due on an interest payment date).

## ARTICLE IV
## COVENANTS

Section 4.01 *Payment of Notes*.

The Company will pay or cause to be paid the principal of, premium, if any, and interest and Additional Interest, if any, on, the Notes on the dates and in the manner provided in the Notes. Principal, premium, if any, and interest and Additional Interest, if any will be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 12:00 p.m. Eastern Time on the due date money deposited by the Company in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due. The Company will pay all Additional Interest, if any, in the same manner on the dates and in the amounts set forth in the Registration Rights Agreement.

The Company will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest (without regard to any applicable grace period) at the same rate to the extent lawful.

Section 4.02 *Maintenance of Office or Agency*.

The Company will maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or

-44-

co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Company may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission will in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, the City of New York for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Company hereby designates the office of U.S. Bank Trust National Association at 100 Wall Street, 16th Floor, New York, New York as one such office or agency of the Company in accordance with Section 2.03 hereof.

Section 4.03 *Reports*.

(a) The Company will file with the Trustee, within 15 days of being required to file the same with the SEC, copies of its annual reports and of the information, documents and other reports that it may be required to file with the SEC pursuant to Section 13 or Section 15(d) of the Exchange Act.

(b) If the Company is not required to file information, documents or reports with the SEC pursuant to Section 13 or Section 15(d) of the Exchange Act, the Company will file with the Trustee and the SEC, in accordance with rules and regulations prescribed from time to time by the SEC, such of the supplementary and periodic information, documents and reports which may be required pursuant to Section 13 of the Exchange Act in respect of a security listed and registered on a national securities exchange as may be prescribed from time to time in those rules and regulations. At any time when the reports referred to herein are not filed with the SEC, the Company will maintain a non-public website on which Holders of Notes, prospective investors and securities analysts may access the quarterly and annual financial information of the Company, and the Company will direct Holders of Notes, prospective investors and securities analysts on its publicly available website to contact the Company's Chief Financial Officer to obtain access to the non-public website.

(c) Delivery of the reports, information and documents described in this Section 4.03, to the Trustee are for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officer's Certificates). The Trustee is under no duty to examine such reports, information or documents to ensure

-45-

Confidential

compliance with the provisions of this Indenture or to ascertain the correctness or otherwise of the information or the statements contained therein. The Trustee is entitled to assume such compliance and correctness unless a Responsible Officer of the Trustee is informed otherwise.

Section 4.04 *Compliance Certificate*.

(a) The Company and each Guarantor (to the extent that such Guarantor is so required under the TIA) shall deliver to the Trustee, within 90 days after the end of each fiscal year, an Officers' Certificate stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officers with a view to determining whether the Company has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Company has kept, observed, performed and fulfilled each and every covenant contained in this Indenture and is not in Default in the performance or observance of any of the terms, provisions and conditions of this Indenture (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if any, on the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto. Except with respect to notice of a Default or Event of Default contained in the Officer's Certificate delivered to it pursuant to this Section 4.04, the Trustee shall have no duty to review, ascertain or confirm the Company's compliance with, or the breach of any representation, warranty or covenant made in this Indenture.

(b) So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default, what action the Company is taking or proposes to take with respect thereto and whether additional premium is payable pursuant to Section 6.02 hereof.

Section 4.05 *Taxes*.

The Company will pay, and will cause each of its Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06 *Stay, Extension and Usury Laws*.

The Company and each of the Guarantors covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Company and each of the Guarantors (to the extent that it may lawfully do so) hereby expressly

-46-

Confidential

waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07 *Restricted Payments*.

(a) The Company will not, and will not permit any of its Subsidiaries to, directly or indirectly make any Restricted Payment unless, at the time of and after giving effect to such Restricted Payment:

(1) no Default or Event of Default shall have occurred and be continuing or will occur as a consequence thereof;

(2) after giving effect to such Restricted Payment on a pro forma basis, the aggregate amount expended or declared for all Restricted Payments made on or after the Issue Date (excluding Restricted Payments permitted by clauses (2), (3), (4), (5), (6) and (7) of clause (b) of this Section 4.07), shall not exceed the sum (without duplication) of:

(A) 50% of the Consolidated Net Income (or, if Consolidated Net Income shall be a deficit, minus 100% of such deficit) of the Company accrued on a cumulative basis during the period (taken as one accounting period) from the beginning of the first full fiscal quarter following the fiscal quarter in which the Issue Date occurs and ending on the last day of the fiscal quarter immediately preceding the date of such Restricted Payment, *plus*

(B) 100% of the aggregate net cash proceeds received by the Company subsequent to the Issue Date either (i) as a contribution to its common equity capital or (ii) from the issuance and sale (other than to a Subsidiary) of Qualified Equity Interests, including Qualified Equity Interests issued upon the conversion of Indebtedness of the Company, and from the exercise of options, warrants or other rights to purchase such Qualified Equity Interests (other than, in each case, Equity Interests or Indebtedness sold to a Subsidiary of the Company),

(C) minus $859.0 million.

(b) Notwithstanding the foregoing provisions, the Company and its Subsidiaries may take the following actions:

(1) the payment of any dividend on Equity Interests in the Company or a Subsidiary within 60 days after declaration thereof if at the declaration date such payment would not have been prohibited by the foregoing provisions of this Section 4.07;

(2) the retirement of any Equity Interests of the Company by conversion into, or by or in exchange for, Qualified Equity Interests, or out of net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of other Qualified Equity Interests;

-47-

Confidential

(3) the redemption, defeasance, repurchase or acquisition or retirement for value of any Indebtedness of the Company or a Guarantor in exchange for or out of the net cash proceeds of a substantially concurrent issue and sale (other than to a Subsidiary of the Company) of (x) Qualified Equity Interests or (y) Permitted Refinancing Indebtedness;

*(4) [Reserved];*

(5) Permitted Tax Distributions;

(6) the exchange of the Preferred Units of the Company existing as of the Issue Date for any property into which such Preferred Units are exchangeable in accordance with their terms; and

(7) Restricted Payments in an amount not to exceed $250 million per year.

Section 4.08 *[Reserved].*

Section 4.09 *Incurrence of Indebtedness.*

(a) The Company will not, nor will it permit any Subsidiary to, at any time create, issue, incur (by conversion, exchange or otherwise), assume, guarantee or otherwise become liable in respect of any Indebtedness (including Acquired Indebtedness) other than Permitted Indebtedness (as defined below).

(b) The provisions of Section 4.09(a) hereof will not prohibit the incurrence of any of the following items of Indebtedness (collectively, "*Permitted Indebtedness*"):

(1) Indebtedness under the Senior Secured Credit Facility in an aggregate principal amount not to exceed $3,500.0 million less the aggregate principal amount of Indebtedness under the Senior Secured Credit Facility permanently repaid (which, if such Indebtedness under the Senior Secured Credit Facility is revolving credit Indebtedness, is accompanied by a corresponding reduction of the commitment with respect thereto) with the Net Cash Proceeds from any Asset Sale of Collateral;

(2) Indebtedness (other than Indebtedness described in the foregoing clause (1)) outstanding on the Issue Date and up to $2,150.0 million of Senior Secured Notes (including Senior Secured Notes issued on the Issue Date) issued in exchange for Existing Notes maturing prior to December 31, 2009 and up to $6,250.0 million of Notes (including the Initial Notes) issued in exchange for any other Existing Notes;

(3) Permitted Funding Indebtedness;

(4) Indebtedness among the Company and its Subsidiaries;

-48-

Confidential

(5) Indebtedness under interest rate agreements and currency exchange agreements entered into in the ordinary course of business and not for speculative purposes;

(6) Permitted Refinancing Indebtedness in respect of Indebtedness outstanding in reliance on clauses (2) and (3) above and this clause (6);

(7) Indebtedness of the Company and the Guarantors that is subordinated to the Notes and the Guarantees;

(8) Indebtedness to the GMAC Parties incurred in accordance with the provisions described in Section 4.11, *provided* that such Indebtedness is not secured by any Collateral; and

(9) Indebtedness of the Company or any Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount and liquidation preference of all other Indebtedness then outstanding and incurred pursuant to this clause (9), does not at any one time outstanding exceed $500.0 million.

For purposes of determining compliance with this Section 4.09, and the outstanding principal amount of any particular Indebtedness incurred pursuant to and in compliance with, this Section 4.09: (x) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (1) through (9) of this Section 4.09(b), the Company will, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness in any manner that complies with this Section 4.09 and such item of Indebtedness will be treated as having been incurred pursuant to only one of such clauses or pursuant to this covenant (provided that all Indebtedness outstanding under the Senior Secured Credit Facility will at all times be deemed to be outstanding pursuant to Section 4.09(b)(1) above); and (y) the principal amount of any Disqualified Equity Interests will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof.

Section 4.10 *Asset Sales*.

(a) The Company will not, and will not permit any of its Subsidiaries to, consummate an Asset Sale unless:

(1) the Company (or the applicable Subsidiary, as the case may be) receives consideration in the form of Permitted Consideration; and

(2) at the time of the Asset Sale, the Permitted Consideration received in such Asset Sale by the Company or such Subsidiary is at least equal to the Fair Value of the Collateral or Supporting Assets issued or sold or otherwise disposed of.

(b) Within 270 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Company or the applicable Subsidiary, as the case may be, may:

-49-

(1) apply such Net Cash Proceeds at its option to permanently repay Permitted First Lien Indebtedness and, if such Permitted First Lien Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto;

(2) apply such Net Cash Proceeds at its option to repurchase, optionally redeem or optionally prepay Senior Secured Notes or the Notes; or

(3) provide additional Collateral or Supporting Assets (including by way of an increase in any advance or Equity Interest which is existing Collateral or Supporting Assets) with a Fair Value substantially equivalent to the Net Cash Proceeds received in such Asset Sale.

(c) Any Net Cash Proceeds from Asset Sales in excess of Retained Proceeds, that are not applied or invested as provided in the preceding paragraph of this Section 4.10 will constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $50.0 million, within 30 days thereof, the Company will make an offer to purchase (an "Asset Sale Offer") to all Holders and holders of Pari Passu Third Lien Indebtedness in an amount equal to the Excess Proceeds in accordance with Section 3.08. The offer price in any Asset Sale Offer will be equal to 100% of the principal amount plus accrued and unpaid interest to the date of purchase, and will be payable in cash. If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Company may use those Excess Proceeds for any purpose not otherwise prohibited by this Indenture. If the sum total of the aggregate principal amount of Notes and Pari Passu Third Lien Indebtedness tendered into an Asset Sale Offer, when aggregated, exceeds the amount of Excess Proceeds, the Trustee will select the Notes and Pari Passu Third Lien Indebtedness to be purchased on a *pro rata* basis. Upon completion of an Asset Sale Offer, the amount of Excess Proceeds will be reset at zero. The Company may, at its election, make an Asset Sale Offer concurrently for the Senior Secured Notes, the Notes, and, if applicable, Pari Passu Third Lien Indebtedness; provided however, that in the event such Asset Sale Offer is oversubscribed, the Company shall first purchase all Senior Secured Notes tendered in such offer prior to purchasing any Notes or Pari Passu Third Lien Indebtedness.

Section 4.11 *Transactions with Affiliates.*

(a) The Company will not, and will not permit any of its Subsidiaries (other than any Excluded Subsidiary) to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of related transactions, contract, agreement, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company involving aggregate consideration in excess of $10.0 million (each of the foregoing, an "*Affiliate Transaction*"), unless:

(1) such Affiliate Transaction is on terms that are not materially less favorable to the Company or the relevant Subsidiary than those that could reasonably have been obtained in a comparable arm's length transaction by the Company or such Subsidiary with an unaffiliated party; and

-50-

(2) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $250.0 million, the Company delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Company approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (1) of this Section 4.11(a); and:

(3) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $500.0 million, the Company must obtain and deliver the Trustee a written opinion of a nationally recognized investment banking, accounting or appraisal firm stating that the transaction is fair to the Company or such Subsidiary, as the case may be, from a financial point of view.

(b) The provisions of Section 4.11(a) shall not apply to:

(1) Restricted Payments that are permitted by Section 4.07;

(2) the payment of reasonable and customary fees and indemnities to members of the Board of Directors of the Company or a Subsidiary;

(3) the payment of reasonable and customary compensation and other benefits (including retirement, health, option, deferred compensation and other benefit plans) and indemnities to Officers and employees of the Company or any Subsidiary;

(4) transactions between or among the Company and/or its Subsidiaries;

(5) the issuance of Equity Interests (other than Disqualified Equity Interests) of the Company otherwise permitted hereunder and capital contributions to the Company;

(6) any agreement or arrangement as in effect on the Issue Date and any amendment or modification thereto so long as such amendment or modification is not more disadvantageous to the Holders of the Notes in any material respect; and

(7) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business and consistent with past practice and on terms that are no less favorable to the Company or such Subsidiary, as the case may be, as determined in good faith by the Company, than those that could be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of the Company.

Section 4.12 *Liens*.

The Company will not, nor will it permit any Subsidiary to, at any time create or suffer to exist any Lien (other than any Permitted Liens) on any Collateral (whether now owned or hereafter acquired) to secure any Indebtedness or other contractual obligations of the Company or any Subsidiary unless the Notes have a third Lien on such Collateral junior to the first Liens

-51-

securing Permitted First Lien Indebtedness and the Liens securing the Senior Secured Notes but not to any other Indebtedness or contractual obligations.

The Company shall not, nor shall it permit any Subsidiary to, at any time create or suffer to exist any Lien on any assets or property of the Company or any Subsidiary (whether now owned or hereafter acquired) which is not Collateral without thereby expressly securing the due and punctual payment of the principal of (premium, if any) and interest on the Notes and all other payments thereunder or hereunder in the order of priority set forth in the Intercreditor Agreement and, in any event, with the Notes being secured at least equally and ratably with any and all other obligations and Indebtedness secured by such pledge or Lien (other than Permitted First Lien Indebtedness and the Senior Secured Notes), for so long as any such other obligations and Indebtedness shall be so secured; provided, however, that this restriction shall not apply to Permitted Liens.

In no event shall any Lien on any assets of the Company or any Subsidiary for the benefit of the holders of Existing Notes be permitted.

Section 4.13 *Maintenance of the Company as a Holding Company*.

The Company shall act as a passive holding company of its Subsidiaries and shall not own any material assets other than (i) Equity Interests of Guarantors, (ii) assets in respect of hedging agreements, (iii) so long as no Event of Default has occurred and is continuing, cash and cash equivalents and other immaterial assets in the ordinary course of business consistent with past practice and (iv) assets which are subject to a perfected Lien as Collateral for the Notes.

Section 4.14 *Corporate Existence*.

Subject to Article V hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights (charter and statutory) and franchises. The Company shall not, however, be required to preserve any rights or franchises if its Board of Directors determines that the preservation thereof is no longer desirable in the conduct of the Company's business and that the loss thereof is not disadvantageous in any material respect to the Holders.

Section 4.15 *[Reserved]*.

Section 4.16 *[Reserved]*.

Section 4.17 *Future Guarantors*.

The Company shall:

(a) within 45 days after the end of each of the first three fiscal quarters of each year and 90 days after the end of each fiscal year,

(b) contemporaneously with the acquisition of any Person which upon such acquisition is, or of any asset which causes the Subsidiary acquiring such assets (without regard

-52-

Confidential

to any other assets of such Subsidiary) to be, a Significant Subsidiary (other than an Excluded Subsidiary), and

(c) contemporaneously with the guarantee by any Subsidiary of any Indebtedness of the Company or any Guarantor,

cause (i) in the case of 4.17(a) above, each Person that is a Significant Subsidiary (other than an Excluded Subsidiary) as of the end of such quarter or fiscal year and is not already a Guarantor, (ii) in the case of the 4.17(b) above, such Significant Subsidiary and (iii) in the case of 4.17(c) above, such Subsidiary, to execute and deliver to the Trustee a supplemental indenture pursuant to this Indenture whereby such Subsidiary unconditionally guarantees the principal of (premium, if any), and interest on the Notes and all other amounts payable by the Company and shall agree to be bound by this Indenture.

## ARTICLE V
## SUCCESSORS

Section 5.01 *Merger, Consolidation, or Sale of Assets.*

The Company shall not merge or consolidate with any other corporation or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to any Person, unless:

(1) either the Company is the continuing corporation, or the successor Person (if other than the Company) is a corporation organized and existing under the laws of the United States or a state thereof and such corporation expressly assumes the due and punctual payment of the principal of (and premium, if any), interest, if any, all the Notes and any coupons, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by the Company by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such corporation;

(2) each Guarantor, by supplemental indenture, confirms that their Guarantee shall apply to the surviving entity's obligations under the Notes and this Indenture, as modified by such supplemental indenture, and confirms the due and punctual performance of the Guarantee and the covenants of the Guarantor in this Indenture; and

(3) immediately after such merger or consolidation, or such sale or conveyance, no Event of Default has occurred and is continuing.

For purposes of Section 5.01, any sale, assignment, transfer, lease or other conveyance or conveyance of the properties and assets of one or more Significant Subsidiaries (other than to the Company or another Subsidiary), which, if such assets were owned by the Company, would constitute all or substantially all of the Company's properties and assets, will be deemed to be the transfer of all or substantially all of the Company's properties and assets.

-53-

Confidential

Section 5.02 *Successor Corporation Substituted.*

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof, the successor Person formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Company" shall refer instead to the successor Person and not to the Company), and may exercise every right and power of the Company under this Indenture with the same effect as if such successor Person had been named as the Company herein; *provided*, *however*, that the predecessor Company shall not be relieved from the obligation to pay the principal of and interest on the Notes except in the case of a sale of all of the Company's assets in a transaction that is subject to, and that complies with the provisions of, Section 5.01 hereof.

## ARTICLE VI
## DEFAULTS AND REMEDIES

Section 6.01 *Events of Default.*

Each of the following is an "*Event of Default*":

(1) the Company's failure to (x) pay principal (or premium, if any, on) any of the Notes as and when the same shall become due and payable either at maturity, upon redemption, by declaration or otherwise or (y) consummate a mandatory redemption of the Notes pursuant to Section 3.09 on any date required by such Section;

(2) the Company's failure to pay any installment of interest, upon any of the Notes as and when due and payable, which such failure continues for a period of 30 days;

(3) the Company's failure to observe or perform any of the covenants or agreements described in Sections 4.07, 4.09, 4.10, 4.11, 4.12, 4.13, 4.17 and 5.01 of this Indenture for a period of 30 days after the date on which the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes gives the Company written notice of its failure to perform;

(4) the Company's failure, or the failure of any Guarantor, to perform any other covenant in this Indenture, which failure continues for 90 days after the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes gives the Company written notice of the Company's, or such Guarantor's, failure to perform;

(5) (x) the Company's failure, or failure by any of the Company's Subsidiaries, to perform any term or provision of any evidence of Indebtedness (excluding Indebtedness of any of the Company's Subsidiaries that is a Financing SPV), whether such Indebtedness now exists or shall hereafter be created, or any other condition shall occur, and as a result of the occurrence of which default or condition any such

-54-

Confidential

Indebtedness in an amount in excess of $50,000,000 shall become or be declared to be due and payable, or the Company, or any of the Company's Subsidiaries, shall be obligated to purchase any such Indebtedness, prior to the date on which it would otherwise become due and payable, (y) any Indebtedness of the Company or any of its Subsidiaries (excluding Indebtedness of any of the Company's Subsidiaries that is a Financing SPV) in an amount in excess of $50,000,000 shall not be paid when due at its stated maturity or (z) an "Event of Default" occurs and is continuing under any indenture governing the Existing Notes;

(6) the entry against the Company or any Significant Subsidiary of a final judgment or final judgments for the payment of money in an aggregate amount in excess of $50,000,000, by a court or courts of competent jurisdiction, which judgments remain undischarged, unwaived, unstayed, unbonded or unsatisfied for a period of 60 consecutive days;

(7) any Security Document or Intercreditor Agreement is held to be unenforceable or invalid for any reason, the security interest purported to be created by the Security Documents are held to be unenforceable, invalid or impaired with respect to a material portion of the Collateral, the Company, any Guarantor or any Grantor (as defined in the Security Agreement) defaults in the performance of the terms of any of the Security Documents or the Intercreditor Agreement in a manner that adversely affects the enforceability or validity of the security interest on a material portion of the Collateral or in a manner that adversely affects the condition or value of a material portion of the Collateral, or the Company, any Guarantor or any Grantor (as defined in the Security Agreement) repudiates or disaffirms any of its obligations under any of the Security Documents or the Intercreditor Agreement;

(8) the Company, any Significant Subsidiary or any Guarantor shall commence a voluntary case or proceeding under any applicable federal or state bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or shall consent to the entry of a decree or order for relief in an involuntary case or proceeding against the Company, such Significant Subsidiary or such Guarantor, or the filing by the Company, any Significant Subsidiary or any Guarantor of a petition or answer to consent seeking reorganization or relief under any such applicable federal or state law, or the consent by the Company, any Significant Subsidiary or any Guarantor to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, custodian, sequestrator (or similar official) of the Company, such Significant Subsidiary or any Guarantor or of any substantial part of its property, or the making by the Company, any Significant Subsidiary or any Guarantor of any general assignment for the benefit of creditors, or the taking of action by the Company, any Significant Subsidiary or any Guarantor in furtherance of any such action;

(9) a court having jurisdiction in the premises shall enter a decree or order for relief in respect of the Company, any Significant Subsidiary or any Guarantor in an involuntary case under any applicable bankruptcy, insolvency, reorganization or other

-55-

Confidential

similar law now or hereafter in effect, or a decree or order adjudging the Company, such Significant Subsidiary or such Guarantor a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of or in respect of the Company, such Significant Subsidiary or Guarantor or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of the Company, such Significant Subsidiary or such Guarantor or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs, shall have been entered and such decree or order shall remain unstayed and in effect for a period of ninety (90) days; or

(10) any Guarantee shall cease to be in full force and effect (unless such Guarantee has been released in accordance with this Indenture).

Section 6.02 *Acceleration*.

If any Event of Default other than an Event of Default specified in clause (8) or (9) of Section 6.01 hereof, has occurred and is continuing, either the Trustee or the Holders of not less than 25% in aggregate principal amount of Notes then outstanding under this Indenture may declare the principal of the Notes and all accrued interest thereon to be due and payable immediately. If an Event of Default specified in clause (8) or (9) of Section 6.01 hereof occurs, the principal of all outstanding Notes and all accrued interest thereon shall be due and payable, without further action or notice on the part of the Trustee or any Holder.

The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders, rescind an acceleration and its consequences, if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest or premium or Additional Interest, if any, that has become due solely because of the acceleration) have been cured or waived.

Section 6.03 *Other Remedies*.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium and Additional Interest, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.04 *Waiver of Past Defaults*.

Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may, on behalf of the Holders of all of the Notes, waive any existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of the principal of, premium and Additional Interest, if any,

-56-

Confidential

or interest on, the Notes (including in connection with an offer to purchase); *provided*, *however*, that the Holders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration in accordance with Section 6.02. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05 *Control by Majority*.

Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture, that the Trustee determines may be unduly prejudicial to the rights of other Holders of Notes or that may involve the Trustee in personal liability.

Section 6.06 *Limitation on Suits*.

A Holder may pursue a remedy with respect to this Indenture or the Notes only if:

(1) such Holder has previously given the Trustee written notice that an Event of Default is continuing;

(2) Holders of at least 25% in aggregate principal amount of the then outstanding Notes have requested that the Trustee pursue the remedy;

(3) such Holder or Holders have offered the Trustee satisfactory indemnity against any loss, liability or expense;

(4) the Trustee has not complied with such request within 60 days after receipt of the request and the offer of indemnity; and

(5) Holders of a majority in aggregate principal amount of the then outstanding Notes have not given the Trustee a direction inconsistent with such request.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07 *Rights of Holders of Notes to Receive Payment*.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium and Additional Interest, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

-57-

Confidential

Section 6.08 *Collection Suit by Trustee*.

If an Event of Default specified in Section 6.01(1) or (2) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Company for the whole amount of principal of, premium and Additional Interest, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09 *Trustee May File Proofs of Claim*.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Company (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10 *Priorities*.

If the Trustee collects any money pursuant to this Article VI or pursuant to the Security Documents, it shall pay out the money in the following order:

*First*: pro rata to the Trustee, its agents and attorneys for amounts due under Section 7.07 hereof, and the Collateral Agent and Collateral Control Agent, their agents and attorneys for amounts due under the Security Documents including, in each case, payment of all compensation, expenses and liabilities incurred by the Trustee, the Collateral Agent and the Collateral Control Agent and the costs and expenses of collection;

-58-

*Second*: to Holders of Notes for amounts due and unpaid on the Notes for principal, premium and Additional Interest, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium and Additional Interest, if any and interest, respectively; and

*Third*: to the Company or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11 *Undertaking for Costs*.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

## ARTICLE VII
## TRUSTEE

Section 7.01 *Duties of Trustee*.

(a) If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default:

(1) the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture. The Trustee shall have no obligation to check or verify the mathematical accuracy of any calculations or financial information contained therein.

-59-

Confidential

(c) The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1) this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2) the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3) the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d) Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 7.01.

(e) No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any liability. The Trustee will be under no obligation to exercise any of its rights and powers under this Indenture at the request of any Holders, unless such Holder has offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(f) The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Company. Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02 *Rights of Trustee*.

(a) The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee need not investigate any fact or matter stated in the document.

(b) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c) The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any agent appointed with due care.

(d) The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

-60-

(e) Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Company will be sufficient if signed by an Officer of the Company.

(f) The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders unless such Holders have offered to the Trustee reasonable indemnity or security reasonably satisfactory to the Trustee against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g) In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(h) The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event that is in fact such a default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(i) The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j) The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture.

(k) The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(l) The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God, earthquakes, fire, flood, terrorism, wars and other military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunction of utilities, computer (hardware or software) or communication services, accidents, labor disputes, acts of civil or military authorities and governmental action.

Section 7.03 *Individual Rights of Trustee*.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Company or any Affiliate of the Company with the same rights it would have if it were not Trustee. However, in the event that the Trustee acquires any conflicting interest (as defined in the TIA) it must eliminate such conflict within 90 days, apply to the SEC for permission to continue as trustee (if this Indenture has been qualified under the

-61-

Confidential

TIA) or resign. Any Agent may do the same with like rights and duties. The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04 *Trustee's Disclaimer*.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Company's use of the proceeds from the Notes or any money paid to the Company or upon the Company's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05 *Notice of Defaults*.

If a Default or Event of Default occurs and is continuing and if it is actually known to a Responsible Officer of the Trustee, the Trustee will mail to Holders of Notes a notice of the Default or Event of Default within 90 days after it occurs. Except in the case of a Default or Event of Default in payment of principal of, premium or Additional Interest, if any, or interest on, any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

Section 7.06 *Reports by Trustee to Holders of the Notes*.

(a) Within 60 days after each February 15 beginning with the February 15 following the date of this Indenture, and for so long as Notes remain outstanding, the Trustee will mail to the Holders of the Notes a brief report dated as of such reporting date that complies with TIA § 313(a) (but if no event described in TIA § 313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted). The Trustee also will comply with TIA § 313(b)(2). The Trustee will also transmit by mail all reports as required by TIA § 313(c).

(b) A copy of each report at the time of its mailing to the Holders of Notes will be mailed by the Trustee to the Company and filed by the Trustee with the SEC and each stock exchange on which the Notes are listed in accordance with TIA § 313(d). The Company will promptly notify the Trustee when the Notes are listed on or delisted from any stock exchange.

Section 7.07 *Compensation and Indemnity*.

(a) The Company will pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as shall be agreed in writing by the Company and the Trustee. The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust. The Company will reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

-62-

(b) The Company and the Guarantors will indemnify the Trustee and any predecessor Trustee against any and all losses, liabilities, damages, claims or expenses, including taxes (other than those based upon, measured by or determined by the income of the Trustee) incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the reasonable costs and expenses of enforcing this Indenture against the Company and the Guarantors (including this Section 7.07) and defending itself against any claim (whether asserted by the Company, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Trustee will notify the Company promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Company will not relieve the Company or any of the Guarantors of their obligations hereunder. The Company or such Guarantor will defend the claim and the Trustee will cooperate in the defense. The Trustee may have separate counsel and the Company will pay the reasonable fees and expenses of such counsel. Neither the Company nor any Guarantor need pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c) The obligations of the Company and the Guarantors under this Section 7.07 will survive the satisfaction and discharge of this Indenture and the resignation or removal of the Trustee.

(d) To secure the Company's and the Guarantors' payment obligations in this Section 7.07, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes. Such Lien will constitute a Permitted Lien and will survive the satisfaction and discharge of this Indenture.

(e) When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(8) or (9) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

(f) The Trustee will comply with the provisions of TIA § 313(b)(2) to the extent applicable.

(g) The Company and the Guarantors will indemnify the Collateral Agent and the Collateral Control Agent and any predecessor Collateral Agent and the Collateral Control Agent against any and all losses, liabilities, damages, claims or expenses (including costs and expenses of counsel), including taxes incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture, including the reasonable costs and expenses of enforcing this Indenture against the Company and the Guarantors (including this Section 7.07) and defending itself against any claim (whether asserted by the Company, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its negligence or bad faith. The Collateral Agent and the Collateral Control Agent will notify the Company promptly of any claim for which it may seek indemnity. Failure by the

-63-

Confidential

Collateral Agent or the Collateral Control Agent to so notify the Company will not relieve the Company or any of the Guarantors of their obligations hereunder. The Company or such Guarantor will defend the claim and the Collateral Agent and the Collateral Control Agent will cooperate in the defense. The Collateral Agent or the Collateral Control Agent may have separate counsel and the Company will pay the reasonable fees and expenses of such counsel. Neither the Company nor any Guarantor need pay for any settlement made without its consent, which consent will not be unreasonably withheld.

Section 7.08 *Replacement of Trustee*.

(a) A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

(b) The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Company. The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Company in writing. The Company may remove the Trustee if:

(1) the Trustee fails to comply with Section 7.10 hereof;

(2) the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3) a custodian or public officer takes charge of the Trustee or its property; or

(4) the Trustee becomes incapable of acting.

(c) If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Company will promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Company.

(d) If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee, the Company, or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction (at the expense of the Company) for the appointment of a successor Trustee.

(e) If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f) A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Company. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and

-64-

Confidential

duties of the Trustee under this Indenture. The successor Trustee will mail a notice of its succession to Holders. The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Company's obligations under Section 7.07 hereof will continue for the benefit of the retiring Trustee.

Section 7.09 *Successor Trustee by Merger, etc.*

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee.

Section 7.10 *Eligibility; Disqualification.*

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100.0 million as set forth in its most recent published annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of TIA § 310(a)(1), (2) and (5). The Trustee is subject to TIA § 310(b).

Section 7.11 *Preferential Collection of Claims Against Company.*

The Trustee is subject to TIA § 311(a), excluding any creditor relationship listed in TIA § 311(b). A Trustee who has resigned or been removed shall be subject to TIA § 311(a) to the extent indicated therein.

Section 7.12 *Patriot Act.*

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify and record information that identifies each individual person who opens an account. For a non-individual person such as a business entity, a charity, a trust or other legal entity the Trustee will ask for documentation to verify its formation and existence as a legal entity. The Trustee may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

Section 7.13 *Payment of Additional Interest.*

If Additional Interest is payable, the Company shall deliver to the Trustee a certificate to that effect stating (a) the amount of such Additional Interest that is payable and (b) the date on which such Additional Interest is payable. Unless and until a Responsible Officer of the Trustee receives at the Corporate Trust Office such a certificate, the Trustee may assume without inquiry that no such Additional Interest is payable. If the Company has paid Additional Interest directly

-65-

Confidential

to the Persons entitled to it, the Company shall deliver to the Trustee a certificate setting forth the particulars of such payment.

## ARTICLE VIII
## COLLATERAL

Section 8.01 *Security Documents.*

The payment of the principal of and interest and premium, if any, on the Notes when due, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise and whether by the Company pursuant to the Notes or by any Guarantor pursuant to its Guarantee and the payment and performance of all other obligations of the Company and the Guarantors under this Indenture, the Notes, the Guarantees and the Security Documents are secured as provided in the Security Documents which the Company, the Guarantors and certain other Subsidiaries of the Company have entered into simultaneously with the execution of this Indenture and will be secured by Security Documents hereafter delivered as required or permitted by this Indenture. The Company shall, and shall cause each Guarantor and each Grantor (as defined in the Security Agreement) to, and each Guarantor shall, do all filings (including filings of continuation statements and amendments to Uniform Commercial Code financing statements that may be necessary to continue the effectiveness of such Uniform Commercial Code financing statements) and all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Company and the Guarantors) the security interest created by the Security Documents in the Collateral as a perfected security interest, subject only to Permitted Liens.

Section 8.02 *Agents.*

Subject to Section 7.01 hereof and Sections 13 and 14 of the Security Agreement, neither the Trustee nor any of its officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of any Lien securing the Notes or the Guarantees, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any such Liens or Security Documents or any delay in doing so.

Section 8.03 *Authorization of Actions to Be Taken.*

(a) Each Holder of Notes, by its acceptance thereof, consents and agrees to be bound by the terms of each Security Document and the Intercreditor Agreement, as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Indenture, authorizes and directs the Trustee and the Collateral Agent to enter into the Security Documents to which it is a party, authorizes and empowers the Trustee and the Collateral Agent to enter into, execute and deliver, the Intercreditor Agreement, and authorizes and empowers the Trustee and the Collateral Agent to bind the Holders of Notes as set forth in the Security Documents to which either of them is a party and the Intercreditor

-66-

Confidential

Agreement and to perform their obligations and exercise their rights and powers thereunder and to make the representations set forth therein on behalf of the Holders.

(b) The Collateral Agent, the Collateral Control Agent and the Trustee are authorized and empowered to receive for the benefit of the Holders of Notes any funds collected or distributed under the Security Documents or the Intercreditor Agreement to which the Collateral Agent or Trustee is a party and, subject to the terms of the Security Documents and the Intercreditor Agreement, to make further distributions of such funds to the Holders of Notes according to the provisions of this Indenture.

(c) Subject to the provisions of Sections 7.01 and Section 7.02 and the Intercreditor Agreement, the Trustee may, in its sole discretion and without the consent of the Holders (but is not obligated to), direct, on behalf of the Holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(1) foreclose upon or otherwise enforce any or all of the Liens;

(2) enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

(3) collect and receive payment of any and all amounts under the Notes and the Guarantees.

Subject to Sections 7.01 and 7.02 and the Intercreditor Agreement and at the Company's sole cost and expense, the Trustee is authorized and empowered (but not obligated) to institute and maintain, or direct the Collateral Agent or Collateral Control Agent to institute and maintain, such suits and proceedings as it may deem reasonably expedient to protect or enforce the Liens under the Security Documents or the Security Documents to which the Collateral Agent or Collateral Control Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Collateral Control Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent or Collateral Control Agent may deem reasonably expedient, at the Company's sole cost and expense, to preserve or protect its interests and the interests of the Holders of Notes in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of Holders, the Trustee, the Collateral Agent, or the Collateral Control Agent.

Section 8.04 *Release of Collateral.*

(a) Collateral may be released from the Lien and security interest created by the Security Documents at any time or from time to time in accordance with the provisions of the Intercreditor Agreement. In addition, the Liens on any Collateral shall be released (and upon the request of the Company pursuant to an Officers' Certificate in the form of Exhibit F and Opinion of Counsel in the form of Exhibit G certifying that all conditions precedent hereunder

-67-

Confidential

have been met, the Trustee shall take such actions as may be requested by the Company to evidence such release at the Company's sole cost and expense) under any one or more of the following circumstances:

(i) upon the sale, transfer or other disposition of such property or assets (other than to the Company or a Guarantor) to the extent not prohibited under Section 4.10 hereof, the Lien of the Security Documents shall be released on the assets so transferred;

(ii) upon the release of a Guarantor from its Guarantee pursuant Section 10.05, the property and assets of such Guarantor shall be released from the Lien of the Security Documents; or

(iii) in connection with any release of Liens pursuant to any amendment complying with Article IX hereof.

No purchaser or grantee of any property or rights purporting to be released shall be bound to ascertain the authority of the Trustee to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority so long as the conditions set forth in Section 10.4 have been satisfied.

(b) The Liens on any Collateral securing the Notes and the Guarantees and the other obligations under this Indenture will terminate and be released automatically upon any satisfaction and discharge of this Indenture pursuant to Section 11.01 or any Legal Defeasance or Covenant Defeasance in compliance with Article XIII.

Section 8.05 *Filing, Recording and Opinions.*

(a) The Company will comply with the provisions of Trust Indenture Act Sections 314(b) and 314(d) (including, without limitation, the provision of an initial and annual Opinion of Counsel under Section 314(b)), in each case following qualification of this Indenture pursuant to the Trust Indenture Act, except to the extent not required as set forth in any SEC regulation or interpretation (including any no-action letter issued by the Staff of the SEC, whether issued to the Company or any other Person). Following such qualification, to the extent the Company is required to furnish to the Trustee an Opinion of Counsel pursuant to Trust Indenture Act Section 314(b)(2), the Company will furnish such opinion not more than 60 but not less than 30 days prior to each September 30.

(b) Following qualification of this Indenture pursuant to the Trust Indenture Act, if any Collateral is released in accordance with this Indenture or any Security Document, the Trustee will determine whether it has received all documentation required by Trust Indenture Act Section 314(d) in connection with such release and, based on such determination and the Opinion of Counsel delivered pursuant to Section 11.04(a), will, upon request, deliver a certificate to the Collateral Agent, the Collateral Control Agent and the Company setting forth such determination.

-68-

Confidential

Section 8.06 *Powers Exercisable by Receiver or Trustee.*

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article VIII upon the Company or a Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Company or a Guarantor or of any Officer or Officers thereof required by the provisions of this Article VIII; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

Section 8.07 *Release upon Termination of the Company's Obligations.*

In the event that the Company delivers to the Trustee, in a form acceptable to it, an Officers' Certificate and Opinion of Counsel certifying that the conditions set forth in Section 8.04 have been satisfied, the Trustee shall deliver to the Company, the Collateral Agent and the Collateral Control Agent a notice stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent and the Collateral Control Agent of such notice, the Collateral Agent and the Collateral Control Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done, at the Company's sole cost and expense, all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

# ARTICLE IX
# AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01 *Without Consent of Holders of Notes.*

Notwithstanding Section 9.02 hereof, the Company, the Guarantors and the Trustee may amend and change this Indenture and the Security Documents and may consent to without the consent of the Holders in order to:

(a) evidence the succession of another corporation to the Company or each Guarantor or successive successions, and the assumption by any successor corporation of certain covenants, agreements and obligations;

(b) add to the covenants of the Company for the benefit of the Holders;

(c) cure any ambiguity, omission, defect or inconsistency, *provided* that such action does not adversely affect the interests of the Holders;

(d) convey, transfer, assign, mortgage or pledge any property to or with the Trustee;

(e) evidence and provide the acceptance of the appointment of a successor Trustee under this Indenture; and

-69-

Confidential

(f) (i) evidence the succession of another corporation to each Guarantor, or successive successions, and the assumption by any successor corporation of certain covenants, agreements and obligations; (ii) add to the covenants of a Guarantor for the benefit of the Holders; (iii) evidence and provide for any new Guarantees with respect to the Notes or the release of any Guarantor pursuant to the Indenture; (iv) provide for additional Collateral; (v) release Collateral in accordance with this Indenture and the Security Documents; and (vi) to secure any Pari Passu Third Lien Indebtedness.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee or the Collateral Agent will join with the Company and the Guarantors in the execution of any amended or supplemental indenture or other amendment authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and Collateral Agent will not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02 *With Consent of Holders of Notes.*

Except as provided below in this Section 9.02, the Company, the Trustee and the Collateral Agent may amend or supplement this Indenture (including, without limitation, Sections 3.08 and 4.10 hereof) and the Notes, the Intercreditor Agreement, the Security Documents and the Guarantees with the consent of the Holders of at least a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes), and, subject to Sections 6.04 and 6.07 hereof, any existing Default (other than a Default in the payment of the principal of, premium or Additional Interest, if any, or interest on, the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of this Indenture, the Notes, the Security Documents or the Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, Additional Notes, if any) voting as a single class (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes). Section 2.08 hereof shall determine which Notes are considered to be "outstanding" for purposes of this Section 9.02.

Upon the request of the Company accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 9.06 hereof, the Trustee or the Collateral Agent will join with the Company and the Guarantors in the execution of such amended or supplemental indenture or other amendment unless such amended or supplemental indenture directly affects the Trustee's or the Collateral Agent's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee or the Collateral

-70-

Confidential

Agent may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture or amendment.

It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Company will mail to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Company to mail such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver. Subject to Sections 6.04 and 6.07 hereof, the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class may waive compliance in a particular instance by the Company with any provision of this Indenture or the Notes or the Guarantees. However, without the consent of each Holder affected, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1) change the fixed maturity of the Notes;

(2) reduce the principal amount of, or premium, if any, or reduce the rate of, or extend the time of payment of interest on, the Notes;

(3) reduce any amount due and payable upon acceleration of the Notes or the amount provable in bankruptcy;

(4) make the principal of, or premium, if any, or interest, if any, on the Notes payable in any currency other than as provided in the Notes;

(5) impair the right to institute suit for the enforcement of any payment on or after its stated maturity, or in the case of redemption, on or after the Redemption Date;

(6) reduce the percentage in aggregate principal amount of outstanding Notes necessary to modify or amend this Indenture;

(7) reduce the percentage in aggregate principal amount of outstanding Notes necessary to waive Event of Defaults as described in Section 6.01; or

(8) release all or substantially all of the Collateral from the Lien of the Security Documents (other than in accordance with Article VIII) or release all or substantially all of the value of the Guarantees (other than in accordance with Section 10.05).

Section 9.03 *Compliance with Trust Indenture Act*.

Every amendment or supplement to this Indenture or the Notes will be set forth in a amended or supplemental indenture that complies with the TIA as then in effect.

-71-

Section 9.04 *Revocation and Effect of Consents*.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

Section 9.05 *Notation on or Exchange of Notes*.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Company in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06 *Trustee to Sign Amendments, etc*.

The Trustee will sign any amended or supplemental indenture authorized pursuant to this Article IX if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee. The Company may not sign an amended or supplemental indenture until the Board of Directors of the Company approves it. In executing any amended or supplemental indenture, the Trustee will be entitled to receive and (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Section 12.04 hereof, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture.

## ARTICLE X
## GUARANTEES

Section 10.01 *Guarantee*.

(a) Subject to this Article X, each of the Guarantors hereby, jointly and severally, unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder or thereunder, that:

(1) the principal of, premium and Additional Interest, if any, and interest on, the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Company to the Holders or the Trustee hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

-72-

Confidential

(2) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b) The Guarantors hereby agree that their obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Company, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Company, any right to require a proceeding first against the Company, protest, notice and all demands whatsoever and covenant that this Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

(c) If any Holder or the Trustee is required by any court or otherwise to return to the Company, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Company or the Guarantors, any amount paid by the Company or any Guarantor either to the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d) Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article VI hereof for the purposes of this Guarantee notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article VI hereof, such obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of this Guarantee. The Guarantors will have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

Section 10.02 *Limitation on Guarantor Liability*.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of any Bankruptcy Law, the Uniform Fraudulent

-73-

Confidential

Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee. To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of such Guarantor will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article X, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent transfer or conveyance.

Section 10.03 *Execution and Delivery of Guarantee.*

To evidence its Guarantee set forth in Section 10.01 hereof, each Guarantor hereby agrees that a notation of such Guarantee substantially in the form attached as Exhibit E hereto will be endorsed by an Officer of such Guarantor on each Note authenticated and delivered by the Trustee and that this Indenture will be executed on behalf of such Guarantor by one of its Officers.

Each Guarantor hereby agrees that its Guarantee set forth in Section 10.01 hereof will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

If an Officer whose signature is on this Indenture or on the Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Guarantee is endorsed, the Guarantee will be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, will constitute due delivery of the Guarantee set forth in this Indenture on behalf of the Guarantors.

Section 10.04 *Guarantors May Consolidate, etc., on Certain Terms.*

For the benefit of the Notes, no Guarantor shall merge or consolidate with any other corporation or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to any Person, unless either:

(a) (x) either such Guarantor is the continuing corporation, or the successor Person (if other than the Guarantor) is a corporation or limited liability company organized and existing under the laws of the United States or a state thereof and, such corporation or limited liability company expressly assumes the Guarantee of such Guarantor by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such corporation; and

(y) immediately after such merger or consolidation, or such sale or conveyance, no Event of Default has occurred and is continuing; or

(b) such merger, consolidation, lease, transfer or conveyance complies with Section 4.10 hereof.

-74-

In case of any such consolidation, merger, sale or conveyance and upon the assumption by the successor Person, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Guarantee endorsed upon the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Guarantor, such successor Person will succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor. Such successor Person thereupon may cause to be signed any or all of the Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee. All the Guarantees so issued will in all respects have the same legal rank and benefit under this Indenture as the Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as though all of such Guarantees had been issued at the date of the execution hereof.

Except as set forth in Articles IV and V hereof, and notwithstanding clauses 2(a) and (b) above, nothing contained in this Indenture or in any of the Notes will prevent any consolidation or merger of a Guarantor with or into the Company or another Guarantor, or will prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety to the Company or another Guarantor.

Section 10.05 *Releases*.

The Guarantee of a Guarantor will be released (so long as no Event of Default has occurred and is continuing) with respect to the Notes:

(a) in connection with any sale, exchange or transfer of all of the stock of the Guarantor to any Person (other than the Company or a Subsidiary or Affiliate of the Company), *provided* such sale is not prohibited under this Indenture;

(b) upon the payment in full of the Notes; or

(c) upon Legal Defeasance or satisfaction and discharge of the Indenture as provided below in Articles XI and XIII.

## ARTICLE XI
## SATISFACTION AND DISCHARGE

Section 11.01 *Satisfaction and Discharge*.

This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(1) either:

(a) all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment

-75-

Confidential

money has been deposited in trust and thereafter repaid to the Company, have been delivered to the Trustee for cancellation; or

(b) all Notes that have not been delivered to the Trustee for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company or any Guarantor has irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders, cash in U.S. dollars, non-callable Government Securities, or a combination of cash in U.S. dollars and non-callable Government Securities, in amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium and Additional Interest, if any, and accrued interest to the date of maturity or redemption;

(2) no Default has occurred and is continuing on the date of the deposit (other than a Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound;

(3) the Company or any Guarantor has paid or caused to be paid all sums payable by the Company and/or the Guarantors under this Indenture; and

(4) the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at maturity or on the Redemption Date, as the case may be.

In addition, the Company must deliver an Officers' Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to subclause (b) of clause (1) of this Section 11.01, the provisions of Sections 11.02 and 8.06 hereof will survive. In addition, nothing in this Section 11.01 will be deemed to discharge those provisions of Section 7.07 hereof, that, by their terms, survive the satisfaction and discharge of this Indenture.

Section 11.02 *Application of Trust Money*.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 11.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium and Additional Interest, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

-76-

Confidential

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 11.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Company's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 11.01 hereof; *provided* that if the Company has made any payment of principal of, premium or Additional Interest, if any, or interest on, any Notes because of the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

## ARTICLE XII
## MISCELLANEOUS

Section 12.01 *Trust Indenture Act Controls*.

If any provision of this Indenture limits, qualifies or conflicts with the duties imposed by TIA §318(c), the imposed duties will control, provided that the provisions under Sections 314(b) and 314(d) shall only apply following qualification of this Indenture pursuant to the Trust Indenture Act.

Section 12.02 *Notices*.

Any notice or communication by the Company, any Guarantor or the Trustee to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Company and/or any Guarantor:

Residential Capital, LLC
7501 Wisconsin Avenue, Suite 900
Bethesda, MD 20814
Facsimile No.: (301) 664-6999
Attention: Hu Benton, Managing Director,
        VP and Associate Counsel

With a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
Attention: Casey Fleck, Esq.

If to the Trustee:

U.S. Bank National Association

-77-

Confidential

60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107-2292
Facsimile No.: (651) 495-8097
Attention: Richard Prokosch

The Company, any Guarantor or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

Any notice or communication to a Holder will be sent by first class mail, certified or registered, return receipt requested, sent by overnight air courier guaranteeing next day delivery, or sent electronically to the Holder at the Holder's address as it appears on the registration books of the Registrar. Any notice or communication will also be sent by first class mail, certified or registered, return receipt requested, or by overnight air courier to any Person described in TIA § 313(c), to the extent required by the TIA. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders.

If a notice or communication is sent in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Company sends a notice or communication to Holders, it will at the same time send to the Trustee and each Agent a copy of such notice or communication by first class mail, certified or registered, return receipt requested, or by overnight air courier.

Section 12.03 *Communication by Holders of Notes with Other Holders of Notes.*

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes. The Company, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

Section 12.04 *Certificate and Opinion as to Conditions Precedent.*

Upon any request or application by the Company to the Trustee to take any action under this Indenture, the Company shall furnish to the Trustee:

(1) an Officers' Certificate in a form reasonably satisfactory to the Trustee (which must include the statements set forth in Section 12.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

-78-

Confidential

(2) an Opinion of Counsel in a form reasonably satisfactory to the Trustee (which must include the statements set forth in Section 12.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 12.05 *Statements Required in Certificate or Opinion*.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than a certificate provided pursuant to TIA § 314(a)(4)) must comply with the provisions of TIA § 314(e) and must include:

(1) a statement that the Person making such certificate or opinion has read such covenant or condition;

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 12.06 *Rules by Trustee and Agents*.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 12.07 *No Personal Liability of Directors, Officers, Employees and Stockholders*.

No director, Officer, employee, incorporator or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, this Indenture or the Guarantees, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

Section 12.08 *Governing Law*.

THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE, THE NOTES, THE SECURITY AGREEMENT AND THE GUARANTEES INCLUDING, WITHOUT LIMITATION, SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

-79-

Confidential

Section 12.09 *No Adverse Interpretation of Other Agreements.*

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 12.10 *Successors.*

All agreements of the Company in this Indenture and the Notes will bind its successors. All agreements of the Trustee in this Indenture will bind its successors. All agreements of each Guarantor in this Indenture will bind its successors, except as otherwise provided in Section 10.05 hereof.

Section 12.11 *Severability.*

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 12.12 *Counterpart Originals.*

The parties may sign any number of copies of this Indenture. Each signed copy will be an original, but all of them together represent the same agreement.

Section 12.13 *Table of Contents, Headings, etc.*

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 12.14 Third-Party Beneficiaries.

The Collateral Agent and Collateral Control Agent are express intended third-party beneficiaries of this Indenture.

## ARTICLE XIII

## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 13.01 Option to Effect Legal Defeasance or Covenant Defeasance. The Company may, at its option and at any time, elect to have either Section 13.02 or 13.03 hereof applied to all outstanding Notes upon compliance with the conditions set forth below in this Article XIII.

Section 13.02 Legal Defeasance and Discharge. Upon the Company's exercise under Section 13.01 hereof of the option applicable to this Section 13.02, the Company and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 13.04

-80-

hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes and Guarantees and with respect to the Security Documents on the date the conditions set forth below are satisfied ("Legal Defeasance"). For this purpose, Legal Defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which shall thereafter be deemed to be "outstanding" only for the purposes of Section 13.05 hereof and the other Sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other obligations under such Notes and this Indenture including that of the Guarantors (and the Trustee, on demand of and at the expense of the Company, shall execute proper instruments acknowledging the same), except for the following provisions which shall survive until otherwise terminated or discharged hereunder:

> (a) the rights of Holders of Notes to receive payments in respect of the principal of, premium, if any, and interest on the Notes when such payments are due solely out of the trust created pursuant to this Indenture referred to in Section 13.04 hereof;

> (b) the Company's obligations with respect to Notes concerning issuing temporary Notes, registration of such Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

> (c) the rights, powers, trusts, duties and immunities of the Trustee, and the obligations of the Company and Guarantors in connection therewith; and

> (d) this Section 13.02.

If the Company exercises under Section 13.01 the option applicable to this Section 13.02, subject to satisfaction of the conditions set forth in Section 13.04 hereof, payment of the Notes may not be accelerated because of an Event of Default under clauses (3), (4), (5), (6), (7), (8), (9) or (10) of Section 6.01. Subject to compliance with this Article VIII, the Company may exercise its option under this Section 13.02 notwithstanding the prior exercise of its option under Section 13.03 hereof.

Section 13.03 Covenant Defeasance. Upon the Company's exercise under Section 13.01 hereof of the option applicable to this Section 13.03, the Company and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 13.04 hereof, be released from their obligations under the covenants contained in Sections 4.03, 4.04, 4.05, 4.06, 4.07, 4.09, 4.10, 4.11, 4.12, 4.13, 4.14 and 4.17 hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 13.04 hereof are satisfied ("Covenant Defeasance"), and the Notes shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Company may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly,

-81-

Confidential

by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby. In addition, upon the Company's exercise under Section 13.01 hereof of the option applicable to this Section 13.03 hereof, subject to the satisfaction of the conditions set forth in Section 13.04 hereof, Sections 6.01(3), 6.01(4), 6.01(5), 6.01(6), 6.01(7), 6.01(8), 6.01(9) and 6.01(10) hereof shall not constitute Events of Default.

     Section 13.04 <u>Conditions to Legal or Covenant Defeasance</u>. The following shall be the conditions to the application of either Section 13.02 or 13.03 hereof to the outstanding Notes:

    In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the Notes:

    (a) the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal amount of, premium, if any, and interest due on the Notes on the stated maturity date or on the Redemption Date, as the case may be, of such principal amount, premium, if any, or interest on such Notes and the Company must specify whether such Notes are being defeased to maturity or to a particular Redemption Date;

    (b) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that the Company has complied with all conditions precedent relating to Legal Defeasance and Covenant Defeasance;

    (c) in the case of Legal Defeasance, the Company shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that,

    (1) the Company has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

    (2) since the Issue Date, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred.

The Company will not have to deliver the Opinion of Counsel required in the immediately preceding paragraph with respect to Legal Defeasance if all the Notes that

-82-

have not at that time been delivered to the Trustee for cancellation (1) are delivered by us to the Trustee for cancellation (other than mutilated, destroyed, lost or stolen New Notes), (2) have become due and payable or (3) will by their terms become due and payable within one year, or are to be called for redemption within one year;

(d) no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit with respect to this Indenture;

(e) such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under, the Senior Credit Facilities or any other material agreement or instrument (other than this Indenture) to which the Company or any Restricted Guarantor is a party or by which the Company or any Restricted Guarantor is bound (other than that resulting from any borrowing of funds to be applied to make the deposit required to effect such Legal Defeasance or Covenant Defeasance and any similar and simultaneous deposit relating to other Indebtedness, and the granting of Liens in connection therewith);

(f) the Company shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of defeating, hindering, delaying or defrauding any creditors of the Company or any Restricted Guarantor or others; and

(g) the Company shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

Section 13.05 <u>Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions</u>. Subject to Section 13.06 hereof, all money and Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 13.05, the "<u>Trustee</u>") pursuant to Section 13.04 hereof in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Company or a Guarantor acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Company shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or Government Securities deposited pursuant to Section 13.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

-83-

Confidential

Anything in this Article XIII to the contrary notwithstanding, the Trustee shall deliver or pay to the Company from time to time upon the request of the Company any money or Government Securities held by it as provided in Section 13.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 13.04(a) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 13.06 <u>Repayment to the Company</u>. Subject to any applicable abandoned property law, any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest on any Note and remaining unclaimed for two years after such principal, and premium, if any, or interest has become due and payable shall be paid to the Company on its request or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease.

Section 13.07 <u>Reinstatement</u>. If the Trustee or Paying Agent is unable to apply any United States dollars or Government Securities in accordance with Section 13.02 or 13.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Company's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 13.02 or 13.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 13.02 or 13.03 hereof, as the case may be; <u>provided</u> that, if the Company makes any payment of principal of, premium, if any, or interest on any Note following the reinstatement of its obligations, the Company shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

[Signature Pages Follow]

-84-

Dated as of June 6, 2008                    RESIDENTIAL CAPITAL, LLC

                                            By:    /s/ James N. Young
                                                   Name: James N. Young
                                                   Title: Chief Financial Officer

Dated as of June 6, 2008

**GUARANTORS**:

GMAC RESIDENTIAL HOLDING COMPANY,
LLC

By:   /s/ James N. Young
      Name: James N. Young
      Title: Chief Financial Officer

GMAC-RFC HOLDING COMPANY, LLC

By:   /s/ James N. Young
      Name: James N. Young
      Title: Chief Financial Officer

GMAC MORTGAGE, LLC

By:   /s/ James N. Young
      Name: James N. Young
      Title: Chief Financial Officer

RESIDENTIAL FUNDING COMPANY, LLC

By:   /s/ James N. Young
      Name: James N. Young
      Title: Chief Financial Officer

HOMECOMINGS FINANCIAL, LLC

By:   /s/ James N. Young
      Name: James N. Young
      Title: Chief Financial Officer

Confidential

Dated as of June 6, 2008                    **U.S. BANK NATIONAL ASSOCIATION**

                                            By:    /s/ Richard Prokosch
                                                   Name: Richard Prokosch
                                                   Title: Vice President

## EXHIBIT A

## [FACE OF NOTE]

CUSIP/CINS _____

9.625% Junior Secured Guaranteed Note due 2015

No. ____                                                                    $_____

### Residential Capital, LLC

promises to pay to [            ] or registered assigns,

the principal sum of _____ on May 15, 2015, or if less, the aggregate principal amount then outstanding.

Interest Payment Dates: May 15 and November 15 (or, if any such day is not a Business Day, the next succeeding Business Day)

Record Dates: May 1 and November 1

Dated: [        ]

Residential Capital, LLC

By: _____
    Name:
    Title:

This is one of the Notes referred to
in the within-mentioned Indenture:

U.S. BANK NATIONAL ASSOCIATION
    as Trustee

By: _____
    Authorized Signatory

A-1

Confidential

9.625% Junior Secured Guaranteed Note due 2015

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1) INTEREST. Residential Capital, LLC, a Delaware limited liability company (the "*Company*"), promises to pay interest on the principal amount of this Note at a rate of 9.625% per annum in cash from June 6, 2008 until maturity and shall pay the Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below. The Company will pay interest and Additional Interest, if any, semiannually in arrears on May 15 and November 15 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "*Interest Payment Date*"). Except as specifically provided with respect to any Additional Notes, interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance. The first Interest Payment Date shall be November 15, 2008. The Company will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate of 9.625% per annum; it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest, if any, (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful. Interest will be computed on the basis of a 360 day year comprised of twelve 30-day months.

(2) METHOD OF PAYMENT. The Company will pay interest on the Notes (except defaulted interest) and Additional Interest, if any, to the Persons who are registered Holders of Notes at the close of business on the May 1 and November 1 next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium and Additional Interest, if any, and Cash Interest at the office or agency of the Company maintained for such purpose within or without the City and State of New York, or, at the option of the Company, payment of interest and Additional Interest, if any, may be made by check mailed to the Holders at their addresses set forth in the register of Holders; *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of and Cash Interest, premium and Additional Interest, if any, on, all Global Notes and all other Notes the Holders of which will have provided wire transfer instructions to the Company or the Paying Agent. Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

A-2

Confidential

(3) *PAYING AGENT AND REGISTRAR*. Initially, U.S. Bank National Association, the Trustee under the Indenture, will act as Paying Agent and Registrar. The Company may change any Paying Agent or Registrar without notice to any Holder. The Company or any of its Subsidiaries may act in any such capacity.

(4) *INDENTURE*. The Company issued the Notes under an Indenture dated as of June 6, 2008 (the "*Indenture*") among the Company, the Guarantors and the Trustee. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the TIA. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling. The Indenture does not limit the aggregate principal amount of Notes that may be issued thereunder.

(5) *OPTIONAL REDEMPTION*. The Company may redeem the Notes at any time, in whole or in part, at a redemption price specified in Section 3.07 of the Indenture.

(6) *MANDATORY REDEMPTION*. The Company will mandatorily redeem one-third of the principal amount of each Note originally issued (or, if less, the entire then remaining principal amount of Notes) on each of May 15, 2013, May 15, 2014 and May 15, 2015 at a redemption price equal to the principal amount thereof plus accrued interest to Redemption Date (subject to the right of Holders on the relevant regular record date to receive interest due on an interest payment date).

(7) *REPURCHASE AT THE OPTION OF THE HOLDER*. The Company may be required to repurchase Notes pursuant to Section 4.10 of the Indenture.

(8) *DENOMINATIONS, TRANSFER, EXCHANGE*. The Notes are in registered form without coupons in initial denominations of $2,000 and integral multiples of $1,000. The transfer of Notes, including transfers to affiliates, shall be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Company may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Company need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed or during the period between a record date and the corresponding Interest Payment Date.

(9) *PERSONS DEEMED OWNERS*. The registered Holder of a Note shall be treated as its owner for all purposes.

(10) *AMENDMENT, SUPPLEMENT AND WAIVER*. Subject to certain exceptions, the Indenture, the Notes, the Security Documents or the Guarantees may be amended or supplemented with the consent of the Holders of at least a majority in aggregate principal

A-3

Confidential

amount of the then outstanding Notes including Additional Notes, if any, voting as a single class, and any existing Default or Event or Default or compliance with any provision of the Indenture, the Notes or the Guarantees may be waived with the consent of the Holders of a majority in aggregate principal amount of the then outstanding Notes including Additional Notes, if any, voting as a single class. Without the consent of any Holder, the Company, the Guarantors and the Trustee may amend or supplement the Indenture, the Notes or the Guarantees to (i) evidence the succession of another corporation to the Company or each Guarantor or successive successions, and the assumption by any successor corporation of certain covenants, agreements and obligations; (ii) add to the covenants of the Company for the benefit of the Holders; (iii) cure any ambiguity, omission, defect or inconsistency, provided that such action does not adversely affect the interests of the Holders; (iv) convey, transfer, assign, mortgage or pledge any property to or with the Trustee; (v) evidence and provide the acceptance of the appointment of a successor trustee under the Indenture; and (vi) (x)evidence the succession of another corporation to each Guarantor, or successive successions, and the assumption by any successor corporation of certain covenants, agreements and obligations; (y) add to the covenants of a Guarantor for the benefit of the Holders; (z) evidence and provide for any new Guarantees with respect to the Notes or the release of any Guarantor pursuant to the Indenture; (xx) provide for additional Collateral; (yy) release Collateral in accordance with the Indenture and the Security Documents and (zz) secure any Pari Passu Third Lien Indebtedness.

(11) *DEFAULTS AND REMEDIES*. Events of Default include: (i) the Company's failure to (x) pay principal (or premium, if any, on) any of the Notes as and when the same shall become due and payable either at maturity, upon redemption, by declaration or otherwise or (y) consummate a mandatory redemption of the Notes pursuant to Section 3.09 of the Indenture on any date required by such Section; (ii) the Company's failure to pay any installment of interest, upon any of the Notes as and when due and payable, which such failure continues for a period of 30 days; (iii) the Company's failure to observe or perform any of the covenants or agreements described in Sections 4.07, 4.09, 4.10, 4.11, 4.12, 4.13, 4.17 and 5.01 of the Indenture for a period of 30 days after the date on which the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes gives the Company written notice of its failure to perform; (iv) the Company's failure, or the failure of any Guarantor, to perform any other covenant in the Indenture, which failure continues for 90 days after the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes gives the Company written notice of the Company's, or such Guarantor's, failure to perform; (v) (x) the Company's failure, or failure by any of the Company's Subsidiaries, to perform any term or provision of any evidence of Indebtedness (excluding Indebtedness of any of the Company's Subsidiaries that is a Financing SPV), whether such Indebtedness now exists or shall hereafter be created, or any other condition shall occur, and as a result of the occurrence of which default or condition any Indebtedness in an amount in excess of $50,000,000 shall become or be declared to be due and payable, or the Company, or any of the Company's Subsidiaries, shall be obligated to purchase any such Indebtedness, prior to the date on which it would otherwise become due and payable, (y) any Indebtedness in an amount in excess of $50,000,000 shall not be paid when due at its stated maturity or (z) an "Event

A-4

Confidential

of Default" occurs and is continuing under any indenture governing the Existing Notes; (vi) the entry against the Company or any Significant Subsidiary of a final judgment or final judgments for the payment of money in an aggregate amount in excess of $50,000,000, by a court or courts of competent jurisdiction, which judgments remain undischarged, unwaived, unstayed, unbonded or unsatisfied for a period of 60 consecutive days; (vii) any Security Document or Intercreditor Agreement is held to be unenforceable or invalid for any reason, the security interest purported to be created by the Security Documents are held to be unenforceable, invalid or impaired with respect to a material portion of the Collateral, the Company or any Guarantor defaults in the performance of the terms of any of the Security Documents or the Intercreditor Agreement in a manner that adversely affects the enforceability or validity of the security interest on a material portion of the Collateral or in a manner that adversely affects the condition or value of a material portion of the Collateral, or the Company or any Guarantor repudiates or disaffirms any of its obligations under any of the Security Documents or the Intercreditor Agreement; (viii) certain events of Bankruptcy with respect to the Company, any Guarantor or any Significant Subsidiary; and (ix) any Guarantee shall cease to be in full force and effect (unless such Guarantee has been released in accordance with the Indenture). If any Event of Default other than an event of Bankruptcy as specified in clauses (8) and (9) of Section 6.01 of the Indenture has occurred and is continuing, either the Trustee or the Holders of not less than 25% in aggregate principal amount of Notes then outstanding under the Indenture may declare the principal of the Notes and all accrued interest thereon to be due and payable immediately. If an Event of Default that is an event of Bankruptcy as specified in clauses (8) and (9) of Section 6.01 of the Indenture occurs, the principal of all outstanding Notes and all accrued interest thereon shall be due and payable, without further action or notice on the part of the Trustee or any Holder. The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders, rescind an acceleration and its consequences, if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest or premium or Additional Interest, if any, that has become due solely because of the acceleration) have been cured or waived.

   (12) *TRUSTEE DEALINGS WITH COMPANY*. The Trustee, in its individual or any other capacity, may make loans to, accept deposits from, and perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

   (13) *SECURITY DOCUMENTS AND INTERCREDITOR AGREEMENT*. The obligations of the Company and the Guarantors under the Indenture, the Notes and the Guarantees are secured by a Lien on the Collateral pursuant to the Security Documents. The provisions of the Indenture and the Security Documents are subject to the Intercreditor Agreement.

   (14) *NO RECOURSE AGAINST OTHERS*. A director, Officer, employee, incorporator or stockholder of the Company or any Guarantors, as such, will not have any liability for any obligations of the Company or the Guarantors under the Notes, the Guarantees or the Indenture or for any claim based on, in respect of, or by reason of, such

A-5

Confidential

obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

(15) *AUTHENTICATION*. This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(16) *ABBREVIATIONS*. Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(17) *ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES*. In addition to the rights provided to Holders of Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes will have, subject to the terms thereof, all the rights set forth in the Registration Rights Agreement dated as of June 6, 2008, by the Company and the Guarantors, as such agreement may be amended, modified or supplemented from time to time. And, with respect to any Additional Notes, Holders of Restricted Global Notes and Restricted Definitive Notes will have, subject to the terms thereof, the rights set forth in one or more registration rights agreements, if any, by the Company, the Guarantors and the other parties thereto, as such agreement(s) may be amended, modified or supplemented from time to time, relating to rights given by the Company to the purchasers of Additional Notes to register such Additional Notes under the Securities Act (collectively, the "*Registration Rights Agreement*").

(18) *CUSIP NUMBERS*. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(19) *GOVERNING LAW*. THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THIS NOTE AND THE GUARANTEES INCLUDING, WITHOUT LIMITATION, SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

The Company will furnish to any Holder upon written request and without charge a copy of the Indenture, the Security Documents, the Intercreditor Agreement and/or the Registration Rights Agreement. Requests may be made to:

A-6

Confidential

Residential Capital, LLC
One Meridian Crossings
Minneapolis, Minnesota 55423
Attention: Hu Benton, Managing Director,
    VP and Associate Counsel

A-7

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____ to transfer this Note on the books of the Company. The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee*: _____

_____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-8

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Company pursuant to Section 4.10 of the Indenture, check the box below:

☐ Section 4.10

If you want to elect to have only part of the Note purchased by the Company pursuant to Section 4.10 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
                              (Sign exactly as your name appears on the face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

_____

*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-9

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |

*  *This schedule should be included only if the Note is issued in global form.*

A-10

**EXHIBIT B**

**FORM OF CERTIFICATE OF TRANSFER**

Residential Capital, LLC
One Meridian Crossings
Minneapolis, Minnesota 55423

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107-2292
Attention: Richard Prokosch

    Re: <u>9.625% Junior Secured Guaranteed Notes due 2015</u>

    Reference is hereby made to the Indenture, dated as of June 6, 2008 (the "*Indenture*"), among Residential Capital, LLC, as issuer (the "*Company*"), each of the Guarantors and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

    _____ (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

    1. ☐ **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A**. The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

B-1

Confidential

2. ☐ **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Restricted Definitive Note pursuant to Regulation S**. The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser). Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

3. ☐ **Check and complete if Transferee will take delivery of a beneficial interest in a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S**. The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a) ☐ such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b) ☐ such Transfer is being effected to the Company or a Subsidiary thereof;

or

(c) ☐ such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act.

4. ☐ **Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note**.

(a) ☐ **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in

B-2

compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b) ☐ **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c) ☐ **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

_____

[Insert Name of Transferor]

By: _____

Name:

Title:

Dated: _____

B-3

Confidential

ANNEX A TO CERTIFICATE OF TRANSFER

1.    The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)    ☐ a beneficial interest in the:

(i)    ☐ 144A Global Note (CUSIP ___), or

(ii)    ☐ Regulation S Global Note (CUSIP ___), or

(b)    ☐ a Restricted Definitive Note.

2.    After the Transfer the Transferee will hold:

[CHECK ONE]

(a)    ☐ a beneficial interest in the:

(i)    ☐ 144A Global Note (CUSIP ___), or

(ii)    ☐ Regulation S Global Note (CUSIP ___), or

(iii)    ☐ Unrestricted Global Note (CUSIP ___); or

(b)    ☐ a Restricted Definitive Note; or

(c)    ☐ an Unrestricted Definitive Note,

in accordance with the terms of the Indenture.

B-4

**EXHIBIT C**

**FORM OF CERTIFICATE OF EXCHANGE**

Residential Capital, LLC
One Meridian Crossings
Minneapolis, Minnesota 55423

U.S. Bank National Association
60 Livingston Avenue
EP-MN-WS3C
St. Paul, MN 55107-2292
Attention: Richard Prokosch

Re: 9.625% Junior Secured Guaranteed Notes due 2015

(CUSIP _____)

Reference is hereby made to the Indenture, dated as of June 6, 2008 (the "*Indenture*"), among Residential Capital, LLC, as issuer (the "*Company*"), each of the Guarantors and U.S. Bank National Association, as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

1. **Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

(a) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial

C-1

Confidential

interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c) ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d) ☐ **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2. **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b) ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] ☐ 144A Global Note,

C-2

☐ Regulation S Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Company.

<br>

[Insert Name of Transferor]

By: _____
Name:
Title:

Dated: _____

C-3

**EXHIBIT D**

**FORM OF NOTATION OF GUARANTEE**

For value received, each Guarantor (which term includes any successor Person under the Indenture) has, jointly and severally, unconditionally guaranteed, to the extent set forth in the Indenture and subject to the provisions in the Indenture dated as of June 6, 2008 (the "*Indenture*") among Residential Capital, LLC (the "*Company*") and U.S. Bank National Association, as Trustee (the "*Trustee*"), (a) the due and punctual payment of the principal of, premium and Additional Interest, if any, and interest on, the Notes, whether at maturity, by acceleration, redemption or otherwise, the due and punctual payment of interest on overdue principal of and interest on the Notes, if any, if lawful, and the due and punctual performance of all other obligations of the Company to the Holders or the Trustee all in accordance with the terms of the Indenture and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. The obligations of the Guarantors to the Holders of Notes and to the Trustee pursuant to the Guarantee and the Indenture are expressly set forth in Article X of the Indenture and reference is hereby made to the Indenture for the precise terms of the Guarantee.

Capitalized terms used but not defined herein have the meanings given to them in the Indenture.

[NAME OF GUARANTOR(S)]

By: _____

      Name:
      Title:

D-1

## EXHIBIT E

### FORM OF SUPPLEMENTAL INDENTURE
### TO BE DELIVERED BY SUBSEQUENT GUARANTORS

Supplemental Indenture (this "*Supplemental Indenture*"), dated as of _____, 200___, among _____ (the "*Guaranteeing Subsidiary*"), a Subsidiary of Residential Capital, LLC (or its permitted successor), a Delaware Limited Liability Company (the "*Company*") the other Guarantors (as defined in the Indenture referred to herein) and U.S. Bank National Association, as Trustee under the Indenture referred to below (the "*Trustee*").

### W I T N E S S E T H

WHEREAS, the Company has heretofore executed and delivered to the Trustee an indenture (the "*Indenture*"), dated as of June 6, 2008, providing for the issuance of 9.625% Junior Secured Guaranteed Notes due 2015 (the "*Notes*");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Company's Obligations under the Notes and the Indenture on the terms and conditions set forth herein (the "*Guarantee*"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

1. CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. AGREEMENT TO GUARANTEE. The Guaranteeing Subsidiary hereby agrees to and does hereby provide an unconditional guarantee on the terms and subject to the conditions set forth in the Guarantee and in the Indenture including but not limited to Article X thereof.

3. NO RECOURSE AGAINST OTHERS. No director, Officer, employee, incorporator or stockholder of the Guaranteeing Subsidiary, as such, shall have any liability for any obligations of the Company or any Guaranteeing Subsidiary under the Notes, any Guarantees, the Indenture or this Supplemental Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of the Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws.

E-1

4. NEW YORK LAW TO GOVERN. THE INTERNAL LAW OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THIS SUPPLEMENTAL INDENTURE WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

5. COUNTERPARTS. The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

6. EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

7. THE TRUSTEE. The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary and the Company.

[Signature Pages Follow]

E-2

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated: _____, 20____

[GUARANTEEING SUBSIDIARY]

By: _____
    Name:
    Title:

Residential Capital, LLC

By: _____
    Name:
    Title:

U.S. Bank National Association
as Trustee

By: _____
    Authorized Signatory

E-3

Confidential

**EXHIBIT F**

**FORM OF OFFICERS' CERTIFICATE FOR RELEASE OF COLLATERAL**

Officer's Certificate

[NAME OF GRANTOR]

Dated as of: [_____]

The undersigned, being a [title] of [Name of Grantor], a [_____] (the "Grantor"), does hereby certify that:

1. [He][She] is a duly appointed and qualified [Title] of the Grantor and is authorized to execute and deliver this Certificate.

2. The Grantor is requesting the release by Wells Fargo Bank, N.A., as Third Priority Collateral Agent, of the property described on Annex A hereto (the "Property") from the security interest created by the Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Third Priority Security Agreement"), dated as of June 6, 2008, among Residential Capital, LLC, certain of its affiliates from time to time parties thereto, U.S. Bank National Association, as Trustee, and Wells Fargo Bank, N.A., as Third Priority Collateral Agent.

3. The conditions specified in (i) Section [      ] of the Indenture, dated as of June 6, 2008, among Residential Capital, LLC, the Guarantors and U.S. Bank National Association, as Trustee, applicable to the release by the Third Priority Collateral Agent of the Property from the security interest of the Third Priority Security Agreement [and (ii) Section [      ] of [              ]][1] have been satisfied.

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first set forth above.

[NAME OF GRANTOR]

By: _____
    Name:
    Title:

---

[1]    To be updated to include appropriate references to collateral release provisions of agreements governing Pari Passu Third Lien Indebtedness, if applicable.

F-1

Confidential

**EXHIBIT G**

**FORM OF OPINION OF COUNSEL FOR RELEASE OF COLLATERAL**

[Letterhead of Counsel to Grantor]

[DATE]

> Wells Fargo Bank, N.A.
> [address]
> [address]
> Attention: [_____]
>
> U.S. Bank National Association, as Trustee
> [address]
> [address]
> Attention: [_____]

> Re:   Third Priority Pledge and Security Agreement and Irrevocable Proxy and Indenture for 9.625% Junior Secured
>       Guaranteed Notes due 2015

Ladies and Gentlemen:

 [I][We] have acted as [special] [other capacity] counsel to [_____], a [_____] (the "Grantor"), in connection with the requested release of [describe assets to be released] more particularly describe in Annex A to the Officer's Certificate referred to below (the "Property") from the security interest created by the Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Third Priority Security Agreement"), dated as of June 6, 2008, among Residential Capital, LLC (the "Company"), certain of its affiliates from time to time parties thereto, U.S. Bank National Association, as Trustee (the "Trustee"), and Wells Fargo Bank, N.A., as Third Priority Collateral Agent. This opinion is being furnished to you pursuant to Section 10 of the Third Priority Security Agreement and Section 8.04 of that certain Indenture (the "Indenture") dated as of June 6, 2008 among the Company, the guarantors names therein and the Trustee.[2]

 In [my][our] examination, [I][we] have assumed the genuineness of all signatures including endorsements, the legal capacity of natural persons, the authenticity of all documents

---

[2]    To be updated to include appropriate references to agreements governing Pari Passu Third Lien Indebtedness, if applicable.

G-1

Confidential

submitted to [me][us] as originals, the conformity to original documents of all documents submitted to us as facsimile, electronic, certified or photostatic copies, and the authenticity of the originals of such copies. As to any facts material to this opinion which [I][we] did not independently establish or verify, [I][we] have relied upon statements and representations of the Grantor and their respective officers and other representatives and of public officials, including the facts and conclusions set forth therein.

Except as otherwise specified herein or as the context may otherwise require, capitalized terms used but not otherwise defined herein are defined in the Third Priority Security Agreement.

In rendering the opinions set forth herein, [I][we] have examined and relied on originals or copies of the following:

(a) the Third Priority Security Agreement

(b) the Indenture; and

(c) an Officer's Certificate of [_____], a [title], of [name of applicable Grantor], dated [_____] (the "Officer's Certificate") delivered by [name of applicable Grantor] pursuant to Section 10 of the Third Priority Security Agreement and Section 8.04 of the Indenture (a copy of which is attached as Exhibit A hereto).

We express no opinion as to the laws of any jurisdiction other than the Applicable Laws of the State of [_____].

"Applicable Laws" means those laws, rules and regulations which, in [my][our] experience, are normally applicable to transactions of the type contemplated by the Third Priority Security Agreement but without [my][our] having made any special investigation as to the applicability of any specific law, rule or regulation, and which are not the subject of a specific opinion herein referring expressly to a particular law or laws.

Based upon the foregoing and subject to the limitations, qualifications, exceptions and assumptions set forth herein, [I][we] are of the opinion that the Officer's Certificate is in the form required by Section [        ] of the Indenture and no other documents, instruments or certificates are required to be delivered to the Third Priority Collateral Agent or the Trustee as a condition to the requested release.

[I][We] have made no investigation and express no opinion regarding any conclusion set forth in the Officer's Certificate.

[My][Our] opinion herein stated is based on the assumptions specified above.

This opinion is furnished to you solely for your benefit and is not to be used, circulated, quoted or otherwise referred to for any other purpose or relied upon by any other person or entity for any purpose without [my][our] prior written consent.

Very truly yours,

G-2

Confidential

# EXHIBIT B

**ResCap Exchange Offer 8-K**

RESIDENTIAL CAPITAL, LLC
**Form 8-K filed on Jun 12, 2008 06:02:46**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
_____

# FORM 8-K

CURRENT REPORT
_____

PURSUANT TO SECTION 13 OR 15( d ) OF THE
SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): June 6, 2008

# RESIDENTIAL CAPITAL, LLC

(Exact name of registrant as specified in its charter)

| Delaware | 0-51438 | 20-1770738 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

One Meridian Crossings
Minneapolis, Minnesota
55423
(Address of principal executive offices)
(Zip Code)

**(952) 857-8700**
(Registrant's telephone number, including area code)

**Not Applicable**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

o Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

o Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

o Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

o Pre-commencements communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Bloomberg Law®

© 2013 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 1
Document Link: http://www.bloomberglaw.com/ms/document/X6G44JOQITE001

## Item 1.01    Entry into Material Definitive Agreement

**8.500% Senior Secured Guaranteed Notes due 2010 and 9.625% Junior Secured Guaranteed Notes due 2015**

On June 6, 2008, Residential Capital, LLC ("ResCap") closed its previously announced private debt tender and exchange offers for certain of its outstanding debt securities (the "Offers").

In connection with the Offers, on June 6, 2008, ResCap issued $1,666,680,000 initial aggregate principal amount of 8.500% Senior Secured Guaranteed Notes due 2010 (the "Senior Secured Notes") and $4,010,280,000 initial aggregate principal amount of 9.625% Junior Secured Guaranteed Notes due 2015 (the "Junior Secured Notes" and, together with the Senior Secured Notes, the "New Notes") in exchange for approximately $2.6 billion aggregate principal amount of notes that mature in 2008-2009 (the "2008-2009 Notes") and approximately U.S. dollar equivalent of $6.0 billion aggregate principal amount of its notes that mature in 2010-2015 (the "2010-2015 Notes" and, together with the 2008-2009 Notes, the "Old Notes"). Each series of New Notes is guaranteed by all of ResCap's domestic significant subsidiaries (other than GMAC Bank and certain other subsidiaries that are restricted from guaranteeing the New Notes), as well as all of ResCap's direct subsidiaries. The Senior Secured Notes are secured by a second priority lien on the collateral securing ResCap's new senior secured credit facility with GMAC LLC (the "GMAC Facility"), and the Junior Secured Notes are secured by a third priority lien on the same collateral.

In addition, in connection with the Offers, holders participating in the exchange offers had the opportunity to elect to receive cash in lieu of the New Notes that they would have otherwise received, pursuant to a "modified Dutch auction" process that was described in the offer documents (the "Auction Process"). In the Auction Process, approximately $1.6 billion aggregate principal amount of the 2008-2009 Notes and U.S. dollar equivalent $2.6 billion aggregate principal amount of the 2010-2015 Notes were tendered. Based on these results, the clearing price in the auction process was $920 per $1,000 principal amount of Senior Secured Notes and $650 per $1,000 principal amount of Junior Secured Notes and approximately 81% of the 2008-2009 Notes and approximately 51% of the 2010-2015 Notes tendered at or below the applicable clearing price were purchased for cash in lieu of New Notes.

Also in connection with the Offers, approximately $853.4 million aggregate principal amount of Floating Rate Notes due June 9, 2008 were purchased for cash.

The Senior Secured Notes are governed by the indenture, dated as of June 6, 2008, among ResCap, the guarantors party thereto and U.S. Bank National Association, as Trustee (the "Senior Secured Note Indenture"). The Junior Secured Notes are governed by the Indenture, dated as of June 6, 2008, among ResCap, the guarantors party thereto and U.S. Bank National Association, as Trustee (the "Junior Secured Note Indenture").

The New Notes are senior secured obligations of ResCap and are: (i) senior in right of payment to all of ResCap's existing and future indebtedness that is expressly subordinated to the New Notes, and, to the extent of the value of the collateral securing the New Notes, effectively senior in right of payment to the unexchanged Old Notes and any other unsecured debt of ResCap or the guarantors; (ii) effectively senior in right of payment to unexchanged Old Notes to the extent of the value of the assets of the subsidiary guarantors; (iii) equal in right of payment with all of ResCap's existing and future unsecured obligations that are not expressly subordinated to the New Notes, to the extent that the value of the collateral securing the New Notes is inadequate to provide for payment in full of the New Notes; and (iv) effectively subordinated in right of payment to all indebtedness pursuant to the GMAC Facility, to the extent of the value of the assets securing the GMAC Facility. The Senior Secured Notes effectively rank senior in right of payment to the Junior Secured Notes to the extent of the value of the collateral securing the Senior Secured Notes as the liens securing the Junior Secured Notes are junior to those securing the Senior Secured Notes.

ResCap may redeem each series of New Notes, in whole at any time or in part from time to time, at its option on not less than 30 nor more than 60 days' notice, subject to the payment of a make-whole premium. For the Senior Secured Notes, the redemption price is equal to (i) the greater of (x) 100% of the principal amount of such notes being redeemed or (y) the present values of the remaining scheduled principal and interest payments on such notes being redeemed (excluding accrued interest through the redemption date) discounted at a rate specified in the indenture, plus (ii) accrued and unpaid interest, if any, to the redemption date on the principal amount of such notes being redeemed. For the Junior Secured Notes, the redemption price is equal to (i) the greater of (x) 100% of the principal amount of such notes being redeemed or (y) the present value of the sum of (A) the redemption price of such notes on May 15, 2010 being redeemed and (B) all remaining scheduled principal and interest payments on such notes being redeemed through May 15, 2010 (excluding accrued interest through the redemption date) discounted at a rate specified in the indenture, plus (ii) accrued and unpaid interest, if any, to the redemption date on the principal amount of such notes being redeemed.

© 2013 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 2
Document Link: http://www.bloomberglaw.com/ms/document/X6G44JOQITE001

RESIDENTIAL CAPITAL, LLC, Form 8-K, File Number 000-9163, filed Jun 12, 2008. Period date: Jun 06, 2008. Corporate Filing

© 2013 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 3
Document Link: http://www.bloomberglaw.com/ms/document/X6G44JOQITE001

Additionally, the Junior Secured Notes will be redeemable at ResCap's option, in whole or in part, at any time following May 15, 2010, upon not less than 30 nor more than 60 days' notice at the following prices (expressed as percentages of the principal amount to be redeemed), plus accrued and unpaid interest, if any, to the redemption date, if redeemed during the 12-month period beginning on May 15 of the years indicated:

| Year | Redemption Price |
|---|---|
| 2010 | 104.813% |
| 2011 | 102.407% |
| 2012 and thereafter | 100.000% |

The Senior Secured Notes will mature on May 15, 2010 and the Junior Secured Notes will mature on May 15, 2015, in each case, unless redeemed earlier by ResCap as described above. In addition, interest on the New Notes will be payable semi-annually on May 15 and November 15 of each year, beginning on November 15, 2008.

ResCap will also mandatorily redeem one-third of the original principal amount of each Junior Secured Note on May 15, 2013 and May 15, 2014 with the remaining full principal amount paid on May 15, 2015.

The indentures for the New Notes contain covenants, subject to numerous qualifications and exceptions, that limit, among other things, ResCap's ability and the ability of its subsidiaries to: incur additional indebtedness; pay dividends on member interests or repurchase ResCap's member interests; make investments in certain affiliates (other than subsidiaries of ResCap); create liens or use assets as security in other transactions; merge, consolidate or transfer or dispose of substantially all of their assets; engage in transactions with affiliates (other than subsidiaries of ResCap); and sell certain assets.

The indentures for the New Notes set forth certain events of default, including, but not limited to, (i) ResCap's failure to pay principal on any New Notes when due or to redeem Junior Secured Notes when required; (ii) ResCap's failure to pay interest on any New Notes for 30 days after becoming due; (iii) ResCap's failure to observe or perform certain covenants for 30 days after the written notice from the trustee or holders representing 25% or more of the outstanding principal amount of applicable New Notes; (iv) ResCap's failure to pay or acceleration of certain other indebtedness aggregating $50 million or more, or the continuance of an event of default under an indenture governing the Old Notes; (v) ResCap's becoming subject to one or more unpaid judgments aggregating $50 million or more, which judgments remain undischarged, unwaived, unstayed, unbonded or unsatisfied for 60 days; (vi) certain bankruptcy events; (vii) any security documents or the intercreditor agreement being held unenforceable or invalid with respect to a material portion of the collateral or ResCap defaults under any security documents or the intercreditor agreement in a manner that materially and adversely affects the condition or value of a material portion of collateral for the New Notes; or (viii) any guarantee shall cease to be in full force and effect (unless such guarantee has been released in accordance with the applicable indenture). Upon the happening of any event of default, the trustee or the holder of at least 25% in principal amount of outstanding New Notes may declare the principal of and accrued interest on all the New Notes to be due and payable immediately. If an event of default with respect to bankruptcy proceedings occurs and is continuing, all the New Notes will become immediately due and payable without any declaration or other act on the part of the trustee or any holder of the New Notes.

Bloomberg Law®

© 2013 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 4

Document Link: http://www.bloomberglaw.com/ms/document/X6G44JOQITE001

On June 6, 2008, ResCap also entered into a registration rights agreement whereby it has agreed to consummate an offer to exchange each series of the New Notes for a new issue of debt securities registered under the Securities Act, with terms substantially identical to those of the New Notes (except for the provisions relating to the transfer restrictions and payment of additional interest) no later than 366 days after the date of the initial issuance of such notes. However, the registration rights agreement provides that ResCap will not be required to consummate the exchange offer if, before the required date for the consummation of such exchange offer, (i) the New Notes are freely tradable and (ii) the restrictive legend on the New Notes has been removed.

**Item 2.03      Creation of a Direct Financial Obligation or an Obligation Under an Off-Balance Sheet Arrangement of a Registrant.**

The information in Item 1.01 of this Form 8-K is hereby incorporated by reference to this Item 2.03.

**Item 3.03      Material Modification of Rights of Security Holders**

In addition, as part of the Offers, ResCap entered into supplemental indentures governing the Old Notes, each of which became operative as of June 6, 2008. The supplemental indentures are described as follows:

Third Supplemental Indenture to the indenture (the "Senior Indenture"), dated as of June 24, 2005, among ResCap, the guarantors party thereto and Deutsche Bank Trust Company Americas, as trustee, governing the Floating Rate Notes due June 9, 2008, Floating Rate Notes due November 21, 2008, 8.125% Notes due November 21, 2008, Floating Rate Notes due April 17, 2009, Floating Rate Notes due May 22, 2009, 8.375% Notes due June 30, 2010, Floating Rate Notes due September 27, 2010, 8.000% Notes due February 22, 2011, 7.125% Notes due May 17, 2012, 8.500% Notes due June 1, 2012, 8.500% Notes due April 17, 2013, 8.375% Notes due May 17, 2013, 9.875% Notes due July 1, 2014 and 8.875% Notes due June 30, 2015 (collectively, the "Old Senior Notes").

Second Supplemental Subordinated Indenture to the subordinated indenture (the "Subordinated Indenture" ), dated as of April 17, 2006, among ResCap, the guarantors party thereto and Deutsche Bank Trust Company Americas, as trustee, governing Floating Rate Subordinated Notes due April 17, 2009 (the "Old Subordinated Notes").

The Third Supplemental Indenture eliminates the limitation on liens covenant and the covenant requiring additional subsidiary guarantees contained in the Senior Indenture. The Second Supplemental Subordinated also eliminates the covenant requiring additional subsidiary guarantees. In addition, each of the of the Third Supplemental Indenture and the Second Supplemental Subordinated Indenture eliminates certain events of default contained in the Senior Indenture and the Subordinated Indenture, respectively. Each of the Third Supplemental Indenture and the Second Supplemental Subordinated Indenture releases the subsidiary guarantees of ResCap's obligations under the Senior Indenture and the Subordinated Indenture, respectively.

Bloomberg Law®

© 2013 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // PAGE 5
Document Link: http://www.bloomberglaw.com/ms/document/X6G44JOQITE001

RESIDENTIAL CAPITAL, LLC, Form 8-K, File Number 001-06639, filed Jun 12, 2008. Period date: Jun 06, 2008. Corporate Filing

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date:   June 11, 2008

RESIDENTIAL CAPITAL, LLC

By: /s/  James N. Young

James N. Young
Chief Financial Officer

4

© 2013 Bloomberg Finance L.P. All rights reserved. For terms of service see bloomberglaw.com // **PAGE 6**
Document Link: http://www.bloomberglaw.com/ms/document/X6G44JOQITE001

**Bloomberg Law**®

# EXHIBIT C

**Junior Secured Notes Security Agreement**

**Exhibit C (Junior Secured Notes Security Agreement) has been filed without Schedules I through IX and Attachments I and II pending the Court's ruling on the *Application of the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure to File Under Seal Certain Exhibits and Schedules to Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims* filed concurrently herewith by the Committee.**

EXECUTION COPY

---

AMENDED AND RESTATED THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT
AND IRREVOCABLE PROXY

dated as of

December 30, 2009

among

RESIDENTIAL CAPITAL, LLC,
and certain of its Affiliates from time to time parties hereto,
as Grantors

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

and

WELLS FARGO BANK, N.A.,
as Third Priority Collateral Agent
and Collateral Control Agent

---

1534209.04-New York Server 7A - MSW

# TABLE OF CONTENTS

**Page**

1. Definitions ........................................................................................................ 2
2. Grant of Security Interest by the Company and the Guarantors ..................... 13
3. Grant of Security Interest by Equity Pledgors ............................................... 15
4. Grant of Security Interest by FABS Grantors ................................................ 16
5. Grant of Security Interest by Additional Account Parties ............................. 17
6. Third Priority Nature of Liens ....................................................................... 18
7. Representations and Warranties ..................................................................... 18
8. Grantor Remains Liable; Nature of Security Interest; Subrogation, etc. ....... 22
9. Collections, etc .............................................................................................. 23
10. Release ........................................................................................................... 24
11. Agreements of the Grantors ........................................................................... 24
12. Agreement as to Investment Property; Voting ............................................... 28
13. Defaults and Events of Default; Remedies .................................................... 32
14. Limitation on Duty in Respect of Collateral .................................................. 35
15. Special Provisions Relating to the Third Priority Collateral Agent .............. 36
16. Special Provisions Relating to the Collateral Control Agent ......................... 44
17. General ........................................................................................................... 44
18. Amendment and Restatement ......................................................................... 48
19. Foreign Pledge Agreements ........................................................................... 48
20. Pari Passu Third Lien Indebtedness ............................................................... 49
21. Intercreditor Matters ...................................................................................... 49

SCHEDULES

| | |
|---|---|
| Schedule I | Grantor Information |
| Schedule II | Additional Places of Business |
| Schedule III | Trade Names; Prior Legal Names; Mergers |
| Schedule IV | Intellectual Property |
| Schedule V | Commercial Tort Claims |
| Schedule VI | Initial Collateral |
| Schedule VII | Direct Subsidiaries |
| Schedule VIII | Excluded Significant Subsidiaries |
| Schedule IX | Bailment Collateral |
| Schedule X | Deposit Accounts and Securities Accounts |
| Schedule XI | Notice Information |

ATTACHMENTS

| | |
|---|---|
| Attachment I | Pledged Equity and Pledged Notes |
| Attachment II | Form of Joinder Agreement |

1534209 04-New York Server 7A - MSW

Confidential

## AMENDED AND RESTATED THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY

THIS AMENDED AND RESTATED THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY (this "Agreement"), dated as of December 30, 2009, is among

(i)    Residential Capital, LLC, a Delaware limited liability company (the "Company");

(ii)    GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage"), Residential Funding Company, LLC, a Delaware limited liability company ("RFC"), HomeComings Financial, LLC, a Delaware limited liability company ("Homecomings"), GMAC-RFC Holding Company, LLC, a Delaware limited liability company ("RFC Holdings"), and GMAC Residential Holding Company, LLC, a Delaware limited liability company ("Residential"; and each of GMAC Mortgage, RFC, Homecomings, RFC Holdings and Residential being a "Guarantor" and collectively, the "Guarantors");

(iii)    GMAC Model Home Finance I, LLC, a Delaware limited liability company ("Model Home I"), Developers of Hidden Springs, LLC, a Delaware limited liability company ("Developers"), DOA Holding Properties, LLC, a Delaware limited liability company ("DOA"), Equity Investment IV, LLC, a Delaware limited liability company ("Equity IV"), RFC Construction Funding, LLC ("RFC Construction"), RFC Asset Holdings II, LLC, a Delaware limited liability company ("RAHI"), and Passive Asset Transactions, LLC, a Delaware limited liability company ("PATI"; and each of Model Home I, Developers, DOA, Equity IV, RFC Construction, RAHI and PATI being an "Equity Pledgor" and collectively, the "Equity Pledgors");

(iv)    each of RAHI and PATI in its capacity as a "FABS Grantor" (collectively, the "FABS Grantors");

(v)    the various other parties signatory hereto as additional account parties (each an "Additional Account Party" and collectively, the "Additional Account Parties");

(vi)    each other Person that agrees to become a "Grantor" by executing and delivering a Joinder Agreement, pursuant to Section 17 (the Company, each Guarantor, each Equity Pledgor, each FABS Grantor, each Additional Account Party and each such other Person is herein a "Grantor" and collectively, the "Grantors");

(vii)    U.S. Bank National Association, as Trustee under the Indenture (the "Trustee"); and

(viii)    Wells Fargo Bank, N.A., as third priority collateral agent (together with its successor(s) thereto in such capacity, the "Third Priority Collateral Agent") for the Notes Parties, and Collateral Control Agent (as defined in the Intercreditor Agreement described below).

Confidential

W I T N E S S E T H:

WHEREAS, the Company issued its 9.625% Junior Secured Guaranteed Notes Due 2015 (the "Notes") pursuant to an Indenture, dated as of June 6, 2008, among the Company, the Guarantors, and the Trustee (as amended, supplemented, restated or otherwise modified from time to time, the "Indenture");

WHEREAS, the Guarantors have pursuant to Article X of the Indenture, among other things, unconditionally guaranteed the obligations of the Company under the Indenture and the Notes (each such guarantee so made by a Guarantor herein its "Guaranty");

WHEREAS, following the Issue Date, the Company and its Subsidiaries may incur Pari Passu Third Lien Indebtedness (as defined in the Indenture) which are secured equally and ratably with the Notes in accordance with Section 19 of this Agreement;

WHEREAS, pursuant to Section 8.01 of the Indenture, the Grantors entered into the Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of June 6, 2008 (as amended, supplemented, restated or otherwise modified from time to time prior to the date hereof, the "Original Security Agreement"); and

WHEREAS, the parties to the Original Security Agreement wish to amend and restate the Original Security Agreement in its entirety.

NOW, THEREFORE, for and in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Definitions.  When used herein and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined herein have the meanings assigned to such terms in the Indenture; (b) the terms Account, Account Debtor, Certificated Security, Chattel Paper, Commercial Tort Claim, Commodity Account, Commodity Contract, Deposit Account, Document, Electronic Chattel Paper, Equipment, Financial Assets, Fixture, General Intangibles, Goods, Health Care Insurance Receivables, Instrument, Inventory, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangible, Proceeds, Securities Account, Security, Security Entitlement, Supporting Obligations and Uncertificated Security have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below); and (c) the following terms have the following meanings (such definitions to be applicable to both the singular and plural forms of such terms):

Account Control Agreements has the meaning given to such term in the Senior Secured Credit Facility.

Amendment Closing Date means December 30, 2009.

Ancillary Income means all money which is due and payable in connection with each mortgage loan other than the servicing fee and specifically including, without limitation, late charge fees, assignment transfer fees, insufficient funds check charges, amortization schedule fees, interest from escrow accounts and all other incidental fees

-2-

Confidential

and charges and any Float Benefit, in each case, to the extent such amounts are allocable to a mortgage loan.

Assets has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Amendment Closing Date.

Assigned Documents means the Note Issuance Facility Deed, the Deed of Charge, the UK Note and any other Transaction Document (as defined in the Master Definitions Schedule dated as of June 4, 2008 relating to the Warehouse Facility of English Sellers) governed by English law to which the Company is a party.

Bailment Collateral has the meaning given such term in the Intercreditor Agreement.

Bilateral Facility means the facilities listed in Schedule 7.01(t) to the Senior Secured Credit Facility on the Issue Date.

Carrying Value has the meaning given such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Collateral means, with respect to any Grantor, all property and rights of such Grantor in which a security interest is granted pursuant to Sections 2, 3, 4 and 5.

Collateral Control Agent has the meaning given such term in the Intercreditor Agreement.

Computer Hardware and Software means, with respect to any Grantor, all of such Grantor's rights (including rights as licensee and lessee) with respect to: (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, features, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software programs designed for use on the computers and electronic data processing hardware described in clause (a) above, including, without limitation, all operating system software, utilities and application programs in whatsoever form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; and (d) any documentation for hardware, software and firmware described in clauses (a), (b) and (c) above, including, without limitation, flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes.

Controlled Collateral means any assets of the Grantors:

(i)     consisting of Deposit Accounts, Securities Accounts or Property deposited or carried therein or credited thereto,

(ii)    described as subject to, or purported to be subject to, (A) Liens in favor of, or for the benefit of, the Collateral Control Agent or (B) control by the

-3-

Confidential

Collateral Agent, in each case in or under the Intercreditor Agreement, the Account Control Agreements (as defined in the Senior Secured Credit Facility), the Real Estate Security Documents (as defined in the Senior Secured Credit Facility), the Mexican Security Documents or any other Notes Document, excluding Sections 2, 3, 4 and 5 of this Agreement, or

(iii)    in the possession or purported to be in the possession of the Collateral Control Agent (including Bailment Collateral), in each case in or under the Intercreditor Agreement, the Account Control Agreements (as defined in the Senior Secured Credit Facility), the Real Estate Security Documents (as defined in the Senior Secured Credit Facility), the Mexican Security Documents or any other Notes Document, excluding Sections 2, 3, 4 and 5 of this Agreement.

Deed of Charge means the deed of charge and assignment dated as of June 4, 2008 between, among others, the UK SPE, the Company and the English Security Trustee as amended, amended and restated, supplemented or modified from time to time.

Default means a "Default" as defined in the Indenture or under any Pari Passu Third Lien Indebtedness Agreement.

Discharge of First Priority Claims has the meaning given to such term in the Intercreditor Agreement.

Discharge of Second Priority Claims has the meaning given to such term in the Intercreditor Agreement.

Distributions means all dividends of stock, membership interests or other ownership interests, liquidating dividends, shares of stock resulting from (or in connection with the exercise of) stock splits, reclassifications, warrants, options, non-cash dividends, mergers, consolidations, and all other distributions (whether similar or dissimilar to the foregoing) on or with respect to any Pledged Share, Pledged Interest or other shares of capital stock, member interest or other ownership interests or security entitlements constituting Collateral, but shall not include Dividends.

Dividends means cash dividends and cash distributions with respect to any Pledged Share or any Pledged Interest made in the ordinary course of business and not as a liquidating dividend.

Dutch Assets means the Dutch Membership Interests and Dutch VFLN Receivables.

Dutch Membership Interests means 65% of any and all rights, claims (*vorderingsrechten*) and interests of each of Residential Funding Company, LLC and GMAC-RFC Holding Company, LLC in their capacity as member (*lid*) of GMAC RFC International Holdings Coöperatief U.A. under or in connection with their membership (*lidmaatschap*).

-4-

Confidential

**Dutch Security Documents** means Dutch VFLN Agreement and the Dutch VFLN Note.

**Dutch VFLN Agreement** means that certain variable funding loan note agreement dated June 4, 2008 and entered into by and between, among others, the Company, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding.

**Dutch VFLN Note** means any note issued by GX CE Funding B.V. to the Company under or pursuant to the Dutch VFLN Agreement.

**Dutch VFLN Receivables** means any and all rights and claims (*vorderingsrechten*) (including but not limited to a right of recourse (*regres*) or subrogation (*subrogatie*)), whether present or future, whether actual or contingent, of the Company under or in connection with (i) the Dutch VFLN Agreement, (ii) each Dutch VFLN Note and (iii) the Dutch VFLN Trust Deed.

**Dutch VFLN Trust Deed** means that certain trust deed dated June 4, 2008 entered into by and between, among others, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding in relation to the Dutch VFLN Agreement.

**English Loan Sale and Purchase Agreement** means the loan sale and purchase agreement dated June 4, 2008 between the SPE, the English Sellers and the English Security Trustee.

**English Security Documents** means the English Loan Sale and Purchase Agreement, the Note Issuance Facility Deed, the English Shares Charge, the UK Third Priority Deed of Assignment and each and every other document, agreement and deed entered into by the Company and/or the English Security Trustee in connection with the purchase of certain residential mortgage loans and development loans, the issuance of the UK Note and creation of security in respect of the UK Note in favor of the English Security Trustee, in each case, by the UK SPE.

**English Security Trustee** means Deutsche Trustee Company Limited (in its capacity as security trustee in respect of the UK Note).

**English Sellers** means GMAC-RFC Limited and GMAC-RFC Property Finance Limited.

**English Shares Charge** means the Third Priority Shares Charge dated June 6, 2008 and entered into by RFC and the Third Priority Collateral Agent.

**ERISA** has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

**Event of Default** means an "Event of Default" as defined in the Indenture or under any Pari Passu Third Lien Indebtedness Agreement.

-5-

Confidential

Excluded Assets means, with respect to any Grantor and to the extent such Property does not constitute Primary Collateral, the following Property: (a) Goods securing purchase money indebtedness or capital lease obligations existing as of the Issue Date to the extent such purchase money indebtedness or capital lease obligations prohibit the granting of a security interest on such assets; (b) voting capital stock of controlled foreign corporations (as defined in the Internal Revenue Code) in excess of sixty-five percent (65%) of the voting rights of such corporations including without limitation GMAC-RFC Australia Pty Limited and GMAC RFC International Holdings Coöperatief U.A. (or any other controlled foreign corporation identified in writing by a Grantor to the Third Priority Collateral Agent); (c) any asset, including any account, note, contract, lease, financing arrangement, general intangible, equity investment, interests in joint ventures or other agreement to the extent that the grant of a security interest therein would violate applicable Requirements of Law, result in the invalidation thereof or provide any party thereto with a right of termination or default with respect thereto or with respect to any Bilateral Facility to which such asset is subject as of the Issue Date (in each case, after giving effect to applicable provisions of the UCC and other applicable Requirements of Law and principles of equity); (d) any trademark applications filed in the United States Patent and Trademark Office on the basis of such Grantor's "intent-to-use" such trademark, unless and until acceptable evidence of use of the trademark had been filed with the United States Patent and Trademark Office pursuant to Section 1(c) or 1(d) of the Lanham Act (15 U.S.C. 1051, et seq.) to the extent that granting a lien in such trademark application prior to such filing would adversely affect the enforceability of validity of such trademark application, (e) Mortgage Loans (the "LOC Mortgage Loans") and assets, rights and property related to such Mortgage Loans, in each case to the extent that, during the period between December 28, 2009 and January 31, 2010, (i) such LOC Mortgage Loans are contributed or otherwise transferred by GMAC, Inc. or its Subsidiary to the Company, and contributed or otherwise transferred by the Company or its Subsidiary to RFC or GMAC Mortgage and (ii) such LOC Mortgage Loans and related rights, assets and property are pledged by RFC or GMAC Mortgage as collateral under the LOC Related Documents; (f) proceeds and products of any and all of the foregoing excluded assets described in clause (a) through (e) above only to the extent such proceeds and products would constitute property or assets of the type described in clause (a) through (e) above; and (g) the Exempt Cash Reserve Account and any proceeds and products thereof.  In addition, solely for purposes of each grant of a security interest under the First Priority Security Agreement to secure Hedge Obligations (as defined in the First Priority Security Agreement), Excluded Assets also means any asset that does not constitute a Financing Asset (as defined in the Indenture, as in effect as of August 1, 2008) whether or not such asset constitutes Primary Collateral, to the extent (if any) that the grant of a security interest therein to secure the Hedge Obligations (as defined in the First Priority Security Agreement) in such asset would violate any provision of, or cause a default under, the Indenture.

Exempt Cash Reserve Account has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Financial Asset-Backed Security means a collateralized mortgage obligation, a collateralized bond obligation, a collateralized loan obligation or any other security the

-6-

Confidential

payments on which depend primarily on the cash flow from a specified pool of financial assets.

First Priority Collateral Agent has the meaning given to such term in the Intercreditor Agreement.

First Priority Security Agreement means the First Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of June 4, 2008, among RFC and GMAC Mortgage, as borrowers, and certain of their Affiliates as grantors thereunder, GMAC Inc., as agent for the lenders, and the First Priority Collateral Agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

Float Benefit means the net economic benefit resulting from investments of funds representing escrow and custodial deposits held for the account of a servicer relating to the mortgage loans.

General Intangibles means, with respect to any Grantor, all of such Grantor's "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Grantor's licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Governmental Authority means any nation or government, any state or other political subdivision thereof, any municipality and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government. Without limiting the generality of the foregoing, with respect to the United States, a "Governmental Authority" shall include any United States federal, state, county, municipal or other local governmental, judicial or regulatory authority, agency, arbitration board, body, commission, instrumentality, court or quasi-governmental authority or tribunal.

Hedge Obligations has the meaning given to such term in the First Priority Security Agreement.

Incremental Advance means an advance made by a Grantor (i) with respect to a construction loan facility or a construction project to complete, or maintain the value of, the related construction project or (ii) under a mezzanine or working capital loan facility under which such Grantor of such Incremental Advance has a legally binding commitment to make such advance.

Initial Collateral means assets of the Company and the Grantors that are listed on, or of a type described on, Schedule VI hereto and that exist on the Issue Date.

Intellectual Property means all past, present and future: trade secrets and other proprietary information; rights in customer lists; trademarks, service marks, business names, trade names, domain names, designs, logos, and/or other source and/or business identifiers and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world (including without limitation the trade name "DITECH");

-7-

Confidential

copyrights (including, without limitation, copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world; inventions (whether or not patentable); patent applications and patents; industrial designs, industrial design applications and registered industrial designs; rights in license agreements related to any of the Intellectual Property and income therefrom; the right to sue for all past, present and future infringements of any of the foregoing; all common law and other rights throughout the world in and to all of the foregoing; and the right to obtain all reissues, extensions or renewals of the foregoing.

Internal Revenue Code means the Internal Revenue Code of 1986, as amended.

Line of Credit Agreement means that certain Loan Agreement dated as of the Amendment Closing Date between GMAC Mortgage and RFC as borrowers and certain of their affiliates as guarantors, GMAC Inc., as initial lender and as lender agent and certain other financial institutions and persons from time to time party thereto as lenders; provided that if at any time such agreement shall cease to be in effect, references herein to the Line of Credit Agreement or terms defined therein shall be references to such agreement or terms as in effect immediately prior to the time at which such agreement ceased to be in effect.

LOC Mortgage Loans has the meaning given such term in clause (e) of the definition of Excluded Assets.

LOC Related Documents means the Line of Credit Agreement and all security documents, sale documents, licenses, service agreements and other agreements and documents to be execute and delivered by the Company and its Subsidiaries in connection with any of the foregoing.

Mexican Security Documents means the Stock Pledge Agreement to be executed by RFC for the benefit of the Collateral Control Agent whereby RFC pledges (i) shares, each with a par value of $1.00 (one Peso 00/100) legal currency of Mexico, representing the corporate capital stock of GMAC RFC Auritec, S.A., (ii) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100), representing a portion of the corporate capital stock of GMAC Hipotecaria, S.A. de C.V., S.F.O.L., and (iii) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100), representing a portion of the corporate capital stock of GMAC Financiera, S.A. de C.V., S.F.O.L. and any and all notices, certificates, agreements and other documents to be executed and delivered by RFC pursuant to the foregoing or otherwise in connection with the transactions contemplated by the Stock Pledge Agreement.

Mortgage Loan has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Amendment Closing Date.

Non-Tangible Collateral means, with respect to any Grantor, collectively, such portion of such Grantor's Collateral that constitutes Accounts, Chattel Paper, Deposit

-8-

Confidential

Accounts, Documents, General Intangibles, Payment Intangibles, Investment Property, Letter-of-Credit Rights, Letters of Credit and Supporting Obligations.

Note Issuance Facility Deed means the note issuance facility deed dated June 4, 2008 between, among others, Residential Capital, LLC and the UK SPE, as amended, amended and restated, supplemented or modified from time to time.

Notes Documents means the Indenture, the Notes, the Security Documents and all notices, certificates, financing statements, agreements and other documents to be executed and delivered by the Company or any other Grantor pursuant to the foregoing or otherwise in connection with the transactions contemplated by the Indenture.

Notes Parties means the Third Priority Collateral Agent, the Collateral Control Agent, the Trustee and the Holders

Obligations means any principal, interest, penalties, fees, indemnifications, reimbursements, damages, guarantees and other liabilities payable under the Notes (other than any Additional Notes except to the extent constituting Pari Passu Third Lien Indebtedness), the Indenture, this Agreement, any other Notes Document and any Pari Passu Third Lien Indebtedness Agreement, in each case, whether now or hereafter existing, renewed or restructured, whether or not from time to time decreased or extinguished and later increased, created or incurred, whether or not arising on or after the commencement of a case under Title 11, U.S. Code or any similar federal or state law for relief of debtors (including post-petition interest) and whether or not allowed or allowable as a claim in any such case; provided that no obligations in respect of any Pari Passu Third Lien Indebtedness Agreement (other than Additional Notes) shall constitute "Obligations" unless the Pari Passu Third Lien Indebtedness Agent for the holders of such Indebtedness has executed a Pari Passu Third Lien Indebtedness Joinder Agreement.

Pari Passu Third Lien Indebtedness Agent means the Person appointed or designated to act as trustee, agent or representative for the holders of Indebtedness under any Pari Passu Third Lien Indebtedness Agreement pursuant to the terms of such agreement.

Pari Passu Third Lien Indebtedness Agreement means the indenture, credit agreement or other agreement under which any Pari Passu Third Lien Indebtedness (other than Additional Notes) are incurred and any notes or other instruments representing such Pari Passu Third Lien Indebtedness.

Pari Passu Third Lien Indebtedness Joinder Agreement means an agreement substantially in the form of Attachment V hereto.

Pledged Interest Issuer means each Person identified in Item B of Attachment I hereto as the Pledged Interest Issuer.

Pledged Interests means all member interests, general or limited partnership interests or other ownership interests of any Pledged Interest Issuer described in Item B of Attachment I hereto, whether now existing or hereafter arising (other than Excluded

-9-

Confidential

Assets); all other member interests, general or limited partnership interests or other ownership interests issued by any Pledgor's Subsidiaries (other than Excluded Assets) that is hereafter from time to time pledged as Collateral under this Agreement by a Pledgor; all registrations, certificates, articles or agreements governing or representing any such interests; all options and other rights, contractual or otherwise, at any time existing with respect to such interests; all distributions, cash, instruments and other property now or hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such interests; and all proceeds of the foregoing.

Pledged Note Issuer means each Person identified in Item D of Attachment I hereto as the issuer of the Pledged Note identified opposite the name of such Person.

Pledged Note Lien means any and all liens or security interests securing the obligation of a Pledged Note Issuer evidenced by the applicable Pledged Note, and all collateral subject to such liens and security interests.

Pledged Notes means all of the promissory notes described in Item D of Attachment I hereto, and all other promissory notes of any Pledged Note Issuer, issued by a Pledged Note Issuer, as such promissory notes, in accordance with Section 12(j), are amended, restated, modified or supplemented from time to time; any promissory note of any Pledged Note Issuer taken in extension or renewal thereof or substitution therefor; all instruments or agreements governing or representing all or any of such notes; all rights, contractual or otherwise, at any time existing with respect to such notes; all distributions, cash, instruments and other property now or hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such notes; and all proceeds of the foregoing.

Pledged Property means all Pledged Interests, all Pledged Notes, all Pledged Shares, all other securities, all assignments of any amounts due or to become due, all other instruments which are now being delivered by any Pledgor to the Third Priority Collateral Agent, the First Priority Collateral Agent, the Second Priority Collateral Agent or the Collateral Control Agent or may from time to time hereafter be delivered by any Pledgor to the Third Priority Collateral Agent or the Collateral Control Agent for the purpose of pledge under this Agreement or any other Notes Document or Pari Passu Third Lien Indebtedness Agreement, and all proceeds of any of the foregoing.

Pledged Share Issuer means each Person identified in Item A of Attachment I hereto as the issuer of the Pledged Shares identified opposite the name of such Person.

Pledged Shares means all shares of capital stock of any Pledged Share Issuer, whether now existing or hereafter arising (other than Excluded Assets) and all other shares of capital stock of any direct Subsidiary of a Pledgor that is hereafter from time to time pledged as Collateral under this Agreement by a Pledgor; all registrations, certificates, articles, or agreements governing or representing any such interest; all options and other rights, contractual or otherwise, at any time existing with respect to all or any of such shares; all distributions, cash, instruments and other property now or

-10-

Confidential

hereafter received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares; and all proceeds of the foregoing.

Pledgor means the Company, any Guarantor or any Equity Pledgor.

Primary Collateral means Initial Collateral, REO Property acquired as the result of foreclosure on Primary Collateral, Reinvestment Collateral, any assets acquired as a result of exercising remedies under any Initial Collateral or Reinvestment Collateral that was designated as such prior to the Amendment Closing Date or Substitute Collateral, and all proceeds of the foregoing.

Property means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

Real Estate Security Documents has the meaning given to such term in the Senior Secured Credit Facility.

Reinvestment Collateral means additional Collateral or Supporting Assets provided pursuant to Section 4.10(b)(3) of the Indenture.

REO Property means real estate owned property (i.e., a mortgaged property acquired through foreclosure or deed in lieu of foreclosure).

Required Secured Parties means the holders of a majority in aggregate principal amount, voting as a single class, of (i) the Notes and (ii) any Indebtedness under Pari Passu Third Lien Agreements, in each case, excluding any holder of such Indebtedness whose vote is required to be disregarded under the Indenture or the applicable Pari Passu Third Lien Indebtedness Agreement.

Requirements of Law means, with respect to any Person or any of its property, the certificate of incorporation or articles of association and by-laws, certificate of limited partnership, limited partnership agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of any arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether federal, state or local (including, without limitation, usury laws, the Federal Truth in Lending Act and retail installment sales acts).

Sales Proceeds Accounts has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Second Priority Collateral Agent means Wells Fargo Bank, N.A. in its capacity as collateral agent under the security agreement for the Senior Secured Notes.

Secured Parties means the Third Priority Collateral Agent, the Trustee, the Holders, each Pari Passu Third Lien Indebtedness Agent and any holders of Obligations under any Pari Passu Third Lien Indebtedness Agreement.

-11-

Confidential

Servicing Contract means any agreement, whether titled a "servicing agreement," a "pooling and servicing agreement," a "sale and servicing agreement," or otherwise, pursuant to which any Grantor is obligated to perform collection, enforcement or foreclosure services with respect to, or to maintain and remit any funds collected from, persons obligated on any mortgage loan or pool of mortgage loans.

Servicing P&I Advance has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

Servicing Rights means all right, title and interest of the Company and Guarantors in, to and under any Servicing Contract, whether now or hereafter existing, acquired or created, whether or not yet accrued, earned, due or payable, as well as all other present and future right and interest under such Servicing Contract, including, without limitation, the right (i) to receive the servicing fee income payable (including without limitation, any uncollected fees), (ii) to receive reimbursement for any Advances, (iii) any and all Ancillary Income, (iv) to hold and administer the related escrow account balances, (v) to hold and administer, in accordance with the applicable Servicing Contract, the related principal and interest custodial account, the custodial file, and the mortgage file arising from or connected to the servicing of such mortgage loan and (vi) all proceeds, income, profits, rents and products of any of the foregoing.

Servicing T&I Advance has the meaning given to such term in the Senior Secured Credit Facility as in effect on the Issue Date.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, as used in Section 11 hereof, "UCC" shall mean the Uniform Commercial Code as in effect from time to time in any applicable jurisdiction.

UK Note means the notes issued to the Company from time to time by the UK SPE pursuant to the Note Issuance Facility Deed (there being only one note outstanding at any time).

UK Note Related Security means all Liens created in favor of the English Security Trustee by the UK SPE in connection with the issuance of the UK Note.

UK Pledged Shares means the UK Pledged Shares in each UK Pledged Shares Company which are held by Residential Funding Company, LLC and represented by the certificates listed in Item C of Attachment I hereto and which represent 65% of the UK Pledged Shares held by Residential Funding Company, LLC in the relevant UK Pledged Shares Company together with all other shares and other assets, including any moneys and other Derivative Rights (as defined in the English Security Documents) from time to time charged to the Third Priority Collateral Agent.

UK Pledged Shares Companies means:

(a)    GMAC-RFC Holdings Limited, a company incorporated in England and Wales (registered number 03471082) whose registered office is at

-12-

Confidential

Eastern Gate, Brants Bridge, Bracknell, Berkshire RG12 9BZ ("GMAC Holdings"); and

(b)    GMAC-RFC Europe Limited, a company incorporated in England and Wales (registered number 03987700) whose registered office is at Eastern Gate, Brants Bridge, Bracknell, Berkshire RG12 9BZ; ("GMAC Europe");

and UK Pledged Shares Company means any of them.

UK Third Priority Deed of Assignment means that certain Third Priority Deed of Assignment dated June 6, 2008 and entered into by and between the Company as Chargor and the Third Priority Collateral Agent.

UK SPE means Viaduct (No. 7) Limited.

2.    Grant of Security Interest by the Company and the Guarantors. As security for the prompt payment in full in cash and performance of all Obligations, the Company and each of the Guarantors and each other Grantor (other than a Grantor that is an Equity Pledgor, a FABS Grantor or an Additional Account Pledgor) hereby pledges to the Third Priority Collateral Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties in, all of the Company's, such Guarantor's or any such other Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Assets including, without limitation, all Financial Asset-Backed Securities, Servicing P&I Advances, Servicing T&I Advances, Mortgage Loans and Incremental Advances of a type specified in, or otherwise described in Schedule VI to this Agreement, and all other Property described in Schedule VI to this Agreement;

(b)    Accounts, including Health Care Insurance Receivables;

(c)    Chattel Paper, including Electronic Chattel Paper;

(d)    Commercial Tort Claims described on Schedule V hereto, as such schedule may be supplemented from time to time by any applicable Grantor in accordance with this Agreement;

(e)    Computer Hardware and Software and all rights with respect thereto, including, without limitation, any and all rights in licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing;

(f)    Deposit Accounts;

(g)    Documents;

-13-

Confidential

(h)    Financial Assets, including, without limitation, (A) all Deposit Accounts and Securities Accounts in which any Financial Assets are carried or credited, and all Investment Property (including all Security Entitlements), Instruments, Money, and other property on deposit therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited to such Deposit Accounts or Securities Accounts, (B) all agreements, contracts, documents and instruments evidencing, arising from, relating to or other otherwise delivered pursuant to or in connection with Financial Assets, (C) all cash and funds delivered to a Grantor (or its bailee or agent) in respect of such Financial Assets and any collateral securing the same, and (D) to the extent not included in the foregoing, all Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Payment Intangibles, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, and Money, consisting of, arising from, or relating to or delivered pursuant to, any of the foregoing;

(i)    General Intangibles (including, without limitation, all Payment Intangibles and all rights, titles and interests in the English Security Documents, the Dutch Security Documents and the Mexican Security Documents);

(j)    Goods (including, without limitation, all its Equipment, Fixtures and Inventory), together with all embedded software, accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor;

(k)    Instruments;

(l)    Intellectual Property;

(m)    (i) (A) all issued and outstanding shares of capital stock of each Pledged Share Issuer identified in Item A of Attachment I hereto, (B) all other Pledged Shares issued from time to time, (C) all Pledged Notes of each Pledged Note Issuer identified in Item D of Attachment I hereto (including, without limitation, the UK Note and the Dutch VFLN Note), (D) all other Pledged Notes issued from time to time, (E) all Pledged Note Liens, (F) all issued and outstanding member interests, general or limited partnership interests or other ownership interests of each Pledged Interest Issuer identified in Item B of Attachment I hereto, (G) all other Pledged Interests issued from time to time, (H) all other Pledged Property, whether now or hereafter delivered to the Third Priority Collateral Agent, the Collateral Control Agent, the First Priority Collateral Agent or the Second Priority Collateral Agent in connection with this Agreement, and (I) all Dividends, Distributions, interest, and other payments and rights with respect to any Pledged Property; (ii) all Sales Proceeds Accounts and all funds, properties and assets (including financial assets) deposited therein or carried in or credited thereto; and (iii) to the extent not included in the foregoing clause (m)(i), all other Investment Property (including, without limitation, Commodity Accounts, Commodity Contracts, Securities (whether Certificated Securities or Uncertificated Securities), Security Entitlements and Securities Accounts);

(n)    Letter-of-Credit Rights and Letters of Credit;

(o)    Money (of every jurisdiction whatsoever);

(p)    Dutch Assets;

-14-

1534209.04-New York Server 7A - MSW

Confidential

(q)    UK Pledged Shares and UK Note;

(r)    Supporting Obligations;

(s)    Servicing Rights and Servicing Contracts;

(t)    Investment Property; and

(u)    to the extent not included in the foregoing, all other personal assets and property of any kind or description;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to, any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing; provided that, notwithstanding the foregoing, the "Collateral" described in this Section 2 shall not include Excluded Assets.

To the extent any of the Collateral described in this Section 2 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the Company and each of the Guarantors and each other Grantor (other than a Grantor that is an Equity Pledgor, a FABS Grantor or an Additional Account Pledgor) hereby pledges to the Collateral Control Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Secured Parties in, all of each such Company's or Guarantor's or any such other Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

The Company agrees with the Third Priority Collateral Agent and undertakes to pledge or, as the case may be, to pledge in advance the Dutch VFLN Receivables and each of RFC and RFC Holdings agrees with the Third Priority Collateral Agent and undertakes to pledge or, as the case may be, to pledge in advance the respective Dutch Membership Interests.

3.    Grant of Security Interest by Equity Pledgors. As security for the prompt payment in full in cash and performance of all Obligations, each of the Equity Pledgors hereby pledges to the Third Priority Collateral Agent for the benefit of the Secured Parties, and grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties in, all of each such Equity Pledgor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Pledged Shares of each Pledged Share Issuer identified in Item A of Attachment I hereto;

(b)    all other Pledged Shares issued by any Pledged Share Issuer and pledged hereunder by any Equity Pledgor from time to time;

-15-

Confidential

(c)      all promissory notes, if any, of each Pledged Note Issuer identified in Item D of Attachment I hereto;

(d)      all other Pledged Notes, if any, issued by any Pledged Note Issuer from time to time;

(e)      all Pledged Note Liens, if any;

(f)      all Pledged Interests of each Pledged Interest Issuer identified in Item B of Attachment I hereto;

(g)      all other Pledged Interests issued by any Pledged Interest Issuer and pledged hereunder by any Equity Pledgor from time to time;

(h)      all Dividends, Distributions, interest, and other payments and rights with respect to any Pledged Shares or Pledged Interests;

(i)      all Deposit Accounts and all Property deposited or carried therein or credited thereto, and solely with respect to RAHI and PATI only to the extent related to any of the Property described in clauses (a) through (h) of this Section 3 or in which any of such Property (or proceeds of such Property) are deposited, carried or credited; and

(j)      all Securities Accounts and all Property (including all Investment Property and Financial Assets) deposited or carried therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited to such Securities Accounts, and solely with respect to RAHI and PATI only to the extent related to any of the Property described in clauses (a) through (h) of this Section 3 or in which any of such Property (or proceeds of such Property) are deposited, carried or credited;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to, any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing; provided that, notwithstanding the foregoing, the "Collateral" described in this Section 3 shall not include Excluded Assets.

To the extent any of the Collateral described in this Section 3 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the Equity Pledgors hereby pledges to the Collateral Control Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Secured Parties in, all of each such Equity Pledgor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

4.      Grant of Security Interest by FABS Grantors. As security for the prompt payment in full in cash and performance of all Obligations, each of the FABS Grantors hereby pledges to

-16-

Confidential

the Third Priority Collateral Agent for the benefit of the Secured Parties, and grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties, in all of each such FABS Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Financial Assets, including without limitation all Financial Asset-Backed Securities;

(b)    all Deposit Accounts and Securities Accounts in which any Financial Assets are carried or credited, and all Investment Property (including all Security Entitlements), Instruments, Money, and other Property on deposit or carried therein or credited thereto, and all permitted investments acquired with funds on deposit in or carried in or credited thereto, and in any event the Securities Accounts identified opposite such FABS Grantor's name on Schedule X hereto;

(c)    all agreements, contracts, documents and instruments evidencing, arising from, relating to or other otherwise delivered pursuant to or in connection with Financial Assets;

(d)    all cash and funds delivered to each FABS Grantor (or its bailee or agent) in respect of such Financial Assets and any collateral securing the same; and

(e)    to the extent not included in the foregoing, all Accounts, Chattel Paper, Deposit Accounts, Documents, General Intangibles, Payment Intangibles, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, and Money, consisting of, arising from, or relating to or delivered pursuant to, any of the foregoing;

together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, all claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing; provided that, notwithstanding the foregoing, the "Collateral" described in this Section 4 shall not include Excluded Assets.

To the extent any Collateral described in this Section 4 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the FABS Grantors hereby pledges to the Collateral Control Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Secured Parties in all of each such FABS Grantor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

5.    Grant of Security Interest by Additional Account Parties. As security for the prompt payment in full in cash and performance of all Obligations, each of the Additional Account Parties hereby pledges to the Third Priority Collateral Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties in, all of each such Additional Account Party's right,

-17-

Confidential

title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Deposit Accounts identified opposite such Additional Account Party's name on Schedule X hereto and in any Property deposited or carried therein or credited thereto; and

(b)    all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on and rights arising out of, any of the foregoing;

provided that, notwithstanding the foregoing, the "Collateral" described in this Section 5 shall not include Excluded Assets.

To the extent any Collateral described in this Section 5 constitutes Controlled Collateral, and as security for the prompt payment in full in cash and performance of all Obligations, each of the Additional Account Parties hereby pledges to the Collateral Control Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Collateral Control Agent for the benefit of the Secured Parties in all of each such Additional Account Party's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the Controlled Collateral.

6.    Third Priority Nature of Liens. Notwithstanding anything herein to the contrary, the lien and security interest granted to the Third Priority Collateral Agent pursuant to this Agreement and the exercise of any right or remedy by the Third Priority Collateral Agent hereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control. Notwithstanding anything herein to the contrary, prior to the Discharge of First Priority Claims and the Discharge of Second Priority Claims, (i) the requirements of this Agreement to endorse, sign or deliver or give "control" as to, Collateral or proceeds thereof, to the Third Priority Collateral Agent or the Collateral Control Agent shall be deemed satisfied by endorsement, assignment or delivery of or the giving of "control" to, such Collateral or proceeds to the First Priority Collateral Agent, Second Priority Collateral Agent or Collateral Control Agent (in each case, as bailee or agent for the Third Priority Collateral Agent) and (ii) any endorsement, assignment or delivery to the First Priority Collateral Agent, Second Priority Collateral Agent or Collateral Control Agent (in each case, as bailee or agent for the Third Priority Collateral Agent) shall be deemed an endorsement, assignment or delivery to the Third Priority Collateral Agent for all purposes hereunder.

7.    Representations and Warranties.

(a)    Each Grantor represents and warrants that:

(i)    no financing statement (other than any which may have been filed on behalf of the Third Priority Collateral Agent or in connection with Permitted Liens) covering any of the Collateral is on file in any public office;

(ii)    (1) such Grantor is and will be the lawful owner of all Collateral, free of all Liens and claims whatsoever, other than the security interest hereunder and Permitted Liens, with full power and authority to execute and deliver this Agreement and perform

-18-

Confidential

such Grantor's obligations hereunder, and to subject the Collateral to the security interest hereunder and (2) none of the Collateral of such Grantor that constitutes Primary Collateral is subject to any Liens securing Indebtedness for borrowed money other than Permitted Liens securing Permitted First Lien Indebtedness and the Junior Secured Notes on the Issue Date;

(iii)    all information with respect to the Collateral and Account Debtors set forth in any schedule, certificate or other writing at any time heretofore or hereafter furnished by such Grantor to the Third Priority Collateral Agent or any Secured Party is and will be true and correct in all material respects as of the date specified therein (or, if no date is so specified, as of the date furnished);

(iv)    such Grantor's true legal name as registered in the jurisdiction in which such Grantor is organized or incorporated, jurisdiction of organization or incorporation, federal employer identification number, organizational identification number, if any, as designated by the state of its organization, formation or incorporation, chief executive office and principal place of business are as set forth on Schedule I hereto (and such Grantor has not maintained its chief executive office and principal place of business at any other location at any time after January 1, 2003 except as otherwise disclosed in writing to the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent);

(v)    each other location where such Grantor maintains a place of business is set forth on Schedule II hereto or as otherwise disclosed in writing to the Third Priority Collateral Agent and , the Trustee and each Pari Passu Third Lien Indebtedness Agent;

(vi)    except as disclosed on Schedule III hereto, such Grantor is not now known and during the five years preceding the date hereof has not previously been known by any trade name;

(vii)    except as disclosed on Schedule III hereto, during the five years preceding the date hereof such Grantor has not been known by any legal name different from the one set forth on the signature page of this Agreement nor has such Grantor been the subject of any merger or other corporate reorganization;

(viii)    Schedule IV hereto contains a complete listing of all of such Grantor's material Intellectual Property which is subject to a registration;

(ix)    Schedule V hereto contains a complete listing of all of such Grantor's Commercial Tort Claims in excess of $10,000,000 in value;

(x)    Schedule VII hereto identifies all direct Subsidiaries of the Company, Guarantors and each Equity Pledgor;

(xi)    Schedule IX hereto lists all Bailment Collateral currently held by the Third Priority Collateral Agent, the Collateral Control Agent, the First Priority Collateral Agent or the Second Priority Collateral Agent as of the Amendment Closing Date, such Schedule IX to be updated at any time additional Bailment Collateral may be so delivered;

-19-

Confidential

(xii)     such Grantor is a corporation, limited partnership or limited liability company as specified in <u>Schedule I</u> hereto and is duly organized, validly existing and in good standing under the laws of the state of its incorporation, formation or organization;

(xiii)    the execution and delivery of this Agreement, the grant of the security interest, proxy and other rights granted herein and the performance by such Grantor of its obligations hereunder are within such Grantor's corporate, partnership or limited liability company powers, have been duly authorized by all necessary corporate, partnership or limited liability company action, have received all necessary governmental approvals (if any shall be required), and do not and will not contravene or conflict with any provision of law or of the charter or by-laws or other organizational documents of such Grantor or any judgment, order or decree, which is binding upon such Grantor and will not cause a breach, default or event of default under any agreement, indenture, instrument or other document to which such Grantor is a party;

(xiv)    this Agreement is a legal, valid and binding obligation of such Grantor, enforceable in accordance with its terms, except that the enforceability of this Agreement may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law);

(xv)     such Grantor has not performed any act which might prevent the Third Priority Collateral Agent from enforcing any of the terms of this Agreement or which could limit the Third Priority Collateral Agent in any such enforcement;

(xvi)    no Collateral is in the possession of any Person (other than such Grantor or a custodian, securities intermediary or account bank appointed by such Grantor) asserting any claim thereto or security interest therein (other than Permitted Liens), except that the Third Priority Collateral Agent or the Collateral Control Agent or their designee or agents may have possession of Collateral as contemplated pursuant to the Notes Documents;

(xvii)   this Agreement creates a valid security interest in the Collateral, securing the payment of the Obligations, and all filings and other actions necessary to perfect and protect such security interest have been duly taken and such security interest shall be a third priority security interest as to all Collateral (except (A) to the extent of actions to be taken post-closing, as described in Schedule 8.01(m) of the Senior Secured Credit Facility, and (B) for Permitted Liens);

(xviii)  in the case of any Pledged Shares constituting Collateral, all of such Pledged Shares are duly authorized and validly issued, fully paid, and non-assessable, and constitute all of the issued and outstanding shares of capital stock of each Pledged Share Issuer owned by the Pledgor set forth across from the name of such Pledged Share Issuer on <u>Attachment I</u> hereto, except as otherwise set forth thereon;

-20-

Confidential

(xix)    in the case of each Pledged Note and the Pledged Note Liens, all of such Pledged Notes and Pledged Note Liens, if any, have been duly authorized, executed, endorsed, issued and delivered, and are the legal, valid and binding obligation of the issuers thereof, and are not in default;

(xx)    in the case of any Pledged Interests constituting Collateral, such Pledged Interests constitute one hundred percent (100%) of the Pledgor's interest in the Pledged Interest Issuer (other than Excluded Assets) and the percentage of the total membership, partnership or other equity interests in the Pledged Interest Issuer indicated on Attachment I, except as otherwise set forth thereon. The Pledged Interests indicated on Attachment I are duly registered in the permanent ownership records of the respective Pledged Interests Issuer, and such registration is maintained in the principal office of such issuer. Such registration continues valid and genuine and has not been altered. All Pledged Interests have been duly authorized and validly issued, are fully paid and non-assessable, and were not issued in violation of the preemptive rights, if any, of any Person or of any agreement by which any Pledgor is bound. All documentary, stamp or other taxes or fees owing in connection with the registration, issuance, transfer or pledge of Collateral have been paid. No restrictions or conditions exist with respect to the registration, transfer, voting or pledge of any Pledged Interests (other than usual or customary securities laws or ERISA restrictions). All requisite formalities for the granting of a security interest in the Pledged Interests required pursuant to the organizational documents of the Pledgors or the Pledged Interest Issuer have been complied with on or prior to the execution and delivery of this Agreement. Each Pledgor represents that, as of the date hereof, none of the Pledged Interests is dealt with or traded on any securities exchange or in any securities market;

(xxi)    Schedule X attached hereto includes all of the Deposit Accounts and Securities Accounts that are, and that under the terms of the Senior Secured Credit Facility are required to be, subject to Account Control Agreements; and

(xxii)    the information set forth on Schedule XI hereto is true and correct in all material respects.

(b)    RFC represents and warrants, with respect to the UK Pledged Shares, that:

(i)    it is the sole legal and beneficial owner of the UK Pledged Shares free from all Liens other than Permitted Liens;

(ii)    the UK Pledged Shares are fully paid;

(iii)    there are no moneys or liabilities outstanding or payable in respect of the UK Pledged Shares or any of them;

(iv)    it is lawfully entitled to create the security over the UK Pledged Shares constituted by this Agreement in favor of the Third Priority Collateral Agent;

(v)    together the UK Pledged Shares constitute 65% of the issued share capital of each UK Pledge Shares Company; and

-21-

Confidential

(vi)    the UK Pledged Shares are fully transferable to the Third Priority
Collateral Agent (or any other Person as the Third Priority Collateral Agent shall direct)
without restriction and in particular in respect of any preemption rights or restrictions in
the articles of association of any UK Pledged Shares Company all appropriate waivers
have been obtained in respect of them from all other shareholders of that UK Pledged
Shares Company, which are unconditional, irrevocable and legally binding and
enforceable.

8.    Grantor Remains Liable; Nature of Security Interest; Subrogation, etc.

(a)    Anything herein to the contrary notwithstanding, (i) each Grantor shall remain
liable under the contracts and agreements included in the Collateral to the extent set forth therein,
and will perform all of its duties and obligations under such contracts and agreements to the
same extent as if this Agreement had not been executed, (ii) the exercise by the Third Priority
Collateral Agent of any of its rights hereunder shall not release any Grantor from any of its
duties or obligations under any such contracts or agreements included in the Collateral, and (iii)
neither the Third Priority Collateral Agent nor any other Secured Party shall have any obligation
or liability under any contracts or agreements included in the Collateral by reason of this
Agreement, nor shall the Third Priority Collateral Agent nor any other Secured Party be
obligated to perform any of the obligations or duties of any Grantor thereunder or to take any
action to collect or enforce any claim for payment assigned hereunder.

(b)    This Agreement shall in all respects be a continuing, absolute, unconditional and
irrevocable grant of security interest, and shall remain in full force and effect as set forth in
Section 16. All rights of the Secured Parties and the security interests granted to the Third
Priority Collateral Agent (for its benefit and the benefit of each other Secured Party) hereunder,
and all obligations of the Grantors hereunder, shall, in each case, be absolute, unconditional and
irrevocable irrespective of (i) any lack of validity, legality or enforceability of any Notes
Document or Pari Passu Third Lien Indebtedness Agreement, (ii) the failure of any Secured
Party (A) to assert any claim or demand or to enforce any right or remedy against any Grantor or
any other Person under the provisions of any Notes Document, Pari Passu Third Lien
Indebtedness Agreement or otherwise, or (B) to exercise any right or remedy against any other
guarantor of, or collateral securing, any Obligations, (iii) any change in the time, manner or place
of payment of, or in any other term of, all or any part of the Obligations, or any other extension,
compromise or renewal of any Obligations, (iv) any reduction, limitation, impairment or
termination of any Obligations (except until all Obligations have been paid in full in cash) for
any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall
not be subject to (and each Grantor hereby waives any right to or claim of) any defense or setoff,
counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality,
nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence
affecting, any Obligations or otherwise, (v) any amendment to, rescission, waiver, or other
modification of, or any consent to or departure from, any of the terms of any Notes Document or
Pari Passu Third Lien Indebtedness Agreement, (vi) any addition, exchange or release of any
Collateral of the Obligations, or any surrender or non-perfection of any Collateral, or any
amendment to or waiver or release or addition to, or consent to or departure from, any other
guaranty held by any Secured Party securing any of the Obligations, or (vii) any other

-22-

Confidential

circumstance which might otherwise constitute a defense available to, or a legal or equitable discharge of, any Grantor, any surety or any guarantor.

(c)     Until one year and one day after all Obligations have been paid in full in cash, each Grantor hereby irrevocably waives any claim or other rights which it may now or hereafter acquire against the Company or any other Grantor that arise from the existence, payment, performance or enforcement of such Grantor's obligations under this Agreement, any other Notes Document or Pari Passu Third Lien Indebtedness Agreement, including any right of subrogation, reimbursement, exoneration or indemnification, any right to participate in any claim or remedy of any Secured Party against the Company or any other Grantor or any Collateral which any Secured Party now has or hereafter acquires, whether or not such claim, remedy or right arises in equity, or under contract, statute or common law, including the right to take or receive from the Company or any Grantor, directly or indirectly, in cash or other property or by set-off or in any manner, payment or security on account of such claim or other rights. If any amount shall be paid to any Grantor in violation of the preceding sentence and the Obligations shall not have been indefeasibly paid in full in cash, then such amount shall be deemed to have been paid to such Grantor for the benefit of, and held in trust for, the Third Priority Collateral Agent (on behalf of the Secured Parties), and shall forthwith be paid to the Third Priority Collateral Agent to be credited and applied upon the Obligations, whether matured or unmatured. Each Grantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated by the Indenture and each Pari Passu Third Lien Indebtedness Agreement and that the waiver set forth in this Section 8(c) is knowingly made in contemplation of such benefits.

(d)     Except as otherwise provided in the Indenture or any Pari Passu Third Lien Indebtedness Agreement, if any Secured Party may, under applicable Requirements of Law, proceed to realize its benefits under this Agreement, the other Notes Documents or any Pari Passu Third Lien Indebtedness Agreement giving any Secured Party a lien upon any Collateral, either by judicial foreclosure or by non-judicial sale or enforcement, such Secured Party may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Agreement. If, in the exercise of any of its rights and remedies, any Secured Party shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Grantor or any other Person, whether because of any applicable Requirements of Law pertaining to "election of remedies" or the like, each Grantor hereby consents to such action by such Secured Party and waives any claim based upon such action, even if such action by such Secured Party shall result in a full or partial loss of any rights of subrogation that such Grantor might otherwise have had but for such action by such Secured Party.

9.     Collections, etc. Until such time during the existence of an Event of Default as the Third Priority Collateral Agent shall notify such Grantor of the revocation of such power and authority, each Grantor (a) will, at its own expense, endeavor to collect, as and when due, all amounts due under any of the Non-Tangible Collateral, including the taking of such action with respect to such collection as the Third Priority Collateral Agent may reasonably request or, in the absence of such request, as such Grantor may deem advisable; and (b) may grant, in the ordinary course of business, to any party obligated on any of the Non-Tangible Collateral, any rebate, refund or allowance to which such party may be lawfully entitled, and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to such Non-

-23-

Confidential

Tangible Collateral. The Third Priority Collateral Agent, however, may, at any time that an Event of Default has occurred and is continuing, whether before or after any revocation of such power and authority or the maturity of any of the Obligations, notify any party obligated on any of the Non-Tangible Collateral to make payment or otherwise render performance to or for the benefit of the Third Priority Collateral Agent and enforce, by suit or otherwise, the obligations of any such party obligated on any Non-Tangible Collateral. In connection therewith, the Third Priority Collateral Agent may surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby. Upon request of the Third Priority Collateral Agent following the occurrence and during the continuation of an Event of Default, each Grantor will, at its own expense, notify any party obligated on any of the Non-Tangible Collateral to make payment to the Third Priority Collateral Agent of any amounts due or to become due thereunder.

10.    Release. Collateral shall from time to time be released from the security interest created by this Agreement pursuant to and in accordance with the provisions of both the Indenture and each Pari Passu Third Lien Indebtedness Agreement. Upon any such release, the Trustee and the applicable Pari Passu Third Lien Indebtedness Agent will, at the Grantors' joint and several expense, cause the Third Priority Collateral Agent to deliver to the relevant Grantor, without any representations, warranties or recourse of any kind whatsoever, such released Collateral held by the Third Priority Collateral Agent or Collateral Control Agent hereunder, and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such release. With respect to any such release, the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent shall be entitled to rely conclusively upon an Officer's Certificate and an Opinion of Counsel delivered in connection with such release, which Officer's Certificate and an Opinion of Counsel shall be in the form of Attachments III and IV, respectively.

11.    Agreements of the Grantors.

(a)    Each Grantor:

(i)    will execute such financing statements (or any equivalent filings in the United Kingdom and the Netherlands) and other documents (and pay the cost of filing or recording the same in all public offices reasonably determined to be appropriate by the Third Priority Collateral Agent or the Trustee or any Pari Passu Third Lien Indebtedness Agent) and do such other acts and things (including, without limitation, delivery to the Third Priority Collateral Agent or the Collateral Control Agent of any Instruments and Certificated Securities which constitute Collateral), all as the Third Priority Collateral Agent or the Trustee or any Pari Passu Third Lien Indebtedness Agent may from time to time reasonably request, to establish and maintain a valid perfected security interest in the Collateral (free of all other liens, claims and rights of third parties whatsoever, other than Permitted Liens) to secure the payment of the Obligations (and each Grantor authorizes the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent to file, without limitation, any financing statement (or any equivalent filings in the United Kingdom and the Netherlands) that (i) indicates the Collateral (x) as "all property" or "all assets" of such Grantor or words of similar effect, regardless of

-24-

Confidential

whether any particular asset in the Collateral falls within the scope of Article 9 of the UCC of the jurisdiction wherein such financing statement is filed, or (y) as being of an equal or lesser scope or with greater detail, and (ii) contains any other information required by Section 5 of Article 9 of the UCC of the jurisdiction wherein such financing statement is filed regarding the sufficiency or filing office acceptance of any financing statement (or any equivalent filings in the United Kingdom and the Netherlands), including (x) whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor and (y) in the case of a financing statement (or any equivalent filings in the United Kingdom and the Netherlands) filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates; provided that, in any event, each Grantor shall take any such action, and any action listed in clauses (x) and (xi) below, for the benefit of the Third Priority Collateral Agent to the extent and at the time it is taking the same action for the benefit of the First Priority Collateral Agent or Second Priority Collateral Agent;

(ii)    will keep all its records regarding Collateral at, and will not maintain any place of business at any location other than, its address(es) shown on Schedules I and II hereto or at such other addresses of which such Grantor shall have given the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent not less than 30 days' prior written notice;

(iii)    will not change its state of organization or incorporation and will not change its name, identity or corporate structure or its organizational identification number for the state of its incorporation, formation or organization, in each case such that any financing statement filed to perfect the Third Priority Collateral Agent's interests under this Agreement would become seriously misleading, unless such Grantor shall have given the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent not less than 30 days' prior notice of such change (provided that this Section 11(a)(iii) shall not be deemed to authorize any change or transaction prohibited under the Indenture or any Pari Passu Third Lien Indebtedness Agreement) and shall have taken or will timely take all action necessary to maintain continued perfection and priority of the security interest created hereunder following such change;

(iv)    to the extent practicable, will keep its records concerning the Collateral in such a manner as will enable the Third Priority Collateral Agent or its designees to determine at any time the status of the Collateral;

(v)    to the extent practicable, will furnish the Third Priority Collateral Agent such information as is available to such Grantor concerning such Grantor, the Collateral and the Account Debtors as the Third Priority Collateral Agent may from time to time reasonably request;

(vi)    will permit the Third Priority Collateral Agent, the Trustee, each Pari Passu Third Lien Indebtedness Agent and their designees, from time to time, on reasonable notice and at reasonable times and intervals during normal business hours (or at any time without notice if a Default has occurred and is continuing) to inspect, audit

-25-

Confidential

and make copies of and extracts from all records and all other papers in the possession of such Grantor pertaining to the Collateral and the Account Debtors, and will, upon request of the Third Priority Collateral Agent during the existence of a Default and to the extent practicable, deliver to the Third Priority Collateral Agent all of such records and papers;

(vii)    will not sell, lease or assign any Collateral except as permitted by both the Notes Documents and each then extant Pari Passu Third Lien Indebtedness Agreement or create or permit to exist any Lien on any Collateral other than Permitted Liens;

(viii)    will at all times keep all of its Inventory and other Goods insured under policies maintained with reputable, financially sound insurance companies against loss, damage, theft and other risks to such extent as is customarily maintained by companies similarly situated, following the Discharge of First Priority Claims and Discharge of Second Priority Claims, and cause all such policies to provide that loss thereunder shall be payable to the Third Priority Collateral Agent as its interest may appear (it being understood that (A) so long as no Default shall be continuing, the Third Priority Collateral Agent shall deliver any proceeds of such insurance which may be received by it to such Grantor and (B) upon the occurrence and during the continuance of a Default shall be continuing, the Required Secured Parties may direct (in writing) the Third Priority Collateral Agent to apply any proceeds of such insurance which may be received by it toward payment of the Obligations, whether or not due, in such order of application as the Required Secured Parties may determine) and such policies or certificates thereof shall, if the Third Priority Collateral Agent so requests, be deposited with or furnished to the Third Priority Collateral Agent;

(ix)    will keep all of the Collateral granted by such Grantor, Deposit Accounts and Investment Property in the United States or at such other locations outside of the United States as may be specified in writing to the Trustee and each Pari Passu Third Lien Indebtedness Agent;

(x)    will promptly notify the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent in writing upon incurring or otherwise obtaining a Commercial Tort Claim which is claiming damages in excess of $10,000,000 (or any lesser amount specified in writing by the Trustee and each Pari Passu Third Lien Indebtedness Agent or the Third Priority Collateral Agent, if a Default has occurred and is continuing) after the date hereof against any third party, and concurrently therewith deliver to the Trustee, in form and substance satisfactory to the Trustee, a supplement to Schedule V sufficiently identifying such Commercial Tort Claim for purposes of Section 9-108 of the UCC;

(xi)    will promptly notify the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent in writing upon becoming the beneficiary under any letter of credit in excess of $10,000,000 (or any lesser amount specified in writing by the Required Secured Parties or the Third Priority Collateral Agent, if a Default has occurred and is continuing) and, at the request of the Third Priority Collateral Agent following the Discharge of First Priority Claims and Discharge of Second Priority Claims, pursuant to an agreement in form and substance satisfactory to the Third Priority

-26-

Confidential

Collateral Agent, either (A) arrange for the issuer and any confirmer or other nominated person of such letter of credit to consent to an assignment to the Third Priority Collateral Agent of such letter of credit or (B) arrange for the Third Priority Collateral Agent to become the transferee beneficiary of such letter of credit;

(xii)    will promptly notify the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent in writing if such Grantor holds or acquires an interest in any Electronic Chattel Paper and, at the request of the Third Priority Collateral Agent take such action as the Third Priority Collateral Agent or the Trustee or any Pari Passu Third Lien Indebtedness Agent may reasonably request to vest control, under Section 9-105 of the UCC, of such Electronic Chattel Paper in the Third Priority Collateral Agent or the Collateral Control Agent;

(xiii)    if any Grantor (i) obtains any rights to any additional Intellectual Property constituting Collateral which is registered with the United States Copyright Office or the United States Patent & Trademark Office or (ii) becomes entitled to the benefit of any additional Intellectual Property constituting Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property constituting Collateral which is registered with the United States Copyright Office or the United States Patent & Trademark Office, or any improvement on any Intellectual Property constituting Collateral which is registered with the United States Copyright Office or the United States Patent & Trademark Office, such Grantor will notify the Third Priority Collateral Agent in writing and use commercially reasonable efforts to cause a short form security agreement in favor of the Third Priority Collateral Agent to be filed in the United States Copyright Office or the Unites States Patent & Trademark Office, as the case may be, with respect to such Intellectual Property; provided that this covenant shall not apply to "off-the-shelf" license rights of any Grantor in any Intellectual Property or any other license rights that are not material to such Grantor;

(xiv)    acknowledges and agrees that it is not authorized to file any financing statement in favor of the Third Priority Collateral Agent without the prior written consent of the Third Priority Collateral Agent and that it will not do so without the prior written consent of the Third Priority Collateral Agent, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC;

(xv)    agrees that, in the event any Grantor takes any action to grant or perfect a Lien in favor of the First Priority Collateral Agent in any assets (other than the delivery of possessory Collateral or the grant of "control" over any Collateral to the Collateral Control Agent but including actions to perfect security interests under the laws of foreign jurisdictions), such Grantor shall also take such action to grant or perfect a Lien in favor of the Third Priority Collateral Agent to secure the Obligations;

(xvi)    will facilitate the realization of the Collateral and the exercise of all powers, authorities and discretions vested by this Agreement in the Third Priority Collateral Agent; and

-27-

Confidential

(xvii)   shall in particular promptly execute all transfers, conveyances, assignments and assurances which the Third Priority Collateral Agent may reasonably request in order to preserve or protect its interest in the Collateral.

Any expenses incurred in protecting, preserving or maintaining any Collateral shall be borne jointly and severally by the Grantors.  Upon the occurrence and during the continuation of an Event of Default, the Third Priority Collateral Agent shall have the right to bring suit to enforce any or all of the Intellectual Property or licenses thereunder, in which event the applicable Grantor shall at the request of the Third Priority Collateral Agent do any and all lawful acts and execute any and all proper documents reasonably requested by the Third Priority Collateral Agent, the Trustee or any Pari Passu Third Lien Indebtedness Agent in aid of such enforcement and such Grantor shall promptly, upon demand, reimburse and indemnify the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent for all costs and expenses incurred by either of them in the exercise of their rights under this Section 11. Notwithstanding the foregoing, the Third Priority Collateral Agent shall have no obligation or liability regarding the Collateral or any proceeds thereof by reason of, or arising out of, this Agreement.

(b)      Each of RFC and RFC Holding (i) shall execute a written declaration as referred to in clause 19.12 of the articles of association (*statuten*) of GMAC RFC International Holdings Coöperatief U.A. pursuant to which it terminates its membership (*lidmaatschap*) of GMAC RFC International Holdings Coöperatief U.A., subject to the occurrence of an Event of Default or the delivery of a notice in accordance with Section 6.02 of the Indenture or the delivery of a notice of acceleration with respect to any Pari Passu Third Lien Indebtedness and (ii) shall not revoke such written declaration or otherwise take any action that results in such written declaration being nullified or declared null and void.

(c)      The Company acknowledges and agrees that (a) it shall (1) not waive any rights under nor amend, novate, repudiate, rescind or otherwise terminate or permit to be terminated any Assigned Document without the prior written consent of the Third Priority Collateral Agent; (2) diligently pursue any remedies available to it for any breach of, or in respect of any claim in relation to, any Assigned Document; (3) deposit the UK Note and any UK Note Related Security issued in relation to a UK Note pursuant to Clause 8.2 (New Note Certificate) of the Note Issuance Facility Deed with the Third Priority Collateral Agent or Collateral Control Agent; and (4) procure that the UK SPE complies with its obligations under Clause 8.2 (New Note Certificate) of the Note Issuance Facility Deed, including, without limitation, granting a power of attorney in favor of the Third Priority Collateral Agent or Collateral Control Agent in a form set out in Schedule 9 to the Note Issuance Facility Deed; and (b) all payments received by it in connection with the UK Note, including the proceeds of any redemption of the UK Note whether as a result of a disposal of any assets or otherwise, shall be deposited into an account specified by the Third Priority Collateral Agent pursuant to the written direction of the Trustee from time to time.

12.      Agreement as to Investment Property; Voting.

(a)      All certificates or Instruments, if any, representing or evidencing any Primary Collateral, including any Pledged Property, shall be delivered to and held by or on behalf of (and,

-28-

Confidential

in the case of the Pledged Notes, endorsed to the order of) the Collateral Control Agent pursuant hereto, shall be in suitable form for transfer by delivery, and shall be accompanied by all necessary endorsements or instruments of transfer or assignment, duly executed in blank; provided that notes evidencing individual residential mortgage loans included in Primary Collateral need not be so delivered before September 15, 2008; and provided further that notes evidencing individual residential mortgage loans that are not included in Primary Collateral need not be so delivered.

(b)     To the extent any of its Primary Collateral constitutes a "certificated security" (as defined in Section 8-102(a)(4) of the UCC), each Grantor shall take such other actions as necessary to grant "control" (as defined in Section 8-106 of the UCC) to the Third Priority Collateral Agent or Collateral Control Agent over such Collateral.

(c)     To the extent any of its Primary Collateral constitutes an "uncertificated security" (as defined in Section 8-102(a)(18) of the UCC) with a Carrying Value of $10,000,000 or more, each Grantor shall take and cause the appropriate Person (including any issuer, entitlement holder or securities intermediary thereof) to take all actions necessary to grant "control" (as defined in Section 8-106 of the UCC) to the Collateral Control Agent over such Primary Collateral including, without limitation, causing delivery of such Primary Collateral or causing the issuer of such Primary Collateral, as appropriate, to agree to comply with the instructions originated by the Collateral Control Agent without further consent by the registered owner thereof.

(d)     To the extent any of its Primary Collateral constitutes a "security entitlement" or a "securities account" (as such terms are defined in Sections 8-102(a)(17) and 8-501(a), respectively, of the UCC), each Grantor shall take and cause the appropriate Person (including any securities intermediary thereof) to take all actions necessary to grant "control" (as defined in Section 8-106 of the UCC) to the Collateral Control Agent over such Primary Collateral including, without limitation, causing to be delivered to the Collateral Control Agent an agreement, executed by the securities intermediary thereof whereby such securities intermediary agrees (i) that it will comply with entitlement orders originated by the Collateral Control Agent without further consent by such Grantor or any other Person with respect to all such Primary Collateral (it being understood that such agreement may provide that at all times when such securities intermediary has not been notified by the Collateral Control Agent to the contrary, the securities intermediary may comply with entitlement orders of such Grantor), (ii) to subordinate any security interest it may have in and to all such Primary Collateral to the security interest of the Collateral Control Agent therein, and (iii) that it will not agree with any Person other than the Collateral Control Agent in any manner that would grant such Person "control" over any such Primary Collateral without the Required Secured Parties' prior written consent.

(e)     Each Pledgor will, from time to time upon the request of the Collateral Control Agent or the Third Priority Collateral Agent, promptly deliver to the Collateral Control Agent such stock powers, instruments, and similar documents, satisfactory in form and substance, following the Discharge of First Priority Claims and the Discharge of Second Priority Claims, to the Trustee and the Third Priority Collateral Agent, with respect to the Collateral as the Collateral Control Agent or the Third Priority Collateral Agent may reasonably request and will, from time to time upon the request of the Collateral Control Agent or the Third Priority

-29-

Confidential

Collateral Agent after the occurrence of any Default, promptly transfer any Pledged Shares, Pledged Interests or other shares of common stock, member interests or other ownership interests constituting Collateral into the name of any nominee, designated by the Trustee following the Discharge of First Priority Claims and Discharge of Second Priority Claims.

(f)    Subject to clause (g) below, each Pledgor will, at all times, keep pledged to the Third Priority Collateral Agent or Collateral Control Agent, as the case may be, pursuant to the Intercreditor Agreement, all Pledged Shares, Pledged Interests and all other shares of capital stock, member interests or other ownership interests constituting Collateral, and all securities, security entitlements and securities accounts constituting Collateral, Dividends and Distributions with respect thereto, all Pledged Notes, all interest, principal and other proceeds received by the Third Priority Collateral Agent with respect to the Pledged Notes, all Pledged Note Liens and all other Collateral and other securities, instruments, security entitlements, financial assets, investment property, proceeds, and rights from time to time received by or distributable to a Pledgor in respect of any Collateral.

(g)    In the event that any Dividend or Distribution is to be paid on any Pledged Share or any Pledged Interest or any payment of principal or interest is to be made on any Pledged Note at a time when no Event of Default has occurred and is continuing, such Dividend, Distribution or payment may be paid directly to the relevant Grantor. If any Event of Default has occurred and is continuing, then any such Dividend, Distribution or payment shall following the Discharge of First Priority Claims and Discharge of Second Priority Claims be paid directly to the Third Priority Collateral Agent in accordance with Section 12(h).

(h)    Following the Discharge of First Priority Claims and Discharge of Second Priority Claims, each Pledgor agrees:

(i)    following the occurrence and during the continuance of any Event of Default, promptly upon receipt thereof by any Pledgor and without any request therefor by the Third Priority Collateral Agent, to deliver (properly endorsed where required hereby or requested by the Third Priority Collateral Agent) to the Third Priority Collateral Agent all Dividends, Distributions, all interest, all principal, all other cash payments, and all proceeds of the Collateral, all of which shall be held by the Third Priority Collateral Agent as additional Collateral for use in accordance with Section 13(f); and

(ii)    after any Event of Default shall have occurred and be continuing and the Third Priority Collateral Agent has notified the relevant Pledgor of the Third Priority Collateral Agent's intention to exercise its voting power under this clause (ii), (A) the Third Priority Collateral Agent may exercise (to the exclusion of such Pledgor) the voting power and all other incidental rights of ownership with respect to any Pledged Shares, Pledged Interests or other shares of capital stock, member interests or other ownership interests constituting Collateral and EACH PLEDGOR HEREBY GRANTS THE THIRD PRIORITY COLLATERAL AGENT AN IRREVOCABLE PROXY, EXERCISABLE UNDER SUCH CIRCUMSTANCES, TO VOTE THE PLEDGED SHARES, THE PLEDGED INTERESTS AND SUCH OTHER COLLATERAL, WITH SUCH PROXY TO REMAIN VALID UNTIL THE PAYMENT IN FULL IN CASH OF

-30-

Confidential

ALL OBLIGATIONS; and (B) promptly to deliver to the Third Priority Collateral Agent such additional proxies and other documents as may be necessary to allow the Third Priority Collateral Agent to exercise such voting power.

(i)    All Dividends, Distributions, interest, principal, cash payments, and proceeds and all rights under the UK Note and the UK Note Related Security which may at any time and from time to time be held by a Pledgor but which such Pledgor is then obligated to deliver to the Third Priority Collateral Agent, shall, until delivery to the Third Priority Collateral Agent, be held by such Pledgor separate and apart from its other property in trust for the Third Priority Collateral Agent. The Third Priority Collateral Agent agrees that unless it has received written notice from the Required Secured Parties that an Event of Default shall have occurred and be continuing and the Third Priority Collateral Agent shall have given the notice referred to in Section 12(h)(ii), such Pledgor shall have the exclusive voting power with respect to any shares of capital stock, member interests or other ownership interest (including any of the Pledged Shares, Pledged Interests or UK Pledged Shares) constituting Collateral and the Third Priority Collateral Agent shall, upon the written request of such Pledgor, promptly deliver (at the Grantors' joint and several expense) such proxies and other documents, if any, as shall be reasonably requested by such Pledgor which are necessary to allow such Pledgor to exercise voting power with respect to any such share of capital stock, member interests or other ownership interests (including any of the Pledged Shares, Pledged Interests or UK Pledged Shares) constituting Collateral; provided, however, that no vote shall be cast, or consent, waiver, or ratification given, or action taken by any Pledgor that could reasonably be expected to be adverse in any material respect to the interests of the Third Priority Collateral Agent and the other Secured Parties or be inconsistent with or violate any provision of the Indenture, any other Notes Document (including this Agreement) or any Pari Passu Third Lien Indebtednesss Agreement.

(j)    No Pledgor will, without the prior written consent of the Trustee and each Pari Passu Third Lien Indebtedness Agent: (A) enter into any agreement amending, supplementing, or waiving in any material respect any provision of any Pledged Note, any Pledged Note Lien or any UK Pledged Share (including the underlying instrument pursuant to which such Pledged Note, Pledged Note Lien or UK Pledged Share is issued) or compromising or releasing or extending the time for payment of any obligation of the maker thereof, (B) take or omit to take any action the taking or the omission of that would result in any impairment or alteration of any obligation of the maker of Pledged Note, Pledged Note Lien, UK Pledged Share or other instrument constituting Collateral, (C) permit the issuance of (x) any additional equity interests of any Pledged Share Issuer or Pledged Interest Issuer (unless immediately upon such issuance the same are pledged and delivered to the Third Priority Collateral Agent, the Collateral Control Agent, the First Priority Collateral Agent or the Second Priority Collateral Agent pursuant to the terms hereof and the Intercreditor Agreement to the extent necessary to give the Third Priority Collateral Agent a security interest after such issue in at least the same percentage of such Pledgor's outstanding interests as before such issue), (y) any securities or other ownership interests convertible voluntarily by the holder thereof or automatically upon the occurrence or non-occurrence of any event or condition into, or exchangeable for, any such shares or other ownership interests, or (z) any warrants, options, contracts or other commitments entitling any Person to purchase or otherwise acquire any such shares or other ownership interests, or (D) enter into any agreement creating or otherwise permit to exist, any restriction or condition upon the transfer, voting or control of any Pledged Share, Pledged Interest or UK Pledged Share that

-31-

Confidential

could reasonably be deemed to be adverse to the Secured Parties. Each Pledgor shall provide, or cause the relevant Pledged Share Issuer or Pledged Interest Issuer to provide, the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent with a copy of any amendment or supplement to, or modification or waiver of, any term or provision of any of the organizational documents of such relevant Pledged Share Issuer or Pledged Interest Issuer; provided that such Pledgor shall not enter into any such amendment, supplement, modification or waiver of the organizational documents of such relevant Pledged Share Issuer or Pledged Interest Issuer which could reasonably be expected to be adverse to the interests of the Secured Parties. The Pledgors covenant and agree that they shall not consent to or permit (1) any Pledged Interest to be dealt with or traded on any securities exchanges or in any securities market or (2) any Pledge Interest Issuer to elect to have its Pledged Interests treated as a "security" under Article 8 of the UCC unless the relevant Pledgors have (I) caused such Pledged Interest to be certificated and (II) delivered all certificates evidencing such Pledged Interest to the Collateral Control Agent, together with duly executed undated blank transfer powers, or other equivalent instruments of transfer.

(k)     Each Pledgor shall take such actions such that its Collateral consisting of Pledged Interests and Pledged Shares at all times shall be duly authorized, validly registered, fully paid and non-assessable, and shall not be registered in violation of the organic documents of the Pledgors or the preemptive rights of any Person, if any, or of any agreement by which the Pledgors or any Pledged Share Issuer or Pledged Interest Issuer is bound.

13.    Defaults and Events of Default; Remedies.

(a)     Each Grantor hereby irrevocably appoints the Third Priority Collateral Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time, upon the occurrence and during the continuation of an Event of Default, to take any action and to execute any instrument which the Third Priority Collateral Agent may request to accomplish the purposes of this Agreement, including (i) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (ii) to receive, endorse, and collect any drafts or other Collateral in connection with clause (i) above, (iii) to file any claims or take any action or institute any proceedings which the Third Priority Collateral Agent may request for the collection of any of the Collateral or otherwise to enforce the rights of the Third Priority Collateral Agent and the other Secured Parties with respect to any of the Collateral, and (iv) to perform the affirmative obligations of such Grantor hereunder. **EACH GRANTOR HEREBY ACKNOWLEDGES, CONSENTS AND AGREES THAT THE POWER OF ATTORNEY GRANTED PURSUANT TO THIS SECTION 13 IS IRREVOCABLE AND COUPLED WITH AN INTEREST AND SHALL BE EFFECTIVE UNTIL ALL OBLIGATIONS HAVE BEEN PAID IN FULL IN CASH.**

(b)     If an Event of Default shall have occurred and be continuing, in addition to its rights in the foregoing clause (a) and without limiting the generality of such clause, the Third Priority Collateral Agent may exercise from time to time any rights and remedies available to it under the UCC, under any other applicable Requirements of Law and in the clauses (c) through (g) set forth below in this Section 13.

-32-

Confidential

(c)    Each Grantor agrees, (i) at the Trustee or any Pari Passu Third Lien Indebtedness Agent's request if a Default has occurred and is continuing, to assemble, at its expense, all its Inventory and other Goods (other than Fixtures) and all records for all Collateral at a convenient place or places acceptable to the Required Secured Parties, and (ii) if an Event of Default has occurred and is continuing, at the Third Priority Collateral Agent's or Required Secured Parties' request, to execute all such documents and do all such other things which may be necessary or desirable in order to enable the Third Priority Collateral Agent or its nominee to be registered as owner of the Intellectual Property with any competent registration authority.

(d)    Notice of the intended disposition of any Collateral may be given by first-class mail, hand-delivery (through a delivery service or otherwise), facsimile or E-mail, and shall be deemed to have been "sent" upon deposit in the U.S. mails with adequate postage properly affixed, upon delivery to an express delivery service, upon the electronic submission through telephonic services or, if by facsimile transmission, when sent against mechanical confirmation of successful transmission, as applicable. Each Grantor hereby agrees and acknowledges that: (i) with respect to Collateral that is (A) perishable or threatens to decline speedily in value or (B) is of a type customarily sold on a recognized market, no notice of disposition need be given; and (ii) with respect to Collateral not described in clause (i) above, notification sent after default and at least ten days before any proposed disposition provides notice within a reasonable time before disposition.

(e)    Each Grantor hereby agrees and acknowledges that a commercially reasonable disposition of Inventory, Equipment, Computer Hardware and Software, or Intellectual Property may be by lease or license of, in addition to the sale of, such Collateral. Each Grantor further agrees and acknowledges that a disposition (i) made in the usual manner on any recognized market, (ii) at the price current in any recognized market at the time of disposition or (iii) in conformity with reasonable commercial practices among dealers in the type of property subject to the disposition shall, in each case, be deemed commercially reasonable.

(f)    Any cash proceeds of any disposition by the Third Priority Collateral Agent of any of the Collateral shall be applied by the Third Priority Collateral Agent first to payment of the Third Priority Collateral Agent's and Collateral Control Agent's fees and expenses in connection with the Collateral, including, without limitation, attorneys' fees and legal expenses, second without duplication of amounts applied pursuant to clause first above, to the indefeasible payment in full in cash, pro rata, based on the amount of Obligations outstanding under the Indenture and each Pari Passu Third Lien Indebtedness Agreement and then due and owing to (i) the Trustee to be applied as provided in the Indenture, and (ii) each Pari Passu Third Lien Indebtedness Agent to be applied as provided in the applicable Pari Passu Third Lien Indebtedness Agreement; and, the balance, if any, to such Grantor or as otherwise directed by a court of competent jurisdiction. Neither the Third Priority Collateral Agent nor any other Secured Party need apply or pay over for application noncash proceeds of collection and enforcement unless (i) the failure to do so would be commercially unreasonable and (ii) the applicable Grantor has provided the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent with a written demand to apply or pay over such noncash proceeds on such basis. To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against the Third Priority Collateral Agent arising out of the exercise by the Third Priority Collateral Agent of any rights hereunder.

-33-

Confidential

(g)     [Reserved].

(h)     If any Event of Default has occurred and is continuing, the Third Priority Collateral Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral) and also may, without notice except as specified below (or, if notice cannot be waived under the UCC, as required to be provided by the UCC) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Third Priority Collateral Agent's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Third Priority Collateral Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' prior notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Third Priority Collateral Agent shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Third Priority Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(i)     If any Event of Default has occurred and is continuing, the Third Priority Collateral Agent may transfer all or any part of the Collateral into the name of the Third Priority Collateral Agent or its nominee, with or without disclosing that such Collateral is subject to the lien and security interest hereunder, notify the parties obligated on any of the Collateral to make payment to the Third Priority Collateral Agent of any amount due or to become due thereunder, enforce collection of any of the Collateral by suit or otherwise, and surrender, release or exchange all or any part thereof, or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, endorse any checks, drafts, or other writings in any Grantor's name to allow collection of the Collateral, take control of any proceeds of the Collateral, and execute (in the name, place and stead of each Grantor) endorsements, assignments, transfer powers and other instruments of conveyance or transfer with respect to all or any of the Collateral.

(j)     Each Grantor agrees that in any sale of any of the Collateral whenever an Event of Default shall have occurred and be continuing, the Third Priority Collateral Agent is hereby authorized to comply with any limitation or restriction in connection with such sale as it may be advised by counsel is necessary in order to avoid any violation of applicable Requirements of Law (including compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any governmental regulatory authority or official, and each Grantor further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner, nor shall the Third Priority Collateral Agent be liable nor accountable to the Grantors for any discount allowed by the reason of the fact that such Collateral is sold in compliance with any such limitation or restriction. The Third Priority Collateral Agent may sell the Collateral without giving any warranties or representations

-34-

1534209.04-New York Server 7A - MSW

Confidential

as to the Collateral.  The Third Priority Collateral Agent may disclaim any warranties of title or the like.  This procedure will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

14.    Limitation on Duty in Respect of Collateral.  Beyond the exercise of reasonable care in the custody and preservation thereof, neither the Third Priority Collateral Agent nor any other Secured Party will have any duty as to any Collateral in its possession or control or in the possession or control of any sub-agent or bailee or any income therefrom or as to the preservation of rights against prior parties or any other rights pertaining thereto.  The Third Priority Collateral Agent will be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession or control if such Collateral is accorded treatment substantially equal to that which it accords similar property held for third parties, and will not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of any act or omission of any sub-agent or bailee selected by the Third Priority Collateral Agent in good faith or by reason of any act or omission by the Third Priority Collateral Agent pursuant to instructions from the Trustee, except to the extent that such liability arises from the Third Priority Collateral Agent's gross negligence or willful misconduct.

To the extent that applicable law imposes duties on the Third Priority Collateral Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is commercially reasonable for the Third Priority Collateral Agent (a) to fail to incur expenses reasonably deemed significant by the Required Secured Parties or to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantors, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, including, without limitation, any warranties of title, (k) to purchase insurance or credit enhancements to insure the Third Priority Collateral Agent against risks of loss, collection or disposition of Collateral, or to provide to the Third Priority Collateral Agent a guaranteed return from the collection or disposition of Collateral or (l) to obtain the services of brokers, investment bankers, consultants and other professionals to assist the Third Priority Collateral Agent in the collection or disposition of any of the Collateral.  Each Grantor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by the Third Priority Collateral Agent would not be commercially unreasonable in the Third Priority Collateral Agent's exercise of remedies against the Collateral

-35-

1534209.04-New York Server 7A - MSW

Confidential

and that other actions or omissions by the Third Priority Collateral Agent shall not be deemed commercially unreasonable solely on account of not being specifically referred to in this Section. Without limitation upon the foregoing, nothing contained in this Section shall be construed to grant any right to a Grantor or to impose any duties on the Third Priority Collateral Agent that would not have been granted or imposed by this Agreement or by applicable Requirements of Law in the absence of this Section.

15.    Special Provisions Relating to the Third Priority Collateral Agent. The following provisions shall govern the Third Priority Collateral Agent's rights, powers, obligations and duties under this Agreement, notwithstanding anything herein to the contrary:

(a)    The Third Priority Collateral Agent shall have no duty to act, consent or request any action of the Grantors or any other Person in connection with this Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy (including all schedules and exhibits attached hereto) unless the Third Priority Collateral Agent shall have received written direction from the Trustee and/or other Pari Passu Third Lien Indebtedness Agents, in each case, acting on behalf of the Required Secured Parties.

(b)    All indemnities to be paid under this Agreement shall be payable immediately when due in U.S. dollars ("Dollars") in the full amount due, without deduction for any variation in any Rate of Exchange (as defined below). The Grantors hereby agree to jointly and severally indemnify the Third Priority Collateral Agent against any losses, damages, penalties, costs, expenses or disbursements of any kind or nature whatsoever, including, without limitation, attorney's fees and expenses, incurred by the Third Priority Collateral Agent as a result of any judgment or order being given or made for the amount due hereunder and such judgment or order being expressed and paid in a currency (the "Judgment Currency") other than Dollars and as a result of any variation as between (i) the rate of exchange at which the dollar amount is converted into Judgment Currency for the purpose of such judgment or order, and (ii) the Rate of Exchange at which the Third Priority Collateral Agent is then able to purchase Dollars with the amount of the Judgment Currency actually received by the Third Priority Collateral Agent. The indemnity set forth in this paragraph shall constitute a separate and independent obligation of the Grantors and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "Rate of Exchange" means the rate at which the Third Priority Collateral Agent is able to purchase Dollars with the Judgment Currency on the foreign exchange market on the relevant date and shall include any premiums and other reasonable costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency. The indemnification set forth in this Section 15 shall survive the termination or assignment of this Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy and the resignation or removal of the Third Priority Collateral Agent.

(c)    For the avoidance of doubt, if there is any inconsistency between the terms of this Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy and those of the Intercreditor Agreement, the terms of the Intercreditor Agreement shall prevail.

(d)    Each of the Trustee, the Holders, each Pari Passu Third Lien Indebtedness Agent and each holder of Pari Passu Third Lien Indebtedness hereby designate and appoint Wells Fargo Bank, N.A. to act as the Third Priority Collateral Agent under this Agreement, the other Notes

-36-

Confidential

Documents and any Pari Passu Third Lien Indebtedness Agreement to which it is a party, and hereby authorize the Third Priority Collateral Agent to take such actions on its behalf under the provisions of this Agreement, such other Notes Documents and each Pari Passu Third Lien Indebtedness Agreement and to exercise such powers and perform such duties as are expressly delegated to the Third Priority Collateral Agent by the terms of this Agreement, such other Notes Documents and each Pari Passu Third Lien Indebtedness Agreement. Notwithstanding any provision to the contrary elsewhere in this Agreement, any other Notes Document or any such Pari Passu Third Lien Indebtedness Agreement, the Third Priority Collateral Agent shall not have any duties or responsibilities, except those expressly set forth in this Agreement, such other Notes Documents and each such Pari Passu Third Lien Indebtedness Agreement or any fiduciary relationship with the Secured Parties, and no implied covenants, functions or responsibilities shall be read into this Agreement or otherwise exist against the Third Priority Collateral Agent.

(e)    The trustee agrees to render to the Third Priority Collateral Agent, at any time upon request of the Third Priority Collateral Agent, an accounting of the amounts of the Obligations owing to the Holders and such other information with respect to the Obligations owing to each such Person as the Third Priority Collateral Agent may reasonably request in order to give effect to the terms and conditions of this Agreement. In the event that the Trustee fails to provide any information required to be provided by it to the Third Priority Collateral Agent, then the Third Priority Collateral Agent may (but shall not be obligated to) (i) take such actions as are required to be taken by it based on the most recent information available to it or (ii) in the case of any distributions to be made pursuant to the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, hold the Holders' share or purported share in escrow (without obligation to pay interest thereon) until the Trustee provides the required information.

(f)    Notwithstanding anything herein to the contrary, in no event shall the Third Priority Collateral Agent have any obligation to inquire or investigate as to the correctness, veracity, or content of any instruction received from the Trustee or any Pari Passu Third Lien Indebtedness Agent on behalf of the Required Secured Parties. In no event shall the Third Priority Collateral Agent have any liability in respect of any such instruction received by it and relied on with respect to any action or omission taken pursuant thereto.

(g)    The Third Priority Collateral Agent may execute any of its duties under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement by or through agents, experts or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Third Priority Collateral Agent shall not be responsible for the negligence or misconduct of any agents, experts or attorneys-in-fact selected by it in good faith.

(h)    Neither the Third Priority Collateral Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it under or in connection with this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement (except for its gross negligence or willful misconduct), or (ii) responsible in any manner to any Secured Party for any recitals, statements, representations or warranties (other than its own recitals, statements, representations or warranties) made in this Agreement, any of the Notes Documents or Pari Passu Third Lien Indebtedness Agreement or in any certificate, report, statement or other

-37-

1534209.04-New York Server 7A - MSW

Confidential

document referred to or provided for in, or received by the Third Priority Collateral Agent under or in connection with, this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or for any failure of the Grantors or any other Person to perform their obligations hereunder and thereunder. The Third Priority Collateral Agent shall not be under any obligation to any Secured Party or any other Person to ascertain or to inquire as to (i) the observance or performance of any of the agreements contained in, or conditions of, this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or to inspect the properties, books or records of the Grantors, (ii) whether or not any representation or warranty made by any Person in connection with this Agreement, any Notes Document or any Pari Passu Third Lien Indebtedness Agreement is true, (iii) the performance by any Person of its obligations under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or (iv) the breach of or default by any Person of its obligations under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement.

(i)     The Third Priority Collateral Agent shall not be bound to (i) account to any Person for any sum or the profit element of any sum received for its own account; (ii) disclose to any other Person any information relating to the Person if such disclosure would, or might, constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person; (iii) be under any fiduciary duties or obligations other than those for which express provision is made in this Agreement, in any of the Notes Documents or in any Pari Passu Third Lien Indebtedness Agreement to which it is a party; or (iv) be required to take any action that it believes, based on advice of counsel, is in conflict with any applicable law, this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, or any order of any court or administrative agency.

(j)     Beyond the exercise of reasonable care in the custody thereof and except as otherwise specifically stated in this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, the Third Priority Collateral Agent shall have no duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or as to preservation of rights against prior parties or any other rights pertaining thereto.

(k)     The Third Priority Collateral Agent shall be authorized to but shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or monitoring or maintaining the perfection of any security interest in the Collateral. It is expressly agreed, to the maximum extent permitted by applicable law, that the Third Priority Collateral Agent shall have no responsibility for (i) taking any necessary steps to preserve rights against any Person with respect to any Collateral or (ii) taking any action to protect against any diminution in value of the Collateral, but, in each case (A) subject to the requirement that the Third Priority Collateral Agent may not act or omit to take any action if such act or omission would constitute gross negligence, bad faith or willful misconduct and (B) the Third Priority Collateral Agent may do so and all expenses reasonably incurred in connection therewith shall be part of the Obligations.

-38-

Confidential

(l)    The Third Priority Collateral Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Third Priority Collateral Agent in good faith, except to the extent of the Third Priority Collateral Agent's gross negligence, bad faith or willful misconduct.

(m)    The Third Priority Collateral Agent shall not be responsible for, nor incur any liability with respect to, (i) the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the security interest in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Third Priority Collateral Agent, (ii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iii) the validity of the title of the Grantors to the Collateral, (iv) insuring the Collateral or (v) the payment of taxes, charges or assessments upon the Collateral or otherwise as to the maintenance of the Collateral.

(n)    Notwithstanding anything in this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement to the contrary, (i) in no event shall the Third Priority Collateral Agent or any officer, director, employee, representative or agent of the Third Priority Collateral Agent be liable under or in connection with this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits or loss of opportunity, whether or not foreseeable, even if the Third Priority Collateral Agent has been advised of the possibility thereof and regardless of the form of action in which such damages are sought; and (ii) the Third Priority Collateral Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the Notes Documents and each Pari Passu Third Lien Indebtedness Agreement to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such Notes Document or Pari Passu Third Lien Indebtedness Agreement, as applicable.  In no event shall the Third Priority Collateral Agent be obligated to invest any amounts received by it hereunder.

(o)    The Third Priority Collateral Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any note, writing, resolution, request, direction, certificate, notice, consent, affidavit, letter, cablegram, telegram, telecopy, email, telex or teletype message, statement, order or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and/or upon advice and/or statements of legal counsel, independent accountants and other experts selected by the Third Priority Collateral Agent and need not investigate any fact or matter stated in any such document.  Any such statement of legal counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in accordance therewith.  Any statement or advice of counsel may be based, insofar as it relates to factual matters, upon a certificate of an officer of the Trustee.  In connection with any request or direction of the Trustee, the Third Priority Collateral Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any instruction delivered by the Trustee.  The

-39-

Confidential

Third Priority Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement (i) if such action would, in the reasonable opinion of the Third Priority Collateral Agent (which may be based on the opinion of legal counsel), be contrary to applicable law, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, (ii) if such action is not specifically provided for in this Agreement or any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, (iii) if, in connection with the taking of any such action hereunder or under any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement that would constitute an exercise of remedies hereunder, under any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement it shall not first be indemnified to its satisfaction by the Trustee and/or Holders against any and all risk of nonpayment, liability and expense that may be incurred by it, its agents or its counsel by reason of taking or continuing to take any such action, or (iv) if, notwithstanding anything to the contrary contained in this Agreement, in connection with the taking of any such action that would constitute a payment due under any agreement or document, it shall not first have received from the Trustee and/or Holders or the Grantors funds equal to the amount payable.  The Third Priority Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement in accordance with a request of the Trustee, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the other Secured Parties.

(p)     If, with respect to a proposed action to be taken by it, a Third Priority Collateral Agent shall determine in good faith that the provisions of this Agreement, any other Notes Document or any Pari Passu Third Lien Indebtedness Agreement relating to the functions or responsibilities or discretionary powers of the Third Priority Collateral Agent are or may be ambiguous or inconsistent, the Third Priority Collateral Agent shall notify the Trustee and each Pari Passu Third Lien Indebtedness Agent, identifying the proposed action, and may decline either to perform such function or responsibility or to take the action requested unless it has received the written confirmation of the Trustee and each Pari Passu Third Lien Indebtedness Agent that the action proposed to be taken by the Third Priority Collateral Agent is consistent with the terms of this Agreement, the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or is otherwise appropriate.  The Third Priority Collateral Agent shall be fully protected in acting or refraining from acting upon the confirmation of the Trustee or any Pari Passu Third Lien Indebtedness Agent on behalf of the Required Secured Parties, in this respect, and such confirmation shall be binding upon the Secured Parties.

(q)     The Third Priority Collateral Agent shall not be deemed to have actual, constructive, direct or indirect knowledge or notice of the occurrence of any Default unless and until the Third Priority Collateral Agent has received a written notice or a certificate from the Trustee, any Pari Passu Third Lien Indebtedness Agent or the Grantors stating that a Default has occurred.  The Third Priority Collateral Agent shall have no obligation whatsoever either prior to or after receiving such notice or certificate to inquire whether a Default has in fact occurred and shall be entitled to rely conclusively, and shall be fully protected in so relying, on any notice or certificate so furnished to it.  No provision of this Agreement, the Intercreditor Agreement or any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement shall require the Third Priority Collateral Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Agreement, any of the Notes

-40-

Confidential

Documents, under any Pari Passu Third Lien Indebtedness Agreement or the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability including an advance of moneys necessary to perform work or to take the action requested is not reasonably assured to it, the Third Priority Collateral Agent may decline to act unless it receives indemnity satisfactory to it in its sole discretion, including an advance of moneys necessary to take the action requested. The Third Priority Collateral Agent shall be under no obligation or duty to take any action under this Agreement, any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement or otherwise if taking such action (i) would subject the Third Priority Collateral Agent to a tax in any jurisdiction where it is not then subject to a tax or (ii) would require the Third Priority Collateral Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(r)    Notwithstanding that the Third Priority Collateral Agent is appointed by and acting for and at the direction of the Secured Parties, the Grantors will jointly and severally pay upon demand to the Third Priority Collateral Agent the amount of any and all reasonable fees (including any as set forth in one or more separate fee letters of the Third Priority Collateral Agent) and out-of-pocket expenses, including the reasonable fees and expenses of its counsel, that the Third Priority Collateral Agent may incur in connection with (i) the negotiation, performance or administration of this Agreement, the Notes Documents and each Pari Passu Third Lien Indebtedness Agreement to which it is a party, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement (whether through negotiations, legal proceedings or otherwise) of any of the rights of the Third Priority Collateral Agent or the other Secured Parties hereunder, under the Notes Documents or under any Pari Passu Third Lien Indebtedness Agreement or (iv) the failure by the Grantors to perform or observe any of the provisions hereof or of any of the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement. The provisions of this section shall survive the termination of this Agreement and resignation or removal of the Third Priority Collateral Agent. The expenses of the Third Priority Collateral Agent incurred in connection with actions undertaken as provided in this Section 15 shall be payable jointly and severally by the Grantors to the Third Priority Collateral Agent upon demand therefor (which demand shall be accompanied by an appropriate invoice).

(s)    Each of the Secured Parties expressly acknowledges that neither the Third Priority Collateral Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it (except as expressly provided herein) and that no act by the Third Priority Collateral Agent hereafter taken, including any review of the Grantors, shall be deemed to constitute any representation or warranty by the Third Priority Collateral Agent to any Secured Party. The Trustee and the Holders represent to the Third Priority Collateral Agent that it has, independently and without reliance upon the Third Priority Collateral Agent or any other Secured Party, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Grantors. The Trustee and the Holders also represent that each will, independently and without reliance upon the Third Priority Collateral Agent or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems

1534209.04-New York Server 7A - MSW

Confidential

necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Grantors. Except for notices, reports and other documents expressly required to be furnished to the Secured Parties by the Third Priority Collateral Agent hereunder, the Third Priority Collateral Agent shall not have any duty or responsibility to provide any Secured Party with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of the Grantors which may come into the possession of the Third Priority Collateral Agent or any of its officers, directors, employees, agents or attorneys-in-fact.

(t)     The Grantors, jointly and severally, agree to indemnify each of the Third Priority Collateral Agent and its officers, directors, employees, agents or attorneys-in-fact (collectively, the "Indemnified Parties") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorneys' fees and expenses) or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against any Indemnified Party in any way relating to or arising out of this Agreement, the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement; provided that the Grantors shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent that any of the foregoing result from any such Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction beyond all applicable appeals.

(u)     Subject to clause (bb) below, neither the Third Priority Collateral Agent, any Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Grantors or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. Subject to clause (bb) below, the powers conferred on the Third Priority Collateral Agent hereunder are solely to protect the Third Priority Collateral Agent's and the Secured Parties' interests in the Collateral and shall not impose any duty upon the Third Priority Collateral Agent to exercise any such powers. The Third Priority Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Grantors for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

(v)     Pursuant to any applicable law, the Grantors authorize the Third Priority Collateral Agent without obligation to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signatures of the Grantors in such form and in such offices as the Trustee or any Pari Passu Third Lien Indebtedness Agent determines appropriate to perfect the security interests of the Third Priority Collateral Agent under this Agreement. The Grantors hereby ratify and authorize the filing by the Third Priority Collateral Agent of any financing statement with respect to the Collateral made prior to the date hereof. Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, in no event shall the Third Priority Collateral Agent have any duty or obligation to monitor the perfection, continuation of perfection or the sufficiency or validity of

-42-

Confidential

any security interest in or related to the Collateral or to prepare or file any Uniform Commercial Code financing statement or continuation statement.

(w)    The Grantors acknowledge that the rights and responsibilities of the Third Priority Collateral Agent under this Agreement with respect to any action taken by the Third Priority Collateral Agent or the exercise or non-exercise by the Third Priority Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Third Priority Collateral Agent and the Secured Parties, be governed by such agreements with respect thereto as may exist from time to time among them, but, as between the Third Priority Collateral Agent and the Grantors, the Third Priority Collateral Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and the Grantors shall not be under any obligation, or entitlement, to make any inquiry respecting such authority.

(x)    Any corporation into which the Third Priority Collateral Agent may be merged, or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Third Priority Collateral Agent shall be a party, shall become a Third Priority Collateral Agent under this Agreement without the execution or filing of any paper or any further act on the part of the parties hereto.

(y)    The Third Priority Collateral Agent may resign as Third Priority Collateral Agent at any time upon written notice to the Trustee, each Pari Passu Third Lien Indebtedness Agent and the Grantors and may be removed at any time with or without cause by the Trustee and/or any Pari Passu Third Lien Indebtedness Agent in each case acting on behalf of the Required Secured Parties, with any such resignation or removal to become effective only upon the appointment of a successor Third Priority Collateral Agent under this Section. If the Third Priority Collateral Agent shall provide notice of its resignation or be removed as Third Priority Collateral Agent, then the Required Secured Parties (and if no such successor shall have been appointed within 45 days of the Third Priority Collateral Agent's resignation or removal, the Third Priority Collateral Agent may) appoint a successor agent for the Secured Parties, which successor agent shall, in the case of any appointment by the Third Priority Collateral Agent, be reasonably acceptable to the Trustee and/or any Pari Passu Third Lien Indebtedness Agent in each case acting on behalf of the Required Secured Parties, and the former Third Priority Collateral Agent's rights, powers and duties as Third Priority Collateral Agent shall be terminated, without any other or further act or deed on the part of such former Third Priority Collateral Agent (except that the resigning Third Priority Collateral Agent at the joint and several expense of the Grantors shall deliver all Collateral then in its possession to the successor Third Priority Collateral Agent and shall execute and deliver to the successor Third Priority Collateral Agent such instruments of assignment and transfer and other similar documents as such successor Third Priority Collateral Agent shall deem necessary or advisable) or any of the Secured Parties. After any retiring Third Priority Collateral Agent's resignation or removal hereunder as Third Priority Collateral Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Third Priority Collateral Agent. In the event that a successor Third Priority Collateral Agent is not appointed within the time period specified in this Section 15 following the provision of a notice of resignation or removal of the Third Priority Collateral Agent, the Third Priority Collateral Agent or any

-43-

Confidential

Secured Party may petition a court of competent jurisdiction for the appointment of a successor Third Priority Collateral Agent (at the joint and several expense of the Grantors).

(z)     The Third Priority Collateral Agent shall maintain accurate and complete accounts, books, records and computer systems with respect to all matters related directly to the administration of the Collateral, in each case consistent with the customary procedures of the Third Priority Collateral Agent.

(aa)     The Third Priority Collateral Agent shall at the Grantors' joint and several expense make available to the Trustee, each Pari Passu Third Lien Indebtedness Agent and their duly authorized representatives, attorneys and auditors, the files and accounts, books, records and computer systems maintained by the Third Priority Collateral Agent or any subcontractor or agent thereof in respect of the Collateral at the locations where such files, accounts, books, records and computer systems are maintained pursuant to this Agreement and the other Notes Documents and any Pari Passu Third Lien Indebtedness Agreement, during normal business hours and subject to reasonable prior written notice.

(bb)     Upon receipt of indemnity requested by the Third Priority Collateral Agent and assuming the requested action does not conflict with other clauses of this Section 15, the Third Priority Collateral Agent shall act upon the specific instructions of the Trustee or any Pari Passu Third Lien Indebtedness Agent on behalf of the Required Secured Parties, except for any instructions that in the good faith judgment of the Third Priority Collateral Agent may be contrary to any Security Document or applicable law.

For the sake of clarity, the parties intend that the term "Notes Documents" includes all English Security Documents and Account Control Agreements (as defined in the Senior Secured Credit Facility as in effect on the Issue Date).

16.     Special Provisions Relating to the Collateral Control Agent.  The Collateral Control Agent shall be entitled to all of the same rights, protections, immunities and indemnities under this Agreement as are afforded to it under the Intercreditor Agreement, as if fully set forth herein.

17.     General.

For the avoidance of doubt, only the Trustee or any Pari Passu Third Lien Indebtedness Agent on behalf of the Required Secured Parties are entitled to direct the Collateral Control Agent to act, consent or request any action in connection with this Agreement.

With respect to each Subsidiary that becomes a Guarantor pursuant to Section 4.17 of the Indenture or as otherwise required by the Notes Documents or any Pari Passu Third Lien Indebtedness Agreement, the Grantors shall and at the option of the relevant Grantor, with respect to any Subsidiary that is not a Grantor, a Grantor may, cause such Subsidiary to become a Grantor hereunder, and such Subsidiary shall execute and deliver to the Third Priority Collateral Agent (with a copy to the Trustee, each Pari Passu Third Lien Indebtedness Agent and the Collateral Control Agent) a joinder agreement substantially in the form of Attachment II (each a "Joinder Agreement") and such Subsidiary shall thereafter for all purposes be a party hereto and have the same rights and obligations as a Grantor party hereto on the Issue Date.

-44-

Confidential

Each Grantor agrees that a carbon, photographic or other reproduction of this Agreement is sufficient as a financing statement. The Grantors hereby ratify their authorization contained in Section 11(a) for the Third Priority Collateral Agent to have filed in any Uniform Commercial Code jurisdiction prior to the date hereof any financing statement or amendment thereto filed prior to the date hereof.

All notices hereunder shall be in writing (including facsimile transmission) and shall be sent, in the case of any Grantor, to the address of such Grantor shown in Schedule I hereto and, in the case of the Third Priority Collateral Agent, at its address set forth beneath its signature page hereto, or to such other address as such party may, by written notice received by the other parties, have designated as its address for such purpose. Notices sent by facsimile transmission or e-mail shall be deemed to have been given when sent against mechanical confirmation of successful transmission; notices sent by mail shall be deemed to have been given three Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery or overnight courier shall be deemed to have been given when received.

Each of the Grantors agrees to pay, jointly and severally, all fees and expenses, including attorneys' fees paid or incurred by the Third Priority Collateral Agent, the Trustee or any Pari Passu Third Lien Indebtedness Agent in endeavoring to collect all or any portion of the Obligations, or any part thereof, and in enforcing this Agreement against such Grantor, and all such fees and expenses shall constitute Obligations.

No delay on the part of the Third Priority Collateral Agent in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by the Third Priority Collateral Agent of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

This Agreement shall remain in full force and effect until both (i) occurrence of the earlier of (a) the discharge of the Indenture pursuant to Article XI thereof and (b) the satisfaction of the conditions in Article XIII of the Indenture with respect to a Legal Defeasance or Covenant Defeasance of the Indenture and (ii) in the case of each Pari Passu Third Lien Indebtedness Agreement, the repayment of the Pari Passu Third Lien Indebtedness under such agreement which entitles the Grantors to obtain a release of the Liens securing such Pari Passu Third Lien Indebtedness under the Security Documents. If at any time all or any part of any payment theretofore applied by the Third Priority Collateral Agent or any Secured Party to any of the Obligations is or must be rescinded or returned by the Third Priority Collateral Agent or such Secured Party for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of any Grantor), such Obligations shall, for the purposes of this Agreement, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by the Third Priority Collateral Agent or such Secured Party, and this Agreement shall continue to be effective or be reinstated, as the case may be, as to such Obligations, all as though such application by the Third Priority Collateral Agent or such Secured Party had not been made.

Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Requirements of Law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be

-45-

Confidential

ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Consistent with the foregoing, and notwithstanding any other provision of this Agreement to the contrary, in the event that any action or proceeding is brought in whatever form and in whatever forum seeking to invalidate any Grantor's obligations under this Agreement under any fraudulent conveyance, fraudulent transfer theory, or similar avoidance theory, whether under state or federal law, such Grantor (the "Affected Person"), automatically and without any further action being required of such Affected Person or any Secured Party, shall be liable under this Agreement only for an amount equal to the maximum amount of liability that could have been incurred under applicable law by such Affected Person under any pledge to secure the Obligations (or any portion thereof) at the time of the execution and delivery of this Agreement (or, if such date is determined not to be the appropriate date for determining the enforceability of such Affected Person's obligations hereunder for fraudulent conveyance or transfer (or similar avoidance) purposes, on the date determined to be so appropriate) without rendering such a hypothetical pledge voidable under applicable Requirements of Law relating to fraudulent conveyance, fraudulent transfer, or any other grounds for avoidance (such highest amount determined hereunder being any such Affected Person's "Maximum Amount"), and not for any greater amount, as if the stated amount of this Pledge Agreement as to such Affected Person had instead been the Maximum Amount. This paragraph is intended solely to preserve the rights of Secured Parties under this Agreement to the maximum extent not subject to avoidance under applicable Requirements of Law, and neither any Affected Person nor any other person or entity shall have any right or claim under this Section with respect to the limitation described in this Agreement, except to the extent necessary so that the obligations of any Affected Person under this Agreement shall not be rendered voidable under applicable Requirements of Law. Without limiting the generality of the foregoing, the determination of a Maximum Amount for any Affected Person pursuant to the provisions of the second preceding sentence of this Section shall not in any manner reduce or otherwise affect the obligations of any other Grantor (including any other Affected Person) under the provisions of this Agreement.

This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until both (1) the occurrence of the earlier of (a) the discharge of the Indenture pursuant to Article XI thereof and (b) the satisfaction of the conditions in Article XIII of the Indenture with respect to a Legal Defeasance or Covenant Defeasance of the Indenture and (2) in the case of each Pari Passu Third Lien Indebtedness Agreement, the repayment of the Pari Passu Third Lien Indebtedness under such agreement which entitles the Grantors to obtain a release of the Liens securing such Pari Passu Third Lien Indebtedness under the Security Documents, (b) be binding upon each Grantor and its successors, transferees and assigns, and (c) inure, together with the rights and remedies of the Third Priority Collateral Agent hereunder, to the benefit of the Third Priority Collateral Agent and each other Secured Party and its respective successors, transferees and assigns. No Grantor may assign (unless otherwise permitted under the terms of the Notes Documents and any extant Pari Passu Third Lien Indebtedness Agreement) any of its obligations hereunder without the prior written consent of the Trustee and each Pari Passu Third Lien Indebtedness Agent.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement. At any

-46-

Confidential

time after the date of this Agreement, one or more additional Persons may become parties hereto by executing and delivering to the Third Priority Collateral Agent a counterpart of this Agreement together with supplements to the Schedules hereto setting forth all relevant information with respect to such party as of the date of such delivery. Immediately upon such execution and delivery (and without any further action), each such additional Person will become a party to, and will be bound by all the terms of, this Agreement.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).

EACH PARTY HEREBY REPRESENTS AND WARRANTS THAT IT HAS NO RIGHT TO IMMUNITY FROM THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT OR FROM EXECUTION OF ANY JUDGMENT OR FROM THE EXECUTION OR ENFORCEMENT THEREIN OF ANY ARBITRATION DECISION IN RESPECT OF ANY SUIT, ACTION, PROCEEDING OR ANY OTHER MATTER ARISING OUT OF OR RELATING TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND TO THE EXTENT THAT ANY PARTY IS OR BECOMES ENTITLED TO ANY SUCH IMMUNITY WITH RESPECT TO THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT, AND TO THE EXTENT PERMITTED BY LAW, IT DOES HEREBY AND WILL IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO PLEAD OR CLAIM ANY SUCH IMMUNITY WITH RESPECT TO ITS OBLIGATIONS OR ANY OTHER MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT

-47-

Confidential

**REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.**

**EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, the holders of Obligations and their respective successors and permitted assignees; provided that the Trustee shall enforce this Agreement on behalf of all holders of Obligations.

This Agreement is a Notes Documents and a Third Priority Security Document (as defined in the Intercreditor Agreement) and may only be amended, waived or otherwise modified by written agreement with the prior written consent of the Grantors, the Trustee, each Pari Passu Third Lien Indebtedness Agent and the Third Priority Collateral Agent subject to the provisions of Article IX of the Indenture and the requirements of any Pari Passu Third Lien Indebtedness Agreement; provided, however, that this Agreement may be supplemented by Joinder Agreements duly executed by the Third Priority Collateral Agent, the Collateral Control Agent, the Trustee and each Grantor directly affected thereby and by updates or supplements to any Schedules, Attachments or Annexes hereto delivered in accordance with this Agreement.

18.     Amendment and Restatement. This Agreement amends and restates in its entirety the Original Security Agreement. This amendment and restatement of the Original Security Agreement shall not effectuate a novation, release or extinguishment of the obligations or security interests outstanding under the Original Security Agreement, the Indenture or any other Security Document (other than any security interest that may have attached on or prior to the date hereof to the LOC Mortgage Loans), but rather are an amendment and restatement of certain terms governing such obligations and security interests. As of date hereof, each reference in the Notes Documents to the "Security Agreement" shall mean this Agreement, as amended, restated or modified from time to time.

19.     Foreign Pledge Agreements.

(a)     Notwithstanding anything to the contrary contained herein or in any other Notes Document or any Pari Passu Third Lien Indebtedness Agreement, in the event that any Collateral is also pledged to the Third Priority Collateral Agent to secure the Obligations by any Grantor pursuant to any security, pledge or similar agreement governed by foreign law (a "Foreign Pledge Agreement") and the provisions of such Foreign Pledge Agreement conflict with the provisions of this Agreement, the applicable Grantor shall comply with the provisions of such Foreign Pledge Agreement and shall not be deemed to have breached any representation or covenant contained herein or in any other Notes Document or any Pari Passu Third Lien Indebtedness Agreement as a result thereof.

-48-

Confidential

(b)     If Supporting Assets with respect to the Dutch VFLN Receivables or the UK Note are transferred at a time when (x) the fair market value of such Supporting Assets is less than (y) the Carrying Value thereof as of the Issue Date (the difference between such amounts beings the "Adjustment Amount"); the Company shall be entitled, following consultation with the Trustee, to reduce the outstanding principal balance of the Dutch VFLN Receivables or the UK Note, as applicable, by the Adjustment Amount; provided that such transfer complies with the applicable requirements of the Indenture and each then extant Pari Passu Third Lien Indebtedness Agreement.

20.     Pari Passu Third Lien Indebtedness.

On or after the Issue Date, the Company may from time to time designate additional obligations as Pari Passu Third Lien Indebtedness by delivering to the Third Priority Collateral Agent, the Trustee and each Pari Passu Third Lien Indebtedness Agent (a) a certificate signed by the chief financial officer of the Company (i) identifying the obligations so designated and the aggregate principal amount or face amount thereof, stating that such obligations are designated as "Pari Passu Third Lien Indebtedness" for purposes hereof, (ii) representing that such designation complies with the terms of the Indenture and each then extant Pari Passu Third Lien Indebtedness Agreement, (iii) specifying the name and address of the Pari Passu Third Lien Indebtedness Agent for such obligations (if other than the Trustee) and (iv) stating that the Grantors have complied with their obligations under Sections 11 and 12; (b) except in the case of Additional Notes, a fully executed Pari Passu Third Lien Indebtedness Joinder Agreement; and (c) an Opinion of Counsel to the effect that the designation of such obligations as "Pari Passu Third Lien Indebtedness" does not violate the terms of the Indenture and each then extant Pari Passu Third Lien Indebtedness Agreement (upon which the Third Priority Collateral Agent and the Trustee may conclusively and exclusively rely).

21.     Intercreditor Matters.

By accepting the benefits of this Agreement, the other Security Documents and any Pari Passu Third Lien Indebtedness Agreement, as applicable, each Secured Party agrees that it is bound by the terms of the Intercreditor Agreement applicable to such Secured Party. Each of the Secured Parties acknowledges and agrees that notwithstanding the date, time or creation of any Liens securing any of the Obligations under the Security Agreement or the Security Documents, the Obligations shall be equally and ratably secured by the Liens of the Security Agreement and the Security Documents and all Liens securing any of the Obligations (and any proceeds received from the enforcement of any such Liens) shall be for the equal and ratable benefit of all Secured Parties shall be applied as provided in Section 13(f). Each Secured Party, by its acceptance of the benefits hereunder and of the Security Documents, hereby agrees for the benefit of the other Secured Parties that, to the extent any additional or substitute collateral for any of the Obligations is delivered by a Grantor to or for the benefit of any Secured Party, such collateral shall be subject to the provisions of this Section 20. Each of the Secured Parties hereby agrees not to challenge or question in any proceeding the validity or enforceability of any Security Document (in each case as a whole or any term or provision contained therein) or the validity of any Lien or financing statement in favor of the Third Priority Collateral Agent for the benefit of the Secured Parties as provided in the Security Agreement and the other Security Documents, or the relative priority of any such Lien. Subject to the Third Priority Collateral Agent's rights

-49-

Confidential

under Section 15, the Required Secured Parties may direct the Third Priority Collateral Agent in exercising any remedy available to the Third Priority Collateral Agent under this Agreement or any Security Document.  In the absence of any such instruction, the Third Priority Collateral Agent may (but shall be under no obligation to) exercise such rights and remedies in any manner that complies with Section 15.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

-50-

1534209.04-New York Server 7A - MSW

Confidential

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

*Grantors (other than Additional Account Parties)*

RESIDENTIAL FUNDING COMPANY, LLC
GMAC MORTGAGE, LLC
RESIDENTIAL CAPITAL, LLC
HOMECOMINGS FINANCIAL, LLC
GMAC-RFC HOLDING COMPANY, LLC
GMAC RESIDENTIAL HOLDING COMPANY, LLC
GMAC MODEL HOME FINANCE I, LLC
DEVELOPERS OF HIDDEN SPRINGS, LLC
DOA HOLDING PROPERTIES, LLC
EQUITY INVESTMENT IV, LLC
RFC ASSET HOLDINGS II, LLC
PASSIVE ASSET TRANSACTIONS, LLC

By: _____
Name:   Michelle Switzer
Title:    Assistant Treasurer

*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

Confidential

RFC CONSTRUCTION FUNDING LLC

By: _____

Name: Michelle Switzer

Title: Authorized Person

*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

*Additional Account Parties*

RESIDENTIAL MORTGAGE REAL ESTATE HOLDINGS, LLC
RESIDENTIAL FUNDING REAL ESTATE HOLDINGS, LLC
HOMECOMINGS FINANCIAL REAL ESTATE
HOLDINGS, LLC
AMERILAND, LLC

BY:    REG-PFH, LLC,
           its sole member

REG-PFH, LLC
HOME CONNECTS LENDING SERVICES, LLC
GMACR MORTGAGE PRODUCTS, LLC
DITECH, LLC
RESIDENTIAL CONSUMER SERVICES, LLC
GMAC MORTGAGE USA CORPORATION
RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.
RFC ASSET MANAGEMENT, LLC
RFC SFJV-2002, LLC

By:    RFC ASSET MANAGEMENT, LLC,
           its sole member

RCSFJV2004, LLC

By:    RFC ASSET MANAGEMENT, LLC,
           its sole member

By: _____
Name:  Michelle Switzer
Title:    Assistant Treasurer

*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

Confidential

U.S. Bank National Association,
as Trustee

By: _____
Name:
Title:    Richard Prokosch
          Vice President

*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

Confidential

WELLS FARGO BANK, N.A.,
as Third Priority Collateral Agent

By: _____

Name:
Title:          Michael Pinzon
                Vice President


WELLS FARGO BANK, N.A.,
as Collateral Control Agent

By: _____

Name:
Title:          Michael Pinzon
                Vice President


*[SIGNATURE PAGE – THIRD PRIORITY PLEDGE AND SECURITY AGREEMENT AND IRREVOCABLE PROXY]*

12/29/2009   3:14PM (GMT-07:00)

Confidential

# EXHIBIT D

## AFI Revolver Loan Agreement

T215

EXECUTION COPY

AMENDED AND RESTATED LOAN AGREEMENT


by and among


RESIDENTIAL FUNDING COMPANY, LLC,
as Borrower,


GMAC MORTGAGE, LLC,
as Borrower,


RESIDENTIAL CAPITAL, LLC AND CERTAIN OTHER
AFFILIATES OF THE BORROWERS,
as Guarantors,


Certain Affiliates of the Borrowers and the Guarantors
party hereto as Obligors,


GMAC Inc.,


as Initial Lender and as Lender Agent


and


Certain Other Financial Institutions and Persons from
time to time party hereto as Lenders


Dated as of December 30, 2009


**(Senior Debt Loan Agreement)**


5254280.33 08048307

## TABLE OF CONTENTS

**Page**

ARTICLE I           DEFINITIONS AND ACCOUNTING MATTERS ........................... 1

Section 1.01.        Definitions; Construction ...................................................... 1
Section 1.02.        Accounting Matters ............................................................. 2

ARTICLE II          COMMITMENTS, LOANS, BORROWING, PREPAYMENT ......... 2

Section 2.01.        Loans .................................................................................. 2
Section 2.02.        Note .................................................................................... 2
Section 2.03.        Permanent Paydowns .......................................................... 3
Section 2.04.        Borrowing Base ................................................................... 3
Section 2.05.        Interest ................................................................................ 4
Section 2.06.        [Reserved] .......................................................................... 4
Section 2.07.        Alternate Rate of Interest; Increased Costs ............................ 5
Section 2.08.        Mandatory Repayment of Loans ........................................... 6
Section 2.09.        Optional Prepayment ........................................................... 7
Section 2.10.        Termination of Commitments and Reduction of
                    Aggregate Commitment Amount ........................................... 8

ARTICLE III        PAYMENTS; COMPUTATIONS; TAXES; EXPENSES ................. 8

Section 3.01.        Payments and Computations, Etc .......................................... 8
Section 3.02.        Taxes ................................................................................ 10
Section 3.03.        Fees and Expenses ............................................................. 13
Section 3.04.        Setoff ................................................................................ 13

ARTICLE IV        ACCOUNTS AND COLLECTIONS ............................................. 13

Section 4.01.        Concentration Accounts ...................................................... 13
Section 4.02.        Sales Proceeds Accounts ..................................................... 13
Section 4.03.        Collections Deposited to Collection Accounts ...................... 14
Section 4.04.        Withdrawals from Designated Accounts; Account
                    Notices .............................................................................. 15
Section 4.05.        Cash and Cash Equivalents .................................................. 15

ARTICLE V          CONDITIONS PRECEDENT ...................................................... 15

Section 5.01.        Conditions Precedent to Effectiveness ................................. 15

ARTICLE VI        REPRESENTATIONS AND WARRANTIES ................................. 15

Section 6.01.        Representations and Warranties of the Obligors .................. 15

ARTICLE VII       COVENANTS ......................................................................... 20

Section 7.01.        Affirmative Covenants of the Obligors ................................. 20
Section 7.02.        Negative Covenants of the Obligors ..................................... 28
Section 7.03.        Notice of Certain Occurrences ............................................. 32

Confidential

**TABLE OF CONTENTS**
(continued)

Page

| ARTICLE VIII | EVENTS OF DEFAULT | 36 |
|---|---|---|
| Section 8.01. | Events of Default | 36 |
| Section 8.02. | Remedies | 38 |
| ARTICLE IX | ASSIGNMENT, PARTICIPATION | 40 |
| Section 9.01. | Assignments | 40 |
| Section 9.02. | Evidence of Assignment | 40 |
| Section 9.03. | Rights of Assignee, Evidence of Assignment | 41 |
| Section 9.04. | Participations | 41 |
| ARTICLE X | INDEMNIFICATION | 42 |
| Section 10.01. | Indemnities by the Borrowers | 42 |
| Section 10.02. | General Provisions | 43 |
| ARTICLE XI | GUARANTEE | 43 |
| Section 11.01. | Unconditional Guarantee | 43 |
| Section 11.02. | Nature of Guarantee | 44 |
| Section 11.03. | Certain Agreements; Waivers of Certain Notices | 44 |
| Section 11.04. | Waiver of Subrogation | 45 |
| Section 11.05. | Taxes | 45 |
| Section 11.06. | Payments | 45 |
| Section 11.07. | Severability of Article XI | 45 |
| Section 11.08. | Acceleration of Guarantee | 46 |
| Section 11.09. | Election of Remedies | 46 |
| Section 11.10. | Benefit to Guarantor | 47 |
| ARTICLE XII | LENDER AGENT | 47 |
| Section 12.01. | Appointment and Authorization | 47 |
| Section 12.02. | Delegation of Duties | 47 |
| Section 12.03. | Liability of Lender Agent | 47 |
| Section 12.04. | Reliance by Lender Agent | 48 |
| Section 12.05. | Notice of Default | 48 |
| Section 12.06. | Credit Decision | 48 |
| Section 12.07. | Indemnification | 49 |
| Section 12.08. | Lender Agent in Individual Capacity | 49 |
| Section 12.09. | Successor Lender Agent | 49 |
| Section 12.10. | [Reserved] | 50 |
| Section 12.11. | Security Matters; Release of Collateral | 50 |
| ARTICLE XIII | MISCELLANEOUS | 51 |
| Section 13.01. | Amendments, Etc | 51 |
| Section 13.02. | Notices, Etc | 52 |
| Section 13.03. | No Waiver; Remedies | 52 |

Confidential

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| Section 13.04. | Binding Effect; Assignability | 53 |
| Section 13.05. | GOVERNING LAW; SUBMISSION TO JURISDICTION | 53 |
| Section 13.06. | Entire Agreement | 53 |
| Section 13.07. | Acknowledgment | 54 |
| Section 13.08. | Captions and Cross References | 54 |
| Section 13.09. | Execution in Counterpart; Effectiveness | 54 |
| Section 13.10. | Confidentiality | 54 |
| Section 13.11. | Survival | 55 |
| Section 13.12. | Joint and Several Liability of Borrowers | 55 |
| Section 13.13. | Obligors Bound by Intercreditor Agreement | 56 |
| Section 13.14. | Third-Party Beneficiaries | 57 |
| Section 13.15. | First Priority Collateral Agent; Capacity under this Agreement and Protections Afforded | 57 |

Confidential

SCHEDULES

| | |
|---|---|
| Schedule 1.01 | Definitions |
| Schedule 2.04 | Collateral Value Calculations |
| Schedule 5.01 | Conditions Precedent |
| Schedule 7.01(g) | Required Reports |
| Schedule 7.01(t) | Bilateral Facilities |
| Schedule 8.01(m) | Post-Closing Requirements |
| Schedule 13.02 | Notices |

EXHIBITS

| | |
|---|---|
| Exhibit A | Eligibility Requirements |
| Exhibit B | Eligibility Requirements for Substitute Collateral |
| Exhibit C | Initial Permitted Funding Indebtedness |
| Exhibit 2.02(a) | Form of Note |
| Exhibit 2.04(a) | Form of Collateral Value Report |
| Exhibit 2.08(b) | Form of Repayment Notice |
| Exhibit 2.09(a) | Form of Optional Prepayment Notice |
| Exhibit 7.01 | Form of Compliance Certificate |
| Exhibit 7.01(s) | Form of Joinder |
| Exhibit 9.01 | Form of Assignment and Acceptance |
| Exhibit 9.02 | Form of Release Documents |

Confidential

This AMENDED AND RESTATED LOAN AGREEMENT (as amended or supplemented from time to time, this "Agreement") dated as of December 30, 2009, is by and among Residential Funding Company, LLC, a Delaware limited liability company ("RFC"), GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage", and together with RFC, each a "Borrower" and collectively, the "Borrowers"), Residential Capital, LLC and the other Affiliates of the Borrowers listed on the signature pages hereto or that otherwise become party hereto as Guarantors (each, a "Guarantor"), the various other parties signatory hereto as obligors (the "Obligors"), GMAC Inc., a Delaware limited liability company (the "Initial Lender"), the financial institutions and other Persons that are or may from time to time become parties hereto as Lenders (together with the Initial Lender and their respective successors and assigns, each a "Lender" and collectively, the "Lenders"), and GMAC Inc., a Delaware limited liability company, as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent") and Wells Fargo Bank, N.A., solely with respect to Section 12.11(b) and in its capacity as First Priority Collateral Agent.

## BACKGROUND

The Borrowers, the Guarantors, the Obligors, the Lenders, the Lender Agent  and Wells Fargo Bank, N.A., solely with respect to Section 12.11(b) and in its capacity as First Priority Collateral Agent, are parties to that certain Loan Agreement dated as of June 4, 2008, as amended from time to time (the "Original Loan Agreement").

The parties to the Original Loan Agreement wish to amend and restate the Original Loan Agreement in its entirety.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, and intending to be legally bound, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01.  Definitions; Construction.  (a)  Capitalized terms used herein and not otherwise defined herein shall have the meanings specified in Schedule 1.01.

(b)    All capitalized terms used herein, and not specifically defined herein, are used herein as defined in Article 9 of the UCC to the extent defined therein.

(c)    Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

(d)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.

(e)    Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

Confidential

(f)    The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".

(g)    Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements, restatements or other modifications set forth herein), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, provided that such successors and assigns are not prohibited by the Facility Documents, (iii) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, and (v) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.02.  Accounting Matters.  Except as otherwise expressly provided herein, all accounting terms used herein shall be interpreted, and all financial statements and certificates and reports as to financial matters required to be delivered to the Lenders hereunder shall be prepared, in accordance with GAAP applied in a manner consistent with that used in preparing the financial statements described in Section 7.01(f) hereof.

## ARTICLE II

## COMMITMENTS, LOANS, BORROWING, PREPAYMENT

Section 2.01.  Loans.  The Borrowers and the Lenders acknowledge that on the Amendment Closing Date, the Loans outstanding to the Borrowers under (and as defined in) the Original Loan Agreement shall continue in existence as loans hereunder (relative to each Lender, its "Loans"). The Borrowers hereby certify that (i) as of the opening of business on the Amendment Closing Date, the Aggregate Commitment Amount is $1,592,640,818 and (ii) as of the Amendment Closing Date, the Outstanding Aggregate Loan Amount is equal to $1,545,587,924.

Section 2.02.  Note.  (a)  The Loans made by each Lender shall be evidenced by a promissory note executed by each Borrower substantially in the form of Exhibit 2.02(a) hereto (a "Note"), dated the date hereof, payable to the applicable Lender in a maximum principal amount equal to such Lender's Pro Rata Share of the Outstanding Aggregate Loan Amount, which Note shall be an amendment and restatement of the original revolving note dated June 4, 2008 which evidenced the Loans under the Original Loan Agreement. The Borrowers hereby irrevocably authorize each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Lender Agent in the Register, be conclusive and binding

Confidential

on each Obligor absent manifest error; <u>provided</u> that, the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Obligor.

(b)     The Borrowers hereby designate the Lender Agent to serve as the Borrowers' agent, solely for the purpose of this clause, to maintain a register (the "<u>Register</u>") on which the Lender Agent will record each Lender's Commitments, the Loans (and interest due thereon) made by each Lender and each repayment in respect of the principal amount of the Loans, annexed to which the Lender Agent shall retain a copy of each Assignment and Acceptance, and each participation (as described in <u>Section 9.04</u>), delivered to the Lender Agent pursuant to <u>Article IX</u>.  Failure to make any recordation, or any error in such recordation, shall not affect any Obligor's Obligations.  The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrowers, the Obligors, the Lender Agent and the other Lender Parties shall treat each Person in whose name a Loan is registered as the owner thereof for the purposes of all Facility Documents, notwithstanding notice or any provision herein to the contrary.  Any assignment or transfer of a Commitment or the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Lender Agent of an Assignment and Acceptance that has been executed by the requisite parties pursuant to <u>Article IX</u>.  Upon its receipt of a duly completed Assignment and Acceptance, the Lender Agent shall record the information contained therein in the Register.  No assignment or transfer of a Lender's Commitment or Loans, including those transfers or assignments to an Affiliate, shall be effective unless such assignment or transfer shall have been recorded in the Register by the Lender Agent as provided in this Section.

(c)     The Register shall be available for inspection by the Borrowers or any Lender (but in each case only as to its relevant portion of the Register), at any reasonable time and from time to time upon reasonable prior notice.

Section 2.03.  <u>Permanent Paydowns</u>.  No principal amounts repaid under this Agreement may be reborrowed.

Section 2.04.  <u>Borrowing Base</u>.  (a)  [Reserved].

(b)     The Borrowers shall deliver to the Lender Agent and the Valuation Agent an updated Monthly Collateral Report no less frequently than once per calendar month and no later than the eleventh Business Day of each calendar month (commencing with January 2010). Each Collateral Value Report delivered by the Borrowers shall be effective (subject to <u>Sections 2.04(c)</u> and <u>(d)</u> below) until such time as the Borrowers shall deliver a subsequent Collateral Value Report.  For purposes of preparing each Collateral Value Report, the Borrowers shall calculate the Collateral Value of the Primary Collateral described in the related Electronic File in accordance with <u>Schedule 2.04</u>.

(c)     If requested to do so by the Lender Agent, within two Business Days after receipt of a Collateral Value Report pursuant to <u>Section 2.04(a)</u> or <u>(b)</u>, as the case may be, together with the related Electronic Files, the Valuation Agent shall, to the extent such Collateral Value calculation relies on market value rather than Carrying Value, verify the Collateral Value for the Primary Collateral and shall notify the Lender Agent and the Borrowers of the amount of such Collateral Value.

Confidential

(d)      Within three Business Days after receipt of a Collateral Value Report pursuant to Section 2.04(a) or (b), the Lender Agent shall determine (taking into account any information provided by the Valuation Agent pursuant to Section 2.04(c)) the Borrowing Base and notify the Lenders and the Borrowers of such determination.  Such determination shall be effective as of the Business Day specified in such written notice from the Lender Agent (or, if no effective date is specified in such written notice, the next Business Day following delivery of such written notice) and such Borrowing Base shall remain in effect until the next determination or redetermination of the Borrowing Base in accordance with this Agreement.

(e)      At the request of the Lender Agent, the Borrowers shall provide any reports, files, spreadsheets or other materials used by the Obligors in calculating the Borrowing Base or Adjusted Borrowing Base as of any date of determination. If the Lender Agent and the Borrowers shall disagree as to the calculation of the Borrowing Base or Adjusted Borrowing Base as of any date of determination, the calculation by the Lender Agent of such Borrowing Base shall be binding for all purposes hereunder and the Borrowers shall make the payment, if any, required by Section 2.08(b) in connection with such recalculated Borrowing Base or Adjusted Borrowing Base.

Section 2.05.  Interest.  Interest shall accrue on each Loan prior to its maturity for each day during the related Interest Period at a rate equal to (a) the sum of (x) the applicable LIBOR Rate for such Interest Period and (y) the Applicable Margin, divided by (b) 360 days.  Interest shall accrue on the Loans after their maturity (whether by acceleration or otherwise) and on any other amount not paid when due under the Facility Documents (including without limitation any prepayment due under Section 2.08(b)) for each day during a related Interest Period at a rate equal to (a) the Default Rate, divided by (b) 360 days.  Interest shall be payable (i) in arrears with respect to each Interest Period through the final day of each Interest Period (regardless of whether such day is a Business Day), such amount to be payable on the first Business Day following the end of such Interest Period, (ii) on the applicable Loan Repayment Date, or (iii) on that portion of Loans the maturity of which is accelerated pursuant to Section 8.02, immediately upon such acceleration.  The Lender Agent shall determine the LIBOR Rate for each Loan prior to the beginning of each Interest Period, as set forth in the definition of "LIBOR Rate."  The Lender Agent shall also calculate the amount of interest and, if applicable, any Breakage Costs or other amounts due to be paid by the Borrowers from time to time hereunder (including in connection with any prepayment or repayment of Loans permitted hereunder) and shall provide a written statement thereof to the Borrowers at least two Business Days prior to the due date of such payment (or the relevant repayment or prepayment after having received a notice thereof); provided that failure to provide such statements on a timely basis shall not relieve the Borrowers of the obligation to pay any interest and principal due on the applicable payment date (based upon their good faith calculation of the amount due, such amount to be promptly reconciled after receipt of a subsequent statement from the Lender Agent) and other such amounts hereunder promptly upon receipt of such statement.

Section 2.06.  [Reserved].

Section 2.07.  Alternate Rate of Interest; Increased Costs.  (a)  If, prior to the commencement of any Interest Period, the Lender Agent determines (which determination shall be conclusive absent manifest error) (i) that adequate and reasonable means do not exist for

Confidential

ascertaining the LIBOR Rate for such Interest Period; or (ii) that the LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to any Lender of making or maintaining its Loans; or (iii) that, after notice from an affected Lender, it has become unlawful for such Lender to honor its obligation to make or maintain Loans hereunder using the LIBOR Rate, then the Lender Agent shall give notice thereof to the Borrowers by telephone, facsimile, or other electronic means as promptly as practicable thereafter and, commencing with the Interest Period immediately following the Interest Period during which such notice is provided to the Borrowers until the Lender Agent notifies the Borrowers that the circumstances giving rise to such notice no longer exist, all Loans shall bear interest at a rate per annum equal to the Applicable Margin plus the rate per annum that the Lender Agent determines in its reasonable discretion adequately reflects the cost to the Lenders of making or maintaining the Loans for such Interest Period.

(b)    The Borrowers jointly and severally agree to reimburse each Lender for any increase in the cost to such Lender of, or any reduction in the amount of any sum receivable by such Lender in respect of, such Lender's Commitments and the making, continuing, maintaining or conversion of Loans hereunder that arise in connection with any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in after the Closing Date of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority; provided, however, that any such changes with respect to increased capital costs and taxes shall be governed by the terms of Sections 2.07(c) and 3.02, respectively. For the purposes of this Section 2.07(b), taxes shall include all present or future taxes, fees, levies, imposts, deductions, duties, withholdings, assessments or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto. Each affected Lender shall promptly notify the Lender Agent and the Borrowers in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required fully to compensate such Lender for such increased cost or reduced amount. Such additional amounts shall be payable jointly and severally by the Borrowers directly to such Lender within ten (10) days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrowers.

(c)    If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority affects or would affect the amount of capital required or expected to be maintained by any Lender or any Person controlling such Lender, and such Lender determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Commitments or the Loans made by such Lender is reduced to a level below that which such Lender or such controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Lender to the Borrowers (with a copy to the Lender Agent), the Borrowers shall within ten (10) days following receipt of such notice jointly and severally pay directly to such Lender additional amounts sufficient to compensate such Lender or such controlling Person for such reduction in rate of return. A statement of such Lender as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrowers. In determining such amount, such Lender may use any method of averaging and attribution that it (acting reasonably) shall deem applicable.

Confidential

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.07 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to Sections 2.07(a), (b) or (c) for any such increased cost or reduction incurred more than one hundred and eighty (180) days prior to the date that such Lender demands, or notifies the Borrowers of its intention to demand, compensation therefor, provided further that, if the circumstance giving rise to such increased cost or reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)        If any Lender requests compensation under this Section 2.07, then such Lender will, if requested by the Borrowers, use commercially reasonable efforts to designate another lending office for any Loan affected by such event; provided that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage, and provided further that nothing in this Section 2.07(e) shall affect or postpone any of the Obligations of the Borrowers or the rights of such Lender pursuant to Sections 2.07(a), (b), (c) or (d).

Section 2.08.  Mandatory Repayment of Loans.  (a)  The Borrowers shall jointly and severally repay the Outstanding Aggregate Loan Amount with respect to all Loans and all other amounts owing under this Agreement in full on the Loan Repayment Date.

(b)        If, on any Business Day (a "Borrowing Base Shortfall Day"), the Outstanding Aggregate Loan Amount on such day exceeds the Borrowing Base or (if a determination is requested by the Lender Agent) Adjusted Borrowing Base on such day by an amount equal to or greater than $250,000 (such circumstance, a "Borrowing Base Deficiency"), the Borrowers shall, within one (1) Business Day after the Borrowing Base Shortfall Day, jointly and severally repay outstanding Loans in an amount equal to the amount of the Borrowing Base Deficiency; provided, however, that to the extent a Borrowing Base Deficiency results from a write-down of the Collateral Value of any Primary Collateral in accordance with ResCap's standard valuation practices applied to its assets as a whole as then in effect (such valuation practices to be consistent with the methodology used in the preparation of ResCap's GAAP financial statements), the obligation of the Borrowers to repay outstanding Loans pursuant to this sentence will be reduced by the Collateral Value of any Eligible Assets which the Borrower designates as Primary Collateral not later than one (1) Business Day following the applicable Borrowing Base Shortfall Day by written notice to the Lender Agent or in the related Repayment Notice (any such collateral, "Substitute Collateral"). It is understood and agreed that the Lender Agent shall have the right to adjust the Specified Percentage used to calculate the Collateral Value for any category of Primary Collateral, whether as a result of the addition of Substitute Collateral or otherwise, in its good faith discretion, taking into account estimated collections, market value, legal risks, cost of recovery and other matters customarily considered by commercial lenders when determining such values, at any time by written notice to the Borrowers. The Borrowers shall deliver a Repayment Notice with respect to each repayment of outstanding Loan amounts and/or designation of Substitute Collateral made pursuant to this paragraph by 1:00 p.m. (New York time) on the day such repayment is due.

The parties shall cause the Valuation Agent (i) at approximately 3:00 p.m. New York City time on each Valuation Date, to calculate the MTM Amount and the Hedge Support

Confidential

Requirement, and (ii) to report to the Initial Lender, ResCap, the Lender Agent and the ResCap Counterparty such MTM Amount and the Hedge Support Requirement no later than 6:00 p.m. New York City time on such Valuation Date. If, on any Valuation Date (which is not a Borrowing Base Shortfall Day) the MTM Amount is equal to or greater than the Minimum Adjustment Amount, the Borrowers shall, within one (1) Business Day after such Valuation Date, jointly and severally repay outstanding Loans in an amount equal to the amount of the MTM Amount as of such Valuation Date.

(c)    The Borrowers shall, on each Mandatory Repayment Date with respect to a Collateral Disposition (the "Subject Disposition"), repay outstanding Loans in an amount (if greater than zero) equal to (i) Net Cash Proceeds in the aggregate received by the Obligors in respect of the Subject Disposition minus (ii) at the Borrower's discretion, all or a portion of the MTM Credit as of such day. It is understood and agreed that the use of the MTM Credit to reduce the repayment of Loans pursuant to the immediately preceding sentence shall be deemed to satisfy the Borrowers' requirement to apply Net Cash Proceeds of a Collateral Dispositions to the permanent reduction of the outstanding principal amount of the Loans.

(d)    The Borrowers shall not be required to pay any Breakage Costs incurred by the Lenders in connection with a mandatory repayment pursuant to this Section 2.08.

Section 2.09.  Optional Prepayment.  The Borrowers may, at their option, prepay any Loan advanced hereunder in full or in part (as well as all interest accrued and unpaid thereon through the end of the related Interest Period) on the last Business Day of any Interest Period related thereto (each an "Optional Prepayment Date"); provided that the Borrowers deliver a Prepayment Notice to each Lender and the Lender Agent, no later than 2:00 p.m. New York City time on a Business Day that is at least two (2) Business Days preceding the Optional Prepayment Date.  Any such partial prepayment shall be in a minimum principal amount of not less than $10,000,000 and in increments of $1,000,000 (or, if less, the Outstanding Aggregate Loan Amount).  Any such prepayment shall be paid over to the Lender Agent for the account of the Lenders by the Borrowers by 2:00 p.m. (New York City time) on such Optional Prepayment Date, and shall be in an amount equal to the sum of (a) the Loan amount being prepaid on the date of such prepayment, plus (b) all accrued and unpaid interest on such Loan being prepaid as of the date of such prepayment, plus (c) the allocable portion (determined by the Lender Agent in its sole reasonable discretion) of all other amounts due from the Borrowers hereunder.  The Borrowers may make a partial or full prepayment on any date other than an Optional Prepayment Date; provided that the Borrowers make a timely delivery of a Prepayment Notice, and in addition to the amount required under items (a), (b), and (c) above, the Borrowers must pay, without duplication, (x) all Breakage Costs, if any, actually incurred by the Lenders and resulting from such prepayment and (y) all accrued and unpaid interest on such Loan being prepaid following the prepayment.  In the absence of a timely delivered Prepayment Notice, the Lenders shall automatically and without further action by the Borrowers continue each Loan at the termination of each Interest Period for a successive Interest Period beginning on the day immediately following the final day of the immediately preceding Interest Period.

Section 2.10.  Termination of Commitments and Reduction of Aggregate Commitment Amount.  (a)  Unless previously terminated, the Commitments shall terminate on the

Confidential

Commitment Termination Date.  If at any time the Borrowing Base is reduced to zero, then the Commitments shall terminate on the effective date of such reduction.

(b)    [Reserved].

(c)    In the event that the Borrowers repay outstanding Loans, the Aggregate Commitment Amount shall be permanently reduced by the amount of any principal payments with respect to the Loans.

Section 2.11    Tracking of Paydown Amounts. The Borrowers shall produce regular reports tracking on a daily basis the reductions in the Outstanding Aggregate Loan Amount pursuant to Section 2.10(c) together with necessary supporting information in spreadsheet form (including, but not limited to, information containing separate tracking of the then current Outstanding Aggregate Loan Amount) (the "Permanent Paydown Report"). The Permanent Paydown Report shall be in the form previously provided to the Lender Agent, which form may be periodically changed by the Borrowers from time to time; provided that after any such changes, the Lender Agent may request reasonable modifications to the modified form to clarify or maintain the information provided in such report prior to the Borrower's changes. The Borrowers shall provide the current Permanent Paydown Report at any time to the Lender Agent at the Lender Agent's request. A Permanent Paydown Report shall be delivered in connection with each Monthly Collateral Report, and such Permanent Paydown Report shall be included in any certifications in connection with the Monthly Collateral Report. If any Lender shall question the validity of the dates or amounts of any actual or scheduled permanent reductions in the Outstanding Aggregate Loan Amount pursuant to Section 2.10(c) reported in a Permanent Paydown Report, the Borrowers shall work with the Lender Agent in good faith to resolve such question; provided that if such question cannot be resolved in 30 days, the determination of the Lender Agent as to the disputed information shall govern and be binding on the parties hereto.

## ARTICLE III

## PAYMENTS; COMPUTATIONS; TAXES; EXPENSES

Section 3.01.  Payments and Computations, Etc.  (a)  Unless otherwise expressly stated herein, all amounts to be paid or deposited hereunder shall be paid or deposited in accordance with the terms hereof no later than 1:00 p.m. (New York City time) on the day when due in lawful money of the United States of America in same day funds (and all funds received after such time shall be deemed to have been received on the next succeeding Business Day).

(b)    The Borrowers shall, to the extent permitted by law, jointly and severally pay interest on all amounts (including principal, interest and fees) due but not paid on the date such payment is due hereunder as provided herein, for the period from, and including, such due date until, but excluding, the date paid, at the applicable Default Rate, payable on demand; provided, however, that such interest rate shall not at any time exceed the maximum rate permitted by applicable law.

Confidential

(c)    All computations of interest and fees hereunder shall be made on the basis of a year of 360 days for the actual number of days elapsed (including the first day but excluding the last day) occurring in the period for which payable.

(d)    Each Borrower agrees that the principal of and interest on the Loans and all other monetary Obligations shall be the joint and several recourse obligations of the Borrowers.

(e)    Except as set forth in Section 3.02, all payments made by the Borrowers or the other Obligors under this Agreement or any other Facility Document shall be made without set-off, deduction or counterclaim.

(f)    After the occurrence and during the continuance of an Event of Default, the Lender Agent may, and upon direction from the Required Lenders, shall, apply all amounts received under the Facility Documents (including from the proceeds of Collateral securing the Obligations) or under applicable Requirements of Law upon receipt thereof to the Obligations as follows: (i) first, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the First Priority Collateral Agent and the Control Collateral Agent, (including the out-of-pocket expenses and reasonable fees of counsel to each), (ii) second after payment in full of the amounts specified in clause (f)(i), to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the Lender Agent, in its capacity as the Lender Agent (including the out-of-pocket expenses and reasonable fees of counsel to the Lender Agent), (iii) third, after payment in full in cash of the amounts specified in clause (f)(i) and (f)(ii), to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing under the Facility Documents, and all costs and expenses owing to the Lender Parties pursuant to the terms of the Facility Documents, until paid in full in cash, (iv) fourth, after payment in full in cash of the amounts specified in clauses (f)(i) through (f)(iii), to the ratable payment of the principal amount of the Loans then outstanding, (v) fifth, after payment in full in cash of the amounts specified in clauses (f)(i) through (f)(iv), to the ratable payment of all other Obligations owing to the Lender Parties, and (vi) sixth, after payment in full in cash of the amounts specified in clauses (f)(i) through (f)(v), and following the Termination Date, to each applicable Obligor or any other Person lawfully entitled to receive such surplus or as may be directed by a court of competent jurisdiction.  Proceeds of Collateral shall be allocated among the Lender Parties in such manner as the Lender Agent shall determine in its sole discretion.

(g)    If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loans (other than pursuant to the terms of Sections 2.07(b), 2.07(c), 3.02, Article X or in respect of Breakage Costs) in excess of its pro rata share of payments obtained by all Lender, such Lender shall purchase from the other Lender such participations in Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably (to the extent such other Lenders were entitled to receive a portion of such payment or recovery) with each of them; provided that, if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Lender, the purchase shall be rescinded and each Lender that has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such recovery together with an amount equal to such

Confidential

selling Lender's ratable share (according to the proportion of (i) the amount of such selling Lender's required repayment to the purchasing Lender to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  Each of the Obligors agrees that any Lender purchasing a participation from another Lender pursuant to this clause (g) may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 3.04) with respect to such participation as fully as if such Lender were the direct creditor of the Obligors in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law any Lender receives a secured claim in lieu of a setoff to which this Section applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this Section to share in the benefits of any recovery on such secured claim.

Section 3.02.  Taxes.  (a)  All payments by the Borrowers or Guarantors (each a "Credit Party") of principal of, and interest on, the Loans and all other amounts payable hereunder (including fees) shall be made free and clear of and without deduction for any present or future income, excise, stamp or franchise taxes and other taxes, fees, levies, imposts, deductions, duties, withholdings, assessments or other charges of any nature whatsoever imposed by any Governmental Authority, but excluding, (i) taxes imposed on or measured by the overall net income, overall receipts or overall assets of any Lender by any Governmental Authority, (ii) franchise taxes or branch profits taxes or any similar tax imposed on any Lender by the United States of America (or any political subdivision thereof) of the jurisdiction of the Lender, as the case may be, in which it is organized or is operating or is otherwise subject to tax as a result of any connection unrelated to this Agreement, and (iii) any U.S. backup withholding taxes (other than due to a change in law as provided in Section 3.02(f)) (such non-excluded taxes, fees, levies, imposts, deductions, duties, withholdings, assessments or other charges, herein "Taxes").  Notwithstanding the foregoing sentence, in the event that any such Taxes are required to be deducted or withheld from any payment required to be made to any Lender as a result of Requirements of Law, the Credit Party shall (a) promptly notify the applicable Lender, in writing, of such requirement, (b) pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid to the applicable Lender pursuant to this paragraph), and (c) jointly and severally pay to the applicable Lender such additional amounts as may be necessary in order that the net amount received by such Lender after such withholding or deduction shall equal the full amounts of moneys which would have been received by such Lender in the absence of such withholding or deduction.  Notwithstanding the foregoing, the Credit Party shall not be required to increase any amounts payable to a Lender that is a Non-U.S. Lender (as defined in Section 3.02(f)) with respect to any Taxes (x) if and to the extent that such taxes would not have been imposed but for such Non-U.S. Lender's failure to provide (or the Lender Agent's failure to provide) to the Borrower the Internal Revenue Service Forms required to be provided to the Borrower pursuant to Section 3.02(f) or (y) that are imposed on amounts payable to such Non-U.S. Lender at the time such Non-U.S. Lender becomes a party hereto (or designates a new lending office) other than due to a change in law as provided in Section 3.02(f).

(b)     In addition, the Borrowers agree to pay any current or future stamp, recording, documentary, excise or property or similar taxes, charges or levies (including, without limitation, mortgage recording taxes and similar fees, but excluding such amounts imposed as a result of an

Confidential

assignment or the transfer of a participation) imposed by any Governmental Authority that arise from any payment made under this Agreement or any other Facility Document, or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Facility Document and the transactions contemplated thereunder ("Other Taxes").

(c)    The Borrowers shall indemnify each Lender for the full amount of Taxes and Other Taxes (including, without limitation, any Taxes and Other Taxes imposed by any jurisdiction on amounts payable under this Section 3.02) paid by such Lender and any liability (including taxes, penalties, interest and expenses) arising therefrom or with respect thereto; provided, however, that when making a demand for indemnity payment a Lender shall provide each Borrower, at its address referred to in Schedule 13.02, with a certificate from the relevant taxing authority or from a Responsible Officer of such party stating or otherwise evidencing, in reasonable detail, that such Lender has made payment of (and the basis of calculation for) such Taxes or Other Taxes. This indemnification shall be made within thirty (30) days from the date a Lender provides written demand therefor, accompanied by the aforementioned certificate.

(d)    Within thirty (30) days after the date of receiving an official receipt for any payment of Taxes or Other Taxes contemplated by this Section 3.02, the Borrower shall furnish to the relevant Lenders, at their addresses set forth in Schedule 13.02 (or such other address as provided by a Lender, in the case of an assignee), appropriate evidence of payment thereof.

(e)    If a Lender shall become aware that it is entitled to receive a refund or credit (such credit to include any increase in any foreign tax credit) as a result of Taxes (including any penalties or interest with respect thereto) as to which it has been indemnified by a Borrower or with respect to which a Borrower has paid additional amounts pursuant to this Section 3.02, it shall promptly notify such Borrower of the availability of such refund or credit and shall, within 30 days after receipt of a request by such Borrower, apply for such refund or credit at such Borrower's expense, and in the case of any application for such refund or credit by such Borrower, shall, if legally able to do so, deliver to the Borrower such certificates, forms or other documentation as may be reasonably necessary to assist such Borrower in such application. If a Lender has determined in its sole judgment that it has received a refund or credit (such credit to include any increase in any foreign tax credit) in respect to any Taxes as to which it has been indemnified by the Borrowers or with respect to which a Borrower has paid additional amounts pursuant to this Section 3.02, it shall promptly notify the Borrowers of such refund or credit and shall, within sixty (60) days after receipt of such refund or the benefit of such credit (such benefit to include any reduction of the Taxes for which a Lender would otherwise be liable due to any increase in any foreign tax credit available to a Lender), repay the amount of such refund or benefit of such credit (with respect to the credit, as determined by a Lender in its sole, reasonable judgment) to the Borrowers (to the extent of amounts that have been paid by a Borrower under this Section 3.02 with respect to Taxes giving rise to such refund or credit), plus any interest received with respect thereto, net of all reasonable out-of-pocket expenses of the Lender and without interest (other than interest actually received from the relevant taxation authority or other Governmental Authority with respect to such refund or credit); provided, however, that each Borrower, upon the request of the Lender, agrees to return the amount of such refund or benefit of such credit (plus interest) to the Lender in the event the Lender is required to repay the amount of such refund or benefit of such credit to the relevant taxation authority or other Governmental Authority.

Confidential

(f)      If a Lender is not a United States Person (within the meaning of Section 7701(a)(30) of the Internal Revenue Code) (a "Non-U.S. Lender"), it shall, on or prior to the Closing Date or, in the case of a Non-U.S. Lender that is an assignee, on the date of such assignment to such Non-U.S. Lender, provide to the Borrowers and Lender Agent (i) two (2) accurate and complete original signed copies of Internal Revenue Service Form W-8ECI or Form W-8BEN (or successor forms) certifying that such Non-U.S. Lender is entitled as of such date to a complete exemption from United States withholding tax pursuant to an applicable income tax treaty with respect to payments of interest to be made under this Agreement (or, in the case of an assignee, entitlement to a withholding tax rate that does not exceed the withholding tax rate in respect of those Taxes in respect of interest for which the assignor was entitled to additional payments under Section 3.02(a) at the time of the assignment), (ii) with respect to a Non-U.S. Lender claiming exemption from United States withholding tax pursuant to its portfolio interest exception, (x) a statement of such Non-U.S. Lender, signed under penalty of perjury, that it is not (A) a "bank" as described in Section 881(c)(3)(A) of the Internal Revenue Code, (B) a 10% shareholder of a Borrower (within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code), or (C) a controlled foreign corporation related to a Borrower within the meaning of Section 864(d)(4) of the Internal Revenue Code (an "Exemption Certificate"), and (y) two properly completed and executed original signed copies of Internal Revenue Service Form W-8BEN (or successor form) certifying that such Non-U.S. Lender is entitled as of such date to a complete exemption from United States withholding tax with respect to payments of interest to be made under this Agreement, (iii) two (2) accurate and complete original signed copies of Internal Revenue Service Form W-8IMY with any accompanying statement and certificate, or (iv) two (2) accurate and complete original signed copies of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from United States federal withholding tax, with such supplementary documentation as may be prescribed by Requirements of Law to permit Borrowers to determine the withholding or deduction required to be made.  In addition, each Non-U.S. Lender agrees that from time to time after the Closing Date, when the passage of time or a change in facts or circumstances renders the previous certification obsolete or inaccurate in any material respect, or on the Borrowers' reasonable request, such Non-U.S. Lender will deliver to the Borrowers two (2) new accurate and complete original signed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (with respect to a complete exemption under an income tax treaty), Form W-8BEN (with respect to the portfolio interest exemption) and an Exemption Certificate, or Form W-8IMY with any accompanying statement or certificate, as the case may be, and such other forms as may be required in order to confirm or establish that such Non-U.S. Lender is entitled to a continued exemption from United States withholding tax with respect to payments under this Agreement, or such Non-U.S. Lender shall immediately notify the Borrowers of its inability to deliver any such form or Exemption Certificate, in which case such Non-U.S. Lender shall not be required to deliver any such form or Exemption Certificate.  Notwithstanding anything to the contrary contained in this Section 3.02, the Borrowers agree to pay any additional amounts and to indemnify each Non-U.S. Lender in the manner set forth in Sections 3.02(a) and (c) in respect of any United States Taxes deducted or withheld by the Borrowers or paid by a Lender, if and to the extent that such Taxes would not have been deducted or withheld or payable (and in the case of a payment by a Lender, no exception is available to the making of such payment, as determined in the sole discretion of such Lender) but for any change after the Closing Date in any applicable law, treaty, governmental rule, regulation, guideline or order, or in the interpretation thereof.  Prior to

Confidential

withholding any amount due a non-U.S. Lender because of such Lender's failure to provide tax forms or certifications under this <u>Section 3.02</u>, the Borrowers shall notify such non-U.S. Lender of its intention to withhold not less than five (5) Business Days prior to such withholding.

(g)     Notwithstanding anything to the contrary contained in this Agreement, this <u>Section 3.02</u> shall govern exclusively any increased costs relating to Taxes resulting from any change in law.

Section 3.03.  <u>Fees and Expenses</u>.  The Borrowers agree to jointly and severally pay to the Lender Agent and the Lenders any expenses (including reasonable fees and expenses of each Lender's counsel) incurred in connection with the negotiation, execution, delivery, administration and enforcement of this Agreement and the Facility Documents (and any amendments, supplements, modifications, consents or waivers thereto), including the reasonable fees and expenses (including, without limitation, attorneys' fees and expenses) of the First Priority Collateral Agent, the Collateral Control Agent and the Valuation Agent.

Section 3.04.  <u>Setoff</u>.  The Obligors agree that each Lender has all rights of set off provided by applicable law, and in addition thereto, the Obligors agree that at any time any Default exists, each Lender may appropriate and apply to the payment of any obligations of the Obligors hereunder owed to it, whether or not then due, any and all balances, credits, deposits, accounts or moneys of the Obligors then or thereafter maintained with or held by such Lender; <u>provided</u> that any such appropriation and application shall be subject to <u>Section 3.01(g)</u>.  Each Lender shall promptly notify the applicable Obligors after making such exercise of the right of set off; <u>provided</u> that failure to give such notice shall not affect the validity of the set-off.

ARTICLE IV

ACCOUNTS AND COLLECTIONS

Section 4.01.  <u>Concentration Accounts</u>.  Subject to Account Exceptions, ResCap and its Subsidiaries shall continue to administer their cash collection system in good faith and in a manner consistent with the requirements of this Agreement.  To the extent in place on or prior to the Closing Date, such administration shall include the sweep of cash from accounts in the system to the Concentration Accounts.  The Obligors will cause the Concentration Accounts to be subject to the Account Control Agreements at all times at and after the Closing Date.

Section 4.02.  <u>Sales Proceeds Accounts</u>.  (a)  On or before the Closing Date, the Borrowers and the Lender Agent established the Sales Proceeds Accounts.  The Obligors hereby agree that the Collateral Control Agent shall have exclusive control of the Sales Proceeds Accounts.  Any Net Cash Proceeds of Collateral Dispositions received by an Obligor shall be deposited in the Sales Proceeds Accounts, no later than the Applicable Deposit Date; provided, however, for the avoidance of doubt, prior to the Applicable Deposit Date, all Net Cash Proceeds of a Collateral Disposition relating to European Reporting Assets underlying the English Note or the Dutch Note shall be deposited into and held, in accordance with the English Security Documents or the Dutch Security Documents, as applicable, in the Blocked Account (as defined in the Master Definitions Schedule dated June 4, 2008, as amended from time to time) with respect to the English SPE or the Blocked Account (as defined in the Master Definitions

Confidential

Agreement dated June 4, 2008, as amended from time to time) with respect to the Dutch SPE. Such Net Cash Proceeds shall be held in the Sales Proceeds Accounts pending application of such proceeds in accordance with this Section 4.02(a), and any such Net Cash Proceeds which for any reason have not yet been deposited into the Sales Proceeds Accounts shall be deemed to be held by such Obligor in trust for the Lenders and shall not be used by any Obligor for any purposes whatsoever.  Net Cash Proceeds on deposit in the Sales Proceeds Accounts (including funds consisting of Net Cash Proceeds of Collateral Dispositions on deposit in the Servicing Advances Accounts) shall be used to make mandatory repayments of Loans in accordance with Section 2.08(c); provided that an amount equal to the portion of the Available MTM Credits applied to reduce the amount of such mandatory prepayment shall be released to the Borrowers in accordance with Section 2.08(c) if no Default has occurred and is continuing.  To the extent that the Borrowers subsequently document in a manner acceptable to the Lender Agent in its discretion that funds were incorrectly deposited into a Sales Proceeds Account and used to repay Loans in accordance with Section 2.08(c), the Lender Agent will authorize the Borrowers to (i) withdraw funds then on deposit in the Sales Proceeds Accounts in an amount equal to such incorrect deposit and/or (ii) net the excess amount against future deposits to the Sales Proceeds Accounts up to an amount equal to such incorrect deposit, rather than use such funds to repay Loans as otherwise required by this Section 4.02(a) and Section 2.08(c).

(b)    The Borrowers shall designate one or more of the Sales Proceeds Accounts as "Servicing Advances Accounts".  Any amounts received in respect of the repayment of Primary Collateral consisting of Servicing Advances received by an Obligor shall be deposited in the Servicing Advances Accounts no later than the Applicable Deposit Date and shall be held in the Servicing Advances Accounts pending application of such proceeds in accordance with this Section 4.02(b).  No funds other than Net Cash Proceeds of Collateral Dispositions with respect to Servicing Advances or amounts received in respect of the repayment of Primary Collateral consisting of Servicing Advances shall be deposited in the Servicing Advances Accounts.  The Borrowers may withdraw Collections (other than Net Cash Proceeds) on deposit in the Servicing Advances Accounts, provided that no Default has occurred and is continuing and no Default would result from such withdrawal, (i) to make Servicing Advances with respect to Eligible Servicing Advances Agreements (which Servicing Advances, for the avoidance of doubt, shall constitute Primary Collateral) or (ii) to make prepayments of any Loan in accordance with Section 2.08(c) or Section 2.09.

Section 4.03.    Collections Deposited to Collection Accounts.  The Obligors agree, subject to the Account Exceptions, to use all commercially reasonable efforts to maintain their cash management system so as to enable the Collateral Control Agent to exercise control, pursuant to Account Control Agreements, over all material U.S. located bank and securities accounts of ResCap and its Subsidiaries intended to contain solely funds and securities of ResCap and its Subsidiaries (excluding the Exempt Cash Reserve Account, accounts of Financing SPVs, accounts of independent third parties, accounts setup for Bilateral Facilities and accounts holding funds held on account for, in trust for, or by ResCap or a Subsidiary as a custodian for, any third party) and cause all liquidity reserves (other than funds permitted to be held in the Exempt Cash Reserve Account) of ResCap and its Subsidiaries to be on deposit in such accounts, subject to such exceptions as the Lender Agent shall agree in writing.  Subject to the Account Exceptions and Section 4.02, the Obligors shall arrange for (a) all Collections in respect of the Collateral to be deposited in a Collection Account no later than the Applicable Deposit Date, (b) all liquidity

Confidential

reserves of ResCap and its Subsidiaries to be held (subject to the Account Exceptions) in the Collection Accounts. To the extent that any funds are not deposited or held in the Collections Accounts in accordance with the preceding sentence, such funds shall be deemed to be held by such Obligor, in trust for the Lenders and shall not be used by any Obligor for any purposes whatsoever. For the avoidance of doubt, all Collections (other than Net Cash Proceeds from a Collateral Disposition) relating to European Reporting Assets underlying the English Note or the Dutch Note shall be deposited into and held in the Transaction Account (as defined in the Master Definitions Schedule dated June 4, 2008, as amended from time to time) for the English SPE or the Transaction Account (as defined in the Master Definitions Agreement dated June 4, 2008, as amended from time to time) for the Dutch SPE, as applicable.

Section 4.04.  <u>Withdrawals from Designated Accounts; Account Notices</u>.  So long as no Default has occurred and is continuing or would result from such withdrawal, the Lender Agent and Lenders shall permit the Obligors to withdraw funds from each Concentration Account, Collection Account and (to the extent permitted under <u>Section 4.02</u>) Sales Proceeds Accounts from time to time and the Lender Agent agrees that it will not direct the Collateral Control Agent to provide any notice to any account bank directing such account bank not to honor a request or instruction from any Obligor with respect to any Concentration Account, Collection Account or Sales Proceeds Account prior to such time.

Section 4.05.  <u>Cash and Cash Equivalents</u>.  Deposits in each Concentration Account, Collection Account or Sales Proceeds Account may be held in cash or Cash Equivalents.  To the extent that any funds that do not constitute Collateral or proceeds of Collateral are deposited to any of such Accounts, as such funds are reasonably identified to the Lender Agent in a timely manner, the Lender Agent shall instruct the Collateral Control Agent to release such funds from the Lien of the Security Agreement.

ARTICLE V

CONDITIONS PRECEDENT

Section 5.01.  <u>Conditions Precedent to Effectiveness</u>.  The amendment and restatement of this Agreement shall become effective upon the satisfaction of (a) the condition precedent that the Lender Agent shall have received (or waived delivery of) each of the items set forth in <u>Schedule 5.01</u> (unless otherwise indicated) dated such date, and in such form and substance, as is satisfactory to the Lender Agent and (b) the other conditions specified in <u>Schedule 5.01</u> have been satisfied or waived by the Lender Agent.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES

Section 6.01.  <u>Representations and Warranties of the Obligors</u>.  Each Obligor represents and warrants to each Lender Party that throughout the term of this Agreement (including but not limited to as of the date of each Collateral Disposition):

Confidential

(a)    <u>Organization and Good Standing</u>.  Each of such Obligor and each of its Subsidiaries has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of organization, and has all requisite corporate or limited liability company power and authority to own its properties and to conduct its business as such properties are presently owned and such business is presently conducted, and had at all relevant times, and now has, all necessary power, authority and legal right to own the portion of the Collateral that it owns.

(b)    <u>Due Qualification</u>.  Each of such Obligor and each of its Subsidiaries is duly qualified to do business, and has obtained all necessary licenses and approvals, in all jurisdictions in which its ownership or lease of property or the conduct of its business requires such qualification, licenses or approvals, except to the extent failure to so qualify or to obtain licenses and approvals could not reasonably be expected to have a Material Adverse Effect.

(c)    <u>Power and Authority; Due Authorization</u>.  Each of such Obligor and each of its Subsidiaries (i) has all necessary power and authority and legal right to (A) execute and deliver each of the Facility Documents to be executed and delivered by it in connection herewith, (B) carry out the terms of the Facility Documents to which it is a party and (C) borrow the Loans or provide the Guarantee hereunder (as applicable) and grant a security interest or lien in the portion of the Collateral that it owns on the terms and conditions herein provided or as otherwise required by the Facility Documents and (ii) has taken all necessary corporate, partnership or limited liability company action to duly authorize (A) such borrowing, guarantee and/or grant, as appropriate and (B) the execution, delivery, and performance of this Agreement and all of the Facility Documents to which it is a party.

(d)    <u>Binding Obligations</u>.  Each Facility Document to which such Obligor and any of its Subsidiaries is a party constitutes, or when duly executed and delivered by such Obligor or Subsidiary will constitute, the legal, valid and binding obligations of such Obligor or such Subsidiary enforceable against it in accordance with its respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law.

(e)    <u>No Violation</u>.  Except for those consents required in connection with the Lenders exercising their rights under <u>Section 8.02</u> hereof, neither the execution and delivery of the Facility Documents, nor the consummation of the transactions contemplated hereby and thereby, will conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice, lapse of time or both) a default under, its organizational documents or any indenture, loan agreement, mortgage, deed of trust, or other material agreement or instrument to which such Obligor or any of its Subsidiaries is a party or by which any of them or their property is otherwise bound, or result in the creation or imposition of any Lien upon any of its properties pursuant to the terms of any such indenture, loan agreement, mortgage, deed of trust, or other agreement or instrument, other than this Agreement and the Security

Confidential

Documents, or violate any Requirements of Law applicable to it of any Governmental Authority having jurisdiction over it or any of its properties if such violation, individually or in the aggregate, is reasonably likely to result in a Material Adverse Effect.

(f)     <u>No Proceedings</u>.  There are no proceedings or investigations pending, or to the best of such Obligor's knowledge threatened in writing, against it before any court, regulatory body, administrative agency, or other tribunal or governmental instrumentality (i) asserting the invalidity of any Facility Document, (ii) seeking to prevent the consummation of any of the transactions contemplated by any Facility Document, or (iii) seeking any determination or ruling that could reasonably be expected to have a Material Adverse Effect; <u>provided</u>, <u>however</u>, that this representation shall not apply to (x) matters that have been disclosed to the Lender Agent in writing prior to closing, or (y) matters arising from the attempts of the Obligors to enforce their rights with respect to the Collateral other than purported or certified class action law suits involving any portion of the Collateral or Supporting Assets consisting of mortgage loans which have a material impact on the enforceability or value of such mortgage loans or the Lender's security therein.

(g)     <u>Government Approvals</u>.  No authorization, consent, approval, or other action by, and no notice to or filing with, any court, governmental authority or regulatory body or other Person, domestic or foreign, is required for the due execution, delivery or performance of any Facility Document to which such Obligor is a party except for (i) consents that have been obtained in connection with transactions contemplated by the Facility Documents, it being understood that consents to the pledge of interests in BCG Joint Ventures were initially verbal consents, to be followed by written consents in accordance with the Post-Closing Requirements, (ii) filings to perfect the security interest created by the Security Documents and (iii) consents required in connection with the First Priority Collateral Agent exercising its rights under <u>Section 8.02</u> hereof.

(h)     <u>Solvent: Fraudulent Conveyance</u>.  ResCap and its Subsidiaries, on a consolidated basis, are Solvent and will not cease to be Solvent due to any Loan or any guaranty hereunder (both immediately before and after giving effect to such Loan or guaranty).  The amount of consideration being received by an Obligor upon its pledge or provision of any Collateral to the First Priority Collateral Agent for the benefit of the Lender Parties constitutes reasonably equivalent value and fair consideration for such Collateral.  No Obligor is pledging or providing any Collateral with any intent to hinder, delay, or defraud any of its creditors.

(i)     <u>Margin Regulations</u>.  Margin Stock (as defined in the regulations of the Board) constitutes less than 25% of the value of those assets of it that are subject to any limitation on sale, pledge, or other restriction hereunder.  No Obligor is engaged in the business of extending credit for the purpose of buying or carrying Margin Stock, and no proceeds of Loans will be used to purchase or carry Margin Stock or otherwise for a purpose that violates, or would be inconsistent with, F.R.S. Board Regulations T, U or X.

Confidential

(j)      Accurate Reports.  No written information, exhibit, financial statement, document, book, record, or report furnished or to be furnished or caused to be furnished by such Obligor to the Lender Agent or any Lender in connection with the Facility Documents was inaccurate in any material respect as of the date it was dated or (except as otherwise disclosed in writing to the Lenders or the Lender Agent at such time) as of the date so furnished, or contained any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading; provided that any such inaccuracy, misstatement or omission in any Permanent Paydown Report not included in the Monthly Collateral Report or any daily report regularly provided to the Lender Agent in connection with this Loan Agreement shall not constitute a breach of this Section 6.01(j) if such calculation was prepared in good faith, based on the actual knowledge of ResCap Treasury available at the time and in accordance with ResCap's general accounting and business policies as in effect as of the date such information was furnished.

(k)      No Default.  No Default has occurred and is continuing.

(l)      Investment Company Act.  Neither such Obligor nor any of its Subsidiaries is required to register as an "investment company" under the Investment Company Act.

(m)      Taxes.  Each of such Obligor and each of its Subsidiaries has filed all material United States federal tax returns and all other material returns that are required to be filed, and has paid all material taxes due pursuant to said returns or pursuant to any assessment received by it, except such taxes, if any, as are being contested in good faith by appropriate proceedings diligently conducted and as to which adequate reserves have been provided in accordance with GAAP.  The charges, accruals and reserves on the books of such Obligor in respect of taxes and other governmental charges are, in the opinion of such Obligor, adequate.

(n)      Approved Servicer.  Except as disclosed to the Lender Agent prior to the Amendment Closing Date, (i) with respect to the Borrowers only, each Borrower is approved by Fannie Mae as an approved lender, (ii) GMAC Mortgage is approved by each of Freddie Mac and Ginnie Mae as an approved seller, HUD pursuant to Sections 203 and 211 of the National Housing Act, the FHA as an FHA Approved Mortgagee and Servicer, and the VA as a VA Approved Lender, (iii) GMAC Mortgage is approved by Freddie Mac, Fannie Mae and Ginnie Mae as an approved servicer, (iv) each Borrower is in good standing with Freddie Mac, Fannie Mae, Ginnie Mae, HUD, the FHA, and/or the VA, as applicable, (v) no circumstances exist that would either entitle Freddie Mac, Ginnie Mae, HUD, the FHA or the VA to revoke or suspend any such approvals or entitle Freddie Mac or Ginnie Mae to terminate any Borrower as servicer for cause under any servicing arrangement, (vi) no Borrower has received from Freddie Mac, Ginnie Mae, HUD, the FHA or the VA any notice revoking or suspending, or indicating any intent to revoke or suspend or indicating any adverse fact or circumstance which could reasonably be expected to entitle Freddie Mac, Ginnie Mae, HUD, the FHA or the VA, as the case may be, to revoke or suspend any of the

Confidential

aforementioned approvals, and (vii) each FHA Insurance Contract and VA Guaranty Agreement applicable to the Borrowers or any other Obligor or their Subsidiaries is in full force and effect.

(o)    _Financial Statements_.  (i) ResCap has delivered to the Lender Agent a copy of (1) ResCap's audited, consolidated financial statements dated as of December 31, 2008, comprised of the consolidated statements of income or operations and cash flows for the preceding twelve (12) month period and the consolidated balance sheet as at December 31, 2008, and (2) ResCap's quarterly consolidated financial report for the period ended September 30, 2009; each was prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, subject to ordinary, good faith year-end audit adjustments; and each of (1) and (2) are correct in all material respects and fairly present the consolidated financial condition of ResCap and its consolidated Subsidiaries, as of the dates thereof and consolidated results of operations for the periods covered thereby and (ii) As of the date of this Agreement, since September 30, 2009, other than as has been previously disclosed by the Borrowers or ResCap to the Lenders or the Lender Agent prior to the date hereof, there has been no change in such financial condition or results of operation that is reasonably likely to have a Material Adverse Effect.  Except as discussed in the financial statements, it is not subject to any contingent liabilities or commitments that, individually, or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect.

(p)    _Chief Executive Office_.  RFC's chief executive office is located at One Meridian Crossings, Suite 100, Minneapolis, MN 55423 or at such other location as hereafter disclosed to the Lender Agent in writing.  GMAC Mortgage's chief executive office is located at 1100 Virginia Drive, Fort Washington, PA 19034 or at such other location as hereafter disclosed to the Lender Agent in writing.  The chief executive office of the Guarantors are as set forth in Schedule II to the Security Agreement or at such other locations as hereafter disclosed to the Lender Agent in writing.

(q)    _Location of Books and Records_.  The location where such Obligor keeps its books and records, including all electronic files and records relating to the Collateral that it owns, is its chief executive office or such other location as disclosed to the Lender Agent in writing.

(r)    _Compliance with Laws_.  It is in compliance in all material respects with all applicable Requirements of Law; _provided_ that any such failure to comply with applicable Requirements of Law with respect to MHF Assets resulting solely from a default by a third-party customer of MHF in the performance of its obligations (including any obligation to comply with law) to MHF shall not constitute an Event of Default unless such failure to comply could reasonably be expected to give rise to liabilities payable out of Collateral other than MHF Assets.

(s)    _Representations and Warranties under the Security Documents_. Each of the representations and warranties it has made or any of its Subsidiaries has made under the Security Documents are true and correct in all material respects, and to the

Confidential

best of its knowledge all of the representations and warranties of all other parties to such agreements are true and correct in all material respects.

    (t)    <u>ERISA</u>.  Each Pension Plan is in compliance in all material respects with, and has been administered in all material respects in compliance with, the applicable provisions of ERISA, the Internal Revenue Code and all other applicable Federal and State laws, and no event has occurred or is reasonably expected to occur with respect to any such Pension Plan or any Multiemployer Plan that has resulted in or is reasonably expected to result in a Material Adverse Effect.

    (u)    <u>Servicing Advances</u>. Each Borrower has provided to GMAC (whether pursuant to this Agreement or another Related Document), as of the date hereof, all relevant information about any circumstance, including but not limited to the servicer status under each of the Borrowers' mortgage loan servicing contracts, that may affect the timely payment of all amounts owed with respect to the Advances included in the Primary Collateral, Supporting Assets or RE Assets, provided such circumstances involve an Agency, a securitization trustee or (to the extent such circumstance could reasonably be expected to give rise to a Material Adverse Effect) any other Person.

    (v)    <u>Underlying Documents; Restricted Entities</u>.  The Obligors have provided to the Lender Agent, or made available to the Lender Agent on a website to which the Lender Agent will have access while the related Collateral is held by the Obligors, true, accurate, and complete copies of each Underlying Document, each as amended, restated, supplemented or otherwise modified as of the Amendment Closing Date, and will promptly provide the Lender Agent with written notice of modifications or terminations thereof (other than Permitted Actions); and all Indebtedness (other than Excluded Debt and Permitted Indebtedness described in clause (c) or (h) of the definition of Permitted Indebtedness) owed by Restricted Entities is reflected in the Carrying Value of Primary Collateral related to such entities.

ARTICLE VII

COVENANTS

Section 7.01.  <u>Affirmative Covenants of the Obligors</u>.  Each Obligor covenants and agrees with the Lender Parties that, until all Loans and other Obligations have been paid in full in cash and the Commitments have terminated or expired, such Obligor will perform or cause to be performed the obligations set forth below in this <u>Article VII</u>:

    (a)    <u>Compliance with Laws, Etc</u>.  Each of such Obligor and each of its Subsidiaries shall comply in all material respects with all applicable Requirements of Law, <u>provided</u> that any such failure to comply with applicable Requirements of Law with respect to MHF Assets resulting solely from default by a third-party customer of MHF in the performance of its obligations (including any obligation to comply with law) to MHF shall not constitute an Event of Default unless such failure to comply could reasonably be expected to give rise to liabilities payable out of Collateral other than MHF Assets.

Confidential

(b)  Performance and Compliance with Agreements.  Each Obligor and each Subsidiary thereof shall comply with all provisions, covenants and other promises required to be observed by it under each of the Facility Documents to which it is a party (subject to all applicable grace periods as provided therein).

(c)  Taxes.  Each of such Obligor and each of its Subsidiaries shall pay and discharge promptly when due all material taxes and governmental charges imposed upon it or upon its income or profits or in respect of its property, in each case before the same shall become delinquent or in default and before penalties accrue thereon, unless and to the extent such taxes are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves shall, to the extent required by GAAP, have been set aside.

(d)  Due Diligence.  Such Obligor agrees and acknowledges that (i) the Lender Agent, at the Lender Agent's own expense except as set forth as provided herein, has the right to perform continuing due diligence reviews with respect to the Collateral, for purposes of verifying compliance with the representations, warranties, and specifications made hereunder and under the other Facility Documents, or otherwise, and (ii) the Lender Agent and its Responsible Officers will be permitted during normal business hours to examine, inspect, make copies of, and make extracts of, any and all documents, records, agreements, instruments or information relating to the Collateral in its possession.  Notwithstanding anything to the contrary herein, the Borrowers shall jointly and severally reimburse the Lender Agent for any and all out-of-pocket costs and expenses reasonably incurred by such party and its respective designees and agents in connection with the ongoing due diligence and auditing activities (A) not more than once a year, if no Event of Default has occurred and is continuing and (B) at all times during any period in which an Event of Default has occurred and is continuing.

(e)  Legal Existence, etc.  Such Obligor shall (i) preserve and maintain its legal existence and good standing and the legal existence and good standing of its Subsidiaries, except to the extent such failure to so preserve and maintain is in connection with a Permitted Dissolution, (ii) preserve and maintain all of its rights, privileges, authorizations, approvals, licenses and franchises, except to the extent such failure to so preserve and maintain relates to a Permitted Dissolution or is not reasonably expected to have a Material Adverse Effect; and (iii) keep adequate records and books of account, in which complete entries will be made in accordance with GAAP consistently applied (or, in the case of Obligors or Subsidiaries organized outside of the United States, in accordance with GAAP and/or applicable local accounting standards, consistently applied) and local law.

(f)  Financial Statements.  ResCap shall deliver each of the following to the Lender Agent:

(i)  as soon as available, but not later than forty-five (45) calendar days after the end of each fiscal quarter ending on March 31, June 30 and September 30, ResCap's unaudited consolidated balance sheet as at the end of such fiscal

Confidential

quarter, the related unaudited, consolidated statement of income for such quarter and the portion of the fiscal year through the end of such quarter and the related unaudited consolidated statements of retained earnings and cash flows for the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year;

(ii)    as soon as available, but not later than ninety (90) days after the end of each fiscal year ResCap's audited consolidated balance sheet as at the end of such fiscal year and the related consolidated statements of income and retained earnings and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous year, and accompanied by the opinion of an independent certified public accountant of recognized national standing, which report shall state that such consolidated financial statements present fairly ResCap's consolidated financial position and the results of its operations for the periods indicated in conformity with GAAP.  Such opinion shall not be qualified or limited because of a restricted or limited examination by the independent auditor of any material portion of its books and records and shall have no "going concern" qualification;

(iii)    as soon as available, but not later than thirty (30) days after the end of each calendar month ResCap's consolidated balance sheet as of the end of such calendar month and the related consolidated statements of income for such calendar month, setting forth in each case in comparative form the figures for the previous calendar month, fairly presenting in all material respects, in accordance with GAAP, as at the end of, and for such period, ResCap's consolidated financial position and the results of ResCap's consolidated operations; and

(iv)    concurrently with the delivery of the financial statements referred to in subsections 7.01(f)(i), (ii), and (iii), a duly completed Compliance Certificate executed by a Responsible Officer of ResCap.

(g)    Required Reports; Additional Information.  The Borrowers will at the times specified in Schedule 7.01(g) attached hereto deliver to the Lender Agent the reports identified in such schedule, and promptly furnish to the Lender Agent all notices of all final written audits, examinations, evaluations, reviews and reports of the Obligors' origination and servicing operations by any state mortgage banking licensing agency or instrumentality (including those prepared on a contract basis for any such agency) in which there are material adverse findings, including without limitation notices of termination or impairment of approved status, and notices of probation, suspension or non-renewals, and such other information, documents, records or reports with respect to the Collateral or the conditions or the Obligors' operations, financial or otherwise, as the Lender Agent may from time to time reasonably request.

(h)    Peak Score.  GMAC Mortgage shall maintain either (i)(1) at all times while Fannie Mae is utilizing the monthly Peak Score rating system, a monthly Peak Score which equates to "Excellent" or better or (2) at all times after Fannie Mae has developed and implemented a replacement rating system for the monthly Peak Score

Confidential

rating system, a score or rating in respect of such replacement rating system that is reasonably equivalent to a monthly Peak Score of "Excellent" or better, as agreed upon by the Lender Agent and GMAC Mortgage, or (ii) an Investor Reporting and Remitting rating from Freddie Mac which equates to "Tier 2" or better.

(i)    Quality Control.  Such Obligor and each of its Subsidiaries shall conduct quality control reviews of its servicing operations in accordance with industry standards and past practice.  Each Obligor shall report to the Lender Agent quality control findings that could reasonably be expected to give rise to a Material Adverse Effect as such reports are produced and upon reasonable request by the Lender Agent.

(j)    Insurance.  Such Obligor shall maintain such insurance with financially sound and reputable insurance companies, and with respect to property and risks of a character usually maintained by entities engaged in the same or similar business similarly situated, against loss, damage and liability of the kinds and in the amounts customarily maintained by such entities.

(k)    Use of Proceeds and Withdrawals.  The Borrowers shall use the proceeds of the Loans and any funds withdrawn from the Concentration Accounts, the Collection Accounts and (to the extent permitted under Section 4.02) Sales Proceeds Account in accordance with Section 4.04 for budgeted working capital and general corporate expenses in the ordinary course of business.

(l)    Accounts.  (i) ResCap shall not hold in the Exempt Cash Reserve Account any amount in excess of the sum of $250,000,000 and any investment earnings on such amount accrued and retained therein, and (ii) the Obligors will (subject to the provisions of Sections 4.02 and 4.03 and the Account Exceptions) insure that all Collections with respect to Collateral (other than funds deposited in the Exempt Cash Reserve Account as described above) are deposited directly into the Collection Accounts.

(m)    Custodial Procedures.  The Borrowers and Obligors have entered into and will maintain one or more custody agreements (as the same may be amended, supplemented, modified or restated from time to time, the "Custody Agreement") governing the custody of certain documentation for Collateral consisting of US Mortgage Loans, which Custody Agreement appoints Wells Fargo Bank National Association as custodian.  At the Lender Agent's request, the Borrowers hereby agree to update the Lender Agent on the applicable custodian's exception report.  The Lender Agent may at any time specify that any US Mortgage Loans included in the applicable custodian's exception report shall no longer constitute Eligible Assets.  It is understood and agreed that the Lender Agent may adjust the Specified Percentage of all or a portion of the US Mortgage Loans in response to the exceptions described therein.

(n)    Collections and Net Cash Proceeds Reporting.  The Borrowers will, within eleven Business Days of the end of each calendar month, provide a written statement to the Lender Agent and each Lender of (i) the aggregate Net Cash Proceeds of all Collateral Dispositions of the Obligors and their Subsidiaries, (ii) the aggregate

Confidential

Collections received relating to Primary Collateral, in each case during the immediately preceding calendar month, and (iii) the Carrying Value of the Primary Collateral of each Obligor at the beginning of such calendar month and at the end of such calendar month.

(o)    REO Property.  With respect to any Primary Collateral consisting of REO Property (other than REO Property held by BCG), the Obligors will obtain a broker price opinion every ninety (90) days to the extent required under the Servicing Guidelines for so long as such Primary Collateral is retained.

(p)    Servicing of Collateral, RE Assets, Supporting Assets.  Such Obligor will ensure, and will direct its Subsidiaries to ensure, that the Collateral, Supporting Assets and RE Assets owned or serviced by it or its Subsidiaries (as applicable) is serviced and administered by it or its Subsidiaries as servicer or administered at all times in accordance with the procedures (including but not limited to collection and enforcement procedures, the maintenance of insurance, custodial arrangements, documentation retention, and the making of servicer advances, including servicer advances with respect to residential mortgage assets) that each Borrower or other Obligor (as the case may be) customarily employs and exercises (or requires to be employed or exercised by those servicing its other assets) in its good faith business judgment and which are normal and usual in the servicing of its other assets, and that such servicing and administration is conducted in the best interest of and for the benefit of the Lender Parties.

(q)    Structuring for Eligible Collateral Acquisition, Excluded Assets, Non-UCC Assets.  Such Obligor will, and will cause its Subsidiaries to, use commercially reasonable efforts to grant and perfect a Lien to secure the Obligations, directly or through the use of a Restricted Entity, with respect to (i) US Mortgage Loans repurchased or otherwise acquired by such Obligor or Subsidiary, or held by such Obligor or Subsidiary and released from the Liens supporting any other facility, (ii) Mortgage Loans denominated in other currencies, provided that, with respect to Mortgage Loans that are denominated in Pounds Sterling or Euros, the covenant contained in this clause (ii) shall not take effect until the third-party credit facility in place on the Amendment Closing Date for financing Mortgage Loans in such currency has been terminated (by prepayment, at maturity or otherwise), and (iii) each of their unencumbered assets with a Carrying Value (in the case of this clause (iii)) greater than $50,000,000.  Without limiting the foregoing and unless the Lender Agent shall agree otherwise, upon the termination of the Conduit (No. 2) Facility, the Obligors will, and will cause its Subsidiaries to (i) transfer the Mortgage Loans pledged under the Conduit (No. 2) Facility and any other unencumbered repurchased Mortgage Loan denominated in Pounds Sterling or Euros to be transferred to a Restricted Entity, (ii) cause such Restricted Entity to issue notes secured by such Mortgage Loans, and (iii) pledge such notes as Collateral under the Security Agreement; provided that unless the Borrowers and the Lender Agent agree, such notes and Mortgage Loans shall not be Primary Collateral or Supporting Assets.

Confidential

(r)    <u>Further Assurances</u>.  Such Obligor will, and will cause each of its Subsidiaries to, at its own expenses promptly execute and deliver to the Lender Agent, the First Priority Collateral Agent or the Collateral Control Agent all such other documents, agreements and instruments reasonably requested by the Lender Agent, the First Priority Collateral Agent or the Collateral Control Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrowers and the Guarantors in the Facility Documents, if requested, or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in this Agreement or the Facility Documents, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to any of the Security Documents or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Lender Agent, in connection therewith.  Each Obligor hereby authorizes, without obligation, the Lender Parties to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of any Collateral or any part thereof or any other collateral without the signature of any Obligor where permitted by law.  Without limiting the foregoing, each Obligor agrees that the Lender Agent and the First Priority Collateral Agent are hereby authorized to file, at such times as the Lender Agent deems necessary or desirable, UCC financing statements naming it and its Subsidiaries as debtor and describing the collateral as "all personal property" or "all assets" of such debtor whether now or hereafter acquired, or words of like import.

(s)    <u>Additional Guarantors</u>.

(i)    ResCap and the Borrowers will, contemporaneously with the direct or indirect acquisition of any Person which upon such acquisition is, or of any asset which causes the Subsidiary acquiring such assets (without regard to any other assets of such Subsidiary) to be, a Significant Subsidiary (other than an Excluded Subsidiary), cause such Person or Subsidiary to execute a joinder agreement in substantially the form of Exhibit 7.01(t) whereby such Person or Subsidiary unconditionally agrees to become a party to, and assume all obligations under, this Agreement as a Guarantor.

(ii)    ResCap and the Borrowers will, contemporaneously with the guarantee by any Subsidiary of any Indebtedness of ResCap or any other Guarantor, cause such Subsidiary (unless such Subsidiary is already a Guarantor) to execute a joinder agreement in substantially the form of Exhibit 7.01(t) whereby such Subsidiary unconditionally agrees to become a party to, and assume all Obligations as a Guarantor.

(iii)    ResCap and the Borrowers will, within forty-five (45) days after the end of each of the first three fiscal quarters of each year and ninety (90) days after the end of each fiscal year, cause each Person that is a Significant Subsidiary (other than an Excluded Subsidiary) as of the end of such quarter or fiscal year that is not already a Guarantor to execute a joinder agreement in substantially the

Confidential

form of Exhibit 7.01(t) whereby such Person unconditionally agrees to become a party to, and assume all obligations under, this Agreement as a Guarantor.

(t)     Terms of Other Debt Facilities.  The Obligors shall (i) give not less than ten (10) Business Days' prior written notice to the Lender Agent of any amendment of any Bilateral Facility or the execution of any other facility under which ResCap or any of its Subsidiaries incur Indebtedness, which amendment or facility varies from this Agreement as to (v) whether Obligors other than ResCap make representations as to, or are required to be, Solvent, (w) the definition of "Solvent" or an equivalent or any representation relating to solvency, (x) the definition of "Change of Control" or the equivalent in any such facility, (y) any financial covenant (including the imposition of a new financial covenant), or (z) any of the definitions of the terms referenced in the provisions described in clauses (w), (x) or (y) above, and (ii) within five (5) Business Days after such provision(s) shall become effective, enter into such amendments hereto as may be required by the Lender Agent to conform in all material respects to the related provisions of this Agreement to such amendment(s).

(u)     Transfer of Rights or Benefits. If requested to do so by the Lender Agent, the Obligors will cooperate, to the fullest extent reasonably possible, with actions taken by a lender under the Dutch Security Documents and the English Security Documents that enable such lender to effect a transfer of servicing, legal title or other rights or benefits in an efficient and orderly manner upon exercise of remedies pursuant to the Dutch Security Documents or the English Security Documents, as applicable, with respect to any collateral maintained for such lender's benefit.

(v)     Underlying Documents Obligations and Contractual Exercise of Rights and Remedies.  Each Obligor shall, and shall cause its Subsidiaries to, (i) perform all of its obligations under the Underlying Documents, except where failure to perform could not reasonably be expected to give rise to a Material Adverse Effect; and (ii) take such actions to exercise the rights and remedies of any ResCap Subsidiary with respect to the Underlying Documents as the Lender Agent shall direct in accordance with the terms of the applicable agreement, provided that, absent such direction, the Obligors and such Subsidiaries may take or permit to occur Permitted Actions.

(w)     Underlying Documents Reports and Notices.  The Obligors shall promptly deliver to the Lender Agent (i) with respect to the English Security Documents and the Dutch Security Documents, all reports, notices and certificates required thereunder and (ii) with respect to all other Underlying Documents, all reports, notices and certificates which describe events or circumstances that could reasonably be expected to give rise to a Material Adverse Effect.

(x)     Additional Collateral.  The Obligors shall provide as soon as practicable prior written notice to the Lender Agent of any proposed Substitute Collateral which they request to be added to the Primary Collateral.  The Obligors shall deliver such documents, agreements, schedules, other information and opinions as the Lender Agent shall reasonably request in connection with any such proposed additional

Confidential

Collateral including, without limitation, all reasonable information with respect to any equity in joint ventures or other Assets acquired by a Restricted Entity.  The Lender Agent shall act in good faith to discuss any such request from the Obligors.

The Obligors shall cooperate with the Lender Agent with respect to any due diligence the Lender Agent reasonably requires with respect to such proposed Substitute Collateral and shall enter into any amendments to the existing Security Documents, and enter into any additional documentation or authorize any filings with respect to the Lender Agent's security interest in any such Substitute Collateral, as the Lender Agent shall reasonably request.

No proposed Substitute Collateral shall become Substitute Collateral without the prior written consent of the Lender Agent, as evidenced by its execution of a Collateral Addition Designation Notice, which notice may set out certain terms and conditions governing the Collateral Value of such Substitute Collateral and additional covenants, representations or eligibility requirements, which additional terms shall apply to such Substitute Collateral as if set forth hereunder unless otherwise later specified by the Lender Agent in writing.

In addition, with respect to the Obligors' request to add US Mortgage Loans, the Obligors shall deliver to the Lender Agent a data file identifying those loans requested to be included on the Mortgage Schedule and be included in the Primary Collateral at the time such Mortgage Schedule is delivered, which data file shall include loan data, with the same detail and in the same format, as the data file delivered to the Lender Agent on May 19, 2009 in connection with the Line of Credit Agreement (or such other data, detail or format as the Lender Agent and the Obligors shall mutually agree), and in any event sufficient data to identify each US Mortgage Loan thereon. If the Lender Agent approves such addition of US Mortgage Loans, the Obligors shall (i) deliver a Mortgage Schedule to the Lender Agent and a final data file, but containing only those loans included in the Mortgage Schedule and those loans to be included in the Primary Collateral  at the time such Mortgage Schedule is delivered, (ii) prepare and file a UCC-3 financing statement adding a description of the Mortgage Schedule to the financing statements outstanding at such time, which shall be in form and substance acceptable to the Lender Agent and its counsel and (iii) deliver any lien releases and related UCC-3 financing statements required to release any outstanding liens on such US Mortgage Loans, which shall be in form and substance acceptable to the Lender Agent and its counsel.  Each Obligor shall promptly mark its books and records to indicate that all US Mortgage Loans included on a Mortgage Schedule have been pledged to the Lender Agent for so long as such US Mortgage Loan constitutes Primary Collateral. The Lender Agent may, in its sole discretion, require updated data files of the US Mortgage Loans included in the Collateral or the Primary Collateral at any time.

(y)    ResCap Liquidity Balance Rollforward.  The Obligors will provide to the Lender Agent, on a daily basis, the ResCap Liquidity Balance Rollforward, prepared in a manner consistent with the methods used by the management of the Guarantors prior to the Amendment Closing Date.

Confidential

(z)      Instructions Under Underlying Documents. ResCap shall, at the specific written direction of the Lender Agent, give (or refrain from giving) any instructions permitted to be given under the Underlying Documents.

Section 7.02. Negative Covenants of the Obligors. Each Obligor covenants and agrees with the Lender Parties that, until all Loans and other Obligations have been paid in full in cash and the Commitments have terminated or expired, it shall not, and shall not permit any Subsidiary to:

(a)      other than in accordance with Section 7.02(k), take any action that would directly or indirectly materially impair or adversely affect its title to, or the value of, the Collateral or Supporting Assets in a manner that could reasonably be expected to give rise to a Material Adverse Effect; provided that (i) actions in accordance with the Credit and Collection Policies, (ii) modifications implemented in a good faith attempt to increase the recovery on, or collectibility of, delinquent or distressed Collateral or Supporting Assets, or (iii) Collateral Dispositions or Permitted Actions otherwise permitted hereunder shall not constitute a violation of this Section 7.02(a);

(b)      engage in any line of business activity other than the businesses in substantially the same fields of enterprise are conducted on the date hereof; provided, however, if an entity is substantially dormant, then such entity may engage in any line of business activity other than the businesses in substantially the same fields of enterprise as are conducted on the date hereof by any Obligor or Subsidiary of an Obligor;

(c)      amend, modify or waive any term or condition of any Facility Document, or consent to any amendment, modification or waiver of any term or condition of any Facility Document, without the prior written consent of the requisite Lenders (as specified in Section 13.01);

(d)      change its name, organizational identification number, organizational structure or its state of incorporation, organization or formation unless it shall have given the Lender Agent at least thirty (30) days' prior written notice thereof and unless, prior to any such change, it shall have filed, or caused to be filed, such financing statements or amendments and taken such further action as any Lender or the Lender Agent determines may be reasonably necessary to continue the perfection and priority of the Lender Agent's interest (on behalf of the Lender Parties) in the Collateral, provided however that this Section 7.02(d) shall only apply to Obligors and issuers of notes, securities or other interests included in the Schedules to the Security Agreement;

(e)      ResCap shall not, and shall not permit the ResCap Counterparty to, (i) reduce the notional amount of any Hedge Transaction, (ii) terminate in whole or in part any Hedge Transaction, or (iii) otherwise modify any Hedge Transaction without the prior written consent of the Initial Lender unless (A) following the closing date for such Hedge Transaction, there has been a reduction in the aggregate outstanding

Confidential

balance of the exposure intended to be hedged by such Hedge Transaction in an amount at least equal to the Minimum Notional Reduction, and (B) such modification to the Hedge Transaction effects a reduction in the notional amount of the applicable Hedge Transaction which is approximately proportionate to the aggregate reduction in the exposure intended to be hedged by such Hedge Transactions since the closing date of such Hedge Transaction;

(f)     at any time (i) create, issue, incur (by conversion, exchange or otherwise), assume, guarantee or otherwise become liable in respect of any Indebtedness (including Acquired Indebtedness) other than Permitted Indebtedness, or (ii) permit any Restricted Entity to create, issue, incur (by conversion or otherwise), assume, guarantee or otherwise become liable in respect of Indebtedness (other than Excluded Debt and Permitted Indebtedness described in clause (c) or (h) of the definition of Permitted Indebtedness);

(g)     (1) directly or indirectly, make any Restricted Payment unless, at the time of and after giving effect to the proposed Restricted Payment either (i) (A) no Default shall have occurred and be continuing or will occur as a consequence thereof and (B) after giving effect to such Restricted Payment on a pro forma basis, the aggregate amount expended or declared for all Restricted Payments made on or after the Closing Date (excluding Restricted Payments described in clauses (b), (c), (d), (e), (f) and (g) of the definition of Permitted Restricted Payments), shall not exceed the Restricted Payment Maximum Amount or (ii) such Restricted Payment is a Permitted Restricted Payment; or (2) without the written consent of the Lender Agent, permit any Restricted Entity to (i) make any dividend or distribution of the RE Assets, except for Ordinary RE Transactions, without the written consent of the Lender Agent, (ii) repurchase any outstanding equity interest issued by a Restricted Entity or (iii) other than as contemplated by Section 7.02(f), Article XI or the Security Documents, act as guarantor or surety with respect to any Indebtedness incurred by the Obligors or any of their Subsidiaries or Affiliates;

(h)     at any time create or suffer to exist any Lien (other than any Permitted Liens) on any of its assets or property (whether now owned or hereafter acquired) which are Collateral or Supporting Assets; or permit any Restricted Entity to at any time create or suffer to exist any Lien on any of its assets or property (whether now owned or hereafter acquired) which are Supporting Assets or RE Assets, other than Permitted Liens; provided that, in the case of a ResCap Subsidiary other than a BCG Joint Venture, such Permitted Liens shall be in favor of GMAC or described in clause (b) through (f), (i), (j), (k), (l), (m) or (o) of the definition of Permitted Lien;

(i)     if, on any Business Day, the aggregate amount of Consolidated Liquidity shall be less than $750,000,000, ResCap shall within two (2) Business Days (if such Business Day is a Remittance Date) or (in all other cases) one (1) Business Day, cause the aggregate amount of Consolidated Liquidity to be not less than $750,000,000; provided that, at no time shall ResCap permit the aggregate amount of Consolidated Liquidity to be less than $450,000,000; provided further that, at no time shall ResCap permit the aggregate amount of unrestricted and unencumbered (x) cash

Confidential

(consisting solely of United States dollars held at all times in the United States by ResCap on a consolidated basis, and (y) Cash Equivalents held by ResCap on a consolidated basis (consisting solely of (A) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, and (B) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of <u>clause (y)(A)</u>) to be less than $250,000,000;

(j)    permit, as of the last Business Day of each fiscal month of ResCap, the Consolidated Tangible Net Worth of ResCap to be less than $250,000,000;

(k)    consummate a Collateral Disposition unless (i) it (or the applicable Subsidiary, as the case may be) receives consideration in the form of Permitted Consideration, and (ii) at the time of the Collateral Disposition, the Permitted Consideration received in such Collateral Disposition by it or such Subsidiary is at least substantially equivalent to the Fair Value of the Primary Collateral or Supporting Assets issued or sold or otherwise disposed of; <u>provided</u> that this <u>clause (k)</u> will not apply to MHF Assets;

(l)    except for Affiliate Transactions engaged by or with any Excluded Subsidiary, directly or indirectly, engage in any Affiliate Transaction which is not a Permitted Affiliate Transaction unless (i) such Affiliate Transaction is on terms that are not materially less favorable to it or the relevant Subsidiary than those that could reasonably have been obtained in a comparable arm's length transaction by it or such Subsidiary with an unaffiliated party (<u>provided</u> that any transactions between Obligors shall be in compliance with the corporate governance policies of each such Obligor), (ii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $250,000,000, it delivers to the Lender Agent a resolution adopted in good faith by the majority of its Board of Directors approving such Affiliate Transaction and set forth in an officers' certificate certifying that such Affiliate Transaction complies with <u>clause (i)</u> above, and (iii) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $500,000,000, it obtains and delivers to the Lender Agent a written opinion of a nationally recognized independent third-party investment banking, accounting or appraisal firm acceptable to the Lender Agent stating that the transaction is fair to it or such Subsidiary, as the case may be, from a financial point of view;

(m)    amend or otherwise modify its organizational documents if the result would have a material adverse effect on the Lender Parties (including on the rights or remedies of the Lender Parties);

(n)    amend or otherwise modify the 2010 Indenture or the 2015 Indenture if the result of such amendment or modification could reasonably be expected to result in a Material Adverse Effect or materially adversely effect the Lender Parties or their rights, priority and/or remedies under the Facility Documents;

Confidential

(o)     enter into any agreement (other than a Facility Document) prohibiting, restricting or otherwise limiting (i) the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired (other than limits arising from the 2010 Indenture or the 2015 Indenture or agreements governing Permitted Funding Indebtedness and Permitted Refinancing Indebtedness restricting Liens on any collateral covered by Permitted Liens arising under such agreements), (ii) the ability of any Obligor to amend or otherwise modify any Facility Document, or (iii) the ability of any Obligor or other Significant Subsidiary to make any payments, directly or indirectly, to the Borrowers or any Guarantor, including by way of dividends, distributions, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments (including, without limitation, entering into any agreement by any Obligor or other Significant Subsidiary that requires distributions otherwise payable to the Borrowers to be escrowed or to be subject to a sinking fund or other similar restriction or to be paid to another Person);

(p)     permit ResCap, the Borrowers, any other Obligor, any Restricted Entity or any Significant Subsidiary of ResCap to merge or consolidate with any other corporation or other entity or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to any Person, or permit any Subsidiary of such foregoing entities to do so, unless (i) such entity is not a Restricted Entity; (ii) such entity is the survivor or such entity's successor is a person organized and existing under the laws of the United States or a state thereof and expressly assumes all of such entity's obligations under this Agreement and the other Facility Documents; (iii) immediately after giving effect to such consolidation, merger, sale or conveyance, no Default shall have occurred and be continuing; and (iv) each Obligor confirms that each of its obligations with respect to the Facility Documents shall remain in full force and effect;

(q)     permit ResCap to directly own any assets other than (i) Equity Interests of the other Obligors, (ii) assets in respect of hedging arrangements, (iii) so long as no Event of Default has occurred and is continuing, cash and cash equivalents and other immaterial assets in the ordinary course of business consistent with past practice, (iv) assets which are subject to a Lien as Collateral under the Security Documents and (v) the Exempted Cash Reserve Account;

(r)     without the written consent of the Lender Agent, agree to amend, modify or waive any provision of the organizational documents of any Restricted Entity (i) relating to the independent directors, the filing of insolvency proceedings or (ii) relating to any other matters unless, in the case of this clause (ii), such modification could not be reasonably expected to be materially adverse to the interests of the Lenders or the Lender Agent;

(s)     without the prior written consent of the Lender Agent, terminate the administrator under the English Security Documents or the Dutch Security Agreements or take any other action under the English Security Documents or the Dutch Security Agreements which could reasonably be expected to adversely affect the Lender or the

Confidential

Lender Agent or the value of the related English Note or the Dutch Note, _provided_, however, that this Section shall not apply to automatic termination of the administrator under the applicable agreements;

(t)        except for Permitted Actions, agree to amend, modify or waive any provision of any Underlying Document  without the written consent of the Lender Agent which consent shall not be unreasonably withheld; and

(u)        except for Permitted Actions, agree to terminate any Underlying Document without the written consent of the Lender Agent.

Section 7.03.  Notice of Certain Occurrences.  Each Obligor covenants and agrees with the Lender Parties that, until all Loans and other Obligations have been paid in full in cash and the Commitments have terminated or expired:

(a)        Defaults.  As soon as possible, but in any event within one Business Day, after any Obligor obtains knowledge of any Default, it shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent a written statement of a Responsible Officer of the Borrowers setting forth details of such Default and the action that it proposes to take with respect thereto;

(b)        Litigation.  As soon as possible, but in any event within ten (10) Business Days, after any Obligor obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent notice of any material action, suit or proceeding instituted by or against it or any of its Subsidiaries in any federal or state court or before any commission, regulatory body or Governmental Authority, and of any material adverse development in any such action, suit or proceeding which either (i) arises with respect to any Indebtedness of ResCap or its Subsidiaries, or arises under any servicing contract pursuant to which a Guarantor services assets for a third party owner of such assets (including an Agency or special purpose vehicle and other securitization vehicle) and is instituted by such owner, or a trustee or administrator on such owner's behalf, or an insurer or guarantor with respect to amounts owed to or by such owner; provided that with respect to servicing contracts related to whole loan mortgage sales to an entity other than an Agency, a special purpose vehicle or any other securitization vehicle, such notice shall only be required if the applicable material adverse development could reasonably be expected to give rise to a Material Adverse Effect, or (ii) in all cases, is reasonably likely to result in a Material Adverse Effect;

(c)        Material Adverse Effect.  Within one Business Day of it becoming aware of any event or circumstance that could reasonably be expected to have a Material Adverse Effect, it shall furnish or caused to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent written notice of such event or circumstance;

Confidential

(d)    Change of Control.  It shall furnish or caused to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent notice of any Change of Control upon the occurrence of such event;

(e)    Event of Default.  Within three Business Days after any Obligor obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent the First Priority Collateral Agent and the Collateral Control Agent notice of any default or event of default under any organizational or constitutive document of any Obligor;

(f)    Adverse Judgment.  Within three Business Days after the entry of a judgment or decree against any Obligor in an amount in excess of $25,000,000, it shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent notice thereof;

(g)    Accounting Policies.  It shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent within three Business Days notice of any material change in accounting policies or financial reporting practices of the Obligor, except for those changes that are in conformity with new or revised GAAP;

(h)    Rating.  Within three Business Days after any Obligor obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent the First Priority Collateral Agent and the Collateral Control Agent notice of any decrease in the servicer rating of any Servicer by any Agency;

(i)    Agency Termination.  Upon the receipt by any Obligor of any notice received from Freddie Mac, Fannie Mae or Ginnie Mae terminating, or indicating any intent to terminate, or indicating any adverse fact or circumstance which could reasonably be expected to entitle Freddie Mac, Fannie Mae or Ginnie Mae to terminate, such Obligor for cause from any servicing arrangement with such agency, it shall furnish or cause to be furnished to the Lender Agent unless it shall have provided GMAC notice thereof pursuant to a Related Document;

(j)    Agency Suspension.  Upon the receipt by any Obligor of any notice received from any Freddie Mac, Fannie Mae, Ginnie Mae, HUD, the FHA or the VA revoking or suspending, or indicating any intent to revoke or suspend, or indicating any adverse fact or circumstance which could reasonably be expected to entitle such agency to revoke or suspend any of the approvals granted to such Obligor that are referenced in Section 6.01(n) hereof, it shall furnish or cause to be furnished to the Lender Agent unless it shall have provided GMAC notice thereof pursuant to a Related Document;

(k)    Insurance Coverage.  Within three Business Days after any Obligor obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent notice of any material change in the insurance coverage maintained by such Obligor or any other

Confidential

person to comply with the requirements of this Agreement, with a copy of evidence of the same.

(l)      ERISA.  As soon as reasonably possible, and in any event within thirty (30) days after a Responsible Officer of any Obligor knows, or with respect to any Pension Plan or Multiemployer Plan to which any Obligor or any of their respective Subsidiaries makes direct contributions, has reason to believe, that any of the events or conditions specified below with respect to any such Pension Plan or Multiemployer Plan has occurred or exists, such Obligor will deliver to the Lender Agent, the First Priority Collateral Agent and the Collateral Control Agent a statement signed by a senior financial officer of the relevant Obligor setting forth details respecting such event or condition and the action, if any, that such Obligor or one of its Subsidiaries proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by the Obligor or such Subsidiary with respect to such event or condition):

(A)      any reportable event, as defined in Section 4043(b) of ERISA, with respect to a Pension Plan, as to which the PBGC has not by regulation or otherwise waived the requirement of Section 4043(a) of ERISA that it be notified within thirty (30) days of the occurrence of such event (provided that a failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code or Section 302 of ERISA, such that Section 430(k) of the Internal Revenue Code would apply, shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(c) of the Internal Revenue Code) and any request for a waiver under Section 412(c) of the Internal Revenue Code for any Pension Plan;

(B)      the distribution under Section 4041(c) of ERISA of a notice of intent to terminate any Pension Plan or any action taken by any Obligor or one of their respective Subsidiaries to terminate any Pension Plan;

(C)      the institution by the PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, or the receipt by any Obligor or one of their respective Subsidiaries of a notice from a Multiemployer Plan that such action has been taken by the PBGC with respect to such Multiemployer Plan;

(D)      the complete or partial withdrawal from a Multiemployer Plan by any Obligor or any of their respective subsidiaries that results in liability to such Obligor or Subsidiary under Section 4201 or 4204 of ERISA (including the obligation to satisfy secondary liability as a result of a purchaser default) or the receipt by any Obligor from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA;

Confidential

(E)    the institution of a proceeding by a fiduciary of any Multiemployer Plan against any Obligor or one of their subsidiaries to enforce Section 515 of ERISA, which proceeding is not dismissed within thirty (30) calendar days;

(F)    the failure of any Pension Plan to meet the requirements of Section 436 of the Internal Revenue Code, resulting in a loss of tax-exempt status of the trust of which such Pension Plan is a part under Section 401(a)(29) of the Internal Revenue Code; and

(G)    any written notice from the PBGC to any Obligor that it intends to place a Lien on the assets of any Obligor, whether or not in connection with a Pension Plan.

(m)    <u>Collateral Impairment</u>. Promptly after ResCap Treasury obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent notice of any fact, circumstance or development could reasonably be expected to result in a material reduction in the market value of any material portion of the Primary Collateral or the ability of the Obligors or the Lender Agent to realize the market value in respect of any material portion of the Primary Collateral.

(n)    <u>Underlying Documents</u>. Promptly after ResCap Treasury obtains knowledge thereof, it shall furnish or cause to be furnished to the Lender Agent notice of any default by any Person in the performance of such Person's obligations in the Underlying Documents that could reasonably be expected to give rise to a Material Adverse Effect.

(o)    <u>Indebtedness Restricted Entity</u>. Promptly upon ResCap Treasury's obtaining notice thereof, it shall furnish or cause to be furnished to the Lender Agent notice of any failure of a BCG Joint Venture or any other Restricted Entity to pay any principal or interest when due (whether by acceleration or otherwise, but subject to applicable grace periods) on any Indebtedness of such Person (other than Ordinary RE Transactions) in excess of $5,000,000.

(p)    <u>Servicing Arrangements</u>. Upon ResCap Treasury obtaining knowledge of any notice terminating, or indicating any intent to terminate, or indicating any adverse fact or circumstance which could reasonably be expected to result in the termination of any Obligor for cause from any mortgage loan servicing arrangement with an Agency, a securitization trustee or (if termination could reasonably be expected to give rise to a Material Adverse Effect) any other Person, it shall furnish or cause to be furnished to the Lender Agent written notice thereof unless an Obligor shall have notified GMAC thereof in writing under the Related Documents.

(q)    <u>Other</u>. Promptly, from time to time, it will furnish to the Lender Agent, each Lender, the First Priority Collateral Agent and the Collateral Control Agent such other information, documents, records or reports with respect to the Collateral or its corporate affairs, conditions or operations, financial or otherwise, as the Lender Agent,

Confidential

any Lender, the First Priority Collateral Agent or the Collateral Control Agent may from time to time reasonably request.

ARTICLE VIII

EVENTS OF DEFAULT

Section 8.01.  <u>Events of Default</u>.  The following events shall be "<u>Events of Default</u>":

(a)    The Borrowers shall fail to pay the principal of, or interest on, any Loan when due (whether at stated maturity, in accordance with <u>Section 2.08(b)</u>, upon acceleration or otherwise); any Obligor shall fail to make any other payment or deposit to be made by them hereunder or under any Facility Document when due and such failure shall continue for two (2) Business Days; <u>provided</u> that if (i) an Obligor shall fail to deposit a Specified Amount, and (ii) such failure results from good faith administrative error in the ordinary course of business, such failure (and any related failure to apply Collateral Disposition Proceeds to the repayment of Loans by the related Mandatory Repayment Date) will not become an Event of Default if such Net Cash Proceeds are deposited by the earlier of (x) the thirteenth Business Day of the calendar month following the month in which such Collateral Disposition occurred and (y) two (2) Business Days after actual knowledge of such failure and (with respect to Collateral Disposition Proceeds) are applied to the repayment of Loans on the next Business Day;

(b)    Any representation or warranty made or deemed to be made by an Obligor or its Subsidiary (or any of such Person's officers) under or in connection with this Agreement or any other Facility Document, or any written information, certificate, or report delivered pursuant hereto or to any Facility Document shall prove to have been false or misleading in any material respect when made or repeated or deemed to have been made, furnished or repeated after the earlier of (i) such Obligor having actual knowledge thereof and (ii) written notice of such default from any Lender or the Lender Agent;

(c)    Any Obligor or its Subsidiary (i) shall fail to comply with the requirements of any of <u>Section 7.01(e)</u>, <u>7.01(k)</u>, <u>7.02(a)</u>, <u>7.02(h)</u> through (<u>l</u>), <u>7.02(p)</u>, <u>7.03(a)</u>, <u>7.03(c)</u>, <u>7.03(i)</u> or <u>7.03(j)</u> hereof or (ii) shall fail to perform or observe any term, covenant or agreement contained in this Agreement or any other Facility Document (other than with respect to the making of any payment or other breach under this Article VIII or as set forth in <u>clause (i)</u> of this <u>Section 8.01(c)</u>) on its part to be performed or observed and any such failure shall remain unremedied for ten (10) Business Days after the earlier of (x) any Obligor having actual knowledge thereof and (y) written notice of such default from the Lender Agent or any Lender to the Borrowers;

(d)    An Event of Bankruptcy shall have occurred with respect to any Obligor or Restricted Entity;

Confidential

(e)    With respect to any Indebtedness arising under (i) a Bilateral Facility or any other Indebtedness (excluding Non-Recourse Debt) of ResCap or any of its Subsidiaries in excess of $25,000,000, individually or in the aggregate, or (ii) a Related Document, such Indebtedness (x) is not paid when due or within any applicable cure period set forth in any agreement or instrument relating to such indebtedness, (y) is declared due and payable before its normal or agreed maturity by reason of default (however described) or (z) is the subject of any other "event of default" or other breach or failure to perform, in either case which remains after the expiration of any applicable grace period under such agreement;

(f)    The failure by any Obligor to pay one or more final judgments for the payment of money aggregating in excess of $25,000,000 rendered against such Person which are not, within 30 days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within 30 days after the expiration of such stay;

(g)    This Agreement, any Note, any Facility Document or any Security Document (other than the Intercreditor Agreement) shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor or Restricted Entity party thereto, or the Lien granted under the Security Documents ceases to be in full force and effect or, in each case, any Obligor, Restricted Entity or other Person shall contest in any manner such effectiveness, validity, binding nature or enforceability;

(h)    The Collateral Control Agent or the First Priority Collateral Agent (for the benefit of the Lender Parties) does not, or ceases to, have a perfected first priority security interest in the Collateral or any material part thereof (other than with respect to Permitted Liens) other than as a result of a release of such security interest by the First Priority Collateral Agent in accordance with the Facility Documents, and such default continues unremedied for a period of one (1) Business Day after the earlier of (i) either Borrower having actual knowledge thereof and (ii) written notice of such default from the Lender Agent, the First Priority Collateral Agent or any Lender to the Borrowers;

(i)    A Change of Control shall occur with respect to any Obligor, without the prior written consent of each Lender, which consent shall not be unreasonably withheld;

(j)    An event of default, early amortization event, termination event or other similar event occurs under (i) Security Document, (ii) a Related Document, (iii) Hedge Document, or (iv) Underlying Document (provided that, in the case of an Underlying Document, such event could reasonably be expected to have a Material Adverse Effect), and the Lender Agent specifies such failure as an Event of Default in writing;

(k)    (i) Any Person shall engage in any non-exempt "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Pension Plan; (ii) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Pension Plan, that has not been waived, shall exist with

Confidential

respect to any Pension Plan; (iii) any Lien in favor of the PBGC or a Pension Plan shall arise on the assets of any Obligor; (iv) a reportable event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Pension Plan, which reportable event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender Agent, likely to result in the termination of such Pension Plan for purposes of Title IV of ERISA; (v) any Pension Plan shall terminate for purposes of Title IV of ERISA in a distress termination as defined in Section 4041 of ERISA; (vi) any Obligor shall, or in the reasonable opinion of the Lender Agent is likely to, incur any liability in connection with a withdrawal from, or the insolvency or reorganization of, a Multiemployer Plan; (vii) if the assets of any Obligor are treated as "plan assets" within the meaning of 29 C.F.R. 2510.3-101 as modified by Section 3(42) of ERISA; (viii) any other event or condition shall occur or exist with respect to a Pension Plan or Multiemployer Plan; and in each case in clauses (i) through (vii) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect or a material adverse effect on the Collateral, or any of the Lenders' rights therein; or (ix) if the PBCG demands payment from any Obligor or any of its Subsidiaries for payment of unfunded liabilities under any pension or employee benefit plan (whether or not established by ResCap or its Subsidiaries) as to which any Obligor or any of its Subsidiaries has liability or (x) the PBGC gives any Obligor written notice of its intent to impose any Lien in favor of the PBGC on the assets of any Obligor or any of its Subsidiaries.

(l)     Any of the following shall occur:  (i) the Intercreditor Agreement or any provision thereof shall cease to be in full force and effect, or (ii) any Lien securing or purporting to secure Second Priority Claims (as defined in the Intercreditor Agreement) or Third Priority Claims (as defined in the Intercreditor Agreement) or any other obligations of any Obligor to any party (other than a "First Priority Secured Party" as defined in the Intercreditor Agreement) subject to the Intercreditor Agreement shall, for any reason, cease to be subordinated to the Lien securing or purporting to secure the First Priority Claims (as defined in the Intercreditor Agreement) in accordance with the terms of the Intercreditor Agreement; or

(m)     The Lender Agent shall notify the Borrowers that an Event of Default has occurred as a result of failure by the Obligors to satisfy any of the Post-Closing Requirements in all material respects.

Section 8.02.  Remedies.

(a)     Optional Acceleration.  Upon the occurrence of an Event of Default (other than an Event of Default described in Section 8.01(d)), the Lender Agent may (and shall if directed by the Required Lenders) by written notice to the Borrowers, terminate the Facility, terminate the Commitments, and declare all Loans and all other Obligations to be immediately due and payable.

Confidential

(b)  <u>Automatic Acceleration</u>.  Upon the occurrence of an Event of Default described in <u>Section 8.01(d)</u>, the Commitments shall automatically terminate and the Loans and all other Obligations shall be immediately due and payable, without demand or notice of any kind.

(c)  <u>Remedies</u>.  Upon any acceleration of the Loans pursuant to this <u>Section 8.02</u>, the Lender Parties, in addition to all other rights and remedies under this Agreement or otherwise, shall have all other rights and remedies provided under the UCC of each applicable jurisdiction and other applicable laws, which rights shall be cumulative.  Each of the Obligors agrees, upon the occurrence of an Event of Default and notice from the Lender Agent, to assemble, at their expense, all of the Collateral that is in their possession (whether by return, repossession, or otherwise) at a place designated by the Lender Agent.  All costs incurred by the Lender Parties in the collection of all Obligations, and the enforcement of their rights hereunder, including attorneys' fees and legal expenses, shall constitute Obligations and be paid out of the Collateral.  Without limiting the foregoing, upon the occurrence of an Event of Default and the acceleration of the Loans pursuant to this <u>Section 8.02</u>, the Lender Agent, the Collateral Control Agent, the First Priority Collateral Agent and any Lender may, to the fullest extent permitted by applicable law, without notice, advertisement, hearing or process of law of any kind, (i) enter upon any premises where any of the Collateral which is in the possession of any Obligor (whether by return, repossession, or otherwise) may be located and take possession of and remove such Collateral, (ii) sell any or all of such Collateral, free of all rights and claims of the Obligors therein and thereto, at any public or private sale, and (iii) bid for and purchase any or all of such Collateral at any such sale.  Any such sale shall be conducted in a commercially reasonable manner and in accordance with applicable law.  Each of the Obligors hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings or process of law in connection with the exercise by the Lender Parties of any of their rights and remedies upon the occurrence of an Event of Default.  Each of the Lender Parties and the Obligors shall have the right (but not the obligation) to bid for and purchase any or all Collateral at any public or private sale.  Each of the Obligors hereby agrees that in any sale of any of the Collateral, the Lender Parties are hereby authorized to comply with any limitation or restriction in connection with such sale as they may be advised by counsel is necessary in order to avoid any violation of applicable law (including, without limitation, compliance with such procedures as may restrict the number of prospective bidders and purchasers, require that such prospective bidders and purchasers have certain qualifications, and restrict such prospective bidders and purchasers to Persons who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or resale of such Collateral), or in order to obtain any required approval of the sale or of the purchaser by any Governmental Authority, and each of the Obligors further agrees that such compliance shall not result in such sale being considered or deemed not to have been made in a commercially reasonable manner.  The Lender Parties shall not be liable for any sale, private or public, conducted in accordance with this <u>Section 8.02(c)</u>.  If an Event of Default occurs, and upon acceleration of the Loans hereunder, the Loans and all other Obligations shall be immediately due and payable, and collections on the Collateral and proceeds of sales and securitizations of Collateral will be used to pay the Obligations.  At any time after an Event of Default has occurred and is continuing, the Lender Agent may (and shall at the direction of any Lender) appoint, at its own expense, one or more third parties to service all or a portion of the Collateral by giving written notice thereof to the Obligors; <u>provided</u> that any such appointment shall not conflict with any existing contractual servicing arrangements with respect to the Collateral.  Each Obligor agrees that it will cooperate

Confidential

with and assist any such third-party servicer (including providing access to, and transferring, all records and allowing the new servicer to use (to the extent legally permissible) all licenses, hardware or software necessary or desirable to service the Collateral).

ARTICLE IX

ASSIGNMENT, PARTICIPATION

Section 9.01.  Assignments.  (a)  No Obligor may assign its rights, interests, liabilities or obligations hereunder or under the other Facility Documents without the prior written consent of each Lender.

(b)      Any Lender may at any time assign and delegate to one or more commercial banks or financial institutions or other Eligible Assignees (an "Assignee") all or any fraction of such Lender's rights under this Agreement (including all or a portion of its outstanding Loans and Commitment); provided that the Lender Agent shall have consented to such assignment in writing and, if such Assignee is not an Affiliate of such Lender and no Event of Default exists, the Borrowers shall have consented to such assignment in writing, which consent of the Borrowers shall not be unreasonably withheld, delayed or conditioned.

(c)      Upon acceptance thereof by the Lender Agent, from and after the effective date specified in each Assignment and Acceptance, (i) the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, subject to Section 13.11, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of any provisions of this Agreement that by their terms survive the termination of this Agreement).  If the consent of the Borrowers to an assignment is required hereunder, each Borrower shall be deemed to have given its consent ten (10) days after the date notice thereof has been delivered by the assigning Lender unless such consent is expressly refused by a Borrower prior to such tenth day.

(d)      The Lender Agent shall record each assignment made in accordance with this Section in the Register pursuant to Section 2.02(b) and periodically give the Borrowers notice of such assignments.  The Register shall be available for inspection by the Borrowers and any Lender, as to its Commitment and outstanding Loans only, at any reasonable time and from time to time upon reasonable prior notice.

(e)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Confidential

(f)     Any attempted assignment and delegation not made in accordance with this Section 9.01 shall be null and void.

Section 9.02.   Evidence of Assignment.   Within five (5) Business Days after effectiveness of any assignment, the Borrowers shall execute and deliver to the Lender Agent (a) for delivery to the Assignee, a new Note or, if the Assignee was already a holder of a Note immediately prior to such effectiveness, a replacement Note in the appropriate principal amount based on such Assignee's Commitments after giving effect to such assignment; and (b) if the assigning Lender still holds any Commitment, for delivery to the assigning Lender, a replacement Note in the appropriate principal amount based on such Assignee's Commitments after giving effect to such assignment.  Each such Note shall be dated the effective date of such assignment.

Section 9.03.   Rights of Assignee, Evidence of Assignment.   From and after the date on which the conditions described in Section 9.01(b) have been met, the assigning Lender shall be released from its obligations hereunder to the extent of the rights and obligations hereunder that have been assigned.  Upon the assignment by the Lender of all of its rights and obligations hereunder, under the Note and under the other Facility Documents to an assignee in accordance with Section 9.01, such assignee shall have all such rights and obligations of the Lender as set forth in such assignment or delegation, as applicable, and all references to the Lender in this Agreement or any Facility Document shall be deemed to apply to such assignee to the extent of such interest.

Section 9.04.   Participations.   (a)  Any Lender may at any time sell to one or more commercial banks or other Persons participating interests in any Loan owing to such Lender, any Note held by any Lender, the obligations to make Loans of such Lender or any other interest of such Lender hereunder (any Person purchasing any such participating interest being herein called a "Participant") provided that so long as no Default exists any such participation (other than a participation to General Motors Corporation, Cerberus Capital Management, L.P., or any of their Affiliates) shall be subject to the consent of each Borrower (such consent not to be unreasonably withheld, delayed or conditioned).  In the event of a sale by any Lender of a participating interest to a Participant, (a) such Lender shall remain the holder of its Note for all purposes of this Agreement, (b) the Obligors shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder and (c) all amounts payable by the Obligors shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender.  No Participant shall have any direct voting rights hereunder.  The Obligors agree that if amounts outstanding under this Agreement and the Notes are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement and any Note to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement or such Note; provided that if any Lender or any Participant shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or offset or otherwise) on account of principal of or interest on any Loan in excess of its pro rata share of payments (after giving effect to all participations hereunder) and other recoveries obtained by such Lender and the Participants on account of principal of and interest on the Loans then held by them, such Lender or the applicable Participant (as the case may be) shall purchase from the other party or parties such participations in the Loans held by them as shall be necessary to cause such purchasing Person to share the excess payment or other recovery

Confidential

ratably with each of them; <u>provided</u> that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Person, the purchase shall be rescinded and the purchase price restored to the extent of such recovery.  Each Obligor also agrees that each Participant shall be entitled to the benefits of <u>Sections 2.07(b)</u>, <u>2.07(c)</u> and <u>3.02</u> as if it were a Lender and had acquired its interest by assignment (<u>provided</u> that such Participant shall have complied with the requirements of said Section as though it were a Lender that acquired its interest by assignment).

(b)    In the event that a Lender sells participations in any Loan, Note or the obligation to make Loans or any interest of such Lender, such Lender shall maintain a register on which it enters the name of all participants in the Loan or Note held by it and the principal amount (and interest thereon) of the portion of the Loan or Note which is the subject of the participation (the "<u>Participant Register</u>").  A Loan or Note may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Loan or Note may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrowers at any reasonable time and from time to time upon reasonable prior notice.

ARTICLE X

INDEMNIFICATION

Section 10.01.  <u>Indemnities by the Borrowers</u>.  Without limiting any other rights which any such Person may have hereunder or under applicable law, and in consideration of the execution and delivery of this Agreement and the Facility evidenced by the Facility Documents, the Borrowers hereby agree to jointly and severally indemnify the Lenders, the Lender Agent, the First Priority Collateral Agent, the Collateral Control Agent and their respective Affiliates, successors, permitted transferees and assigns and all officers, directors, shareholders, controlling persons, employees and agents of any of the foregoing (each an "<u>Indemnified Party</u>"), forthwith on demand, from and against any and all damages, losses, claims, liabilities, obligations penalties, causes of action, demands, judgments, suits and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as "<u>Indemnified Amounts</u>") awarded against or incurred by any of them arising out of or as a result of (a) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of any Loan; (b) the entering into and performance of any Facility Document by any of the Indemnified Parties; (c) the Facility Documents, the Loans and the extension of the Commitments, the failure of any Obligor or Restricted Entity to comply with the terms of the Facility Documents or Requirements of Law, the inaccuracy of any representation or warranty of any Obligor or Restricted Entity set forth in the Facility Documents or in a certificate, instrument or document delivered in connection therewith, and the use by any Obligor of the proceeds of any Loans; (d) any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Obligor or any Subsidiary thereof of all or any portion of the capital stock or assets of any Person, whether or not an Indemnified Party is party thereto; and (e) any transaction contemplated under the Facility Documents; <u>excluding</u>, <u>however</u>, (i) Indemnified Amounts to the extent a court of competent jurisdiction in a final non-appealable judgment determines that they resulted from gross negligence, bad faith or willful misconduct on the part

Confidential

of such Indemnified Party; (ii) any lost profits (other than in connection with Breakage Costs) or indirect, exemplary, punitive or consequential damages of any Indemnified Party; and (iii) any and all present or future taxes, fees, levies, imposts, deductions, duties, withholdings, assessments or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto, which shall be governed by the terms of Section 3.02.  Without limiting the foregoing, in any suit, proceeding or action brought by any Indemnified Party in connection with any Collateral for any sum owing thereunder, or to enforce any provisions of any Collateral, the Borrowers will save, indemnify and hold the applicable Indemnified Party harmless from and against all expense, loss or damage suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the account debtor or obligor thereunder, arising out of a breach by either Borrower of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing to or in favor of such account debtor or obligor or its successors from the Borrowers.  The Borrowers also agree to reimburse the Indemnified Parties as and when billed by such party for all out-of-pocket costs and expenses (including reasonable attorneys' fees and expenses) incurred in connection with the enforcement or the preservation of such party's rights under or in connection with this Agreement, the Notes, any other Facility Document, any Security Document, any Collateral or any transaction contemplated hereby or thereby, including without limitation the fees and disbursements of its counsel.  The Borrowers hereby acknowledge that, notwithstanding the fact that the Notes are secured by the Collateral, the obligation of the Borrowers under the Notes are recourse obligations of the Borrowers.  Under no circumstances shall any Indemnified Party be liable to the Borrowers for any lost profits (other than in connection with Breakage Costs) or indirect, exemplary, punitive or consequential damages.

Section 10.02.  General Provisions.  If for any reason the indemnification provided above in Section 10.01 (and subject to the limitations on indemnification contained therein) is unavailable to an Indemnified Party or is insufficient to hold an Indemnified Party harmless on the basis of public policy, then the Borrowers shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect not only the relative benefits received by such Indemnified Party on the one hand and the Borrowers on the other hand but also the relative fault of such Indemnified Party as well as any other relevant equitable considerations.

The provisions of this Article X shall survive the termination or assignment of this Agreement, the payment of the Obligations and the resignation or removal of any of the Indemnified Parties.

ARTICLE XI

GUARANTEE

Section 11.01.  Unconditional Guarantee.  To induce the Lenders to enter into this Agreement, each of the Guarantors jointly and severally, absolutely, unconditionally and irrevocably guarantees to the Lender Parties and their successors and permitted assigns (a) the prompt and complete payment and performance when due (whether at stated maturity, or otherwise by required prepayment, declaration, acceleration, demand or otherwise), of the Obligations now or hereafter owing; and (b) all renewals, rearrangements, increases, extensions

Confidential

for any period, substitutions, modification, amendments or supplements in whole or in part of any of the Facility Documents or obligations (in each case including all such amounts which would become due but for the operation of the automatic stay under Section 362(a) of the United States Bankruptcy Code, 11 U.S.C. §362(a), and the operation of Sections 502(b) and 506(b) of the United States Bankruptcy Code, 11 U.S.C. §502(b) and §506(b)).

Section 11.02. <u>Nature of Guarantee</u>. Each Guarantor's obligations hereunder (a) are continuing, absolute, unconditional and irrevocable; (b) shall remain in full force and effect until all Obligations are paid in full in cash and the Commitments have terminated or expired (unless this Guarantee is reinstated pursuant to the terms of this <u>Article XI</u>); and (c) shall not be affected by (i) the existence, validity, enforceability, perfection or extent of any collateral therefor, the validity, regularity or enforceability of the Facility Documents, (ii) the absence of any action to enforce any Obligor's or other Person's obligations under any of the Facility Documents or to otherwise assert any claim or enforce any right of any Lender Party under the Facility Documents or in or to the Collateral, (iii) any waiver or consent by any Obligor with respect to any provisions of this Agreement or any other Facility Document, (iv) any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other extension, increase, compromise or renewal of any Obligation, (v) any reduction, limitation, impairment or termination of any Obligations for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and each Guarantor hereby waives any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Obligations, (vi) any amendment to, extension, variance, alteration, rescission, waiver, increase, or other modification of, or any consent to departure from, any of the terms of this Agreement or any other Facility Document including, without limitation, any increase or reduction to the rate of interest on all or any of the Obligations, (vii) any addition, exchange, release, surrender or non-perfection of any Collateral, or any amendment to or waiver or release or addition of, or consent to departure from, any other guaranty or any other security document, held by a Lender Party, (viii) the insolvency of any other Obligor, or (ix) any other circumstance relating to the Obligations that might otherwise constitute a legal or equitable discharge of or defense to this Guarantee. Each of the Guaranties under this <u>Article XI</u> is a guarantee of payment and not a guarantee of collection, and each Guarantor jointly and severally agrees that any Lender Party may resort to such Guarantor for payment of any of the Obligations owed to it whether or not such Lender Party shall have resorted to any collateral therefor or shall have proceeded against any Person principally or secondarily liable for any of the Obligations, including any Obligor, and whether or not such Lender Party has pursued any other remedy available to it. No Lender Party shall be obligated to file any claim relating to the Obligations in the event that any Obligor becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the applicable Lender Party to so file shall not affect any obligation of a Guarantor hereunder. In the event that any payment to the Lender Parties in respect of any Obligations owed to them is rescinded or must otherwise be returned for any reason whatsoever, the Guarantors shall remain jointly and severally liable hereunder with respect to such Obligations as if such payment had not been made and the Guarantee shall be reinstated, if applicable. At any time and from time to time, upon the written request of any Lender Party, and at the sole expense of the Guarantors, the Guarantors will furnish such information regarding the financial well-being of the Guarantors as may be reasonably requested by such Lender Party.

Confidential

Section 11.03.  <u>Certain Agreements; Waivers of Certain Notices</u>.  Each Guarantor authorizes each Lender Party, without notice or demand and without affecting its liability hereunder, from time to time, to forbear, indulge or take other action or inaction in respect of this Guarantee or the Obligations, or to exercise or not exercise any right or remedy hereunder or otherwise with respect to the Obligations.  Each Guarantor waives (a) promptness, diligence, presentment, notice of acceptance and any other notice with respect to any of the Obligations and this <u>Article XI</u> and any requirement that any Lender Party protect, secure, perfect or insure any security interest or Lien, or any property subject thereto, or exhaust any right or take any action against the Borrower, any Guarantor or any other Person (including any other guarantor) or any collateral securing the Obligations; (b) all rights that it may have now or in the future under any statute, or at common law, or in law or equity, or otherwise, to the extent allowed under Requirements of Law, to compel any Lender Party to marshal assets or to proceed in respect of Obligations guaranteed hereunder or under any Facility Document against any Borrower or any other Guarantor, any other party or against any security for the payment and performance of the Obligations before proceeding against, or as a condition to proceeding against, such Guarantor; and (c) each and every right to which it may be entitled by virtue of the suretyship under Requirements of Law.  It is agreed among each Guarantor and the Lender Parties that the foregoing waivers and the other waivers contained in this Agreement are of the essence of the transaction contemplated by this Agreement (including <u>Article XI</u>) and the Facility Documents and that, but for the provisions of this <u>Section 11.03</u> and such waivers, the Lender Parties would decline to enter into this Agreement.

Section 11.04.  <u>Waiver of Subrogation</u>.  Until two years and one day after the Obligations are repaid in full in cash and the Commitments have expired or terminated, each Guarantor hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor.  If any amounts are paid to the Guarantors in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Lender Parties and shall forthwith be paid to the Lender Agent for the account of the Lender Parties to reduce the amount of outstanding Obligations, whether matured or unmatured.  Subject to the foregoing, upon payment of any of the Obligations, the Guarantors shall be subrogated to the rights of the Lender Parties against other Obligors with respect to such Obligations.

Section 11.05.  <u>Taxes</u>.  All payments by the Guarantors hereunder will be subject to <u>Section 3.02</u>.

Section 11.06.  <u>Payments</u>.  Each Guarantor hereby jointly and severally guarantees that the Obligations will be paid to each Lender Party without set-off or counterclaim, in lawful currency of the United States of America at the offices of each Lender Party specified by each Lender Party for such payment.  The obligations of the Guarantors hereunder shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency except to the extent to which such tender or recovery shall result in the effective receipt by each applicable Lender Party of the full amount of the currency or currencies owing under this Guarantee, and the Guarantors shall jointly and severally indemnify each applicable Lender Party (as an alternative or additional cause of action) for the amount (if any) by which such effective receipt shall fall short of the full amount of currency or currencies

Confidential

owing under this Guarantee and such obligation to indemnify shall not be affected by judgment being obtained for any other sums due hereunder.

Section 11.07.  Severability of Article XI.  Wherever possible, each provision of this Article XI will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Article XI is prohibited by or invalid under such law, such provision will be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Article XI.  Consistent with the foregoing, and notwithstanding any other provision of this Article XI to the contrary, in the event that any action or proceeding is brought in whatever form and in whatever forum seeking to invalidate any Guarantor's obligations under this Article XI under any fraudulent conveyance, fraudulent transfer theory, or similar avoidance theory, whether under state or federal law, such Guarantor (the "Affected Guarantor"), automatically and without any further action being required of such Affected Guarantor or any Lender Party, shall be liable under this Article XI only for an amount equal to the maximum amount of liability that could have been incurred under applicable law by such Affected Guarantor under any guaranty of the Obligations (or any portion thereof) at the time of the execution and delivery of this Article XI (or, if such date is determined not to be the appropriate date for determining the enforceability of such Affected Guarantor's obligations hereunder for fraudulent conveyance or transfer (or similar avoidance) purposes, on the date determined to be so appropriate) without rendering such a hypothetical guaranty voidable under applicable law relating to fraudulent conveyance, fraudulent transfer, or any other grounds for avoidance (such highest amount determined hereunder being any such Affected Guarantor's "Maximum Guaranty Amount"), and not for any greater amount, as if the stated amount of this Article XI as to such Affected Guarantor had instead been the Maximum Guaranty Amount.  This Section 11.07 is intended solely to preserve the rights of the Lender Parties under this Article XI to the maximum extent not subject to avoidance under applicable law, and neither any Affected Guarantor nor any other person or entity shall have any right or claim under this Section 11.07 with respect to the limitation described in this Article XI, except to the extent necessary so that the obligations of any Affected Guarantor under this Article XI shall not be rendered voidable under applicable law.  Without limiting the generality of the foregoing, the determination of a Maximum Guaranty Amount for any Affected Guarantor pursuant to the provisions of the second preceding sentence of this Section 11.07 shall not in any manner reduce or otherwise affect the obligations of any other Guarantor (including any other Affected Guarantor) under the provisions of this Article XI.

Section 11.08.  Acceleration of Guarantee.  Each Guarantor agrees that, in the event of the dissolution or insolvency of any Obligor, or the inability or failure of any Obligor to pay debts as they become due, or an assignment by any Obligor for the benefit of creditors, or the commencement of any case or proceeding in respect of any Obligor under any bankruptcy, insolvency or similar laws, and if such event shall occur at a time when any of the Obligations of any Obligor may not then be due and payable, such Guarantor will pay to the Lender Agent for the account of the Lender Parties forthwith the full amount which would be payable hereunder by such Guarantor if all such Obligations were then due and payable.

Section 11.09.  Election of Remedies.  Except as otherwise provided in this Agreement, if any Lender Party proceeds to realize its benefits under any Facility Documents giving any Lender or the First Priority Collateral Agent a Lien upon any Collateral, either by judicial

Confidential

foreclosure or by non-judicial sale or enforcement, such Lender Party may, at its option acting in its sole discretion, determine which remedies or rights it may pursue without affecting any of its rights and remedies under this Article XI.  If, in the exercise of any of its rights and remedies, any Lender Party shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Obligor or any other Person, whether because of any Requirements of Law pertaining to "election of remedies" or the like, each Guarantor hereby consents to such action and waives any claim based upon such action, even if such action by the applicable Lender or First Priority Collateral Agent shall result in a full or partial loss of any rights of subrogation that such Guarantor might otherwise have had but for such action by such Lender Party.  Any election of remedies that results in the denial or impairment of the right of any Lender Party to seek a deficiency judgment against any other Obligor shall not impair any Guarantor's obligation to pay the full amount of the Obligations under this Article XI.

Section 11.10.  Benefit to Guarantor.  Each Guarantor represents and agrees that (a) its business is integrally related to the business of the Borrowers and that it is in the best interests of the Guarantor to execute this Agreement and the Security Documents to which it is a party inasmuch as such Guarantor will derive substantial direct and indirect benefits from the Loans made from time to time to the Borrowers; (b) such Guarantor is willing to guarantee the Obligations; and (c) such Guarantor agrees that the Lender Parties are relying on this representation in agreeing to make Loans to the Borrower.

ARTICLE XII

LENDER AGENT

Section 12.01.  Appointment and Authorization.  Each Lender hereby irrevocably (subject to Section 12.09) appoints and designates GMAC Inc. as the Lender Agent under and for purposes of the Facility Documents and hereby authorizes the Lender Agent to take such action on its behalf under the provisions of this Agreement and each other Facility Document and to exercise such powers and perform such duties as are expressly delegated to or required of it by the terms of this Agreement or any other Facility Document, together with such powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement or in any other Facility Document, the Lender Agent shall not have any duty or responsibility except those expressly set forth herein, nor shall the Lender Agent have or be deemed to have any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Facility Document or otherwise exist against the Lender Agent.

Section 12.02.  Delegation of Duties.  The Lender Agent may execute any of its duties under this Agreement or any other Facility Document by or through agents, employees or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Lender Agent shall not be responsible for the negligence or misconduct of any agent or attorney in fact that it selects with reasonable care.

Section 12.03.  Liability of Lender Agent.  None of the Lender Agent nor any of its directors, officers, employees or agents shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Facility Document

Confidential

or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any of the Lenders for any recital, statement, representation or warranty made by the Obligors or any Subsidiary or Affiliate of the Obligors, or any officer thereof, contained in this Agreement or in any other Facility Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Lender Agent under or in connection with, this Agreement or any other Facility Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Facility Document, or for any failure of the Obligors or any other party to any Facility Document to perform its obligations hereunder or thereunder. The Lender Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Facility Document, or to inspect the properties, books or records of the Obligors or any of the Obligors' Subsidiaries or Affiliates.

Section 12.04.  Reliance by Lender Agent.  The Lender Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, email, telex or telephone message, statement or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to the Obligors), independent accountants and other experts selected by the Lender Agent. The Lender Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Facility Document unless it shall first receive such advice or concurrence of each Lender as it deems appropriate and, if it so requests, confirmation from the Lenders of their obligation to indemnify the Lender Agent against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Lender Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Facility Document in accordance with a request or consent of the Required Lenders or, to the extent expressly required by Section 13.01 or any other provision of the Facility Documents, all Lenders.

Section 12.05.  Notice of Default.  The Lender Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Borrowing Base Deficiency, unless the Lender Agent shall have received written notice from a Lender or the Borrowers referring to this Agreement, describing such Default and stating that such notice is a "notice of default" or describing such Borrowing Base Deficiency. The Lender Agent will notify the Lenders of its receipt of any such notice. The Lender Agent shall take such action with respect to such Default as may be requested by the Required Lenders in accordance with Section 8.02; provided that, unless and until the Lender Agent has received any such request, the Lender Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable or in the best interest of the Lenders (except to the extent that this Agreement expressly requires that such action be taken, or not taken, only with the consent of the Required Lenders or all Lenders).

Section 12.06.  Credit Decision.  Each Lender acknowledges that the Lender Agent has not made any representation or warranty to it, and that no act by the Lender Agent hereafter taken, including any review of the affairs of the Obligors and their Subsidiaries, shall be deemed to constitute any representation or warranty by the Lender Agent to any Lender. Each Lender

Confidential

represents to the Lender Agent that it has, independently and without reliance upon the Lender Agent and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors, and made its own decision to enter into this Agreement and to extend credit to the Borrowers hereunder.  Each Lender also represents that it will, independently and without reliance upon the Lender Agent and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Facility Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors.  Except for notices, reports and other documents expressly herein required to be furnished to the Lenders by the Lender Agent, the Lender Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial or other condition or creditworthiness of the Borrowers that may come into the possession of the Lender Agent.

Section 12.07.  <u>Indemnification</u>.  Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand the Lender Agent and its directors, officers, employees and agents (to the extent not reimbursed by or on behalf of the Obligors and without limiting the obligation of the Obligors to do so), <u>pro</u> <u>rata</u> based on their Pro Rata Shares, from and against any and all Indemnified Amounts; <u>provided</u> that, no Lender shall be liable for any payment to any such Person of any portion of the Indemnified Amounts resulting from such Person's gross negligence or willful misconduct.  Without limitation of the foregoing, each Lender shall reimburse the Lender Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorney costs) incurred by the Lender Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Facility Document, or any document contemplated by or referred to herein, to the extent that the Lender Agent is not reimbursed for such expenses by or on behalf of the Obligors.  The undertaking in this Section shall survive repayment of the Loans, termination of the Commitments, cancellation of the Notes, any foreclosure under, or modification, release or discharge of, any or all of the Collateral Documents, termination of this Agreement and the resignation or replacement of the Lender Agent.

Section 12.08.  <u>Lender Agent in Individual Capacity</u>.  The Lender Agent and its Affiliates may make loans to, acquire equity interests in and generally engage in any kind of business with the Obligors and their respective Subsidiaries and Affiliates as though the Lender Agent were not the Lender Agent hereunder and without notice to or consent of the Lenders.  Each of the Lenders acknowledges that, pursuant to such activities, the Lender Agent or its Affiliates may receive information regarding the Obligors or their respective Affiliates (including information that may be subject to confidentiality obligations in favor of the Obligors or their Affiliates) and acknowledges that the Lender Agent shall be under no obligation to provide such information to them.  With respect to their Loans (if any), the Lender Agent and its Affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise the same as though the Lender Agent were not the Lender Agent, and the terms "Lender" and "Lenders"

Confidential

include the Lender Agent and its Affiliates, to the extent applicable, in their individual capacities.

Section 12.09.  <u>Successor Lender Agent</u>.  The Lender Agent may resign as Lender Agent upon 30 days' notice to the Lenders.  If the Lender Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of the Lender Agent, the Lender Agent may appoint, after consulting with (but without the consent of) the Lenders, a successor agent which shall be a Lender or a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, and having a combined capital and surplus of at least $250,000,000.  Upon the acceptance of its appointment as successor agent hereunder, such successor agent shall succeed to all the rights, powers and duties of the retiring Lender Agent and the term "<u>Lender Agent</u>" shall mean such successor agent, and the retiring Lender Agent's appointment, powers and duties as Lender Agent shall be terminated.  After any retiring Lender Agent's resignation hereunder as Lender Agent, the provisions of this <u>Article XII</u> and <u>Article X</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Lender Agent under this Agreement.  If no successor agent has accepted appointment as Lender Agent by the date that is 30 days following a retiring Lender Agent's notice of resignation, the retiring Lender Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Lender Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

Section 12.10.  [Reserved].

Section 12.11.  <u>Security Matters; Release of Collateral</u>.  (a)  Each Lender and other Lender Party (by their acceptance of the benefits of any Collateral) acknowledges and agrees that the Lender Agent, the Collateral Control Agent and/or the First Priority Collateral Agent have entered into the Security Documents (including, without limitation, the Intercreditor Agreement) on behalf of the Lender Parties, and the Lender Parties hereby agree to be bound by the terms of such Security Documents, acknowledge receipt of copies of such Security Documents and consent to the rights, powers, remedies, indemnities and exculpations given to the Lender Agent, the First Priority Collateral Agent and/or the Collateral Control Agent thereunder.  All rights, powers and remedies available to the Lender Agent, the First Priority Collateral Agent, the Collateral Control Agent and the Lender Parties with respect to the Collateral, or otherwise pursuant to the Security Documents, shall be subject to the provisions of such Security Documents.  In the event of any conflict or inconsistency between the terms and provisions of this Agreement and the terms and provisions of such Security Documents, the terms and provisions of such Security Documents shall govern and control except that this Agreement shall govern and control the rights, powers, duties, immunities and indemnities of the Lender Agent.  Each Lender and other Lender Party (by their acceptance of the benefits of any Collateral) hereby authorizes the Lender Agent, the Collateral Control Agent and/or the First Priority Collateral Agent to release (or authorize the release of) any collateral that is permitted to be sold or released pursuant to the terms of the Facility Documents.  Each Lender hereby authorizes the First Priority Collateral Agent and the Collateral Control Agent to execute and deliver to the Borrowers, at the Borrowers' joint and several cost and expense, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrowers

Confidential

in connection with any sale or other disposition of property to the extent such sale or other disposition is permitted by the terms of this Agreement or is otherwise authorized by the terms of the Facility Documents. Each release of Collateral shall be substantially in the form of Exhibit 9.02 hereto.

(b)    No Collateral shall be released from the security interest created by the Security Agreement without the prior written consent of the Lender Agent unless:

(i)    If Financing Assets are sold or financed in the ordinary course of an Obligor's business pursuant to a Bilateral Facility, the Lien on such Asset shall be released automatically concurrently with sale or financing;

(ii)    If Financing Assets with a Carrying Value of less than $100,000,000 are sold or financed in the ordinary course of an Obligor's business, the Lien on such Asset shall be released automatically concurrently with sale or financing; or

(iii)    If an Agency Asset is sold in the ordinary course of an Obligor's trading activities to a Person that is not an Affiliate of an Obligor, such Agency Asset shall be automatically released concurrently with such sale.

Any such release shall not become effective unless an Obligor shall have directed the First Priority Collateral Agent to release the applicable Collateral by delivering a Collateral Release Certificate to the First Priority Collateral Agent. In connection with any release effectuated pursuant to this Section 12.11 hereof, the First Priority Collateral Agent shall be entitled to conclusively rely, and shall be fully protected in relying, upon any such Collateral Release Certificate, and shall incur no liability to any Person in connection with acting in reliance thereon.

(c)    This amendment and restatement of the Original Loan Agreement shall not effectuate a novation or extinguishment of the Liens securing obligations outstanding under the Original Agreement, and the obligations under this Agreement shall be secured by the Liens securing the obligations under the Original Agreement.

ARTICLE XIII

MISCELLANEOUS

Section 13.01.  Amendments, Etc.  The provisions of each Facility Document may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrowers and the Required Lenders; provided that no such amendment, modification or waiver shall:

(a)    modify Section 3.01(f), Section 3.01(g) (as it relates to sharing of payments) or this Section, in each case, without the consent of all Lenders;

(b)    increase the aggregate amount of any Loans required to be made by a Lender pursuant to its Commitments, extend the Commitment Termination Date or extend the Loan Repayment Date, in each case without the consent of each Lender (it

Confidential

being agreed, however, that any vote to rescind any acceleration made pursuant to Section 8.02 of amounts owing with respect to the Loans and other Obligations shall only require the vote of the Required Lenders);

(c)     reduce the principal amount of or reduce the rate of interest on any Lender's Loans, reduce any fees described in Section 2.06 payable to any Lender or extend the date on which principal, interest or fees are payable in respect of such Lender's Loans, in each case without the consent of such Lender (provided that, the vote of Required Lenders shall be sufficient to waive the payment, or reduce the increased portion, of interest accruing under Section 3.01(b));

(d)     reduce the percentage set forth in the definition of "Required Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of all Lenders;

(e)     except as otherwise expressly permitted under a Facility Document, release (i) either Borrower from its Obligations under the Facility Documents or any Guarantor from its obligations under a Guarantee or (ii) all or substantially all of the Collateral under the Facility Documents, in each case without the consent of all Lenders; or

(f)     affect adversely the interests, rights, protections or obligations of the Lender Agent (in its capacity as the Lender Agent), the First Priority Collateral Agent (in its capacity as the First Priority Collateral Agent) or the Collateral Control Agent (in its capacity as the Collateral Control Agent) unless consented to by the Lender Agent, the First Priority Collateral Agent or the Collateral Control Agent, respectively.

Section 13.02.  Notices, Etc.  All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including facsimile communication and electronic mail) and shall be personally delivered or sent by certified mail or overnight air courier, postage prepaid, or by facsimile, to the intended party at the address or facsimile number of such party set forth opposite its name on Schedule 13.02 or at such other address or facsimile number as shall be designated by such party in a written notice to the other parties hereto.  All such notices and communications shall be effective, (i) if personally delivered, when received, (ii) if sent by overnight air courier, the next Business Day after delivery to the related air courier service, if delivery is guaranteed as of the next Business Day, (iii) if sent by certified mail, three Business Days after having been deposited in the mail, postage prepaid, and (iv) if transmitted by facsimile, when sent, receipt confirmed by telephone or electronic means, if sent during business hours (if sent after business hours, then on the next Business Day) except that notices and communications pursuant to Article I shall not be effective until received.

Section 13.03.  No Waiver; Remedies.  No failure on the part of any Lender Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  No notice to or demand on any Obligor in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Lender Party under any Facility Document shall, except as may be otherwise stated in

Confidential

such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 13.04.  <u>Binding Effect; Assignability</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, <u>provided, however</u>, that nothing in the foregoing shall be deemed to authorize any assignment not permitted in <u>Section 9.01</u>.

Section 13.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION</u>.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT).  EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION.  EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.

EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

Section 13.06.  <u>Entire Agreement</u>.  This Agreement amends and restates in its entirety the Original Loan Agreement. As so amended, this Agreement and the Facility Documents embody the entire agreement and understanding of the parties hereto and supersede any and all prior agreements, arrangements and understanding of such parties, verbal or written, relating to the matters provided for herein. This amendment and restatement of the Original Loan Agreement shall not effectuate a novation or extinguishment of the obligations outstanding under the

Confidential

Original Loan Agreement, but rather are an amendment and restatement of certain terms governing such obligations. As of the Amendment Closing Date, each reference in any Facility Document to the "Loan Agreement" shall mean this Agreement, as it may hereinafter be amended, restated or otherwise modified.

Section 13.07.  <u>Acknowledgment</u>.  Each Obligor hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and deliver of this Agreement, the Notes and the other Facility Documents to which it is a party;

(b)     no Lender Party has a fiduciary relationship to it, and the relationship between it and each Lender is solely that of debtor and creditor; and

(c)     no joint venture exists among or between it and any Lender Party.

Section 13.08.  <u>Captions and Cross References</u>.  The various captions (including, without limitation, the table of contents) in this Agreement are included for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.  References in this Agreement to any underscored Section or Exhibit are to such Section or Exhibit of this Agreement, as the case may be.

Section 13.09.  <u>Execution in Counterpart; Effectiveness</u>.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to any Note) and all of which when taken together shall constitute one and the same agreement.  This Agreement shall become effective (i) with respect to all parties (other than the Affected Subsidiaries) when counterparts hereof executed on behalf of the parties hereto (other than the Affected Subsidiaries) shall have been received by the Lender Agent, and (ii) with respect to an Affected Subsidiary, when a counterpart hereof and an Authorization Notice, each executed by such Affected Subsidiary, shall have been received by the Lender Agent.  The parties hereto agree that delivery of a counterpart of a signature page to this Agreement and each other Facility Document (except for any Note) by facsimile or electronic transmission shall be effective as delivery of an original executed counterpart of this Agreement or such other Facility Document.

Section 13.10.  <u>Confidentiality</u>.  Each party hereto agrees that it will hold any confidential information received from the other party pursuant to this Agreement or any other Facility Document, it being understood that this Agreement is confidential information of the Lender, in strict confidence, as long as such information remains confidential, except for disclosure to (a) its Affiliates; (b) its legal counsel, accountants, and other professional advisors or to a permitted assignee or participant; (c) regulatory officials or Governmental Authorities; (d) any Person as requested pursuant to or as required by law, regulation, or legal process; (e) any Person in connection with any legal proceeding to it is a party; (f) rating agencies if requested or required by such agencies in connection with a rating; (g) the Lender Agent; (h) any pledgee referred to in <u>Section 9.01(e)</u> or any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes, Loans or Commitments or

Confidential

any interest therein by such Lender, underlined(provided) that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section; and (i) any Person as permitted pursuant to the terms of this Agreement and the other Facility Documents; provided, however, that no Lender Party shall be liable for any disclosure of confidential information to the extent that such Lender Party followed its customary procedures and practices with respect to confidential information. This Section 13.10 shall survive termination of this Agreement. Notwithstanding anything to the contrary in this Agreement, the tax treatment and the tax structure of the transactions contemplated under this Agreement shall not be treated as confidential information.

Section 13.11. Survival. The obligations of the Obligors under Sections 3.02 and 13.10 and Article X hereof, and the obligations of the Lenders under Section 12.07, shall survive the repayment in full in cash of the Obligations and the termination of this Agreement. In addition, each representation and warranty made, or deemed to be made by a request for a borrowing, herein or pursuant hereto shall survive the making of such representation and warranty, and the Lenders shall not be deemed to have waived, by reason of making any Loan, any Default that may arise by reason of such representation or warranty proving to have been false or misleading, notwithstanding that the Lenders may have had notice or knowledge or reason to believe that such representation or warranty was false or misleading at the time such Loan was made.

Section 13.12. Joint and Several Liability of Borrowers. (a) Each Borrower has determined that it is in its best interest and in pursuance of its legitimate business purposes to induce the Lenders to make Loans to the Borrowers pursuant to this Agreement. Each Borrower acknowledges and represents that its business is integrally related to the business of the other Borrower, that the availability of the Commitments benefits each Borrower individually and that the Loans made will be for and inure to the benefit of each of the Borrowers individually and as a group. Accordingly, each Borrower shall be jointly and severally liable (as a principal and not as a surety, guarantor or other accommodation party) for each and every representation, warranty, covenant and obligation (including payment, indemnification and reimbursement obligations) to be performed by the Borrowers under this Agreement, the Notes and the other Facility Documents, and each Borrower acknowledges that in extending the credit provided herein the Lenders are relying upon the fact that the obligations of each Borrower hereunder are the joint and several obligations of a principal. The invalidity, unenforceability or illegality of this Agreement, the Notes or any other Facility Document as to one Borrower or the release by the Lender Parties of a Borrower hereunder or thereunder shall not affect the Obligations of the other Borrower under this Agreement, the Notes or the other Facility Documents, all of which shall otherwise remain valid and legally binding obligations of the other Borrower. Any Borrower that makes a payment or distribution hereunder will be entitled to a contribution from the other Borrower in a pro rata amount, based on the adjusted net assets of each Borrower determined in accordance with GAAP (provided that such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder until one year and one day after the Obligations have been repaid in full in cash and the Commitments have terminated or expired). The provisions of this Section 13.12 shall in no respect limit the obligations and liabilities of each Borrower to the Lender Parties, and each Borrower shall remain liable to the Lender Parties for the full amount of the Obligations.

Confidential

(b)    Notwithstanding any provision herein contained to the contrary, each Borrower's obligations under this Section 13.12 (which obligations are in any event in addition to all liabilities in respect of Loans advanced to such Borrower) shall be limited to an amount not to exceed as of any date of determination the greater of: (i) the net amount of all Loans advanced to or for the account of the other Borrower under this Agreement and then re-loaned or otherwise transferred to such Borrower; and (ii) the amount that could be claimed by any Lender Party from such Borrower under this Section 13.12 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from the other Borrower.

(c)    Each Borrower assumes responsibility for keeping itself informed of the financial condition of each other Borrower, and each Borrower agrees that the Lender Parties shall not have any duty to advise such Borrower of information known to the Lender Parties regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine. If the Lender Party, in its sole discretion, undertakes at any time or from time to time to provide any such information to a Borrower, such Lender Party shall be under no obligation to update any such information or to provide any such information to such Borrower on any subsequent occasion.

(d)    If (i) one or both Borrowers are entitled to a return of excess interest or other amounts or payments delivered under the Facility Documents, or the return of surplus funds or monies from bank accounts maintained in accordance with the requirements of the Facility Documents or the return of any other Collateral or any other proceeds of Collateral (a "Returned Amount"), and (ii) the Lender Parties are uncertain as to which Borrower is entitled to the Returned Amount, in the absence of a promptly delivered joint notice from the Borrowers regarding the return of such Returned Amount, the Lender Parties may either return the Returned Amount to the Borrower they in good faith believe to be entitled to the same (and the Lender Parties shall not be liable for so doing; provided that the Lender Parties acted in good faith) or, at the joint and several expense of the Borrowers, interplead such Returned Amount or take such other actions or exercise such rights or remedies as permitted by Requirements of Law.

(e)    Each Borrower agrees that any notices and information to be provided to any Borrower or both Borrowers by any Lender Party under the Facility Documents may be sent to both Borrowers or either Borrower, regardless of whether or not a receiving Borrower is actually the relevant Borrower or the appropriate person or persons to whom such notice or information should be addressed or delivered (and each Borrower hereby agrees that no Lender Party will be liable to the Borrowers for the failure to deliver such notice or information to the appropriate recipient). Each Borrower hereby waives all confidentiality rights with respect to the delivery of all such notices and information and agrees that no Lender Party shall be liable for delivering a notice or information to a Borrower that is not the relevant Borrower or the appropriate recipient of such notice or information. Each Borrower acknowledges and agrees that it has received full and sufficient consideration for this provision and that this provision is a material inducement for the Lender Agent and each Lender entering into the loan documents.

Confidential

Section 13.13.  <u>Obligors Bound by Intercreditor Agreement</u>.  Each Obligor agrees that ResCap and the Borrowers are entering into the Intercreditor Agreement on behalf of all the Obligors, and further agrees to be bound by the terms and provisions of the Intercreditor Agreement (including any amendments, supplements, restatements or other modifications thereto) is if it were a signatory thereto.

Section 13.14.  <u>Third-Party Beneficiaries</u>.  Each of the First Priority Collateral Agent and the Collateral Control Agent is an express third-party beneficiary hereof.

Section 13.15.  <u>First Priority Collateral Agent; Capacity under this Agreement and Protections Afforded</u>.  Wells Fargo Bank, N.A. is party to this Agreement solely in its capacity as First Priority Collateral Agent under the Security Agreement and solely for purposes of <u>Section 12.11(b)</u> herein.  The First Priority Collateral Agent shall be fully protected under this Agreement with respect to any action or inaction hereunder by the indemnities, costs, expenses and other protective provisions set forth for its benefit under the Security Agreement.

Confidential

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

RESIDENTIAL FUNDING COMPANY, LLC
as Borrower
GMAC MORTGAGE, LLC
as Borrower
RESIDENTIAL CAPITAL, LLC
as Guarantor
GMAC RESIDENTIAL HOLDING COMPANY,
LLC, as Guarantor
GMAC-RFC HOLDING COMPANY, LLC
as Guarantor
HOMECOMINGS FINANCIAL, LLC
as Guarantor
RESIDENTIAL MORTGAGE REAL ESTATE
HOLDINGS, LLC, as Obligor
RESIDENTIAL FUNDING REAL ESTATE
HOLDINGS, LLC, as Obligor
HOMECOMINGS FINANCIAL REAL ESTATE
HOLDINGS, LLC, as Obligor
DEVELOPERS OF HIDDEN SPRINGS, LLC
as Obligor
DOA HOLDING PROPERTIES, LLC
as Obligor
RFC ASSET HOLDINGS II, LLC
as Obligor
PASSIVE ASSET TRANSACTIONS, LLC
as Obligor
GMAC MODEL HOME FINANCE I, LLC
as Obligor
EQUITY INVESTMENT IV, LLC
as Obligor
AMERILAND, LLC
as Obligor
  By: REG-PFH, LLC, its sole member
REG-PFH, LLC
as Obligor
HOME CONNECTS LENDING SERVICES, LLC
as Obligor
GMACR MORTGAGE PRODUCTS, LLC
as Obligor
DITECH, LLC
as Obligor
RESIDENTIAL CONSUMER SERVICES, LLC
as Obligor

Confidential

GMAC MORTGAGE USA CORPORATION
as Obligor
RESIDENTIAL FUNDING MORTGAGE
SECURITIES I, INC.
as Obligor
RFC ASSET MANAGEMENT, LLC
as Obligor
RFC SFJV-2002, LLC
as Obligor
  By: RFC ASSET MANAGEMENT, LLC
  its sole member
RCSFJV2004, LLC
as Obligor
  By: RFC ASSET MANAGEMENT, LLC
  its sole member

By: _____

  Name: Michelle Switzer
  Title: Assistant Treasurer

Confidential

RFC CONSTRUCTION FUNDING, LLC
as Obligor
RC PROPERTIES I, LLC
as Obligor
RC PROPERTIES II, LLC
as Obligor
RC PROPERTIES III, LLC
as Obligor
RC PROPERTIES IV, LLC
as Obligor
RC PROPERTIES V, LLC
as Obligor
RC PROPERTIES VI, LLC
as Obligor
RC PROPERTIES VII, LLC
as Obligor
RC PROPERTIES VIII, LLC
as Obligor
RC PROPERTIES IX, LLC
as Obligor
RC PROPERTIES X, LLC
as Obligor
RC PROPERTIES XI, LLC
as Obligor
RC PROPERTIES XII, LLC
as Obligor
RC PROPERTIES XIII, LLC
as Obligor
RC PROPERTIES XIV, LLC
as Obligor
RC PROPERTIES XV, LLC
as Obligor
RC PROPERTIES XVI, LLC
as Obligor
RC PROPERTIES XVII, LLC
as Obligor
RC PROPERTIES XVIII, LLC
as Obligor
RC PROPERTIES XIX, LLC
as Obligor
RC PROPERTIES XX, LLC
as Obligor
DOA PROPERTIES I, LLC
as Obligor

Confidential

DOA PROPERTIES II, LLC
as Obligor
DOA PROPERTIES III (MODELS), LLC
as Obligor
DOA PROPERTIES IV, LLC
as Obligor
DOA PROPERTIES V (LOTS-CA), LLC
as Obligor
DOA PROPERTIES VI, LLC
as Obligor
DOA PROPERTIES VII (LOTS-NV), LLC
as Obligor
DOA PROPERTIES VIII, LLC
as Obligor
DOA PROPERTIES IX (LOTS-OTHER), LLC
as Obligor

By: _____
    Name:   Michelle Switzer
    Title:    Authorized Person

Confidential

GMAC INC.,
as Lender Agent and as Initial Lender

By:_____

   Name:

   Title:    **Jeff Brown**
              **Corporate Treasurer**

Confidential

For purposes of Sections 12.11(b):

WELLS FARGO BANK, N.A., solely in its
capacity as First Priority Collateral Agent under the
Security Agreement

By:_____

    Name:
    Title:     **Michael Pinzon**
                  **Vice President**

12/29/2009   3:14PM (GMT-07:00)

Confidential

SCHEDULE 1.01

DEFINITIONS

1.1.    <u>Definitions</u>.  As used in this Agreement the following terms have the meanings as indicated:

"<u>2010 Notes</u>" shall have the meaning given such term in the Intercreditor Agreement.

"<u>2010 Indenture</u>" shall have the meaning given such term in the Intercreditor Agreement.

"<u>2015 Notes</u>" shall have the meaning given such term in the Intercreditor Agreement.

"<u>2015 Indenture</u>" shall have the meaning given such term in the Intercreditor Agreement.

"<u>Account Control Agreements</u>" means securities account control agreements and deposit account control agreements  in form and substance satisfactory to the Lender Agent in its sole discretion covering the Concentration Accounts, the Collection Accounts and the Sales Proceeds Accounts.

"<u>Account Exceptions</u>" means:  (a) ResCap shall be entitled to hold in the Exempt Cash Reserve Account, free of any Liens or control rights in favor of either the First Priority Collateral Agent or the Collateral Control Agent, up to $250,000,000 and investment earnings on such amount; and (b) the Obligors may make such other exceptions to <u>Sections 4.01</u> and <u>4.03</u> as the Lender Agent shall agree in writing.

"<u>Acquired Indebtedness</u>" means Indebtedness of a Person existing at the time such Person becomes a Subsidiary or assumed in connection with the acquisition of assets from such Person.

"<u>Adjusted Borrowing Base</u>" means, as of any date of determination, the <u>sum</u> of:

(a)    the aggregate Collateral Value of all Primary Collateral determined in accordance with <u>Section 2.04</u> as of the Cut-Off Date which is the subject of the then most recently delivered Collateral Value Report, <u>plus</u>

(b)    the aggregate Collateral Value determined in accordance with Section 2.04 and Schedule 2.04 of Eligible Assets that were designated as Primary Collateral or Supporting Assets of Primary Collateral in accordance with the Loan Agreement since the applicable Cut-Off Date, <u>plus</u>

(c)    the aggregate amount of funds on deposit in the Sales Proceeds Accounts as of such date, <u>minus</u>

(d)    the Hedge Support Requirement in effect as of such date, <u>minus</u>

5254280.33 08048307

Confidential

(e)      the aggregate Collateral Value of all Primary Collateral or Supporting Assets that have been subject to a Collateral Disposition since the applicable Cut-Off Date, minus

(f)      with respect to each category of Primary Collateral set forth on Schedule 2.04, the aggregate amount of Collections (other than Net Cash Proceeds) received since the applicable Cut-Off Date with respect to such Primary Collateral multiplied by the applicable advance rate represented by the percentage for such category of Primary Collateral set forth on Schedule 2.04, minus

(g)      any Reserves applicable on such date.

An Adjusted Borrowing Base shall be prepared promptly, and in any event within four (4) Business Days, following request by the Lender Agent, provided that such request may not be furnished during the first 11 Business Days of any month; provided further, that any Adjusted Borrowing Base calculation may be based upon the actual knowledge of the ResCap Treasury Group available at the time of calculation, and any resulting inaccuracy in the Adjusted Borrowing Base (or a related Borrowing Base Deficiency) shall not result in a breach of this Agreement, if such calculation was prepared in good faith, and in accordance with ResCap's general accounting and business policies as in effect as of the date such information was furnished.

"Advances" means any advance relating to domestic Mortgage Loans or REO Property made by a Borrower: (i) to inspect, protect, preserve or repair properties that secure defaulted Mortgage Loans or that have been acquired through foreclosure or deed in lieu of foreclosure or other similar action pending disposition thereof, or for similar or related purposes, including, but not limited to, necessary legal fees and costs expended or incurred by such servicer in connection with foreclosure, bankruptcy, eviction or litigation actions, as well as costs to obtain clear title to such a property, to protect the priority of the lien created by a Mortgage Loan on such a property, and to dispose of properties taken through foreclosure or by deed in lieu thereof or other similar action, or any other out of pocket expenses incurred as servicer and in the ordinary course of business to maintain or maximize the value of a Mortgage Loan or REO Property; (ii) of delinquent interest and/or principal on the related Mortgage Loan to the extent such advance is funded out of a Borrower's own funds and not using amounts held for future distribution; or (iii) with respect to a Mortgage Loan of real estate taxes and assessments, or of hazard, flood or primary mortgage insurance premiums, required to be paid by the related payor under the terms of the related Mortgage Loan.

"Affected Subsidiaries" shall mean DOA Properties I, LLC, DOA Properties II, LLC, RC Properties I, LLC, RC Properties II, LLC, RC Properties III, LLC, RC Properties IV, LLC, RC Properties V, LLC, RC Properties VI, LLC, RC Properties VII, LLC, RC Properties VIII, LLC, RC Properties IX, LLC, RC Properties X, LLC, RC Properties XI, LLC, RC Properties XII, LLC, RC Properties XIII, LLC, RC Properties XIV, LLC, RC Properties XV, LLC, RC Properties XVI, LLC, RC Properties XVII, LLC, RC Properties XVIII, LLC, RC Properties XIX, LLC and RC Properties XX, LLC.

"Affected Guarantor" has the meaning set forth in Section 11.07.

Confidential

"<u>Affiliate</u>" means, with respect to any Person, any other Person which, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" (together with the correlative meanings of "controlled by" and "under common control with") means possession, directly or indirectly, of the power (a) to vote 20% or more of the securities (on a fully diluted basis) having ordinary voting power for the directors or managing general partners (or their equivalent) of such Person, or (b) to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.

"<u>Affiliate Transaction</u>" means, with respect to any Person any direct or indirect payment to, or sale, lease, transfer or disposal of any of its properties or assets to, or purchase of any property or assets from, or entry into or amend any transaction or series of related transactions, contract, agreement, loan, advance or guarantee with, or for the benefit of, any Affiliate of ResCap involving aggregate consideration in excess of $10,000,000.

"<u>Agency</u>" means Freddie Mac, Fannie Mae or Ginnie Mae.

"<u>Agency Assets</u>" means whole loans eligible for delivery to, or securities issued by and guaranteed by, Fannie Mae, Ginnie Mae or Freddie Mac.

"<u>Aggregate Commitment Amount</u>" means, at any time commencing on the opening of business on the Amendment Closing Date, the sum of (i) $1,592,640,818, <u>minus</u> (ii) the amount of any reductions to the Aggregate Commitment Amount pursuant to <u>Section 2.10(c)</u> in connection with a repayment of principal of the Loans, <u>minus</u> (iii) the amount of MTN Credits applied to reduce the amount of mandatory repayments of Loans pursuant to <u>Section 4.02(a)</u>.

"<u>Agreement</u>" has the meaning set forth in the <u>preamble</u>.

"<u>Ally Bank</u>" means, collectively, (i) IB Finance Holding Company, LLC, (ii) Ally Bank, formerly known as GMAC Bank and (iii) any successor thereto.

"<u>Amendment Closing Date</u>" means December 30, 2009.

"<u>Applicable Deposit Date</u>" means:

(i) in the case of any Net Cash Proceeds of a Collateral Disposition or other Collections relating to an Asset (other than with respect to Net Cash Proceeds relating to Servicing Advances or U.S. residential REO Property and Net Cash Proceeds and Collections relating to the European Reporting Assets underlying the English Note and the Dutch Note), (a) the day such funds are received if such Net Cash Proceeds or Collections exceed $100,000,000 or (b) in all other cases, three Business Days after such funds are received;

(ii) in the case of any Net Cash Proceeds of a Collateral Disposition relating to Servicing Advances, (a) the day such funds are received if such Net Cash Proceeds exceed $100,000,000 or (b) in all other cases, three Business Days after such funds are received;

(iii) in the case of any Net Cash Proceeds of a Collateral Disposition or other Collections relating to any European Reporting Assets underlying the English Note and the Dutch Note:

Schedule 1.01-3

Confidential

(a) one (1) Business Day after (x) such funds are received in relation to the European Reporting Assets underlying the English Note if such Net Cash Proceeds or other Collections exceed $100,000,000; or (y) such funds are received in relation to the European Reporting Assets underlying the Dutch Note if such Net Cash Proceeds or other Collections exceed $100,000,000;

(b) in all other cases relating to Net Cash Proceeds of a Collateral Disposition, not later than five Business Days after the earlier of (x) the next monthly Distribution Date or Redemption Date (as defined in the Master Definitions Schedule dated June 4, 2008, as amended from time to time) with respect to Collateral Dispositions of European Reporting Assets relating to the English Note or the Note Payment Date (as defined in the Master Definitions Agreement dated June 4, 2008, as amended from time to time) with respect to Collateral Dispositions of European Reporting Assets relating to the Dutch Note or (y) the date the amount of Net Cash Proceeds on deposit in (1) the applicable accounts relating to the English SPE exceeds £5,000,000 in the aggregate or (2) the applicable accounts relating to the Dutch SPE exceeds EUR5,000,000 in the aggregate, as applicable; and

(c) in all other cases relating to Collections (excluding Net Cash Proceeds), not later than five Business Days after the next monthly Distribution Date (as defined in the Master Definitions Schedule dated June 4, 2008, as amended from time to time) with respect to Collections (excluding Net Cash Proceeds) with respect to European Reporting Assets relating to the English Note or the Note Payment Date (as defined in the Master Definitions Agreement dated June 4, 2008, as amended from time to time) with respect to Collections (excluding Net Cash Proceeds) with respect to European Reporting Assets relating to the Dutch Note; and

(iv) in the case of any Net Cash Proceeds of a Collateral Disposition relating to a U.S. residential REO Property (1) the day such funds are received if such Net Cash Proceeds exceed $100,000,000 or (2) five Business Days after receipt of such funds, provided, however, that if the Collateral Disposition has occurred within the first nine Business Days of a month, the earlier of (x) the 14th Business  Day of such month or (y) 5 Business Days after ResCap Treasury has actual knowledge of the receipt of the related funds.

"Applicable Margin" means 2.75% (275 basis points).

"Approved Exceptions" means, with respect to an Asset, any irregularity in the documentation, underwriting or origination for such Asset, such irregularity (i) does not make the related Contracts unenforceable and is not reasonably expected to impair the practical realization of benefits intended to be created by such Contracts (determined without giving effect to any indemnification from the related Originator), (ii) with respect to Substitute Collateral, has been taken into account by the Obligors in determining the Carrying Value of such Asset in accordance with its usual and customary business practices, and (iii) with respect to Substitute Collateral, has been disclosed to the Lender Agent, it being understood and agreed that disclosure may be in the form of discussion between the Obligors and the Lender in the context of the Lender Agent's determination of whether to include such Asset in a Collateral Designation Notice and establishment of a related Specified Percentage (as defined in Schedule 2.04);

Schedule 1.01-4

Confidential

<u>provided</u> that the Obligors' description of such irregularity is sufficiently clear and detailed to enable the Lender to reasonably evaluate the risks with respect to such Asset.

"<u>Approved Fund</u>" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business; and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"<u>Asset</u>" means (i) a Mortgage Loan, (ii) a Financial Asset-Backed Security, (iii) a Servicing P&I Advance, a Servicing T&I Advance or a Servicing Corporate Advance, (iv) an Incremental Advance, (v) an Agency Asset, (vi) an Equity Interest in a BCG Subsidiary, an REO Owner or, subject to the written approval of the Lender Agent, any other Person, (vii) the Equity Interest in GMAC Residential Holding Company, LLC, or (viii) an "Asset" as defined in the Line of Credit Agreement.

"<u>Assignee</u>" has the meaning set forth in <u>Section 9.01</u>.

"<u>Assignment and Acceptance</u>" means an assignment and acceptance agreement entered into by a Lender, an Eligible Assignee and the Agent, pursuant to which such Eligible Assignee may become a party to this Agreement, in substantially the form of <u>Exhibit 9.01</u>.

"<u>Authorization Notice</u>" means a written notice from an Affected Subsidiary to the Lender Agent, (ii) confirming that such Affected Subsidiary's execution and delivery of the Facility Documents to which it is a party have been duly authorized in accordance with such Affected Subsidiary's limited liability company agreement, as the same is modified prior to the date of such notice, and (ii) providing to the Lender Agent a copy of such limited liability agreement, as so modified.

"<u>Base Currency</u>" means Dollars unless otherwise specified in a Confirmation.

"<u>BCG</u>" means the Business Capital Group division of ResCap.

"<u>BCG Assets</u>" means the assets of BCG and its Subsidiaries which are not Excluded Assets.

"<u>BCG Joint Venture</u>" means a joint venture to which a ResCap Subsidiary is a party (i) that either existed on the Closing Date or was formed with the Lender Agent's written consent in connection with a workout of BCG Assets, and (ii) that is the asset, or holds the assets, constituting a primary source of funds expected to pay the investment in, and return on, Primary Collateral or Supporting Assets.

"<u>BCG REO Subsidiaries</u>" means (a) DOA Holdings; DOA Holdings NoteCo, LLC; DOA Properties I, LLC; DOA Properties II, LLC; DOA Properties III (Models), LLC; DOA Properties IV, LLC; DOA Properties V, LLC (Lots-CA); DOA Properties VII, LLC (Lots-NV); DOA Properties IX (Lots-Other), LLC; (b) any special purpose vehicle which (i) has been designated by the Borrowers and either approved in writing by the Lender Agent or is established with

Confidential

organizational documents in a form approved by the Lender Agent in writing, and (ii) is a subsidiary of DOA Holdings and (c) the WestLB Program Subsidiaries.

"BCG Subsidiary" means (i) a BCG REO Subsidiary, (ii) MHFI, (iii) any Subsidiary of any of the foregoing, or (iv) any other Subsidiary that is party to, or owns a Person that is party to, a BCG Joint Venture.

"Bilateral Facility" means the facilities listed in Schedule 7.01(t), as such Schedule may be amended, supplemented or otherwise modified with the consent of the Lender Agent in its sole and absolute discretion.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning set forth in the preamble.

"Borrowing Base" means, as of any date of determination, an amount determined as of the Cut-Off Date and reported in the related Collateral Value Report to be equal to the lesser of (a) the Hedge Adjusted Available Amount and (b) the sum of (i) the aggregate Collateral Value of all Primary Collateral as of the Cut-Off Date as determined in accordance with Section 2.04, plus (ii) the amount of funds on deposit in the Sales Proceeds Accounts on such Cut-Off Date minus (iii) (for any determination after the initial determination of the Borrowing Base) any Reserves applicable on such date and minus (iv) the Hedge Support Requirement in effect on such Cut-Off Date.

"Borrowing Base Deficiency" has the meaning set forth in Section 2.08(b).

"Borrowing Base Shortfall Day" has the meaning set forth in Section 2.08(b).

"Breakage Costs" means those amounts payable by the Borrowers to the Lenders in the event of (a) the payment of any principal of any Loan bearing interest at the LIBOR Rate other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default); (b) the failure to borrow, continue or prepay any such Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked hereunder and is in fact revoked); or (c) any circumstance described in Section 2.07. In any such event, the Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event, such compensation to include an amount determined by each such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the LIBOR Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for such Loan (not taking into effect any Applicable Margin applicable thereto)), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the applicable Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the LIBOR market (not taking into effect any Applicable Margin applicable thereto); provided that each Lender agrees to take commercially reasonable steps to avoid the

Confidential

need for, or reduce the amount of, such compensation, in a manner that will not, in the good faith opinion of applicable Lender, be disadvantageous to such Lender.

"Business Day" means any day other than (a) a Saturday or Sunday; or (b) a day on which banking institutions in the States of New York, Minnesota or Pennsylvania are required or authorized by law to be closed.

"Capital Lease" means, with respect to any Subsidiary, any lease of (or other agreement conveying the right to use) any real or personal property by such Subsidiary that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Subsidiary.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests, including, without limitation, limited and general partnership interests, in a person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Carrying Value" means, with respect to any asset and for purposes of determining Collateral Value, the carrying value of such asset as determined by ResCap in accordance with its standard valuation practices as applied to its assets as a whole as then in effect (such valuation practices to be consistent with the methodology used in the preparation of ResCap's GAAP financial statements).

"Cash Equivalents" means (i) securities with weighted average maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (ii) certificates of deposit and eurodollar time deposits with weighted average maturities of 90 days or less from the date of acquisition and overnight bank deposits of any commercial bank having capital and surplus in excess of $500,000,000 and a rating of at least A+ and A1 from S&P and Moody's, respectively, (iii) repurchase obligations of any commercial bank satisfying the requirements of clause (ii) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (iv) securities with weighted average maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (v) securities with weighted average maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any commercial bank satisfying the requirements of clause (ii) of this definition or, (vi) shares of 2-a7 money market mutual funds rated AAA by Moody's and S&P that have a weighted average maturity of 90 days or less or similar funds which invest exclusively in assets satisfying the requirements of clauses (i) through (v) of this definition.

"Change of Control" means the occurrence of any of the following events: (i) any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act), other than the Investors, the United States Department of the Treasury, the GM Trusts, or any purchaser of the beneficial interest of General Motors in the GM Trusts, shall acquire ownership, directly or

Confidential

indirectly, beneficially or of record, in the aggregate, Capital Stock representing a majority of the Voting Stock of ResCap; or (ii) at any time, ResCap shall fail to own, directly or indirectly, 100% of the aggregate issued and outstanding Capital Stock of the Obligors.

"Closing Date" means June 4, 2008.

"Collateral" means all property and rights of the Obligors in which a security interest is granted under the Security Agreement.

"Collateral Addition Date" means, with respect to any Substitute Collateral, the date specified in the applicable Collateral Addition Designation Notice as the date such Substitute Collateral may constitute Primary Collateral hereunder.

"Collateral Addition Designation Notice" means a notice in writing (which may be electronic) delivered by the Lender Agent at a Borrower's request with respect to Substitute Collateral, which notice shall approve or designate a Collateral Addition Date for such Substitute Collateral as well as any applicable advance rates, additional eligibility requirements, opinion requirements, or other restrictions, terms or conditions as the Lender Agent may specify in its discretion; it being understood that this Agreement and the other Facility Documents may refer to a category of Collateral prior to the Collateral Addition Date therefor, but that such references will not be given effect until such Collateral Addition Date.

"Collateral Control Agent" means the "Collateral Control Agent" as defined in the Intercreditor Agreement.

"Collateral Disposition" means any Transfer, provided that if any such transaction constitutes part of a series of related transactions, all of the transactions in such series shall constitute a single Transfer.  Collateral Disposition shall not include: (a) the write-off or forgiveness of investments in the ordinary course of business; (b) any sale of MHF Assets in the ordinary course of business; (c) the collection of regularly scheduled payments of principal and interest on an Asset, (d) the foreclosure (or deed in lieu of foreclosure) of a Mortgage Loan, construction loan, mezzanine loan, working capital loan or commercial loan, provided that (i) ownership of any resulting REO Property shall be transferred to a REO Owner or (in the case of construction loans or commercial loans which are BCG Assets) to a BCG REO Subsidiary as soon as reasonably practicable and shall become part of Primary Collateral (or Supporting Assets for Primary Collateral in the case of BCG Assets) and (ii) in the case of REO Property (other than residential REO Property obtained by exercise of remedies under individual consumer Mortgage Loans), a mortgage or deed of trust shall have been recorded or sent for recording immediately following the acquisition thereof by the resulting owner thereof for the benefit of the First Priority Collateral Agent, and such mortgage or deed of trust shall be in a form substantially consistent with the forms approved by the Lender Agent and will secure an amount of at least the Carrying Value of such REO Property.

"Collateral Release Certificate" means a certificate, in such form as the Lender Agent and the Borrowers shall agree from time to time and notified to the First Priority Collateral Agent, executed by an Obligor and delivered to the First Priority Collateral Agent pursuant to Section 12.11(b).

Confidential

"Collateral Value" means the value of the Primary Collateral (or a portion thereof) calculated in accordance with Schedule 2.04.

"Collateral Value Report" means a Collateral Value Report, substantially in the form of Exhibit 2.04(a), delivered by the Borrowers to the Lender Agent in accordance with Sections 2.04(a)-(b).

"Collection Accounts" means each segregated trust account established in the name of an Obligor and subject to the control of the Collateral Control Agent in a manner satisfactory to the Lender Agent.

"Collections" means all payments or proceeds with respect to the Collateral or Supporting Assets received by the Borrowers or the Guarantors and not required to be retained or distributed to third parties pursuant to the terms of the documents governing any applicable Permitted Funding Indebtedness.

"Commitment" means the commitment of each Lender, subject to the terms and conditions hereof, to make Loans to the Borrowers pursuant to Article II.

"Commitment Termination Date" means the earlier of (a) the Loan Repayment Date; and (b) the date on which the Commitments are terminated in full or the Aggregate Commitment Amount is reduced to zero pursuant to the terms of this Agreement (including pursuant to Section 2.10 or Section 8.02).

"Compliance Certificate" means a certificate substantially in the form of Exhibit 7.01 hereto or such other form as acceptable to the Lender Agent.

"Concentration Accounts" means the deposit accounts listed on Schedule X(a) to the Security Agreement.

"Conduit No. 2 Facility" means the mortgage loan financing facility contemplated by (i) that certain Amended and Restated Note Issuance Facility Deed, dated November 7, 2008, among Conduit (No. 2) Limited, as SPE, Scaldis Capital Limited, Regency Assets Limited, Form Limited, Rheingold No. 14 (Jersey) Limited and Gresham Receivables (No. 1) Limited, as Original Bank Conduit Vehicles, Deutsche Trustee Company Limited, as Security Trustee, GMAC-RFC Limited, as Administrator and Originator, Silo No. 2 Limited, as Subordinated Loan Provider, and Residential Capital, LLC, as Guarantor, and (ii) all other agreements, contracts, documents and instruments evidencing or relating thereto.

"Confirmation" means written confirmation of the specific terms of a Hedge Transaction executed by the ResCap Counterparty and the Initial Lender.

"Conforming Loan" means a Mortgage Loan which conforms to the Guidelines as such guidelines have been modified by Freddie Mac, Fannie Mae, any FHLB, and Ginnie Mae with respect to a Mortgage Loan originated or purchased by a GMAC Originator.

"Consolidated Liquidity" means the cash and cash equivalents of ResCap, determined on a consolidated basis.

Confidential

"Consolidated Net Income" for any period means the net income (or loss) of ResCap and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

> (a)    the net income (or loss) of any Person that is not a Subsidiary, except to the extent that cash in an amount equal to any such income has actually been received by ResCap or, subject to clause (c) below, any Subsidiary during such period;

> (b)    except to the extent includible in the consolidated net income of ResCap pursuant to the foregoing clause (a), the net income (or loss) of any Person that accrued prior to the date that (i) such Person becomes a Subsidiary or is merged into or consolidated with ResCap or any Subsidiary or (ii) the assets of such Person are acquired by ResCap or any Subsidiary;

> (c)    the net income of any Subsidiary during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary on that income is not permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary during such period, except that ResCap's equity in a net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income;

> (d)    in the case of a successor to ResCap by consolidation, merger or transfer of its assets, any income (or loss) of the successor prior to such merger, consolidation or transfer of assets; and

> (e)    without duplication of amounts otherwise deducted in determining Consolidated Net Income, the amount of Permitted Tax Distributions for such period.

"Consolidated Net Worth" means, at any date, the amount which would appear in accordance with GAAP on a consolidated balance sheet of ResCap and its Subsidiaries opposite the heading "equity" (or any similar item), but not including the equity of GMAC Bank to the extent included in such consolidated balance sheet equity.

"Consolidated Tangible Net Worth" means, at any date, the result of (a) Consolidated Net Worth, minus (b) the net book value of all assets on the consolidated balance sheet of ResCap used to calculate Consolidated Net Worth that would be treated as intangible assets under GAAP (including goodwill, trademarks, trade names, service marks, service names, copyrights, patents, organizational expenses and the excess of any equity in any subsidiary over the cost of the investment in such subsidiary, but not including mortgage servicing rights or any retained interest in securitized receivables), all as determined on a consolidated basis in accordance with GAAP.

"Contract" means, with respect to any Asset, the loan agreement, indenture or other agreement pursuant to which such Asset has been issued or created, and each other agreement that governs the terms of, or secures the obligations represented by such Asset.

Confidential

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control that, together with a Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Internal Revenue Code or Section 4001 of ERISA.

"Credit and Collection Policies" means, with respect to an Asset, the credit and collection policies, including loan modification policies, of the related Obligor applicable to origination and servicing of assets of that type, as the same may be amended from time to time in accordance with its usual and customary practices.

"Credit Party" has the meaning set forth in Section 3.02(a).

"Credit Risk Asset" means any Asset with respect to which:

(a) an Obligor has determined that a default, other than a payment default, as defined under the related Contract has occurred and such non-payment default continues unremedied for at least 100 days after notice thereof to the Payor thereof;

(b) an Obligor learns that the Payor in respect of such Asset has defaulted in the payment of principal or interest on any other Indebtedness and such default has not been cured within 100 days; or

(c) if such Asset is a Financial Asset-Backed Security that was originally rated by any nationally recognized rating agency, the rating on such security shall have been reduced by more than two notches by such rating agency.

"Cumulative Substitute Collateral Schedule" means a schedule setting forth, on a cumulative basis after the Amendment Closing Date, the Substitute Collateral, which schedule shall be in such form as the Lender Agent may approve from time to time in its discretion after consultation with the Borrowers.

"Cut-Off Date" means, for any date of determination, the last day of the immediately prior calendar month.

"Default" means an Event of Default or an Unmatured Event of Default.

"Default Rate" means, with respect to any Loan for any Interest Period, and any late payment of fees or other amounts due hereunder, the LIBOR Rate for the related Interest Period (or for all successive Interest Periods during which such fees or other amounts were delinquent), plus the Applicable Margin, plus 2% per annum.

"Defaulted Asset" means any Asset arising under a Contract for which:

(a) all or a portion of a scheduled payment is more than 120 days past due (based on its original due date),

(b) the related Obligor has determined in accordance with its customary practices that such Asset is uncollectible,

Confidential

(c)    the related Payor is subject to an Event of Bankruptcy, or

(d)    such Asset is rated "C" or less by Moody's Investors Service or "CC" or less by Standard & Poor's.

"Disposition Offset" means, with respect to a Collateral Disposition, the amount by which the portion of related Net Cash Proceeds required to be applied to the repayment of the principal of Loans is reduced on account of the application of the MTM Credit pursuant to Section 2.08(c).

"Disqualified Equity Interests" means any class of Equity Interests of ResCap or any of its Subsidiaries that, by its terms, or by the terms of any related agreement or of any security into which it is convertible, puttable or exchangeable, is, or upon the happening of any event or the passage of time would be, required to be redeemed by ResCap or such Subsidiary, whether or not at the option of the holder thereof, or matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, in whole or in part, on or prior to the date which is 91 days after the date set forth in Clause (a) of the definition of Loan Repayment Date.

"DOA Holdings" means DOA Holdings Properties, LLC, a Delaware limited liability company.

"Dollars" or "$" means dollars in lawful money of the United States of America.

"Dutch Note" means any note issued by GX CE Funding B.V. to ResCap under or pursuant to the Dutch VFLN Agreement.

"Dutch SPE" means GX CE Funding B.V.

"Dutch Security Documents" means the Dutch VFLN Agreement and the Dutch Note.

"Dutch VFLN Agreement" means that certain variable funding loan note agreement dated June 4, 2008 and entered into by and between, amongst others, ResCap, GX CE Funding B.V. and Stichting Security Trustee GX CE Funding.

"Electronic Files" means (i) the electronic data file delivered by the Borrowers to the Lender Agent immediately prior to the Closing Date with respect to the Initial Collateral, and (ii) an electronic data file related to any Collateral Value Report, substantially in the form of the file described in clause (i).

"Eligibility Requirements" are defined in (i) Exhibit B with respect to Substitute Collateral, and (ii) Exhibit A with respect to other Collateral.

"Eligible Asset" means an Asset which satisfies the following criteria:

(a)    such Asset (i) is a Conforming Loan, Jumbo Loan, Wet Loan, Second Lien Loan, HELOC Loan, High LTV Loan, Scratch and Dent Loan, (ii) is an Agency Asset, (iii) is a Financial Asset-Backed Security secured by Conforming Loans, Jumbo Loans, Wet Loans, Second Lien Loans, HELOC Loans, High LTV Loans, Scratch and

Schedule 1.01-12

Confidential

Dent Loans or is an RMBS, CMBS, CDO or CLO, (iv) is an Equity Interest in a BCG Subsidiary, (v) is an Equity Interest in REO Owner, (vi) is an Incremental Advance; (vii) is an Equity Interest in a joint venture or an Equity Interest in a wholly owned Subsidiary owning Equity Interests in a BCG Joint Venture; (viii) is a Servicing Corporate Advance, Servicing T&I Advance or Servicing P&I Advance; (ix) is REO Property which has been transferred to an REO Owner, (x) an increase in the aggregate outstanding principal balance of the English Notes or Dutch Notes in accordance with the terms of the applicable Security Documents as a result of transferring Eligible UK Assets or Eligible Dutch Assets to the English SPV or Dutch SPV, (xi) in the case of Substitute Collateral, a Substitute Eligible Asset or (xii) with the written consent of the Lender Agent, is an Equity Interest in a Financing SPV that holds Assets that consist of Conforming Loans, Jumbo Loans, Wet Loans, Second Lien Loans, HELOC Loans, High LTV Loans, Scratch and Dent Loans or RMBS, CMBS, CDOs or CLOs.

(b)    such Asset is either (i) owned by a Borrower or Guarantor; (ii) owned by an Obligor and is an Incremental Advance or (iii) with respect to clause (a)(iv), (v), (vii) and (xii) above is owned by an Obligor;

(c)    such Asset does not arise from, and is not subject to, Permitted Funding Indebtedness; and

(d)    such Asset satisfies the Eligibility Requirements.

"Eligible Assignee" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; or (d) any other Person; provided that the Borrowers have consented to such other Person (which consent shall not be unreasonably withheld, delayed or conditioned and shall not be required if a Default has occurred and is continuing).

"Eligible Dutch Assets" means, as of any date on which Substitute Collateral are to be designated as Primary Collateral, residential mortgage loans denominated in Euros and originated or acquired by Subsidiaries of the Borrowers in the ordinary course of business, provided in each case that such loans satisfy the eligibility criteria set forth in the Dutch Security Documents.

"Eligible Servicing Advances Agreement" means (i) the agreements giving rise to Servicing Advances of the type described as Initial Collateral in the Schedules to the Security Agreement, and (ii) other agreements identified as such on a Substitute Collateral Certificate approved by the Lender Agent in writing.

"Eligible UK Assets" means, as of any date on which Substitute Collateral are to be designated as Primary Collateral, residential mortgage loans denominated in Pounds Sterling and originated or acquired by Subsidiaries of the Borrowers in the ordinary course of business, provided in each case that such loans satisfy the eligibility criteria set forth in the English Security Documents.

"English Deed of Assignment" means the First Priority Deed of Assignment, dated on June 4, 2008, between ResCap and the First Priority Collateral Agent.

Confidential

"English Loan Sale and Purchase Agreement" means the loan sale and purchase agreement dated on June 4, 2008 between the SPE, the English Sellers and the English Security Trustee.

"English Note" means the notes issued from time to time under and in accordance with the English Note Issuance Facility Deed.

"English Note Issuance Facility Deed" means the note issuance facility deed dated on June 4, 2008 between English SPE, ResCap, the English Security Trustee and the English Sellers, as the same may be amended or modified from time to time with the prior written consent of the Lender Agent.

"English Security Documents" means the English Loan Sale and Purchase Agreement, the English Note Issuance Facility Deed, the English Shares Charge, the English Deed of Assignment, and each and every other document, agreement and deed entered into by ResCap, its Subsidiary and/or the English Security Trustee in connection with the purchase of certain residential mortgage loans and development loans, the issuance of the English Note and creation of security in respect of the English Note in favor of the English Security Trustee, in each case, by the English SPE.

"English Security Trustee" means Deutsche Trustee Company Limited (in its capacity as security trustee in respect of the English Note).

"English Sellers" means GMAC-RFC Limited and GMAC-RFC Property Finance Limited.

"English Shares Charge" means the First Priority Shares Charge, dated on or about the Closing Date, between RFC and the First Priority Collateral Agent.

"English SPE" means Viaduct (No.7) Limited.

"Equity Interests" of any Person means (a) any and all shares or other equity interests (including common stock, preferred stock, limited liability company interests and partnership interests) in such Person; and (b) all rights to purchase, warrants or options (whether or not currently exercisable), participations or other equivalents of or interests in (however designated) such shares or other interests in such Person.

"Equivalent" means, with respect to an amount on a Valuation Date, in the case of an amount denominated in the Base Currency, such Base Currency amount and, in the case of an amount denominated in a currency other than the Base Currency (the "Other Currency"), the amount of Base Currency required to purchase such amount of the Other Currency at the spot exchange rate determined by the Hedge Valuation Agent for Value on such Valuation Date.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to sections of ERISA also refer to any successor sections thereto.

Confidential

"European Documents" means Underlying Documents described in clause (a) or (b) of the definition of Underlying Documents and any other document designated as such in a Collateral Addition Designation Notice.

"European Reporting Assets" means Supporting Assets for the Primary Collateral consisting of the Dutch Notes and the English Notes.

"European SPV Accounts" means each account held in the name the English SPE or the Dutch SPE pursuant to the terms of the English Security Documents or the Dutch Security Documents (as applicable) and any other account designated as such in a Collateral Addition Designation Notice.

"Event of Bankruptcy" shall be deemed to have occurred with respect to a Person if either:

(a)     such Person files a voluntary petition in bankruptcy, seeks relief under any provision of any Insolvency Law or consents to the filing of any petition against it under any such law;

(b)     a proceeding shall have been instituted by any Affiliate of such Person in a court having jurisdiction in the premises seeking a decree or order for relief in respect of such Person in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Person, or for any substantial part of its property, or for the winding-up or liquidation of its affairs;

(c)     a proceeding shall have been commenced, without the application or consent of such Person, in a court having jurisdiction in the premises seeking a decree or order for relief in respect of such Person in an involuntary case under any applicable Insolvency Law, or for the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator, conservator or other similar official of such Person, or for any substantial part of its Property, or for the winding-up or liquidation of its affairs and such Person shall have failed to obtain a relief (including, without limitation, a dismissal) or a stay of such involuntary proceeding within thirty (30) days;

(d)     the admission in writing by such Person of its inability to pay its debts as they become due;

(e)     such Person consents to the appointment of or taking possession by a custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official, of all or any part of its Property, or any custodian, receiver, conservator, trustee, liquidator, sequestrator or similar official takes possession of all or any part of the Property of such Person;

(f)     such Person makes an assignment for the benefit of any of its creditors; or

(g)     such Person generally fails to pay its debts as they become due.

Confidential

"<u>Event of Default</u>" has the meaning set forth in <u>Section 8.01</u>.

"<u>Exchange Offer</u>" means the $14,040,000,000 bond exchange and tender offer by ResCap as substantially described in the Exchange Offer OM pursuant to which, among other things, ResCap exchanged certain unsecured bonds issued by it for secured bonds, which closed on June 6, 2008.

"<u>Exchange Offer Notes</u>" means any series of ResCap's senior and senior subordinated notes which were the subject of, or issued pursuant to, the exchange offer contemplated by the Exchange Offer OM.

"<u>Exchange Offer OM</u>" means the Confidential Offering Memorandum and Consent Solicitation Statement of ResCap dated as of May 5, 2008 as supplemented on May 14, 2008.

"<u>Excluded Assets</u>" has the meaning set forth in the Security Agreement.

"<u>Excluded Debt</u>" means Indebtedness owed by a Restricted Entity to a Specified Affiliate.

"<u>Excluded Subsidiary</u>" means (a) a Foreign Subsidiary; (b) any Subsidiary that is effectively restricted from offering a Guarantee hereunder by law or regulation; (c) any Financing SPV; or (d) any Subsidiary that is effectively restricted from offering a Guarantee hereunder by its charter, so long as such Subsidiary referred to in this <u>clause (e)</u> is required to make dividends of all cash legally available therefor that is not required to pay current obligations of such Subsidiary; <u>provided</u> that (i) no Subsidiary under <u>clause (a)</u>, <u>(b)</u>, <u>(c)</u> or <u>(e)</u> above shall be deemed an Excluded Subsidiary if it guarantees any Indebtedness of ResCap or any unsecured Indebtedness of any Guarantor for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments and (ii) no Subsidiary the Equity Interests of which are directly owned by ResCap shall be an Excluded Subsidiary.

"<u>Exempt Cash Reserve Account</u>" means (a) (i) account number 2000042898508 maintained by ResCap at Wachovia Bank, N.A. or (ii) account number 2000042898511 maintained by ResCap at Wachovia Bank, N.A., or (b) an account maintained by ResCap at another financial institution in lieu of the accounts described in <u>clause (a)</u>, <u>provided</u> that (i) ResCap shall have notified the Lender Agent in writing of the designation of such account and (ii) at any time there shall only be one Exempt Cash Reserve Account.

"<u>Exemption Certificate</u>" has the meaning set forth in <u>Section 3.02(f)</u>.

"<u>Facility</u>" means the loan facility provided to the Borrowers by the Lenders pursuant to this Agreement.

"<u>Facility Documents</u>" means this Agreement, the Notes, the Security Documents, the Intercreditor Agreement, the Hedge Documents and all notices, certificates, financing statements, agreements and other documents to be executed and delivered by the Borrowers or ResCap pursuant to the foregoing or otherwise in connection with this Agreement or the extension of financing by the Lenders contemplated hereunder.

Confidential

"Fair Value" means with respect to (i) any Permitted Consideration received in connection with, or acquired with the proceeds of, a Collateral Disposition, the fair market value of such Permitted Consideration (determined as of the date a binding commitment to acquire such Permitted Consideration was entered into and taking into account, among other things, current market conditions and whether such Permitted Consideration is subject to senior claims or set-off rights), and (ii) any Primary Collateral or Supporting Assets that are the subject of a Collateral Disposition, the fair market value of such Primary Collateral or Supporting Assets (determined as of the date a binding commitment to effect such Collateral Disposition was entered into and taking into account, among other things, current market conditions and whether such Primary Collateral or Supporting Assets are subject to senior claims or set-off rights); provided that the Fair Value of a Residual Right in which the holder of an interest senior to the holders of Obligations has not waived its rights of offset and cross collateralization shall be zero.

"Fannie Mae" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"FHA" shall mean The Federal Housing Administration, an agency within the United States Department of Housing and Urban Development, or any successor thereto and including the Federal Housing Commissioner and the Secretary of Housing and Urban Development where appropriate under the applicable FHA regulations.

"FHA Approved Mortgagee" shall mean an institution which is approved by the FHA to act as mortgagee and servicer of record, pursuant to applicable FHA regulations.

"FHA Insurance Contract" shall mean the contractual obligation of FHA respecting the insurance of an FHA mortgage loan pursuant to the National Housing Act, as amended.

"FHLB" means any Federal Home Loan Bank, or any successor thereto.

"Financial Asset-Backed Security" means a collateralized mortgage obligation, a collateralized bond obligation, a collateralized loan obligation or any other security the payments on which depend primarily on the cash flow from a specified pool of financial assets.

"Financing Assets" means whole loan mortgages, Residual Rights, securities (including Equity Interests or Indebtedness of Subsidiaries that are Financing SPVs but excluding Equity Interests of other Subsidiaries) and other financial assets or any related assets, rights or property or the proceeds therefrom.

"Financing SPV" means a special purpose vehicle formed for financing purposes by ResCap or any Subsidiary in accordance with past practice of ResCap (or any reasonable extension or modification of such past practice, including for purposes of financing other types of financial assets) that does not guarantee any Indebtedness of ResCap or any Subsidiary other than Indebtedness of another Financing SPV and substantially all of the assets of which consist of Financing Assets.

"First Priority Collateral Agent" means Wells Fargo Bank, N.A., in its capacity as First Priority Collateral Agent under the Security Agreement, and its permitted successors and assigns thereunder.

Confidential

"Foreign Subsidiary" means (a) a Subsidiary that is not organized within one of the 50 states of the United States of America or any jurisdiction that hereafter becomes a state; and (b) any Subsidiary of a Subsidiary referred to in clause (a) above.

"Freddie Mac" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"GAAP" means, United States generally accepted accounting principles as in effect from time to time and as applied by ResCap in the preparation of its financial statements.

"Ginnie Mae" means Ginnie Mae, formerly known as The Government National Mortgage Association, or any successor thereto.

"GM Trusts" means one or more trusts initially naming General Motors as beneficiary thereof that were or will be established to hold Capital Stock in GMAC held directly or indirectly by General Motors as of May 20, 2009.

"GMAC" means GMAC Inc., a Delaware corporation, in its individual capacity.

"GMAC Mortgage" has the meaning set forth in the preamble.

"GMAC Originator" means RFC, GMAC Mortgage or any other Subsidiary of ResCap that originates or purchases Mortgage Loans in the ordinary course of business.

"GMAC Parties" means GMAC Inc. (and its successors) and its Affiliates (other than ResCap and ResCap's Subsidiaries and Ally Bank).

"Government Mortgage Loan" means a Mortgage Loan insured by the FHA or VA.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any municipality and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government. Without limiting the generality of the foregoing, with respect to the United States, a "Governmental Authority" shall include any United States federal, state, county, municipal or other local governmental, judicial or regulatory authority, agency, arbitration board, body, commission, instrumentality, court or quasi-governmental authority or tribunal.

"Guarantee" means the guarantee set forth in Article XI.

"Guarantor" means (a) ResCap; (b) each of the Subsidiaries of ResCap that is a signatory hereto as a Guarantor; (c) any other Subsidiary that executes a joinder agreement to become a party as Guarantor to this Agreement.

"Guidelines" means the Freddie Mac Guides, Fannie Mae Guides, FHLB Guides or Ginnie Mae Guides, as such guides have been amended from time to time with respect to each Seller.

Confidential

"Hedge Adjusted Available Amount" means, on any Business Day, an amount equal to the then current Aggregate Commitment Amount minus the Hedge Support Requirement.

"Hedge Documents" shall mean (i) the Primary Hedge Documents as supplemented by the Confirmations; and (ii) the Hedge Security Agreement.

"Hedge Exposure" means, on a Valuation Date, the amount, if any, that would be payable to the Initial Lender by the ResCap Counterparty (expressed as a positive number) or by the Initial Lender to the ResCap Counterparty (expressed as a negative number) pursuant to the Hedge Documents if all Hedge Transactions were being terminated as of the relevant Valuation Date, on the basis that (i) the Initial Lender is not the Affected Party (as defined in the Hedge Documents) and (ii) the Termination Currency (as defined in the Hedge Documents) is Dollars; *provided* that Market Quotations will be determined by the Hedge Valuation Agent using the applicable forward rate of exchange for the applicable currencies appearing on the "FRD" Bloomberg page as of 3pm New York time on such Valuation Date (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided by such service); provided further that if no such page or service is available for any reason the ResCap Counterparty, the Initial Lender and the Hedge Valuation Agent shall mutually agree in good faith to an alternative method of objectively determining the applicable forward rate of exchange to calculate Market Quotation and, if no such alternative can be agreed, the Hedge Valuation Agent shall use its estimates of the applicable mid-market forward rates of exchange, in each case for the amounts that would be paid for Replacement Hedge Transactions (as that term is defined in the definition of "Market Quotation").

"Hedge Exposure Decrease" for any Valuation Date will equal the amount by which (i) the Hedge Support Requirement in effect on the immediately prior Business Day exceeds (ii) the Hedge Support Requirement on such Valuation Date.

"Hedge Exposure Increase" for any Valuation Date will equal the amount by which (i) the Hedge Support Requirement on such day exceeds (ii) the Hedge Support Requirement in effect on the immediately prior Business Day.

"Hedge Security Agreement" means the Security and Pledge Agreement dated as of August 14, 2008 among the Obligors and the Initial Lender, as amended and restated as of the Amendment Closing Date and as further amended, amended and restated or otherwise modified from time to time.

"Hedge Settlement Amount" means (i) a payment due to the Initial Lender at the maturity of a Hedge Transaction, and (ii) a payment due to the Initial Lender upon the early termination of a Hedge Transaction pursuant to Section 6(e) of the Primary Hedge Documents.

"Hedge Support Requirement" means, on a Valuation Date, the sum of (a) the Independent Amount, plus (b) if positive, the Hedge Exposure.

"Hedge Transaction" means one or more hedge transactions subject to, and governed by, the Hedge Documents between the ResCap Counterparty and the Initial Lender and consented to in writing by the Lender Agent and the other Lenders.

Confidential

"Hedge Valuation Agent" means GMAC Investment Management LLC, a Delaware limited liability company.

"HELOC Loan" means an open-end, revolving, home equity line of credit.

"HLTV Loan" means any Mortgage Loan with a Loan-to-Value Ratio of 100% or more at the time of its origination.

"Homecomings" means Homecomings Financial, LLC.

"HUD" shall mean the U.S. Department of Housing and Urban Development.

"IBG" means International Business Group, a division of ResCap.

"IBG Assets" means the assets of IBG and its Subsidiaries which are not Excluded Assets.

"Identified Lien Exceptions" means the exceptions listed on Schedule VI(a) to the Security Agreement.

"Incremental Advance" means an advance made by an Obligor (i) with respect to a construction loan facility or a construction project to complete, or maintain the value of, the related construction project or (ii) under a mezzanine or working capital loan facility under which such Obligor of such Incremental Advance has a legally binding commitment to make such advance.

"Indebtedness" means, with respect to any Person, without duplication: (a) all indebtedness of such Person for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments; (b) all obligations of such Person as lessee under Capital Leases that have been or should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP and all obligations of such Person as lessee under any so-called synthetic, off-balance sheet or tax retention lease; (c) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business); (d) all indebtedness secured by a Lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person; (e) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit and banker's acceptances issued for the account of such Person; (f) all Disqualified Equity Interests of such Person; (g) obligations of such Person under a Bilateral Facility; (h) all Suretyship Liabilities of such Person in respect of obligations of others of the type described in clauses (a) through (g) above; and (i) all indebtedness of any partnership of which such Person is a general partner, to the extent of such liability; provided that Indebtedness shall not include (i) obligations arising from agreements of ResCap or a Subsidiary providing for indemnification, contribution, earnout, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the acquisition or disposition of any business, assets or Equity Interests of a Subsidiary otherwise permitted under this Agreement and not required to be reflected as a liability on a consolidated balance sheet of ResCap; or (ii) obligations arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against

Confidential

insufficient funds in the ordinary course of business; <u>provided</u>, <u>however</u>, that such Indebtedness is extinguished within five business days of incurrence.

"<u>Indemnified Amounts</u>" has the meaning set forth in <u>Section 10.01</u>.

"<u>Indemnified Party</u>" has the meaning set forth in <u>Section 10.01</u>.

"<u>Independent Amount</u>" means the sum of (i) 5% of the notional amount of the Hedge Transactions plus (ii) any additional amount determined by agreement of the Lender Agent, the Initial Lender and the ResCap Counterparty in connection with the execution of a Hedge Transaction.

"<u>Initial Collateral</u>" means assets of the Borrowers, the Guarantors and the Subsidiary Pledgors that are listed on, or of a type described on, Schedule VI to the Security Agreement and that exist on the Closing Date.

"<u>Initial Lender</u>" has the meaning set forth in the <u>preamble</u>.

"<u>Insolvency Law</u>" means any bankruptcy, reorganization, moratorium, delinquency, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction in effect at any time during the term of this Agreement.

"<u>Intercreditor Agreement</u>" means the Intercreditor Agreement, dated as of a date on or before June 6, 2008, among the Senior Secured Collateral Agent, as First Priority Collateral Agent, Second Priority Collateral Agent and Third Priority Collateral Agent thereunder, the Collateral Control Agent, the Lender Agent, U.S. Bank National Association, as Trustee under the 2010 Indenture, U.S. Bank National Association, as Trustee under the 2015 Indenture, the Borrowers and Guarantors signatories thereto.

"<u>Interest Period</u>" means, for any Loan, a period beginning on the first day of each calendar month and ending on the earlier of (i) the last day of the same calendar month in which such Interest Period began and (ii) the Loan Repayment Date.

"<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Investment Company Act</u>" means the Investment Company Act of 1940, as amended, together with the rules and regulations promulgated thereunder.

"<u>Investments</u>" of any Person means:

(a)    all direct or indirect investments by such Person in any other Person in the form of loans, advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commission, travel and similar advances to officers, directors and employees) or other credit extensions constituting Indebtedness of such other Person, and any guarantee of Indebtedness of any other Person;

(b)    all purchases (or other acquisitions for consideration) by such Person of Indebtedness, Equity Interests or other securities of any other Person (other than any

Confidential

such purchase that constitutes a Restricted Payment of the type described in <u>clause (b)</u> of the definition thereof); and

(c)    all other items that would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP (including, if required by GAAP, purchases of assets outside the ordinary course of business).

Except as otherwise expressly specified in this definition, the amount of any Investment (other than an Investment made in cash) shall be the fair market value thereof on the date such Investment is made.

"<u>Investors</u>" means the collective reference to General Motors and the Sponsor.

"<u>Jumbo Loan</u>" means a Mortgage Loan which substantially conforms to the Guidelines except (i) the principal amount thereof may exceed the principal amount of loans which conform to the Guidelines or (ii) for other specified exceptions to the Guidelines that are consistent with the customary practices of the applicable GMAC Originator.

"<u>Kick-Out Loan</u>" means a Mortgage Loan repurchased by an Obligor from a Financing SPV.

"<u>Lender</u>" has the meaning set forth in the <u>preamble</u>.

"<u>Lender Agent</u>" means, initially, GMAC Inc. and thereafter any successor Lender Agent appointed pursuant to <u>Section 12.09</u>.

"<u>Lender Parties</u>" means the Lender Agent, the First Priority Collateral Agent, the Collateral Control Agent, the Lenders, the Initial Lender (as counterparty under the Hedge Documents) and the other Indemnified Parties.

"<u>LIBOR Rate</u>" means, with respect to any Loan for any Interest Period, the rate appearing on Page 3750 of the Dow Jones "Markets" screen (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Lender Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity of one (1) month.  In the event that such rate is not available at such time for any reason, then the "LIBOR Rate" with respect to such Interest Period shall be the rate at which dollar deposits of an amount comparable to the amount of the requested Loan and for a maturity of one (1) month are offered by the principal London office of JPMorgan Chase Bank in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period.

"<u>Lien</u>" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a

Schedule 1.01-22

Confidential

security interest in and any filing of or agreement to give any financing statement under the UCC of any jurisdiction.

"Line of Credit Agreement" means that certain Loan Agreement dated as of the Amendment Closing Date between GMAC Mortgage and RFC as borrowers and certain of their affiliates as guarantors, GMAC Inc., as initial lender and as lender agent and certain other financial institutions and persons from time to time party thereto as lenders; provided that if at any time such agreement shall cease to be in effect, references herein to the Line of Credit Agreement or terms defined therein shall be references to such agreement or terms as in effect immediately prior to the time at which such agreement ceased to be in effect.

"Line of Credit Asset" means any "Asset" as defined in the Line of Credit Agreement.

"Loan Repayment Date" means the earliest to occur of (a) the Scheduled Loan Repayment Date; (b) the date that the Loans are declared to be due and payable in accordance with Section 8.02(a); or (c) the date of the occurrence of an Event of Default described in Section 8.01(d); provided, however, that the Loan Repayment Date may be extended or accelerated by the mutual agreement of each Lender and the Borrowers.

"Loans" has the meaning set forth in Section 2.01.

"Loan-to-Value Ratio" means with respect to a Mortgage Loan, a fraction, expressed as a percentage, the numerator of which is the then current principal balance of such Mortgage Loan on such date, and the denominator of which is the appraised value of the related mortgaged property on such date.

"Mandatory Repayment Date" means, with respect to any Collateral Disposition, the Business Day immediately following the earlier of (a) the Business Day the Net Cash Proceeds of such Collateral Disposition are deposited in the Wachovia Sweep Account and (b) the related Applicable Deposit Date.

"Market Quotation" has the meaning set forth in the Hedge Documents.

"Material Adverse Effect" means any event which has had or would reasonably be expected to have a material adverse effect on (i) the business, assets or financial condition of any Obligor or any such Obligor and its Subsidiaries taken as a whole since September 30, 2009, other than as disclosed in the Obligor's financial statements as detailed in Section 6.01(o) or as disclosed to the Lender Agent prior to the Amendment Closing Date, (ii) the validity or enforceability of any of the Facility Documents or the rights or remedies of the Lender Parties thereunder, or (iii) the value, validity, enforceability, saleability or collectibility of the Collateral or a material portion thereof, or the enforceability, perfection or priority of the First Priority Collateral Agent's security interest on behalf of the Lender Parties in the Collateral; provided, however, that a Material Adverse Effect shall not be determined to include effects arising out of, relating to or resulting from the occurrence of a ratings downgrade of GMAC Inc. or any of its Affiliates (including ResCap) or any of their outstanding debt (it being understood that the events giving rise to such downgrade shall not be excepted from the definition of Material Adverse Effect).

Schedule 1.01-23

Confidential

"Maximum Guaranty Amount" has the meaning set forth in Section 11.07.

"Mexican Security Documents" means the Stock Pledge Agreement dated October 2, 2008 executed by RFC for the benefit of the Collateral Control Agent whereby RFC pledges (i) shares, each with a par value of $1.00 (one Peso 00/100) legal currency of Mexico, representing the corporate capital stock of GMAC RFC Auritec, S.A., (ii) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100), representing a portion of the corporate capital stock of GMAC Hipotecaria, S.A. de C.V., S.F.O.L., and (iii) shares, each with a par value of $1,000.00 (one thousand Pesos 00/100), representing a portion of the corporate capital stock of GMAC Financiera, S.A. de C.V., S.F.O.L. and any and all notices, certificates, agreements and other documents to be executed and delivered by RFC pursuant to the foregoing or otherwise in connection with the transactions contemplated by the Stock Pledge Agreement.

"MHF" means GMAC Model Home Finance, LLC, a Delaware limited liability company, and its successors in interest.

"MHFI" means GMAC Model Home Finance I, LLC, a Delaware limited liability company.

"MHF Assets" means (i) the assets of MHF, its Subsidiaries and any entity which was a Subsidiary of MHF as of the Closing Date, other than the Equity Interests in such Subsidiaries to the extent such assets were held by MHF or such Subsidiaries on the Closing Date or arise out of assets, properties or rights that were so held on the Closing Date, or (ii) if the Equity Interest in MHF or its Subsidiary shall have been the subject of a Collateral Disposition, assets that were MHF Assets at the time of such Collateral Disposition.

"Minimum Adjustment Amount" means $5,000,000.

"Minimum Notional Reduction" means (i) with respect to the Hedge Transaction executed as of August 14, 2008, 25,000,000 Euro, and (ii) with respect to any other Hedge Transaction, the amount agreed in writing by the Lender Agent, the Initial Lender and the ResCap Counterparty concurrently with the execution of such Hedge Transaction.

"Model Home" means a model home, the construction of which was financed by BCG, located on real property owned wholly or partially by BCG.

"Monthly Collateral Report" shall mean a Collateral Value Report together with the related Substitute Collateral Schedule and Electronic File.

"Mortgage Loan" means (a) any first or second lien mortgage loan subject to the terms of this Agreement, and (b) any collateral, insurance, guaranty or other credit support arrangement related thereto.

"Mortgage Schedule" means any schedule of mortgage loans delivered by the Obligors in connection with a Collateral Addition Designation Notice relating to US Mortgage Loans in the form of a data tape, CD Rom or other tangible medium identifying for each mortgage loan: (i) the loan number, (ii) the name of the borrower, (iii) the address of the property securing such mortgage loan, and (iv) the original principal amount of such mortgage loan.

Confidential

"MTM Amount" means, with respect to a Valuation Date, the sum of the aggregate of all Hedge Exposure Increases that have occurred since the last MTM Reset Date, minus the aggregate of all Hedge Exposure Decreases that have occurred since the last MTM Reset Date, plus the aggregate amount of Disposition Offsets since the last MTM Reset Date; provided that the MTM Amount shall not be less than zero.

"MTM Credit" means, with respect to a Valuation Date, the sum of the aggregate amount of all Hedge Exposure Decreases that have occurred since the last MTM Reset Date, minus the aggregate of all Hedge Exposure Increases that have occurred since the last MTM Reset Date, minus the aggregate amount of Disposition Offsets since the last MTM Reset Date; provided that the MTM Credit shall not be less than zero.

"MTM Reset Date" means each date on which the Borrowers repay outstanding Loans in connection with a Hedge Exposure Increase pursuant to the second paragraph of Section 2.08(b).

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA which (i) has been established by ResCap or its Subsidiaries, and (ii) is not maintained for the benefit of employees of GMAC or its Subsidiaries, other than ResCap and its Subsidiaries.

"Net Cash Proceeds" means, with respect to any Collateral Disposition, the proceeds thereof in the form of cash or cash equivalents, net of:

(a)    brokerage commissions and other fees and expenses (including fees, discounts and expenses of legal counsel, accountants and investment banks, consultants and placement agents) of such Collateral Disposition;

(b)    provisions for taxes payable as a result of such Collateral Disposition (after taking into account any available tax credits or deductions and any tax sharing arrangement);

(c)    amounts required to be paid to any Person (other than ResCap or any Subsidiary thereof) owning a beneficial interest in the assets subject to the Collateral Disposition or having a Lien thereon (excluding the Lien under the Security Agreement);

(d)    payments of unassumed liabilities (not constituting Indebtedness) relating to the assets sold at the time of, or within 30 days after the date of, such Collateral Disposition; and

(e)    appropriate amounts to be provided by any Obligor, as the case may be, as a reserve required in accordance with GAAP against any adjustment in the sale price of such asset or assets or liabilities associated with such Collateral Disposition and retained by any Obligor, as the case may be, after such Collateral Disposition, including pensions and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Collateral Disposition, all as reflected in an officers' certificate delivered to the Lender Agent.

Schedule 1.01-25

Confidential

"Non-Agency MSR Loan Agreement" means the Loan and Security Agreement, dated as of April 18, 2008, between RFC and GMAC Mortgage, as borrowers, and GMAC Inc. as lender.

"Non-Recourse Debt" means Indebtedness of any Subsidiaries of ResCap that are special purpose vehicles acting as sellers or borrowers under an asset securitization; provided that no Bilateral Facility shall be Non-Recourse Debt.

"Non-UCC Assets" means (a) assets of the Borrowers and the other Obligors located outside the United States to the extent a Lien on such assets cannot be perfected by the filing of UCC financing statement in the jurisdictions of organization of the Borrowers and such Obligors; (b) all of the Borrowers' and the other Obligors' right, title and interest in owned real property; and (c) motor vehicles and other assets subject to certificates of title to the extent that a Lien therein cannot be perfected by the filing of UCC financing statement in the jurisdiction of organization of the Borrowers or the other Obligors.

"Non-U.S. Lender" has the meaning set forth in Section 3.02(f).

"Note" means any promissory note of the Borrowers issued to a Lender, in substantially the form of Exhibit 2.02(a), as amended from time to time, and any replacements thereof or substitution therefor.

"Obligations" means obligations, indebtedness, fees, expenses (including, without limitation, attorneys' fees and expenses) and liabilities of any Borrower, any Guarantor or any other Obligor to any Lender Party, now existing or hereafter arising under or in connection with any Facility Document, whether monetary or otherwise, matured or unmatured, direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several, including the obligations, indebtedness and liabilities of the Borrowers under the Notes or otherwise pursuant to the terms of the other Facility Documents, and all interest accruing thereon (including any interest that accrues after the commencement of any proceeding by or against any Borrower, any Obligor or any other Person under any bankruptcy, insolvency, liquidation, moratorium, receivership, reorganization or other debtor relief law) and all attorneys' fees and other expenses incurred in the collection or enforcement thereof.

"Obligors" means, collectively, ResCap, the Subsidiary Pledgors, the Guarantors, the Borrowers, any party signatory as an Obligor hereto, and any other Person designated as an "Obligor" in a Collateral Addition Designation Notice.

"Optional Prepayment Date" has the meaning set forth in Section 2.09.

"Ordinary RE Transactions" means the transfer of funds by a Restricted Entity to a Specified Affiliate, or by a Specified Affiliate to a Restricted Entity, whether in the form of an intercompany loan, intercompany loan repayment, dividend, distribution, contribution, remittance of proceeds of the sale of assets or another form provided under the cash management and accounting systems of ResCap, provided that such transfer is made in good faith in the ordinary course of business and in a manner consistent with the requirements of this Agreement.

"Originator" means a Person (other than an Obligor) from which an Obligor (or its predecessor in interest) acquired an interest in an Asset.

Confidential

"Other Receivables" means receivables due to affiliates of ResCap from either the FHA or the VA relating to a pool of loans subject to FHA Insurance Contracts or VA Guaranty Agreements that either: (i) are more than ninety (90) days delinquent, (ii) are in the foreclosure process, or (iii) have completed the foreclosure process.

"Other Taxes" has the meaning set forth in Section 3.02(b).

"Outstanding Aggregate Loan Amount" means, at any time, the aggregate of the Outstanding Lender Loan Amount of all the Lenders.

"Outstanding Lender Loan Amount" means, at any time with respect to any Lender, the aggregate principal amount of all then outstanding Loans advanced by such Lender.

"Par Value" means, with respect to any Asset and for purposes of determining Collateral Value, the par value of such Asset as determined by ResCap in accordance with its customary practices in effect on the Closing Date.

"Participant" shall have the meaning set forth in Section 9.04.

"Payor" means any Person required to make payments representing the return of an Obligor's investment in an Asset.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, that is subject to Title IV of ERISA (other than a Multiemployer Plan) established by ResCap or its Subsidiary, and to which any Obligor or any corporation, trade or business that is, along with the Obligor, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA; provided that such plan is not maintained for the benefit of GMAC and its Subsidiaries, other than ResCap and its Subsidiaries.

"Permanent Paydown Report" has the meaning set forth in Section 2.11(a).

"Permitted Action" means, with respect to an Underlying Document, (i) scheduled termination of such document in accordance with its terms for reasons other than cause, (ii) except with respect to the European Documents, enforcement of rights or remedies by a ResCap Subsidiary against a Person that is not an Affiliate of ResCap; provided that such exercise could not be reasonably expected to give rise to a Material Adverse Effect, and (iii) except with respect to the European Documents, any amendment, waiver or other modification of such Underlying Document if such action, taken together with related actions, could not reasonably be expected to give rise to a Material Adverse Effect.

"Permitted Affiliate Transaction" means an Affiliate Transaction constituting or involving (a) a Restricted Payment permitted pursuant to Section 7.02(g); (b) the payment of reasonable and customary fees and indemnities to members of the Board of Directors of ResCap or a Subsidiary; (c) the payment of reasonable and customary compensation and other benefits

Confidential

(including retirement, health, option, deferred compensation and other benefit plans) and indemnities to officers and employees of ResCap or any Subsidiary; (d) transactions between or among ResCap and/or its Subsidiaries; (e) the issuance of Equity Interests (other than Disqualified Equity Interests) of ResCap otherwise permitted hereunder and capital contributions to ResCap by its equity owners; (f) any agreement or arrangement as in effect on the Closing Date and any amendment or modification thereto so long as such amendment or modification is consented to in writing by each Lender; and (g) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case, in the ordinary course of business and consistent with past practice and on terms that are no less favorable to ResCap or the applicable Subsidiary, as the case may be, as determined in good faith by ResCap, than those that could be obtained in a comparable arm's length transaction with a Person that is not an Affiliate of ResCap.

"<u>Permitted Consideration</u>" means, with respect to each Collateral Disposition, (i) cash, cash equivalents and/or (ii) with the prior consent of the Lender Agent, Eligible Assets that, concurrently with such Collateral Disposition, become Primary Collateral or Supporting Assets for Primary Collateral.

"<u>Permitted Dissolution</u>" means a dissolution and termination of the legal existence of (a) an Obligor with the prior written consent of the Lender Agent, which consent shall not be unreasonably withheld, and (b) a Subsidiary of an Obligor which is not itself an Obligor which (i) does not have any material assets (other than assets transferred to an Obligor or a Subsidiary of an Obligor or assets contractually required to be paid to third parties prior to dissolution) and (ii) does not own or have title to any Primary Collateral, Supporting Assets or RE Assets (other than any such assets transferred to an Obligor).

"<u>Permitted Funding Indebtedness</u>" means the Bilateral Facilities, the Indebtedness listed on <u>Exhibit C</u> hereto and any Indebtedness incurred in the ordinary course of the business of ResCap and its Subsidiaries (other than Restricted Entities) through financing, securitization and hedging activities (and <u>provided</u> that hedging activities cannot be for speculative purposes), including customary lines of credit, asset swaps, repurchase transactions or warehouse financings involving residential mortgage loans, home equity loans or second lien loans (including any reasonable extension or evolution of such activities including for purposes of financing other types of financial assets) and other Indebtedness on terms at least as favorable to ResCap or the applicable Subsidiary than would be available on an arm's-length basis.

"<u>Permitted Indebtedness</u>" means,

       (a)     the Obligations;

       (b)     other Indebtedness of the Obligors and their Subsidiaries outstanding on the Closing Date and up to $3,050,000,000 of 2010 Notes and up to $7,700,000,000 of 2015 Notes issued pursuant to the Exchange Offer;

       (c)     Permitted Funding Indebtedness of the Obligors and their Subsidiaries; <u>provided</u> that the Borrowers shall have given the Lender Agent written notice of any such Indebtedness incurred by a Restricted Entity that is a BCG Joint Venture prior to

Confidential

the Amendment Closing Date or, in the case of Indebtedness incurred after such date, within five (5) Business Days of ResCap Treasury obtaining knowledge thereof; and provided further that any other Restricted Entities may not incur or be liable with respect to Permitted Funding Indebtedness (other than Ordinary RE Transactions) without the prior written consent of the Lender Agent; and provided further that any such Permitted Funding Indebtedness (other than Excluded Debt) shall have been taken into account in determining the Collateral Value of Assets securing such indebtedness;

(d) unsecured Indebtedness among ResCap and its Subsidiaries; provided that if a Restricted Entity has not subjected substantially all of its assets to a perfected security interest or a mortgage or deed of trust that is or has submitted for recording in favor of the First Priority Collateral Agent or its designee (unless the Lender Agent shall otherwise consent in writing) Intercompany Indebtedness owed by such Restricted Entity shall be limited to obligations incurred in the ordinary course operation of ResCap's cash management system and obligations recorded in ResCap's accounting system in connection with the accounting for proceeds of a Collateral Disposition, in each case in a manner consistent with the other terms of this Agreement;

(e) Indebtedness of the Obligors and their Subsidiaries under interest rate agreements and currency exchange agreements entered into in the ordinary course of business and not for speculative purposes;

(f) Permitted Refinancing Indebtedness of the Obligors and their Subsidiaries in respect of Indebtedness outstanding in reliance on clauses (b) and (c) above and this clause (f);

(g) Indebtedness of the Obligor and their Subsidiaries to the GMAC Parties incurred in accordance with Section 7.02(l), provided that such Indebtedness is not secured by any Collateral, Supporting Assets or RE Assets; and

(h) Indebtedness of the Borrowers or any of their Subsidiaries not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount and liquidation preference of all other Indebtedness then outstanding and incurred pursuant to this clause (h), does not at any one time outstanding exceed $500,000,000; provided (i) ResCap Treasury shall have given the Lender Agent notice of any such Indebtedness of a BCG Joint Venture promptly upon obtaining knowledge thereof and (ii) such Indebtedness shall not be incurred by any other Restricted Entity unless the Lender Agent shall have consented thereto.

it being understood that (i) in the event that an item of Indebtedness meets the criteria of more than one of the categories of Permitted Indebtedness described in clauses (a) through (g) of this definition, ResCap will, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness in any manner that complies with this definition and such item of Indebtedness will be treated as having been incurred pursuant to only one of such clauses

Confidential

or pursuant to this definition (<u>provided</u> that all Indebtedness outstanding under this Agreement will at all times be deemed to be outstanding pursuant to <u>clause (a)</u> above); and (ii) the principal amount of any Disqualified Equity Interests will be equal to the greater of the maximum mandatory redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference thereof.

"<u>Permitted Liens</u>" means:

(a)    Liens against the Obligors and their Subsidiaries existing at the Closing Date and arising under the Bilateral Facilities;

(b)    (i) Liens that secure Obligations; and (ii) Liens that secure Indebtedness under the 2010 Notes and the 2010 Indenture and the 2015 Notes and the 2015 Indenture; <u>provided</u> that the Liens in <u>clause (ii)</u> are subordinated in priority to the Liens in <u>clause (i)</u> in accordance with, and subject to the terms of, the Intercreditor Agreement;

(c)    any Lien for taxes or assessments or other governmental charges or levies not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such taxes are owed or the third party obligated to pay such taxes and for which adequate reserves are being maintained, to the extent required by GAAP and such proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien);

(d)    any warehousemen's, materialmen's, landlord's or other similar Liens arising by law for sums not then due and payable (or which, if due and payable, are being contested in good faith either with the third party to whom such sums are owed or the third party obligated to pay such sums and with respect to which adequate reserves are being maintained, to the extent required by GAAP and such proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien);

(e)    survey exceptions, encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other similar restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not individually or in the aggregate materially adversely affect the value of ResCap and its Subsidiaries or materially impair the operation of the business of such Person;

(f)    pledges or deposits (i) in connection with workers' compensation, unemployment insurance and other types of statutory obligations or the requirements of any official body, or (ii) to secure the performance of tenders, bids, surety or performance bonds, leases, purchase, construction, sales or servicing contracts and other similar obligations incurred in the normal course of business consistent with industry practice, or (iii) to obtain or secure obligations with respect to letters of credit,

Confidential

guarantees, bonds or other sureties or assurances given in connection with the activities described in clauses (f)(i) and (f)(ii) above, in each case not incurred or made in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of property or services or imposed by ERISA or the Internal Revenue Code, in connection with a "plan" (as defined in ERISA), or (iv) arising in connection with any attachment unless such Liens shall not be satisfied or discharged or stayed pending appeal within sixty (60) days after the entry thereof or the expiration of any such stay;

(g)    Liens securing Indebtedness of ResCap or a Subsidiary thereof to the extent such secured Indebtedness is pledged as Collateral pursuant to the Facility Documents;

(h)    Liens to secure any Permitted Refinancing Indebtedness secured by Liens referred to in clause (a) above; provided that such Liens do not extend to any other property or assets and the principal amount of the obligations secured by such Liens is not increased;

(i)    licenses of intellectual property granted in the ordinary course of business;

(j)    Liens (i) that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of ResCap or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations and other cash management activities incurred in the ordinary course of business of ResCap and or any of its Subsidiaries or (C) relating to purchase orders and other agreements entered into with customers of ResCap or any of its Subsidiaries in the ordinary course of business, and (ii) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (A) encumbering reasonable customary initial deposits and margin deposits and attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business, and (B) in favor of banking institutions arising as a matter of law or pursuant to customary account agreements encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(k)    deposits made in the ordinary course of business to secure liability to insurance carriers;

(l)    leases, subleases, licenses or sublicenses granted to others in the ordinary course of business so long as such leases, subleases, licenses or sublicenses are subordinate in all respects to the Liens granted and evidenced by the Security Documents and which do not materially interfere with the ordinary conduct of the business of ResCap or any Subsidiaries and do not secure any Indebtedness;

Confidential

(m)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by ResCap or any Subsidiary thereof in the ordinary course of business;

(n)    Liens on the assets of a Subsidiary that is not a Guarantor securing Indebtedness and other obligations of such Subsidiary incurred in compliance with this Agreement; provided that such Liens shall not attach to (i) Primary Collateral, (ii) Supporting Assets, (iii) RE Assets held by a BCG Joint Venture unless the Lender Agent shall have received written notice thereof prior to the Amendment Closing Date or, with respect to Liens incurred after such date, within five (5) Business Days of ResCap Treasury obtaining knowledge thereof, or (iv) any other RE Assets without written consent of the Lender Agent;

(o)    Liens on the Collateral granted under the Security Documents in favor of the First Priority Collateral Agent to secure the Obligations and the notes issued pursuant to the Exchange Offer; provided that such Liens are subject to the terms of the Intercreditor Agreement;

(p)    Liens on Financing Assets securing Permitted Funding Indebtedness; provided that such Liens shall not attach to (i) Primary Collateral, (ii) Supporting Assets, (iii) RE Assets held by a BCG Joint Venture unless the Lender Agent shall have received written notice thereof prior to the Amendment Closing Date or, with respect to Liens incurred after such date, within five (5) Business Days of ResCap Treasury obtaining knowledge thereof, or (iv) any other RE Assets without consent of the Lender Agent;

(q)    any extensions, substitutions, replacements or renewals of the foregoing; and

(r)    Identified Lien Exceptions denoted with an asterix on Schedule VI(a) to the Security Agreement.

"Permitted Refinancing Indebtedness" means Indebtedness that refunds, refinances, renews, replaces or extends any Indebtedness permitted to be incurred by ResCap or any Subsidiary pursuant to the terms of this Agreement, whether involving the same or any other lender or creditor or group of lenders or creditors, but only to the extent that:

(a)    the Permitted Refinancing Indebtedness is scheduled to mature either (a) no earlier than the Indebtedness being refunded, refinanced or extended or (b) at least 91 days after the Scheduled Loan Repayment Date,

(b)    the Permitted Refinancing Indebtedness has a weighted average life to maturity that is equal to or greater than the remaining weighted average life to maturity of the Indebtedness being refunded, refinanced, renewed, replaced or extended,

(c)    such Permitted Refinancing Indebtedness is in an aggregate principal amount that is less than or equal to the sum of (i) the aggregate principal or accreted amount (in the case of any Indebtedness issued with original issue discount) then

Confidential

outstanding under the Indebtedness being refunded, refinanced, renewed, replaced or extended, (ii) the amount of accrued and unpaid interest, if any, and premiums owed, if any, not in excess of preexisting prepayment provisions on such Indebtedness being refunded, refinanced, renewed, replaced or extended and (iii) the amount of reasonable and customary fees, expenses and costs related to the incurrence of such Permitted Refinancing Indebtedness,

(d)      such Permitted Refinancing Indebtedness is incurred by the same Person (or its successor) that initially incurred the Indebtedness being refunded, refinanced, renewed, replaced or extended or by ResCap or a Guarantor; and

(e)      if the Indebtedness is unsecured, such Permitted Refinancing Indebtedness is unsecured.

"Permitted Restricted Payments" means any of the following:

(a)      the payment of any dividend on Equity Interests in ResCap or a Subsidiary within sixty (60) days after declaration thereof if on the declaration date after giving effect to such Restricted Payment on a pro forma basis, the aggregate amount expended or declared for all Restricted Payments made on or after the Closing Date (excluding Restricted Payments described in clauses (b), (c), (d), (f) and (g) and of this definition), shall not exceed the Restricted Payment Maximum Amount;

(b)      the retirement of any Equity Interests of ResCap by conversion into, or by or in exchange for, Qualified Equity Interests, or out of net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of ResCap) of other Qualified Equity Interests;

(c)      the redemption, defeasance, repurchase or acquisition or retirement for value of any Indebtedness of ResCap or a Guarantor in exchange for or out of the net cash proceeds of a substantially concurrent issue and sale (other than to a Subsidiary of ResCap) of (i) Qualified Equity Interests or (ii) Permitted Refinancing Indebtedness;

(d)      in the case of a Collateral Disposition, the repurchase or other acquisition out of Net Cash Proceeds of notes issued pursuant to the Exchange Offer to the extent required under the terms thereof and not otherwise required to make payments or reinvestments pursuant to Section 2.08(c);

(e)      Permitted Tax Distributions;

(f)      the exchange of, the Preferred Units of ResCap existing as of the Closing Date for any property into which such Preferred Units are exchangeable in accordance with their terms; and

(g)      if no Default is continuing, Restricted Payments not otherwise Permitted Restricted Payments in an amount not to exceed $250,000,000 per year.

Confidential

"Permitted Tax Distributions" means, with respect to any period during which ResCap is treated as a disregarded entity or partnership for U.S. federal, state and/or local income tax purposes, distributions to ResCap's direct owner(s) (whether pursuant to a tax sharing agreement or otherwise) to fund the income tax liabilities of such owner(s) (or, if a direct owner is a pass-through entity, of an indirect owner) resulting from ResCap being a partnership or disregarded entity for federal, state and/or local income tax purposes, in an aggregate amount not to exceed the product of (a) the net taxable income of ResCap for such period, calculated in accordance with applicable law, reduced by any cumulative net taxable loss with respect to all prior post-closing periods (determined as if all such periods were one period) to the extent such cumulative net taxable loss is of a character (ordinary or capital) that would permit such loss to be deducted against the income of the current period; and (b) the highest combined marginal federal, state and/or local income tax rate (taking into account the deductibility of state and local income taxes for federal income tax purposes and the character of the taxable income in question (i.e., long term capital gain, qualified dividend income, etc.)) applicable to any such direct or indirect owner of ResCap.  Permitted Tax Distributions may be made quarterly based on ResCap's good faith estimate of its taxable income, with appropriate adjustments to be made on an annual basis based upon the determination of ResCap's actual taxable income.

"Person" means any individual, corporation, estate, partnership, limited liability company, limited liability partnership, joint venture, association, joint-stock company, business trust, trust, unincorporated organization, government or any agency or political subdivision thereof, or other entity of a similar nature.

"Post-Closing Requirements" means the delivery of the items specified on Schedule 8.01(m) in form and substance satisfactory to the Lender Agent in its reasonable discretion within the time frame specified in such schedule for each such item.

"Preferred Units" means the non-cumulative, non-participating, perpetual preferred membership interests of ResCap, the designation of which is as set forth in the Amended and Restated Operating Agreement of ResCap.

"Prepayment Notice" means a notice substantially in the form of Exhibit 2.09(a).

"Primary Collateral" means Initial Collateral, REO Property acquired as the result of foreclosure on Primary Collateral, Reinvestment Collateral, Substitute Collateral, any assets acquired as a result of exercising remedies under any Initial Collateral, Reinvestment Collateral that was designated as such prior to the Amendment Closing Date or Substitute Collateral, and all proceeds of the foregoing.

"Primary Hedge Documents" means the ISDA master agreement and related schedule in the form set forth in Exhibit A hereto and entered into between the ResCap Counterparty and the Initial Lender, as such documents are amended or modified from time to time.

"Pro Rata Share" means, relative to any Lender, the percentage set forth below its name on its signature page hereto or set forth in an Assignment and Acceptance under the "Pro Rata Share" column, as such percentage may be adjusted from time to time pursuant to Assignment

Confidential

and Acceptances executed by such Lender and its assignee and delivered pursuant to
Section 9.01. A Lender shall not have any Commitment if its Pro Rata Share is zero.

"Qualified Equity Interests" means Equity Interests of ResCap other than Disqualified
Equity Interests.

"Real Estate Security Documents" means (i) the RE Pledge Agreement and (ii)
mortgages, deeds of trust and similar documents executed by ResCap Subsidiaries to create
Liens on REO Property and/or other real estate to secure, among other things, the Obligations, as
contemplated by this Agreement, together with any guarantees executed by such Subsidiaries in
connection therewith.

"RE Assets" means the assets of a Restricted Entity, to the extent such assets constitute
the basis for attributing Collateral Value to any Asset.

"RE Pledge Agreement" means the Real Estate Subsidiary Pledge and Security
Agreement and Irrevocable Proxy, dated as of the Amendment Closing Date, among the
Collateral Control Agent and certain subsidiaries of ResCap.

"Register" has the meaning set forth in Section 2.02(b).

"Reinvestment Collateral" means (i) Eligible Assets acquired as Permitted Consideration
for a Collateral Disposition prior to the Amendment Closing Date, (ii) Servicing P&I Advances,
Servicing Corporate Advances and Servicing T&I Advances arising under an Eligible Servicing
Advances Agreement, (iii) REO Property, ownership of which has been transferred to an REO
Owner, and (iv) other Eligible Assets acquired with Net Cash Proceeds of a Collateral
Disposition or otherwise designated by the Borrowers as new Primary Collateral or Supporting
Assets to replace the assets subject to a Collateral Disposition, which Reinvestment Collateral
shall be included in any Permanent Paydown Reports prior to the Amendment Closing Date;
provided that the failure to include such Reinvestment Collateral on any Permanent Paydown
Report shall not relieve the Obligors of any of their obligations to treat assets acquired as
Permitted Consideration for a Collateral Disposition or with Net Cash Proceeds of a Collateral
Disposition as Primary Collateral or to comply with the provisions of the Facility Documents
relating to Primary Collateral.

"Related Documents" means the Line of Credit Agreement and all security documents,
sale documents, licenses, service agreements and other agreements and documents to be execute
and delivered by ResCap and its Subsidiaries in connection with any of the foregoing.

"Remittance Date" means the 18th calendar day of each month (or if such day is not a
Business Day, the first Business Day preceding such date) on which servicing advances are due
under the applicable servicing agreement by a servicing Subsidiary of ResCap.

"REO Owner" means (i) Residential Mortgage Real Estate Holdings, LLC, a Delaware
limited liability company, (ii) Residential Funding Real Estate Holdings, LLC, a Delaware
limited liability company, (iii) Homecomings Financial Real Estate Holdings, LLC, a Delaware
limited liability company, and (iv) any other company approved in writing by the Lender Agent.

Confidential

"REO Property" means real estate owned property (i.e., a mortgaged property acquired through foreclosure or deed-in-lieu of foreclosure).

"Repayment Notice" means a notice substantially in the form of Exhibit 2.08(b).

"Requirements of Law" means, with respect to any Person or any of its property, the certificate of incorporation of articles of association and by-laws, certificate of limited partnership, limited partnership agreement or other organizational or governing documents of such Person, and any law, treaty, rule or regulation, or determination of any arbitrator or Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, whether Federal, state or local (including, without limitation, usury laws, the Federal Truth in Lending Act and retail installment sales acts).

"Required Lenders" means, at any time, Lenders holding more than 67% of the sum of the Outstanding Aggregate Loan Amount.

"ResCap" means Residential Capital, LLC, a Delaware limited liability company, and its successors in interest.

"ResCap Counterparty" means ResCap and any successor to ResCap as counterparty under the Hedge Documents.

"ResCap Liquidity Balance Rollforward" means the liquidity balance rollforward data delivered daily by the Obligors pursuant to Section 2.4 of the Consent Agreement dated as of October 17, 2008 among GMAC, as lender, as initial lender and as Lender Agent, RFC and GMAC Mortgage, as borrowers, ResCap, as guarantor and certain other parties thereto.

"ResCap Treasury" means the ResCap treasury operations group located in the Chief Executive Office of ResCap.

"Reserves" shall mean as of any date of determination, such amounts as the Lender Agent may, from time to time and acting reasonably, establish and revise reducing the amount of Loans which would otherwise be available to Borrowers under the lending formula(s) provided for under Schedule 2.04: (a) to reflect events, conditions, contingencies or risks which, as reasonably determined by the Lender Agent, adversely affect, or would have a reasonable likelihood of adversely affecting, either (i) the Primary Collateral or any other property which is security for the Obligations or its value, (ii) the assets, business or prospects of any Borrower or any Guarantor or (iii) the security interests and other rights of the Lender Parties in the Primary Collateral (including the enforceability, perfection and priority thereof); or (b) to reflect the Lender Agent's reasonable belief that any collateral report or financial information furnished by or on behalf of any Borrower or any Guarantor to the Lenders is or may have been incomplete, inaccurate or misleading in any material respect; or (c) in respect of any state of facts which the Lender Agent reasonably determines constitutes a Default or an Event of Default.  To the extent the Lender Agent may revise the lending formulas used to determine the Borrowing Base or establish new criteria or revise existing criteria for Eligible Assets so as to address any circumstances, condition, event or contingency in a manner satisfactory to the Lender Agent, the Lender Agent shall not establish a Reserve for the same purpose.  The amount of any Reserve

Confidential

established by the Lender Agent shall have a reasonable relationship to the event, condition or other matter which is the basis for such reserve as reasonably determined by the Lender Agent.

"Residual Rights" means (i) in the case of loans secured by mortgage loans or mortgage related securities, rights in the mortgage loans or mortgage-related securities securing such loan after taking into account senior claims thereon, (ii) in the case of repurchase agreements, both the rights under the repurchase agreement (or any transaction thereunder) and rights in the mortgage loans or mortgage-related securities transferred pursuant to the provisions of the repurchase agreement (or any transaction thereunder) after taking into account any senior claim claims, thereon, and (iii) in the case of any other Collateral or Supporting Assets, rights in such Collateral or Supporting Assets after taking into account senior claims thereon.

"Responsible Officer" means (a) with respect to each Borrower and each Obligor, the chief executive officer, president, chief financial officer, treasurer, assistant vice president, assistant treasurer, secretary or assistant secretary of such Borrower, or any other officer having substantially the same authority and responsibility; provided that with respect specifically to the obligations of each Borrower or ResCap set forth in Section 7.01(f) hereof, only the chief financial officer, treasurer, assistant treasurer, or controller and chief accounting officer of such Person shall be deemed to be a Responsible Officer; and (b) with respect to any Lender, a lending officer charged with responsibility for the day to day management of the relationship of such institution with the Borrowers.

"Restricted Entity" means (i) English SPE, (ii) Dutch SPE, (iii) each BCG REO Subsidiary, (iii) each REO Owner, (iv) each Person whose equity has been designated as Primary Collateral or Supporting Assets (other than GMAC Mortgage), (v) each Person designated as a Restricted Entity in a Collateral Addition Designation Notice in connection with the designation of Substitute Collateral, and (vi) any Subsidiary of any of the foregoing.

"Restricted Payment" is defined to mean any of the following:

> (a)    any dividend or other distribution declared and paid on the Equity Interests of ResCap or on the Equity Interests in any Subsidiary of ResCap that are held by, or declared and paid to, any Person other than ResCap or a Subsidiary of ResCap or any GMAC Party other than (i) dividends, distributions or payments made solely in Qualified Equity Interests of ResCap; and (ii) dividends or distributions payable to ResCap or a Subsidiary of ResCap or to other holders of Equity Interests of ResCap or a Subsidiary (other than the GMAC Parties) on a pro rata basis;

> (b)    any payment made by ResCap or any of its Subsidiaries to purchase, redeem, acquire or retire any Equity Interests in ResCap or any of its Subsidiaries (including any issuance of Indebtedness in exchange for such Equity Interests or the conversion or exchange of such Equity Interests into or for Indebtedness) other than any such Equity Interests owned by ResCap or any Subsidiary and other than the redemption of Equity Interests of IB Finance for up to the fair market value thereof at the time of redemption (it being understood that any excess over such fair market value which is paid shall be deemed to be a Restricted Payment and shall be permitted to be paid to the extent otherwise in compliance with Section 7.02(g));

Confidential

(c)    any payment made by ResCap or any of its Subsidiaries (other than payments out of the proceeds of, or in exchange for, the notes issued pursuant to the Exchange Offer or Permitted Refinancing Indebtedness) to redeem, repurchase, defease (including in substance or legal defeasance) or otherwise acquire or retire for value (including pursuant to mandatory repurchase covenants), prior to any scheduled maturity, scheduled sinking fund or mandatory redemption payment, Exchange Offer Notes, unsecured Permitted Refinancing Indebtedness of Exchange Offer Notes or subordinated indebtedness of any Obligor, except, in each case, payments of principal required in order to satisfy a scheduled maturity date on the date such payment is due; and

(d)    any Investment by ResCap or any of its Subsidiaries in any GMAC Party.

"Restricted Payment Maximum Amount" means the sum (without duplication) of (a) 50% of the Consolidated Net Income (or, if Consolidated Net Income shall be a deficit, minus 100% of such deficit) of ResCap accrued on a cumulative basis during the period (taken as one accounting period) from the beginning of the first full fiscal quarter following the fiscal quarter in which the Closing Date occurs and ending on the last day of the fiscal quarter immediately preceding the date of such Restricted Payment; plus (b) 100% of the aggregate net cash proceeds received by ResCap subsequent to the Closing Date either (i) as a contribution to its common equity capital or (ii) from the issuance and sale (other than to a Subsidiary) of Qualified Equity Interests, including Qualified Equity Interests issued upon the conversion of Indebtedness of ResCap, and from the exercise of options, warrants or other rights to purchase such Qualified Equity Interests (other than, in each case, Equity Interests or Indebtedness sold to a Subsidiary of ResCap); minus (c) $859,000,000.

"Returned Amount" has the meaning set forth in Section 13.12(d).

"RFC" means Residential Funding Company, LLC, and its successors in interest.

"RFC Construction Funding" means RFC Construction Funding, LLC, a Delaware limited liability company.

"Sales Proceeds Accounts" means the accounts listed on Schedule X(b) of the Security Agreement; provided that to the extent any Net Cash Proceeds are required to be held in the European SPV Accounts under the Dutch Security Documents and the English Security Documents, the European SPV Accounts shall constitute Sales Proceeds Accounts with respect to such funds for the purposes of Section 4.02(a); provided further that the Wachovia Sweep Account shall constitute a Sales Proceeds Account solely for the purpose of receiving Net Cash Proceeds and using such Net Cash Proceeds to make mandatory repayments of Loans in accordance with Section 2.08(c).

"Scheduled Loan Repayment Date" means May 1, 2010.

"Scratch and Dent Mortgage Loans" means mortgage loans acquired by the Borrowers or their Subsidiaries in the ordinary course of business which are not saleable to FNMA, FHLMC, or in the normal whole loan and securitization markets in the ordinary course of business as

Confidential

newly originated, non-defective mortgage loans, which loans include but are not limited to Kick-Out Loans, aged mortgage loans, nonperforming mortgage loans and mortgage loans which have defects in their documentation or underwriting.

"Second Lien Loan" means any Mortgage Loan secured by a second lien on or second priority interest in a mortgaged property securing a mortgage note.

"Secured Parties" means the Lender Agent, the Lenders, the Indemnified Parties and each other Person identified as a "Secured Party" in the Security Agreement.

"Security Agreement" means the First Priority Pledge and Security Agreement and Irrevocable Proxy, dated June 4, 2008, among the Borrowers and certain of their Affiliates, as grantors thereunder, the Lender Agent and the First Priority Collateral Agent, as amended and restated as of the Amendment Closing Date and as further amended, amended and restated or otherwise modified from time to time.

"Security Documents" means the Security Agreement, the Hedge Security Agreement, the Intercreditor Agreement, the Account Control Agreements, the Dutch Security Documents, the English Security Documents, the Mexican Security Documents, the Real Estate Security Documents, all documents delivered in satisfaction of the Post Closing Requirements, and all of the security agreements, pledges, collateral assignments, mortgages, deeds of trust, trust deeds or other instruments evidencing or creating or purporting to create any security interests in favor of, or for the benefit of, the First Priority Collateral Agent or the Collateral Control Agent for its benefit and for the benefit of the Lender Parties.

"Servicing Advances" means Servicing T&I Advances, Servicing P&I Advances and Servicing Corporate Advances.

"Servicing Advances Accounts" means the Sales Proceeds Accounts designated as such in accordance with Section 4.02(b).

"Servicing Corporate Advances" means any Advance relating to domestic Mortgage Loans or REO Property made by an Obligor made (except with respect to Servicing Corporate Advances which constitute Substitute Collateral) pursuant to an Eligible Servicing Advances Agreement in the ordinary course of business to maintain or maximize the value of a Mortgage Loan or REO Property, which Advance is described in clause (i) of the definition of Advance.

"Servicing Guidelines" means the policies and procedures of ResCap, its Subsidiaries and subservicers in servicing Mortgage Loans and REO properties, which policies and procedures meet the parameters set forth in Section 7.01(p).

"Servicing P&I Advance" means any Advance relating to domestic Mortgage Loans or REO Property made by an Obligor made (except with respect to Servicing P&I Advances) which constitute Substitute Collateral, pursuant to an Eligible Servicing Advances Agreement which is described in clause (ii) of the definition of Advance.

"Servicing T&I Advance" means any Advance relating to domestic Mortgage Loans or REO Property made by an Obligor (made in accordance with a contractual obligation and, except

Confidential

with respect to Servicing T&I Advances which constitute Substitute Collateral, pursuant to an Eligible Servicing Advances Agreement) which is described in <u>clause (iii)</u> of the definition of Advance.

"<u>Significant Subsidiary</u>" means any Subsidiary of ResCap (or group of Subsidiaries as to which a specified condition applies) which meets any of the following conditions:

> (a)    ResCap's and its other Subsidiaries' proportionate share of the total assets (after intercompany eliminations) of the Subsidiary exceeds 10 percent of the total assets of ResCap and its Subsidiaries on a consolidated basis as of the end of the most recently completed fiscal year; or

> (b)    the Subsidiary's income from continuing operations before income taxes, extraordinary items and cumulative effect of a change in accounting principle exceeds 10 percent of such income of ResCap and its Subsidiaries on a consolidated basis for the most recently completed fiscal year.

For purposes of this definition, a "<u>Subsidiary</u>" shall mean a Person that is controlled by ResCap directly or indirectly through one or more intermediaries.  For purposes of making any determination or calculations, this definition will be interpreted in accordance with the rules and instructions of Rule 1-02 of Regulation S-X under the Securities Act as in effect on the date hereof.

"<u>Solvent</u>" means, with respect to the Obligors on a particular date, that on such date (i) the most recently reported value of the assets pursuant to <u>Section 7.01(f)</u> of such Obligor, taking into account the fair value of assets accounted for on a fair value basis and the carrying value of other assets, is greater than the total amount of the most recently reported liabilities of such Obligor (including the fair value of liabilities reported on a fair value basis), (ii) after giving effect to each Loan, such Obligor is able to realize upon its assets and pay its debts and other liabilities as they mature, assuming an orderly disposition, and (iii) such Obligor does not have unreasonably small capital with which to conduct its business.

"<u>Specified Affiliate</u>" means a Borrower, a Guarantor or, during the first six weeks following the Amendment Closing Date, any other Subsidiary of ResCap.

"<u>Specified Amount</u>" means (i) the Net Cash Proceeds of a Collateral Disposition, which Net Cash Proceeds are less than $10,000,000 or (ii) Collections (other than Net Cash Proceeds) in respect of an Asset or group of Assets for which Collections (other than Net Cash Proceeds) are processed in the same operations department, provided that such Collections (other than Net Cash Proceeds) are less than $1,000,000.

"<u>Specified Percentage</u>" has the meaning set forth in <u>Schedule 2.04</u>.

"<u>Sponsor</u>" means Cerberus Capital Management, L.P., any of its affiliates and any affiliated investment funds or managed accounts which are managed or advised by Cerberus Capital Management, L.P. or any of its affiliates.

"<u>Subject Asset</u>" means an Asset which is an Eligible Asset or Primary Collateral.

Confidential

"Subsidiary" of any Person means any corporation, partnership, limited liability company, association or other entity of which at least a majority of the outstanding stock or other interest having by its terms ordinary voting power to elect a majority of the board of directors, managers or trustees of such corporation, partnership, limited liability company, association or other entity (irrespective of whether or not at the time stock or other interest of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person, or owned by one or more Subsidiaries of such Person (provided that, it is understood that Ally Bank is not a Subsidiary of either Borrower).

"Subsidiary Pledgor" means any Subsidiary that executes or delivers a Security Document pursuant to the Facility Documents or otherwise becomes a party under a Security Document as a grantor, pledgor, mortgagor, guarantor, provider of credit support or other obligor.

"Substitute Collateral" has the meaning set forth in Section 2.08(b).

"Substitute Collateral Certificate" means a certificate of a Responsible Officer of the relevant Obligor (i) identifying the Primary Collateral and/or Supporting Assets that has been the subject of a write-down, (ii) identifying any Substitute Collateral designated as Primary Collateral and all related Supporting Assets, Restricted Entities, and Underlying Documents, (iii) certifying that such write-down complied with ResCap's standard valuation practices applied to its assets as a whole as then in effect (such valuation practices to be consistent with the methodology used in the preparation of ResCap's GAAP financial statements), and (iv) certifying that such Primary Collateral constitutes Eligible Assets.

"Substitute Collateral Schedule" means a schedule setting forth the Substitute Collateral added since the cutoff date relating to the most recently delivered Substitute Collateral Schedule, which schedule shall be in such form as the Lender Agent may approve from time to time in its discretion after consultation with the Borrowers.

"Substitute Eligible Asset" means (i) an Eligible Asset, or (ii) a Line of Credit Asset which is an "Eligible Asset" as defined in the Line of Credit Agreement.

"Supporting Assets" means, with respect to any Primary Collateral or Eligible Asset, (a) if such Subject Asset consists of an Equity Interest in any Person, the assets of such Person; (b) if such asset consists of a direct or indirect ownership interest in a Restricted Entity, such entity's RE Assets, (c) if such Subject Asset consists of a note or other security backed by financial assets and related property, such assets and property; and (d) with respect to any Subject Asset, any other asset or claim that constitutes a primary source of the funds expected to repay the investment in, and return on, such Subject Asset.

"Suretyship Liability" means any agreement, undertaking or arrangement by which any Subsidiary guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to or otherwise to invest in a debtor, or otherwise to assure a creditor against loss) any Indebtedness, obligation or other liability of any other Subsidiary (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon

Schedule 1.01-41

Confidential

the shares of any other Subsidiary.  The amount of any Subsidiary's obligation in respect of any Suretyship Liability will (subject to any limitation set forth therein) be deemed to be the principal amount of the debt, obligation or other liability supported thereby.

"Transfer" means any sale, securitization, financing, exchange, creation of lien, pledge or encumbrance or other disposition by ResCap or any Subsidiary of any Primary Collateral or Supporting Assets to any Person, provided that Transfers shall exclude any foreclosure by ResCap or any of its Affiliates to the extent that ownership of any REO Property resulting from such foreclosure shall be transferred to an REO Owner or a BCG REO Subsidiary as soon as reasonably practicable and shall become part of Supporting Assets.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Underlying Documents" means:

(a) the English Note and the English Security Documents;

(b) the Dutch Note and the Dutch Security Documents;

(c) with respect to the BCG Subsidiaries whose equity is part of Primary Collateral or Supporting Assets, each of the following agreements to which such BCG Subsidiary is a party:  (i) joint venture agreement or other agreement with other equity investors, (ii) land acquisition, development, construction or similar agreement with a Person or Persons primarily responsible for the development of a real estate project, including the Master Sale and Rental Agreements, lot option agreements and agreements to share profits and losses, including any Master Sale and Rental Agreement, lot option agreement or related promissory notes, and (ii) any agreement under which such BCG Subsidiary extends credit (other than trade credit in the ordinary course of business) to another Person and the primary collateral documents securing such extension of credit;

(d) each agreement or document designated as an Underlying Document in a Collateral Addition Designation Notice;

(e) with respect to any Substitute Collateral previously pledged as collateral under the Line of Credit Agreement, all "Underlying Documents" (as defined in the Line of Credit Agreement) with respect to such Substitute Collateral; and

(f) any other material agreement or document that relates to Primary Collateral, Supporting Assets, RE Assets or Restricted Entities, whose termination, material breach or material modification could reasonably be expected to give rise to a Material Adverse Effect.

"Unmatured Event of Default" means any event that, with the giving of notice or lapse of time, or both, would become an Event of Default.

"VA" means the U.S. Department of Veterans Affairs, an agency of the United States of America, or any successor thereto.

Confidential

"VA Approved Lender" means those lenders which are approved by the VA to act as a lender in connection with the origination of any mortgage loan subject to a VA Guaranty Agreement.

"VA Guaranty Agreement" means the obligation of the United States to pay a specific percentage of a mortgage loan (subject to a maximum amount) upon default of the mortgagor pursuant to the Serviceman's Readjustment Act, as amended.

"Valuation Agent" means the Person selected by the Lender Agent from time to time in its sole discretion whose responsibility is to calculate the Collateral Value from time to time.

"Valuation Date" means each Business Day.

"Value" means (a) with respect to Conforming Loans, Jumbo Loans, Wet Loans, Second Lien Loans or HELOC Loans that are being held for sale, HLTV Loans that are being held for sale, Scratch and Dent Loans that are being held for sale and Financial Asset-Backed Securities, the lower of market value or Par Value; and (b) with respect to Servicing P&I Advances, Servicing T&I Advances, Servicing Corporate Advances, Other Receivables, IBG Assets, BCG Assets, Residual Rights, Second Lien Loans that are being held for investment, REO Properties, Kick-Out Loans, Model Homes and HLTV Loans that are being held for investment, the Carrying Value.

"Voting Stock" means, with respect to any person, such person's Capital Stock having the right to vote for election of directors (or the equivalent thereof) of such person under ordinary circumstances.

"Wachovia Sweep Account" means account number 2000042898663 at Wachovia Bank, National Association in the name of Residential Capital, LLC Concentration Account for the benefit of Wells Fargo Bank N.A. as Collateral Control Agent.

"WestLB Program Subsidiary" means a special purpose vehicle which has (a) has been designated by the Borrowers and either approved in writing by the Lender Agent or is established with organizational documents in substantially the same form as the organizational documents for RC Properties VI, LLC or another form approved by the Lender Agent in writing and (b) is a subsidiary of RFC Construction Funding.

"Wet Loan" means a Mortgage Loan for which the related mortgage file has not been delivered to the applicable mortgage loan custodian.

Confidential

SCHEDULE 2.04

## COLLATERAL VALUE CALCULATIONS

1.    <u>Collateral Value</u>.  The Collateral Value of the Assets comprising the Primary Collateral shall be calculated by the Borrower on a monthly basis in accordance with <u>Section 2.04</u>.  Upon such calculation, the Valuation Agent shall promptly notify the Lender Agent and Borrowers of its calculation of Collateral Value.  In the event that the Valuation Agent is uncertain as to whether a particular Asset constitutes Primary Collateral, or as to whether the documents relating to a particular Assets is in form and substance satisfactory to the Lender Agent, the Valuation Agent shall rely on the direction of the Lender Agent which direction shall be conclusive and binding on the Valuation Agent absent manifest error.  The Carrying Value of all Primary Collateral shall be included by the Obligors in the Collateral Value Report.

2.    <u>Definitions</u>.  Capitalized terms used herein and not otherwise defined shall have the meanings given to them in <u>Schedule 1.01</u> to the Loan Agreement to which this <u>Schedule 2.04</u> is attached.  In addition, the following terms shall have the meanings as indicated.

3.    <u>Collateral Value Determination</u>.  "Collateral Value" means, as of any date of determination and solely with respect to Primary Collateral or Supporting Assets for Primary Collateral, the sum of the amounts determined (with respect to each category of Primary Collateral or such Supporting Assets but without duplication) to be the Specified Percentage of the Value of such Primary Collateral or Supporting Assets; <u>provided</u> that Collateral Value shall be adjusted to take into account the restrictions in <u>Part 5</u> below.

As of the Amendment Closing Date and until such time as the Lender Agent shall notify the Borrowers in writing to the contrary, the Specified Percentage for Primary Collateral or Supporting Assets designated as such prior to the Amendment Closing Date shall be as set forth below.

(a)    90% for Conforming Loans;

(b)    80% for Jumbo Loans;

(c)    85% for Wet Loans;

(d)    50% for Second Lien Loans and HELOC Loans that are held for sale;

(e)    50% for HLTV Loans that are held for sale;

(f)    50% for Scratch and Dent Loans that are held for sale;

(g)    50% for Financial Asset-Backed Securities;

(h)    80% for Servicing P&I Advances to the extent that the documents relating to such Servicing P&I Advances are in form and substance satisfactory to the Lender Agent and its counsel;

5254280.33 08048307

Confidential

(i)     70% for Servicing T&I Advances to the extent that the documents relating to such Servicing T&I Advances are in form and substance satisfactory to the Lender Agent and its counsel;

(j)     70% for Servicing Corporate Advances to the extent that the documents relating to such Servicing Corporate Advances and Corporate Advances are in form and substance satisfactory to the Lender Agent and its counsel;

(k)     50% for Other Receivables;

(l)     50% for IBG Assets;

(m)     50% for BCG Assets (including, for the avoidance of doubt, BCG Assets consisting of REO Property);

(n)     50% for Residual Rights;

(o)     50% for Second Lien Loans and HELOC Loans and are being held for investment;

(p)     50% for Scratch and Dent Loans that are being held for investment;

(q)     50% for Kick-Out Loans;

(r)     50% for HLTV Loans that are being held for investment;

(s)     50% for (i) REO Property (A) included in the Supporting Assets for Primary Collateral, (B) arising from the foreclosure of Mortgage Loans previously included in Primary Collateral or (C) transferred to a REO Subsidiary prior to December 1, 2009, or (ii) Model Homes owned by MHFI or its Subsidiary, provided in each case that such ownership interest has been submitted for recordation in the applicable real estate records; and 0% for all other REO Property.

4.     Specified Percentage Determination.  "Specified Percentage" means, with respect to any group of Assets, the percentage specified in the most recent written notice from the Lender Agent to the applicable Obligor, whether such notice is given at the inclusion of such Assets in the Borrowing Base or at any time thereafter.  It is understood and agreed that the Lender Agent shall have right to adjust the Specified Percentage for any group of Collateral in its reasonable discretion, taking into account estimated collections, market value, legal risks, cost of recovery and other matters customarily considered by commercial lenders when determining advance rates.

With respect to Mortgage Loans that are Supporting Assets for the English Note or the Dutch Note, it is understood that Mortgage Loans secured by real estate in different countries may have different Specified Percentages, even though such Mortgage Loans are Supporting Assets for a single security.

Confidential

5.        <u>Restrictions</u>.  The Collateral Value shall be adjusted to reflect the following restrictions:

(i)        The aggregate amount included in the Collateral Value with respect to REO Property at any time shall not exceed the lesser of (x) $30,000,000 or (y) 5% of the aggregate Collateral Value of all Primary Collateral included in the Borrowing Base.

(ii)        At any time the aggregate value included in Collateral Value with respect to any Asset that was not an Eligible Asset as of the Closing Date (in the case of Initial Collateral) or as of the date it became Collateral shall in each case be zero.

(iii)        The aggregate value included in Collateral Value with respect to any Mortgage Loan shall be zero following the day on which such Mortgage Loan is shown in a Collateral Value Report as having become REO Property, and no calculation of the Borrowing Base or Adjusted Borrowing Base shall include Collateral Value for both such Mortgage Loan and such REO Property.

(iv)        The Collateral Value for the equity of a Restricted Entity shall not be increased due to acquisition of any Asset by such Person unless (i) such REO results from the foreclosure (or deed in lieu of foreclosure) of Assets previously designated as Primary Collateral or Supporting Assets and satisfies the requirements set forth in <u>clause (x)</u> of <u>Exhibit A</u>, <u>clause (z)</u> of <u>Exhibit A</u>, <u>clause (v)</u> of <u>Exhibit B</u> or <u>clause (y)</u> of <u>Exhibit B</u> (as applicable), or (ii) such Asset is an Eligible Asset proposed to be a Supporting Asset by a Borrower and has been approved by the Lender Agent in writing.

Confidential

SCHEDULE 5.01

CONDITIONS PRECEDENT

(a)      This Agreement duly executed by the parties hereto;

(b)      A replacement Note dated as of the Amendment Closing Date payable to the order of the initial Lender in an amount equal to the Outstanding Aggregate Loan Amount on such date;

(c)      The Security Agreement, the RE Pledge Agreement and the Hedge Security Agreement executed by the parties thereto, together with all related amendments to the financing statements filed in connection therewith;

(d)      The Intercreditor Agreement shall have been amended to expand the role of the Collateral Control Agent, as contemplated by the Real Estate Security Documents, in such manner as the Lender Agent shall require;

(e)      All conditions precedent to the effectiveness of the Related Documents shall have been satisfied or waived by GMAC Inc. and any other Person whose waiver is required;

(f)      A certificate of a secretary or assistant secretary of each Borrower, ResCap and each other Guarantor and each other Obligor, each (i) certifying the names and true signatures of the persons authorized on such party's behalf to sign, as applicable, this Agreement, the initial Note (if applicable) and the other Facility Documents to be delivered by such party in connection herewith and (ii) attaching true and correct copies of the authorizing resolutions of the foregoing in form and substance satisfactory to the Lender Agent;

(g)      A certificate of a Responsible Officer of each Borrower, ResCap and each other Guarantor and each other Obligor, each certifying as to (i) the accuracy and completeness of each of the representations and warranties contained in each Facility Document to which such entity is a party (except for representations and warranties made in respect of specific mortgage loans), (ii) the absence of any Default under such Facility Documents to which such entity is a party as of the Amendment Closing Date and (iii) the absence of any event or circumstances (other than those disclosed to the Lender Agent) since December 31, 2008 that could reasonably be expected to give rise to a Material Adverse Effect;

(h)      A certificate of a Responsible Officer of each Borrower, ResCap and each other Obligor (i) if such Obligor was party to the Original Loan Agreement, certifying as to the accuracy and completeness and absence of changes, as of the Amendment Closing Date, in (A) the certificate of incorporation or formation of each entity provided to the Lender Agent on the Closing Date and (B) its limited liability company agreement or bylaws provided to the Lender Agent on the Closing Date, and (iii) otherwise certifying that the attached certificate of incorporation or formation, limited liability company agreement and bylaws are accurate and complete;

(i)      A (i) good standing certificate issued by the Secretary of State of the State of Delaware certifying that RFC, GMAC Mortgage and ResCap are validly existing and in good

Confidential

standing and (ii) good standing certificate issued by appropriate authority in the jurisdiction of each other Obligor's formation, certifying that such Obligor is validly existing and in good standing;

(j)     The filing of proper financing statements (Form UCC-1) or amendments to financing statements (Form UCC-3), naming each Obligor as debtor and the First Priority Collateral Agent as the secured party, or other, similar instruments or documents, and the taking of all actions under the UCC or any Requirements of Law (including under English law) as necessary or reasonably requested by the Lender Agent to perfect the First Priority Collateral Agent's interest in the Collateral;

(k)     Opinions of external and/or in-house counsel for the Borrowers, the Guarantors and each Subsidiary Pledgor and each other Obligor covering such matters as may be reasonably requested by the Lender Agent;

(l)     All documents executed or submitted pursuant hereto by or on behalf of any Obligor shall be reasonably satisfactory in form and substance to the Lender Agent; and the Lenders and their counsel shall have received all information, approvals, opinions, documents or instruments as the Lenders or their legal counsel may reasonably request; and

(m)     To the extent not previously delivered to the Lender Agent, the Lender Agent shall have received, or shall have been granted website access to, true and correct copies of the Underlying Documents.

Confidential

SCHEDULE 7.01(g)

REQUIRED REPORTS

A.    Monthly Collateral Report, to be in detail satisfactory to the Lender Agent and delivered by the eleventh Business Day of each month, comprising:

    1.    Collateral Value Report

    2.    Substitute Collateral Schedule

    3.    Electronic File

    4.    Permanent Paydown Report

B.    Within two (2) Business Days after the delivery of each Monthly Collateral Report, a Cumulative Substitute Collateral Schedule.

5254280.33 08048307

SCHEDULE 7.01(t)

BILATERAL FACILITIES

(See Attached)

5254280.33 08048307

Confidential

T215

**BILATERAL FACILITIES**

| T# | Company Name | Internal Contract Number | Expiration Date | Description | Legal Entity Name |
|---|---|---|---|---|---|
| T005 | Fannie Mae | FNM-06863 | Perpetual | FNMA; Off-balance sheet (Gestation Repo); As Soon As Pooled Sale Agreement, dated July 28, 2003 | X- GMAC Mortgage Corporation |
| T009 | Fannie Mae | FAN-06642 | 6/30/10 | Fannie Mae; Off Balance Sheet; Master Agreement No. MP04297.1 4/24/2009 | GMAC LLC, Residential Capital, LLC, GMAC Mortgage, LLC |
| T223 | GMAC LLC | GMA-11089 | 4/30/10 | GMAC; Intercompany; Amended and Restated Loan Agreement dated December 30, 2009 | GMAC LLC, GMAC Mortgage, LLC, Passive Asset Transaction, LLC, Residential Capital, LLC, RFC Asset Holdings II, Inc, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, and Equity Investment I, LLC |
| T610 | Deutsche Trustee Company Limited | DEU-10963 | 5/31/10 | Deutsche Trustee; Secured Aggregation Facility; Amended and Restated Note Issuance Facility Deed dated November 7, 2008 | Residential Capital, LLC, GMAC-RFC Limited, CONDUIT (NO. 2) LIMITED, SILO N0.2 LIMITED |
| T622 | The Royal Bank of Scotland PLC | PRE-12357 | 3/16/10 | Preemac II; Secured Aggregation; Class D Variable Funding Loan Note Agreement dated March 19, 2009 | GMAC RFC Investments B.V.; GMAC-RFC Nederland B.V.; Preemac II, NL B.V.; Residential Capital, LLC |
| T711 | International Finance Company | INT-06675 | 5/27/10 | IFC; Whole Loan Repo; Amended & Restated Local Currency Revolving Loan Agreement dated April 16, 2007 | Residential Funding Company, LLC, GMAC Financiera, S.A. |
| T909 | Barclays Bank PLC | BAR-07730 | 2/24/10 | Barclays - GSAP; Other Secured Borrowings; Second Amended and Restated Indenture dated March 6, 2008 | GMACR Mortgage Products, Inc., GMAC Mortgage, LLC, GMAC Bank, Residential Funding Company, LLC |
| T924 | Lehman Commercial Paper Inc | LEH-08871 | 1/29/10 | Lehman; Other Secured Borrowing; Second Amended & Restated Master Repurchase Agreement dated June 4, 2008 | Residential Funding Company, LLC and Residential Capital, LLC |
| T932 | Citibank, NA | CIT-06399 | 5/31/10 | Citibank; Mortgage Servicing Rights; Loan and Security Agreement dated September 10, 2007 | Residential Capital, LLC, GMAC Mortgage, LLC |

**Note** Schedule excludes ResCap intercompany agreements, bank lines and loans, bonds and deposit liabilities.

1

SCHEDULE 8.01(m)

POST-CLOSING REQUIREMENTS

*(All of the documents described below are required to be executed and delivered within the time specified below and are required to be in form and substance satisfactory to the Lender Agent.)*

A.     Within 30 days from the Amendment Closing Date, the Obligors shall, and shall cause their Subsidiaries to, execute and deliver such mortgages and deeds of trust in favor of the Collateral Control Agent or its representative for the benefit of the Lender Parties with respect to real estate held by the Restricted Entities as the Lender Agent shall require, together with evidence that such documents have been submitted for recording together with all amounts necessary to pay recording and similar taxes.

B.     Within 30 days from the Amendment Closing Date, Obligors shall cause the Custodial Agreement Supplement to be amended to provide for the delivery of mortgage loan notes, guaranties, mortgages, deeds of trust and related releases by the BCG Subsidiaries.

C.     Within 15 days from the Amendment Closing Date, the BCG Subsidiaries shall have delivered to the Lender Agent all third party consents required in connection with the pledge of interests in BCG Joint Ventures.

D.     Within 30 days from the Amendment Closing Date, the Obligors shall, and shall cause their Subsidiaries to, cause the account control agreements executed under the MSR Loan Agreement to be amended to grant control of the accounts subject thereto to the Collateral Control Agent.

E.     Within 30 days of the Amendment Closing Date, each Restricted Entity (other than Developers of Hidden Springs, LLC) that is not party to the RE Pledge Agreement and is not a BCG Joint Venture shall have modified its organization documents, in a manner satisfactory to the Lender Agent, so as to require at least one independent director and shall have appointed such director.

F.     Within 30 days of the Amendment Closing Date, the Obligors will cause the English Security Documents to be amended to require the consent of the Lender Agent to certain actions, and to permit the Lender Agent to exercise certain rights (in a manner discussed by the Lender Agent and the Borrowers in anticipation of establishing a new Restricted Entity to hold UK Mortgage Loans), and to otherwise reflect the changes herein from the Original Loan Agreement; provided that such 30-day period may be extended by an additional 30 days if, in the Lender Agent's reasonable judgment, the Obligors have used commercially reasonable efforts to cause such amendments to be executed.

G.     Within 15 days of the Amendment Closing Date, the Obligors shall deliver to the Lender Agent copies of all Contracts relating to the third party servicing of Mortgage Loans held by the Dutch SPE or the English SPE; provided that such 15 day period may be extended by an additional 15 days due to a delay in obtaining any necessary consents if, in the Lender Agent's reasonable discretion, the Obligors have used commercially reasonable efforts to obtain such consents.

5254280.33 08048307

H.      As soon as practicable, and in any event no later than January 10, 2010, the Obligors will cause each Affected Subsidiary to deliver an Authorization Notice to the Lender Agent.

I.      As soon as practicable, and in any event no later than January 15, 2010, the Obligors will deliver notes evidencing loans pledged by certain ResCap Subsidiaries which are party to the RE Pledge Agreement together with related allonges executed in blank, to the initial Lender Agent or its designee.

J.      Within 10 days of the Amendment Closing Date, the Obligors shall deliver to the First Priority Collateral Agent the limited liability company interest certificate for RAHI A, LLC and PATI A, LLC along with the appropriate membership interest power.

Confidential

SCHEDULE 13.02

NOTICES

The Borrowers:

Residential Funding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: Jerry.Lombardo@gmacrescap.com

With copy to:

GMAC Mortgage, LLC
c/o Residential Funding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email:  Jerry.Lombardo@gmacrescap.com

With copy to:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax: (866) 572-7524
Email: tammy.hamzehpour@gmacrescap.com

5254280.33 08048307

The Lender:

GMAC Inc.
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Phone: 704-540-6133
Fax: 704-540-6549
Email: Jeff.Brown@gmacfs.com

With copy to:

William B. Solomon, VP and General Counsel
Phone: (313) 656-6128
Fax: (313) 656-6124
Email: William.b.solomon@gm.com

Guarantors:

Residential Capital, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN 55423
Attn: Tammy Hamzehpour
Phone: (952) 857-6415
Fax: (866) 572-7524
Email: tammy.hamzehpour@gmacrescap.com

Homecomings Financial, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-7359
Fax: (952) 921-4230
Email:  Jerry.Lombardo@gmacrescap.com

GMAC-RFC Holding Company, LLC
One Meridian Crossings
Suite 100
Minneapolis, MN  55423
Attn: Jerry Lombardo
Phone: (952) 857-7359
Fax: (952) 921-4230
Email:  Jerry.Lombardo@gmacrescap.com

Confidential

GMAC Residential Holding Company, LLC
3993 Howard Hughes Parkway
Suite 250
Las Vegas, NV  89169
Attn: Jerry Lombardo
Phone: (952) 857-6565
Fax: (866) 501-6585
Email: Jerry.Lombardo@gmacrescap.com

Confidential

EXHIBIT A

ELIGIBILITY REQUIREMENTS

Capitalized terms used in this Exhibit A have the meaning set forth in Schedule 1.01 to the Loan Agreement to which the Exhibit A is a part.

An Asset shall be deemed to satisfy the Eligibility Requirements if such Asset meets the following requirements:

(a)      each related Contract constitutes a legal, valid and binding obligation of the related Payor, enforceable against the Payor in accordance with its terms and is not subject to any right of rescission, set-off, counterclaim or other defense of the related Payor (except as enforceability may be limited or defenses may arise by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors', mortgagees' or lessors' rights in general and general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law); provided however that this requirement shall not apply in the case of REO Property;

(b)      each related Contract was originated and has been administered in accordance with Applicable Law (including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, warehousing and disclosure laws); provided however that this requirement shall not apply in the case of REO Property;

(c)      each related Contract was originated by an Obligor or acquired by an Obligor in the ordinary course of business; provided however that this requirement shall not apply in the case of REO Property;

(d)      each related Contract has been underwritten and serviced by an Obligor in accordance with the Credit and Collection Policies pursuant to (i) documentation acceptable to prudent lending institutions or investors, subject to Approved Exceptions and Permitted Liens in the case of Mortgage Loans, and (ii) origination practices that are customary for the origination of assets of such type as of the time such Asset was originated; provided however that this requirement will not apply to REO Property;

(e)      such Asset has been selected for inclusion in the Primary Collateral using no selection procedures adverse to the Secured Parties;

(f)      such Asset is not a Defaulted Asset or a Credit Risk Asset; provided however that this requirement shall not apply in the case of REO Property;

(g)      the First Priority Collateral Agent acquired and has good title and a valid and perfected security interest in such Asset, free of any Lien (other than Permitted Liens) of a type described in clauses (b) through (f), (i), (j), (k), (l), (m) or (o) of the definition of Permitted Liens; provided however that this requirement shall not apply in the case of REO Property;

5254280.33 08048307

(h)     the obligations of the Payor under the related Contract are irrevocable, unconditional and non-cancelable; provided however that this requirement shall not apply in the case of REO Property;

(i)     the related Contract is denominated and payable in (A) Dollars by a Payor in the United States of America, (B) in the case of an increase in the aggregate outstanding balance of the English Notes, Pounds Sterling by the English SPV, provided that in the case of any such increase in the aggregate outstanding balance of the English Notes, the English SPV shall have acquired Eligible UK Assets with a Carrying Value equal to or greater than the amount of such increase, or (C) in the case of an increase in the aggregate outstanding balance of the Dutch Notes) Euros by the Dutch SPV, provided that in the case of any such increase in the aggregate outstanding balance of the Dutch Notes, the Dutch SPV shall have acquired Eligible Dutch Assets with a Carrying Value equal to or greater than the amount of such increase; and provided further that this requirement shall not apply in the case of REO Property;

(j)     the related Contract would be characterized as "chattel paper", an "account", an "instrument", a "general intangible" or "investment property" under the UCC; provided however that this requirement shall not apply in the case of REO Property;

(k)     the pledge of the Asset or any interest therein by the relevant Obligor to the First Priority Collateral Agent does not require the consent of any Person that has not been obtained and does not otherwise violate the terms of any other agreement binding on the Obligors;

(l)     such Asset is not subject to an offer of exchange or tender by its issuer or by any other Person for securities or any other type of consideration other than cash, and such Asset does not provide at any time over its life of the payment of any amounts due to be made by delivery of an equity security or mandatory conversion into an equity security; provided however that this requirement shall not apply in the case of REO Property;

(m)     either (i) no payments of principal or interest on such security are subject to withholding taxes imposed by any jurisdiction or (ii) if any such payments are subject to withholding tax imposed by any jurisdiction, the obligor thereunder is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis; provided however that this requirement shall not apply in the case of REO Property;

(n)     [Reserved];

(o)     either (i) future advances are not required to be made by the holder of such Asset, or (ii) if future advances are required to be made, the Obligors have adequate means with which to make future advances;

(p)     the related Payor with respect to such Asset is organized or incorporated under the laws of a country that does not impose foreign exchange restrictions effectively

Ex. A-2

Confidential

limiting the availability or use of U.S. Dollars to make scheduled payments of principal or interest on such Asset; provided however that this requirement shall not apply in the case of REO Property;

(q)      such Asset requires the payment of a fixed amount of principal in cash no later than its stated maturity or termination date, and such Asset is not callable for less than its face amount; provided however that this requirement shall not apply in the case of REO Property;

(r)      such Asset is not an operating lease or financing by a debtor-in-possession in an insolvency proceeding;

(s)      the terms of such Asset have not been impaired, waived, altered or modified in any respect, except (i) in accordance with the Credit and Collection Policy with a view to maximizing the value of such Asset or (ii) as required by Applicable Law; provided however that this requirement shall not apply in the case of REO Property;

(t)      if such Asset is a Mortgage Loan, the related mortgage has not been satisfied, canceled, subordinated or rescinded and the related mortgage property has not been released from the lien of the mortgage;

(u)      in the case of an Asset that is a Servicing P&I Advance, Servicing Corporate Advance or Servicing T&I Advance, the related Obligor reasonably believes that such advance is recoverable from the proceeds of the sale of the related real estate;

(v)      in the case of an Asset that is a Servicing P&I Advance, Servicing Corporate Advance or Servicing T&I Advance, such Asset arises under an Eligible Servicing Advances Agreement;

(w)      in the case of an Asset that is an Incremental Advance, the related Obligor reasonably believes that it is contractually obligated to make such advance or that such advance is necessary to maximize its recovery on the related collateral;

(x)      in the case of an Asset that is an Equity Interest in a Subsidiary or BCG Joint Venture that holds parcels of real estate, such Equity Interest shall be considered to be an Eligible Asset to the extent of the Value of parcels for which (i) an enforceable deed evidencing such Subsidiary's or joint venture's ownership interest in such parcel has been submitted for recording in the appropriate filing office, (ii) such parcel is not subject to any Liens other than Permitted Liens, provided that with respect to a parcel owned by a ResCap Subsidiary such Permitted Liens are described in clauses (b) through (f), (i), (j), (k), (l), (m) or (o) of the definition of Permitted Liens, and (iii) in the case of any parcel of real estate owned by a ResCap Subsidiary (other than individual parcels of residential real estate acquired by a ResCap Subsidiary through foreclosure or deed in lieu of foreclosure on a Mortgage Loan), a mortgage or deed of trust on such real estate in favor of the First Priority Collateral Agent or its designee shall have been recorded or submitted for recording within 30 days of the Amendment Closing Date, which mortgage or deed of trust shall be in a form substantially similar to the forms approved in writing

Confidential

by the Lender Agent and shall secure Obligations in an amount not less than the Carrying Value of such real estate at the time such mortgage or deed of trust was prepared;

(y)       if such Asset represents the right to be paid by the VA or the FHA in respect of servicing costs on an insured Mortgage Loan, such Mortgage Loan shall have been included in Primary Collateral;

(z)       is REO Property or supported by REO Property, (i) the related REO Owner, BCG REO Subsidiary or WestLB Program Subsidiary has good and marketable title to such REO Property, free of any Lien (other than Permitted Liens), (ii) if such REO was part of the Initial Collateral or acquired through the foreclosure of a Mortgage Loan which constituted Primary Collateral, the Collateral Value of such REO and any other Primary Collateral related thereto is calculated without double counting, (iii) the Obligors do not have actual knowledge that any such REO Property has suffered material uninsured damage due to hurricane, flood, tornado or other natural disaster or environmental hazard; it being understood that if any such damage is subsequently discovered, the Value of the REO Property will be reduced to reflect such damage, and (iv) such REO Property is located in the United States or a territory thereof; and

(aa)       such Asset is not an Excluded Asset.

For the avoidance of doubt, with respect to any REO Property, the related Contract shall be the Contract relating to the loan or financing pursuant to which such property was acquired through foreclosure or deed in lieu of foreclosure.

Confidential

EXHIBIT B

## ELIGIBILITY REQUIREMENTS
## FOR SUBSTITUTE COLLATERAL

Capitalized terms used in this <u>Exhibit B</u> but not otherwise defined in this Agreement have the meaning set forth in <u>Schedule 1.01</u> to the Line of Credit Agreement.

An Asset shall be deemed to satisfy the Eligibility Requirements for Substitute Collateral if such Asset meets the following requirements,

(a)     each related Contract constitutes a legal, valid and binding obligation of the related Payor, enforceable against the Payor in accordance with its terms and is not subject to any right of rescission, set-off, counterclaim or other defense of the related Payor (except as enforceability may be limited or defenses may arise by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors', mortgagees' or lessors' rights in general and general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law);

(b)     subject to Approved Exceptions, each related Contract was originated and has been administered in accordance with Applicable Law (including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, warehousing and disclosure laws);

(c)     each related Contract was originated by an Obligor or acquired by an Obligor in the ordinary course of business;

(d)     subject to Approved Exceptions, each related Contract has been underwritten and serviced by an Obligor in accordance with the Credit and Collection Policies pursuant to (i) documentation acceptable to prudent lending institutions or investors, and (ii) origination practices that are customary for the origination of assets of such type as of the time such Asset was originated;

(e)     except with respect to US Mortgage Loans, and subject to Approved Exceptions, such Asset has been selected for inclusion in the Collateral using no selection procedures adverse to the Lender Parties;

(f)     the First Priority Collateral Agent acquired and has good title and a valid and perfected security interest in such Asset, free of any Lien (other than Permitted Liens);

(g)     the obligations of the Payor under the related Contract are irrevocable, unconditional and non-cancelable;

(h)     the related Contract is denominated and payable in Dollars by a Payor in the United States of America or, in the case of a European Note, the currency of the jurisdiction where the real estate securing the related Supporting Assets is located;

Confidential

provided that in the case of any such increase in the aggregate outstanding balance of a European Note, the related European SPV shall have acquired Assets that satisfy the eligibility criteria in the related English Security Documents and Dutch Security Documents with a Carrying Value equal to or greater than the amount of such increase;

(i)    the related Contract would be characterized as "chattel paper", an "account", an "instrument", a "general intangible" or "investment property" under the UCC;

(j)    the pledge of the Asset or any interest therein by the relevant Obligor to the Lender does not require the consent of any Person that has not been obtained and does not otherwise violate the terms of any other agreement binding on the Obligors;

(k)    such Asset is not subject to an offer of exchange or tender by its issuer or by any other Person for securities or any other type of consideration other than cash, and such Asset does not provide at any time over its life of the payment of any amounts due to be made by delivery of an equity security or mandatory conversion into an equity security;

(l)    either (i) no payments of principal or interest on such security are subject to withholding taxes imposed by any jurisdiction or (ii) if any such payments are subject to withholding tax imposed by any jurisdiction, the obligor thereunder is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis;

(m)    either (i) future advances are not required to be made by the holder of such Asset, or (ii) if future advances are required to be made, the Obligors have adequate means with which to make future advances;

(n)    the related Payor is organized or incorporated under the laws of a country that does not impose foreign exchange restrictions effectively limiting the availability or use of U.S. Dollars to make scheduled payments of principal or interest on such Asset;

(o)    except with respect to the equity in Equity Investment I, LLC or a Restricted Entity, such Asset requires the payment of a fixed amount of principal in cash no later than its stated maturity or termination date, and such Asset is not callable for less than its face amount;

(p)    such Asset is not an operating lease or financing by a debtor-in-possession in an insolvency proceeding;

(q)    the terms of such Asset have not been impaired, waived, altered or modified in any respect, except (i) in accordance with the Credit and Collection Policy with a view to maximizing the Value of such Asset, (ii) as required by Applicable Law, (iii) pursuant to the conversion of the First Security Credit Agreement, in whole or in part, to the First Security Repurchase Agreement as contemplated by the related Collateral Addition Designation Notice, and (iv) as are permitted with respect to an Asset by Approved Exceptions;

Confidential

(r)      if such Asset is a Mortgage Loan, the related mortgage has not been satisfied, canceled, subordinated or rescinded and the related mortgage property has not been released from the lien of the mortgage;

(s)      in the case of an Asset that is a Servicing P&I Advance, Servicing Corporate Advance or Servicing T&I Advance, the related Obligor reasonably believes that such advance is recoverable from the proceeds of the sale of the related real estate;

(t)      in the case of an Asset that is a Servicing P&I Advance, Servicing Corporate Advance or Servicing T&I Advance, such Asset arises under an Eligible Servicing Advances Agreement;

(u)      in the case of an Asset that is an Incremental Advance, the related Obligor reasonably believes that it is contractually obligated to make such advance or that such advance is necessary to maximize its recovery on the related collateral;

(v)      in the case of an Asset that is an Equity Interest in a Subsidiary or BCG Joint Venture that holds parcels of real estate, such Equity Interest shall be considered to be an Eligible Asset to the extent of the Value of parcels for which (i) an enforceable deed evidencing such Subsidiary's or joint venture's ownership interest in such parcel has been submitted for recording in the appropriate filing office, (ii) such parcel is not subject to any Liens other than Permitted Liens; provided that with respect to a parcel owned by a ResCap Subsidiary such Permitted Liens are described in clauses (b) through (f), (i), (l) or (o) of the definition of Permitted Liens, and (iii) in the case of any parcel of real estate owned directly by a ResCap Subsidiary (other than individual parcels of residential real estate acquired by a ResCap Subsidiary through foreclosure or deed in lieu of foreclosure on a Mortgage Loan), a mortgage or deed of trust on such real estate in favor of the First Priority Collateral Agent or its designee shall have been recorded or submitted for recording, which mortgage or deed of trust shall be in a form substantially similar to the forms approved in writing by the Lender Agent and shall secure Obligations in an amount not less than the Carrying Value of such real estate at the time such mortgage or deed of trust was prepared;

(w)      if such Asset represents the right to be paid by the VA or the FHA in respect of servicing costs on an insured Mortgage Loan, such Mortgage Loan shall have been included in Primary Collateral;

(x)      if such Asset is a US Mortgage Loan, (i) such Asset has been identified to be pledged as Collateral under this Agreement in a Mortgage Schedule provided by the related Obligor to the Lender Agent, (ii) the Obligor has marked its books and record to indicate that such Mortgage Loan has been pledged to the Lender Agent, and (iii) such Asset has been approved by the Lender Agent as an Eligible Asset prior to the initial inclusion of such Asset in the Borrowing Base; and

(y)      if such Asset is REO Property or supported by REO Property, (i) the related REO Subsidiary has good and marketable title to such REO Property, free of any Lien (other than Permitted Liens described in clauses (b) through (f), (i), (l) and (o) of the

Ex. B-3

Confidential

definition of Permitted Liens), (ii) if such REO was acquired through the foreclosure of a Mortgage Loan which constituted Collateral, the Collateral Value of such REO Property and any other Collateral related thereto is calculated without double counting, (iii) the Obligors do not have actual knowledge that any such REO Property has suffered material uninsured damage due to hurricane, flood, tornado or other natural disaster or environmental hazard; it being understood that if any such damage is subsequently discovered, the Carrying Value of the REO Property will be reduced to reflect such damage, and (iv) such REO Property is located in the United States or a territory thereof.

Confidential

EXHIBIT C

## INITIAL PERMITTED FUNDING INDEBTEDNESS

1.    Description of Notes

    (a)    Floating Rate Notes due June 9, 2008; Floating Rate Notes due November 21, 2008; 8.125% Notes due November 21, 2008; Floating Rate Notes due April 17, 2009; Floating Rate Subordinated Notes due April 17, 2009; Floating Rate Notes due May 22, 2009; 8.375% Notes due June 30, 2010; Floating Rate Notes due September 27, 2010; 8.000% Notes due February 22, 2011; 7.125% Notes due May 17, 2012; 8.500% Notes due June 1, 2012; 8.500% Notes due April 17, 2013; 8.375% Notes due May 17, 2013; 9.875% Notes due July 1, 2014; and 8.875% Notes due June 30, 2015.

2.    Term Loan Agreement

    (a)    Term Loan Facility dated as of July 28, 2005 among ResCap, the lenders thereunder, Citibank, N.A., as syndication agent, the documentation agents thereunder, and JPMorgan Chase Bank, N.A., as administrative agent, from the lenders thereunder

3.    Related Documents

    (a)    Indebtedness outstanding under the Related Documents

4.    Other

    (a)    Any indebtedness referenced in Residential Capital, LLC's Current Report on Form 8-K filed with the Securities and Exchange Commission prior to October 31, 2009.

    (b)    Indebtedness under agreements listed in <u>Schedule 7.01(t)</u>

    (c)    The 2010 Notes and the 2015 Notes

Confidential

EXHIBIT 2.02(a)

## FORM OF NOTE

December 30, 2009

$1,545,587,924

FOR VALUE RECEIVED, Residential Funding Company, LLC, a Delaware limited liability company ("RFC"), and GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage" and together with RFC, each a "Borrower" and collectively, the "Borrowers"), jointly and severally promise to pay to the order of GMAC Inc. (the "Lender") on or before the Loan Repayment Date the principal amount of ONE BILLION FIVE HUNDRED FORTY FIVE MILLION FIVE HUNDRED EIGHTY SEVEN THOUSAND NINE HUNDRED TWENTY FOUR DOLLARS ($1,545,587,924), or such lesser amount as shall reflect the Outstanding Aggregate Loan Amount of the Loans (each as defined in the Loan Agreement referred to below) made by the Lender to the Borrower.

The Borrowers further promise to pay interest on the unpaid principal amount of this Note from time to time outstanding, payable as provided in the Loan Agreement (referred to below), at the rates per annum provided in the Loan Agreement; provided, however, that such interest rate shall not at any time exceed the maximum rate permitted by law.  All payments of principal of and interest on this Note shall be payable in lawful currency of the United States of America at the office of the Lender as provided above or such other address as the holder hereof shall have designated to the Borrowers, in immediately available funds.

The date, amount and interest rate of each Loan made by the Lender to the Borrowers, and each payment made on account of the principal thereof, shall be recorded by the Lender on its books and, prior to any transfer of this Note, endorsed by the Lender on the schedule attached hereto or any continuation thereof; provided that the failure of the Lender to make any such recordation or endorsement shall not affect the obligations of the Borrowers to make a payment when due of any amount owing under the Loan Agreement or hereunder in respect of the Loans made by the Lender.

This Note is one of the Notes referred to in the Amended and Restated Loan Agreement dated December 30, 2009 between the Borrowers, GMAC Inc., as Lender Agent, the Lender and certain other lenders and guarantors party thereto (the "Loan Agreement").  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement.  Upon occurrence of any Event of Default, the principal hereof, and all accrued interest thereon, may be declared or shall automatically become, due and payable pursuant to the Loan Agreement.

This Note amends and restates in its entirety the promissory notes, dated June 4, 2008, in the original principal amount of $3,500,000,000, payable by the Borrowers to the order of the Lender (the "Original Notes").  This amendment and restatement of the Original Notes shall not effectuate a novation or extinguishment of the obligations outstanding under the Original Notes or a release of any lien or security interest securing the Original Notes.  Each reference in the Loan Agreement or in any other Facility Document to the "Note" shall include this Note as hereinafter amended, restated or otherwise modified.

Confidential

The Borrowers agree to pay all the Lender's costs of collection and enforcement (including reasonable attorneys' fees and disbursements of lender's counsel) in respect of this Note when incurred, including, without limitation, reasonable attorneys' fees through appellate proceedings.

Notwithstanding the pledge of the Collateral, the Borrowers hereby acknowledge, admit and agree that the Borrowers' obligations under this Note are recourse obligations of the Borrowers to which the Borrowers pledge their full faith and credit.

The Borrowers, and any indorsers or guarantors hereof, (a) severally waive diligence, presentment, protest and demand and also notice of protest, demand, dishonor and nonpayment of this Note, (b) expressly agree that this Note, or any payment hereunder, may be extended from time to time, and consent to the acceptance of further Collateral, the release of any Collateral for this Note, the release of any party primarily or secondarily liable hereon, and (c) expressly agree that it will not be necessary for the Lender, in order to enforce payment of this Note, to first institute or exhaust the Lender's remedies against the Borrowers or any other party liable hereon or against any Collateral for this Note.  No extension of time for the payment of this Note, or any installment hereof, made by agreement by the Lender with any person now or hereafter liable for the payment of this Note, shall affect the liability under this Note of the Borrowers, even if the Borrowers are not a party to such agreement; provided, however, that the Lender and the Borrowers, by written agreement between them, may affect the liability of the Borrowers.

This Note may be assigned in whole or in part only by registration of such assignment or sale on the Register.  Any participation in respect of this Note may be effected only by the registration of such participation on the Participant Register.

Any reference herein to the Lender shall be deemed to include and apply to every subsequent holder of this Note.  Reference is made to the Loan Agreement and Security Agreement for provisions concerning optional and mandatory prepayments, Collateral, acceleration and other material terms affecting this Note.

Any enforcement action relating to this Note may be brought by motion for summary judgment in lieu of a complaint pursuant to Section 3213 of the New York Civil Practice Law and with respect to this Note and waives any right with respect to the doctrine of forum non conveniens with respect to such transactions.

**This Note shall be governed by and construed in accordance with the laws of the state of New York without regard to conflicts of laws principles (but with reference to section 5-1401 of the New York General Obligation law) whose laws the Borrowers expressly elect to apply to this Note.  Each party hereto hereby submits to the nonexclusive jurisdiction of the United States District Court for the Southern District of New York for purposes of all legal proceedings arising out of or relating to this Note.  The Borrowers irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Borrowers hereby consent to process being served in any suit, action or proceeding with respect to this agreement, or any document delivered pursuant hereto by the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to its respective address specified at the time for notices under the**

Confidential

**Loan Agreement or to any other address of which it shall have given written or electronic notice to the Lender.  The foregoing shall not limit the ability of Lender to bring suit in the courts of any jurisdiction.**

**The Borrowers hereby irrevocably waive any and all right to a trial by jury with respect to any legal proceeding arising out of or relating to this Note.**

IN WITNESS WHEREOF, the undersigned has caused this Note to be executed by its duly authorized officer as of the day and year first above written.

Residential Funding Company, LLC


By: _____
    Name:
    Title:


GMAC Mortgage, LLC


By: _____
    Name:
    Title:

Confidential

EXHIBIT 2.04(a)

## FORM OF COLLATERAL VALUE REPORT

GMAC Inc.,
  as Lender Agent
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Fax: 704-540-6549


Re: Residential Funding Company, LLC, and GMAC Mortgage, LLC

Gentlemen and Ladies:

This Collateral Value Report is delivered to you pursuant to Section 2.04(b) and Section 7.01(g) of the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent").  Unless otherwise defined herein or the context otherwise requires, capitalized terms used herein have the meanings provided in the Loan Agreement.

The information contained herein is as of the [●]  day of [●] , [●]  (the "Cutoff Date.")

The Borrowers hereby certify a Collateral Value of $[●].  The related Collateral Value Report is attached hereto as Exhibit A.

The Borrowers hereby certify that the Collateral Dispositions that have occurred since the date of the previously delivered Collateral Value Report have occurred in compliance with Section 7.02(k).  The Primary Collateral which was the subject of such Collateral Dispositions is set forth on Exhibit B hereto.

Since the date of the previously delivered Collateral Value Report, $[●] of Net Cash Proceeds have been received with respect to Collateral Dispositions. The total amount of Net Cash Proceeds, including amounts designated as such since the previously delivered Collateral Value Report is $[●].

The Net Cash Proceeds have either been utilized to repay outstanding Loans in accordance with Section 2.08(c) or are being held pending application in accordance with the terms of the Loan Agreement.

5254280.33 08048307

Since the date of the previously delivered Collateral Value Report, valuation adjustments of $[●] have decreased the Collateral Value of Primary Collateral and Supporting Assets in accordance with GAAP and the normal business practices of ResCap as of the date hereof.  The resulting Borrowing Base Shortfall is $[_____].  The Eligible Assets which have been designated as Substitute Collateral in accordance with Section 2.08 of the Loan Agreement since the cut-off date of the previously delivered Collateral Value Report are set forth on Exhibit C hereto and the Collateral Value included in the Collateral Value Report delivered herewith is $[●].

The Borrowers have caused this Collateral Value Report to be executed and delivered, and the certification and warranties contained herein to be made, on this [●]day of [●], [●].

Residential Funding Company, LLC

By: _____
Name: James Young
Title: Chief Financial Officer

GMAC Mortgage, LLC

By: _____
Name: James Young
Title: Chief Financial Officer

Confidential

EXHIBIT 2.08(b)

FORM OF REPAYMENT NOTICE

[●], 200[●]

TO:     The Lender Agent as defined in the Loan Agreement referred to below

Reference is hereby made to the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding RFC Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent"). Capitalized terms not otherwise defined herein are used herein as defined in the Loan Agreement.

The Borrowers hereby notify you that, pursuant to Section 2.08[(a)/(b)] of the Loan Agreement, it shall make a repayment of the Loans outstanding under the Loan Agreement to the Lender on [●], 200[●] in the amount of $[●].

Also included in the repayment amount shall be accrued and unpaid interest, Breakage Costs (as determined by the Lender Agent and provided to the undersigned) and other amounts due and owing to the Lenders in the amount of $[●].

The undersigned has caused this Repayment Notice to be executed and delivered by its duly authorized officer this [●] day of [●], 200[●].

Residential Funding Company, LLC

By: _____
    Name:
    Title:

GMAC Mortgage, LLC

By: _____
    Name:
    Title:

5254280.33 08048307

Confidential

EXHIBIT 2.09(a)

FORM OF OPTIONAL PREPAYMENT NOTICE

[●], 200[●]

TO:  The Lender Agent as defined in the Loan Agreement referred to below

      Reference is hereby made to the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding RFC Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent"). Capitalized terms not otherwise defined herein are used herein as defined in the Loan Agreement.

      The Borrowers hereby notify you that pursuant to and in compliance with Section 2.09 of the Loan Agreement, it shall make a prepayment of Loans outstanding under the Loan Agreement on [●], 200[●] in the amount of $[●].

      Also included in the prepayment amount shall be accrued and unpaid interest, Breakage Costs (as determined by the Lender Agent and provided to the undersigned) and other amounts due and owing to the Lenders in the amount of $[●].

      The undersigned has caused this Prepayment Notice to be executed and delivered by its duly authorized officer this [●]day of [●], 200[●].

Residential Funding Company, LLC

By: _____
     Name:
     Title:

GMAC Mortgage, LLC

By:_____
     Name:
     Title:

5254280.33 08048307

EXHIBIT 7.01

FORM OF COMPLIANCE CERTIFICATE

GMAC Inc.,
   as Lender Agent
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Fax: 704-540-6549

Re:    _____ Reporting Date

      Reference is made to the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent"). Terms defined in the Loan Agreement and not otherwise defined herein are used herein as defined in the Loan Agreement.

      Pursuant to Section 7.01(f) of the Loan Agreement, ResCap is furnishing to you herewith (or has most recently furnished to you) the financial statements of ResCap for the fiscal period ended as of the reporting date shown above (the "Reporting Date"). Such financial statements have been prepared in accordance with generally accepted accounting principles and present fairly, in all material respects, the financial position of ResCap covered thereby at the date thereof and the results of its operations for the period covered thereby, subject in the case of interim statements only to normal year-end audit adjustments and the addition of footnotes.

      The undersigned Responsible Officer of ResCap has caused the provisions of the Loan Agreement to be reviewed and certifies to the Lenders that: (a) as of the Reporting Date, (i) the aggregate amount of Consolidated Liquidity was $[_____], (ii) the aggregate amount of unrestricted and unencumbered Consolidated Liquidity was $[_____], and (iii) the Consolidated Tangible Net Worth of ResCap was $[_____], (b) the undersigned has no knowledge of any Default or Event of Default, (c) attached hereto are the computations necessary to determine that ResCap is in compliance with the provisions of the Loan Agreement as of the Reporting Date referenced thereon, and (d) to the best of the undersigned's knowledge no event has occurred since the date of the most recent financial statements upon which such covenant compliance was calculated that would cause ResCap to no longer be in compliance with said provisions.

5254280.33 08048307

Confidential

The statements made herein (and in the Schedule attached hereto) shall be deemed to be representations and warranties made in a document for the purposes of <u>Section 6.01(j)</u> of the Loan Agreement.

IN WITNESS WHEREOF, the undersigned Responsible Officer of ResCap has set [his/her] hand this [●], 200[●].

Residential Capital, LLC

By: _____

    Name:

    Title:

Confidential

EXHIBIT 7.01(s)

FORM OF JOINDER

[Date]

GMAC Inc.
3420 Toringdon Way Floor 4
Charlotte, NC 28277
Attn: Jeffrey Brown, Corporate Treasurer
Fax: 704-540-6549

Ladies and Gentlemen:

Reference is made to the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the "Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent"); and to the First Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of June 4, 2008 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Security Agreement"), by and among the Lenders, Wells Fargo Bank, N.A., as First Priority Collateral Agent, the Borrowers and the Guarantors.  Terms defined in the Loan Agreement and not otherwise defined herein are used herein as defined in the Loan Agreement in.

The undersigned, [name of new Guarantor], a [jurisdiction of incorporation] corporation (the "New Guarantor"), and the Borrowers hereby elect that the New Guarantor shall be a Guarantor for purposes of the Loan Agreement and the Security Agreement, effective from the date hereof [until a Consent to Terminate shall have been delivered by the Lender Agent in respect of the New Guarantor in accordance with the Loan Agreement].  The Borrowers and the New Guarantor confirm that the representations and warranties set forth in Article VI of the Credit Agreement and Section 6 of the Security Agreement are true and correct in all material respects as to the New Guarantor as of the date hereof as though such representations and warranties had been made on and as of the date hereof unless stated to relate to a specific earlier date in which case such representations and warranties specifically relating to an earlier date shall be true and correct in all material respects as of such earlier date, and the New Guarantor agrees to perform all the obligations of a Guarantor under, and to be bound in all respects by the terms of, the Loan Agreement, the Security Agreement, the Hedge Security Agreement and the Intercreditor Agreement as if the New Guarantor were a signatory party thereto.  The New Guarantor acknowledges receipt of copies of the Loan Agreement, the Security Agreement, the Hedge Security Agreement and the Intercreditor Agreement.

Confidential

The New Guarantor acknowledges that all notices to it under the Loan Agreement or the Security Agreement are to be given to it in care of the Borrowers as provided in the Loan Agreement.  This instrument shall be construed in accordance with and governed by the laws of the State of New York.

Very truly yours,

[NAME OF GUARANTOR]


By: _____
    Name:
    Title:


Residential Funding Company, LLC


By: _____
    Name:
    Title:


GMAC Mortgage, LLC


By: _____
    Name:
    Title:

Confidential

Receipt of the above Joinder is acknowledged on and as of the date set forth above.

GMAC Inc.,
as Lender Agent,

By:_____
    Name:
    Title:

Confidential

EXHIBIT 9.01

FORM OF ASSIGNMENT AND ACCEPTANCE

ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment Agreement") dated as of [_____], between [_____] ("Assignor") and [_____] ("Assignee"). All capitalized terms used herein and not otherwise defined herein shall have the respective meanings provided to such terms in the Schedule 1.01 to the Loan Agreement (as defined below).

WHEREAS, Assignor is a party to a Amended and Restated Loan Agreement, dated as of December 30, 2009 (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage" and together with RFC, the "Borrowers"), GMAC Inc. (the "Initial Lender"), Residential Capital, LLC and the other Affiliates of the Borrowers party thereto as Guarantors (each, a "Guarantor"), the Principal institutions and other Persons that are or may from time to time become parties thereto as Lenders (together with the Initial Lender and their respective successor and assigns, each a "Lender" and collectively, the Lenders") and GMAC Inc., as agent for the Lenders (in such capacity together with its successors and assigns in such capacity, the "Lender Agent");

WHEREAS, the aggregate Commitments of the Lenders and the aggregate principal amount of outstanding Loans pursuant to the Loan Agreement as at the date hereof are set forth in Item 6(a) of Annex I hereto; and

WHEREAS, the Assignee proposes to assume all of the rights and obligations of the Assignor under the Loan Agreement and the other Facility Documents in respect of the portion of the Assignor's Commitment and outstanding Loans under the Loan Agreement as set forth in Item 6(c) of Annex I (the "Assignee's Share");

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

1.     Assignment.  Effective on the Assignment Effective Date (as defined below), Assignor hereby assigns to Assignee, without recourse and without representation or warranty (other than as expressly provided herein), that Dollar amount listed in Item 6(c) of Annex I hereto as the Assignee's Share of all of the Assignor's rights, title and interest arising under the Loan Agreement and the other Facility Documents in respect of the Assignor's Commitment including, without limitation (but subject to Section 5) all rights with respect to Assignee's Share of such outstanding Loans.

2.     Assumption.  Effective on the Assignment Effective Date, Assignee hereby assumes from Assignor all of Assignor's obligations arising under the Loan Agreement relating to Assignee's Share.  Effective on the Assignment Effective Date, Assignor shall be released from all of its obligations under the Loan Agreement relating to Assignee's Share pursuant to Article IX the terms of the Loan Agreement, but subject to Section 13.11 thereof.

5254280.33 08048307

3.     <u>Assignments; Participation</u>. On and after the Assignment Effective Date, the Assignee may assign all or any part of the rights granted to it as an Assignee hereunder in accordance with the applicable provisions of <u>Section 9.01</u> of the Loan Agreement. On and after the Assignment Effective Date, the Assignee may sell or grant participations in all or any part of the rights granted to it as an Assignee hereunder in accordance with the applicable provisions of <u>Section 9.04</u> of the Loan Agreement.

4.     <u>Payment of Interest to Assignee</u>. (a) Interest is payable by the Borrowers in respect to the Assignee's Share of the Loans at the applicable rates set forth in <u>Section 2.05</u> of the Loan Agreement. Notwithstanding anything to the contrary contained above, all payments with respect to the Assignee's Share made or accrued to, but excluding, the Assignment Effective Date shall be for the account of the Assignor.

(b)     Notwithstanding anything to the contrary contained in this Assignment Agreement, if and when the Assignor receives or collects any payment of interest on any Loan attributable to the Assignee's Share or any payment of commitment fee attributable to the Assignee's Share which, in any such case, is required to be paid to the Assignee as described in <u>Section 4(a)</u> above, the Assignor shall distribute to the Assignee such payment but only to the extent such interest or commitment fee accrued on or after the Assignment Effective Date.

(c)     Notwithstanding anything to the contrary contained in this Assignment Agreement, if and when the Assignee receives or collects any payment of interest on any Loan attributable to the Assignor's Share which, in any such case, is required to be paid to the Assignor as described in <u>Section 4(a)</u> above, the Assignee shall distribute to the Assignor such payment but only to the extent such interest or commitment fee accrued prior to the Assignment Effective Date.

5.     <u>Payments on Effective Date</u>. In consideration of the assignment by the Assignor to the Assignee of the Assignee's Share the Assignee agrees to pay to the Assignor on or prior to the Assignment Effective Date an amount specified by the Assignor in writing on or prior to the Assignment Effective Date which represents the Assignee's Share of the principal amount, if any, of the Loans made by the Assignor pursuant to the Loan Agreement and outstanding on the Assignment Effective Date.

6.     <u>Effectiveness</u>. The Assignment Agreement hereunder shall become effective on the date (the "<u>Assignment Effective Date</u>") on which (i) the Assignor and the Assignee shall have signed a copy hereof (whether the same or different copies) and, in the case of the Assignee, shall have delivered same to the Assignor, (ii) the Assignee shall have paid to the Assignor the amount specified in writing by the Assignor in accordance with <u>Section 5</u> hereof, (iii) the Borrowers and the Lender shall have received a copy hereof, (iv) the Lender Agent shall have received a processing and recordation fee in the amount of $3,500 (unless such fee is waived or reduced by the Lender Agent in its sole discretion), and (v) the Lender Agent shall have recorded the Assignment in accordance with <u>Section 9.01</u> of the Loan Agreement.

7.     <u>Issuance of New Promissory Notes on the Assignment Effective Date</u>. In accordance with the requirements of <u>Section 9.02</u> of the Loan Agreement, within five (5)

Confidential

Business Days of the Assignment Effective Date, a new Note will be issued by the Borrowers to the Assignor and/or the Assignee, as the case may be.  On the Assignment Effective Date, the Assignee shall be deemed a Lender for all purposes under the Loan Agreement and the other Facility Documents, and shall be subject to and shall benefit from all of the rights and obligations of a Lender under the Loan Agreement and the other Facility Documents, and the address of the Assignee for notice purposes shall be as set forth in Item 7 of Annex I hereto.

8.    Representations and Warranties.  (a) Each of Assignor and Assignee represents and warrants to the other parties as follows:

(i)    it has full power and authority, and has taken all actions necessary, to execute and deliver this Assignment Agreement and to fulfill its obligations under, and to consummate the transactions contemplated by, this Assignment Agreement,

(ii)    the making and performance by it of this Assignment Agreement and all documents required to be executed and delivered by it hereunder do not and will not violate any law or regulation of the jurisdiction of its incorporation or any other law or realization applicable to it,

(iii)    this Assignment Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding, obligation, enforceable in accordance with its terms; and

(iv)    all approvals, authorizations, or other actions by, or filings with, any governmental authority or regulatory body or any other third party necessary for the validity or enforceability of its obligations under this Assignment Agreement have been obtained.

(b)    Assignor represents and warrants to Assignee that Assignee's Share and the Loans attributable to Assignee's Share are subject to no liens or security interests created by Assignor.

9.    Expenses.  Assignor and Assignee agree that each party shall bear its own expenses in connection with the preparation and execution of this Assignment Agreement.

10.    Miscellaneous.  (a) Neither the Lender Agent nor the Assignor shall be responsible to the Assignee for the execution (by any party other than the Assignor or the Lender Agent, as the case may be), effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of any of the Loan Agreement or the other Facility Documents or for any representations, warranties, recitals or statements made therein or in any written or oral statement or in any financial or other statements, instruments, reports, certificates or any other documents made or furnished or made available by the Assignor to the Assignee or by or on behalf of the Borrowers to the Assignor or the Assignee in connection with the Loan Agreement or the other Facility Documents and the transactions contemplated thereby.  Neither the Lender Agent nor the Assignor shall be required to ascertain or inquire as to the performance or observance of any of the terms,

Confidential

conditions, provisions, covenants or agreements contained in any of the Loan Agreement or the other Facility Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default.

(b)     The Assignee represents and warrants that it (i) has made its own independent investigation, without reliance upon the Lender Agent, the Assignor or any other Purchaser Liquidity Bank, of the financial condition and affairs of the Borrowers in connection with this Assignment Agreement, the making of the Loans and the Assignment of the Assignee's Share of the Assignor's Commitment and of the Loans to the Assignee hereunder and (ii) has made and shall continue to make its own appraisal of the creditworthiness of the Borrowers.  Neither the Lender Agent nor the Assignor shall have any duty or responsibility either initially or on a continuing basis to make any such investigation or any such appraisal on behalf of the Assignee or to provide the Assignee with any credit or other information with respect thereto whether coming into its possession before the making of any Loan or at any time or times thereafter and shall further have no responsibility with respect to the accuracy of, or the completeness of, any information provided to the Assignee, whether by the transferor or by or on behalf of any other person.

(c)     <u>GOVERNING LAW</u>.  THIS ASSIGNMENT AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE SUBSTANTIVE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THEREOF OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(d)     <u>WAIVER OF JURY TRIAL</u>.  THE PARTIES TO THIS ASSIGNMENT AGREEMENT KNOWINGLY, VOLUNTARILY AND EXPRESSLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ENFORCING OR DEFENDING ANY RIGHTS ARISING OUT OF OR RELATING TO THIS ASSIGNMENT AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE PARTIES HERETO ACKNOWLEDGE THAT THE PROVISIONS OF THIS SECTION 10(d) HAVE BEEN BARGAINED FOR AND THAT EACH SUCH PARTY HAS BEEN REPRESENTED BY COUNSEL IN CONNECTION HEREWITH.

(e)     (i)     <u>Submission to Jurisdiction</u>.  With respect to any claim or action arising hereunder, the parties (a) irrevocably submit to the nonexclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in The City of New York, New York, and appellate courts from any thereof, and (b) irrevocably waive any objection which such party may have at any time to the laying of venue of any suit, action or proceeding arising out of or relating to this Assignment Agreement brought in any such court, and irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

[(ii)     (A)  The Assignor hereby irrevocably designates, appoints and empowers [_____] with offices at [_____] and (B) the Assignee hereby irrevocably designates, appoints and empowers [_____] with offices at [_____], as its respective designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and its properties, assets and revenues, service for any and all legal process, summons, notices and documents which may be served in

Confidential

any such action, suit or proceeding brought in the courts listed in Section 10(e)(i) hereof which may be made on such designee, appointee and agent in accordance with legal procedures prescribed for such courts.]

(f)    Amendments.  This Assignment Agreement may be supplemented, modified or amended by written instrument signed on behalf of both parties thereto.

(g)    Facsimile and Counterparts.  This Assignment Agreement may be executed by facsimile in any number of counterparts and by different parties thereto on separate counterparts, each of which counterparts, when executed and delivered, shall be deemed an original and all of which counterparts, taken together, shall constitute one and the same agreement.

(h)    Assignment.  The Assignor may at any time or from time to time grant to others assignments or participations in its Commitment or Loans but not in the portions thereof sold as an assignment to the Assignee pursuant to this Assignment Agreement.

(i)    Payments.  All payments hereunder or in connection herewith shall be made in Dollars and in immediately available funds, if payable to the Assignor, to the account of the Assignor at its offices as designated in Item 8 of Annex I hereto, and, if payable to the Assignee, to the account of the Assignee, as designated in Item 8 of Annex I hereto.

(j)    Binding Effect.  This Assignment Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Neither of the parties hereto may assign or transfer any of its rights or obligations under this Assignment Agreement without the prior consent of the other party.  The preceding sentence shall not limit the right of the Assignee to assign all or part of the Assignee's Share of the Assignor's Commitment and outstanding Loans, if assigned under this Assignment Agreement in the manner contemplated by the Loan Agreement and Section 3 hereof.

(k)    Survival.  All representations and warranties made herein and indemnities provided for herein shall survive the consummation of the transactions contemplated hereby.

(l)    Severability.  Any provision of this Assignment Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability, without invalidating the remaining provisions hereof or affecting the validity or enforceability, of such provision in any other jurisdiction.

(m)    Headings.  The headings contained in this Assignment Agreement are for convenience of reference only and shall not affect the construction or interpretation of any provision of this Assignment Agreement.

(n)    Successors.  This Assignment Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(o)    Cumulative Rights, No Waiver.  The rights, powers and remedies of the each party under this Assignment Agreement are cumulative and in addition to all rights, powers and remedies provided under any and all agreements between the parties relating thereto, at law, in equity or otherwise.  Neither any delay nor any omission by the parties to exercise any right,

Ex. 9.01-5

Confidential

power or remedy shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or any exercise of any other right, power or remedy.

(p)    <u>No Payments</u>.  The Assignee hereby acknowledges and agrees that, at any time that the Loans are outstanding and no Event of Default has occurred and is continuing, (i) the Borrowers shall not make any payment to the Assignee, (ii) the Borrowers shall have no duty, liability or obligation to make any such payment to the Assignee, (iii) no such payment shall be due from the Borrowers and (iv) the Assignee shall not have any right to enforce any claim against the Borrowers in respect of any payment, in each case (w) except for those costs to be reimbursed by the Borrowers to the Lenders pursuant to <u>Section 2.07(b)</u> of the Loan Agreement; (w) unless and to the extent that the Lender Agent has provided written notice to the Borrowers of a Borrowing Base Deficiency pursuant to <u>Section 2.08</u> of the Loan Agreement; (x) unless and to the extent that the Borrowers have delivered a Prepayment Notice pursuant to <u>Section 2.09</u> of the Loan Agreement; or (z) the Loan Repayment Date has occurred.

(q)    <u>Limited Recourse</u>.  No recourse under or with respect to any obligation, covenant or agreement (including, without limitation, any obligation or agreement to pay fees or any other amount) of the Borrowers contained in this Assignment Agreement or any other agreement, instrument or document entered into by it pursuant hereto or in connection herewith shall be had against any affiliate, stockholder, officer, member, manager, partner, employee or director of the Borrowers, by the enforcement of any assessment, by any legal or equitable proceeding, by virtue of any statute or otherwise; it being expressly agreed and understood that the agreements of the Borrowers contained in this Assignment Agreement and all of the other agreements, instruments and documents entered into by it pursuant hereto or in connection herewith are, in each case, solely the obligations of the Borrowers, and that no personal liability whatsoever shall attach to or be incurred by any stockholder, affiliate, officer, member, manager, partner, employee or director of the Borrowers, or any of them, under or by reason of any of the obligations, covenants or agreements of the Borrowers contained in this Assignment Agreement or in any other such instrument, document or agreement, or which are implied therefrom, and that any and all personal liability of the Borrowers and every such stockholder, affiliate, officer, employee, member, manager, partner or director of the Borrowers for breaches by the Borrowers of any such obligations, covenants or agreements, which liability may arise either at common law or at equity, by statute or constitution, or otherwise, is hereby expressly waived as a condition of and in consideration for the execution of this Assignment Agreement.  Unpaid amounts hereunder shall not constitute a "claim" for purposes of Section 101(5) of the U.S. Bankruptcy Code or similar law affecting creditors' rights.  The provisions of this <u>Section 10(q)</u> shall survive the termination of this Assignment Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Confidential

IN WITNESS WHEREOF, the parties hereto have executed this Assignment Agreement as of the date first above written.

_____
as Assignor

By:_____
    Name:
    Title:

_____
as Assignee

By: _____
    Name:
    Title:

We hereby consent to the foregoing assignment and acknowledge receipt of notice thereof.

GMAC Inc.
as Lender Agent

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

[Assignment and Assumption Agreement Signature Page]

Confidential

ANNEX I
to
Assignment and Assumption Agreement

1.    Borrowers:    Residential Funding Company, LLC

GMAC Mortgage, LLC

2.    Date of Loan Agreement: December 30, 2009

3.    Assignor:

4.    Assignee:

5.    Date of Assignment and Assumption Agreement:

6.

(a)    Aggregate Amount for all Lenders: U.S.$

(b)    Assignee's Assigned Percentage of Aggregate: U.S.$

(c)    Assignee's Share: U.S.$

(d)    Assignor's Retained
Percentage of Aggregate: U.S.$

(e)    Assignor's Share: U.S.$

7.    Notice Instructions for Assignee:

Attention:
Address:
Telephone:
Fax:
Additional Contacts:

8.    Payment Instructions:

(a)    Assignor:

Administrative Contact:
Address:
Telephone:
Fax:
Payment Information:

Confidential

Bank Name:
Account Name:
Account Number:
Reference:

(b)  Assignee:

Administrative Contact:
Address:
Telephone:
Fax:
Payment Information:

Bank Name:
Account Name:
Account Number:
Reference:

Accepted and Agreed:

     as Assignee                                    as Assignor

By:_____     By:_____
Name:_____     Name:_____
Title:   as Assignor                     Title:   as Assignor

Confidential

Exhibit 9.02

**FORM OF RELEASE DOCUMENTS**

**REQUEST FOR COLLATERAL RELEASE**

(_____)

[date]

This Request for Collateral Release is being made on behalf of [Name of Borrower] (the "Debtor") pursuant to Section 12.11(b) of the Amended and Restated Loan Agreement, (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), dated December 30, 2009, by and among Residential Funding Company, LLC and GMAC Mortgage, LLC, as borrowers; Residential Capital, LLC ("ResCap"), GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, as guarantors, certain other of their affiliates party thereto, as obligors, Wells Fargo Bank, N.A. as first priority collateral agent (the "First Priority Collateral Agent"), and GMAC Inc., as initial lender and as lender agent (the "Lender Agent"). All capitalized terms used and not otherwise defined herein shall have the respective meanings provided to such terms in the Schedule 1.01 to the Loan Agreement.

The Debtor hereby notifies the Lender Agent that in connection with certain transactions (collectively, the "Transactions" ) contemplated by [_____], by and among [_____], the Debtor intends to sell the Released Collateral (as defined below) to [_____].

The Debtor hereby represents and warrants to the Lender Agent [that it will receive Fair Value in the form of Permitted Consideration for the Released Collateral in connection with the Transactions,] that any other conditions precedent to the Transactions required pursuant to the Facility Documents have been satisfied and that the Transactions otherwise comply with the terms of the Facility Documents.

So as to consummate the Transactions, the Debtor hereby requests that the Lender Agent execute and deliver to the First Priority Collateral Agent the Consent and Direction to Release Collateral (the "Direction") attached hereto as Annex A, pursuant to which the Lender Agent shall:

1. authorize the First Priority Collateral Agent to release and terminate all of its liens and security interests and all of its right, title and interest in and to the assets of [___] described on Exhibit A to the Direction (the "Released Collateral") and evidenced by the UCC Financing Statement(s) attached as Exhibit B to the Direction and (b) direct ResCap to file UCC-3 Financing Statement(s) attached as Exhibit C to the Direction; provided that ResCap shall return file stamped copies of such UCC-3 Financing Statement(s) to the Lender Agent within ten (10) Business Days of filing;

2. authorize the First Priority Collateral Agent to execute and deliver the Partial Release of Collateral attached as Exhibit D to the Direction; and

5254280.33 08048307

3. authorize and direct the First Priority Collateral Agent to take all actions which are requested in writing and are reasonable or appropriate to effectuate the release of the liens on the Released Collateral.

Confidential

In witness whereof, the undersigned has executed this Request for Collateral Release as of the date first written above.

[_____]

By:_____

Name:

Title:

Confidential

**ANNEX A**
**CONSENT AND DIRECTION TO RELEASE COLLATERAL**

Confidential

## CONSENT AND DIRECTION TO RELEASE COLLATERAL

(_____)

[date]

We hereby reference the Request for Collateral Release dated [_____] (the "Request for Collateral Release") submitted by [_____] (the "Debtor") pursuant to Section 12.11(b) of the Amended and Restated Loan Agreement, dated December 30, 2009 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Residential Funding Company, LLC and GMAC Mortgage, LLC as borrowers; Residential Capital, LLC ("ResCap"), GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, as guarantors; certain other of their affiliates party thereto, as obligors, Wells Fargo Bank, N.A. as first priority collateral agent (the "First Priority Collateral Agent"), and GMAC Inc., as initial lender and as lender agent (the "Lender Agent"). All capitalized terms used and not otherwise defined herein shall have the respective meanings provided to such terms in the Schedule 1.01 to the Loan Agreement.

As requested in the Request for Collateral Release, the Lender Agent hereby consents and authorizes and directs the First Priority Collateral Agent to:

1. (a) release and terminate all of its liens and security interests and all of its right, title and interest in and to the assets of the Debtor described on Exhibit A attached hereto (the "Released Collateral") and evidenced by the UCC Financing Statement(s) attached hereto as Exhibit B and (b) direct ResCap to file UCC-3 Financing Statement(s) attached as Exhibit C hereto; provided that ResCap shall return file stamped copies of such UCC-3 Financing Statement(s) to the Lender Agent within ten (10) Business Days of filing;

2. execute and deliver the Partial Release of Collateral attached as Exhibit D hereto; and

3. take all actions which are requested in writing by the Lender Agent and are reasonable or appropriate to effectuate the release of the liens on the Released Collateral.

Ex. 9.02-5

Confidential

     In witness whereof, the undersigned has executed this Consent and Direction to Release Collateral as of the date first written above.

                 GMAC Inc., as Lender Agent

                 By:_____
                 Name:
                 Title:

Confidential

**EXHIBIT A**

**RELEASED COLLATERAL**

Confidential

**EXHIBIT B**
**FILED UCC FINANCING STATEMENTS**

Confidential

**EXHIBIT C**
**UCC-3 FINANCING STATEMENTS**

Confidential

**EXHIBIT D**
**PARTIAL RELEASE OF COLLATERAL**

Ex. 9.02-10

Confidential

## PARTIAL RELEASE OF COLLATERAL

(_____)

[date]

We hereby reference (i) the Consent and Direction to Release, dated [_____], (the "Direction") provided by GMAC Inc. (the "Lender Agent") pursuant to Section 12.11(b) of the Amended and Restated Loan Agreement, dated December 30, 2009, (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement") by and among Residential Funding Company, LLC and GMAC Mortgage, LLC, as borrowers; Residential Capital, LLC ("ResCap"), GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, as guarantors; certain other of their affiliates party thereto, as obligors, Wells Fargo Bank, N.A. as first priority collateral agent (the "First Priority Collateral Agent"), and GMAC Inc., as initial lender and as lender agent, attached hereto as Exhibit A; (ii) the Officer's Certificates each dated as of [_____], attached hereto as Exhibit B (collectively, the "Officer's Certificates"); and (iii) the Legal Opinions each dated as of [_____], attached hereto as Exhibit C (collectively, the "Legal Opinions").  All capitalized terms used and not otherwise defined herein shall have the respective meanings provided to such terms in the Schedule 1.01 to the Loan Agreement.

The First Priority Collateral Agent, as directed by the Lender Agent in the Direction, hereby releases and terminates all of its liens and security interests and all of its right, title and interest in and to the assets of [_____] described on Exhibit D attached hereto (the "Released Collateral") and evidenced by the UCC Financing Statement(s) attached in the Direction as Exhibit B.

Each of the Second Priority Collateral Agent and the Third Priority Collateral Agent, in reliance upon each of the Officer's Certificates and the Legal Opinions hereby release and terminate all of its liens and security interests and all of its right, title and interest in and to the Released Collateral and evidenced by the UCC Financing Statement(s) attached in each of the Officers Certificates as Exhibit B.

Ex. 9.02-11

Confidential

IN WITNESS WHEREOF, the undersigned has executed this Release of Collateral as of the date first set forth above.

Wells Fargo Bank, N.A.,
as First Priority Collateral Agent


By:_____
Name:
Title:



Wells Fargo Bank, N.A.,
as Second Priority Collateral Agent


By:_____
Name:
Title:



Wells Fargo Bank, N.A.,
as Third Priority Collateral Agent


By:_____
Name:
Title:

Confidential

# EXHIBIT A

## CONSENT AND DIRECTION TO RELEASE

Confidential

# EXHIBIT B

## OFFICER'S CERTIFICATES

Confidential

**EXHIBIT C**

**LEGAL OPINIONS**

Ex. 9.02-15

Confidential

**EXHIBIT D**

**RELEASED COLLATERAL**

Confidential

# EXHIBIT E

## Intercreditor Agreement

Exhibit 4.7

Execution Copy

INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT, dated as of June 6, 2008, is among Wells Fargo Bank, N.A., as First Priority Collateral Agent for the First Priority Secured Parties under the First Priority Documents referenced below (in such capacity, the "First Priority Collateral Agent"), Wells Fargo Bank, N.A., as Second Priority Collateral Agent for the Second Priority Secured Parties under the Second Priority Documents referenced below (in such capacity, the "Second Priority Collateral Agent"), and Wells Fargo Bank, N.A., as Third Priority Collateral Agent for the Third Priority Secured Parties under the Third Priority Documents referenced below (in such capacity, the "Third Priority Collateral Agent"; and together with the First Priority Collateral Agent and the Second Priority Collateral Agent, the "Collateral Agents"), and Wells Fargo Bank, N.A., as Collateral Control Agent (as defined below); GMAC LLC, in its capacity as agent for the Lenders under the Loan Agreement referred to below (in such capacity, the "Lender Agent"); U.S. Bank National Association, as Trustee under the 2010 Indenture referred to below (in its capacity as Trustee thereunder, the "2010 Trustee"); U.S. Bank National Association, as Trustee under the 2015 Indenture referred to below (in its capacity as Trustee thereunder, the "2015 Trustee"); any Additional Third Priority Representative (as defined below); Residential Funding Company, LLC, a Delaware limited liability company ("RFC"), and GMAC Mortgage, LLC, a Delaware limited liability company ("GMAC Mortgage", and together with RFC, each a "Borrower" and together the "Borrowers"); Residential Capital, LLC, a Delaware limited liability company ("ResCap"); and the other undersigned Obligors.

W I T N E S S E T H :

WHEREAS, the Borrowers, the Person or Persons from time to time parties thereto as lenders (the "Lenders"), the Lender Agent, and ResCap and the other "Guarantors" specified therein are entering into a Loan Agreement, dated as of June 4, 2008 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Loan Agreement");

WHEREAS, the Obligors (as hereinafter defined) will grant to the First Priority Collateral Agent, for the benefit of the First Priority Secured Parties, security interests in the Collateral (as hereinafter defined) as security for payment and performance of the First Priority Claims (as hereinafter defined);

WHEREAS, ResCap and the 2010 Trustee have entered into an Indenture, dated as of June 6, 2008 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "2010 Indenture"), governing the rights and duties of ResCap under its 8.50% Senior Secured Guaranteed Notes due 2010 (together with any additional notes issued under the 2010 Indenture, the "2010 Notes");

WHEREAS, the Obligors will grant to the Second Priority Collateral Agent, for the benefit of the Second Priority Secured Parties, security interests in the Collateral as security for payment and performance of the Second Priority Claims (as hereinafter defined);

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

WHEREAS, ResCap and the 2015 Trustee have entered into an Indenture, dated as of June 6, 2008 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "2015 Indenture"), governing the rights and duties of ResCap under its 9.625% Junior Secured Guaranteed Notes due 2015 (together with any additional notes issued under the 2015 Indenture, the "2015 Notes");

WHEREAS, the Obligors may incur Indebtedness under one or more Additional Pari Passu Third Priority Agreements following the date hereof; and

WHEREAS, the Obligors will grant to the Third Priority Collateral Agent, for the benefit of the Third Priority Secured Parties, security interests in the Collateral as security for payment and performance of the Third Priority Claims (as hereinafter defined);

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, and in reliance upon the representations, warranties and covenants herein contained, the parties hereto, intending to be legally bound, hereby agree as follows:

Section 1. Definitions.

1.1 Defined Terms. As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and the plural forms of the terms indicated):

"2010 Indenture" is defined in the third recital.

"2010 Noteholder Security Agreement" means the Pledge and Security Agreement and Irrevocable Proxy, dated as of June 6, 2008, among ResCap, the Borrowers, certain of their affiliates, the Second Priority Collateral Agent and the 2010 Trustee, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

"2010 Noteholders" means the Persons holding 2010 Notes.

"2010 Notes" is defined in the third recital.

"2010 Trustee" shall include, in addition to the 2010 Trustee defined in the preamble, the then acting trustee under the 2010 Indenture and any successor thereto exercising substantially the same rights and powers.

"2015 Indenture" is defined in the fifth recital.

"2015 Noteholder Security Agreement" means the Pledge and Security Agreement and Irrevocable Proxy, dated as of June 6, 2008, among ResCap, the Borrowers, certain of their affiliates, the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative from time to time party thereto as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

-2-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

"2015 Noteholders" means the Persons holding 2015 Notes.

"2015 Notes" is defined in the fifth recital.

"2015 Trustee" shall include, in addition to the 2015 Trustee defined in the preamble, the then acting trustee under the 2015 Indenture and any successor thereto exercising substantially the same rights and powers.

"Additional Pari Passu Third Priority Agreement" means any agreement other than the 2015 Indenture and the 2015 Notes pursuant to which any Indebtedness is incurred which is secured by the Liens of the Third Priority Collateral Documents; provided that (a) such Indebtedness is permitted to be incurred under the terms of the First Priority Documents, the 2010 Indenture, the 2015 Indenture and each other Additional Pari Passu Third Priority Agreement then extant and (b) the Additional Third Priority Representative for the holders of such Indebtedness has executed a joinder agreement hereto in form reasonably satisfactory to the Collateral Agents agreeing on behalf of itself and the holders of such Indebtedness to be bound by the terms of this Agreement applicable to them as Third Priority Secured Parties.

"Additional Third Priority Representative" means, with respect to any Additional Pari Passu Third Priority Agreement, the Person appointed to act as trustee or agent for the holders of Indebtedness under such Additional Pari Passu Third Priority Agreement who has been designated as "Additional Third Priority Representative" for purposes of this Agreement by such holders.

"Agreement" means this Intercreditor Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms hereof.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. 101 et seq.).

"BofA Account Control Agreements" means (a) that certain Deposit Account Control Agreement dated as of June 6, 2008, among Residential Capital, LLC and certain of its Subsidiaries signatory thereto, the Collateral Control Agent and Bank of America, N.A.; and (b) that certain Collateral Account Control Agreement dated as of June 6, 2008, among Residential Capital, LLC and certain of its Subsidiaries signatory thereto, the Collateral Control Agent and Banc of America Securities LLC.

"Borrower" is defined in the preamble.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are required or authorized to be closed in New York, New York or Minneapolis, Minnesota.

"Collateral" means any property, real, personal or mixed, of any Obligor in which the First Priority Collateral Agent or any First Priority Secured Party, the Second Priority Collateral Agent or any Second Priority Secured Party, or the Third Priority Collateral Agent or any Third Priority Secured Party has a security interest pursuant to any First Priority Collateral Document, Second Priority Collateral Document or Third Priority Collateral Document, as the case may be; provided that the "Collateral" shall not include (and the provisions of Section 2.3, Section 4.2

-3-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

and the other provisions of this Agreement shall not apply to) any funds deposited with the 2010 Trustee, 2015 Trustee or any Additional Third Priority Representative in connection with (a) any legal or covenant defeasance of the 2010 Indenture, the 2015 Indenture or any Additional Pari Passu Third Priority Agreement pursuant to Sections 13.02 or 13.03 of the 2010 Indenture or 2015 Indenture or the corresponding sections of any Additional Pari Passu Third Priority Agreement or (b) any discharge of the 2010 Indenture, the 2015 Indenture or any Additional Pari Passu Third Priority Agreement pursuant to Article XI of the 2010 Indenture or 2015 Indenture or corresponding section or article of any Additional Pari Passu Third Priority Agreement, in each case so long as the deposit of such funds was not made in violation of the Loan Agreement (or, in the case of a discharge or defeasance of the 2015 Indenture or any Additional Pari Passu Third Priority Agreement, the 2010 Indenture).

"Collateral Agents" is defined in the introductory paragraph hereto.

"Collateral Control Agent" is defined in Section 5.5.

"Collateral Disposition" shall have the meaning given such term in the Loan Agreement as in effect on the date hereof or as amended or otherwise modified from time to time to the extent permitted by the 2010 Indenture and 2015 Indenture.

"Collateral Documents" means the First Priority Collateral Documents, the Second Priority Collateral Documents and the Third Priority Collateral Documents (and including, for sake of clarity, this Agreement).

"Comparable Noteholder Collateral Document" means, (a) in relation to any Collateral subject to any Lien created under any First Priority Collateral Document, that Second Priority Collateral Document or Third Priority Collateral Document, as the case may be, which creates a Lien in the same Collateral, granted by the same Obligor, as applicable; and (b) in relation to any Collateral subject to any Lien created under any Second Priority Collateral Document, that Third Priority Collateral Document which creates a Lien in the same Collateral, granted by the same Obligor, as applicable.

"Conforming Plan of Reorganization" means any Plan of Reorganization whose provisions are consistent with the provisions of this Agreement.

"DIP Financing" is defined in Section 6.1.

"Discharge of First Priority Claims" means, except to the extent otherwise provided in Sections 5.6 and 6.5 or except to the extent the relevant Indebtedness described below is excluded from the definition of First Priority Claims, (a) payment in full in cash of (i) the principal of and interest (including interest accruing on or after the commencement of any Insolvency Proceeding, whether or not such interest would be allowed in such Insolvency Proceeding) and premium, if any, on all Indebtedness outstanding under the First Priority Documents and, with respect to letters of credit outstanding thereunder, if any, termination thereof or delivery of cash collateral or backstop letters of credit in respect thereof and for the full amount thereof in compliance with such First Priority Documents, in each case after or concurrently with termination of all commitments to extend credit thereunder and (ii) any other First Priority Claims that are due and payable or otherwise accrued and owing at or prior to the

-4-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

time such principal and interest are paid, in each case other than obligations that constitute Unasserted Contingent Obligations at the time such principal and interest is paid; and (b) delivery by the Lender Agent to the First Priority Collateral Agent (with copies to the Second Priority Collateral Agent, the Third Priority Collateral Agent, the Collateral Control Agent, the 2010 Trustee, the 2015 Trustee and each other Additional Third Priority Representative) of a written notice that the Discharge of First Priority Claims has occurred.

"Discharge of Second Priority Claims" means, except to the extent otherwise provided in Sections 5.6 and 6.5 or except to the extent the relevant Indebtedness described below is excluded from the definition of Second Priority Claims, (a) payment in full in cash of (i) the principal of and interest (including interest accruing on or after the commencement of any Insolvency Proceeding, whether or not such interest would be allowed in such Insolvency Proceeding) and premium, if any, on all 2010 Notes and (ii) any other Second Priority Claims that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid, in each case other than obligations that constitute Unasserted Contingent Obligations at the time such principal and interest is paid; and (b) delivery by the 2010 Trustee to the Second Priority Collateral Agent (with copies to the Third Priority Collateral Agent, the Collateral Control Agent, the 2010 Trustee, the 2015 Trustee and each other Additional Third Priority Representative) of a written notice that the Discharge of Second Priority Claims has occurred.

"Facility Documents" means the Loan Agreement (including the "Guarantees" provided for pursuant to Article XI thereof), the Security Documents (as defined in the Loan Agreement) and the other Facility Documents (as defined in the Loan Agreement), and any other related document or instrument executed or delivered pursuant to any Facility Document at any time or otherwise evidencing any Loan Agreement Obligation, as any such document or instrument may from time to time be amended, supplemented, amended and restated or otherwise modified from time to time.

"First Priority Claims" means (a) all Loan Agreement Obligations, and (b) all other Indebtedness or other obligations of the Borrowers or any other Obligor under the First Priority Documents; provided, however, that if the amount of Obligations constituting principal on outstanding Loans under the First Priority Documents is in excess of the Maximum First Priority Amount, then only that portion of such Obligations equal to the Maximum First Priority Amount shall be included in the First Priority Claims and interest and fees with respect to such Obligations shall only constitute First Priority Claims to the extent related to the principal amount of Obligations included in the First Priority Claims. First Priority Claims shall include all interest accrued or accruing (or which would, absent the commencement of an Insolvency Proceeding, accrue) after the commencement of an Insolvency Proceeding in accordance with and at the rate specified in the relevant First Priority Document whether or not the claim for such interest is allowed as a claim in such Insolvency Proceeding. For the avoidance of any doubt, First Priority Claims shall include the fees, expenses, disbursements and indemnities of the First Priority Collateral Agent. To the extent any payment with respect to the First Priority Claims (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off or otherwise) is declared to be fraudulent or preferential in any respect, set aside or required to be paid to a debtor in possession, trustee, receiver or similar Person, then the obligation or part thereof

-5-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred. Notwithstanding the foregoing the Notes and related Obligations will not constitute First Priority Claims even if any proceeds of the Notes are used to repay Obligations under the Loan Agreement. Notwithstanding anything to the contrary contained in this definition, any Obligation under a First Priority Document shall constitute a "First Priority Claim" if the Lender Agent or the relevant First Priority Secured Party or First Priority Secured Parties under such First Priority Document shall have received a written representation from each Borrower in or in connection with such First Priority Document that such Obligation constitutes a "First Priority Claim" under and as defined in the 2010 Indenture or 2015 Indenture (whether or not such Obligation is at any time determined not to have been permitted to be incurred under the Indenture).

"First Priority Collateral Agent" shall include, in addition to the First Priority Collateral Agent defined in the preamble, any successor thereto appointed by the requisite First Priority Secured Parties exercising substantially the same rights and powers.

"First Priority Collateral Documents" mean collectively, the First Priority Security Agreement and any other agreement, document or instrument pursuant to which a Lien is granted to secure (or perfect, preserve or maintain the security of) any First Priority Claim or under which rights or remedies with respect to such Liens are governed.

"First Priority Documents" means the Loan Agreement (including the "Guarantees" provided for pursuant to Article XI thereof), the First Priority Collateral Documents, the other Facility Documents, and each of the other agreements, documents and instruments providing for or evidencing any Loan Agreement Obligation, and any other related document or instrument executed or delivered pursuant to any of the foregoing at any time or otherwise evidencing any Obligation thereunder.

"First Priority Liens" means all Liens that secure the First Priority Claims.

"First Priority Secured Parties" means the "Lender Parties" as defined in the Loan Agreement; provided that the Collateral Control Agent shall cease to be a First Priority Secured Party upon the Discharge of First Priority Claims.

"First Priority Security Agreement" means the Pledge and Security Agreement and Irrevocable Proxy, dated as of June 4, 2008, among ResCap, the Borrowers, certain of their affiliates and the First Priority Collateral Agent, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

"Indebtedness" has the meaning assigned thereto in the 2010 Indenture as in effect on the date hereof.

"Indenture" means, as the context may require, either the 2010 Indenture or the 2015 Indenture.

"Insolvency Proceeding" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Obligor as a debtor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership,

-6-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

liquidation, reorganization or other similar case or proceeding with respect to any Obligor as a debtor or with respect to any substantial part of their respective assets, (c) any liquidation, dissolution, reorganization or winding up of any Obligor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any assignment for the benefit of creditors or any other marshaling of assets and liabilities of any Obligor.

"Lenders" is defined in the first recital; provided that if there is only one Lender under the Loan Agreement, then reference to the Lenders hereunder shall be deemed to refer to that Lender.

"Lender Agent" means, in addition to the Lender Agent defined in the preamble, the then acting agent for the Lenders under the Loan Agreement and any successor thereto exercising substantially the same rights and powers.

"Lien" means, when used with respect to any Person, any interest in any property, asset or other right owned or being purchased or acquired by such Person which secures payment or performance of any obligation, and shall include any mortgage, lien, encumbrance, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"Loan Agreement" is defined in the first recital; provided that the term "Loan Agreement" shall (a) also include any renewal, extension, refunding, restructuring, replacement or refinancing thereof (whether with the original lenders or with an administrative agent or agents or other lenders, whether provided under the original Loan Agreement or any other credit or other agreement or indenture and whether entered into concurrently with or subsequent to the termination of the prior Loan Agreement), and (b) exclude the Notes and the Second Priority Documents and Third Priority Documents.

"Loan Agreement Obligations" means all "Obligations" as defined in the Loan Agreement.

"Maximum First Priority Amount" means $3,500,000,000 less (a) the aggregate principal amount of Indebtedness under the Loan Agreement permanently repaid with the Net Cash Proceeds from any Collateral Disposition and (b) any amount of principal on the loans made or reimbursement obligations in respect of drawings under letters of credit issued under the Loan Agreement repaid by virtue of any exercise of remedies by the First Priority Collateral Agent or the Lender Agent under the First Priority Collateral Documents or pursuant to Section 4.1. For sake of clarity, it is understood that a repayment or prepayment of the Indebtedness under the Loan Agreement does not constitute a permanent repayment of thereof except to the extent that there is a related reduction in the "Commitment Amount" of the Lenders pursuant to Section 2.10(c) of the Loan Agreement as a result of such repayment or prepayment.

"Maximum Second Priority Amount" means $2,150.0 million (less the principal amount of any 2010 Notes issued following the date hereof, to the extent the issuance of such 2010 Notes violated the terms of (x) the 2015 Indenture as in effect on the date hereof or (y) the Loan Agreement as in effect at the time of such issuance) less any principal amount of prepayment, repayment or defeasance of the 2010 Notes (including, without limitation, any amount of

-7-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

principal on the 2010 Notes repaid by virtue of any exercise of remedies by the Second Priority Collateral Agent or 2010 Trustee under the Second Priority Collateral Documents or pursuant to Section 4.1).

"Net Cash Proceeds" shall have the meaning given such term in the Loan Agreement as in effect on the date hereof or as amended or otherwise modified from time to time to the extent permitted by the 2010 Indenture and 2015 Indenture.

"Non-Conforming Plan of Reorganization" any Plan of Reorganization whose provisions are inconsistent with or in contravention of the provisions of this Agreement, including any plan of reorganization that purports to re-order (whether by subordination, invalidation, or otherwise) or otherwise disregard, in whole or part, the provisions of Section 2 (including the Lien priorities of Section 2.1), the provisions of Section 4 or the provisions of Section 6.

"Noteholders" means, collectively, the 2010 Noteholders, the 2015 Noteholders and the holders of Indebtedness under any Additional Pari Passu Third Priority Agreement; and "Noteholder" means any of them.

"Notes" means, collectively, the 2010 Notes and the 2015 Notes; and "Note" means any of them.

"Obligations" means any and all obligations with respect to the payment of (a) any principal of or interest (including interest accruing on or after the commencement of any Insolvency Proceeding, whether or not a claim for post-filing interest is allowed in such proceeding) or premium on any Indebtedness, including any reimbursement obligation in respect of any letter of credit, (b) any fees, indemnification obligations, damages, expense reimbursement obligations (including, without limitation, reasonable attorneys' fees and expenses) or other liabilities payable under the documentation governing any Indebtedness and (c) any obligation to post cash collateral in respect of letters of credit and any other obligations.

"Obligors" means ResCap, the Borrowers and each of their Subsidiaries that is obligated under any First Priority Document, Second Priority Document or Third Priority Document.

"Person" means any natural person, corporation, partnership, limited liability company, trust, association, governmental authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity.

"Plan of Reorganization" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any Insolvency Proceeding.

"Recovery" is defined in Section 6.5.

"Relevant Directing Party" means the following Person(s) who are entitled to instruct or direct the Collateral Control Agent: (a) (i) until the Discharge of First Priority Claims has occurred, the Lender Agent, (ii) following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, the 2010 Trustee, and (iii) thereafter, the 2015 Trustee or any Additional Third Priority Representative acting at the written direction of

-8-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

the holders of a majority of the aggregate principal amount of the Third Priority Claims; and (b) solely with respect to a release of Collateral pursuant to Section 12.11(b) of the Loan Agreement, an Obligor that delivers a Collateral Release Certificate in accordance with such Section.

"ResCap" is defined in the preamble.

"Second Priority Claims" means all Indebtedness, Obligations and other liabilities (contingent or otherwise) arising under or with respect to the Second Priority Documents or any of them; provided, however, that if the amount of Obligations constituting principal outstanding under the Second Priority Documents is in excess of the Maximum Second Priority Amount, then only that portion of such Obligations equal to the Maximum Second Priority Amount shall be included in the Second Priority Claims and interest and fees with respect to such Obligations shall only constitute Second Priority Claims to the extent related to the principal amount of Obligations included in the Second Priority Claims. Second Priority Claims shall include all interest accrued or accruing (or which would, absent the commencement of an Insolvency Proceeding, accrue) after the commencement of an Insolvency Proceeding in accordance with and at the rate specified in the relevant Second Priority Document whether or not the claim for such interest is allowed as a claim in such Insolvency Proceeding. For the avoidance of any doubt, Second Priority Claims shall include the fees, expenses, disbursements and indemnities of the Second Priority Collateral Agent and, following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, the Collateral Control Agent. To the extent any payment with respect to the Second Priority Claims (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off or otherwise) is declared to be fraudulent or preferential in any respect, set aside or required to be paid to a debtor in possession, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred.

"Second Priority Collateral Agent" shall include, in addition to the Second Priority Collateral Agent defined in the preamble, any successor thereto appointed by the requisite Second Priority Secured Parties exercising substantially the same rights and powers.

"Second Priority Collateral Documents" means, collectively, the 2010 Noteholder Security Agreement and any document or instrument executed and delivered pursuant to any Second Priority Document at any time or otherwise pursuant to which a Lien is granted by an Obligor to secure (or perfect, preserve or maintain the security of) the Second Priority Claims or under which rights or remedies with respect to any such Lien are governed, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

"Second Priority Documents" means, collectively, the 2010 Indenture, the 2010 Notes, the Second Priority Collateral Documents and any other related document or instrument executed and delivered pursuant to any of the foregoing at any time or otherwise evidencing any Obligation thereunder, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

"Second Priority Liens" means all Liens that secure the Second Priority Claims.

-9-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

"<u>Second Priority Secured Parties</u>" means the Persons holding Second Priority Claims, including the Second Priority Collateral Agent, the 2010 Trustee and the 2010 Noteholders and, as appropriate, the Collateral Control Agent.

"<u>Secured Parties</u>" means collectively, the First Priority Secured Parties, the Second Priority Secured Parties and the Third Priority Secured Parties.

"<u>Subsidiary</u>" means, with respect to any Person, a corporation, partnership, limited liability company or other entity of which such Person and/or its other Subsidiaries own, directly or indirectly, such number of outstanding shares or other ownership interests as have more than 50% of the ordinary voting power for the election of directors or other managers of such corporation, partnership, limited liability company or other entity.

"<u>Third Priority Claims</u>" means all Indebtedness, Obligations and other liabilities (contingent or otherwise) arising under or with respect to the Third Priority Documents or any of them. For the avoidance of any doubt, Third Priority Claims shall include the fees, expenses, disbursements and indemnities of the Third Priority Collateral Agent and, following the Discharge of First Priority Claims and the Discharge of Second Priority Claims, the Collateral Control Agent.

"<u>Third Priority Collateral Agent</u>" shall include, in addition to the Third Priority Collateral Agent defined in the <u>preamble</u>, any successor thereto appointed by the requisite Third Priority Secured Parties exercising substantially the same rights and powers.

"<u>Third Priority Collateral Documents</u>" means, collectively, the 2015 Noteholder Security Agreement and any document or instrument executed and delivered pursuant to any Third Priority Document at any time or otherwise pursuant to which a Lien is granted by an Obligor to secure (or perfect, preserve or maintain the security of) the Third Priority Claims or under which rights or remedies with respect to any such Lien are governed, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Third Priority Documents</u>" means, collectively, the 2015 Indenture, the 2015 Notes, each Additional Pari Passu Third Priority Agreement, the Third Priority Collateral Documents and any other related document or instrument executed and delivered pursuant to any of the foregoing at any time or otherwise evidencing any Obligation thereunder, as the same may be amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Third Priority Liens</u>" means all Liens that secure the Third Priority Claims.

"<u>Third Priority Secured Parties</u>" means the Persons holding Third Priority Claims, including the Third Priority Collateral Agent, the 2015 Trustee, the 2015 Noteholders, each Additional Third Priority Representative and the holders of Indebtedness under any Additional Pari Passu Third Priority Agreement and, following the Discharge of First Priority Claims and the Discharge of Second Priority Claims, the Collateral Control Agent.

"<u>Trustee</u>" means either the 2010 Trustee or the 2015 Trustee, as the case may be.

-10-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

"Unasserted Contingent Obligations" shall mean, at any time, Obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities (except for (a) the principal of and interest and premium (if any) on, and fees relating to, any Indebtedness and (b) contingent reimbursement obligations in respect of amounts that may be drawn under letters of credit) in respect of which no claim or demand for payment has been made (or, in the case of Obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"Use of Cash Collateral" is defined in Section 6.1.

"Wachovia Account Control Agreements" means those certain Deposit Account Control Agreements each dated on or near June 6, 2008, among the Collateral Control Agent, Wachovia Bank, National Association, and each of RFC, GMAC Mortgage, ResCap, Homecomings Financial, LLC, Residential Mortgage Real Estate Holdings, LLC, Residential Funding Real Estate Holdings LLC, Homecomings Financial Real Estate Holdings, LLC, Passive Asset Transactions, LLC, RFC Asset Holdings II, LLC, Developer of Hidden Springs, LLC, Equity Investments I, LLC, DOA Holding Properties, LLC, and GMAC Model Home Finance, LLC.

1.2 Terms Generally. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, document or other writing herein shall be construed as referring to such agreement, document or other writing as from time to time amended, supplemented or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns to the extent that such successors and assigns are permitted pursuant to the applicable agreement, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and general intangibles, (f) terms defined in the UCC but not otherwise defined herein shall have the same meanings herein as are assigned thereto in the UCC, (g) reference to any law means such law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretation promulgated thereunder and (h) underscored references to Sections or clauses shall refer to those portions of this Agreement, and any underscored references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs.

-11-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Section 2. <u>Lien Priorities</u>.

2.1 <u>Relative Priorities</u>.

(a) Irrespective of the date, time, method, manner or order of grant, attachment or perfection of any Lien granted to the First Priority Collateral Agent, the Second Priority Collateral Agent, the Third Priority Collateral Agent, any First Priority Secured Party, any Second Priority Secured Party, any Third Priority Secured Party or any other Person on the Collateral (including, in each case, irrespective of whether any such Lien is granted, or secures obligations relating to the period, before or after the commencement of any Insolvency Proceeding) and notwithstanding (i) any provision of the UCC or any other applicable law or the Second Priority Documents or Third Priority Documents, or any defect or deficiency in, or failure to attach or perfect any aspect or portion of any First Priority Lien, to the contrary, (ii) the fact that any First Priority Lien may have been subordinated, voided, avoided, invalidated or lapsed or (iii) any other circumstance whatsoever, each of the Second Priority Collateral Agent and the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, hereby agrees that: (A) any Lien on the Collateral securing the First Priority Claims now or hereafter held by the First Priority Secured Parties shall be senior in priority to any Lien on the Collateral securing the Second Priority Claims; and (B) any Lien on the Collateral now or hereafter securing any Second Priority Claim regardless of how or when acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in priority in all respects to all Liens on the Collateral securing the First Priority Claims. All Liens on the Collateral securing the First Priority Claims shall be and remain first in priority to all Liens on the Collateral securing the Second Priority Claims for all purposes, whether or not such First Priority Liens are subordinated to any Lien securing any other obligation of any Obligor.

(b) Irrespective of the date, time, method, manner or order of grant, attachment or perfection of any Lien granted to the First Priority Collateral Agent, the Second Priority Collateral Agent, the Third Priority Collateral Agent, any First Priority Secured Party, any Second Priority Secured Party, any Third Priority Secured Party or any other Person on the Collateral (including, in each case, irrespective of whether any such Lien is granted, or secures obligations relating to the period, before or after the commencement of any Insolvency Proceeding) and notwithstanding (i) any provision of the UCC or any other applicable law or the Third Priority Documents, or any defect or deficiency in, or failure to attach or perfect any aspect or portion of any First Priority Lien or any Second Priority Lien, to the contrary, (ii) the fact that any First Priority Lien or Second Priority Lien may have been subordinated, voided, avoided, invalidated or lapsed or (iii) any other circumstance whatsoever, each of the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby agrees that: (A) (1) any Lien on the Collateral securing the First Priority Claims now or hereafter held by the First Priority Secured Parties shall be senior in priority to any Lien on the Collateral securing the Third Priority Claims or the Second Priority Claims and (2) any Lien on the Collateral securing the Second Priority Claims now or hereafter held by the Second Priority Secured Parties shall be prior to any Lien on the Collateral securing the Third Priority Claims (but junior in priority to the First Priority Liens); and (B) (1) any Lien on the Collateral now or hereafter securing any Third Priority Claim regardless of how or when acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in priority in all respects to all Liens on

-12-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

the Collateral securing the First Priority Claims and (2) any Lien on the Collateral now or hereafter securing the Third Priority Claims regardless of how or when acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in priority in all respects to all Liens on the Collateral securing the Second Priority Claims. All Liens on the Collateral securing the First Priority Claims and the Second Priority Claims shall be and remain prior to all Liens on the Collateral securing the Third Priority Claims for all purposes, whether or not such First Priority Liens or Second Priority Liens are subordinated to any Lien securing any other obligation of any Obligor.

2.2 Prohibition on Contesting Liens. Each of the First Priority Collateral Agent, the Second Priority Collateral Agent, the Third Priority Collateral Agent, the Lender Agent, on behalf of itself and the other First Priority Secured Parties, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that it shall not (and hereby waives any right to) contest or support, directly or indirectly, any other Person in contesting, in any proceeding (including any Insolvency Proceeding), the priority, validity or enforceability of (a) the First Priority Claims or any Lien held by the First Priority Secured Parties in the Collateral securing the First Priority Claims; (b) the Second Priority Claims or any Liens by the Second Priority Secured Parties in the Collateral securing the Second Priority Claims; or (c) the Third Priority Claims or any Liens by the Third Priority Secured Parties in the Collateral securing the Third Priority Claims, as the case may be.

2.3 No New Liens.

So long as the Discharge of First Priority Claims has not occurred, the parties hereto agree that the Obligors shall not (a) grant or permit any additional Lien on any asset or property to secure any Third Priority Claim unless it has granted Liens on such asset or property to secure the First Priority Claims and the Second Priority Claims; (b) grant or permit on any Lien on any asset or property to secure any Second Priority Claim unless it has granted Liens on such asset or property to secure the First Priority Claims and the Third Priority Claims; or (c) grant or permit any additional Lien on any asset to secure any First Priority Claim unless it has granted a Lien on such asset to secure the Second Priority Claims and the Third Priority Claims. To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Priority Collateral Agent, the Lender Agent and/or the First Priority Secured Parties, (A) each of the Second Priority Collateral Agent and the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, agrees that any amount received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2 and (B) each of the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that any amount received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

2.4 Nature of First Priority Obligations. Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative on behalf of themselves and the other Third Priority Secured Parties,

-13-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

acknowledges that a portion of the First Priority Claims are revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased (subject to the limitation specified in the definition of First Priority Claims) or reduced and subsequently reborrowed without affecting the lien subordination or other provisions of this Agreement.

Section 3. <u>Enforcement</u>.

3.1 <u>Exercise of Remedies</u>.

(a) (i) (A) So long as the Discharge of First Priority Claims has not occurred, whether or not any Insolvency Proceeding has been commenced by or against any Obligor, none of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the other Second Priority Secured Parties or the other Third Priority Secured Parties will exercise or seek to exercise any rights or remedies (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Priority Collateral Agent, the Third Priority Collateral Agent, any such Second Priority Secured Party or any such Third Priority Secured Party is a party and including the exercise of any right to direct or provide direction or orders to the Collateral Control Agent or any account bank, securities intermediary or any other custodian as to the disposition of the asset or property on deposit in, carried in or otherwise credited to any deposit accounts or securities accounts), with respect to any Collateral (and hereby waive any right to), institute any action or proceeding with respect to such rights or remedies, including any action of foreclosure, or contest, protest or object to any foreclosure proceeding or action brought by the First Priority Collateral Agent, the Lender Agent or any other First Priority Secured Party, any exercise of any right under any control agreement in respect of a deposit account, securities account, security entitlement or other investment property constituting Collateral (including, without limitation, any right to direct or provide direction or orders to the Collateral Control Agent or any account bank, securities intermediary or other custodian as to the disposition of the asset or property on deposit in, carried in or otherwise credited to any deposit accounts or securities accounts), or any bailee's letter or similar agreement or arrangement to which the Second Priority Collateral Agent, the Third Priority Collateral Agent, any other Second Priority Secured Party or any other Third Priority Secured Party is a party, or any other exercise by any such party, of any rights and remedies relating to the Collateral under the Second Priority Documents or the Third Priority Documents or otherwise, or object to the forbearance by the First Priority Collateral Agent, the Lender Agent or any First Priority Secured Party from bringing or pursuing any foreclosure proceeding or action or any other exercise of any right or remedy relating to the Collateral, in each case so long as the respective interests of the Second Priority Secured Parties and the Third Priority Secured Parties, as the case may be, attach to the proceeds thereof (if any) remaining after the Discharge of First Priority Claims subject to the relative priorities described in <u>Section 2</u>, and (B) so long as the Discharge of Second Priority Claims has not occurred, whether or not any Insolvency Proceeding has been commenced by or against any Obligor, each of the Third Priority Collateral Agent and the other Third Priority Secured Parties will not exercise or seek to exercise any rights or remedies (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Third Priority Collateral Agent or any other Third Priority Secured Party is a party and including

-14-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

the exercise of any right to direct or provide direction or orders to the Collateral Control Agent or any account bank, securities intermediary or any other custodian as to the disposition of the asset or property on deposit in, carried in or otherwise credited to any deposit accounts or securities accounts) with respect to any Collateral (and hereby waive any right to), institute any action or proceeding with respect to such rights or remedies, including any action of foreclosure, or contest, protest or object to any foreclosure proceeding or action brought by the Second Priority Collateral Agent or any other Second Priority Secured Party, any exercise of any right under any control agreement in respect of a deposit account, securities account, security entitlement or other investment property constituting Collateral (including, without limitation, any right to direct or provide direction or orders to the Collateral Control Agent or any account bank, securities intermediary or any other custodian as to the disposition of the asset or property on deposit in, carried in or otherwise credited to any deposit accounts or securities accounts), or any bailee's letter or similar agreement or arrangement to which the Third Priority Collateral Agent or any other Third Priority Secured Party is a party, or any other exercise by any such party, of any rights and remedies relating to the Collateral under the Third Priority Documents or otherwise, or object to the forbearance by the Second Priority Collateral Agent or any other Second Priority Secured Party from bringing or pursuing any foreclosure proceeding or action or any other exercise of any right or remedy relating to the Collateral, in each case so long as the respective interests of the Third Priority Secured Parties attach to the proceeds thereof (if any) remaining after the Discharge of Second Priority Claims subject to the relative priorities described in Section 2; and (ii) (A) so long as the Discharge of First Priority Claims has not occurred, whether or not any Insolvency Proceeding has been commenced by or against any Obligor, the First Priority Collateral Agent, the Lender Agent and the other First Priority Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Priority Collateral Agent, the Third Priority Collateral Agent, any other Second Priority Secured Party or any other Third Priority Secured Party is a party and including the exercise of any right to direct or provide direction or orders to the Collateral Control Agent or any account bank, securities intermediary or any other custodian as to the disposition of the asset or property on deposit in, carried in or otherwise credited to any deposit accounts or securities accounts), refrain from enforcing or exercising remedies, and make determinations regarding release or disposition of the Collateral without the consent of or any consultation with the Second Priority Collateral Agent, the Third Priority Collateral Agent, any other Second Priority Secured Party or any other Third Priority Secured Party, and (B) following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Obligor, the Second Priority Collateral Agent and the other Second Priority Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Third Priority Collateral Agent or any other Third Priority Secured Party is a party and including the exercise of any right to direct or provide direction or orders to the Collateral Control Agent or any account bank, securities intermediary or any other custodian as to the disposition of the asset or property on deposit in, carried in or otherwise credited to any deposit accounts or securities accounts), refrain from enforcing or exercising remedies, and make determinations regarding release or disposition of the Collateral without the consent of or any

-15-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

consultation with the Third Priority Collateral Agent or any other Third Priority Secured Party; provided that with respect to clauses (i) and (ii) above, (1) in any Insolvency Proceeding commenced by or against any Obligor, any Second Priority Secured Party or Third Priority Secured Party may file a claim or statement of interest with respect to the Second Priority Claims or the Third Priority Claims, as the case may be, (2) the Second Priority Collateral Agent or the Third Priority Collateral Agent may take any action not adverse to the Liens on the Collateral securing the First Priority Claims or the rights of the First Priority Collateral Agent, the Lender Agent or any other First Priority Secured Party to exercise remedies in respect thereof in order to establish, preserve, or perfect its rights in the Collateral and (3) any Second Priority Secured Party or Third Priority Secured Party shall be entitled to (u) file any necessary responsive or defensive pleading in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the Second Priority Claims or the Third Priority Claims, including without limitation any claim secured by the Collateral, if any, in each case in accordance with the terms of this Agreement, (v) file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Obligors arising under the Bankruptcy Code (including exercising the right, if any, to file an involuntary petition against any Obligor), any similar law or any applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement, (w) exercise any rights and remedies as an unsecured creditor against the Borrowers or any other Obligor in accordance with the Second Priority Documents or Third Priority Documents, as the case may be, and applicable law, (x) bid (but only for cash) for or purchase (but only for cash) Collateral at any private or judicial foreclosure upon such Collateral initiated by any secured party in respect thereof, (y) file any notice of or vote any claim in any Insolvency Proceeding of any Obligor but solely in accordance with Section 6.9 of this Agreement and (z) file any proof of claim and other filings, appear and be heard on any matter in connection therewith and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Priority Claims or the Third Priority Claims, as the case may be, and the Collateral and (4) nothing herein shall be construed to limit or impair in any way the right of any Second Priority Secured Party or Third Priority Secured Party to receive any remaining Collateral and proceeds of Collateral after the Discharge of First Priority Claims has occurred (or, with respect to the Third Priority Secured Parties, after both the Discharge of First Priority Claims and the Discharge of Second Priority Claims has occurred). In exercising rights and remedies with respect to the Collateral, the First Priority Collateral Agent, the Lender Agent or the other First Priority Secured Parties may enforce the provisions of the First Priority Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion except that, following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, the Second Priority Collateral Agent, the 2010 Trustee or the other Second Priority Secured Parties may enforce the provisions of the Second Priority Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by the First Priority Collateral Agent, the Lender Agent and the other First Priority Secured Parties (or, following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, the Second Priority Collateral Agent, the 2010 Trustee or the other Second Priority Secured Parties) to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured

-16-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

party under the UCC of any applicable jurisdiction and of a secured creditor under bankruptcy or similar laws of any applicable jurisdiction.

(b) (i) Until the Discharge of First Priority Claims has occurred, each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that it will not, in connection with the exercise of any right or remedy (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Priority Collateral Agent, the Third Priority Collateral Agent or any other Second Priority Secured Party or Third Priority Secured Party is a party) with respect to any Collateral (but instead shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived until after the Discharge of First Priority Claims any right to) take or receive any Collateral or any proceeds of Collateral unless and until the Discharge of First Priority Claims has occurred.

(ii) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, each of the Third Priority Collateral Agent and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that it will not, in connection with the exercise of any right or remedy (including the exercise of any right of setoff or any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which such Third Priority Collateral Agent or any other Third Priority Secured Party is a party and including the exercise of any right to direct or provide direction or orders to the Collateral Control Agent or any account bank, securities intermediary or any other custodian as to the disposition of the asset or property on deposit in, carried in or otherwise credited to any deposit accounts or securities accounts) with respect to any Collateral (but instead shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived until after the Discharge of Second Priority Claims any right to) take or receive any Collateral or any proceeds of Collateral unless and until the Discharge of Second Priority Claims has occurred.

(iii) Without limiting the generality of the foregoing clauses (i) and (ii), (A) unless and until the Discharge of First Priority Claims has occurred, except as expressly provided in the proviso in clause (a) of Section 3.1, the sole right of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the other Second Priority Secured Parties and the other Third Priority Secured Parties as secured parties with respect to the Collateral is to hold a perfected Lien on the Collateral pursuant to the Second Priority Documents or Third Priority Documents, as the case may be, for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Priority Claims has occurred and (B) unless and until the Discharge of Second Priority Claims has occurred, except as expressly provided in the proviso in clause (a) of Section 3.1, the sole right of the Third Priority Collateral Agent and the other Third Priority Secured Parties as secured parties with respect to the Collateral is to hold a perfected Lien on the Collateral pursuant to the Third Priority Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Priority Claims and the Discharge of Second Priority Claims have both occurred.

-17-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(c) (i) Each of the Obligors agree that it will not, and will not permit any of its Subsidiaries to, in connection with the exercise of any right or remedy with respect to any Collateral by the Second Priority Collateral Agent, the Third Priority Collateral Agent or any other Second Priority Secured Party or Third Priority Secured Party, transfer, deliver or pay, as applicable, to the Second Priority Collateral Agent, the Third Priority Collateral Agent or any other Second Priority Secured Party or Third Priority Secured Party, any Collateral or any proceeds of Collateral unless and until the Discharge of First Priority Claims has occurred.

(ii) Each of the Obligors agree that it will not, and will not permit any of its Subsidiaries to, in connection with the exercise of any right or remedy with respect to any Collateral by the Third Priority Collateral Agent or any other Third Priority Secured Party, transfer, deliver or pay, as applicable, to the Third Priority Collateral Agent or any other Third Priority Secured Party, any Collateral or any proceeds of Collateral unless and until the Discharge of Second Priority Claims has occurred.

(d) (i) Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that the Second Priority Secured Parties and the Third Priority Secured Parties will not (and instead shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right to) take any action (other than as provided in Section 3.1(a)) that would hinder or cause to delay any exercise of remedies undertaken by the First Priority Collateral Agent, the Lender Agent or any other First Priority Secured Party under the First Priority Documents as secured parties in respect of any Collateral, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise.

(ii) Each of the Third Priority Collateral Agent and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that the Third Priority Secured Parties will not (and instead shall be deemed to have hereby irrevocably, absolutely and unconditionally waived any right to) take any action (other than as provided in Section 3.1(a)) that would hinder or cause to delay any exercise of remedies undertaken by the Second Priority Collateral Agent or any other Second Priority Secured Party under the Second Priority Documents as secured parties in respect of any Collateral, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise.

(iii) Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby irrevocably, absolutely and unconditionally waives any and all rights it or the Second Priority Secured Parties or the Third Priority Secured Parties may have as a junior lien creditor or otherwise (whether arising under the UCC or any other law) to object to the manner (including by judicial foreclosure, non-judicial foreclosure, strict foreclosure or otherwise) in which the First Priority Collateral Agent, the Lender Agent or the other holders of First Priority Claims seek to enforce the Liens granted in any of the Collateral except that there shall be no waiver of the obligation, if any, of the First Priority

-18-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Collateral Agent or the Lender Agent to dispose of the Collateral in a "commercially reasonable" manner within the meaning of any applicable UCC.

(iv) Each of the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby irrevocably, absolutely and unconditionally waives any and all rights it or the Third Priority Secured Parties may have as a junior lien creditor or otherwise (whether arising under the UCC or any other law) to object to the manner (including by judicial foreclosure, non-judicial foreclosure, strict foreclosure, or otherwise) in which the Second Priority Collateral Agent, the 2010 Trustee or the other holders of Second Priority Claims seek to enforce the Liens granted in any of the Collateral except that there shall be no waiver of the obligation, if any, of the Second Priority Collateral Agent or the 2010 Trustee to dispose of the Collateral in a "commercially reasonable" manner within the meaning of any applicable UCC.

(e) (i) Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Second Priority Collateral Documents or any other Second Priority Noteholder Document (other than this Agreement) or in the Third Priority Collateral Documents or any other Third Priority Document (other than this Agreement) is intended to restrict in any way the rights and remedies of the First Priority Collateral Agent, the Lender Agent or the First Priority Secured Parties with respect to the Collateral as set forth in this Agreement and the First Priority Documents.

(ii) Each of the Third Priority Collateral Agent and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Third Priority Collateral Documents or any other Third Priority Document (other than this Agreement) is intended to restrict in any way the rights and remedies of the Second Priority Collateral Agent or any other Second Priority Secured Party with respect to the Collateral as set forth in this Agreement and the Second Priority Documents.

3.2 Cooperation. Subject to the proviso in Section 3.1(a), (a) each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that, unless and until the Discharge of First Priority Claims has occurred, it will not, and shall be deemed to have waived any right to, commence, or join with any Person in commencing any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it under any Second Priority Document or Third Priority Document, as the case may be; and (b) each of the Third Priority Collateral Agent and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that, unless and until the Discharge of Second Priority Claims has occurred, it will not, and shall be deemed to have waived any right to, commence, or join with any Person in commencing any enforcement, collection, execution, levy or foreclosure action or proceeding with respect to any Lien held by it under any Third Priority Document.

-19-

3.3 <u>Notices of Default</u>. Each Collateral Agent, the Lender Agent, each Trustee and each Additional Third Priority Representative will provide such information as it may have to the others as the others may from time to time reasonably request concerning the status of the exercise of any enforcement action against the Collateral, and each Collateral Agent, the Lender Agent, each Trustee and each Additional Third Priority Representative shall be available on a reasonable basis during normal business hours to review with each other alternatives available in exercising such rights; <u>provided</u> that the failure of any of them to do any of the foregoing shall not affect the relative priorities of the First Priority Liens, the Second Priority Liens or the Third Priority Liens as provided herein or the validity or effectiveness of any notice or demand as against any Obligor. The Obligors hereby consent and agree to each Collateral Agent, the Lender Agent, each Trustee and each Additional Third Priority Representative, providing any such information to the other and to such actions by any of them and waives any right or claim against any of them arising as a result of such information or actions.

Section 4. <u>Payments</u>.

4.1 <u>Application of Proceeds</u>.

(a) As long as the Discharge of First Priority Claims has not occurred, whether or not any Insolvency Proceeding has been commenced by or against any Obligor, the cash proceeds of Collateral received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies, shall, after payment of all outstanding fees, expenses (including reasonable fees and expenses of counsel), disbursements and indemnities of the First Priority Collateral Agent and the Collateral Control Agent, be delivered by the First Priority Collateral Agent or the Collateral Control Agent to the Lender Agent for application against the First Priority Claims in such order as the Lender Agent may determine in its sole discretion until the Discharge of First Priority Claims has occurred. Upon the Discharge of First Priority Claims, (i) the Lender Agent shall promptly deliver to the First Priority Collateral Agent (with copies to the Second Priority Collateral Agent, the Third Priority Collateral Agent, the Collateral Control Agent, the 2010 Trustee, the 2015 Trustee and each other Additional Third Priority Representative) a written notice stating that the Discharge of First Priority Claims has occurred and (ii) promptly following receipt of such notice in <u>clause (i)</u>, the First Priority Collateral Agent or Lender Agent as applicable shall deliver at the joint and several cost of the Obligors to the Second Priority Collateral Agent for distribution to the 2010 Trustee for the benefit of the Second Priority Secured Parties (or, following the Discharge of Second Priority Claims, shall deliver to the Third Priority Collateral Agent for distribution to the 2015 Trustee and the Additional Third Party Representatives for the benefit of the Third Priority Secured Parties in accordance with the 2015 Noteholder Security Agreement) any proceeds of Collateral held by it in the same form as received, with any necessary endorsement or as a court of competent jurisdiction may otherwise direct.

(b) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Obligor, the cash proceeds of Collateral received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies, shall, after payment of all outstanding fees, expenses (including reasonable fees and expenses of counsel), disbursements and indemnities of the Second Priority Collateral Agent and

-20-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

the Collateral Control Agent, be delivered by the Second Priority Collateral Agent or Collateral Control Agent to the 2010 Trustee for application against the Second Priority Claims in such order as is specified in the 2010 Indenture until the Discharge of Second Priority Claims has occurred. Upon the Discharge of Second Priority Claims, (i) the 2010 Trustee shall promptly deliver to the Second Priority Collateral Agent (with copies to the Third Priority Collateral Agent, the Collateral Control Agent, the 2015 Trustee and each other Additional Third Priority Representative) a written notice stating that the Discharge of Second Priority Claims has occurred and (ii) promptly following receipt of such notice in clause (i), the Second Priority Collateral Agent shall deliver at the joint and several cost of the Obligors to the Third Priority Collateral Agent any proceeds of Collateral held by it in the same form as received, with any necessary endorsement or as a court of competent jurisdiction may otherwise direct.

4.2 Payments Over.

(a) So long as the Discharge of First Priority Claims has not occurred, whether or not any Insolvency Proceeding has been commenced by or against any Obligor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3(a)) received by the Second Priority Collateral Agent, the Third Priority Collateral Agent, any other Second Priority Secured Party or any other Third Priority Secured Party in connection with the exercise of any right or remedy (including set-off) relating to the Collateral in contravention of this Agreement or any distribution received on account of or by virtue of any Lien on the Collateral in any Insolvency Proceeding (including any distribution on account of or otherwise by virtue of any Lien on the Collateral under any Plan of Reorganization) shall, upon receiving appropriate written direction from the Lender Agent, be segregated and held in trust and forthwith paid over to the First Priority Collateral Agent for the benefit of the First Priority Secured Parties in the same form as received, with any necessary endorsement, or as a court of competent jurisdiction may otherwise direct. The First Priority Collateral Agent is hereby authorized to make any such endorsement as agent for the Second Priority Collateral Agent, the Third Priority Collateral Agent or any other Second Priority Secured Party or Third Priority Secured Party. This authorization is coupled with an interest and is irrevocable until the Discharge of First Priority Claims has occurred.

(b) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, whether or not any Insolvency Proceeding has been commenced by or against any Obligor, any Collateral or proceeds thereof (including assets or proceeds subject to Liens referred to in the final sentence of Section 2.3(b)) received by the Third Priority Collateral Agent or any other Third Priority Secured Party in connection with the exercise of any right or remedy (including set-off) relating to the Collateral in contravention of this Agreement or any distribution received on account of or by virtue of any Lien on the Collateral in any Insolvency Proceeding (including any distribution on account of or otherwise by virtue of any Lien on the Collateral under any Plan of Reorganization) shall, upon receiving appropriate written direction from the 2010 Trustee, be segregated and held in trust and forthwith paid over to the Second Priority Collateral Agent for the benefit of the Second Priority Secured Parties in the same form as received, with any necessary endorsement, or as a court of competent jurisdiction may otherwise direct. The Second Priority Collateral Agent is hereby authorized to make any such endorsement as agent for the Third Priority Collateral Agent or any other Third

-21-

Priority Secured Party. This authorization is coupled with an interest and is irrevocable until the Discharge of Second Priority Claims has occurred.

Section 5. Other Agreements.

5.1 Releases.

(a) If, in connection with (i) the exercise of any remedies by the First Priority Collateral Agent or any other First Priority Secured Party in respect of the Collateral provided for in Section 3.1, including any sale, lease, exchange, transfer or other disposition of any such Collateral or (ii) any sale, lease, exchange, transfer or other disposition of any Collateral (other than to another Obligor) permitted under the terms of the First Priority Documents, the Second Priority Documents and the Third Priority Documents (in each case, as in effect on the date hereof), the First Priority Collateral Agent, on behalf of itself and the other First Priority Secured Parties, releases any of its Liens on any part of the Collateral, the Lien of the Second Priority Collateral Agent for the benefit of the Second Priority Secured Parties on such Collateral (but not on any proceeds of such Collateral not required to be paid to the First Priority Secured Parties for application to the First Priority Claims) and the Lien of the Third Priority Collateral Agent for the benefit of the Third Priority Secured Parties on such Collateral (but not on any proceeds of such Collateral not required to be paid to the First Priority Secured Parties for application to the First Priority Claims) shall in each case be automatically and unconditionally released with no further consent or action of any Person, and each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, shall promptly execute and deliver, at the joint and several expense of the Obligors, to the First Priority Collateral Agent and the Lender Agent and the Obligors such termination statements, releases and other documents as the First Priority Collateral Agent, the Lender Agent and the Obligors may reasonably request to effectively confirm such release at the joint and several expense of the Obligors.

(b) Following the Discharge of First Priority Claims if, in connection with (i) the exercise of any remedies by the Second Priority Collateral Agent or the 2010 Trustee or any other Second Priority Secured Party in respect of the Collateral provided for in Section 3.1, including any sale, lease, exchange, transfer or other disposition of any such Collateral or (ii) any sale, lease, exchange, transfer or other disposition of any Collateral (other than to another Obligor) permitted under the terms of the Second Priority Documents and the Third Priority Documents (in each case, as in effect on the date hereof), the Second Priority Collateral Agent, on behalf of itself and the other Second Priority Secured Parties, releases any of its Liens on any part of the Collateral, the Lien of the Third Priority Collateral Agent for the benefit of the Third Priority Secured Parties on such Collateral (but not on any proceeds of such Collateral not required to be paid to the Second Priority Secured Parties for application to the Second Priority Claims) shall be automatically and unconditionally released with no further consent or action of any Person, and each of the Third Priority Collateral Agent and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, shall promptly execute and deliver, at the joint and several expense of the Obligors, to the Second Priority Collateral Agent and the 2010 Trustee and the Obligors such termination statements, releases and other documents as the Second Priority Collateral Agent, the

-22-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

2010 Trustee and the Obligors may reasonably request to effectively confirm such release at the joint and several expense of the Obligors.

(c) Until the Discharge of First Priority Claims occurs, each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby irrevocably constitutes and appoints the First Priority Collateral Agent and any officer or agent of the First Priority Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Person or in the First Priority Collateral Agent's own name, from time to time in the First Priority Collateral Agent's discretion (as directed by the Lender Agent in writing), for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all releases, documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any financing statements, mortgage releases, intellectual property releases, endorsements or other instruments of transfer or release.

(d) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims occurs, each of the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby irrevocably constitutes and appoints the Second Priority Collateral Agent and any officer or agent of the Second Priority Collateral Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Third Priority Collateral Agent or Third Priority Secured Party or in the Second Priority Collateral Agent's own name, from time to time in the Second Priority Collateral Agent's discretion (as directed by the 2010 Trustee in writing), for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all releases, documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any financing statements, mortgage releases, intellectual property releases, endorsements or other instruments of transfer or release.

5.2 Insurance.

(a) Unless and until the Discharge of First Priority Claims has occurred, the First Priority Collateral Agent, the Lender Agent and the other holders of First Priority Claims shall have the sole and exclusive right, subject to the rights of the Obligors under the Facility Documents, to adjust settlement for any award under any insurance policy relating to an insured loss in respect of Collateral and to approve any award granted in any condemnation or similar proceeding affecting the Collateral. Following the Discharge of First Priority Claims and until such time that the Discharge of Second Priority Claims has occurred, the Second Priority Collateral Agent, the 2010 Trustee and the other holders of Second Priority Claims shall have the sole and exclusive right, subject to the rights of the Obligors under the Second Priority Documents, to adjust settlement for any award under any insurance policy relating to an insured loss relating to the Collateral and to approve any award granted in any condemnation or similar proceeding affecting the Collateral.

-23-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(b) Unless and until the Discharge of First Priority Claims has occurred, all proceeds of any such insurance policy and any such award if in respect to the Collateral shall, after payment of all outstanding fees, expenses (including reasonable fees and expenses of counsel), disbursements and indemnities of the First Priority Collateral Agent and the Collateral Control Agent, be delivered by the First Priority Collateral Agent to the Lender Agent for benefit of the First Priority Secured Parties to the extent required under the Loan Agreement and pursuant to the terms of the First Priority Documents; and thereafter, following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, and after payment of all outstanding fees, expenses (including reasonable fees and expenses of counsel), disbursements and indemnities of the Second Priority Collateral Agent and the Collateral Control Agent, be delivered by the Second Priority Collateral Agent to the 2010 Trustee for the benefit of the Second Priority Secured Parties to the extent required under the applicable Second Priority Documents; and following the Discharge of First Priority Claims and Second Priority Claims, and after payment of all outstanding fees, expenses (including reasonable fees and expenses of counsel), disbursements and indemnities of the Third Priority Collateral Agent and the Collateral Control Agent, be delivered by the Third Priority Collateral Agent to the 2015 Trustee and the Additional Third Priority Representatives in accordance with the 2015 Noteholder Security Agreement; and finally, to the owner of the subject property or as a court of competent jurisdiction may otherwise direct.

(c) Unless the Discharge of First Priority Claims has occurred, if the Second Priority Collateral Agent, the Third Priority Collateral Agent or any other Second Priority Secured Party or Third Priority Secured Party shall, at any time, receive any proceeds of any such insurance policy or any such award or payment thereunder in contravention of this Agreement, it shall pay such proceeds, award or payment over to the First Priority Collateral Agent in accordance with <u>Section 4.2</u>.

(d) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, if the Third Priority Collateral Agent or any other Third Priority Secured Party shall, at any time, receive any proceeds of any insurance policy or any award or payment thereunder in contravention of this Agreement, it shall pay such proceeds, award or payment over to the Second Priority Collateral Agent in accordance with <u>Section 4.2</u>.

5.3 <u>Amendments to Second Priority Documents and Third Priority Documents, etc</u>.

(a) Unless and until the Discharge of First Priority Claims has occurred, without the prior written consent of the Lender Agent (and the First Priority Collateral Agent and the Collateral Control Agent, to the extent an amendment, supplement or modification would affect its respective rights, protections or obligations), no Second Priority Collateral Document or Third Priority Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Second Priority Collateral Document or Third Priority Collateral Document, would contravene any of the terms of this Agreement or the First Priority Documents. Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, no Third Priority Collateral Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new Third Priority

-24-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Collateral Document, would contravene any of the terms of this Agreement or the Second Priority Documents.

(b) The 2010 Trustee agrees that each Second Priority Collateral Document granting a Lien on any Collateral shall include the following language (or similar language satisfactory to the Lender Agent):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to [the Second Priority Collateral Agent] pursuant to this Agreement and the exercise of any right or remedy by [the Second Priority Collateral Agent] hereunder are subject to the provisions of the Intercreditor Agreement, dated as of June 6, 2008 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Intercreditor Agreement"), among Wells Fargo Bank, N.A., in its capacity as First Priority Collateral Agent, Wells Fargo Bank, N.A., in its capacity as Second Priority Collateral Agent, Wells Fargo Bank, N.A., in its capacity as Third Priority Collateral Agent and the other parties thereto. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

In addition, the 2015 Trustee agrees that each Third Priority Collateral Document granting a Lien on any Collateral shall include the following language (or similar language satisfactory to the Lender Agent):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to [the Third Priority Collateral Agent] pursuant to this Agreement and the exercise of any right or remedy by [the Third Priority Collateral Agent] hereunder are subject to the provisions of the Intercreditor Agreement, dated as of June 6, 2008 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Intercreditor Agreement"), among Wells Fargo Bank, N.A., in its capacity as First Priority Collateral Agent, Wells Fargo Bank, N.A., in its capacity as Second Priority Collateral Agent, Wells Fargo Bank, N.A., in its capacity as Third Priority Collateral Agent, and the other parties thereto. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(c) Unless and until the Discharge of First Priority Claims has occurred, in the event the First Priority Collateral Agent or the Lender Agent enters into any amendment, waiver or consent in respect of any First Priority Collateral Document for the purpose of adding to, or deleting from, or waiving or consenting to any departure from any provision of, any First Priority Collateral Document or changing in any manner the rights of the First Priority Collateral Agent, the Lender Agent, the other First Priority Secured Parties or the Obligors thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of each Comparable Noteholder Collateral Document without the consent of the Second Priority Collateral Agent, the Third Priority Collateral Agent, any Trustee, and any Additional Third Priority Representative, the Second Priority Secured Parties or the Third Priority Secured Parties

-25-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

and without any action by any of them or any Obligor; provided that (i) no such amendment, waiver or consent shall have the effect of (A) removing assets subject to the Lien of the Second Priority Collateral Documents or Third Priority Collateral Documents, except to the extent that a release of such Lien is permitted by Section 5.1 and provided there is a corresponding release of the Lien securing the First Priority Claims, (B) imposing duties or adding liabilities on the Second Priority Collateral Agent, Third Priority Collateral Agent, any other Second Priority Secured Party or any other Third Priority Secured Party without its consent or (C) permitting other Liens on the Collateral which are prohibited under the terms of the 2010 Indenture (as in effect on the date hereof), the 2015 Indenture (as in effect on the date hereof) or Section 6, (ii) any such amendment, waiver or consent that materially and adversely affects the rights of the Second Priority Collateral Agent, the Third Priority Collateral Agent, any other Second Priority Secured Party or any other Third Priority Secured Party (and not the First Priority Secured Parties in a like or similar manner) shall not apply to the Second Priority Collateral Documents without the consent of the Second Priority Collateral Agent (acting at the written direction of the 2010 Trustee (itself acting at the direction of the holders of a majority of the aggregate principal amount of the Second Priority Claims)) and shall not apply to the Third Priority Collateral Documents without the consent of the Third Priority Collateral Agent (acting at the written direction of the requisite Third Priority Secured Parties in accordance with the Third Priority Security Agreements), and (iii) notice of such amendment, waiver or consent shall have been given by the Lender Agent to the Second Priority Collateral Agent (unless it is the same Person as the First Priority Collateral Agent), the Third Priority Collateral Agent (unless it is the same Person as the First Priority Collateral Agent), each Trustee and any Additional Third Priority Representative within 10 Business Days after the effective date thereof; provided, further, that (x) nothing contained in this clause (c) shall impair the rights of the First Priority Collateral Agent, the Lender Agent and the holders of First Priority Claims, or the obligations and agreements of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the other Second Priority Secured Parties and the other Third Priority Secured Parties, under Sections 3 and 5.1 and (y) the First Priority Collateral Documents, the Second Priority Collateral Documents and the Third Priority Collateral Documents may, without the consent of any Second Priority Secured Party or the Third Priority Secured Party, be amended or modified pursuant to this Section 5.3(c) to secure additional extensions of credit and add additional secured creditors as long as such amendments or modifications do not violate the express provisions of the Indentures or any other Second Priority Document or Third Priority Document.

(d) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, in the event the Second Priority Collateral Agent or the 2010 Trustee enters into any amendment, waiver or consent in respect of any Second Priority Collateral Document for the purpose of adding to, or deleting from, or waiving or consenting to any departure from any provision of, any Second Priority Collateral Document or changing in any manner the rights of the Second Priority Collateral Agent, the 2010 Trustee, the other Second Priority Secured Parties or the Obligors thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of each Comparable Noteholder Collateral Document in respect of the Third Priority Collateral Documents without the consent of the Third Priority Collateral Agent, the 2015 Trustee, any Additional Third Priority Representative or any other Third Priority Secured Party and without any action by any of them or any Obligor; provided that (i) no such amendment, waiver or consent shall have the effect of (A) removing assets subject to the Lien of the Third Priority Collateral Documents, except to the

-26-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

extent that a release of such Lien is permitted by Section 5.1 and provided there is a corresponding release of the Lien securing the Second Priority Claims, (B) imposing duties or adding liabilities on the 2015 Trustee, any Additional Third Priority Representative, the Third Priority Collateral Agent or any other Third Priority Secured Party without its consent or (C) permitting other Liens on the Collateral which are prohibited under the terms of the 2015 Indenture (as in effect on the date hereof) or Section 6, (ii) any such amendment, waiver or consent that materially and adversely affects the rights of the Third Priority Collateral Agent, the 2015 Trustee, any Additional Third Priority Representative or any other Third Priority Secured Party (and not Second Priority Security Parties in a like or similar manner) shall not apply to the Third Priority Collateral Documents without the consent of the Third Priority Collateral Agent (acting at the written direction of the requisite Third Priority Secured Parties in accordance with the Third Priority Security Documents), and (iii) notice of such amendment, waiver or consent shall have been given in writing by the 2010 Trustee to the Third Priority Collateral Agent (unless it is the same Person as the Second Priority Collateral Agent), the 2015 Trustee and each Additional Third Priority Representative within 10 Business Days after the effective date thereof; provided, further, that (x) nothing contained in this clause (d) shall impair the rights of the Second Priority Collateral Agent, the 2010 Trustee and the holders of Second Priority Claims, or the obligations and agreements of the Third Priority Collateral Agent and the other Third Priority Secured Parties, under Sections 3 and 5.1 and (y) the Second Priority Collateral Documents and the Third Priority Collateral Documents may, without the consent of any Third Priority Secured Party, be amended or modified pursuant to this Section 5.3(d) to secure additional extensions of credit and add additional secured creditors as long as such amendments or modifications do not violate the express provisions of the 2015 Indenture or any other Third Priority Document.

(e) The First Priority Documents may be amended, supplemented or otherwise modified in accordance with their terms and the Loan Agreement may be refinanced, in each case, without notice to, or the consent of the Second Priority Collateral Agent, the Trustees, any Additional Third Priority Representative, the other Second Priority Secured Parties or the other Third Priority Secured Parties subject to the terms hereof, all without affecting the lien subordination or other provisions of this Agreement.

(f) Subject to Section 5.3, the Second Priority Documents may be amended, supplemented or otherwise modified in accordance with their terms and the 2010 Notes may be refinanced, in each case, without notice to, or the consent of the Third Priority Collateral Agent, the 2015 Trustee, any Additional Third Priority Representative or the other Third Priority Secured Parties subject to the terms hereof, all without affecting the lien subordination or other provisions of this Agreement.

(g) Without the written consent of the Lender Agent, none of the Second Priority Collateral Agent, Third Priority Collateral Agent, any other Second Priority Secured Party or any other Third Priority Secured Party will be entitled to agree (and none of them will agree) to any amendment to or modification of, or consent to any waiver of departure from, the Second Priority Documents or the Third Priority Documents, whether in a refinancing or otherwise, that is prohibited by or in contravention of the First Priority Documents as in effect on the date hereof or this Agreement.

-27-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(h) Without the written consent of the 2010 Trustee, none of the Third Priority Collateral Agent, 2015 Trustee, any Additional Third Priority Representative or any other Third Priority Secured Party will be entitled to agree (and none of them will agree) to any amendment to or modification of, or consent to any waiver of departure from, the Third Priority Documents, whether in a refinancing or otherwise, that is prohibited by or in contravention of the Second Priority Documents as in effect on the date hereof or this Agreement.

(i) Unless and until the Discharge of First Priority Claims has occurred, (i) the Second Priority Secured Parties shall not consent to the release of any Second Priority Lien on any Collateral without the written consent of the Lender Agent except for releases pursuant to Section 8.04(a)(i) or (ii) or Section 8.04(b) of the 2010 Indenture, and (ii) the Third Priority Secured Parties shall not consent to the release of any Third Priority Lien on any Collateral without the written consent of the Lender Agent except for releases pursuant to Section 8.04(a)(i) or (ii) or Section 8.04(b) of the 2015 Indenture and any equivalent provision of any Additional Pari Passu Third Priority Agreement.

(j) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, the Third Priority Secured Parties shall not consent to the release of any Third Priority Lien on any Collateral without the consent of the 2010 Trustee except for releases pursuant to Section 8.04(a)(i) or (ii) or Section 8.04(b) of the 2015 Indenture and any equivalent provision of any Additional Pari Passu Third Priority Agreement.

5.4 <u>Rights as Unsecured Creditors</u>. Notwithstanding anything to the contrary in this Agreement, the Second Priority Secured Parties and the Third Priority Secured Parties may exercise rights and remedies as unsecured creditors against the Obligors in accordance with the terms of the Second Priority Documents or the Third Priority Documents, as the case may be, and applicable law only to the extent set forth in the *proviso* of <u>Section 3.1(a)</u> hereof. Nothing in this Agreement shall prohibit the receipt by any Second Priority Secured Priority or Third Priority Secured Party of any payment of interest and principal on the Second Priority Claims or Third Priority Claims so long as such receipt is not (a) the direct or indirect result of the exercise by any Second Priority Secured Party or Third Priority Secured Party of rights and remedies as a secured creditor in respect of the Second Priority Claims or Third Priority Claims or enforcement of any Second Priority Lien or Third Priority Lien, in either case in contravention of this Agreement, or (b) a distribution in any Insolvency Proceeding on account of or otherwise by virtue of any Second Priority Lien or Third Priority Lien (including any distribution on account of or otherwise by virtue of any Lien on the Collateral under any Plan of Reorganization). In the event that any Second Priority Secured Party or Third Priority Secured Party becomes a judgment lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor in respect of the Second Priority Claims or Third Priority Claims, such judgment lien shall be subject to the terms of this Agreement (including in relation to the First Priority Liens and the First Priority Claims and including in relation to the Second Priority Liens and Second Priority Claims) to the same extent as the other Liens securing the Second Priority Claims (created pursuant to the Second Priority Collateral Documents) or Third Priority Claims (created pursuant to the Third Priority Collateral Documents), as the case may be, are subject to the terms of this Agreement. Nothing in this Agreement modifies any right or remedy the holders of First Priority Claims or, after the Discharge of First Priority Claims has occurred, the holders of Second Priority Claims may have with respect to the Collateral.

-28-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

5.5 <u>Bailee for Perfection; Collateral Control Agent</u>.

(a) The First Priority Collateral Agent hereby acknowledges that, to the extent that it holds, or a third party holds on its behalf, physical possession over Collateral pursuant to any of the First Priority Collateral Documents (any such Collateral, as updated from time to time in accordance with the relevant Collateral Document, the "<u>Bailment Collateral</u>"), such possession or control is also held as a bailee for, on behalf of and for the benefit of the Second Priority Collateral Agent (as collateral agent for the Second Priority Secured Parties) and for the benefit of the Third Priority Collateral Agent (as collateral agent for the Third Priority Secured Parties), such bailment being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the UCC, and in each case solely to the extent required to perfect and enforce their security interests in such Bailment Collateral. Nothing in the preceding sentence shall be construed to impose any duty on the First Priority Collateral Agent, the Lender Agent or any First Priority Secured Party (or any third party acting on their behalf) with respect to such Bailment Collateral or provide the Second Priority Collateral Agent, the Third Priority Collateral Agent, any other Second Priority Secured Party or any other Third Priority Secured Party with any rights with respect to such Bailment Collateral beyond those specified in this Agreement or the Second Priority Collateral Documents or Third Priority Collateral Documents (<u>it being understood that</u> the First Priority Collateral Agent's duty under this <u>Section 5.5(a)</u> shall be limited solely to holding any such Collateral as bailee); <u>provided</u> that promptly following the Discharge of First Priority Claims, the First Priority Collateral Agent (upon the written direction of the Lender Agent) shall deliver to the Second Priority Collateral Agent, at the Obligors' joint and several cost and expense, such Bailment Collateral in its possession together with any necessary endorsements or direct and deliver such Collateral as a court of competent jurisdiction may otherwise direct (and the Second Priority Collateral Agent will hold the same as bailee for, on behalf of and for the benefit of the Third Priority Secured Parties on the same terms as specified above in this <u>Section 5.5(a)</u>)); <u>provided</u>, <u>further</u>, that promptly following the Discharge of Second Priority Claims, the Second Priority Collateral Agent (upon the written direction of the 2010 Trustee) shall deliver to the Third Priority Collateral Agent, at the Obligors' joint and several cost and expense, such Collateral in its possession together with any necessary endorsements or direct and deliver such Collateral as a court of competent jurisdiction may otherwise direct.

(b) Each Obligor hereby grants to the Collateral Control Agent a security interest in the Controlled Collateral to secure the First Priority Claims, the Second Priority Claims and the Third Priority Claims, and in each case such claims shall be subject to the relative priorities and the other provisions set forth herein. Without limiting the generality of the foregoing, it is agreed that distributions on account of or by virtue of such security interest are subject to the relative priorities and the other provisions set forth herein and that such grant to the Collateral Control Agent (or any similar provision of any Collateral Document) is in no manner intended to (or shall be deemed to) alter in any manner whatsoever (i) the distinct nature or character of each of the First Priority Claims (and the accompanying First Priority Liens granted in the First Priority Collateral Documents), the Second Priority Claims (and the accompanying Second Priority Liens granted in the Second Priority Collateral Documents), or the Third Priority Claims (and the accompanying Third Priority Liens granted in the Third Priority Collateral Documents), (ii) the sole exclusive right of the First Priority Secured Parties to direct the Collateral Control Agent until the Discharge of First Priority Claims has occurred regarding the Controlled Collateral

-29-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(including the disposition thereof, the exercise of rights and remedies with respect thereto and application of proceeds thereof), and (iii) following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, the sole exclusive right of the Second Priority Secured Parties to direct the Collateral Control Agent regarding the Controlled Collateral (including the disposition thereof, the exercise of rights and remedies with respect thereto and application of proceeds thereof). As used herein, (i) "Collateral Control Agent" means Wells Fargo Bank, N.A., acting in its capacity as the collateral agent for each of the First Priority Collateral Agent, the Second Priority Collateral Agent and the Third Priority Collateral Agent for purposes of this Section 5.5(b); and (ii) "Controlled Collateral" means that portion of the Collateral consisting of "deposit accounts" or "securities accounts" or Property deposited or carried therein or credited thereto, each as defined in the UCC. In addition to the foregoing, the parties hereto agree that the Collateral Control Agent will be acting as collateral agent on behalf of the First Priority Collateral Agent, the Second Priority Collateral Agent and the Third Priority Collateral Agent under (A) any agreement or document executed to effect a pledge of any equity interests of a Subsidiary organized under the laws of Mexico, Brazil or Chile and (B) any control agreement entered into by the Collateral Control Agent with respect to the Controlled Collateral. Consistent with the foregoing, but subject to the terms of this Agreement, the Collateral Control Agent shall (x) prior to the Discharge of First Priority Claims, have all of the same rights (including rights of foreclosure and enforcement), remedies, protections, duties and responsibilities given to the First Priority Collateral Agent, including the rights of a secured creditor under the UCC, pursuant to the terms of the First Priority Collateral Documents, but only with respect solely to the Controlled Collateral, (y) following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims have occurred, have all of the same rights (including rights of foreclosure and enforcement), remedies, protections, duties and responsibilities given to the Second Priority Collateral Agent, including the rights of a secured creditor under the UCC, pursuant to the terms of the Second Priority Collateral Documents, but only with respect solely to the Controlled Collateral, and (z) following the Discharge of First Priority Claims and the Discharge of Second Priority Claims, have all of the same rights (including rights of foreclosure and enforcement), remedies, protections, duties and responsibilities given to the Third Priority Collateral Agent, including the rights of a secured creditor under the UCC, pursuant to the terms of the Third Priority Collateral Documents, but only with respect solely to the Controlled Collateral.

5.6 Special Provisions Relating to Collateral Control Agreement. The following provisions shall govern the Collateral Control Agent's rights, powers, obligations and duties under this Agreement, notwithstanding anything herein to the contrary:

(a) Each of the First Priority Collateral Agent (for itself and on behalf of the First Priority Secured Parties), the Second Priority Collateral Agent (for itself and on behalf of the Second Priority Secured Parties), the Third Priority Agent and each Additional Third Priority Representative (for themselves and on behalf of the Third Priority Secured Parties) (each a "Control Secured Party" and collectively, the "Control Secured Parties"), hereby designates and appoints Wells Fargo Bank, N.A. to act as the Collateral Control Agent under this Agreement and the other Collateral Documents to which it is a party, and hereby authorize the Collateral Control Agent to take such actions on its behalf under the provisions of this Agreement and such other Collateral Documents and to exercise such powers and perform such duties as are expressly delegated to the

-30-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Collateral Control Agent by the terms of this Agreement and such other Collateral Documents. Notwithstanding any provision to the contrary elsewhere in this Agreement or any other Collateral Document, the Collateral Control Agent shall not have any duties or responsibilities, except those expressly set forth in this Agreement or such other Collateral Documents any fiduciary relationship with the Control Secured Parties, and no implied covenants, functions or responsibilities shall be read into this Agreement or otherwise exist against the Collateral Control Agent.

(b) Each Control Secured Party agrees to render to the Collateral Control Agent, at any time upon request of the Collateral Control Agent, an accounting of the amounts of the Obligations owing to it and such other information with respect to the Obligations owing to each such Person as the Collateral Control Agent may reasonably request in order to give effect to the terms and conditions of this Agreement. In the event that any Control Secured Party fails to provide any information required to be provided by it to the Collateral Control Agent, then the Collateral Control Agent may (but shall not be obligated to) (i) take such actions as are required to be taken by it based on the most recent information available to it or (ii) in the case of any distributions to be made pursuant to the Collateral Documents, hold such Control Secured Party's share or purported share in escrow (without obligation to pay interest thereon) until such Control Secured Party provides the required information.

(c) Notwithstanding anything herein to the contrary, in no event shall the Collateral Control Agent have any obligation to inquire or investigate as to the correctness, veracity, or content of any instruction received from the Relevant Directing Party. In no event shall the Collateral Control Agent have any liability in respect of any such instruction received by it and relied on with respect to any action or omission taken pursuant thereto.

(d) The Collateral Control Agent may execute any of its duties under this Agreement or any of the Collateral Documents by or through agents, experts or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Collateral Control Agent shall not be responsible for the negligence or misconduct of any agents, experts or attorneys-in-fact selected by it in good faith.

(e) Neither the Collateral Control Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it under or in connection with this Agreement or any of the Collateral Documents (except for its gross negligence or willful misconduct), or (ii) responsible in any manner to any Control Secured Party for any recitals, statements, representations or warranties (other than its own recitals, statements, representations or warranties) made in this Agreement or any of the Collateral Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Control Agent under or in connection with, this Agreement or any of the Collateral Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any of the Collateral Documents or for any failure of the Obligors or any other Person to perform their obligations hereunder and thereunder. The Collateral Control Agent shall not be under any obligation to any Control Secured

-31-

Party or any other Person to ascertain or to inquire as to (i) the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Collateral Documents or to inspect the properties, books or records of the Obligors, (ii) whether or not any representation or warranty made by any Person in connection with this Agreement or any Collateral Document is true, (iii) the performance by any Person of its obligations under this Agreement or any of the Collateral Documents or (iv) the breach of or default by any Person of its obligations under this Agreement or any of the Collateral Documents.

(f) The Collateral Control Agent shall not be bound to (i) account to any Person for any sum or the profit element of any sum received for its own account; (ii) disclose to any other Person any information relating to the Person if such disclosure would, or might, constitute a breach of any law or regulation or be otherwise actionable at the suit of any Person; (iii) be under any fiduciary duties or obligations other than those for which express provision is made in this Agreement or in any of the Collateral Documents to which it is a party; or (iv) be required to take any action that it believes, based on advice of counsel, is in conflict with any applicable law, this Agreement or any of the Collateral Documents, or any order of any court or administrative agency.

(g) Beyond the exercise of reasonable care in the custody thereof and except as otherwise specifically stated in this Agreement or any of the Collateral Documents, the Collateral Control Agent shall have no duty as to any of the Collateral in its possession or control or in the possession or control of any agent or bailee or as to preservation of rights against prior parties or any other rights pertaining thereto.

(h) The Collateral Control Agent shall be authorized to but shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or monitoring or maintaining the perfection of any security interest in the Collateral. It is expressly agreed, to the maximum extent permitted by applicable law, that the Collateral Control Agent shall have no responsibility for (i) taking any necessary steps to preserve rights against any Person with respect to any Collateral or (ii) taking any action to protect against any diminution in value of the Collateral, but, in each case (A) subject to the requirement that the Collateral Control Agent may not act or omit to take any action if such act or omission would constitute gross negligence, bad faith or willful misconduct and (B) the Collateral Control Agent may do so and all expenses reasonably incurred in connection therewith shall be repaid in accordance with Section 4.1.

(i) The Collateral Control Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Control Agent in good faith, except to the extent of the Collateral Control Agent' gross negligence, bad faith or willful misconduct.

(j) The Collateral Control Agent shall not be responsible for, nor incur any liability with respect to, (i) the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the security interest in any of the

-32-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part under this Agreement or any of the Collateral Documents, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Collateral Control Agent, (ii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iii) the validity of the title of the Obligors to the Collateral, (iv) insuring the Collateral or (v) the payment of taxes, charges or assessments upon the Collateral or otherwise as to the maintenance of the Collateral

(k) Notwithstanding anything in this Agreement or any of the Collateral Documents to the contrary, (i) in no event shall the Collateral Control Agent or any officer, director, employee, representative or agent of the Collateral Control Agent' be liable under or in connection with this Agreement or any of the Collateral Documents for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including but not limited to lost profits or loss of opportunity, whether or not foreseeable, even if the Collateral Control Agent has been advised of the possibility thereof and regardless of the form of action in which such damages are sought; and (ii) the Collateral Control Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the Collateral Documents to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such Collateral Document. In no event shall the Collateral Control Agent be obligated to invest any amounts received by it hereunder.

(l) The Collateral Control Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any note, writing, resolution, request, direction, certificate, notice, consent, affidavit, letter, cablegram, telegram, telecopy, email, telex or teletype message, statement, order or other document or conversation believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and/or upon advice and/or statements of legal counsel, independent accountants and other experts selected by the Collateral Control Agent and need not investigate any fact or matter stated in any such document. Any such statement of legal counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in accordance therewith. Any statement or advice of counsel may be based, insofar as it relates to factual matters, upon a certificate of an officer of the Relevant Directing Party. In connection with any request or direction of the Relevant Directing Party, the Collateral Control Agent shall be entitled conclusively to rely, and shall be fully protected in relying, upon any instruction delivered by the Relevant Directing Party. The Collateral Control Agent shall be fully justified in failing or refusing to take any action under this Agreement or any of the Collateral Documents (i) if such action would, in the reasonable opinion of the Collateral Control Agent (which may be based on the opinion of legal counsel), be contrary to applicable law or any of the Collateral Documents, (ii) if such action is not specifically provided for in this Agreement or any of the Collateral Documents, (iii) if, in connection with the taking of any such action hereunder or under any of the Collateral Documents that would constitute an exercise of remedies hereunder or under any of the Collateral Documents it shall not first be indemnified to its satisfaction by the Control Secured Parties against any and all risk of nonpayment, liability and expense that may be incurred by it, its agents or its

-33-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

counsel by reason of taking or continuing to take any such action, or (iv) if, notwithstanding anything to the contrary contained in this Agreement, in connection with the taking of any such action that would constitute a payment due under any agreement or document, it shall not first have received from the Control Secured Parties or the Obligors funds equal to the amount payable. The Collateral Control Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any of the Collateral Documents in accordance with a request of the Relevant Directing Party, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the other Control Secured Parties.

(m) If, with respect to a proposed action to be taken by it, a Collateral Control Agent shall determine in good faith that the provisions of this Agreement or any other Collateral Document relating to the functions or responsibilities or discretionary powers of the Collateral Control Agent are or may be ambiguous or inconsistent, the Collateral Control Agent shall notify the Relevant Directing Party, identifying the proposed action, and may decline either to perform such function or responsibility or to take the action requested unless it has received the written confirmation of the Relevant Directing Party that the action proposed to be taken by the Collateral Control Agent is consistent with the terms of this Agreement or of the Collateral Documents or is otherwise appropriate. The Collateral Control Agent shall be fully protected in acting or refraining from acting upon the confirmation of the Relevant Directing Party, in this respect, and such confirmation shall be binding upon the Collateral Control Agent and the other Control Secured Parties.

(n) The Collateral Control Agent shall not be deemed to have actual, constructive, direct or indirect knowledge or notice of the occurrence of any Default unless and until the Collateral Control Agent has received a written notice or a certificate from the Relevant Directing Party or the Obligors stating that a Default has occurred. The Collateral Control Agent shall have no obligation whatsoever either prior to or after receiving such notice or certificate to inquire whether a Default has in fact occurred and shall be entitled to rely conclusively, and shall be fully protected in so relying, on any notice or certificate so furnished to it. No provision of this Agreement, any of the Collateral Documents shall require the Collateral Control Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Agreement, any of the Collateral Documents or the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability including an advance of moneys necessary to take the action requested is not reasonably assured to it, the Collateral Control Agent may decline to act unless it receives indemnity satisfactory to it in its sole discretion, including an advance of moneys necessary to take the action requested. The Collateral Control Agent shall be under no obligation or duty to take any action under this Agreement or any of the Collateral Documents or otherwise if taking such action (i) would subject the Collateral Control Agent to a tax in any jurisdiction where it is not then subject to a tax or (ii) would require the Collateral Control Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(o) Notwithstanding that the Collateral Control Agent is appointed by and acting for and at the direction of the Control Secured Parties, the Obligors will jointly and

-34-

severally pay upon demand to the Collateral Control Agent the amount of any and all reasonable fees (including any as set forth in one or more separate fee letters of the Collateral Control Agent) and out-of-pocket expenses, including the reasonable fees and expenses of its counsel, that the Collateral Control Agent may incur in connection with (i) the negotiation, administration and performance of this Agreement and the Collateral Documents to which it is a party, (ii) the custody or preservation of, or the sale of, collection from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement (whether through negotiations, legal proceedings or otherwise) of any of the rights of the Collateral Control Agent or the other Control Secured Parties hereunder or under the Collateral Documents or (iv) the failure by the Obligors to perform or observe any of the provisions hereof or of any of the Collateral Documents. The provisions of this section shall survive the termination of this Agreement and resignation or removal of the Collateral Control Agent. The expenses of the Collateral Control Agent incurred in connection with actions undertaken as provided in this Section 8.1 shall be payable jointly and severally by the Obligors to the Collateral Control Agent upon demand therefore (which demand shall be accompanied by an appropriate invoice).

(p) Each of the Control Secured Parties expressly acknowledges that neither the Collateral Control Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it (except as expressly provided herein) and that no act by the Collateral Control Agent hereafter taken, including any review of the Obligors, shall be deemed to constitute any representation or warranty by the Collateral Control Agent to any Control Secured Party. Each Control Secured Party represents to the Collateral Control Agent that it has, independently and without reliance upon the Collateral Control Agent or any other Control Secured Party, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Obligors. Each Control Secured Party also represents that it will, independently and without reliance upon the Collateral Control Agent or any other Control Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Obligors. Except for notices, reports and other documents expressly required to be furnished to the Control Secured Parties by the Collateral Control Agent hereunder, the Collateral Control Agent shall not have any duty or responsibility to provide any Control Secured Party with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of the Obligors which may come into the possession of the Collateral Control Agent or any of its officers, directors, employees, agents or attorneys-in-fact.

(q) The Obligors, jointly and severally, agree to indemnify each of the Collateral Control Agent and its officers, directors, employees, agents or attorneys-in-fact (collectively, the "Control Indemnified Parties") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time be imposed on, incurred by

-35-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

or asserted against any Control Indemnified Party in any way relating to or arising out of this Agreement or the Collateral Documents; provided that the Obligors shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent that any of the foregoing result from any such Control Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction beyond all applicable appeals.

(r) Neither the Collateral Control Agent, any Control Secured Party nor any of their respective officers, directors, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Obligors or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on the Collateral Control Agent hereunder are solely to protect the Collateral Control Agent's and the Control Secured Parties' interests in the Collateral and shall not impose any duty upon the Collateral Control Agent to exercise any such powers. The Collateral Control Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Obligors for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.

(s) Pursuant to any applicable law, the Obligors authorize the Collateral Control Agent without obligation to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signatures of the Obligors in such form and in such offices as the Relevant Directing Party determines appropriate to perfect the security interests of the Collateral Control Agent under this Agreement. The Obligors hereby ratify and authorize the filing by the Collateral Control Agent of any financing statement with respect to the Collateral made prior to the date hereof. Notwithstanding the foregoing or anything else to the contrary contained in this Agreement, in no event shall the Collateral Control Agent have any duty or obligation to monitor the perfection, continuation of perfection or the sufficiency or validity of any security interest in or related to the Collateral or to prepare or file any Uniform Commercial Code financing statement or continuation statement.

(t) The Obligors acknowledge that the rights and responsibilities of the Collateral Control Agent under this Agreement with respect to any action taken by the Collateral Control Agent or the exercise or non-exercise by the Collateral Control Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Collateral Control Agent and the Control Secured Parties, be governed by such agreements with respect thereto as may exist from time to time among them, but, as between the Collateral Control Agent and the Obligors, the Collateral Control Agent shall be conclusively presumed to be acting as agent for the Control Secured Parties with full and valid authority so to act or refrain from acting, and the Obligors shall not be under any obligation, or entitlement, to make any inquiry respecting such authority.

-36-

(u) Any corporation into which the Collateral Control Agent may be merged, or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Collateral Control Agent shall be a party, shall become a Collateral Control Agent under this Agreement without the execution or filing of any paper or any further act on the part of the parties hereto.

(v) The Collateral Control Agent may resign as Collateral Control Agent at any time upon written notice to the Relevant Directing Party and may be removed at any time with or without cause by the Relevant Directing Party, with any such resignation or removal to become effective only upon the appointment of a successor Collateral Control Agent under this Section. If the Collateral Control Agent shall provide notice of its resignation or be removed as Collateral Control Agent, then the Relevant Directing Party (and if no such successor shall have been appointed within 45 days of the Collateral Control Agent's resignation or removal, the Collateral Control Agent may) appoint a successor agent for the Control Secured Parties, which successor agent shall, in the case of any appointment by the Collateral Control Agent, be reasonably acceptable to the Relevant Directing Party, and the former Collateral Control Agent's rights, powers and duties as Collateral Control Agent shall be terminated, without any other or further act or deed on the part of such former Collateral Control Agent (except that the resigning Collateral Control Agent shall deliver all Collateral then in its possession to the successor Collateral Control Agent and shall execute and deliver to the successor Collateral Control Agent such instruments of assignment and transfer and other similar documents as such successor Collateral Control Agent shall deem necessary or advisable) or any of the Control Secured Parties. After any retiring Collateral Control Agent's resignation or removal hereunder as Collateral Control Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Collateral Control Agent. In the event that a successor Collateral Control Agent is not appointed within the time period specified in this Section 8.1 following the provision of a notice of resignation or removal of the Collateral Control Agent, the Collateral Control Agent or any Control Secured Party may petition a court of competent jurisdiction for the appointment of a successor Collateral Control Agent.

(w) The Collateral Control Agent shall maintain accurate and complete accounts, books, records and computer systems with respect to all matters related directly to the administration of the Collateral, in each case consistent with the customary procedures of the Collateral Control Agent.

(x) The Collateral Control Agent shall at the Obligors' joint and several expense make available to the Relevant Directing Party and its duly authorized representatives, attorneys and auditors, the files and accounts, books, records and computer systems maintained by the Collateral Control Agent or any subcontractor or agent thereof in respect of the Collateral at the locations where such files, accounts, books, records and computer systems are maintained pursuant to this Agreement and the other Collateral Documents, during normal business hours and subject to reasonable prior written notice.

-37-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(y) Each of the Lenders agree to indemnify on a pro rata basis each of the Control Indemnified Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, reasonable attorneys' fees) or disbursements of any kind whatsoever ("Liabilities") which may at any time be imposed on, incurred by or asserted against any Control Indemnified Party to the extent they result from any indemnity provided by the Collateral Control Agent to an account bank or securities intermediary under any Account Control Agreement existing at the date hereof or from any other indemnity provided by the Collateral Control Agent to an account bank or securities intermediary under any Account Control Agreement at the written instruction of the Lender Agent following the date hereof; provided that (i) the Lenders shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent that any of the foregoing result from any such Control Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction beyond all applicable appeals and (ii) any such indemnity so provided by the Collateral Control Agent under such Account Control Agreement is limited to Liabilities that arise as a result of any such account bank or securities intermediary taking action or not taking action at the written instructions or order of the Collateral Control Agent to such account bank or securities intermediary that were made by the Collateral Control Agent at the written instruction or order of the Lender Agent.

(z) With respect to the Bank of America Account Control Agreements and the Wachovia Account Control Agreement, each of the Lenders agree to indemnify on a pro rata basis each of the Control Indemnified Parties from and against any and all Liabilities which may at any time be imposed on, incurred by or asserted against any Control Indemnified Party to the extent they result from any agreement to pay fees, expenses, disbursements, indemnities or other costs provided by the Collateral Control Agent to the applicable account bank or securities intermediary under the Bank of America Account Control Agreements and the Wachovia Account Control Agreements; provided that (i) the Lenders shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent that any of the foregoing result from any such Control Indemnified Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final non-appealable judgment, and (ii) the Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent that any of the foregoing arises after the Discharge of First Priority Claims.

(aa) The Collateral Control Agent shall not be required to act, refrain from acting, consent, or request any action under this Agreement or any other Collateral Document, or to enter into any agreement amending, modifying or supplementing any provision of this Intercreditor Agreement or any Collateral Document unless it shall have been directed to do so by the Relevant Directing Party. Additionally, the permissive right of the Collateral Control Agent to take any action under this Intercreditor Agreement or any of the Collateral Documents shall not be construed as a duty to so act.

-38-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(bb) All indemnities to be paid to the Collateral Control Agent under this Agreement shall be payable immediately when due in U.S. dollars ("Dollars") in the full amount due, without deduction for any variation in any Rate of Exchange (as defined below). The Obligors hereby agree to jointly and severally indemnify the Collateral Control Agent against any losses, damages, penalties, costs, expenses or disbursements of any kind or nature whatsoever, including, without limitation, attorney's fees and expenses, incurred by the Collateral Control Agent as a result of any judgment or order being given or made for the amount due hereunder and such judgment or order being expressed and paid in a currency (the "Judgment Currency") other than Dollars and as a result of any variation as between (i) the rate of exchange at which the dollar amount is converted into Judgment Currency for the purpose of such judgment or order, and (ii) the Rate of Exchange at which the Collateral Control Agent is then able to purchase Dollars with the amount of the Judgment Currency actually received by the Collateral Control Agent. The indemnity set forth in this paragraph shall constitute a separate and independent obligation of the Obligors and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "Rate of Exchange" means the rate at which the Collateral Control Agent is able to purchase Dollars with the Judgment Currency on the foreign exchange market on the relevant date and shall include any premiums and other reasonable costs of exchange payable in connection with the purchase or, or conversion into, the relevant currency.

(cc) The indemnifications set forth in this Section 5.6 shall survive the termination or assignment of this Agreement and the resignation or removal of the Collateral Control Agent.

(dd) For the avoidance of doubt, if there are any conflicts between the rights, protections and responsibilities of the Collateral Control Agent under the terms of this Agreement and the rights, protections and responsibilities of the Collateral Control Agent under the terms of the Collateral Documents, the terms of this Agreement shall control.

(ee) Each of the First Priority Collateral Agent, Second Priority Collateral Agent and Third Priority Collateral Agent shall be entitled to the same rights, protections, immunities and indemnities as set forth in the First Priority Security Agreement, the Second Priority Security Agreement and the Third Priority Security Agreement, respectively, as if the provisions setting forth those rights, protections, immunities and indemnities are fully set forth herein.

Section 6. Insolvency Proceedings.

6.1 Finance and Sale Issues.

(a) Until the Discharge of First Priority Claims has occurred, if any Obligor shall be subject to any Insolvency Proceeding and the holders of a majority in principal amount of the First Priority Claims shall desire to permit the use of cash collateral (as such term is defined in Section 363(a) of the Bankruptcy Code) under Section 363(c) of the Bankruptcy Code ("Use of Cash Collateral") or to permit an Obligor to obtain financing, whether from the First Priority Secured Parties, any other Person, or any combination thereof, under Section 364 of the

-39-

Bankruptcy Code ("DIP Financing"), then each of the Second Priority Collateral Agent and the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that it shall not be entitled to raise (and will not raise), but instead shall be deemed to have otherwise irrevocably, absolutely, and unconditionally waived any right to raise, any objection to such Use of Cash Collateral or DIP Financing (and instead will be deemed to have consented to such Use of Cash Collateral or DIP Financing) and shall not be entitled to request (and will not request) adequate protection or any other relief in connection therewith (except as expressly agreed by the Lender Agent or to the extent permitted by Section 6.3) and, to the extent the First Priority Liens are junior in priority or pari passu with such Use of Cash Collateral or such DIP Financing, will maintain the priority of its Liens in the Collateral as junior in priority to such First Priority Liens on the same basis as the other Liens securing the Second Priority Claims or the Third Priority Claims, as the case may be, are junior in priority to First Priority Liens under this Agreement; provided, however, that either the 2010 Trustee or 2015 Trustee, on behalf of the Second Priority Secured Parties or the Third Priority Secured Parties, as the case may be, may object to such Use of Cash Collateral or DIP Financing if (i) the sum of (A) the cash collateral permitted to be used therein and (B) the aggregate principal amount of such DIP Financing exceeds $250,000,000 in the aggregate, or (ii) the Second Priority Secured Parties or the Third Priority Secured Parties, as the case may be, are not permitted to retain a Lien on the Collateral (including proceeds thereof arising after the commencement of such proceeding) with the same priority as existed prior to the commencement of the case under the Bankruptcy Code (subject to the subordination of the Liens securing such DIP Financing as described above). Without limiting the other provisions of this Agreement, nothing in this Section 6.1(a) is intended to limit the ability of the First Priority Secured Parties, the Second Priority Secured Parties or the Third Priority Secured Parties to participate in, support, or object to any Use of Cash Collateral or DIP Financing that does not involve the Collateral.

    (b) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, if any Obligor shall be subject to any Insolvency Proceeding and the holders of a majority in principal amount of the Second Priority Claims shall desire to permit the Use of Cash Collateral or to permit an Obligor to obtain DIP Financing, then each of the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that it shall not be entitled to raise (and will not raise), but instead shall be deemed to have otherwise irrevocably, absolutely, and unconditionally waived any right to raise, any objection to such Use of Cash Collateral or DIP Financing (and instead will be deemed to have consented to such Use of Cash Collateral or DIP Financing) and shall not be entitled to request (and will not request) adequate protection or any other relief in connection therewith (except as expressly agreed by the 2010 Trustee or to the extent permitted by Section 6.3) and, to the extent the Second Priority Liens are junior in priority or pari passu with such Use of Cash Collateral or such DIP Financing, will maintain the priority of its Liens in the Collateral as junior in priority to such Second Priority Liens on the same basis as the other Liens securing the Third Priority Claims are junior in priority to Second Priority Liens under this Agreement; provided, however, that the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties may object to such Use of Cash Collateral or DIP Financing if (i) the sum of (A) the cash collateral permitted to be used therein (together with any Use of Cash

-40-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Collateral pursuant to Section 6.1(a) above) and (B) the aggregate principal amount of such DIP Financing (together with any outstanding DIP Financing obtained and cash collateral used pursuant to Section 6.1(a) above) exceeds $250,000,000 in the aggregate, or (ii) the Third Priority Secured Parties are not permitted to retain a Lien on the Collateral (including proceeds thereof arising after the commencement of such proceeding) with the same priority as existed prior to the commencement of the case under the Bankruptcy Code (subject to the subordination of the Liens securing such DIP Financing as described above). Without limiting the other provisions of this Agreement, nothing in this Section 6.1(b) is intended to limit the ability of the Second Priority Secured Parties or Third Priority Secured Parties to participate in, support, or object to any Use of Cash Collateral or DIP Financing that does not involve the Collateral.

(c) Until the Discharge of First Priority Claims has occurred, and unless 2010 Noteholders holding at least one-third of the principal amount of outstanding 2010 Notes direct such opposition by the 2010 Trustee or unless 2015 Third Priority Secured Parties holding at least one-third of the principal amount of outstanding Third Priority Claims direct such opposition by the 2015 Trustee and the other Additional Third Priority Representatives, the Second Priority Secured Parties (unless the 2010 Trustee receives such direction by the requisite 2010 Noteholders) and the Third Priority Secured Parties (unless the 2015 Trustee and the other Additional Third Priority Representatives receive such direction by the requisite Third Priority Secured Parties), in any Insolvency Proceeding or otherwise, shall not be entitled to oppose (and shall not oppose) any sale or disposition of any assets of any of the Obligors that is supported by First Priority Secured Parties, and the Second Priority Secured Parties or Third Priority Secured Parties or both, as the case may be, will be deemed to have consented under Section 363 of the Bankruptcy Code to any sale supported by such First Priority Secured Parties and to have released their Liens in such assets so long as and to the extent that (i) the First Priority Secured Parties shall have likewise released their Liens and (ii) the First Priority Liens, the Second Priority Liens and the Third Priority Liens shall attach to the proceeds of any Collateral sold or disposed of in the priorities set forth herein.

(d) Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, and unless Third Priority Secured Parties holding at least one-third of the principal amount of outstanding Third Priority Claims direct such opposition by the 2015 Trustee and the other Additional Third Priority Representatives, the Third Priority Secured Parties, in any Insolvency Proceeding or otherwise, shall not be entitled to oppose (and shall not oppose) any sale or disposition of any assets of any of the Obligors that is supported by Second Priority Secured Parties holding 50% of the principal amount of the Second Priority Claims, and the Third Priority Secured Parties will be deemed to have consented under Section 363 of the Bankruptcy Code to any sale supported by such Second Priority Secured Parties and to have released their Liens in such assets so long as and to the extent that (i) the Second Priority Secured Parties shall have likewise released their Liens and (ii) the Second Priority Liens and the Third Priority Liens shall attach to the proceeds of any Collateral sold or disposed of in the priorities set forth herein.

6.2 **[Intentionally Omitted]**.

6.3 Adequate Protection. If and only if directed to do so by (a) in the case of the 2010 Trustee, 2010 Noteholders holding at least one-third of the principal amount of the 2010 Notes or

-41-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(b) in the case of the 2015 Trustee or any Additional Third Priority Representative, the holders of at least one-third of the principal amount of the Third Priority Claims, (i) each Trustee and each Additional Third Priority Representative, on behalf of itself and the Second Priority Secured Parties or Third Priority Secured Parties, as the case may be, may seek or request adequate protection in the form of a Lien on any additional collateral (including by way of objecting to any DIP Financing that does not provide for such Lien), which Lien will be junior in priority to the First Priority Liens and such DIP Financing (and all Obligations relating thereto) (and in the case of any such Lien securing the Third Priority Claims, junior in priority to the Second Priority Liens) on the same basis as the other Liens securing the Second Priority Claims or the Third Priority Claims are junior in priority to the First Priority Liens under this Agreement and subject in all respects to the release obligations set forth in this Agreement, including in Section 5.1 and Section 6.1 hereof, and (ii) the Trustees, each Additional Third Priority Representative, and the other Second Priority Secured Parties or Third Priority Secured Parties, as the case may be, may seek or request post-petition interest and/or adequate protection payments in any Insolvency Proceeding in respect of the Second Priority Liens and the Third Priority Liens, and the First Priority Collateral Agent and the Lender Agent, on behalf of themselves and the other First Priority Secured Parties, may oppose such motions or requests made by or on behalf of the Second Priority Secured Parties or the Third Priority Secured Parties (provided also that the Second Priority Collateral Agent and the 2010 Trustee, on behalf of themselves and the other Second Priority Secured Parties, may oppose such motions or requests made by or on behalf of the Third Priority Secured Parties). If the Second Priority Secured Parties or the Third Priority Secured Parties are granted post-petition interest and/or adequate protection payments in an Insolvency Proceeding ("Junior Priority Bankruptcy Payments"), such amounts shall be deemed Collateral, shall be turned over to the First Priority Collateral Agent in accordance with Section 4.2 hereof (or, following the Discharge of First Priority Claims and prior to the Discharge of Second Priority Claims, to the Second Priority Collateral Agent) and shall be applied according to the terms thereof (regardless of whether or not any order of a bankruptcy court authorizing and/or directing any Junior Priority Bankruptcy Payments shall expressly provide for such direct payment to the First Priority Collateral Agent or the Second Priority Collateral Agent, as applicable).

6.4 No Waiver. Subject to Section 3.1(a), nothing contained herein shall prohibit or in any way limit the First Priority Collateral Agent, the Lender Agent or any other First Priority Secured Party from objecting in any Insolvency Proceeding or otherwise to any action taken by any Second Priority Secured Party or Third Priority Secured Party, including the seeking by any Second Priority Secured Party or Third Priority Secured Party of adequate protection or the asserting by any Second Priority Secured Party or Third Priority Secured Party of any of its rights and remedies under the Second Priority Documents, the Third Priority Documents or otherwise. Subject to Section 3.1(a), following the Discharge of First Priority Claims, nothing contained herein shall prohibit or in any way limit the 2010 Trustee or any other Second Priority Secured Party from objecting in any Insolvency Proceeding or otherwise to any action taken by any Third Priority Secured Party, including the seeking by any Third Priority Secured Party of adequate protection or the asserting by any Third Priority Secured Party of any of its rights and remedies under the Third Priority Documents or otherwise.

6.5 Preference Recoveries. If any First Priority Secured Party is required in any Insolvency Proceeding or otherwise to turn over or otherwise pay to the estate of any Obligor

-42-

any amount as a preference (a "<u>Recovery</u>"), then the First Priority Claims shall be reinstated to the extent of such Recovery. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement. If any Second Priority Secured Party is required in any Insolvency Proceeding or otherwise to turn over any Recovery, then the Second Priority Claims shall be reinstated to the extent of such Recovery. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

6.6 <u>Post-Petition Interest</u>. No Second Priority Secured Party or Third Priority Secured Party shall oppose or seek to challenge any claim by the First Priority Collateral Agent, the Lender Agent or any other First Priority Secured Party for allowance in any Insolvency Proceeding of the First Priority Claims consisting of post-petition interest, fees or expenses to the extent of the value of any First Priority Lien on the Collateral, without regard to the existence of the Second Priority Liens or Third Priority Liens on the Collateral, such value to be determined without regard to the existence of the Second Priority Liens or the Third Priority Liens on the Collateral. No Third Priority Secured Party shall oppose or seek to challenge any claim by the Second Priority Collateral Agent, the 2010 Trustee or any other Second Priority Secured Party for allowance in any Insolvency Proceeding of the Second Priority Claims consisting of post-petition interest, fees or expenses to the extent of the value of any Second Priority Lien on the Collateral, without regard to the existence of the Third Priority Liens on the Collateral, such value to be determined without regard to the existence of the Third Priority Liens on the Collateral.

6.7 **[Intentionally Omitted]**.

6.8 <u>Separate Grants of Security and Separate Classification</u>. Each of the First Priority Collateral Agent, the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of themselves and the other Second Priority Secured Parties, the 2015 Trustee, and each Additional Third Priority Representative on behalf of themselves and the other Third Priority Secured Parties, and the Lender Agent, on behalf of itself and the other First Priority Secured Parties, acknowledge and agree that:

(a) the grants of Liens pursuant to the First Priority Collateral Documents, the Second Priority Collateral Documents and the Third Priority Collateral Documents constitute three separate and distinct grants of Liens; and

(b) because of, among other things, their differing rights in the Collateral, the First Priority Claims, the Second Priority Claims and the Third Priority Claims are fundamentally different from one another and must be separately classified in any Plan of Reorganization proposed or confirmed in an Insolvency Proceeding.

To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that, contrary to the intention of the parties, the claims of the First Priority Secured Parties, the Second Priority Secured Parties and/or the Third Priority Secured Parties in respect

-43-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

of the Collateral constitute only one secured claim (rather than separate classes of first priority, second priority and third priority secured claims), then (i) each of the parties hereto hereby acknowledges and agrees that, subject to Sections 2.1 and 4.1, all distributions shall be made as if there were separate classes of first priority, second priority and third priority secured claims against the Obligors in respect of the Collateral (with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties and the Third Priority Secured Parties), (ii) the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, including any additional interest payable pursuant to the First Priority Documents, arising from or related to a default, which is disallowed as a claim in any Insolvency Proceeding, and reimbursement of all fees and expenses of the First Priority Collateral Agent's and the Lender Agent's respective attorneys, financial consultants, and other agents) before any distribution is made in respect of or by virtue of the Second Priority Liens or the Third Priority Liens, with each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby acknowledging and agreeing to turn over to the First Priority Collateral Agent amounts otherwise received or receivable by them in respect of or by virtue of the Third Priority Liens to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Priority Secured Parties or the Third Priority Secured Parties, and (iii) following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, the Second Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, including any additional interest payable pursuant to the Second Priority Documents, arising from or related to a default, which is disallowed as a claim in any Insolvency Proceeding, and reimbursement of all fees and expenses of the Second Priority Collateral Agent's and the 2010 Trustee's respective attorneys, financial consultants, and other agents) before any distribution is made in respect of or by virtue of the Third Priority Liens, with each of the Third Priority Collateral Agent and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby acknowledging and agreeing to turn over to the Second Priority Collateral Agent amounts otherwise received or receivable by them in respect of or by virtue of the Third Priority Liens to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Third Priority Secured Parties.

6.9 <u>Voting for Plan of Reorganization</u>. The First Priority Secured Parties, the Second Priority Secured Parties and the Third Priority Secured Parties shall be entitled to vote to accept or reject any Plan of Reorganization in connection with any Insolvency Proceeding so long as such Plan of Reorganization is a Conforming Plan of Reorganization and shall be entitled to vote to reject any such Plan of Reorganization that is a Non-Conforming Plan of Reorganization; <u>provided</u> that each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that none of the Second Priority Secured Parties or the Third Priority Secured Parties shall be entitled to take any action or vote in any way that supports

-44-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

any Non-Conforming Plan of Reorganization. Without limiting the generality of the foregoing or of the other provisions of this Agreement, any vote to accept, and any other act to support the confirmation or approval of, any Non-Conforming Plan of Reorganization by any Second Priority Secured Party or Third Priority Secured Party shall be inconsistent with and accordingly, a violation of the terms of this Agreement, and the Lender Agent shall be entitled (and hereby authorized by the Second Priority Secured Parties and Third Priority Secured Parties) to have any such vote to accept a Non-Conforming Plan of Reorganization changed and any such support of any such Non-Conforming Plan of Reorganization withdrawn (and following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, the 2010 Trustee shall be entitled to have any such vote by any Third Priority Secured Party to accept a Non-Conforming Plan of Reorganization changed and any such support of any such Non-Conforming Plan of Reorganization withdrawn).

6.10 <u>No X Clause</u>. This Agreement does not include any "X Clause" in favor of the Second Priority Secured Parties or the Third Priority Secured Parties. Without limiting the generality of the foregoing or of any other provision of this Agreement, absent a Discharge of First Priority Claims occurring on or before the effective date of any such Plan of Reorganization, none of the Second Priority Secured Parties or the Third Priority Secured Parties shall be entitled to receive or retain any debt or equity securities to be distributed under any confirmed Plan of Reorganization on account of or otherwise by virtue of the Second Priority Liens or the Third Priority Liens on the Collateral, as the case may be, but any such debt or equity securities instead shall be distributed to the Lender Agent for further distribution to the First Priority Secured Parties in accordance with the provisions of <u>Section 4.2</u> hereof; provided that following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims, any debt or equity securities to be distributed under any confirmed Plan of Reorganization on account of or otherwise by virtue of the Third Priority Liens on the Collateral shall be distributed to the 2010 Trustee for further distribution to the Second Priority Secured Parties in accordance with the provisions of <u>Section 4.2</u> hereof.

6.11 <u>Determination of Distributions on Account of Lien on Collateral</u>. For the purposes of this Agreement, including for the purposes of <u>Sections 4.2</u>, <u>5.4</u>, and <u>6.10</u> hereof, there shall be a presumption that any distribution to or for the benefit of the Second Priority Secured Parties or the Third Priority Secured Parties under any Plan of Reorganization for any Obligor shall be on account of or by virtue of the Second Priority Liens or the Third Priority Liens, as the case may be, on the Collateral. Each Trustee and each Additional Third Priority Representative, on behalf of itself and the Second Priority Secured Parties or the Third Priority Secured Parties, as the case may be, shall have the burden of rebutting that presumption, and of proving the portion (if any) of any distribution under any Plan of Reorganization to or for the benefit of the Second Priority Secured Parties or the Third Priority Secured Parties, as the case may be, that does not consist of proceeds of (or is not otherwise on account of or by virtue of) such Lien on the Collateral, in each case by clear and convincing evidence.

Section 7. <u>Reliance; Waivers; etc.</u>

7.1 <u>Reliance</u>. Each of the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, acknowledges that the

-45-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Second Priority Secured Parties and Third Priority Secured Parties have, independently and without reliance on the Collateral Agents, the Lender Agent or any other First Priority Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the Indentures or any other applicable Second Priority Document or Third Priority Document, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decisions in taking or not taking any action under the Indentures, any such other Second Priority Document, any such other Third Priority Document or this Agreement. Each of the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, acknowledges that the Third Priority Secured Parties have, independently and without reliance on the Collateral Agents, the 2010 Trustee or any other Second Priority Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into the 2015 Indenture or any other applicable Third Priority Document, this Agreement and the transactions contemplated hereby and thereby and they will continue to make their own credit decisions in taking or not taking any action under the 2015 Indenture, any such other Third Priority Document or this Agreement.

7.2 <u>No Warranties or Liability</u>.

(a) Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, acknowledges and agrees that each of the First Priority Collateral Agent, the Lender Agent and the other holders of First Priority Claims have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Priority Documents or the ownership of any Collateral or the perfection or priority of any Lien thereon. The holders of First Priority Claims will be entitled to manage and supervise their respective loans and extensions of credit to the Obligors in accordance with applicable law and as they may otherwise, in their sole discretion, deem appropriate, and the holders of First Priority Claims may manage their loans and extensions of credit without regard to any right or interest that any Second Priority Secured Party or any Third Priority Secured Party may have in the Collateral or otherwise, except as otherwise provided in this Agreement. None of the First Priority Collateral Agent, the Lender Agent or any other First Priority Secured Party shall have any duty to any Second Priority Secured Party or any Third Priority Secured Party to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreement with any Obligor (including the Second Priority Documents and Third Priority Documents), regardless of any knowledge thereof which they may have or be charged with.

(b) Each of the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, acknowledges and agrees that each of the Second Priority Collateral Agent, the 2010 Trustee and the other holders of Second Priority Claims have made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Priority Documents or the ownership of any Collateral or the perfection or priority of any Lien thereon. The holders of

-46-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Second Priority Claims will be entitled to manage and supervise their extensions of credit to the Obligors in accordance with applicable law and as they may otherwise, in their sole discretion, deem appropriate, and the holders of Second Priority Claims may manage their extensions of credit without regard to any right or interest that any Third Priority Secured Party may have in the Collateral or otherwise, except as otherwise provided in this Agreement. None of the Second Priority Collateral Agent, the 2010 Trustee or any other Second Priority Secured Party shall have any duty to any Third Priority Secured Party to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreement with any Obligor (including the Third Priority Documents), regardless of any knowledge thereof which they may have or be charged with.

7.3 <u>No Waiver of Lien Priorities</u>.

(a) To the fullest extent permitted under applicable law, no right of the First Priority Collateral Agent, the Lender Agent, the other First Priority Secured Parties or any of them to enforce any provision of this Agreement shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Obligor or by any act or failure to act by any First Priority Secured Party, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement or any of the First Priority Documents, the Second Priority Documents or the Third Priority Documents, regardless of any knowledge thereof which the First Priority Collateral Agent, the Lender Agent or the other First Priority Secured Parties, or any of them, may have or be otherwise charged with. To the fullest extent permitted under applicable law, no right of the Second Priority Collateral Agent, the 2010 Trustee, the other Second Priority Secured Parties or any of them to enforce any provision of this Agreement shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Obligor or by any act or failure to act by any Second Priority Secured Party, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement or any of the Second Priority Documents or the Third Priority Documents, regardless of any knowledge thereof which the Second Priority Collateral Agent, the 2010 Trustee or the other Second Priority Secured Parties, or any of them, may have or be otherwise charged with.

(b) Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Obligors under the First Priority Documents), the First Priority Secured Parties and any of them, may, to the fullest extent permitted under applicable law, at any time and from time to time, without the consent of, or notice to, any Second Priority Secured Party or Third Priority Secured Party, without incurring any liability to any Second Priority Secured Party or Third Priority Secured Party and without impairing or releasing the lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of any Second Priority Secured Party or Third Priority Secured Party is affected, impaired or extinguished thereby) do any one or more of the following:

(i) make loans and advances to any Obligor or issue, guaranty or obtain letters of credit for account of any Obligor or otherwise extend credit to any Obligor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

-47-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(ii) change the manner, place or terms of payment or change or extend the time of payment of, or renew, exchange, amend, increase or alter, the terms of any of the First Priority Claims or any First Priority Lien or guaranty thereof or any liability of the Obligors, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Priority Claims), without any restriction as to the amount, tenor or terms of any such increase or extension or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the holders of First Priority Claims, the First Priority Claims or any of the First Priority Documents;

(iii) sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral or any liability of any Obligor to the First Priority Secured Parties, or any liability incurred directly or indirectly in respect thereof;

(iv) settle or compromise any First Priority Claim or any other liability of any Obligor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sum by whomsoever paid and however realized to any liability (including the First Priority Claims) in any manner or order; and

(v) exercise or delay in or refrain from exercising any right or remedy against any Obligor or any security or any other Person, elect any remedy and otherwise deal freely with the Obligors and the Collateral and any security or any liability of any Obligor to the holders of First Priority Claims or any liability incurred directly or indirectly in respect thereof.

(c) Without in any way limiting the generality of the foregoing paragraph (a) (but subject to the rights of the Obligors under the Second Priority Documents), the Second Priority Secured Parties and any of them, may, to the fullest extent permitted under applicable law but subject to the terms of this Agreement (including, without limitation, Section 5.3 hereof), at any time and from time to time, without the consent of, or notice to, any Third Priority Secured Party, without incurring any liability to any Third Priority Secured Party and without impairing or releasing the lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of any Third Priority Secured Party is affected, impaired or extinguished thereby) do any one or more of the following:

(i) change the manner, place or terms of payment or change or extend the time of payment of, or renew, exchange, amend, increase or alter, the terms of any of the Second Priority Claims or any Second Priority Lien or guaranty thereof or any liability of the Obligors, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the Second Priority Claims), without any restriction as to the amount, tenor or terms of any such increase or extension or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the holders of Second Priority Claims, the Second Priority Claims or any of the Second Priority Documents;

(ii) sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Collateral or any liability of any

-48-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor to the Second Priority Secured Parties, or any liability incurred directly or indirectly in respect thereof;

(iii) settle or compromise any Second Priority Claim or any other liability of any Obligor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sum by whomsoever paid and however realized to any liability (including the Second Priority Claims) in any manner or order; and

(iv) exercise or delay in or refrain from exercising any right or remedy against any Obligor or any security or any other Person, elect any remedy and otherwise deal freely with the Obligors and the Collateral and any security or any liability of any Obligor to the holders of Second Priority Claims or any liability incurred directly or indirectly in respect thereof.

(d) Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, also agrees, to the fullest extent permitted under applicable law, that no First Priority Secured Party shall have any liability to any of them, and each of them, to the fullest extent permitted under applicable law, hereby waives any claim against any First Priority Secured Party, arising out of any action which such holders of First Priority Claims may take or permit or omit to take with respect to the foreclosure upon, or sale, liquidation or other disposition of, the Collateral. Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that none of the First Priority Collateral Agent, the Lender Agent or any other First Priority Secured Party shall have any duty to them, express or implied, fiduciary or otherwise, in respect of the maintenance or preservation of the Collateral, the First Priority Claims or otherwise.

(e) Each of the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, also agrees, to the fullest extent permitted under applicable law, that no Second Priority Secured Party shall have any liability to any of them, and each of them, to the fullest extent permitted under applicable law, hereby waives any claim against any Second Priority Secured Party, arising out of any action which such holders of Second Priority Claims may take or permit or omit to take with respect to the foreclosure upon, or sale, liquidation or other disposition of, the Collateral. Each of the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees that none of the Second Priority Collateral Agent, the 2010 Trustee or any other Second Priority Secured Party shall have any duty to them, express or implied, fiduciary or otherwise, in respect of the maintenance or preservation of the Collateral, the Second Priority Claims or otherwise.

(f) Except to the extent otherwise expressly provided herein, each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional

-49-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshaling, appraisal, valuation or other similar right that may otherwise be available under applicable law or any other similar right a junior secured creditor may have under applicable law.

7.4 Obligations Unconditional. All rights, interests, agreements and obligations of the First Priority Secured Parties, the Second Priority Secured Parties and the Third Priority Secured Parties hereunder shall remain in full force and effect irrespective of:

(a) any lack of validity or enforceability of any First Priority Document, Second Priority Document or Third Priority Document or any setting aside or avoidance of any First Priority Lien, Second Priority Lien or Third Priority Lien;

(b) any change in the time, manner or place of payment of, or in any other terms of, any First Priority Claim, Second Priority Claim or Third Priority Claim, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of the First Priority Documents, the Second Priority Documents or the Third Priority Documents;

(c) any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of any First Priority Claim, Second Priority Claim or Third Priority Claim or any guarantee thereof;

(d) the commencement of any Insolvency Proceeding in respect of any Obligor; or

(e) any other circumstance which otherwise might constitute a defense available to, or a discharge of, any Obligor in respect of the First Priority Claims, Second Priority Claims or Third Priority Claims or of any First Priority Secured Party, Second Priority Secured Party or Third Priority Secured Party in respect of this Agreement.

Section 8. Miscellaneous.

8.1 Conflicts. In the event of any conflict between the provisions of this Agreement and the provisions of the First Priority Documents, the Second Priority Documents and the Third Priority Documents, the provisions of this Agreement shall govern and control.

8.2 Continuing Nature of this Agreement. This Agreement shall continue to be effective until both the Discharge of First Priority Claims and the Discharge of Second Priority Claims shall have occurred. This is a continuing agreement of lien priority. Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby irrevocably, absolutely, and unconditionally waives any right it may have under applicable law to revoke this Agreement or any provisions hereof.

-50-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

8.3 <u>Amendments; Waivers</u>. No amendment, modification or waiver of any provision of this Agreement shall be deemed to be made unless the same shall be in writing signed by the First Priority Collateral Agent, the Second Priority Collateral Agent, the Third Priority Collateral Agent, the Lender Agent, the 2010 Trustee, the 2015 Trustee and each and each Additional Third Priority Representative and, subject to the immediately following sentence, each Obligor and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Notwithstanding the foregoing, no Obligor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights are directly affected (which includes any amendment to such Obligor's ability to cause additional obligations to constitute First Priority Claims, Second Priority Claims or Third Priority Claims as such Obligor may designate).

8.4 <u>Information Concerning Financial Condition of the Obligors and their Subsidiaries</u>.

(a) Each of the First Priority Secured Parties, the Second Priority Secured Parties and the Third Priority Secured Parties, as separate groups of secured creditors shall be responsible for keeping themselves informed of (i) the financial condition of the Obligors and their Subsidiaries and all endorsers and/or guarantors of the First Priority Claims, the Second Priority Claims or the Third Priority Claims and (ii) all other circumstances bearing upon the risk of nonpayment of the First Priority Claims, the Second Priority Claims or the Third Priority Claims.

(b) None of the First Priority Collateral Agent, the Lender Agent nor any other First Priority Secured Party shall have any duty to advise the Second Priority Collateral Agent, the Third Priority Collateral Agent, any Trustee, and Additional Third Priority Representative, any other Second Priority Secured Party or any other Third Priority Secured Party of information known to it or them regarding such condition or any such circumstance or otherwise. In the event the First Priority Collateral Agent or the Lender Agent or any other First Priority Secured Party undertakes at any time or from time to time to provide any such information to any Second Priority Secured Party or Third Priority Secured Party, it or they shall be under no obligation (i) to provide any additional information or to provide any such information on any subsequent occasion, (ii) to undertake any investigation or (iii) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential.

(c) None of the Second Priority Collateral Agent, the 2010 Trustee nor any other Second Priority Secured Party shall have any duty to advise the Third Priority Collateral Agent, the 2015 Trustee, any Additional Third Priority Representative or any other Third Priority Secured Party of information known to it or them regarding such condition or any such circumstance or otherwise. In the event the Second Priority Collateral Agent or the 2010 Trustee or any other Second Priority Secured Party undertakes at any time or from time to time to provide any such information to any Third Priority Secured Party, it or they shall be under no obligation (i) to provide any additional information or to provide any such information on any subsequent occasion, (ii) to undertake any investigation or (iii) to disclose any information

-51-

which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential.

8.5 <u>Certain Successors</u>. Each successor First Priority Collateral Agent, Second Priority Collateral Agent, Third Priority Collateral Agent, Trustee and each Additional Third Priority Representative, shall execute and deliver a counterpart of and become a party to this Agreement (but the failure to execute such counterpart shall not diminish such Person's obligations under this Agreement).

8.6 <u>Application of Payments</u>. All payments received by the holders of First Priority Claims may be applied, reversed and reapplied, in whole or in part, to such part of the First Priority Claims as the holders of First Priority Claims, in their sole discretion, deem appropriate. Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, all payments received by the holders of Second Priority Claims may be applied, reversed and reapplied, in whole or in part, to such part of the Second Priority Claims as the holders of Second Priority Claims, in their sole discretion, deem appropriate.

8.7 <u>Marshalling of Assets</u>. Each of the Second Priority Collateral Agent, the Third Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, and the 2015 Trustee any Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby irrevocably, absolutely, and unconditionally waives any and all rights or powers any Second Priority Secured Party or Third Priority Secured Party, as the case may be, may have at any time under applicable law or otherwise to have the Collateral, or any part thereof, marshaled upon any foreclosure or other enforcement of the First Priority Liens or the Second Priority Liens.

8.8 <u>No Purchase Option in Favor of Second Priority Secured Parties or Third Priority Secured Parties</u>. Without in any manner limiting the other provisions of this Agreement (including as to the enforcement of the rights, powers and/or remedies of the First Priority Collateral Agent, the Lender Agent or the other First Priority Secured Parties in and to the Collateral), nothing herein is intended to grant the Second Priority Secured Parties or Third Priority Secured Parties the option to purchase the aggregate amount (or any other portion) of the outstanding First Priority Claims, whether at par or at any other price or under any other terms or conditions. Without in any manner limiting the other provisions of this Agreement (including as to the enforcement of the rights, powers, and/or remedies of the Second Priority Collateral Agent, the 2010 Trustee or the other Second Priority Secured Parties in and to the Collateral following the Discharge of First Priority Claims), nothing herein is intended to grant the Third Priority Secured Parties the option to purchase the aggregate amount (or any other portion) of outstanding Second Priority Claims, whether at par or at any other price or under any other terms or conditions.

8.9 <u>Notices</u>. All notices to the First Priority Secured Parties permitted or required under this Agreement may be sent to the Lender Agent (with a copy to the First Priority Collateral Agent). All notices to the Second Priority Secured Parties permitted or required under this Agreement may be sent to the 2010 Trustee (with a copy to the Second Priority Collateral Agent). All notices to the Third Priority Secured Parties permitted or required under this Agreement may be sent to the 2015 Trustee and each Additional Third Priority Representative

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

(with a copy to the Third Priority Collateral Agent). All notices to the Obligors permitted or required under this Agreement may be sent to the Borrowers. Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or four Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed). For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

8.10 Further Assurances. Each of the Lender Agent, on behalf of itself and the other First Priority Secured Parties, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, and each Obligors, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as any other party may reasonably request to effect the terms of this Agreement (including, in the case of the Lender Agent, 2010 Trustee, 2015 Trustee or any other Additional Third Priority Representative, to direct the First Priority Collateral Agent, Second Priority Collateral Agent, and Third Priority Collateral Agent to do the same). Each of ResCap and the Borrowers shall cause each of its Subsidiaries that becomes an Obligor to execute and deliver a counterpart of and become a party to this Agreement.

8.11 Governing Law. THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES (BUT WITH REFERENCE TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW, WHICH BY ITS TERMS APPLIES TO THIS AGREEMENT.

8.12 Binding on Successors and Assigns; No Third Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the First Priority Collateral Agent, the Lender Agent, the other First Priority Secured Parties (including to the benefit of any successors to the First Priority Secured Parties by virtue of any refinancing), the Second Priority Collateral Agent, the 2010 Trustee, the other Second Priority Secured Parties, the Third Priority Collateral Agent, the 2015 Trustee and each Additional Third Priority Representative, the other Third Priority Secured Parties, and their respective successors and assigns. No other Person shall have or be entitled to assert rights or benefits hereunder. This Agreement shall be binding upon the Obligors and their successors and assigns; provided that no Obligor or any successor or assign thereof shall be entitled to enforce any provision of this Agreement (other than any provision hereof expressly preserving any right of any Obligor under any First Priority Document, Second Priority Document or Third Priority Document).

8.13 Specific Performance. Each of the First Priority Collateral Agent, the Second Priority Collateral Agent, the Third Priority Collateral Agent, the Lender Agent, the Trustees and the Additional Third Priority Representatives may demand specific performance of this Agreement. Each of the Second Priority Collateral Agent, the 2010 Trustee, on behalf of itself and the other Second Priority Secured Parties, the Third Priority Collateral Agent, and the 2015

-53-

Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the First Priority Collateral Agent, the Lender Agent or any other First Priority Secured Party (other than the defense that the obligation for which specific performance is being sought has been performed in accordance with this Agreement). Each of the Third Priority Collateral Agent and the 2015 Trustee and each Additional Third Priority Representative, on behalf of themselves and the other Third Priority Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the Second Priority Collateral Agent, the 2010 Trustee or any other Second Priority Secured Party. Without limiting the generality of the foregoing or of the other provisions of this Agreement, in seeking specific performance in any Insolvency Proceeding, the First Priority Collateral Agent and the Lender Agent may seek such relief as if it were the "holder" of the claims of the Second Priority Secured Parties and the Third Priority Secured Parties under Section 1126(a) of the Bankruptcy Code or otherwise had been granted an irrevocable power of attorney by the Second Priority Secured Parties and Third Priority Secured Parties. Following the Discharge of First Priority Claims and until the Discharge of Second Priority Claims has occurred, without limiting the generality of the foregoing or of the other provisions of this Agreement, in seeking specific performance in any Insolvency Proceeding, the Second Priority Collateral Agent and the 2010 Trustee may seek such relief as if it were the "holder" of the claims of the Third Priority Secured Parties under Section 1126(a) of the Bankruptcy Code or otherwise had been granted an irrevocable power of attorney by the Third Priority Secured Parties.

8.14 Section Titles; Time Periods. The section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

8.15 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which shall together constitute one and the same document. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

8.16 Authorization. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

8.17 Effectiveness. This Agreement shall become effective when executed and delivered by the parties listed below. This Agreement shall be effective both before and after the commencement of any Insolvency Proceeding. Consistent with, but not in limitation of, the preceding sentence, each of the First Priority Collateral Agent, the Second Priority Collateral Agent, the Third Priority Collateral Agent, the Lender Agent (on behalf of itself and the other First Priority Secured Parties), the 2010 Trustee (on behalf of itself and the other Second Priority Secured Parties) and the 2015 Trustee and each Additional Third Priority Representative (on behalf of themselves and the other Third Priority Secured Parties), irrevocably acknowledges

-54-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

that this Agreement constitutes a "subordination agreement" within the meaning of both New York law and Section 510(a) of the Bankruptcy Code. All references to any Obligor shall include any Obligor as debtor and debtor-in-possession and any receiver or trustee for such Obligor (as the case may be) in any Insolvency Proceeding.

8.18 <u>Provisions Solely to Define Relative Rights</u>. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Priority Secured Parties, the Second Priority Secured Parties and the Third Priority Secured Parties as separate groups of secured creditors. None of the Borrowers, any other Obligor (including any Guarantor) or any other creditor thereof shall have any right hereunder. Nothing in this Agreement is intended to or shall impair the obligations of either Borrower or any other Obligor, which are absolute and unconditional, to pay the First Priority Claims, the Second Priority Claims and the Third Priority Claims as and when the same shall become due and payable in accordance with their terms.

8.19 <u>Compliance with Trust Indenture Act</u>. Nothing contained herein shall impair the ability of either Trustee or any Additional Third Priority Representative to take any action necessary to comply with any obligation imposed by applicable law, including the Trust Indenture Act.

8.20 <u>Exclusive Means of Exercising Rights under this Agreement</u>. The First Priority Secured Parties shall be deemed to have irrevocably appointed the Lender Agent as their exclusive agent hereunder. The 2010 Noteholders shall be deemed to have irrevocably appointed the 2010 Trustee as their exclusive agent hereunder. The 2015 Noteholders shall be deemed to have irrevocably appointed the 2015 Trustee as their exclusive agent hereunder. The holders of Indebtedness under any Additional Pari Passu Third Priority Agreement shall be deemed to have irrevocably appointed its designated Additional Third Priority Representative as their exclusive agent hereunder. Consistent with such appointment, (a) the First Priority Secured Parties further shall be deemed to have agreed that only the Lender Agent (and not any individual claimholder or group of claimholders) as agent for the First Priority Secured Parties, or any of the Lender Agent's agents (including the First Priority Collateral Agent) shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); provided, that (i) First Priority Secured Parties holding obligations in respect to obligations in respect of hedging agreements may exercise customary netting rights with respect thereto, (ii) cash collateral may be held pursuant to the terms of the First Priority Documents (including any relating to hedging agreements) and any such individual First Priority Secured Party may act against such cash collateral, and (iii) First Priority Secured Parties may exercise customary rights of setoff against depository or other accounts maintained with them; (b) the Second Priority Secured Parties further shall be deemed to have agreed that only the 2010 Trustee (and not any individual claimholder or group of claimholders), as the agent of the Second Priority Secured Parties, or any of the 2010 Trustee's agents (including the Second Priority Collateral Agent) shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); (c) the 2015 Noteholders further shall be deemed to have agreed that only the 2015 Trustee (and not any individual claimholder or group of claimholders), as the agent for the 2015 Noteholders, or any of the 2015

-55-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Trustee's agents (including the Third Priority Collateral Agent) shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement); and (d) (c) the holders of the Indebtedness under each Additional Pari Passu Third Priority Agreement further shall be deemed to have agreed that only the Additional Third Priority Representative thereof (and not any individual claimholder or group of claimholders), as the agent for such holders, or any of the 2015 Trustee's agents (including the Third Priority Collateral Agent) shall have the right on their behalf to exercise any rights, powers, and/or remedies under or in connection with this Agreement (including bringing any action to interpret or otherwise enforce the provisions of this Agreement). Specifically, but without limiting the generality of the foregoing, each First Priority Secured Party or group of First Priority Secured Parties, each Second Priority Secured Party or group of Second Priority Secured Parties, and each Third Priority Secured Party or group of Third Priority Secured Parties, shall not be entitled to take or file, but instead shall be precluded from taking or filing (whether in any Insolvency Proceeding or otherwise), any action, judicial or otherwise, to enforce any right or power or pursue any remedy under this Agreement (including any declaratory judgment or other action to interpret or otherwise enforce the provisions of this Agreement), except solely as provided in the *proviso* in the immediately preceding sentence.

8.21 <u>Right of First Priority Collateral Agent or Collateral Control Agent to Continue.</u> Any Person serving as First Priority Collateral Agent or Collateral Control Agent shall be entitled to continue, including to continue to perform his, her or its rights, obligations and duties, as the First Priority Collateral Agent or Collateral Control Agent, as the case may be, notwithstanding whether any such Person has served or is serving as the Second Priority Collateral Agent and/or the Third Priority Collateral Agent and/or Additional Third Priority Representative. Without limiting the generality of the preceding sentence of this <u>Section 8.21</u>, any Person serving as First Priority Collateral Agent or Collateral Control Agent shall be entitled to continue to so serve in such capacity (including to continue to perform any of such First Priority Collateral Agent's or Collateral Control Agent's rights, obligations, and/or duties) even if any such Person has resigned as the Second Priority Collateral Agent and/or Third Priority Collateral Agent and/or Additional Third Priority Representative, but such resignation has not become effective for any reason, including because a successor Second Priority Collateral Agent or Third Priority Collateral Agent or Additional Third Priority Representative, as the case may be, has not been appointed or has accepted such appointment, without any liability to any of the 2010 Trustee and the 2010 Noteholders or to any of the 2015 Trustee, any Additional Third Priority Representative and the Third Priority Secured Parties, as the case may be, by virtue of any such resignation and any of the circumstances relating in any manner whatsoever to such resignation.

8.22 <u>Interpretation.</u> This Agreement is a product of negotiations among representatives of, and has been reviewed by counsel to, each of the First Priority Collateral Agent, the Second Priority Collateral Agent, the Third Priority Collateral Agent, the Trustees, each Additional Third Priority Representative, the Lender Agent and each Obligor and is the product of those Persons on behalf of themselves and the First Priority Secured Parties (in the case of the Lender Agent), the Second Priority Secured Parties (in the case of the 2010 Trustee) and the Third Priority Secured Parties (in the case of the 2015 Trustee and each Additional Third Priority Representative). Accordingly, this Agreement's provisions shall not be construed

-56-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

against, or in favor of, any party or other Person merely by virtue of the extent of that party or other Person's involvement, or lack of involvement, in the preparation of this Agreement and of any of its specific provisions.

8.23 Forum Selection and Consent to Jurisdiction. ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO RELATING THERETO SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY (TO THE EXTENT PERMITTED UNDER APPLICABLE LAW) IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY, OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK LOCATED IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH LITIGATION. EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK. EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HEREBY REPRESENTS AND WARRANTS THAT IT HAS NO RIGHT TO IMMUNITY FROM THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT OR FROM EXECUTION OF ANY JUDGMENT OR FROM THE EXECUTION OR ENFORCEMENT THEREIN OF ANY ARBITRATION DECISION IN RESPECT OF ANY SUIT, ACTION, PROCEEDING OR ANY OTHER MATTER ARISING OUT OF OR RELATING TO ITS OBLIGATIONS UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND TO THE EXTENT THAT ANY PARTY HERETO IS OR BECOMES ENTITLED TO ANY SUCH IMMUNITY WITH RESPECT TO THE SERVICE OF PROCESS OR JURISDICTION OR ANY JUDICIAL PROCEEDINGS OF ANY COMPETENT COURT, AND TO THE EXTENT PERMITTED BY LAW, IT DOES HEREBY AND WILL IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO PLEAD OR CLAIM ANY SUCH IMMUNITY WITH RESPECT TO ITS OBLIGATIONS OR ANY OTHER MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

8.24 Waiver of Jury Trial. THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN)

-57-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

OR ACTIONS OF SUCH PARTIES RELATING THERETO. EACH OF THE PARTIES HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION.

-58-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

First Priority Collateral Agent:

WELLS FARGO BANK, N.A.,
  in its capacity as First Priority Collateral Agent for the
First Priority Secured Parties

By:  /s/ Nicholas D. Tally
      Name:  Nicholas D. Tally
      Title:   Vice President


Address:      625 Marquette Avenue
              N9311-110
              Minneapolis, Minnesota 55479
Attention:    Nicholas D. Tally – Specialized Products Group

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Second Priority Collateral Agent:

WELLS FARGO BANK, N.A.,
   in its capacity as Second Priority Collateral Agent for the
Second Priority Secured Parties

By:                  /s/ Nicholas D. Tally
                     Name:          Nicholas D. Tally
                     Title:         Vice President


                     Address:       625 Marquette Avenue
                                     N9311-110
                                     Minneapolis, Minnesota 55479
                     Attention:     Nicholas D. Tally — Specialized Products Group

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

<u>Third Priority Collateral Agent</u>:

WELLS FARGO BANK, N.A.,
   in its capacity as Third Priority Collateral Agent for the
Third Priority Secured Parties

By:        /s/ Nicholas D. Tally
                Name:        Nicholas D. Tally
                Title:         Vice President

                Address:     625 Marquette Avenue
                                   N9311-110
                                   Minneapolis, Minnesota 55479
                Attention:   Nicholas D. Tally — Specialized Products Group

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Collateral Control Agent:

WELLS FARGO BANK, N.A.,
   in its capacity as Collateral Control Agent

By:     /s/ Nicholas D. Tally
           Name:    Nicholas D. Tally
           Title:     Vice President

           Address:    625 Marquette Avenue
                       N9311-110
                       Minneapolis, Minnesota 55479
           Attention:   Nicholas D. Tally — Specialized Products Group

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

<u>Lender Agent</u>:

GMAC LLC,
as Lender Agent

By:   <u>/s/ David C. Walker</u>
      Name:  David C. Walker
      Title:   Group Vice President and Treasurer


Address:      GMAC LLC
              200 Renaissance Center
              Detroit, Michigan 48265
Attention:    David Walker, Group VP & Treasurer

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

2010 Trustee:

U.S. Bank National Association,
    as Trustee

By:  /s/ Richard Prokosch
       Name:  Richard Prokosch
       Title:   Vice President


       Address:      U.S. Bank National Association
                     60 Livingston Avenue
                     EP-MN-WS3C
                     St. Paul, MN 55107-2292
       Attention:    Richard Prokosch

2015 Trustee:

U.S. Bank National Association,
   as Trustee

By: /s/ Richard Prokosch
     Name:  Richard Prokosch
     Title:   Vice President


     Address:      U.S. Bank National Association
                   60 Livingston Avenue
                   EP-MN-WS3C
                   St. Paul, MN 55107-2292
     Attention:    Richard Prokosch

Borrower:

RESIDENTIAL FUNDING COMPANY, LLC

By:   /s/ Melissa White
      Name:  Melissa White
      Title:    Assistant Treasurer


      Address:     Residential Funding Company LLC
                    One Meridian Crossings, Suite 100
                    Minneapolis, MN 55423
      Attention:

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Borrower:

GMAC MORTGAGE, LLC

By:  /s/ Melissa White
    Name:  Melissa White
    Title:   Assistant Treasurer


    Address:    GMAC Mortgage, LLC
                1100 Virginia Drive
                Fort Washington, PA 19034-3200
    Attention:

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

RESIDENTIAL CAPITAL, LLC

By:  /s/ John M. Peterson
      Name:  John M. Peterson
      Title:    Assistant Treasurer

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

HOMECOMINGS FINANCIAL, LLC

By:    /s/ Melissa White
       Name:  Melissa White
       Title:    Assistant Treasurer

Obligor:

GMAC-RFC HOLDING COMPANY, LLC

By: /s/ Melissa White
  Name: Melissa White
  Title:  Assistant Treasurer

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

GMAC RESIDENTIAL HOLDING COMPANY, LLC

By:   /s/ Melissa White
      Name:  Melissa White
      Title:   Assistant Treasurer

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

GMAC MODEL HOME FINANCE, LLC

By: /s/ Michael J. Franta
    Name:  Michael J. Franta
    Title:   President

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

DEVELOPERS OF HIDDEN SPRINGS, LLC

By:  /s/ Michael J. Franta
     Name:  Michael J. Franta
     Title:   President

Obligor:

DOA HOLDING PROPERTIES, LLC

By:  /s/ Michael J. Franta
     Name:  Michael J. Franta
     Title:   President

Obligor:

RFC ASSET HOLDINGS II, LLC

By: /s/ Melissa White

    Name:  Melissa White
    Title:   Assistant Treasurer

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

PASSIVE ASSET TRANSACTIONS, LLC

By:    /s/ Melissa White
       Name:  Melissa White
       Title:    Assistant Treasurer

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

RESIDENTIAL MORTGAGE REAL ESTATE
HOLDINGS, LLC

By:   /s/ Melissa White
      Name:  Melissa White
      Title:   Assistant Treasurer

---

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

RESIDENTIAL FUNDING REAL ESTATE
HOLDINGS, LLC

By:  /s/ Melissa White
      Name:  Melissa White
      Title:   Assistant Treasurer

Obligor:

HOMECOMINGS FINANCIAL REAL ESTATE
HOLDINGS, LLC

By:    /s/ Melissa White
      Name:  Melissa White
      Title:    Assistant Treasurer

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

Obligor:

EQUITY INVESTMENT I, LLC

By:  /s/ Michael J. Franta
     Name:  Michael J. Franta
     Title:    President

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

# TABLE OF CONTENTS

|  | Page |
|---|---|
| SECTION 1. DEFINITIONS | 2 |
| 1.1 Defined Terms | 2 |
| 1.2 Terms Generally | 11 |
| SECTION 2. LIEN PRIORITIES | 12 |
| 2.1 Relative Priorities | 12 |
| 2.2 Prohibition on Contesting Liens | 13 |
| 2.3 No New Liens | 13 |
| 2.4 Nature of First Priority Obligations | 13 |
| SECTION 3. ENFORCEMENT | 14 |
| 3.1 Exercise of Remedies | 14 |
| 3.2 Cooperation | 19 |
| 3.3 Notices of Default | 20 |
| SECTION 4. PAYMENTS | 20 |
| 4.1 Application of Proceeds | 20 |
| 4.2 Payments Over | 21 |
| SECTION 5. OTHER AGREEMENTS | 22 |
| 5.1 Releases | 22 |
| 5.2 Insurance | 23 |
| 5.3 Amendments to Second Priority Documents and Third Priority Documents, etc. | 24 |
| 5.4 Rights as Unsecured Creditors | 28 |
| 5.5 Bailee for Perfection; Collateral Control Agent | 29 |
| 5.6 Special Provisions Relating to Collateral Control Agreement | 30 |
| SECTION 6. INSOLVENCY PROCEEDINGS | 39 |
| 6.1 Finance and Sale Issues | 39 |
| 6.2 [Intentionally Omitted] | 41 |
| 6.3 Adequate Protection | 41 |
| 6.4 No Waiver | 42 |
| 6.5 Preference Recoveries | 42 |
| 6.6 Post-Petition Interest | 43 |

-i-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

## TABLE OF CONTENTS
### (Continued)

| | Page |
|---|---|
| 6.7 [Intentionally Omitted] | 43 |
| 6.8 Separate Grants of Security and Separate Classification | 43 |
| 6.9 Voting for Plan of Reorganization | 44 |
| 6.10 No X Clause | 45 |
| 6.11 Determination of Distributions on Account of Lien on Collateral | 45 |
| SECTION 7. RELIANCE; WAIVERS; ETC | 45 |
| 7.1 Reliance | 45 |
| 7.2 No Warranties or Liability | 46 |
| 7.3 No Waiver of Lien Priorities | 47 |
| 7.4 Obligations Unconditional | 50 |
| SECTION 8. MISCELLANEOUS | 50 |
| 8.1 Conflicts | 50 |
| 8.2 Continuing Nature of this Agreement | 50 |
| 8.3 Amendments; Waivers | 51 |
| 8.4 Information Concerning Financial Condition of the Obligors and their Subsidiaries | 51 |
| 8.5 Certain Successors | 52 |
| 8.6 Application of Payments | 52 |
| 8.7 Marshalling of Assets | 52 |
| 8.8 No Purchase Option in Favor of Second Priority Secured Parties or Third Priority Secured Parties | 52 |
| 8.9 Notices | 52 |
| 8.10 Further Assurances | 53 |
| 8.11 Governing Law | 53 |
| 8.12 Binding on Successors and Assigns; No Third Party Beneficiaries | 53 |
| 8.13 Specific Performance | 53 |
| 8.14 Section Titles; Time Periods | 54 |
| 8.15 Counterparts | 54 |
| 8.16 Authorization | 54 |
| 8.17 Effectiveness | 54 |
| 8.18 Provisions Solely to Define Relative Rights | 55 |

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

**TABLE OF CONTENTS**
(Continued)

| | Page |
|---|---|
| 8.19 Compliance with Trust Indenture Act | 55 |
| 8.20 Exclusive Means of Exercising Rights under this Agreement | 55 |
| 8.21 Right of First Priority Collateral Agent or Collateral Control Agent to Continue | 56 |
| 8.22 Interpretation | 56 |
| 8.23 Forum Selection and Consent to Jurisdiction | 57 |
| 8.24 Waiver of Jury Trial | 57 |

-iii-

Source: RESIDENTIAL CAPITAL,, 10-Q, August 08, 2008

# EXHIBIT F

## Partial Release of Collateral

**Exhibit F (Partial Release of Collateral) has been omitted pending the Court's ruling on the** *Application of the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure to File Under Seal Certain Exhibits and Schedules to Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims* **filed concurrently herewith by the Committee.**

# EXHIBIT G

## UCC-3 Termination Statements

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:57 PM 05/17/2010
INITIAL FILING # 2008 1911518
AMENDMENT     # 2010 1724040
SRV: 100520311

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Jay Lakshmanan
CT Corporation
208 S. LaSalle Street
Chicago, IL 60604

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
2008 1911518   filed 06/04/2008

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address. Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GMAC Mortgage, LLC | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION.

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

See Exhibit A attached hereto and made a part hereof for a description of the released collateral.

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Wells Fargo Bank, N.A., as First Priority Collateral Agent | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA
File with Delaware Secretary of State (Repo) 5275280  2 additional sheets presented  08048307-518 3A93C

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

EXHIBIT A
TO
UCC FINANCING STATEMENT AMENDMENT

| Debtor: | Secured Party: |
|---|---|
| GMAC Mortgage, LLC | Wells Fargo Bank, N.A., as First Priority |
| 1100 Virginia Drive | Collateral Agent |
| Fort Washington, PA 19034 | 625 Marquette Avenue, N9311-110 |
| USA | Minneapolis, MN 55479, USA |

All of Debtor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)     all Repo Loans, including all related servicing rights, and all assets, rights or property related thereto;

(b)     other payments and rights, in each case if and to the extent evidencing or related to the Repo Loans;

(c)     to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or related to the Repo Loans;

(d)     (i) all books, records, writings, data bases, information and other property relating to or evidencing the Repo Loans, including, but not limited to, mortgage files or servicing records and (ii) all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or related to the Repo Loans;

(e)     to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the Repo Loans; and

(f)     all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on any of the foregoing.

When used in this exhibit and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined in this exhibit have the meanings assigned to such terms in the Senior Debt Loan Agreement and the Security Documents (as defined in the Senior Debt Loan Agreement), as applicable; (b) unless otherwise defined in this exhibit, the terms Account, Chattel Paper, Commercial Tort Claims, Document, Financial Assets, Goods, Instrument, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles,

Proceeds and Supporting Obligations have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below).

General Intangibles means, with respect to any Relevant Party, all of such Relevant Party's respective "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Relevant Party's respective licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Relevant Party means any party signatory to the Request for Collateral Release (Pledge of Repo Loans) dated May 17, 2010.

Repo Loan means any Mortgage Loan listed on (i) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among Residential Funding Company, LLC ("RFC"), as a seller, GMAC Mortgage. LLC ("GMAC Mortgage"), as a seller, Residential Capital, LLC ("ResCap"), as guarantor and Goldman Sachs Mortgage Company, as buyer, and (ii) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among RFC, as a seller, GMAC Mortgage, as a seller, ResCap, as guarantor, and Citibank, N.A., a national banking association, as buyer.

Senior Debt Loan Agreement means the Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time) by and among RFC, GMAC Mortgage, ResCap, and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, Ally Financial Inc. (f/k/a GMAC Inc. f/k/a GMAC LLC), a Delaware corporation, as the initial lender and as agent for the lenders, the financial institutions and other Persons that are or may from time to time become parties thereto as lenders and Wells Fargo Bank, N.A., as first priority collateral agent.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

⌐ Jay Lakshmanan
  CT Corporation
  208 S. LaSalle Street
  Chicago, IL 60604 ⌐                                   4 ⌐

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 06:03 PM 05/17/2010*
*INITIAL FILING # 2008 1952959*
*AMENDMENT      # 2010 1723190*
*SRV: 100520132*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1a. INITIAL FINANCING STATEMENT FILE #**
2008 1952959    filed 06/06/2008

**1b.** This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

**3.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

**4.** ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

**5. AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7e (if applicable).

**6. CURRENT RECORD INFORMATION:**

**6a. ORGANIZATION'S NAME**
GMAC Mortgage, LLC

| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

**7. CHANGED (NEW) OR ADDED INFORMATION:**

**7a. ORGANIZATION'S NAME**

| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**8. AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

See Exhibit A attached hereto and made a part hereof for a description of the released collateral.

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

**9a. ORGANIZATION'S NAME**
Wells Fargo Bank, N.A., as Second Priority Collateral Agent

| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|

**10. OPTIONAL FILER REFERENCE DATA**
File with Delaware Secretary of State (Repo) 5275282 2 additional sheets presented 08048307-520 3 P97

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

EXHIBIT A
TO
UCC FINANCING STATEMENT AMENDMENT

| Debtor: | Secured Party: |
|---|---|
| GMAC Mortgage, LLC | Wells Fargo Bank, N.A., as Second Priority |
| 1100 Virginia Drive | Collateral Agent |
| Fort Washington, PA 19034 | 625 Marquette Avenue, N9311-110 |
| USA | Minneapolis, MN 55479, USA |

All of Debtor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)     all Repo Loans, including all related servicing rights, and all assets, rights or property related thereto;

(b)     other payments and rights, in each case if and to the extent evidencing or related to the Repo Loans;

(c)     to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or related to the Repo Loans;

(d)     (i) all books, records, writings, data bases, information and other property relating to or evidencing the Repo Loans, including, but not limited to, mortgage files or servicing records and (ii) all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or related to the Repo Loans;

(e)     to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the Repo Loans; and

(f)     all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on any of the foregoing.

When used in this exhibit and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined in this exhibit have the meanings assigned to such terms in the Senior Debt Loan Agreement and the Security Documents (as defined in the Senior Debt Loan Agreement), as applicable; (b) unless otherwise defined in this exhibit, the terms Account, Chattel Paper, Commercial Tort Claims, Document, Financial Assets, Goods, Instrument, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles,

Proceeds and Supporting Obligations have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below).

General Intangibles means, with respect to any Relevant Party, all of such Relevant Party's respective "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Relevant Party's respective licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Relevant Party means any party signatory to the Request for Collateral Release (Pledge of Repo Loans) dated May 17, 2010.

Repo Loan means any Mortgage Loan listed on (i) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among Residential Funding Company, LLC ("RFC"), as a seller, GMAC Mortgage. LLC ("GMAC Mortgage"), as a seller, Residential Capital, LLC ("ResCap"), as guarantor and Goldman Sachs Mortgage Company, as buyer, and (ii) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among RFC, as a seller, GMAC Mortgage, as a seller, ResCap, as guarantor, and Citibank, N.A., a national banking association, as buyer.

Senior Debt Loan Agreement means the Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time) by and among RFC, GMAC Mortgage, ResCap, and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, Ally Financial Inc. (f/k/a GMAC Inc. f/k/a GMAC LLC), a Delaware corporation, as the initial lender and as agent for the lenders, the financial institutions and other Persons that are or may from time to time become parties thereto as lenders and Wells Fargo Bank, N.A., as first priority collateral agent.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Jay Lakshmanan
CT Corporation
208 S. LaSalle Street
Chicago, IL 60604

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 06:06 PM 05/17/2010*
*INITIAL FILING # 2008 1954286*
*AMENDMENT    # 2010 1723265*
*SRV: 100520143*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS |
|---|---|
| 2008 1954286    filed 06/06/2008 | |

2. [ ] TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. [ ] CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. [ ] ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects [ ] Debtor or [ ] Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
[ ] CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. [ ] DELETE name: Give record name to be deleted in item 6a or 6b. [ ] ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| GMAC Mortgage, LLC | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | [ ] NONE |
|---|---|---|---|---|---|

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral [X] deleted or [ ] added, or give entire [ ] restated collateral description, or describe collateral [ ] assigned.

See Exhibit A attached hereto and made a part hereof for a description of the released collateral.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here [ ] and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Wells Fargo Bank, N.A., as Third Priority Collateral Agent | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
File with Delaware Secretary of State (Repo) 5275284  2 additional sheets presented  08048307-522  3PGJL

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

EXHIBIT A
TO
UCC FINANCING STATEMENT AMENDMENT

| Debtor: | Secured Party: |
|---|---|
| GMAC Mortgage, LLC | Wells Fargo Bank, N.A., as Third Priority |
| 1100 Virginia Drive | Collateral Agent |
| Fort Washington, PA 19034 | 625 Marquette Avenue, N9311-110 |
| USA | Minneapolis, MN 55479, USA |

All of Debtor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Repo Loans, including all related servicing rights, and all assets, rights or property related thereto;

(b)    other payments and rights, in each case if and to the extent evidencing or related to the Repo Loans;

(c)    to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or related to the Repo Loans;

(d)    (i) all books, records, writings, data bases, information and other property relating to or evidencing the Repo Loans, including, but not limited to, mortgage files or servicing records and (ii) all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or related to the Repo Loans;

(e)    to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the Repo Loans; and

(f)    all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on any of the foregoing.

When used in this exhibit and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined in this exhibit have the meanings assigned to such terms in the Senior Debt Loan Agreement and the Security Documents (as defined in the Senior Debt Loan Agreement), as applicable; (b) unless otherwise defined in this exhibit, the terms Account, Chattel Paper, Commercial Tort Claims, Document, Financial Assets, Goods, Instrument, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles,

Proceeds and Supporting Obligations have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below).

General Intangibles means, with respect to any Relevant Party, all of such Relevant Party's respective "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Relevant Party's respective licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Relevant Party means any party signatory to the Request for Collateral Release (Pledge of Repo Loans) dated May 17, 2010.

Repo Loan means any Mortgage Loan listed on (i) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among Residential Funding Company, LLC ("RFC"), as a seller, GMAC Mortgage. LLC ("GMAC Mortgage"), as a seller, Residential Capital, LLC ("ResCap"), as guarantor and Goldman Sachs Mortgage Company, as buyer, and (ii) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among RFC, as a seller, GMAC Mortgage, as a seller, ResCap, as guarantor, and Citibank, N.A., a national banking association, as buyer.

Senior Debt Loan Agreement means the Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time) by and among RFC, GMAC Mortgage, ResCap, and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, Ally Financial Inc. (f/k/a GMAC Inc. f/k/a GMAC LLC), a Delaware corporation, as the initial lender and as agent for the lenders, the financial institutions and other Persons that are or may from time to time become parties thereto as lenders and Wells Fargo Bank, N.A., as first priority collateral agent.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:09 PM 05/17/2010
INITIAL FILING # 2010 0075782
AMENDMENT      # 2010 1723349
SRV: 100520159

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Jay Lakshmanan
CT Corporation
208 S. LaSalle Street
Chicago, IL 60604

10

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
2010 0075782   filed 01/08/2010

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor ☒ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.
☐ DELETE name: Give record name to be deleted in item 6a or 6b.
☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

OR
6a. ORGANIZATION'S NAME
GMAC Mortgage, LLC

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

OR
7a. ORGANIZATION'S NAME

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

See Exhibit A attached hereto and made a part hereof for a description of the released collateral.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

OR
9a. ORGANIZATION'S NAME
Wells Fargo Bank, N.A., as Collateral Control Agent

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA
File with Delaware Sec. of State (Repo) 5275442  2 additional sheets presented

78430985D(4)
08048307-526   3 Page

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

EXHIBIT A
TO
UCC FINANCING STATEMENT AMENDMENT

| Debtor: | Secured Party: |
|---|---|
| GMAC Mortgage, LLC<br>1100 Virginia Drive<br>Fort Washington, PA 19034<br>USA | Wells Fargo Bank, N.A., as Collateral Control Agent<br>45 Broadway, 14th Floor<br>New York, NY 10006, USA |

All of Debtor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Repo Loans, including all related servicing rights, and all assets, rights or property related thereto;

(b)    other payments and rights, in each case if and to the extent evidencing or related to the Repo Loans;

(c)    to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or related to the Repo Loans;

(d)    (i) all books, records, writings, data bases, information and other property relating to or evidencing the Repo Loans, including, but not limited to, mortgage files or servicing records and (ii) all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or related to the Repo Loans;

(e)    to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the Repo Loans; and

(f)    all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on any of the foregoing.

When used in this exhibit and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined in this exhibit have the meanings assigned to such terms in the Senior Debt Loan Agreement and the Security Documents (as defined in the Senior Debt Loan Agreement), as applicable; (b) unless otherwise defined in this exhibit, the terms Account, Chattel Paper, Commercial Tort Claims, Document, Financial Assets, Goods, Instrument, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles,

Proceeds and Supporting Obligations have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below).

General Intangibles means, with respect to any Relevant Party, all of such Relevant Party's respective "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Relevant Party's respective licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Relevant Party means any party signatory to the Request for Collateral Release (Pledge of Repo Loans) dated May 17, 2010.

Repo Loan means any Mortgage Loan listed on (i) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among Residential Funding Company, LLC ("RFC"), as a seller, GMAC Mortgage. LLC ("GMAC Mortgage"), as a seller, Residential Capital, LLC ("ResCap"), as guarantor and Goldman Sachs Mortgage Company, as buyer, and (ii) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among RFC, as a seller, GMAC Mortgage, as a seller, ResCap, as guarantor, and Citibank, N.A., a national banking association, as buyer.

Senior Debt Loan Agreement means the Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time) by and among RFC, GMAC Mortgage, ResCap, and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, Ally Financial Inc. (f/k/a GMAC Inc. f/k/a GMAC LLC), a Delaware corporation, as the initial lender and as agent for the lenders, the financial institutions and other Persons that are or may from time to time become parties thereto as lenders and Wells Fargo Bank, N.A., as first priority collateral agent.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Jay Lakshmanan
CT Corporation
208 S. LaSalle Street
Chicago, IL 60604

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:01 PM 05/17/2010
INITIAL FILING # 2008 1911500
AMENDMENT    # 2010 1723166
SRV: 100520126

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is |
|---|---|
| 2008 1911500  filed 06/04/2008 | ☐ to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.   ☐ DELETE name: Give record name to be deleted in item 6a or 6b.   ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | Residential Funding Company, LLC | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 7d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

See Exhibit A attached hereto and made a part hereof for a description of the released collateral.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | Wells Fargo Bank, N.A., as First Priority Collateral Agent | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
File with Delaware Secretary of State  (Repo) 5275279  2 additional sheets presented 08048307-5    78480#5 50    (1)    17 3 Pgs

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/28/98)

EXHIBIT A

TO

UCC FINANCING STATEMENT AMENDMENT

| Debtor:<br>Residential Funding Company, LLC<br>One Meridian Crossings, suite 100<br>Minneapolis, MN 55423-3940<br>USA | Secured Party:<br>Wells Fargo Bank, N.A., as First Priority<br>Collateral Agent<br>625 Marquette Avenue, N9311-110<br>Minneapolis, MN 55479, USA |
|---|---|

All of Debtor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)     all Repo Loans, including all related servicing rights, and all assets, rights or property related thereto;

(b)     other payments and rights, in each case if and to the extent evidencing or related to the Repo Loans;

(c)     to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or related to the Repo Loans;

(d)     (i) all books, records, writings, data bases, information and other property relating to or evidencing the Repo Loans, including, but not limited to, mortgage files or servicing records and (ii) all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or related to the Repo Loans;

(e)     to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the Repo Loans; and

(f)     all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on any of the foregoing.

When used in this exhibit and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined in this exhibit have the meanings assigned to such terms in the Senior Debt Loan Agreement and the Security Documents (as defined in the Senior Debt Loan Agreement), as applicable; (b) unless otherwise defined in this exhibit, the terms Account, Chattel Paper, Commercial Tort Claims, Document, Financial Assets, Goods, Instrument, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles,

Proceeds and Supporting Obligations have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below).

General Intangibles means, with respect to any Relevant Party, all of such Relevant Party's respective "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Relevant Party's respective licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Relevant Party means any party signatory to the Request for Collateral Release (Pledge of Repo Loans) dated May 17, 2010.

Repo Loan means any Mortgage Loan listed on (i) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among Residential Funding Company, LLC ("RFC"), as a seller, GMAC Mortgage. LLC ("GMAC Mortgage"), as a seller, Residential Capital, LLC ("ResCap"), as guarantor and Goldman Sachs Mortgage Company, as buyer, and (ii) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among RFC, as a seller, GMAC Mortgage, as a seller, ResCap, as guarantor, and Citibank, N.A., a national banking association, as buyer.

Senior Debt Loan Agreement means the Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time) by and among RFC, GMAC Mortgage, ResCap, and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, Ally Financial Inc. (f/k/a GMAC Inc. f/k/a GMAC LLC), a Delaware corporation, as the initial lender and as agent for the lenders, the financial institutions and other Persons that are or may from time to time become parties thereto as lenders and Wells Fargo Bank, N.A., as first priority collateral agent.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Jay Lakshmanan
CT Corporation
208 S. LaSalle Street
Chicago, IL 60604

3

**DELAWARE DEPARTMENT OF STATE**
**U.C.C. FILING SECTION**
**FILED 06:02 PM 05/17/2010**
**INITIAL FILING # 2008 1952983**
**AMENDMENT     # 2010 1723182**
**SRV: 100520131**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
2008 1952983    filed 06/06/2008

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address. Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c. ☐ DELETE name: Give record name to be deleted in item 6a or 6b. ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Residential Funding Company, LLC | | | |

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.
Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

See Exhibit A attached hereto and made a part hereof for a description of the released collateral.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Wells Fargo Bank, N.A., as Second Priority Collateral Agent | | | |

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA
File with Delaware Secretary of State (Repo) 5275281  2 additional sheets presented  08048307-5193P93c

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

EXHIBIT A
TO
UCC FINANCING STATEMENT AMENDMENT

| Debtor: | Secured Party: |
|---|---|
| Residential Funding Company, LLC | Wells Fargo Bank, N.A., as Second Priority |
| One Meridian Crossings, suite 100 | Collateral Agent |
| Minneapolis, MN 55423-3940 | 625 Marquette Avenue, N9311-110 |
| USA | Minneapolis, MN 55479, USA |

All of Debtor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Repo Loans, including all related servicing rights, and all assets, rights or property related thereto;

(b)    other payments and rights, in each case if and to the extent evidencing or related to the Repo Loans;

(c)    to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or related to the Repo Loans;

(d)    (i) all books, records, writings, data bases, information and other property relating to or evidencing the Repo Loans, including, but not limited to, mortgage files or servicing records and (ii) all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or related to the Repo Loans;

(e)    to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the Repo Loans; and

(f)    all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on any of the foregoing.

When used in this exhibit and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined in this exhibit have the meanings assigned to such terms in the Senior Debt Loan Agreement and the Security Documents (as defined in the Senior Debt Loan Agreement), as applicable; (b) unless otherwise defined in this exhibit, the terms Account, Chattel Paper, Commercial Tort Claims, Document, Financial Assets, Goods, Instrument, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles,

5275429.3 08048307                    Page 1 of 2

Proceeds and Supporting Obligations have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below).

General Intangibles means, with respect to any Relevant Party, all of such Relevant Party's respective "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Relevant Party's respective licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Relevant Party means any party signatory to the Request for Collateral Release (Pledge of Repo Loans) dated May 17, 2010.

Repo Loan means any Mortgage Loan listed on (i) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among Residential Funding Company, LLC ("RFC"), as a seller, GMAC Mortgage. LLC ("GMAC Mortgage"), as a seller, Residential Capital, LLC ("ResCap"), as guarantor and Goldman Sachs Mortgage Company, as buyer, and (ii) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among RFC, as a seller, GMAC Mortgage, as a seller, ResCap, as guarantor, and Citibank, N.A., a national banking association, as buyer.

Senior Debt Loan Agreement means the Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time) by and among RFC, GMAC Mortgage, ResCap, and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, Ally Financial Inc. (f/k/a GMAC Inc. f/k/a GMAC LLC), a Delaware corporation, as the initial lender and as agent for the lenders, the financial institutions and other Persons that are or may from time to time become parties thereto as lenders and Wells Fargo Bank, N.A., as first priority collateral agent.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**DELAWARE DEPARTMENT OF STATE**
**U.C.C. FILING SECTION**
**FILED 06:05 PM 05/17/2010**
**INITIAL FILING # 2008 1954245**
**AMENDMENT # 2010 1723232**
**SRV: 100520140**

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Jay Lakshmanan
CT Corporation
208 S. LaSalle Street
Chicago, IL 60604

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is |
|---|---|
| 2008 1954245    filed 06/06/2008 | ☐ to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT (full or partial):** Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  Residential Funding Company, LLC | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 7d. TAX ID #:  SSN OR EIN | ADD'L INFO RE: ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

**See Exhibit A attached hereto and made a part hereof for a description of the released collateral.**

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR  Wells Fargo Bank, N.A., as Third Priority Collateral Agent | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
File with Delaware Secretary of State (Repo) 5275283  2 additional sheets presented  08048307-521 3035\

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

EXHIBIT A
TO
UCC FINANCING STATEMENT AMENDMENT

| Debtor: | Secured Party: |
|---|---|
| Residential Funding Company, LLC | Wells Fargo Bank, N.A., as Third Priority |
| One Meridian Crossings, suite 100 | Collateral Agent |
| Minneapolis, MN 55423-3940 | 625 Marquette Avenue, N9311-110 |
| USA | Minneapolis, MN 55479, USA |

All of Debtor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

(a)    all Repo Loans, including all related servicing rights, and all assets, rights or property related thereto;

(b)    other payments and rights, in each case if and to the extent evidencing or related to the Repo Loans;

(c)    to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or related to the Repo Loans;

(d)    (i) all books, records, writings, data bases, information and other property relating to or evidencing the Repo Loans, including, but not limited to, mortgage files or servicing records and (ii) all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or related to the Repo Loans;

(e)    to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the Repo Loans; and

(f)    all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on any of the foregoing.

When used in this exhibit and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined in this exhibit have the meanings assigned to such terms in the Senior Debt Loan Agreement and the Security Documents (as defined in the Senior Debt Loan Agreement), as applicable; (b) unless otherwise defined in this exhibit, the terms Account, Chattel Paper, Commercial Tort Claims, Document, Financial Assets, Goods, Instrument, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles,

Proceeds and Supporting Obligations have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below).

General Intangibles means, with respect to any Relevant Party, all of such Relevant Party's respective "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Relevant Party's respective licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Relevant Party means any party signatory to the Request for Collateral Release (Pledge of Repo Loans) dated May 17, 2010.

Repo Loan means any Mortgage Loan listed on (i) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among Residential Funding Company, LLC ("RFC"), as a seller, GMAC Mortgage, LLC ("GMAC Mortgage"), as a seller, Residential Capital, LLC ("ResCap"), as guarantor and Goldman Sachs Mortgage Company, as buyer, and (ii) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among RFC, as a seller, GMAC Mortgage, as a seller, ResCap, as guarantor, and Citibank, N.A., a national banking association, as buyer.

Senior Debt Loan Agreement means the Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time) by and among RFC, GMAC Mortgage, ResCap, and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, Ally Financial Inc. (f/k/a GMAC Inc. f/k/a GMAC LLC), a Delaware corporation, as the initial lender and as agent for the lenders, the financial institutions and other Persons that are or may from time to time become parties thereto as lenders and Wells Fargo Bank, N.A., as first priority collateral agent.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Jay Lakshmanan
CT Corporation
208 S. LaSalle Street
Chicago, IL 60604

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 06:08 PM 05/17/2010
INITIAL FILING # 2010 0075741
AMENDMENT    # 2010 1723331
SRV: 100520156

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #
2010 0075741    filed 01/08/2010

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.

Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Give current record name in item 6a or 6b; also give new name (if name change) in item 7a or 7b and/or new address (if address change) in item 7c.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7d-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Residential Funding Company, LLC | | | |
| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 7d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

See Exhibit A attached hereto and made a part hereof for a description of the released collateral.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Wells Fargo Bank, N.A., as Collateral Control Agent | | | |
| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
File with Delaware Sec. of State (Repo) 5275441  2 additional sheets presented  08048307-525    78430985O (17)  3PGJL

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 07/29/98)

EXHIBIT A
TO
UCC FINANCING STATEMENT AMENDMENT

| Debtor: | Secured Party: |
|---|---|
| Residential Funding Company, LLC<br>One Meridian Crossings, suite 100<br>Minneapolis, MN 55423-3940<br>USA | Wells Fargo Bank, N.A., as Collateral Control<br>Agent<br>45 Broadway, 14th Floor<br>New York, NY 10006, USA |

All of Debtor's right, title and interest, in, to, and under, whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following:

        (a)     all Repo Loans, including all related servicing rights, and all assets, rights or property related thereto;

        (b)     other payments and rights, in each case if and to the extent evidencing or related to the Repo Loans;

        (c)     to the extent not included in the foregoing, all agreements, contracts, documents and instruments if and to the extent evidencing or related to the Repo Loans;

        (d)     (i) all books, records, writings, data bases, information and other property relating to or evidencing the Repo Loans, including, but not limited to, mortgage files or servicing records and (ii) all insurance policies, claims and/or insurance proceeds arising out of the loss, nonconformity or any interference with the use of, or any defect or infringement of rights in, or damage to, any of the foregoing, in each case if and to the extent evidencing or related to the Repo Loans;

        (e)     to the extent not included in the foregoing, all Accounts, Chattel Paper, Commercial Tort Claims, Documents, General Intangibles (including Payment Intangibles), Goods, Instruments, Investment Property, Letter-of-Credit Rights, Letters of Credit, Supporting Obligations, Money and all other personal assets and property of any kind or description, in each case if and to the extent related to the Repo Loans; and

        (f)     all Proceeds, products, offspring, rents, issues, profits and returns of and from, and all distributions on any of the foregoing.

When used in this exhibit and unless the context otherwise requires, (a) capitalized terms which are not otherwise defined in this exhibit have the meanings assigned to such terms in the Senior Debt Loan Agreement and the Security Documents (as defined in the Senior Debt Loan Agreement), as applicable; (b) unless otherwise defined in this exhibit, the terms Account, Chattel Paper, Commercial Tort Claims, Document, Financial Assets, Goods, Instrument, Investment Property, Letter of Credit, Letter-of-Credit Rights, Money, Payment Intangibles,

Proceeds and Supporting Obligations have the respective meanings assigned thereto in Article 8 or Article 9 of the UCC (as defined below).

General Intangibles means, with respect to any Relevant Party, all of such Relevant Party's respective "general intangibles" as defined in the UCC and, in any event, includes (without limitation) all of such Relevant Party's respective licenses, franchises, tax refund claims, guarantee claims, security interests and rights to indemnification.

Relevant Party means any party signatory to the Request for Collateral Release (Pledge of Repo Loans) dated May 17, 2010.

Repo Loan means any Mortgage Loan listed on (i) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among Residential Funding Company, LLC ("RFC"), as a seller, GMAC Mortgage. LLC ("GMAC Mortgage"), as a seller, Residential Capital, LLC ("ResCap"), as guarantor and Goldman Sachs Mortgage Company, as buyer, and (ii) Schedule 4 to the Master Repurchase Agreement, dated as of May 14, 2010, by and among RFC, as a seller, GMAC Mortgage, as a seller, ResCap, as guarantor, and Citibank, N.A., a national banking association, as buyer.

Senior Debt Loan Agreement means the Amended and Restated Loan Agreement (Senior Debt Loan Agreement), dated as of December 30, 2009 (as amended, supplemented, restated or otherwise modified from time to time) by and among RFC, GMAC Mortgage, ResCap, and the various other parties signatory thereto as guarantors, the various other parties signatory thereto as obligors, Ally Financial Inc. (f/k/a GMAC Inc. f/k/a GMAC LLC), a Delaware corporation, as the initial lender and as agent for the lenders, the financial institutions and other Persons that are or may from time to time become parties thereto as lenders and Wells Fargo Bank, N.A., as first priority collateral agent.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York.

# **SCHEDULES**

**Schedule 1**

**Released Bilateral Facilities Collateral**

THE SCHEDULE SET FORTH BELOW REPRESENTS THE COMMITTEE'S UNDERSTANDING, AS OF FEBRUARY 28, 2013, OF CERTAIN OF THE DEBTORS' ASSETS (IN THE CATEGORIES SUMMARIZED BELOW) THAT ARE NOT SUBJECT TO LIENS AND/OR MORTGAGES IN FAVOR OF THE SECURED PARTIES.  SUCH SCHEDULE IS SUBJECT TO CHANGE AND IS FILED WITHOUT PREJUDICE TO SUBSEQUENT SUPPLEMENTS, AMENDMENTS AND MODIFICATIONS.  THE COMMITTEE RESERVES ALL RIGHTS.

| | | |
|---|---|---|
| 1. | $26,858,720 | HFS |
| 2. | $866,176 | REO |
| 3. | $227,112 | Trading Securities |
| 4. | $108,163 | FHA/VA |
| 5. | $26,667,075 | BMMZ former Bilateral |
| | **$54,727,245** | |

**Schedule 1 (Released Bilateral Facilities Collateral) has been omitted pending the Court's ruling on the *Application of the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure to File Under Seal Certain Exhibits and Schedules to Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims* filed concurrently herewith by the Committee.**

## **Schedule 2**

## **Unencumbered Real Property**

THE SCHEDULE SET FORTH BELOW REPRESENTS THE COMMITTEE'S UNDERSTANDING, AS OF FEBRUARY 28, 2013, OF THE DEBTORS' OWNED AND LEASED REAL ESTATE (OTHER THAN REO PROPERTIES, WHICH ARE LISTED ON SCHEDULE 6 AT CATEGORY 4 AND ARE INCORPORATED HEREIN BY REFERENCE) THAT ARE NOT SUBJECT TO MORTGAGES IN FAVOR OF THE SECURED PARTIES. SUCH SCHEDULE IS SUBJECT TO CHANGE AND IS FILED WITHOUT PREJUDICE TO SUBSEQUENT SUPPLEMENTS, AMENDMENTS AND MODIFICATIONS.  THE COMMITTEE RESERVES ALL RIGHTS.

## Owned Real Property

| Debtor Owner | Nature of Debtor's Interest in Property | Description and Location of Property |
|---|---|---|
| GMAC Mortgage, LLC | Land & Building – Servicing Center | 3451 Hammond Ave Waterloo, IA 50702 |
| EPRE LLC | Building, Land and Leasehold Improvements | Eden Prairie 6875 Shady Oak Rd Hennepin, MN 55344 |

## Leasehold Interests

| Debtor Lessee/ Sublessee | Lease and Related Documents[1] | Lease Location |
|---|---|---|
| Residential Funding Company, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2255 N. Ontario Street #400 (Dated 10/15/1999) | 2255 N. Ontario Street #400 Burbank, CA 91504 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement, Occupancy Agreement - 17470 Pacesetter Way (Dated 11/17/2011)) | 17470 Pacesetter Way, Scottsdale, AZ 85255 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1307 Avenel Boulevard Apt. 1307 (Dated 5/21/2011) | 1307 Avenel Boulevard, Apt. 1307, North Wales, PA 19454 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 7676 Hazard Center Drive, Suite 500-33A and B (Dated 8/10/2011) | 7676 Hazard Center Drive, Suite 500-33A and B, San Diego, CA 92108 |
| ETS of Virginia, Inc. | Service Agreement between Business Suites (Texas) Ltd and Lessee (Dated 9/13/2011) | 3900 Westerre Parkway Suite 300, Office 328, 330, 332, Richmond, VA 23233 |
| Residential Funding Company, LLC | Real Estate Lease, Sublease, Office Service Agreement- 300 East Fall Creek (Suite 124) (Dated 7/1/2005) | 300 East Fall Creek, Suite 124, Indianapolis, IN 46205 |
| Residential Funding Company, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2711 North Haskell Avenue (Dated 12/17/1993) | 2711 North Haskell Avenue, Dallas, TX 75204 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1140 Virginia Drive (Dated 5/3/2012) | 1140 Virginia Drive, Fort Washington, PA 19034--3200 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2501 S State Hwy 121 Suite 300 Denton (Dated 7/30/2002)[2] | 2501 S State Hwy 121 Suite 300 Denton, Lewisville, TX 75067 |

---

[1]     Leases referred to herein include all addenda, amendments, renewals, extensions, assignments, substitutions and subleases thereof.

[2]     Pursuant to an Assignment of Leasehold Interest dated May 9, 2012, GMAC Mortgage LLC assigned a 51% leasehold interest to Ally Financial Inc. and has a right to require the re-assignment of such leasehold interest from Ally Financial Inc. as provided therein.

| Debtor Lessee/ Sublessee | Lease and Related Documents[1] | Lease Location |
|---|---|---|
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 15821 Ventura Boulevard, Suite 180 (Dated 6/26/2001)[3] | 15821 Ventura Boulevard, Suite 180, Encino, CA 91436 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 10775 Double R Boulevard (Dated 10/2/2008) | 10775 Double R Boulevard, Reno, NV 89521 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 53 Hereford Street (Dated 4/16/2012) | 53 Hereford Street, Boston, MA 02115 |
| GMAC-RFC Holding Company, LLC and Homecomings Financial, LLC | Memo of Understanding between Homeowners Alliance and Lessee (Dated 11/1/2006) | 24516 Harper Avenue, St. Clair Shores, MI  48081 |
| Homecomings Financial, LLC | Real Estate Lease, Sublease, Office Service Agreement- 24516 Harper Avenue (Dated 11/01/2006) | 24516 Harper Avenue, St. Clair Shores, MI  48081 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 34 Hayden Rowe Street, Suite 162 (Dated 7/20/2011) | 34 Hayden Rowe Street, Suite 162, Hopkinton, MA  01748 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- Two Ravinia, Suite 5001 (Dated 1/16/2009) | Two Ravinia, Suite 5001, Atlanta, GA  30346 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1100 Virginia Drive (Dated 1/31/2006) | 1100 Virginia Drive, Fort Washington, PA  19034-3200 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 4426 Washington Road (Dated 4/16/2012) | 4426 Washington Road, Evans, GA  30809 |
| GMAC Mortgage, LLC | Parking Lease, Sublease, Office Service Agreement-  1051 E. San Marnan Drive (Dated 2/24/2012) | Parking parcel adjacent to 1051 E. San Marnan Drive, Waterloo, IA 50702 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2504 Anderson Highway (Dated 12/11/2011) | 2504 Anderson Highway, Powhatan, VA  23139 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 9635 Granite Ridge Drive (Dated 9/16/2009) | 9635 Granite Ridge Drive, San Diego, CA  92123 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 915 East McLemore Avenue, Suite 205, Office "LOCCDC" (Dated 10/19/2010) | 915 East McLemore Avenue, Suite 205, Memphis, TN 38106 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 233 Needham Street, Office #78 (Dated 4/25/2012) | 233 Needham Street, Office #78, Newton, MA  02464 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 277 Mallory Station Road, Suite 106 (Dated 2/17/2012) | 277 Mallory Station Road, Suite 106, Franklin, TN 37067 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 111 N. Market Street Suite 300, Offices #8 and 9 (Dated 4/6/2011) | 111 N. Market Street Suite 300, Offices #8 and 9, San Jose, CA 95113 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 111 N. Market Street Suite 300, Office #10 (Dated 9/8/2011) | 111 N. Market Street Suite 300, Office #10, San Jose, CA 95113 |

---

[3]        Property was to be surrendered to Landlord upon expiration, July 31, 2012.

| Debtor Lessee/ Sublessee | Lease and Related Documents[1] | Lease Location |
|---|---|---|
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1990 North California Blvd., 8th Floor #830, Office 228 (Dated 4/1/2010) | 1990 North California Blvd., 8th Floor #830, Office 228, Walnut Creek, CA 94596-7261 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 990 North State Road 434 (Dated 4/16/2012) | 990 North State Road 434, Altamonte Springs, FL 32714 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 100 West 5th Avenue (Dated 4/16/2012) | 100 West 5th Avenue, Mt. Dora, FL 32757 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1977 Dundee Drive (Dated 4/16/2012) | 1977 Dundee Drive, Winter Park, FL 32792 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 9442 Capital of Texas Highway North, Plaza One, Suite 500 (Dated 2/1/2012) | 9442 Capital of Texas Highway North, Plaza One, Suite 500, Austin, TX 78759 |
| Homecomings Financial, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1650 Corporate Circle, Suites 100, 150 and 200 (Dated 12/12/2003) Sublease between Lessee and Amy's Kitchen, Inc. (Dated 1/22/2009) | 1650 Corporate Circle, Suites 100, 150 and 200, Petaluma, CA 94954 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2004 Route 17M (Dated 3/1/2012) | 2004 Route 17M, Goshen, NY 10924 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 112 W. Boulevard (Dated 10/1/2011) | 112 W. Boulevard, Laurinburg, NC 28352 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 625 N. Euclid, Suite 515 (Dated 11/1/2010, Amendment dated 10/2011) | 625 N. Euclid, Suite 515, St. Louis, MO 63108 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 60 East Rio Salado Pkwy, 9th Floor (Dated 10/6/2009) | 60 East Rio Salado Pkwy, 9th Floor, Tempe, AZ 85281 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 1224 Mill Street, Office 215 (Dated 3/31/2011) | 1224 Mill Street, Office 215, East Berlin, CT 06023 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1560 Sawgrass Corporate Parkway, Suite 401 (Dated 2/1/2011) | 1560 Sawgrass Corporate Parkway, Suite 401, Fort Lauderdale (Sunrise), FL 33323 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1560 Sawgrass Corporate Parkway, Suite 494 (Dated 2/1/2011) | 1560 Sawgrass Corporate Parkway, Suite 494, Fort Lauderdale (Sunrise), FL 33323 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1170 Peachtree Street NE, Suite 1200-1239 (Dated 12/2/2011) | 1170 Peachtree Street NE, Suite 1200‑1239, Atlanta, GA 30309 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 33 Wood Avenue South, Office 633 (Dated 7/13/2009) | 33 Wood Avenue South, Office 633, Iselin, NJ 08830 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 4449 Easton Way 2nd Floor, Offices 2106 & 2094 (Dated 10/28/2011) | 4449 Easton Way 2nd Floor, Offices 2106 & 2094, Columbus, OH 43219 |
| ETS of Washington, Inc. | Office Service Agreement between Regus Management Group LLC and Lessee (Dated 8/1/2011) | 800 Bellevue Way, Office 420, Bellevue, WA 98004 |

| Debtor Lessee/ Sublessee | Lease and Related Documents[1] | Lease Location |
|---|---|---|
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 800 Bellevue Way, Office 429 and 430 (Dated 2/14/2011) | 800 Bellevue Way, Office 429 and 430, Bellevue, WA 98004 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 11601 Wilshire Blvd., 5th Fl (Dated 2/8/2012) | 11601 Wilshire Blvd., 5th Fl., Los Angeles, CA 90025 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1215 K Street, 17th Floor, Offices 1720 and 1721 (Dated 1/11/2012) | 1215 K Street, 17th Floor, Offices 1720 and 1721, Sacramento , CA 95814 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 655 North Central Avenue, 17th Fl (Dated 2/22/2012) | 655 North Central Avenue, 17th Fl., Glendale, CA 91203 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 1320 Main Street Suite 300, Office 341 (Dated 7/27/2011)) | 1320 Main Street Suite 300, Office 341, Columbia, SC 29201 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 511 W Bay Street, Suite 350 (Dated 3/6/2012) | 511 W Bay Street, Suite 350, Tampa, FL 33606 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 28005 N. Smyth Drive (Dated 3/12/2012) | 28005 N. Smyth Drive, Valencia, CA 91355 |
| Residential Funding Company, LLC | Real Estate Lease, Sublease, Office Service Agreement- 8400 Normandale Lake Boulevard (Dated 7/7/2004) | 8400 Normandale Lake Boulevard, Bloomington, MN 55437 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 111 Second Avenue NE Suite 532 (Dated 5/17/2011) | 111 Second Avenue NE Suite 532, St. Petersburg, FL 33701 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2480 Route 97, Suite 7 (Dated 5/1/2012) | 2480 Route 97, Suite 7, Glenwood, MD 21738 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 105 Maxess, Office # 106 (Dated 4/26/2012) | 105 Maxess, Office #106, Melville, NY 11747 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2448 Junipero Serra Boulevard (Dated 5/1/2012) | 2448 Junipero Serra Boulevard, Daly City, CA 94015 |
| GMAC Mortgage, LLC | Lease between 1891 Professional Building Associates and Lessee (Dated 5/30/2012) | 10 Liberty Street, Office 111 & 411, Danvers MA 01923 |
| GMAC Mortgage, LLC | Lease Agreement between Bridgeton Executive Suites, Inc. and Lessee (Dated 6/29/2012) | 3466 Bridgeland Drive, Office 201, Bridgeton MO 63044 |
| GMAC Mortgage, LLC | Lease between Trotter Holdings, LLC dba Bridlewood Executive Suites and Lessee (Dated 8/6/12) | 204 Muirs Chapel Rd, Suite 100, Greensboro NC 27410 |
| GMAC Mortgage, LLC | Lease between Kalyvas Group, LLC and Lessee (Dated 6/29/2012) | 111 Second Avenue NE Suite 910, St. Petersburg FL 33701 |
| GMAC Mortgage, LLC | Lease between Landfall Executive Suites, LLC and Lessee (Dated 7/24/12) | 1213 Culbreth Drive, Suites 143 & 144, Wilmington NC |
| GMAC Mortgage, LLC | Office Service Agreement between Regus Management Group LLC and Lessee (Dated 7/9/2012) | 4040 Civic Center Drive, Suite 200, San Rafael CA 94903 |
| GMAC Mortgage, LLC | Office Service Agreement between Regus Management Group LLC and Lessee dated (7/12/2012) | 33 Wood Avenue South, Office 425, Iselin NJ 08830 |

Schedule 2

| Debtor Lessee/ Sublessee | Lease and Related Documents[1] | Lease Location |
|---|---|---|
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 725 Cool Springs, Suite 600 (Dated 6/13/2011) | 725 Cool Springs, Suite 600, Office 6001, Franklin  TN 37067 |
| GMAC Mortgage, LLC | Service Agreement between Your Office - Orlando/Lake Mary and Lessee (Dated 8/1/1012) | 1540 International Parkway, Office 203, Lake Mary FL 32746 |
| GMAC Mortgage LLC | Sublease between Steven S. Nagy, Reliant Holdings, LLC and Lessee (Dated 7/1/2012) | 256 Seaboard Lane, Suite E 105, Franklin  TN 37067 |
| GMAC Mortgage LLC | Sublease between Steven S. Nagy, Reliant Holdings, LLC and Lessee (Dated 7/1/2012) | 505 East Main Street, Hendersonville TN |
| GMAC Mortgage LLC | Sublease between Steven S. Nagy, Reliant Holdings, LLC and Lessee (Dated 7/1/2012) | 4711 Trousdale Drive, Suite 121, Nashville TN 37220 |
| GMAC Mortgage LLC | Executive Suites Lease between SW+A Pendleton West, LLC and Lessee (Dated 6/30/2012) | 607 Pendleton Street, Office #ES2, Greenville SC  29601 |
| GMAC Mortgage LLC | Real Estate Lease, Sublease, Office Service Agreement- 3200 Park Center Drive (Dated 8/1/2005) | 3200 Park Center Drive Suites 150 & 400, Costa Mesa CA 92626 |
| GMAC Mortgage LLC | Sublease between United Country- Columbia Realty and Lessee (Dated 7/1/2012) | 740 Nashville Hwy, Columbia TN 38401 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 10625 Ellis Avenue, Suite B (Dated 2/1/2012) | 10625 Ellis Avenue, Suite B Fountain Valley, CA 92708 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 100 Cummings Center Suite 312-G (Dated 4/25/2012) | 100 Cummings Center Suite 312-G, Beverly, MA 01915 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 1076 Ocean Avenue (Dated 03/1/2012) | 1076 Ocean Avenue, Sea Bright, NJ 07760 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 2027 State Highway 35 (Dated 2/1/2012) | 2027 State Highway 35, Wall, NJ 07719 |
| GMAC Mortgage, LLC | Real Estate Lease, Sublease, Office Service Agreement- 922 Washington Street (Dated 12/1/2011) | 922 Washington Street, Hoboken, NJ 07030 |

## Schedule 3

### Released Mortgage Loans

THE SCHEDULE SET FORTH BELOW REPRESENTS THE COMMITTEE'S
UNDERSTANDING, AS OF FEBRUARY 28, 2013, OF CERTAIN OF THE DEBTORS'
HELD FOR SALE MORTGAGES THAT ARE NOT SUBJECT TO LIENS IN FAVOR OF
THE SECURED PARTIES.  SUCH SCHEDULE IS SUBJECT TO CHANGE AND IS FILED
WITHOUT PREJUDICE TO SUBSEQUENT SUPPLEMENTS, AMENDMENTS AND
MODIFICATIONS.  THE COMMITTEE RESERVES ALL RIGHTS.

**Schedule 3 (Released Mortgage Loans) has been omitted pending the Court's ruling on the** *Application of the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure to File Under Seal Certain Exhibits and Schedules to Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims* **filed concurrently herewith by the Committee.**

## Schedule 4

## BMMZ Mortgage Loans

THE SCHEDULE SET FORTH BELOW REPRESENTS THE COMMITTEE'S
UNDERSTANDING, AS OF FEBRUARY 28, 2013, OF CERTAIN OF THE DEBTORS'
HELD FOR SALE MORTGAGES THAT ARE NOT SUBJECT TO LIENS IN FAVOR OF
THE SECURED PARTIES.  SUCH SCHEDULE IS SUBJECT TO CHANGE AND IS FILED
WITHOUT PREJUDICE TO SUBSEQUENT SUPPLEMENTS, AMENDMENTS AND
MODIFICATIONS.  THE COMMITTEE RESERVES ALL RIGHTS.

**Schedule 4 (BMMZ Mortgage Loans) has been omitted pending the Court's ruling on the** *Application of the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure to File Under Seal Certain Exhibits and Schedules to Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims* **filed concurrently herewith by the Committee.**

## Schedule 5

## Deposit Accounts

THE SCHEDULE SET FORTH BELOW REPRESENTS THE COMMITTEE'S
UNDERSTANDING, AS OF FEBRUARY 28, 2013, OF THE DEBTORS' DEPOSIT
ACCOUNTS THAT ARE NOT SUBJECT TO CONTROL AGREEMENTS IN FAVOR OF
THE SECURED PARTIES.  SUCH SCHEDULE IS SUBJECT TO CHANGE AND IS FILED
WITHOUT PREJUDICE TO SUBSEQUENT SUPPLEMENTS, AMENDMENTS AND
MODIFICATIONS.  THE COMMITTEE RESERVES ALL RIGHTS.

**Schedule 5 (Deposit Accounts) has been omitted pending the Court's ruling on the** *Application of the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure to File Under Seal Certain Exhibits and Schedules to Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims* **filed concurrently herewith by the Committee.**

## Schedule 6

## Preference Assets

THE SCHEDULE SET FORTH BELOW REPRESENTS THE COMMITTEE'S
UNDERSTANDING, AS OF FEBRUARY 28, 2013, OF CERTAIN OF THE DEBTORS'
ASSETS (IN THE CATEGORIES SUMMARIZED BELOW) THAT WERE TRANSFERRED
TO OR FOR THE BENEFIT OF THE SECURED PARTIES WITHIN 90 DAYS PRIOR TO
THE PETITION DATE.  SUCH SCHEDULE IS SUBJECT TO CHANGE AND IS FILED
WITHOUT PREJUDICE TO SUBSEQUENT SUPPLEMENTS, AMENDMENTS AND
MODIFICATIONS.  THE COMMITTEE RESERVES ALL RIGHTS.

| | | |
|---|---|---|
| 1. | $1,244,836 | HFS Revolver |
| 2. | $137,263,088 | HFS Blanket |
| 3. | $212,788,562 | FHA/VA |
| 4. | $13,803,291 | REO |
| | **$365,099,777** | |

**Schedule 6 (Preference Assets) has been omitted pending the Court's ruling on the** *Application of the Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure to File Under Seal Certain Exhibits and Schedules to Adversary Complaint for Declaratory Judgment, Avoidance of Liens, and Disallowance of Claims* **filed concurrently herewith by the Committee.**