PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein
Henry C. Kevane (admitted *pro hac vice*)
John A. Morris
Jason H. Rosell
780 Third Avenue, 36th Floor
New York, New York 10017
Telephone:    (212) 561-7700
Facsimile:    (212) 561-7777

*Co-Counsel to the*
*Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- x

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*,

                  Debtors.

:    Chapter 11
:    Case No. 12-12020 (MG)
:    Jointly Administered

-------------------------------------------------------------------------- x

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, on behalf of the estates of the Debtors,

                  Plaintiff,

                  v.

UMB BANK, N.A., as successor indenture trustee under that
certain Indenture, dated as of June 6, 2008; and WELLS
FARGO BANK, N.A., third priority collateral agent and
collateral control agent under that certain Amended and
Restated Third Priority Pledge and Security Agreement and
Irrevocable Proxy, dated as of December 30, 2009,

                  Defendants.

:    Adversary Proceeding
:    No. 13-01277 (MG)

-------------------------------------------------------------------------- x

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OPPOSITION**
**TO DEFENDANT UMB BANK, N.A.'S PARTIAL MOTION TO DISMISS**
**PURSUANT TO FRCP 12(b)(6)**

# TABLE OF CONTENTS

                                                                                                    **Page**

I.      PRELIMINARY STATEMENT ........................................................................................1

II.     ARGUMENT ...................................................................................................................2

        A.      The Preference Claim Is Legally Sufficient (Count XI)..........................................3

        B.      The Claims that the Secured Parties' Liens Do Not Attach to the Released
                Mortgage Loans (Count IV) and that the BMMZ Facility Should Be
                Characterized as a Financing (Count V) Are Legally Sufficient............................6

        C.      The Claim that the Secured Parties' Liens Do Not Attach to
                the Released Bilateral Facilities Collateral Is Legally
                Sufficient (Count I) ................................................................................................11

        D.      The Claim that OID Must Be Excluded from the Principal
                Portion of the Secured Parties' Claims as Unmatured Interest
                Is Legally Sufficient (Count XIII) .........................................................................14

                i.      The Stipulations Wrongfully Allow OID, Ignoring Disallowance
                        Under 11 U.S.C. § 502(b)(2) ....................................................................15

                ii.     *Chateaugay* Is Distinguishable and the Secured Parties' OID
                        Should Be Disallowed................................................................................16

                        a.      *Chateaugay* Did Not Address a Fair Market Value
                                Debt-for-Debt Exchange................................................................17

                        b.      Where the Debtor's Overall Obligations Are Reduced – as
                                in a Fair Market Value Exchange – the Disallowance of
                                OID Is Appropriate ........................................................................18

        E.      The Committee Has Standing to Dispute the Priority of the
                Secured Parties' Liens (Count VII)........................................................................20

        F.      Temporary Disallowance Under Section 502(d) Is Appropriate
                (Count XII)............................................................................................................21

        G.      The Committee Is Not Attempting to Litigate the Undersecured
                Status of JSNs, but Rather Responding to Concessions Made by the
                Debtors in the DIP Order (Count XIV)..................................................................23

        H.      The Complaint Sufficiently Defines "Non-Obligors" (Count III).........................23

        I.      The Committee Can Avoid the Unperfected Liens (Count X) ...............................24

III.    CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Am. Home Mortg. Holdings v. Lehman Bros. Inc. (In re Am. Home Mortg. Holdings, Inc.),*
  388 B.R. 69 (Bankr. D. Del. 2008) ......................................................................... 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................... 2

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................... 1, 2, 5

*Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202 (2d Cir. 2012) ..................................... 4

*Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg., Inc.),*
  379 B.R. 503 (Bankr. D. Del. 2008) ....................................................................... 8

*Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.),*
  303 F.3d 161 (2d Cir. 2002) ............................................................................... 21

*Conley v. Gibson*, 355 U.S. 41 (1957) ......................................................................... 2

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,*
  67 F.3d 1063 (2d Cir. 1995) ................................................................................. 7

*In re Jensen,*
  Case No. 09-14830, 2010 WL 424693 (Bankr. S.D.N.Y. Feb. 3, 2010) .................. 22

*In re Lids Corp.,*
  260 B.R. 680 (Bankr. D. Del. 2001) ...................................................................... 22

*Liona Corp. v. PCH Assocs. (In re PCH Assocs.),*
  949 F.2d 585 (2d Cir. 1991) ............................................................................... 10

*Liquidation Trust v. Daimler AG (In re Old Carco LLC),*
  454 B.R. 38 (Bankr. S.D.N.Y. 2011) ...................................................................... 2

*LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.),*
  961 F.2d 378 (2d Cir. 1992) ................................................................... 14, 16, 17

*Official Comm. v. Blomen (In re Hydrogen, L.L.C.),*
  431 B.R. 337 (Bankr. S.D.N.Y. 2010) .................................................................... 6

*Official Comm. v. Pirelli Comm. Cables & Systems USA (In re 360 Networks (USA) Inc.),*
  367 B.R. 428 (Bankr. S.D.N.Y. 2007) .................................................................... 5

*Stolt-Nielsen, S.A. v. Animal Feeds Int'l Corp.,*
  559 U.S. 662 (2010) .......................................................................................... 12

*Wells Fargo Bank v. Homebanc Corp. (In re Homebanc Mortg. Corp.)*,
Case No. 07-51740, 2013 WL 211180 (Bankr. D. Del. Jan. 18, 2013) ................................... 9

**Statutes**

11 U.S.C. § 101(54)(A) ................................................................................................... 5

11 U.S.C. § 101(54)(A), (D) ........................................................................................... 4

11 U.S.C. § 547(c)(3) ..................................................................................................... 5

11 U.S.C. §§ 555, 559 ................................................................................................... 11

26 C.F.R. § 1.273-1(a)-(d) (2013) ................................................................................ 17

**Other Authorities**

2 COLLIER ON BANKRUPTCY ¶ 101.54 (16th ed. 2013) ................................................... 3

4 COLLIER ON BANKRUPTCY ¶ 502.05[2][a] (16th ed. 2013) ......................................... 23

C. Wright & A. Miller, *Federal Practice and Procedure*
§ 1216, at 235-236 (3d ed. 2004) ................................................................................. 2

H.R. Rep. No. 595, 95th Cong., 1st Sess. 352–353 (1977) ........................................... 16

*Prepackaged Bankruptcy Plans: The Deleveraging Tool of the '90s in the
Wake of OID and Tax Concerns*, 21 Seton Hall L. Rev. 643, 645-46 (1991) ............ 20

S. Rep. No. 989, 95th Cong., 2d Sess. 62 (1978) ......................................................... 16

Uniform Commercial Code § 9-203(b)(2) ...................................................................... 4

Plaintiff Official Committee of Unsecured Creditors (the "Committee") of

Residential Capital, LLC, a Delaware limited liability company ("ResCap"), and its affiliated

debtors (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this

opposition to Defendant UMB Bank, N.A.'s Partial Motion to Dismiss Pursuant to FRCP

12(b)(6) [Docket Nos. 20 and 21] (the "Motion to Dismiss") filed in this adversary proceeding.[1]

# I.
## PRELIMINARY STATEMENT

In a scatter-shot effort to retain the value of assets to which they are not entitled,

Defendants challenge nearly every aspect of the Committee's detailed Complaint.

In doing so, Defendants variously contest the Committee's factual assertions,

wrongly contend that the Committee has proffered insufficient facts to support its claims, ignore

relevant legal precedent, and misconstrue the law.

Taking the Committee's factual allegations as true, and viewing them in the light

most favorable to the Committee, Defendants have ample notice of the legal and factual bases of

the Committee's claims, each of which is a viable cause of action.  For the reasons set forth

below, the Committee exceeds the standard for the denial of a motion to dismiss set forth in *Bell*

*Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), and its progeny.  The Motion to Dismiss should be

denied in all respects.

---

[1]    Defendant Wells Fargo Bank, N.A. ("Wells Fargo" and, together with UMB Bank, N.A., the "Defendants")
joined the Motion to Dismiss [Docket No. 23].  All capitalized terms not defined herein shall have the
meanings ascribed to them in the *Adversary Complaint for Declaratory Judgment, Avoidance of Liens and
Disallowance of Claims*  [Docket No. 1] (the "Complaint" and cited as "Comp.").

## II.
## ARGUMENT

Defendants' burden on a motion to dismiss is heavy.  While a complaint must do more than set forth conclusory statements or recite the bare elements of a cause of action,[2] the pleading standard is a liberal one.

"[T]he court draws all reasonable inferences from the factual allegations in favor of the plaintiff," *Liquidation Trust v. Daimler AG (In re Old Carco LLC)*, 454 B.R. 38, 45 (Bankr. S.D.N.Y. 2011), to determine whether the factual allegations "plausibly suggest that the defendant is liable for the conduct that is alleged."  *Id.*  This does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 at 570.  Rule 8(a), made applicable to adversary proceedings by Bankruptcy Rule 7008, provides that, in asserting a claim, the pleader need only set forth "(1) a short and plain statement of the grounds for the court's jurisdiction. . .; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought."  Fed. R. Civ. P. 8(a).  "The purpose of the statement is to provide 'fair notice' of the claim and 'the grounds upon which it rests.'"  *Twombly*, 550 at 545 (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)).  *See also Enron Corp. v. Avenue Special Situations Fund II, LP (In re Enron Corp.)*, 340 B.R. 180, 187 (Bankr. S.D.N.Y. 2006).

The Committee has provided the grounds of its entitlement to relief and its allegations unquestionably "raise a right to relief above the speculative level."  *Twombly, 550* at 555 (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216 at 235-236 (3d ed. 2004)).  The Motion to Dismiss should be denied in all respects.

---

[2]     *See* Defendant UMB Bank, N.A.'s *Memorandum of Law In Support of its Partial Motion to Dismiss Pursuant to FRCP 12(b)(6)* [Docket No. 21] (cited as "Def. Br.") at 8-9 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

A.    **The Preference Claim Is Legally Sufficient (Count XI)**

Defendants contend that the Committee has failed to adequately plead the

elements of a preferential transfer, and provide sufficient factual allegations to put Defendants on

notice as to which transfers are being challenged, such that Count XI should be dismissed.  Def.

Br. at 9-12.  Defendants are wrong.

Defendants initially contend that the Committee has failed to adequately plead

that there was a "transfer of an interest of the debtor in property."  Def. Br. at 10.  In the

Complaint, the Committee alleges that the "Debtors granted the Collateral Agent [*i.e.,* Defendant

Wells Fargo] liens on and security interests in certain of their assets" pursuant to the Notes

Security Agreement, with such assets defined as the "Notes Collateral."  Comp. ¶ 47.  The

Committee further alleges that "at least $350 million of assets" were added to the Notes

Collateral during the 90 days prior to the Petition Date.  Comp. ¶ 207.  Finally, the Committee

alleges that "[e]ach addition of the Preference Assets to the Notes Collateral [during the 90 day

period] was a transfer for the benefit of the Secured Parties."  Comp. ¶ 214.

There is nothing "vague" or "ambiguous" about the Committee's theory:  Each

time during the 90 days prior to the Petition Date that the Debtors added previously

unencumbered assets or new assets to the Notes Collateral, Defendants received a preferential

transfer for the benefit of the Secured Parties.  The Committee's theory is consistent with the

plain meaning of the term "transfer" under the Bankruptcy Code.

"Congress intended that the scope of the term 'transfer' be broad."  COLLIER ON

BANKRUPTCY ¶ 101.54 (16th ed. 2013) (citing cases); *see also* ¶ 547.03 [1][a] ("the definition of

'transfer' is comprehensive, every conceivable type of transfer may be avoided. . .").  The term

"transfer" includes, among other things, "the creation of a lien" as well as "each mode, direct or

indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with. . . an interest in property."  11 U.S.C. § 101(54)(A), (D).

The Committee's allegations are consistent with the plain words of the Bankruptcy Code:  Each asset "added" to the Notes Collateral during the 90-day period was a "transfer" because it resulted in the creation of a lien on such asset and otherwise disposed of the Debtors' interest in the Preference Assets.[3]  Comp. ¶¶ 207, 211, 214.  Naturally, under black letter law, a security interest cannot attach to collateral unless and until a debtor has rights in the collateral.[4]  Here, the Debtors acquired rights in the Preference Assets during the 90-day preference period and, at that point, purportedly transferred a lien on such property.[5]  The Preferential Transfers enabled the Secured Parties to enhance their position vis-à-vis general unsecured creditors by obtaining a lien on the Preference Assets during the 90 days prior to the Petition Date.

The Bankruptcy Code expressly acknowledges that the attachment of a lien on property of a debtor might be preferential.  *See* 11 U.S.C. § 101(54)(A).  One of the defenses to the avoidance of a preference, which is not applicable here, applies to a transfer "that creates a security interest in property acquired by the debtor. . ."  11 U.S.C. § 547(c)(3).  Of course, there would be no need for this defense if Defendants' theory were correct.

---

[3]    Defendants misconstrue the Debtors' assertions concerning the Database.  *See* Def. Br. at 10, n.9.  The Debtors did not take a position as to which assets were added to the Notes Collateral during the preference period; rather, the Debtors were responding to issues concerning the "blanket lien" that were raised by the Committee.  In any event, the Debtors are not the arbiters of whether preferential transfers occurred and, as Defendants acknowledge, "a court must accept as true all of the *factual* allegations contained in a complaint…." Def. Br. at 9 (citing *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 210 (2d Cir. 2012)).

[4]    *See* Uniform Commercial Code § 9-203(b)(2).

[5]    In addition, with respect to REO Properties subject to Count XI that were transferred to special purpose vehicles (the "SPVs") during the 90-day preference period, to the extent no mortgages were granted on such REO Properties and the only basis for Defendants' assertion of a lien on such properties was through the pledge of such SPVs' equity to Defendants, the transfer of such REO Properties to the SPVs constitutes preferential transfers.

Defendants also feign a lack of knowledge with respect to the transfers at issue, contending that they are "simply unable to determine what 'preferential transfers' the Committee is seeking to avoid." Def. Br. at 11. This argument borders on specious.

In Schedule 6 of the Complaint, the Committee specifically identified over 2,500 individual mortgages and other mortgage-related assets that were added to the Notes Collateral during the 90-day period. Contrary to Defendants' assertion, the Committee disclosed the particular Debtor that made each transfer and the amount of each transfer.[6] Schedule 6 also includes other information unique to each Preferential Transfer (*e.g.*, identification numbers). There can be no credible dispute as to what transfers are at issue.[7]

Based on the foregoing, the Committee has exceeded the *Twombly* standard.[8] Rather than a "formulaic recitation of the elements of [the] cause of action," the Complaint provides sufficient information to enable Defendants to know what the Committee is complaining about and to identify each transfer at issue. *See Twombly,* 550 U.S. at 555. Consequently, Defendants' motion to dismiss Count XI should be denied.[9]

---

[6] *Compare* Schedule 6 (columns entitled "Legal Entity" (identifying the particular Debtor) and "Net Asset Carry Value" (identifying the precise amount of each of the transfers)) *with* Def. Br. at 11 (alleging that Schedule 6 does not identify "which specific Debtor made the transfer, or even the amount of the transfer.").

[7] The Committee's preference claim is based on certain collateral reports that cover only the period from February 29 through May 14, 2012. These reports, covering the approximately 75-day period prior to the Petition Date, are sufficient evidence that each Preferential Transfer occurred within the 90-day preference period. The Committee reserves the right to seek leave to amend its preference claim if it identifies any mortgage loans or other mortgage-related assets that were added to the Notes Collateral during the 90 days prior to the Petition Date, including the period February 14 through February 28, 2012.

[8] In addition to Schedule 6, the Committee has provided additional information to Defendants with respect to each mortgage at issue as part of its production of documents, including the bases on which the "Net Asset Carry Value" was determined for each transfer. If Defendants require further information about any of the more than 2,500 mortgages and mortgage-related assets that were added to the Notes Collateral during the 90-day period, they can seek it in discovery.

[9] The cases cited by defendants do not command a different result. *See Official Comm. v. Pirelli Comm. Cables & Systems USA (In re 360 Networks (USA) Inc.),* 367 B.R. 428 (Bankr. S.D.N.Y. 2007) (the adequacy of the preference allegations was an issue only because the plaintiff attempted to add new

(continued. . .)

### B.    The Claims that the Secured Parties' Liens Do Not Attach to the Released Mortgage Loans (Count IV) and that the BMMZ Facility Should Be Characterized as a Financing (Count V) Are Legally Sufficient

Count IV of the Complaint (concerning Released Mortgage Loans) and Count V of the Complaint (concerning the BMMZ Facility) seek declaratory relief that Defendants are not entitled, as proposed under the Stipulations, to liens on certain mortgage loans, the proceeds thereof or the equity therein.  Comp. ¶¶ 117-159.

Defendants concede that they specifically released the Released Mortgage Loans from the Notes Collateral to enable the use of such loans for financings (the "Goldman/Citi Repo Facilities") provided by Goldman Sachs Mortgage Company and Citibank, N.A.  Def. Br. at 7. Despite such concession, Defendants contend that they still can usurp the Debtors' equity in the Released Mortgage Loans at the expense of unsecured creditors.  Defendants argue that they reacquired liens upon the Released Mortgage Loans, their proceeds and the equity therein by virtue of their so-called all-asset liens, affording them liens on the Debtors' alleged contractual repurchase rights under the BMMZ Facility.  Def. Br. at 15-16.

The Committee's allegations regarding the Released Mortgage Loans are divided into two separate counts.  Count IV addresses all of the Released Mortgage Loans, which include both (a) those mortgage loans that were initially included in a subsequent financing, the BMMZ Facility, and remained a part thereof, until the BMMZ Facility was refinanced / unwound (referred to in the Complaint as the "BMMZ Mortgage Loans"), and (b) any other Released

---

transfers after the expiration of the statute of limitations; the court denied plaintiff's motion to amend the complaint because plaintiff had not timely provided any notice of the new transfers and there was no basis to find that the new transfers related back to the timely-filed transfers); *Official Comm. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337 (Bankr. S.D.N.Y. 2010) (in contrast to the plaintiff in *Hydrogen*, who failed to provide "a single relevant detail" regarding the transfers such that it was "impossible to identify any specific avoidable transfer," the Committee has provided sufficient detail concerning over 2,500 unique mortgages that leaves no doubt as to what transfers are at issue).

Mortgage Loans, including some that never became part of the BMMZ Facility in the first place and others that were initially included in the BMMZ Facility but were released before the refinancing / unwinding of the BMMZ Facility (collectively, the "Other Mortgage Loans"). Count V addresses only the BMMZ Mortgage Loans, that is, the Released Mortgage Loans that were included and remained in the BMMZ Facility until it was refinanced / unwound.

Defendants imply that upon termination of the Goldman/Citi Repo Facilities, **_all_** of the Released Mortgage Loans became part of the BMMZ Facility and, thereby, constitute BMMZ Mortgage Loans. Def. Br. at 7, 15. Defendants see no distinction between the mortgage loans addressed in Counts IV and V of the Complaint. Thus, they contend that Count IV and Count V should both be dismissed because they purportedly reacquired an indirect lien in the BMMZ Mortgage Loans through their all-asset lien on the Debtors' contractual repurchase obligations under the BMMZ Facility.[10] Def. Br. at 15-16. Defendants are wrong as to their contentions regarding the BMMZ Mortgage Loans addressed in both Count IV and Count V, as more fully discussed below. As a threshold matter, however, since Defendants have not refuted Count IV's allegations that, after Defendants' release of the Released Mortgage Loans, Defendants never reacquired any liens in those Released Mortgage Loans that are not BMMZ Mortgage Loans (the Other Mortgage Loans), Count IV cannot be dismissed as to the Other Mortgage Loans.

Count V avers facts that, if accepted as true and viewed in the light most favorable to the Committee, would result in a conclusion that the BMMZ Facility, although styled as a sale and repurchase of the BMMZ Mortgage Loans, was in substance a secured financing. *See, e.g.,*

---

[10]     As is discussed below, Defendants further contend that the BMMZ Facility financing, under which certain of the BMMZ Mortgage Loans were purportedly "sold" by certain of the Debtors to BMMZ, an affiliate of the Debtors, at a $121 million discount to estimated value, involved a true sale of all of the BMMZ Mortgage Loans and, thus, the creation of the contractual repurchase rights therein to which the Defendants allege their all-asset lien attached.

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc*., 67 F.3d 1063, 1068-69 (2d Cir. 1995).  For

purposes of the Motion to Dismiss, the BMMZ Facility must therefore be characterized as a

financing rather than a true sale such that there could be no contractual "repurchase" rights under

the BMMZ Facility as to mortgage loans that were never sold.  Thus, as alleged in Count V,

Defendants' liens did not indirectly reattach to the BMMZ Mortgage Loans included in the

BMMZ Facility, as the Stipulations would provide (absent the Committee's challenge).

Defendants counter that Count IV and Count V must be dismissed, alleging that:  (1)

Bankruptcy Code sections 555 and 559 ("Sections 555/559") do not permit the characterization

of a repurchase agreement as a financing; and (2) the Committee's statement in its motion for

standing to file the Complaint (Docket No. 1546) (the "Standing Motion"), that it was not

seeking to challenge BMMZ as to the application of Sections 555/559 to the BMMZ Facility,[11]

precludes a characterization of the BMMZ Facility as a financing with respect to the Secured

Parties' alleged lien.  Def. Br. at 13-14.

Defendants misapply the statutes and misread the applicable cases.  Sections 555/559 do

not address whether repurchase agreements should be characterized as true sales or as

financings; indeed, they make the distinction irrelevant for the statutes' specified purposes.

Defendants' argument appears to be that if a transaction is a "repurchase agreement" under

Bankruptcy Code section 101(47), then the transaction is a true sale rather than a financing.

Defendants rely on *Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg.,*

---

[11]     The Committee states in the Standing Motion at 19, n.22:

    The Committee does not seek to challenge the characterization of the BMMZ Repo
    Facility as a "Repurchase Agreement" for purposes of the safe harbor provision of the
    Bankruptcy Code. The safe harbor provisions relating to repurchase agreements exist to
    protect the nondebtor parties to those agreements, in this case BMMZ, and the
    Committee is not seeking to disturb the rights of BMMZ.

*Inc.)*, 379 B.R. 503, 515 (Bankr. D. Del. 2008).  In fact, the court in *American Home*, in rejecting

a debtor's argument that a repurchase agreement must be a true sale, concluded that it does not

matter whether the contract provides for an outright sale or "merely" the transfer of a lien,

because:

> [S]ection 101(54) of the Bankruptcy Code . . . defines 'transfer' to
> include the creation of a lien.  Thus, *even if the Contract only
> provides for the creation of a lien in the mortgage loans, it still
> constitutes a "transfer" for the purpose of determining whether the
> sale and repurchase of mortgage loans under the Contract
> constitutes a repurchase agreement.*

*Id*. at 516 (emphasis added).  Similarly, Defendants also misconstrue *Wells Fargo Bank v.*

*Homebanc Corp. (In re Homebanc Mortg. Corp.*), Case No. 07-51740, 2013 WL 211180 (Bankr.

D. Del. Jan. 18, 2013), and certain legislative history.  Def. Br. at 14.  *Homebanc* and the cited

legislative history say nothing more than that a financing characterization is irrelevant to

Sections 555/559; they also do not support Defendants' erroneous conflation of a "repurchase

agreement" under the Bankruptcy Code with a determination of a true sale characterization.

The fact that the characterization of a repurchase agreement as a true sale or financing

transaction is irrelevant to the application of Sections 555/559 does not prevent such

characterization from remaining relevant in other contexts.  Significantly, in a subsequent

decision in the *American Home* bankruptcy case, the court, after holding Sections 555/559

applicable to a transaction, proceeded to analyze the substance of the transaction to determine

whether it should properly be characterized as a financing or true sale for other purposes.  *Am.*

*Home Mortg. Holdings, Inc. v. Lehman Bros. Inc. (In re Am. Home Mortg. Holdings)*, 388 B.R.

69, 88-89 (Bankr. D. Del. 2008) ("*American Home II*").  Similarly here, the fact that the BMMZ

Facility was a repurchase agreement under section 101(47), subject to the safe harbors of

Sections 555/559 (which the Committee has not disputed), does not prevent this Court, as

requested by Count V, to determine, after appropriate factual development, that the BMMZ

Facility is a financing and not a true sale.

Defendants also argue that the BMMZ Facility cannot be characterized as a financing

with respect to the lien interests of the Secured Parties because (i) any such characterization must

apply to all parties affected by the BMMZ Facility and (ii) the Committee represented in the

Standing Motion that it was not seeking to affect BMMZ's rights.  Def. Br. at 13.  These

arguments are without merit.

First, nothing in Sections 555/559 precludes characterizing the BMMZ Facility as a

financing transaction for purposes of determining the alleged secured claim of the Secured

Parties.  Sections 555/559, by their plain and unambiguous terms, provide protection only to

specified actions of the non-debtor parties to repurchase agreements, not to the lien status of third

parties.[12]

Further, Defendants contend that any characterization of the BMMZ Facility will affect

and be binding on both the parties thereto and all third persons as a matter of law, citing *Liona*

*Corp. v. PCH Assocs. (In re PCH Assocs.)*, 949 F.2d 585, 597 (2d Cir. 1991).  Def. Br. at 13, 15.

Yet, although the Second Circuit noted there that a characterization decision "can" impact both

the parties to the transaction and third parties (*id.* at 597), the court specifically held that a

transaction's structure may be treated differently for third parties than it is treated for the parties

to the transaction:  "the parties to a transaction can bind themselves *inter se* but the manner in

which they structure their relationship is not necessarily binding on third parties."  *Id.* at 602-

603.  Moreover, Defendants acknowledge that the BMMZ Facility does not exist today; it was

---

[12]       Sections 555/559 provide, in relevant part, that "[t]he exercise of a contractual right . . . to cause the
liquidation, termination, or acceleration of [a repurchase agreement because of a debtors' bankruptcy filing
or financial condition] shall not be stayed, avoided or otherwise limited by operation of any provision of
this title or by order of a court . . . in any proceeding under this title . . . ."  11 U.S.C. §§ 555, 559.

refinanced and unwound by the Barclays DIP. Def. Br. at 13, n.10. Thus, the Committee's

claim to characterize the BMMZ Facility as a financing does not affect any party besides

Defendants. Characterizing the BMMZ Facility as a financing will not impact BMMZ or the

Debtors, and will not result in two owners claiming rights to sell, control or finance the loans, as

Defendants allege. Def. Br. at 15.

  *Liona* does not command a different conclusion. There, the court observed that it is "well

established that a bankruptcy court, as a court of equity, may look through form to substance

when determining the true nature of a transaction as it relates to the right of parties against a

bankrupt's estate." *Id.* at 597. On that basis, the Second Circuit treated a "purported sale and

leaseback as an equitable mortgage" after an extensive review of the factual record. *See id.* at

603. The same factual review is required here.

  Accordingly, Defendants' motion to dismiss Count IV and Count V should be denied.

### C. The Claim that the Secured Parties' Liens Do Not Attach to the Released Bilateral Facilities Collateral Is Legally Sufficient (Count I)

  In Count I of the Complaint, the Committee seeks a declaratory judgment that the

Secured Parties have no lien on or security interest in the Released Bilateral Facilities Collateral.

Comp. ¶¶ 77-84; Comp., Ex. C at 3. Defendants concede that this property was not initially part

of their collateral package and constituted "Excluded Assets" under the applicable Notes

Security Agreement. *See* Def. Br. at 16. But, they argue, once such property was released as

collateral under a particular Bilateral Facility, or a facility was terminated, the property was then

picked up as collateral for Defendants by operation of the "floating lien" on "hereafter acquired"

assets. *See* Def. Br. at 17. Defendants also contend that their liens attach to the "proceeds" of

Released Bilateral Facilities Collateral, arguing without any basis that proceeds of Excluded

Assets are not necessarily themselves Excluded Assets. Def. Br. at 18. Defendants are wrong.

The after-acquired property clause of the Notes Security Agreement expressly excludes Excluded Assets. Specifically, the grant of the security interest under section 2 of the Notes Security Agreement applies to "all of the [Company's] right, title and interest in, to, and under, whether now or hereafter existing . . . all of the following . . . [(a) through (u)] . . . provided that, notwithstanding the foregoing, the 'Collateral' described in this Section 2 shall not include Excluded Assets." Comp. Ex. C § 2; *see also* §§ 3-5. The placement of the exclusion for Excluded Assets at the very end of the collateral description is instructive – the entirety of the collateral package granted to the Junior Secured Noteholders, whether currently existing or subsequently acquired, does not include any of the Excluded Assets. In other words, **all** of the collateral granted to the Junior Secured Noteholders under the Notes Security Agreement, whether then existing or after-acquired was specifically qualified to omit any of the Excluded Assets.

Further, the Notes Security Agreement does not contain a traditional savings clause through which previously excluded property automatically became subject to a lien once the reason for the exclusion is removed.[13] Hence, these assets remained unencumbered by the liens in favor of Defendants and were available for use by the Debtors in connection with other funding or financing facilities as and when a particular Bilateral Facility was terminated.[14] The

---

[13]    To the contrary, it was expressly contemplated that the Debtors would need to grant and perfect subsequent liens on previously excluded property for a secured party (in this case, AFI, the first lien creditor ahead of Defendants) to enjoy the benefit of such liens. Section 7.01(q) of the AFI Revolver provides in pertinent part: "(q) Structuring for Eligible Collateral Acquisition, Excluded Assets, Non-UCC Assets. Such Obligor will, and will cause its Subsidiaries to, use commercially reasonable efforts to grant and perfect a Lien to secure the Obligations, directly or through the use of a Restricted Entity, with respect to (i) US Mortgage Loans repurchased or otherwise acquired by such Obligor or Subsidiary, or held by such Obligor or Subsidiary and released from the Liens supporting any other facility…." Comp. Ex. D § 7.01(q). Defendants have not identified any such subsequent lien grants or any efforts taken to perfect any such liens.

[14]    If the floating lien is determined to be ambiguous as to its application to property that at one time fit the definition of an Excluded Asset and later does not, viewing the facts in the light most favorable to the

(continued. . .)

security interest granted to the Junior Secured Noteholders, thus, does not include Excluded

Assets whether or not such assets were "now owned or hereafter acquired."  Notably, Defendants

fail to specify any provision of the Notes Security Agreement which provides that Defendants

automatically acquire any liens on collateral that was initially excluded.

Moreover, the alternative argument made by Defendants -- that the proceeds of

Excluded Assets are not themselves Excluded Assets -- is wrong and, in any event, does not

render Count I defective.  As noted, the entirety of the Secured Parties' collateral package

(whether original property, after-acquired property or the proceeds of either of these) does not

include Excluded Assets.  In the Complaint, the Committee asserts that certain of the Bilateral

Facilities Collateral were unencumbered by Defendants' liens *as of the Petition Date*.  *See*

Comp. ¶ 83.  The Complaint defined this property, and the proceeds thereof, as "Released

Bilateral Facilities Collateral" that constituted Excluded Assets.  *Id.*  To the extent that any of the

Bilateral Facilities Collateral was liquidated after the Petition Date, Defendants' liens do not

extend to such property by operation of section 552(a) of the Bankruptcy Code.[15]  Because any

proceeds of the Bilateral Facilities Collateral that constituted Released Bilateral Facilities

Collateral would necessarily issue from assets that were Excluded Assets as of the Petition Date,

such proceeds are likewise not subject to Defendants' liens.[16]

---

Committee, custom and practice will, with further factual development, reveal that the parties interpreted the Notes Security Agreement to permanently exclude Excluded Assets.  *See Stolt-Nielsen, S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, n. 6 (2010) (evidence of "custom and usage" is relevant to determining the parties' intent when an express agreement is ambiguous).

[15]    Section 552(a) of the Bankruptcy Code provides that any property acquired by the estate after the petition date is not subject to a lien under a prepetition security agreement.  The exception for proceeds under section 552(b) of the Bankruptcy Code is inapplicable because it only applies to the proceeds of property that was subject to a lien *prior* to the petition date.  Here, by definition, Defendants did not have a lien on the Excluded Assets as of the Petition Date.

[16]    In addition, the Committee believes that the proceeds of the Bilateral Facilities Collateral that constituted Excluded Assets would in any event itself constitute Excluded Assets under the Notes Security Agreement.  Encumbering such proceeds in favor of the Secured Parties would potentially trigger the same default under

(continued. . .)

Count I sufficiently states its claim that Defendants hold no liens or security interests against the Released Bilateral Facilities Collateral or its proceeds. Thus, this is an appropriate challenge to the Stipulations made by the Debtors in the Final DIP Order, which purport to validate liens on Released Bilateral Facilities Collateral and its proceeds, and the Motion to Dismiss Count I should be denied.

> **D.** **The Claim that OID Must Be Excluded from the Principal Portion of the Secured Parties' Claims as Unmatured Interest Is Legally Sufficient (Count XIII)**

Count XIII of the Complaint alleges that, contrary to the Stipulations, a portion of the principal amount of the Secured Parties' claims, consisting of at least $377 million of original issue discount ("OID") that remained unaccreted as of the Petition Date, must be disallowed as unmatured interest under section 502(b)(2) of the Bankruptcy Code. *See* Comp. ¶¶ 225-233. Defendants argue that OID generated in connection with an exchange offer is not disallowable as unmatured interest based only on a limited policy exception first announced in *LTV Corp. v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378 (2d Cir. 1992). Def. Br. at 18-22.

Accepting the Committee's factual allegations as true and viewing the facts in the light most favorable to the Committee, the facts of *Chateaugay* are distinguishable and neither the *Chateaugay* decision, nor the policy underlying that decision, compels the dismissal of Count XIII as a matter of law. In fact, the Committee believes that the application of the *Chateaugay*

---

a Bilateral Facility as encumbering the underlying asset. In other words, merely because an Excluded Asset was converted to cash would not itself render such property free from the prior liens that had attached under a Bilateral Facility. Otherwise, the secured parties to the Bilateral Facility would have found themselves in competition with the Secured Parties if and to the extent any of their collateral was converted to proceeds.

policy to the facts alleged in the Complaint, which is a matter of first impression, will result in

the subject OID being disallowed as part of the Secured Parties' claim.

### i. The Stipulations Wrongfully Allow OID, Ignoring Disallowance Under Bankruptcy Code Section 502(b)(2)

Absent the Committee's challenge, the AFI DIP Order would have provided, in

accordance with the Stipulations, for the allowance of the principal amount outstanding under the

Junior Secured Notes in at least the amount of $2,120,452,000, plus additional amounts for

interest, fees, costs, and charges, all of which purportedly constitute "legal, valid and binding

obligations" of the Debtors.  *See* AFI DIP Order ¶¶ 5(b), (c).  For purposes of the Motion to

Dismiss, however, the Committee's allegations must be taken as true and the facts viewed in the

light most favorable to the Committee.  Thus, Defendants cannot dispute the allegation that at

least $377 million of OID remained as of the Petition Date from the issuance of the Junior

Secured Notes as a ground for their Motion to Dismiss.[17]  Comp. ¶¶ 41 & 43; Ex. B.

Section 502(b)(2) of the Bankruptcy Code provides that the court shall allow a

creditor's claim "except to the extent that . . . (2) such claim is for unmatured interest."  The

legislative history to section 502(b)(2) explains that:

> Paragraph (2) requires disallowance to the extent that the claim is
> for unmatured interest as of the date of the petition.  Whether
> interest is matured or unmatured on the date of bankruptcy is to be

---

[17]    The basis for the creation of OID was the difference between the face amount of the notes upon issuance ($4,010,280,000), and the "issue price" of the notes under applicable nonbankruptcy law (determined by reference to the trading value of the new notes on the date of issuance).  Defendants, who distinguish between OID for tax and bankruptcy purposes, nonetheless speciously contend that the Committee has not alleged sufficient facts to support the existence of even tax OID under 26 C.F.R. § 1.273-1(a)-(d) (2013). Def. Br. at 22, n.11.  Even ignoring the factual deference that must be afforded to the Committee in the context of this Motion to Dismiss, this tax code regulation only discusses the proper measure of issue price, not the existence of OID.  The Complaint contains sufficient factual content to apprise Defendants, and allow the Court, to draw the reasonable inference that the purportedly allowed principal amount of the notes includes OID, that such OID was outstanding as of the Petition Date and that such OID is subject to disallowance as unmatured interest under section 502(b)(2) of the Bankruptcy Code.  Comp. ¶¶ 225, 227-233.

> determined without reference to any ipso facto or bankruptcy
> clause in the agreement creating the claim. Interest disallowed
> under this paragraph includes postpetition interest that is not yet
> due and payable, *and any portion of prepaid interest that*
> *represents an original discounting of the claim, yet that would not*
> *have been earned on the date of bankruptcy.*

H.R. Rep. No. 595, 95th Cong., 1st Sess. 352–353 (1977); S. Rep. No. 989, 95th Cong., 2d Sess.

62 (1978) (emphasis added).

The Complaint alleges sufficient factual matter, if accepted as true, to state a

claim for the disallowance of at least $377 million of OID as unmatured interest. Defendants

acknowledge that OID, no matter how it arises (*i.e.*, whether in the context of an exchange offer

or otherwise), is fundamentally a creature of tax law. Def. Br. at 19.[18] The Complaint

adequately alleges that a portion of the outstanding notes is comprised of OID. The Complaint

further adequately alleges that section 502(b)(2) provides a basis to seek the disallowance of the

OID that remained outstanding on the petition date. Comp. ¶¶ 224-233. The **only** issue, thus, is

whether there is a definitive basis, as a matter of law, to override the otherwise plain and

straight-forward application of applicable tax law and the Bankruptcy Code. There is not.

### ii. *Chateaugay* Is Distinguishable and the Secured Parties' OID Should Be Disallowed

Although Defendants contend that any OID generated in connection with the

exchange offer affecting their claims is not disallowable as unmatured interest based on

*Chateaugay* (Def. Br. at 19-22), the facts here are critically distinguishable from those in

*Chateaugay* in that, among other things, *Chateaugay* involved a "face value" exchange (*i.e.*,

---

[18]      Defendants point out that two appellate decisions, *Chateaugay* and *Pengo*, hold that the tax considerations that trigger OID do not automatically compel the bankruptcy consequences of disallowance under section 502(d)(2). While that may be true, it is no more remarkable than the converse proposition that the bankruptcy laws may occasionally vary the treatment and allowance of tax claims. There is no dispute, however, that applicable non-bankruptcy law (namely, tax law) treats the face amount of the Junior Secured Notes as comprised partly of principal and partly of deferred interest.

where the face amount of the debt remains unchanged through the exchange) whereas the

Secured Parties' claims were part of a fair market value exchange (*i.e.*, where the face amount of

the debt is reduced through the exchange).   Thus, whether the Secured Parties' OID must be

disallowed cannot be determined solely from a review of *Chateaugay*.   Because, as Defendants

recognize, "this issue has remained undecided in the intervening two decades," (Def. Br. at 21),

fuller factual development is appropriate and required.

> a.   *Chateaugay* Did Not Address a Fair Market Value Debt-for-
> Debt Exchange

Defendants ask this Court – on a motion to dismiss, without further factual

development – to extend the application and reasoning of *Chateaugay* to the instant case and

thereby create another equitable policy exception to otherwise unambiguous statutory language.

The Second Circuit in *Chateaugay* held that "a *face value exchange* of debt obligations in a

consensual workout does not, for purposes of section 502(b)(2), generate new OID."   961 F.2d at

383 (emphasis added).   Although Defendants believe that the distinction between a face value

exchange and a fair market value exchange (as occurred with the Junior Secured Notes) for

purposes of section 502(b)(2) is contrary to common sense, the Second Circuit disagreed in

*Chateaugay*.   The Second Circuit recognized that it actually might make sense to disallow OID

"in the context of a *fair market value exchange*, where the corporation's overall debt obligations

are reduced."   *Id.* (emphasis added).   Accordingly, the Second Circuit restricted its holding to a

face value exchange, where "[s]uch an exchange does not change the character of the underlying

debt, but reaffirms and modifies it." *Id.*

In this case, of course, the character of the underlying debt was dramatically

altered – the maturities were extended, the overall indebtedness was reduced, and collateral was

granted. *See, e.g.*, Comp. ¶¶ 36-43, Ex. B.  Moreover, such new debt (the Junior Secured Notes)

was generally promoted within the Debtors' capital structure in part because the character of the

Old Notes (to the extent not exchanged) was also dramatically altered.  The Old Notes became

both lien subordinated to the new Junior Secured Notes (to the extent of the value of the assets

newly pledged to secure repayment of the new notes) and structurally subordinated to the new

Junior Secured Notes (as a result of the release of the affiliate guaranties in support of the Old

Notes, eliminated by amendments to the governing indentures).  *See* Comp., Ex. B at pp. 1, 3.

> b.  Where the Debtor's Overall Obligations Are Reduced – as in a
>     Fair Market Value Exchange – the Disallowance of OID Is
>     Appropriate

*Chateaugay* recognized significant differences between face value exchanges and

fair market value exchanges that would justify the disparate treatment of OID for purposes of

section 502(b)(2) of the Bankruptcy Code.

A face value exchange does not reduce a corporation's liabilities.  Rather, the

terms of the underlying debt are modified (albeit reflected as a new instrument), but the principal

or face amount of the debt remains unaffected.  For example, in *Chateaugay*, the old notes were

13% notes due December 1, 2002, with a face amount of $1,000.  The new notes were 15% notes

due January 15, 2000, with a face amount of $1,000.  Accordingly, although the interest rate was

increased and the maturity date accelerated, the overall liability of the debtor remained the same

($116 million face amount of old notes were exchanged for the same face amount of new notes).

In this context, where maturity dates and interest rates are being modified, but overall

indebtedness remains the same, the Second Circuit recognized that "[i]f unamortized OID is

unallowable in bankruptcy, and if exchanging debt increases the amount of OID, then creditors

will be disinclined to cooperate in a consensual workout that might otherwise have rescued a

borrower from the precipice of bankruptcy."  961 F.2d at 382.  The Second Circuit was

cognizant of "the ramifications of a rule that places a creditor in the position of choosing whether

to cooperate with a struggling debtor, when such cooperation might make the creditor's claim in the event of bankruptcy smaller than they would have been had the creditor refused to cooperate." *Id.*

However, these twin incentives (encouraging workouts and discouraging a windfall to holdouts) are not undermined in the context of a fair market value exchange where the overall indebtedness of the company is reduced. In the instant case, the Old Notes with a face amount of $1,000 were converted to Junior Secured Notes with a face amount of $800.[19] Comp. ¶ 38. Other incentives and enhancements, thus, are at work in a fair market value exchange. As noted above, the exchange offer expressly warned that the Junior Secured Notes would be, "to the extent of the value of the collateral securing the [Junior Secured Notes], effectively senior in right of payment to the unexchanged Old Notes . . . [and] . . . effectively senior in right of payment to unexchanged Old Notes to the extent of the value of the assets of the subsidiary guarantors . . . ." Comp., Ex. B., at p. 1.

Unlike a face value exchange that merely modifies the terms of the debt instrument but not the principal, a fair market value exchange reduces a corporation's liability and more closely resembles two separate transactions: (1) the purchase of outstanding debt at fair market value and (2) the sale of new bonds at fair market value. Therefore, in the bankruptcy context, holders of new bonds received in a fair market value exchange would have claims only equal to the cash value of the old bonds that were tendered, discounted for OID, because the

---

[19]     Of course, as noted, the "issue price" (or market value) of the Junior Secured Notes was even less than the reduced $800 face amount, which triggered the creation of OID. This suggests that the face amount of the Junior Secured Notes should in fact have been priced below $800 and that tendering noteholders consciously accepted the "upside" potential (and risks) of notes with a nominal principal amount above market value. Noteholders also had the option of receiving $520 in cash per $1,000 face amount of Old Notes, further supporting the inference that the market value of the new Junior Secured Notes was less than the reduced face amount and, hence, the creation and potential disallowance of OID was not an unfair outcome to holders of the Junior Secured Notes. *See* Comp., Ex. B, at p. 1.

exchange of the old bonds was economically equivalent to a cash purchase. *See* Marc S.

Kirschner et al., *Prepackaged Bankruptcy Plans: The Deleveraging Tool of the '90s in the Wake*

*of OID and Tax Concerns*, 21 Seton Hall L. Rev. 643, 645-46 (1991) (describing a fair market

value exchange as "an attempt to capture the market 'discount' that debentures may be trading at

in the marketplace by offering to exchange an existing debt instrument for a new debenture").

For these reasons, Congress' intent to encourage workouts and minimize bankruptcy filings is

not offended if a fair market value exchange results in OID for bankruptcy purposes.  A

creditor's participation in a fair market value exchange is a function of more incentives and

penalties than the mere potential for the creation and disallowance of OID in a subsequent

bankruptcy.  Moreover, from a policy perspective, a broad "workout" exception to the

application of Section 502(b)(2) might swallow instances where OID would otherwise be plainly

disallowed if the debt was issued in furtherance of a restructuring.

        In sum, the Committee has sufficiently asserted a claim for which relief may be

granted as no dispositive case law exists.  Accordingly, the Motion to Dismiss Count XIII should

be denied.

> ### E.    The Committee Has Standing to Dispute the Priority of the Secured
>     Parties' Liens (Count VII)

        Defendants contend that Count VII should be dismissed because the Committee

(as well as the Debtors, on whose behalf the Committee commenced this adversary proceeding)

lacks standing to bring the claim.  Defendants' narrow view of standing should be rejected and

the Motion to Dismiss Count VII should be denied.

        As a threshold matter, section 1109(b) of the Bankruptcy Code expressly grants a

creditors' committee broad standing to raise, appear and be heard on any issue in a case under

chapter 11 of the Bankruptcy Code.  11 U.S.C. § 1109(b) ("A party in interest, including . . . a

creditors' committee . . . may raise and may appear and be heard on any issue in a case under

[chapter 11]."); *cf. Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.)*, 303

F.3d 161 (2d Cir. 2002) (plain text of section 1109(b) of the Bankruptcy Code grants an

unconditional statutory right for parties in interest to intervene in adversary proceedings).

    Moreover, the Standing Order expressly granted the Committee standing to

pursue, on behalf of the Debtors, the causes of action set forth in the (then) draft Complaint,

including Count VII.[20]  This was not a mistake or an oversight.[21]  The Motion to Dismiss Count

VII should be denied.

### F.    Temporary Disallowance Under Section 502(d) Is Appropriate (Count XII)

    Defendants contend that their claims cannot be temporarily disallowed under

section 502(d) because the Committee has not yet obtained a judgment.  Def. Br. at 23-24.

Defendants misconstrue the law in this district and the Motion to Dismiss Count XII should be

denied.

    The Committee commenced this adversary proceeding, and asserted its claims, in

a timely manner pursuant to the AFI DIP Order.[22]  Count XII merely seeks to maintain the status

---

[20]    Under the AFI DIP Order, the Committee could be deemed to have waived any claims or causes of action implicated by the Stipulations that were not brought by the Challenge Deadline.  The Committee was therefore arguably required to bring Count VII by the Challenge Deadline or risk having it barred under the AFI DIP Order.

[21]    Defendants and the Junior Secured Noteholders were on notice that the Committee intended to pursue the claim set forth in Count VII and had an opportunity to object on standing grounds but failed to do so.  On this basis, the Standing Order should be deemed to be the law of the case, and Defendants should otherwise be estopped from objecting on standing grounds since they failed to do so when the issue was ripe for adjudication.

[22]    Under the AFI DIP Order, the Committee could be deemed to have waived any claims or causes of action implicated by the Stipulations that were not brought by the Challenge Deadline.  The Committee was therefore arguably required to bring its cause of action under section 502(d) by the Challenge Deadline or risk having it barred under the AFI DIP Order.  If the Court dismisses Count XII, the Committee respectfully requests that it be without prejudice to the Committee's right to bring that claim when and if it obtains a judgment and notwithstanding anything to the contrary in the AFI DIP Order.

quo by temporarily disallowing Defendants' claims "until such time as the Committee's claims []

have been finally resolved." Comp. ¶ 223. The procedural posture of this case distinguishes it

from the cases cited by Defendants.[23]

Indeed, courts in this district have declined to dismiss section 502(d) objections

(temporary disallowance of claims) where the merits of the underlying cause of action were

asserted in an adversary proceeding that had not yet resulted in the entry of a judgment. *See,*

*e.g., In re Enron Corp.*, 340 B.R. at 183.

In *Enron*, the debtor commenced an adversary proceeding and asserted a claim

under section 502(d) seeking the temporary disallowance of claims until certain property was

turned over to the estate. On a Motion to Dismiss, the defendants argued that the objections

under section 502(d) were not viable until a judgment was entered on the underlying cause of

action. 340 B.R. at 189. The court soundly rejected that contention, concluding "that a cause of

action based on section 502(d) should not be dismissed even though the court has not yet

adjudicated an avoidance action concerning the unrelated cause of action. . . ." *Id.* at 183, 193.[24]

*See also* 4 COLLIER ON BANKRUPTCY ¶ 502.05[2][a] (16th ed. 2013) ("The wording of section

502(d) refer to transfers "avoidable" under various sections and not to claims that have been

avoided . . . . To assure the effectuation of the purpose of this section, a claim may be

---

[23]    For example, unlike the Committee, the debtor in *In re Jensen*, Case No. 09-14830, 2010 WL 424693 (Bankr. S.D.N.Y. Feb. 3, 2010), had not commenced an adversary proceeding and could only assert that he "may have" some unarticulated causes of action. The court found this to be insufficient to disallow a claim under section 502(d). *Id.* at *2.

[24]    Notably, the court distinguished *In re Lids Corp.*, 260 B.R. 680 (Bankr. D. Del. 2001), upon which Defendants rely (Def. Br. at 23), as well as other cases holding that a judgment is a prerequisite to a viable cause of action under section 502(d). *Enron*, 340 B.R. at 191-92. The court observed that "although the Court has not yet adjudicated the underlying avoidance action against [the creditor], the Court's determination not to dismiss [the debtor's] disallowance cause of action recognizes that the cause of action remains viable awaiting the determination of the underlying avoidance action against" the creditor. *Id.* at 193.

disallowed at least temporarily and for certain purposes, subject to reconsideration, simply upon

the allegation of an avoidable transfer.").

        For the foregoing reasons, the Motion to Dismiss Count XII should be denied.

**G.**        **The Committee Is Not Attempting to Litigate the Undersecured
Status of JSNs, but Rather Responding to Concessions Made by the
Debtors in DIP Order (Count XIV)**

        In Count XIV, the Committee objects to the Stipulations to the extent they permit

the Secured Parties payment of fees, costs, and expenses on the basis that the Notes Obligations

are oversecured.  Comp. ¶¶ 234-239.  Among the Stipulations that would otherwise bind the

Committee if not preserved by the claims asserted in the Complaint is a waiver of "any right or

basis to challenge or object to the amount, validity or enforceability of the Junior Secured Notes

Obligations."  *See* AFI DIP Order ¶ 5(k).

        Several of the claims for relief in the Complaint challenge the validity,

enforceability, priority or non-avoidability of the liens granted in favor of the Secured Parties.

Cumulatively, the outcome of these claims may, naturally, affect whether the Secured Parties are

oversecured.  Consequently, the Committee objects to the Stipulations as set forth in Count XIV,

and merely preserves its objection (and its objection to any claim by the Junior Secured

Noteholders or Defendants), as it was required to do on or before the Challenge Deadline.

        Count XIV provides fair notice to Defendants that the Committee objects to those

aspects of the Stipulations, and to any claim, that purport to confer secured status on Defendants'

claim for fees, costs, and expenses.  On this basis, Count XIV states a viable cause of action and

the Motion to Dismiss should be denied with respect to Count XIV.

**H.**        **The Complaint Sufficiently Defines "Non-Obligors" (Count III)**

        Count III alleges that, notwithstanding the AFI DIP Order, the Secured Parties do

not have a security interest in or liens "on any assets of the Non-Obligor Debtors because none

of the Non-Obligor Debtors is an obligor under the Notes Security Agreement. . ." Comp. ¶ 114.

The Committee alleges that the "Non-Obligor Debtors consist of EPRE LLC, ETS of

Washington, Inc., and Residential Funding Mortgage Exchange, LLC, among other Debtors."

Comp. ¶ 111.

Defendants move to dismiss Count III in its entirety because the words "among

other Debtors" were included in the description of "Non-Obligor Debtors" and such words are

"vague and ambiguous." Def. Br. at 25. The Committee has submitted a complete list of the

Non-Obligor Debtors. Declaration of John A. Morris, filed in support of the Opposition

simultaneously herewith, Ex. 1. Thus, any claim of vagueness has been removed, and the

Motion to Dismiss Count III should be denied.[25]

### I.        The Committee Can Avoid the Unperfected Liens (Count X)

Defendants seek partial dismissal of Count X "[t]o the extent the Court dismisses

the Committee's requests for declaratory judgment relief in Counts III, IV, or V. . ." Def. Br. at

25. Defendants do not contend that Count X fails to state a cause of action. Rather, they seek

partial dismissal based on the speculative occurrence of a future event. Defendants provide no

legal authority for this part of the Motion to Dismiss. Moreover, even if the Committee's request

for declaratory relief in Counts III, IV and V is denied, Count X may still be viable with respect

to the assets subject to those counts because the Committee has alleged that the Secured Parties

failed to properly perfect their liens. Comp. ¶¶ 199-204. There is no basis to dismiss Count X.

---

[25]        There was, of course, no basis to dismiss Count III as it pertains to those Non-Obligor Debtors that were
specifically identified in paragraph 111 of the Complaint.

### III.
### <u>CONCLUSION</u>

For the foregoing reasons, the Motion to Dismiss should be denied in its

entirety.[26]

Dated:  May 23, 2013              PACHULSKI STANG ZIEHL & JONES LLP
       New York, New York

                                   /s/ *Robert J. Feinstein*
                                   Robert J. Feinstein
                                   Henry C. Kevane
                                   John A. Morris
                                   Jason H. Rosell
                                   780 Third Avenue, 36th Floor
                                   New York, New York 10017
                                   Telephone:    (212) 561-7700
                                   Facsimile:    (212) 561-7777

---

[26]     If any aspect of the Motion to Dismiss is granted, the Committee respectfully requests that it be without prejudice.