AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Daniel H. Golden
David M. Zensky
Deborah J. Newman
Brian T. Carney

*Special Counsel to UMB Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
: 
In re: : Chapter 11
 : 
RESIDENTIAL CAPITAL, LLC, *et al.*, : Case No. 12-12020 (MG)
 : (Jointly Administered)
Debtors. : 
 : 
---------------------------------------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED :
CREDITORS, on behalf of the estates of the Debtors, :
 : 
Plaintiff, : 
 : 
v. : Adversary Proceeding
 : No. 13-01277
UMB BANK, N.A., as successor indenture trustee under :
that certain Indenture, dated as of June 6, 2008; and :
WELLS FARGO BANK, N.A., third priority collateral :
agent and collateral control agent under that certain :
Amended and Restated Third Priority Pledge and :
Notes Security Agreement and Irrevocable Proxy, :
dated as of December 30, 2009, :
 : 
Defendants. : 
---------------------------------------------------------------------x

**DEFENDANT UMB BANK, N.A.'s REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF ITS PARTIAL MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6)**

# TABLE OF CONTENTS

**Page**

ARGUMENT ...........................................................................................................................1

I.   THE JUNIOR SECURED NOTES CLAIM DOES NOT INCLUDE OID THAT
     IS DISALLOWABLE IN BANKRUPTCY (COUNT XIII)................................................1

II.  THE NOTES SECURITY AGREEMENT'S ALL-ASSETS GRANTING
     CLAUSE PROVIDES THE SECURED PARTIES WITH A VALID SECURITY
     INTEREST IN THE RELEASED BILATERAL FACILITIES COLLATERAL
     (COUNT I)..........................................................................................................................6

III. THE SECURED PARTIES HAVE VALID AND PERFECTED SECURITY
     INTERESTS IN THE RELEASED MORTGAGE LOANS (COUNTS IV AND
     V) .......................................................................................................................................8

CONCLUSION........................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*American Home Mortg. Holdings, Inc. v. Lehman Brothers, Inc.* (*In re American Home Mortg. Holdings*),
388 B.R. 69 (Bankr. D. Del. 2008) ("*American Home II*") ..................................................9, 10

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998)......................................................................................9, 10

*Jovanovic v. City of New York*,
No. 04-8437, 2006 WL 2411541 (S.D.N.Y. Aug. 17, 2006)........................................................8

*LTV Corp v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*,
961 F.2d 378 (2d Cir. 1992).............................................................................................2, 3, 5, 6


**STATUTES AND RULES**

11U.S.C. § 502(b)(2) ...................................................................................................... passim

Fed. R. Bankr. P. 7012(b) .......................................................................................................1

Fed. R. Civ. P.12(b)(6)............................................................................................................1


**OTHER AUTHORITIES**

STAFF OF JOINT COMM. ON TAXATION, 98TH CONG., GENERAL EXPLANATION OF THE REVENUE PROVISIONS OF THE DEFICIT REDUCTION ACT OF 1984, JCS 41-84 (Joint Comm. Print 1984)......................................................................................................................5

Marc S. Kirschner et al., *Prepackaged Bankruptcy Plans: The Deleveraging Tool of the '90s in the Wake of OID and Tax Concerns*, 21 Seton Hall L. Rev. 643, 660 (1991)...........4, 5

Defendant UMB Bank, N.A., as successor indenture trustee (the "Notes Trustee")[1] under that certain Indenture, dated as of June 6, 2008, by and through its attorneys, Akin Gump Strauss Hauer & Feld LLP, hereby files this reply memorandum of law in further support of its motion (the "Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable herein by Federal Rule of Bankruptcy Procedure 7012(b), to partially dismiss, with prejudice, the Complaint (ECF No. 1) filed by the Official Committee of Unsecured Creditors (the "Committee") of Residential Capital, LLC, *et al.* (the "Debtors") on February 28, 2013.[2]

## ARGUMENT

### I. THE JUNIOR SECURED NOTES CLAIM DOES NOT INCLUDE OID THAT IS DISALLOWABLE IN BANKRUPTCY (COUNT XIII)

Even accepting all of the Committee's factual allegations with respect to Count XIII as true, the Complaint does not, as a matter of law, adequately allege that the Secured Parties' claims include unmatured interest that should be disallowed under section 502(b)(2) of the Bankruptcy Code. Rather, the Complaint alleges that the Junior Secured Noteholders exchanged $1,000 face amount of Old Notes for $800 of Junior Secured Notes (¶ 38) (the "Exchange Offer"). Based on this assertion, the Committee makes the conclusory and unsupported allegations that "the exchange of the Junior Secured Notes resulted in original issue discount . . . that was to accrete over the life of the Junior Secured Notes," which the Committee apparently

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Complaint, the Motion and/or the Committee's opposition thereto (the "Opposition" or "Opp."), as applicable.

[2] In an effort to narrow the issues that must be adjudicated in connection with the Motion, and based on certain of the representations and clarifications made in the Opposition, the Notes Trustee voluntarily withdraws its Motion with respect to counts III, VII, X, XI, and XII of the Complaint, and, in the interest of time, will treat the declaration of John A. Morris filed in support of the Opposition as an amendment to the Complaint, provided that the declaration provides a definitive list of alleged "Non-Obligor Debtors." The Committee has agreed that the Notes Trustee's answer to counts III, VII, X, XI, and XII of the Complaint shall be filed on or before June 19, 2013. The Notes Trustee reserves all of its rights to contest these claims on other grounds, including that the Committee's preference claim fails because it does not take into account any reduction in the value of the Junior Secured Note collateral package during the preference period.

bases on the "difference between the face amount of the [new] notes upon issuance . . . and the [alleged] trading value of the new notes on the date of the issuance" (¶ 41; Opp. at 15, n. 17).

While the Notes Trustee disputes the Committee's allegations respecting the generation of OID as a result of the Exchange Offer, even accepting these allegations as true, the Committee fails to state a claim that any portion of the Secured Parties' claims should be disallowed as unmatured interest under section 502(b)(2) of the Bankruptcy Code. (Compl. ¶ 28.) As set forth in greater detail in the Motion, the Second Circuit has held that exchanges of a debtor's bonds do not generate unmatured interest that is disallowable under section 502(b)(2), notwithstanding that, from a tax perspective, the exchange results in OID that accretes over time. *LTV Corp v. Valley Fid. Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378, 383 (2d Cir. 1992).

In *Chateaugay*, the Second Circuit held that the "application . . . of OID to exchange offers . . . does not make sense if one takes into account the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition." *Id.* at 382. The Second Circuit explained further:

> If unamortized OID is unallowable in bankruptcy, and if exchanging debt increases the amount of OID, then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy. We must consider the ramifications of a rule that places a creditor in the position of choosing whether to cooperate with a struggling debtor, when such cooperation might make the creditor's claims in the event of bankruptcy smaller than they would have been had the creditor refused to cooperate. The bankruptcy court's ruling places creditors in just such a position, and unreversed would likely result in fewer out-of-court debt exchanges and more Chapter 11 filings. Just as that ruling creates a disincentive for creditors to cooperate with a troubled debtor, it grants a corresponding windfall both to holdouts who refuse to cooperate and to an issuer that files for bankruptcy subsequent to a debt exchange.

*Id.* Because the Second Circuit in *Chateaugay* was presented only with the question of whether face value exchanges—which alter the terms of the outstanding debt but leave the face value intact—create disallowable unmatured interest, the court did not determine whether its decision

2

would extend to fair market value exchanges—which reduce the outstanding debt's face value. Nevertheless, the Committee seizes on the court's statement that "[t]he bankruptcy court's decision might make sense in the context of a fair market value exchange," and argues that "the Second Circuit disagree[s]" that its reasoning would apply to a fair market value exchange. (Opp. at 17.)  This is patently incorrect, as the Second Circuit was clear that it was not rendering an opinion with respect to fair market value exchanges.  *See Chateaugay*, 961 F.2d at 382-83.

Moreover, examination of the *Chateaugay* decision leads to the inescapable conclusion that its reasoning applies with even greater force to fair market value exchanges, where a struggling company often cannot survive unless it is able to reduce the aggregate amount of its debt, and where a meaningful number of creditors must necessarily agree to reduce the amount of their potential claim against the company if that goal is to be accomplished.  If this Court finds that fair market value exchanges result in the generation of disallowable unmatured interest, creditors who might otherwise agree to reduce the amount of their claim will be confronted not only with the prospect that similarly-situated creditors who refuse to exchange will have a larger claim in the event of a bankruptcy, but, worse, that the amount of the exchanging creditors' claims will be unknown, and subject to the objection that they include unmatured interest (and, if so, in an undetermined amount based on an irrelevant trading value).  Injecting an additional disincentive to creditors will undoubtedly result in a serious chilling effect on out-of-court restructurings.  Thus, the Committee's contention that "Congress' intent to encourage workouts and minimize bankruptcy filings is not offended if a fair market value exchange results in OID for bankruptcy purposes" defies logic. (Opp. at 20.)

The Committee also contends that the legislative history of section 502(b)(2), which states that  disallowed interest shall include "any portion of prepaid interest that represents an

3

original discounting of the claim [but] would not have been earned on the date of the bankruptcy," shows that section 502(b)(2) applies to fair market value exchanges. (Opp. at 16.) The Committee wholly ignores, however, that far from representing an "original discounting of the claim," fair market value exchanges involve the forgiveness of debt, in order to help facilitate a struggling company's ability to survive without seeking bankruptcy protection. Thus, viewed from the perspective of a creditor's rights in bankruptcy, fair market value exchanges are the exact opposite of a "discount"—they are the creditor's agreement to forego a larger claim in exchange for a smaller one, for the benefit of the company. The Junior Secured Noteholders forgave $200 per $1,000 of the face amount of their debt. They should not now be penalized for doing so by virtue of a new rule that attempts to inject the tax code into the Bankruptcy Code.

       The absurdity of the Committee's position is revealed by the following example. Assume that the transaction was identical except that the face amount of the Junior Secured Notes remained at $1,000 instead of being reduced to $800. Under the tax code, there would be even more OID, although the Committee concedes that, pursuant to *Chateaugay*, the exchanging noteholders' claim would not include disallowable unmatured interest. It is incomprehensible that the result should change simply because the creditors agreed to reduce the amount of the obligation owed to them.

       Additionally, the Committee's proposed rule is contrary to the basic bankruptcy tenet that "[a] debenture claim should be allowed at an amount equal to the original obligation created for the amount of money originally borrowed (less the true original unamortized OID) . . . ." *See* Marc S. Kirschner et al., *Prepackaged Bankruptcy Plans: The Deleveraging Tool of the '90s in the Wake of OID and Tax Concerns*, 21 Seton Hall L. Rev. 643, 660 (1991). Indeed, a "major precept of the [Bankruptcy] Code" is that it "does not contemplate the valuation of liabilities;

4

neither the interest rate, maturity date nor market value affects the initial amount of the claim against the company." *Id.* at 656-57.  Thus, creditors who voluntarily agree to participate in an exchange offer in an effort to reduce a struggling company's debt should not have the amount of their claim in bankruptcy reduced based on the (likely low) market value of the exchanged notes. *Id.*  Market value has no relevance to bankruptcy claim enforcement.

The differing policy objectives underlying the tax code and the Bankruptcy Code demonstrate why the two regimes will often mandate different treatment for the same event.  As the Second Circuit recognized in *Chateaugay*, "Congress designed the [Bankruptcy] Code, in large measure, to encourage workouts in the first instance, with refuge in bankruptcy as a last resort." 961 F.2d at 382.  Conversely, tax laws focus on establishing a consistent system of accounting for increases and decreases in taxpayers' wealth, in order to impose a tax on net increases.  Kirschner, *Prepackaged Bankruptcy Plans*, 21 Seton Hall L. Rev. at 656.  In furtherance of these objectives, the tax laws create a complex system respecting the "recognition" of income, in order to determine when taxes must be paid. *Id.*  Congress designed the rules respecting OID in a debt-for-debt exchange as part of this dynamic, in order to "eliminate the distortions caused by the mismatching of income and deductions by lenders and borrowers . . . ."  *See* STAFF OF JOINT COMM. ON TAXATION, 98TH CONG., GENERAL EXPLANATION OF THE REVENUE PROVISIONS OF THE DEFICIT REDUCTION ACT OF 1984, JCS 41-84 at 110 (Joint Comm. Print 1984).  It does not follow, however, that there should also be a corresponding effect on the exchanging creditor's bankruptcy claim.

The Committee also argues that "[o]ther incentives and enhancements" are at work in the case of fair market value exchanges that will induce holders to participate in such exchanges despite the threat of OID. (Opp. at 19.)  Specifically, the Committee suggests that here, the

5

holders of Old Notes were encouraged to participate in the Exchange Offer, despite the threat of incurring OID, because the new Junior Secured Notes would be effectively senior in right of payment to the Old Notes. Yet this incentive can be used with equal force in a face value exchange or a fair value exchange. Thus, while other incentives may encourage creditors to participate in an exchange offer, the Committee is incorrect that the existence of these incentives provides a reason to distinguish between face value and fair value exchanges when determining whether the exchanged claim includes disallowable unmatured interest.

Finally, the Committee's assertion that "a broad 'workout' exception to the application of section 502(b)(2) might swallow instances where OID would otherwise be plainly disallowed if the debt was issued in furtherance of a restructuring" is disingenuous. (Opp. at 20.) As explained in *Chateaugay*, "[o]riginal issue discount results when a bond is issued for less than face value." 961 F.2d at 380. This is the "original discounting of the claim" that section 502(b)(2) was intended to capture. A ruling that the Bankruptcy Code does not require artificial generation of OID upon an exchange offer will not alter the application of section 502(b)(2) to typical instances of OID, where an issuer receives less cash than the face amount of debt.

II. **THE NOTES SECURITY AGREEMENT'S ALL-ASSETS GRANTING CLAUSE PROVIDES THE SECURED PARTIES WITH A VALID SECURITY INTEREST IN THE RELEASED BILATERAL FACILITIES COLLATERAL (COUNT I)**

Count I of the Complaint should also be dismissed. As set forth in the Complaint, the Notes Security Agreement carves "Excluded Assets" out of the collateral securing the Junior Secured Notes. (*See* Compl. ¶ 77; Notes Security Agreement §§ 2-5.) As relevant to Count I, the Notes Security Agreement defines Excluded Assets to include assets pledged by the Debtors under any "Bilateral Facility" (as defined in the Notes Security Agreement), if the Bilateral Facility prohibits the Debtors from granting the Secured Parties a lien on or security interest in such assets. (Compl. ¶ 79.) The Complaint alleges that the Debtors pledged the Released

6

Bilateral Facilities Collateral to other creditors under the Bilateral Facilities, but that the Released Bilateral Facilities Collateral was subsequently released from those pledges, and remained property of the estates at the Petition Date. (*Id.* ¶¶ 82-83.) It cannot be disputed that upon such release, the Released Bilateral Facilities Collateral ceased to be "Excluded Assets."

Nevertheless, the Committee alleges in Count I that because "the Debtors did not separately grant to the Secured Parties, and the Secured Parties did not separately perfect, liens on or security interests in any of the Released Bilateral Facilities Collateral . . . [t]he Secured Parties do not have security interests in or liens (either perfected or unperfected) on the Released Bilateral Facilities Collateral." (*Id.* at ¶¶ 84, 90.) This allegation is directly contrary to the plain language of the after-acquired property clause contained in Section 2 of the Notes Security Agreement (the "<u>All-Assets Granting Clause</u>"), which, as relevant here, provides that the Secured Parties have a valid security interest in "all Assets" owned by the Grantors and Guarantors other than "Excluded Assets," "*whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced*." This security interest is perfected by the UCC-1 Financing Statements[3] filed by each Grantor and Guarantor, which mirror the language of the All-Assets Granting Clause.

There is no language in the Notes Security Agreement providing that assets owned by the Debtors that once were, but cease to be, Excluded Assets fall outside the scope of the All-Assets Granting Clause. Such an illogical interpretation must be rejected as a matter of law. Moreover, the Committee's citation to section 7.01(q) of the AFI Revolver is unavailing. To the extent that section 7.01(q) is even relevant, it merely ensures that the Debtors will use "commercially reasonable efforts" to grant and perfect liens in US Mortgage Loans (as defined therein) that are,

---

[3] The UCC-1 Financing Statements are attached as Exhibit A to the Motion.

*inter alia*, repurchased or released from other liens, for the benefit of the lenders under the AFI Revolver. Where valid liens in such assets automatically arise by virtue of the all-assets granting clause in the Revolver Security Agreement (which substantially mirrors the All-Assets Granting Clause), the Debtors need not take any further action to grant or perfect such liens.

**III.    THE SECURED PARTIES HAVE VALID AND PERFECTED SECURITY INTERESTS IN THE RELEASED MORTGAGE LOANS (COUNTS IV AND V)**

The Committee contends that the Released Mortgage Loans fall into one of three categories: (1) loans that were included in the BMMZ Facility prepetition and that remained there until the Barclays DIP was approved (the "BMMZ Mortgage Loans"); (2) loans that were included in the BMMZ Facility prepetition but were released from the BMMZ Facility before the Petition Date (the "Released BMMZ Mortgage Loans," and, together with the BMMZ Mortgage Loans, the "BMMZ Collateral"); and (3) other mortgage loans for which the Notes Trustee's liens were allegedly released prepetition (the "Other Released Mortgage Loans"). (Opp. at 6-7.) The Notes Security Agreement provides, and the Court can determine as a matter of law, that the Secured Parties have a valid and perfected security interest in *all* of the BMMZ Collateral.

Count IV of the Complaint seeks a declaration that "none of the Secured Parties has a lien on or security interest in the Released Mortgage Loans." (Compl. ¶ 134.) This Claim should be dismissed to the extent that it relates to the BMMZ Collateral. The BMMZ Collateral was sold by the Debtors to BMMZ pursuant to a valid prepetition repurchase agreement. As the Opposition states, the Debtors then reacquired title to the Released BMMZ Mortgage Loans in the prepetition period, pursuant to the repurchase provisions of the Master Repurchase Agreement governing the BMMZ Facility (the "MRA").[4] (Opp. at 6-7.) Once repurchased by the Debtors, the Released BMMZ Mortgage Loans became part of the Secured Parties' collateral

---

[4] A copy of the MRA is attached to the Committee's Standing Motion as Exhibit C-6. This Court can consider the MRA on the Motion because it is integral to the Complaint and is part of the public record. *See Jovanovic v. City of New York*, No. 04-8437, 2006 WL 2411541, at *5 (S.D.N.Y. Aug. 17, 2006).

8

package by virtue of the All-Assets Granting Clause, which provides the Secured Parties with a security interest in, *inter alia*, all of the following, regardless of "whether now or hereafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced":

> (a) all Assets. . . (h) Financial Assets, including . . . all agreements, contracts, documents, and instruments evidencing, arising from, relating to or otherwise delivered pursuant to or in connection with Financial Assets . . . (i) General Intangibles . . . (k) instruments . . . and (u) to the extent not specifically enumerated, all other personal assets and property of any kind or description . . .,

(Notes Security Agreement § 2.) The BMMZ Collateral falls squarely within the All-Assets Granting Clause. Additionally, the MRA grants the Debtors a right to repurchase the BMMZ Mortgage Loans subject to the BMMZ Repo Facility. (MRA § 3(ix).) This right is a general intangible under the UCC, and is unequivocally subject to the All-Assets Granting Clause.

In an effort to evade the clear impact of the All-Assets Granting Clause, however, the Committee seeks to recharacterize the BMMZ Facility as a secured financing. Specifically, the Committee asserts that "[b]ecause the BMMZ Facility should properly be characterized as a secured financing, at all relevant times, RFC and GMACM owned the BMMZ Mortgage Loans," and that the Secured Parties could thus not have obtained a lien on or security interest in the Released BMMC Mortgage Loans that were subsequently returned to the Debtors, or any contractual right to repurchase the BMMZ Mortgage Loans. (Compl. ¶¶ 156-157.)

This claim should also be dismissed. The "key to the inquiry as to whether [repurchase agreements] should be characterized as purchase and sale agreements or secured loans lies in the intention of the parties." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 300 (S.D.N.Y. 1998). Under New York law, which governs the BMMZ Repo Facility (MRA § 23), "the intention of contracting parties controls a court's interpretation of their contract." *American Home Mortg. Holdings, Inc. v. Lehman Brothers, Inc.* (*In re American Home Mortg. Holdings*), 388 B.R. 69, 90 (Bankr. D. Del. 2008) ("*American Home II*"). As *American Home II*—a case

9

cited by the Committee—demonstrates, where, as here, it is clear from the four corners of the agreement governing the transaction that the parties intended the repurchase agreement in question to be treated as a purchase and sale and not a secured financing, a recharacterization claim must be dismissed. *Id.* The MRA expressly provides that "*the parties intend that all Transactions hereunder be sales and purchases and not loans*." (MRA § 6.) (emphasis added.) A plainer or more unambiguous expression of the parties' intent is hard to imagine.

Moreover, in both *American Home II* and *Granite Partners*, the courts granted motions to dismiss on the ground that the clear and unambiguous terms of the agreements at issue demonstrated that, as a matter of law, the transactions were true sales. *Id.*; *Granite Partners*, 17 F. Supp. at 302 n.13. In reaching these conclusions, the courts relied on the facts that, *inter alia*, the agreements (i) stated that the parties "intend that all Transactions hereunder be sales and purchases and not loans"; (ii) denominated the parties "Buyer" and "Seller"; (iii) provided that the Seller agreed to transfer to the Buyer securities or other assets in exchange for the transfer of funds by the Buyer; (iv) defined the securities or other assets as "Purchased Securities"; (v) defined the date on which the Purchased Securities were transferred to the Buyer as the "Purchase Date"; (vi) defined the price at which the Purchased Securities were transferred to the Buyer as the "Purchase Price"; (vii) defined the price at which Purchased Securities were to be transferred from Buyer to Seller as the "Repurchase Price"; and (viii) defined the date on which the Seller was to repurchase the Purchased Securities from the Buyer as the "Repurchase Date." *All* of these factors are present in the MRA. (*See* MRA §§ 2, 3(ix), 27.)

## CONCLUSION

For the reasons stated herein and in the Motion, the Notes Trustee respectfully requests that the Court grant the relief sought in the Motion, as modified hereby.

Dated:     New York, New York
           June 7, 2013

           AKIN GUMP STRAUSS HAUER & FELD LLP

By:     */s/ Brian Carney*
      Daniel H. Golden
      David M. Zensky
      Deborah J. Newman
      Brian T. Carney
      Akin Gump Strauss Hauer & Feld LLP
      One Bryant Park
      New York, New York 10036
      (212) 872-1000 (Telephone)
      (212) 872-1002 (Facsimile)
      dgolden@akingump.com
      dzensky@akingump.com
      djnewman@akingump.com
      bcarney@akingump.com

*Special Counsel to UMB Bank, N.A.*