**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>　　　RESIDENTIAL CAPITAL, LLC, *et al.*,<br><br>　　　　　　　　　　Debtors. | **FOR PUBLICATION**<br><br>Case No. 12-12020 (MG) |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS, on behalf of the estates of the Debtors,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　*v.*<br><br>UMB Bank, N.A., as successor indenture trustee under<br>that certain Indenture, dated as of June 6, 2008; and<br>WELLS FARGO BANK, N.A., third priority<br>collateral agent and collateral control agent under that<br>certain Amended and Restated Third Priority Pledge<br>and Security Agreement and Irrevocable Proxy, dated<br>as of December 30, 2009,<br><br>　　　　　　　　　　Defendants. | Adv. Proc. 13-01277(MG) |

---

**MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART**
**UMB BANK'S MOTION TO DISMISS**

*A P P E A R A N C E S:*

AKIN GUMP STRAUSS HAUER & FELD LLP
*Special Counsel to UMB Bank, N.A.*
One Bryant Park
New York, NY 10036
By:　　David M. Zensky, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Creditors' Committee*
1177 Avenue of the Americas
New York, NY 10036
By:　　Gregory A. Horowitz, Esq.

PACHULSKI STANG ZIEHL & JONES LLP
*Conflicts Counsel for the Official Creditors' Comittee*
780 Third Avenue
New York, New York 10017
By:    John A. Morris, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is *Defendant UMB Bank, N.A.'s Partial Motion to Dismiss Pursuant to FRCP 12(b)(6)* ("Motion," ECF Doc. # 21).  The Adversary Proceeding was brought by the Official Committee of Unsecured Creditors (the "Committee") of Residential Capital, LLC ("ResCap"), *et al.* (the "Debtors") on February 28, 2013 against UMB Bank, N.A., as successor indenture trustee ("UMB" or the "Indenture Trustee") under that certain Indenture, dated as of June 6, 2008 (the "Indenture"), and Wells Fargo Bank, N.A. ("Wells  Fargo"), as third priority collateral agent and collateral control agent ("Collateral Agent") under an Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009 (the "Notes Security Agreement").

Through the Motion, UMB sought dismissal of ten of the fourteen counts asserted in the Adversary Proceeding.  Wells Fargo Bank, N.A. ("Wells Fargo") filed a joinder of the Motion (ECF Doc. # 23).  The Committee filed an objection to the Motion ("Objection," ECF Doc. # 28) supported by the Declaration of John A. Morris ("Morris Decl.," ECF Doc. # 29).  UMB filed a reply ("Reply," ECF Doc. # 37) in which it withdrew the Motion with respect to five of the counts.  The Court heard argument on the Motion on July 26, 2013 and UMB withdrew the Motion with respect to Count XIV.

For the reasons discussed below, the Motion is **DENIED** without prejudice as to Counts I, IV, and XIII, and the Motion is **GRANTED** with prejudice as to Count V.

## I.   BACKGROUND

On May 14, 2012 (the "Petition Date"), the Debtors filed voluntary petitions for relief

under chapter 11 of the Bankruptcy Code.  On the Petition Date, the Debtors sought approval for

postpetition financing from Ally Financial, Inc. ("AFI").  The Court granted interim relief on this

request on May 15, 2012 (Interim AFI DIP Order, 12-12020, ECF Doc. # 80), and entered the

AFI DIP Order granting final approval on June 25, 2012.  (12-12020, ECF Doc. # 491).

Pursuant to the AFI DIP Order, the Debtors agreed to a series of stipulations (the "Stipulations")

concerning the liens and security interests granted for the benefit of the Collateral Agent for the

benefit of the Indenture Trustee and the Junior Secured Noteholders (defined below, and

collectively, the "Secured Parties").  (*Id.* ¶ 5.)  The Stipulations provided the Committee with a

period in which to challenge the validity of the liens and security interests and it spent months

investigating the claims and liens of the Secured Parties.  (Compl. ¶ 20.)

The Committee's investigation focused on a $1.1 billion discrepancy in the Debtors'

prepetition and postpetition disclosure concerning the Notes Collateral (defined below).  The

Debtors' audited financial statements for the year ended December 31, 2011, and unaudited

financial statements for the quarter ended March 31, 2012 (the most recent statements prior to

the Petition Date), describe the Junior Secured Notes as secured by the same $1.3 billion in

collateral that purportedly secures the AFI Revolver (as defined below).  (Compl. ¶ 22.)

According to the Stipulations, the Notes Collateral includes $1.3 billion of assets identified under

the column labeled "Ally Revolver" and an additional $1.1 billion of assets identified under the

column labeled "Blanket" on Exhibit A to the AFI DIP Order.  (Compl. ¶ 23.)  The Committee

asserts that, upon information and belief, prior to the Petition Date, the Debtors' internal

collateral tracking database identified only approximately $1.3 billion in collateral securing the

3

Junior Secured Notes and the AFI Revolver and nearly all of the "Blanket" collateral as "Unpledged." (Compl. ¶¶ 24-25.) Moreover, the Debtors failed to independently verify whether the Secured Parties had liens on the assets that comprise "Blanket" property or whether any such assets constitute Excluded Assets under the Notes Security Agreement. On December 26, 2012, the Court granted the Committee's motion ("Standing Motion," ECF Doc. # 1546) for standing to pursue the claims in this adversary complaint. ("Standing Order," ECF Doc. # 2518.)

A.    **Relevant Facts**

1.    *Junior Secured Notes*

On or about June 6, 2008, ResCap entered into various financing transactions in connection with the issuance of approximately $4 billion of 9.625% Junior Secured Guaranteed Notes Due 2015 ("Junior Secured Notes," and the holders the "Junior Secured Noteholders" or "JSNs"). (Compl. ¶¶ 32-36.) The Junior Secured Notes were issued as part of an exchange offer (the "Exchange Offer"), detailed in the ResCap Exchange Offer 8-K (Compl., Ex. B). (Compl. ¶¶ 35-36.) ResCap offered the Junior Secured Notes in return for outstanding ResCap notes maturing in 2010 through 2015 ("Old Notes"). (*Id., Compl. ¶ 36.) As an alternative exchange mechanism for a limited number of the Old Notes, ResCap offered cash, with the price determined by a modified Dutch auction. (*Id.*; Compl. ¶ 39.) Through the Exchange Offer, ResCap was able to exchange approximately $6 billion of Old Notes for approximately $4 billion in Junior Secured Notes and roughly $862 million in cash. (*Id.*; Compl. ¶ 35-36.) As of the Petition Date, the outstanding face amount of Junior Secured Notes was approximately $2.12 billion and, according to the Committee, the remaining amount of unaccreted original issue discount ("OID") was at least $377 million. (Compl. ¶¶ 42-43.)

4

The Junior Secured Notes were issued pursuant to the Indenture (Compl., Ex. A), entered into on June 6, 2008, by and among ResCap, as issuer, GMAC Residential Holding Company, LLC, GMAC- RFC Holding Company, LLC, GMAC Mortgage, LLC, Residential Funding Company, LLC and HomeComings Financial, LLC, as guarantors (the "Guarantors"), and U.S. Bank N.A., as indenture trustee (the "Original Trustee").   That same day, certain Debtors entered into a Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "Original Notes Security Agreement") with the Indenture Trustee and the Collateral Agent.  On or about December 30, 2009, the parties amended the Original Security Agreement by entering into the Notes Security Agreement (Compl., Ex. C.).

In the Notes Security Agreement, certain Debtors granted the Collateral Agent liens on and security interests in certain of their assets (collectively, the "Notes Collateral") to secure payment of the obligations under the Indenture (the "Notes Obligations").   Sections 2 through 5 of the Notes Security Agreement (the "Granting Clauses") grant the Collateral Agent liens and security interests on various assets.[1]  Each Granting Clause provides that "notwithstanding the foregoing, the [Notes Collateral] described in [such Granting Clause] shall not include Excluded Assets."   Notes Security Agreement §§ 2-5.  The Committee asserts, upon information and belief, that at least $350 million of assets, including mortgage loans, REO Property, and governmental insurance claims (collectively, the "Preference Assets") were added to the Notes Collateral during the 90 days before the Petition Date.  (Compl. ¶ 207.)  It claims that each

---

[1]      The liens in section 2 were granted by the "Recourse Obligors" on certain servicer advances, mortgage loans, trading securities, accounts receivable, chattel paper, computer hardware, software and related rights/licenses, deposit accounts, securities accounts, instruments, investment property, documents, general intangibles, goods, equipment, fixtures, intellectual property, equity interests, promissory notes, and all other personal assets and property of any kind or description; the liens in section 4 were granted by the "FABS Grantors" on certain of their financial assets, trading securities, deposit accounts, investment property, instruments, cash delivered in respect of and collateral securing any financial assets, related documents, accounts receivable, general intangibles, supporting assets, and proceeds; and the liens in section 5 were granted by the "Additional Account Parties" on certain deposit accounts and related proceeds.  (Compl. ¶¶ 48-54.)

addition of the Preference Assets to the Notes Collateral was a transfer for the benefit of the

Secured Parties (the "Preferential Transfers").

UMB asserts that those security interests and liens were first perfected via, among other

things, the filing of UCC-1 Financing Statements on June 6, 2008 (the "UCC-1 Financing

Statements," Motion, Ex. A).

### 2.  *The AFI Revolver*

On or about June 4, 2008, AFI, as lender, and certain Debtors entered into a loan

agreement (the "Original Loan Agreement"), which was amended and restated (the "AFI

Revolver," Compl., Ex. D.) on December 30, 2009.  AFI made certain loans to the Debtors

("AFI Revolver Obligations") pursuant to the AFI Revolver.  Approximately $747 million in

outstanding principal was due under the AFI Revolver on the Petition Date.  Also on June 4,

2008, the Debtors entered into a First Priority Pledge and Security Agreement and Irrevocable

Proxy (the "Original Revolver Security Agreement") with the Collateral Agent, which was

amended and restated (the "Revolver Security Agreement").  (Compl. ¶ 62.)  The Revolver

Security Agreement grants the Collateral Agent liens on and security interests in the Notes

Collateral to secure the AFI Revolver Obligations.

### 3.  *The Intercreditor Agreement*

On or about June 6, 2008, the Collateral Agent, AFI, the Original Trustee and certain

Debtors entered into the Intercreditor Agreement (Compl., Ex. E), which, among other things,

governs the rights of parties in collateral held for the benefit of the Indenture Trustee and AFI.

Section 2.1(b) of the Intercreditor Agreement provides that the liens and security interests

granted under the Revolver Security Agreement are first priority liens and security interests

senior to the liens and security interests granted under the Notes Security Agreement.  (Compl.

¶¶ 64, 66.)  However, the Debtors have stipulated that the Secured Parties' liens on and security interests in the Notes Collateral are "first priority" and, at the same time, subject to and subordinate to other liens.

### 4.   *The Stipulations*

In connection with the AFI DIP Order, the Debtors made certain Stipulations that, among other things, provide for the allowance of the Notes Obligations and define and acknowledge the perfection of security interests in the Notes Collateral securing payment.  In particular, the Debtors conceded that: (i) the aggregate principal amount outstanding under the Junior Secured Notes as of the Petition Date is at least $2,120,452,000, plus accrued and unpaid interest and reimbursable expenses and fees (AFI DIP Order ¶ 5(b)(iii)); (ii) the Debtors' obligations under the Junior Secured Notes are legal, valid, and binding and are not subject to avoidance (AFI DIP Order ¶¶ 5(c) and (d)); (iii) the liens and security interests granted to the Secured Parties on the Notes Collateral are first priority, valid, binding, perfected, and enforceable (AFI DIP Order ¶ 5(g)); (iv) the Notes Collateral includes the "Pre-Petition Ally Repo Facility" and any residual value therefrom (AFI DIP Order ¶ 5(h)); and (v) the Notes Collateral includes the assets listed in the columns labeled "Ally Revolver" and "Blanket" on Exhibit A to the AFI DIP Order (AFI DIP Order ¶ 5(h)).

The Stipulations also (i) provide that the Debtors have released the Secured Parties from all causes of action in connection with the Junior Secured Notes and the Secured Parties' liens on and security interests in the Notes Collateral, and (ii) if not challenged, provide for the allowance of the Notes Obligations and excuse the filing of a proof of claim.  *See* AFI DIP Order ¶¶ 5(c), (d), and (k).  Under the AFI DIP Order, the Secured Parties were granted several forms of adequate protection, including replacement liens and administrative expense claims to the extent

7

of the diminution in value of the Secured Parties' interest in the Notes Collateral.  *See* AFI DIP

Order ¶ 16(c).  In particular, the Secured Parties were granted liens as adequate protection on the

equity interests of the Barclays DIP Borrowers (as defined in the AFI DIP Order), but only to the

extent that such parties' liens on the BMMZ Facility (defined below) or any residual value

therefrom were valid.

In its Complaint, the Committee, *inter alia*, challenges the definition of the Notes

Collateral and objects to the secured status of the Indenture Trustee, the Collateral Agent and the

JSNs.

> 5. *The Released Mortgaged Loans and the BMMZ Repo Facility*

ResCap, RFC, and/or GMACM own certain mortgage loans that were pledged to

Citibank or Goldman Sachs under May 2010 repurchase facilities (the "Released Mortgage

Loans").  Before May 2010, the Released Mortgage Loans that were not otherwise Excluded

Assets may have been subject to the liens or security interests of the Secured Parties as collateral

for the Notes Obligations.

On May 17, 2010, the Collateral Agent agreed to a partial release of collateral to AFI as

lender under the Revolver Security Agreement.  ("Pledge Release," Compl., Ex. F.)  Pursuant to

the Pledge Release, the Collateral Agent released the Secured Parties' liens on certain mortgage

loans.  (Compl. ¶¶ 119-23.)  That same day, the Collateral Agent also filed UCC-3 termination

statements (the "Termination Statements") causing any prior financing statements to cease to be

effective for the Released Mortgage Loans.  The Committee asserts that although the Debtors did

not subsequently grant the Secured Parties any lien on or security interest in any of the Released

Mortgage Loans, the assets listed in the "Ally Revolver" and/or "Blanket" columns on Exhibit A

to the AFI DIP Order, which the Debtors stipulated constitute Notes Collateral, include the Released Mortgage Loans.  *See* Compl. ¶¶ 125-30.

On December 21, 2011, BMMZ Holdings LLC ("BMMZ"), ResCap, GMACM, and RFC entered a Master Repurchase Agreement ("MRA") dated as of December 21, 2011 (the "BMMZ Agreement"), and ResCap and BMMZ entered into a Master Guarantee (as amended, the "BMMZ Facility").  (Compl. ¶¶ 136-37.)  Under the BMMZ Facility, GMACM and RFC purported to "sell" mortgage loans with a book value of $371 million as of the Petition Date (excluding the Released Mortgage Loans, the "BMMZ Mortgage Loans") to BMMZ for the aggregate "purchase price" of $250 million, and agreed to "repurchase" the same loans for an amount generally equal to the purchase price plus a Price Differential (as defined in the BMMZ Facility) equal to LIBOR plus 4.75%.  *See* Barclays DIP Order (ECF Doc. # 490) ¶ 7(d).

The Committee contends that although the BMMZ Facility was styled as a "sale" and "repurchase" of mortgage loans, the provisions of that facility demonstrate that it was, in substance, a secured financing and should properly be characterized as such.  (Compl. ¶ 141.)

UMB observes that, as a condition precedent to obtaining DIP financing, Ally "stipulate[d] and agree[d] that the mortgage loans that were, as of the Petition Date, the subject of the Pre-Petition Ally Repo Facility, were transferred from BMMZ to GMACM and RFC, as applicable, free and clear of all liens, claims and encumbrances."  (Barclays DIP Order § 7(e), ECF Doc. # 490.)  Further, the Debtors "stipulate[d] and agree[d] that such mortgage loans were transferred to the GMACM Borrower and the RFC Borrower, as applicable, free and clear of all liens, claims and encumbrances."  (*Id*.)  The Barclays DIP financed the unwinding of the BMMZ Facility and, according to UMB, the Released Mortgage Loans were pledged as collateral for the Barclays DIP.  (Barclays DIP Order § 14(a).)

9

6. *The Bilateral Facilities Collateral*

The Notes Security Agreement defines Excluded Assets to include assets pledged by the

Debtors under any "Bilateral Facility," if the Bilateral Facility prohibits the Debtors from

granting the Secured Parties a lien on or security interest in such assets.  The Notes Security

Agreement defines the term "Bilateral Facility" to mean approximately 53 financing

arrangements to which certain Debtors or their affiliates were party as of June 6, 2008, and were

listed on Schedule 7.01(t) to the Original Loan Agreement (the "Bilateral Facilities").  The

Committee asserts, upon information and belief, that the Debtors pledged certain of their assets

to other creditors under the Bilateral Facilities (the "Bilateral Facilities Collateral"), and certain

of the Bilateral Facilities Collateral was subsequently released from the liens or security interests

granted pursuant to one or more of the Bilateral Facilities and remained property of the estates as

of the Petition Date (such collateral and the proceeds thereof, the "Released Bilateral Facilities

Collateral").  (Compl. ¶¶ 81-83.)  The Committee asserts that although the Debtors did not

subsequently grant the Secured Parties any lien on or security interest in any of the Released

Bilateral Facilities Collateral, the assets listed in the "Ally Revolver" and/or "Blanket" columns

on Exhibit A to the AFI DIP Order (which the Debtors stipulated constitute Notes Collateral)

include the Released Bilateral Facilities Collateral.  (Compl. ¶¶ 84-88.)

7. *Non-Obligor Debtors*

According to the Committee, certain of the Debtors are Non-Obligor Debtors, including

EPRE LLC, ETS of Washington, Inc., and Residential Funding Mortgage Exchange, LLC,

among other Debtors.  The Committee asserts, upon information and belief, the rows entitled

"Cash and Cash Equivalents" and "Other Assets" in the "Blanket" column on Exhibit A to the

AFI DIP Order include assets owned by these Non-Obligor Debtors that have not guaranteed the

Junior Secured Notes, have not granted any liens or security interests to the Secured Parties, and

are not otherwise obligated under the Indenture or the JSNs

**B.      Committee's Complaint**

The Complaint asserts fourteen counts against the defendants.  UMB requests the Court

to dismiss four counts.  The relevant counts are as follows:

- *Count I*: A declaratory judgment that none of the Secured Parties has a lien on or security interest in any of the Released Bilateral Facilities Collateral.

- *Count IV*: A declaratory judgment that none of the Secured Parties has a lien on or security interest in any of the Released Mortgage Loans.

- *Count V*: A declaratory judgment that (a) the BMMZ Facility was a secured financing for purposes of determining the enforceability of any liens or security interests in favor of the Secured Parties in the BMMZ Facility, in the residual value under the BMMZ Facility or the Debtors' rights in the BMMZ Mortgage Loans; (b) the Debtors did not have any right to "residual value" under the BMMZ Facility that could have been pledged to the Secured Parties; (c) at all relevant times, the Debtors owned the BMMZ Mortgage Loans; (d) any liens or security interests held by the Secured Parties on the BMMZ Mortgage Loans were either excluded or released before the Petition Date; and (e) the Secured Parties are not entitled to Adequate Protection Liens on the equity of Barclays DIP Borrowers on account of their asserted interest in the BMMZ Facility and any residual value therefrom.

- *Count XIII*: Disallowance of the Secured Parties' claims to the extent such claims include unmatured interest, or OID, under sections 105, 502, and 506 of the Bankruptcy Code and Rules 3007, 3012, and 7001 of the Federal Rules of Bankruptcy Procedure.

## II.      DISCUSSION

**A.      Legal Standard**

Rule 12(b)(6) allows a party to move to dismiss a cause of action for "failure to state a

claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 8(a)(2) requires a

complaint to contain "a short and plain statement of the claim showing that the pleader is entitled

to relief."  FED. R. CIV. P. 8(a)(2).  To survive a motion to dismiss pursuant to Rule 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Courts also consider documents not attached to the complaint or incorporated by reference, but "upon which the complaint *solely* relies and which *[are] integral to the complaint*." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks omitted; emphasis in original) (quoting *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)); *see also Kalin v. Xanboo, Inc.*, No. 04 Civ. 5931(RJS), 2009 WL 928280, at *8 (S.D.N.Y. Mar. 30, 2009) (Sullivan, J.); *Grubin v. Rattet (In re Food Mgmt. Grp.)*, 380 B.R. 677, 690 (Bankr. S.D.N.Y. 2008) (holding that a court may consider documents that have "not been incorporated by reference where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint") (internal quotation marks omitted).

Following the Supreme Court's decision in *Ashcroft v. Iqbal*, courts use a two-prong approach when considering a motion to dismiss. *See, e.g.*, *Weston v. Optima Commc'ns Sys., Inc.*, No. 09 Civ. 3732(DC), 2009 WL 3200653, at *2 (S.D.N.Y. Oct. 7, 2009) (Chin, J.) (acknowledging a "two-pronged" approach to deciding motions to dismiss); *S. Ill. Laborers' and Employers Health and Welfare Fund v. Pfizer, Inc.*, No. 08 CV 5175(KMW), 2009 WL 3151807, at *3 (S.D.N.Y. Sept. 30, 2009) (Wood, J.) (same); *Inst. for Dev. of Earth Awareness v.*

12

*People for the Ethical Treatment of Animals*, No. 08 Civ. 6195(PKC), 2009 WL 2850230, at *3 (S.D.N.Y. Aug. 28, 2009) (Castel, J.) (same). First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in the factual garb. *Iqbal*, 556 U.S. at 678-79; *Boykin v. Keycorp*, 521 F.3d 202, 204 (2d Cir. 2008); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). Second, the court must determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S. at 679.

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Meeting the plausibility standard requires a complaint to plead facts that show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). A complaint that only pleads facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* (quoting *Twombly*, 550 U.S. at 557 (internal quotation marks omitted)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555 (internal quotation marks omitted)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**B.        Committee Failed to Adequately Plead a Claim for a Declaratory Judgment Regarding the BMMZ Facility (Count V)**

The Committee requests a declaratory judgment that (a) the BMMZ Facility was a secured financing for purposes of determining the enforceability of any liens or security interests in favor of the Secured Parties in the BMMZ Facility, in the residual value under the BMMZ Facility or the Debtors' rights in the BMMZ Mortgage Loans. UMB asserts that the

Committee's allegations that the BMMZ Facility should be "recharacterized" as a secured

facility fail as a matter of law because the Committee cannot recharacterize a repurchase

agreement as a secured financing for only one party to the BMMZ Facility with the intent to

disturb the rights of the Secured Parties.  UMB points to the Standing Motion, where the

Committee stated that it "is not seeking to disturb the rights of BMMZ," and seeks to have the

BMMZ Facility "recharacterized for these limited purposes," meaning only to challenge the

Secured Parties' security interests in the BMMZ Facility.  (Standing Mot., ¶ 46, n.22.)

UMB explains that, pursuant to the terms of the BMMZ Facility, two of the Debtors sold

mortgage loans to BMMZ and agreed to repurchase those loans at a future date for an amount

generally equal to the purchase price plus a "Price Differential."  In the Standing Motion, the

Committee acknowledged that the BMMZ Facility is a Repurchase Agreement under the

Bankruptcy Code and is thus subject to the safe harbor provisions of sections 555 and 559.[2]

(Standing Mot., ¶ 46 n.22.)  In *Calyon N. Y. Branch v. Am. Home Mortg. Corp.* (*In re Am. Home

Mortg., Inc.*), 379 B.R. 503, 516 (Bankr. D. Del. 2008), the court rejected the debtors' argument

that a repurchase agreement lacked all indicia of a "true" repurchase agreement and, in

substance, constituted secured financing.  UMB argues that the Committee's claim for

recharacterization should similarly be denied—the only difference between the cases is that here,

---

[2]    Congress enacted a number of amendments to the Bankruptcy Code that work in concert to preserve the
liquidity of the repo market by exempting repurchase agreements from significant provisions such as the automatic
stay.  In particular, Congress enacted sections 555 and 559, which protect the exercise of certain contractual rights to
liquidate, terminate and accelerate repurchase agreements from stays, avoidance and other limitations; sections
362(b)(7)) and 362(o), which exempt from the automatic stay and all other Bankruptcy Code stays setoffs under
repurchase agreements and the realization against collateral for repurchase agreements; sections 546(f) and 548(d),
which provide exemptions from preference and fraudulent transfer avoidance for settlement and margin payments;
and portions of sections 101 and 741, which define the key terms repurchase agreement, margin payment, settlement
payment, repo participant and financial participant.  *See* COLLIER ON BANKRUPTCY ¶ 559.01.

Section 559 protects rights triggered by a condition of the kind specified in section 365(e)(1), *i.e.,* ipso
facto clauses or bankruptcy defaults.  Thus, "section 559 allows protected parties to act upon ipso facto clauses." *Id.*
¶¶ 559.04.  In addition, section 555 "provides the tool for the non-defaulting repo participant to exercise its
contractual right to close-out, terminate or accelerate a 'securities contract.'"  *Am. Home Mortg.*, 379 B.R. at 513.

the Committee seeks to disturb the rights of the selling party in the repurchase agreement and
third parties such as the Secured Parties instead of the purchasing party.    UMB states that if the
Committee were to prevail on Count V, and only the Debtor's rights were affected, BMMZ, as a
party to the BMMZ Facility, would still own the assets that the Debtors have a right to
repurchase, but the Debtors would also own those assets, with BMMZ being considered a
secured lender, which would be an illogical and inequitable result.

In addition, UMB asserts that the Released Mortgage Loans were released to be sold
pursuant to the Goldman/Citi Repo Facility, which was then replaced by the BMMZ Facility.  To
the extent the Court declines to recharacterize the BMMZ Facility, then the Secured Parties, as of
the Petition Date, had a security interest in the Debtors' contractual rights to repurchase the
Released Mortgage Loans pursuant to the terms of the BMMZ Facility, and therefore, Count IV
should be dismissed.

In response, the Committee notes that the count avers facts that, if accepted as true,
would result in a conclusion that the BMMZ Facility, although styled as a "sale" and repurchase
of the BMMZ Mortgage Loans, was in substance a secured "financing."  However, sections 555
and 559 of the Code do not address whether repurchase agreements should be characterized as
true sales or as financings; indeed, they make the distinction irrelevant for the statutes' specified
purposes.  Defendants' argument appears to be that if a transaction is a "repurchase agreement"
under Bankruptcy Code section 101(47), then the transaction is a true sale rather than a
financing.

The Committee also contends that UMB misconstrues *American Home*.  The court there
concluded that it does not matter whether the contract provides for an outright sale or "merely"
the transfer of a lien, because:

> [S]ection 101(54) of the Bankruptcy Code . . . defines 'transfer'
> to include the creation of a lien. Thus*, even if the Contract only
> provides for the creation of a lien in the mortgage loans, it still
> constitutes a "transfer" for the purpose of determining whether
> the sale and repurchase of mortgage loans under the Contract
> constitutes a repurchase agreement.*

*Id*. at 516 (emphasis added). On a subsequent decision in the *American Home* bankruptcy case, the court, after holding sections 555 and 559 applicable to a transaction, proceeded to analyze the substance of the transaction to determine whether it should properly be characterized as a financing or true sale for other purposes. *Am. Home Mortg. Holdings, Inc. v. Lehman Bros. Inc. (In re Am. Home Mortg. Holdings),* 388 B.R. 69, 88-89 (Bankr. D. Del. 2008) *("American Home II").* The Committee believes that the fact that the BMMZ Facility was a repurchase agreement under section 101(47), and subject to the safe harbors of sections 555 and 559 (which the Committee has not disputed), does not prevent this Court from determining that the BMMZ Facility is a financing and not a true sale.

The Committee also disputes UMB's contention that the BMMZ Facility cannot be characterized as a financing with respect to the lien interests of the Secured Parties because (i) any such characterization must apply to all parties affected by the BMMZ Facility and (ii) the Committee represented in the Standing Motion that it was not seeking to affect BMMZ's rights. First, nothing in sections 555 or 559 precludes characterizing the BMMZ Facility as a financing transaction for purposes of determining the alleged secured claim of the Secured Parties. Second, citing *Liona,* 949 F.2d at 602, a transaction's structure may be treated differently for third parties than it is treated for the parties to the transaction. There, the Second Circuit treated a "purported sale and leaseback as an equitable mortgage" after an extensive review of the factual record. Third, the BMMZ Facility does not exist today (it was refinanced and unwound

16

by the Barclay's DIP), meaning the Committee's claim to characterize the BMMZ Facility as a financing does not affect any party besides Defendants.

In its Reply, UMB argues that where, as here, it is clear from the four corners of the agreement governing the transaction that the parties intended the repurchase agreement in question to be treated as a purchase and sale and not a secured financing, a recharacterization claim must be dismissed. The MRA expressly provides that "the parties intend that all Transactions hereunder be sales and purchases and not loans." (MRA § 6.) In both *American Home II* and *Granite Partners*, the courts granted motions to dismiss on the ground that the clear and unambiguous terms of the agreements at issue demonstrated that, as a matter of law, the transactions were true sales. *American Home II,* 388 B.R. at 90; *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 302 n.13 (S.D.N.Y. 1998).

The Court concludes that the Committee failed to adequately plead a claim for a declaratory judgment that the BMMZ Repo Facility is a "secured financing" and not a repurchase sale. The Court rejects the Committee's argument that this Court should recharacterize the BMMZ Repo Facility as a "secured financing." The MRA clearly expresses that the intent of the parties is to enter into a repurchase agreement. For example, the MRA denominated the parties "Buyer" and "Seller" rather than lender and borrower or secured creditor and debtor (*see* MRA at 1). The definitions of "Purchased Mortgage Loans," "Purchase Date," and "Purchase Price" all indicate that the transactions under the MRA are sales and not loans (*see* MRA at 16). And, the parties agree that the title to the Purchased Securities passes to the Buyer, who is explicitly permitted to engage in repos with the Purchased Securities or otherwise transafer or hypothecate them (*see* MRA at 57). Moreover, the Committee itself acknowledges that the agreement is a repurchase agreement for purposes of sections 555 and 559 of the

Bankruptcy Code (*see* Committee Opposition at n.11), and that they do not wish to disturb the rights of BMMZ.

The Court cannot recharacterize the BMMZ Repo Facility as a "secured financing" for the limited purpose of determining the enforceability of any liens or security interests in favor of the Secured Parties in the BMMZ Facility, in the residual value under the BMMZ Facility or the Debtors' rights in the BMMZ Mortgage Loans, when the BMMZ Master Repurchase Agreement reflects the intent of the parties to enter into a repurchase agreement. The Court accordingly declines to do so. Therefore, Count V of the Complaint is dismissed with prejudice.

### C. Committee Adequately Pled a Claim for Declaratory Judgments Regarding the Released Bilateral Facilities Collateral (Count I) and the Released Mortgage Loans (Count IV)

The Committee seeks a declaratory judgment that none of the Secured Parties has a lien on or security interest in any of the Released Bilateral Facilities Collateral or the Released Mortgage Loans. The Notes Security Agreement included a broad all-assets granting clause (the "All-Assets Granting Clause") which provides, *inter alia*,

> [T]he Company and each of the Guarantors and each other Grantor . . . hereby pledges to the Third Priority Collateral Agent for the benefit of the Secured Parties, and hereby grants a continuing security interest to the Third Priority Collateral Agent for the benefit of the Secured Parties in, all of the Company's, such Guarantor's or any such other Grantor's right, title and interest, in, to, and under, whether now or herafter existing, owned or acquired and wherever located and howsoever created, arising or evidenced, all of the following: (a) all Assets. . . .

(Notes Security Agreement § 2.)

With respect to Count I, UMB recognizes that the Notes Security Agreement excludes the Bilateral Facilities Collateral from the Secured Parties' collateral package, but it claims that once the Bilateral Facilities Collateral was released, or a Bilateral Facility was terminated, such

Bilateral Facilities Collateral ceased to be an "Excluded Asset."  Because it remained an asset of

the Debtors, it purportedly became part of the Secured Parties' collateral pursuant to the All-

Assets Granting Clause.  *See* Mot. at 17.

In the alternative, UMB asserts that to the extent the Committee is seeking to avoid the

Indenture Trustee's liens on proceeds of Released Bilateral Facilities Collateral, such a claim is

directly contradicted by the plain language of the Notes Security Agreement and should be

dismissed.  The Notes Security Agreement does not exclude such proceeds from the Secured

Parties' collateral package.  (*See* Notes Security Agreement at 6.)  Specifically, subsection (f) of

the definition of "Excluded Assets" provides that the "proceeds and products" of other Excluded

Assets are excluded from the Secured Parties' collateral package only to the extent that such

proceeds and products would independently qualify as "Excluded Assets."  (*See id.*)  The

Complaint is devoid of any allegation that the proceeds of Released Bilateral Facilities Collateral

are themselves "Excluded Assets."

In response, the Committee argues that the All-Assets Granting Clause expressly

excludes Excluded Assets.  Specifically, the grant of the security interest under section 2 of the

Notes Security Agreement applies to "all of the [Company's] right, title and interest in, to, and

under, whether now or hereafter existing . . . all of the following . . . [(a) through (u)] . . .

provided that, notwithstanding the foregoing, the 'Collateral' described in this Section 2 shall not

include Excluded Assets."  Comp. Ex. C § 2; see also §§ 3-5.  The placement of the exclusion for

Excluded Assets at the very end of the collateral description is instructive: the entirety of the

collateral package granted to the JSNs, whether currently existing or subsequently acquired, does

not include any of the Excluded Assets.  In other words, all of the collateral granted to the JSNs

under the Notes Security Agreement, whether then existing or after-acquired was specifically

qualified to omit any of the Excluded Assets.  Further, the Notes Security Agreement does not

contain a traditional savings clause through which previously excluded property automatically

became subject to a lien once the reason for the exclusion is removed.

The Committee also disputes UMB's alternative argument that the proceeds of Excluded

Assets are not themselves Excluded Assets.  In the Complaint, the Committee asserts that certain

of the Bilateral Facilities Collateral were unencumbered by Defendants' liens as of the Petition

Date.  Because any proceeds of the Bilateral Facilities Collateral that constituted Released

Bilateral Facilities Collateral would necessarily issue from assets that were Excluded Assets as

of the Petition Date, such proceeds are likewise not subject to Defendants' liens.

In response to Count IV, UMB argues that the Released Mortgage Loans were released to

be sold pursuant to the Goldman/Citi Repo Facility, which was then replaced by the BMMZ

Facility.  It asserts that the Secured Parties, as of the Petition Date, had a security interest in the

Debtors' contractual rights to repurchase the Released Mortgage Loans pursuant to the terms of

the BMMZ Facility.  The Committee argues that, because Defendants have not refuted Count

IV's factual allegations that, after Defendants' release of the Released Mortgage Loans,

Defendants never reacquired any liens in those Released Mortgage Loans that are not BMMZ

Mortgage Loans, Count IV cannot be dismissed.

The Notes Security Agreement is ambiguous whether an Excluded Asset becomes part of

the Secured Parties' collateral pursuant to the All-Asset Granting Clause once it ceases to

constitute an Excluded Asset.  A fuller evidentiary record is required for this Court to make a

determination on this issue.  Therefore, the Motion is denied without prejudice as to Counts I and

IV.

**D.      Committee Adequately Pled a Claim for Disallowance of the Secured Parties'
Claims to the Extent Such Claims Include Unmatured Interest (Count XIII)**

The Committee is seeking to disallow $377 million of the JSNs' claim because it

constitutes OID.  In *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*,

961 F.2d 378 (2d Cir. 1992), the Second Circuit explained:

> Original issue discount results when a bond is issued for less than
> its face value.  The discount, which compensates for a stated
> interest rate that the market deems too low, equals the difference
> between a bond's face amount (stated principal amount) and the
> proceeds, prior to issuance expenses, received by the issuer.  OID
> is amortized, for accounting and tax purposes, over the life of the
> bond, with the face value generally paid back to the bondholders
> on the maturity date. If the debtor meets with financial trouble and
> turns to the bankruptcy court for protection, as in the present case,
> then OID comes into play as one of the factors determining the
> amount of the bondholder's allowable claim in bankruptcy.

*Id*. at 380.

Section 502 of the Bankruptcy Code provides that a claim shall be allowed "except to the

extent that . . . such claim is for unmatured interest."  11 U.S.C. § 502(b)(2).  This rule is based

on the legal principle that "interest stops accruing at the date of the filing of the petition."  S.

Rep. No. 989, 95th Cong., 2d Sess. 63, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849.  The law in

this Circuit is clear that unamortized OID constitutes "unmatured interest" under section

502(b)(2) and must be disallowed.  *See Chateaugay*, 961 F.2d at 381.  The House committee

report on section 502(b) explains:

> Interest disallowed under this paragraph includes postpetition
> interest that is not yet due and payable, and *any portion of prepaid
> interest that represents an original discounting of the claim*, yet
> that would not have been earned on the date of bankruptcy.  For
> example, a claim on a $1,000 note issued the day before
> bankruptcy would only be allowed to the extent of the cash
> actually advanced.  If the original issue discount was 10% so that
> the cash advanced was only $900, then notwithstanding the face
> amount of [the] note, only $900 would be allowed.  If $900 was

21

> advanced under the note some time before bankruptcy, the interest
> component of the note would have to be pro-rated and disallowed
> to the extent it was for interest after the commencement of the
> case.

H. Rep. No. 595, 95th Cong., 1st Sess. 352-53 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787,

5963, 6308-09 (emphasis added).

The Second Circuit has determined that a face value exchange of debt (as opposed to a

fair market value exchange) in a consensual out-of-court workout does not result in the

generation of disallowable OID.  In *Chateaugay,* the debtor had previously offered to exchange

$1,000 face amount of new 15% senior notes and shares of common stock for each $1,000 face

amount of old 13 7/8% debentures.  *Chateaugay*, 961 F.2d at 380.  When the debtor filed

bankruptcy, the indenture trustees filed proofs of claim for the face value of the new notes; the

claims did not deduct any amount for unamortized OID.  *Id.*  The debtor objected to the claims,

arguing that the claims must be reduced by the amount of unamortized OID.  *Id.*  The bankruptcy

court held that the exchange generated disallowable OID because OID arises whenever a bond is

issued for less than its face amount, and in the exchange, the new notes were issued at a discount

equaling the difference between their face value and the fair market value of the old notes.  *Id.*  It

held that unamortized OID on the new notes could not be resolved on a motion for summary

judgment because a dispute existed as to the value of the old debentures on the exchange date.

*Id.*  The parties thereafter stipulated to the amount of unamortized OID and the court entered a

judgment partially disallowing the claims.  *Id.*

The district court affirmed the ruling but the Second Circuit reversed.  *Id.* at 379-80.  It

first explained the difference between a fair value exchange, like that in *Chateaugay*, and a fair

market exchange, as in this case:

> In a fair market value exchange, an existing debt instrument is
> exchanged for a new one with a reduced principal amount,
> determined by the market value at which the existing instrument is
> trading. By offering a fair market value exchange, an issuer seeks
> to reduce its overall debt obligations. Usually, this is sought only
> by companies in severe financial distress. A face value exchange,
> by contrast, involves the substitution of new indebtedness for an
> existing debenture, modifying terms or conditions but not reducing
> the principal amount of the debt. A relatively healthy company
> faced with liquidity problems may offer a face value exchange to
> obtain short-term relief while remaining fully liable for the original
> funds borrowed.

*Chateaugay*, 961 F.2d at 381-82.

The court rejected the bankruptcy court's reasoning because it "ignores the importance of context, and does not make sense if one takes into account the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition." *Id.* at 382. It explained that "[i]f unamortized OID is unallowable in bankruptcy, and if exchanging debt increases the amount of OID, then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy." *Id.* In holding that face value exchanges do not generate disallowable OID, the court differentiated fair market value exchanges:

> *The bankruptcy court's decision might make sense in the context of
> a fair market value exchange,* where the corporation's overall debt
> obligations are reduced. In a face value exchange such as LTV's,
> however, it is unsupportable. LTV's liability to the holders of the
> New Notes was no less than its liability to them had been when
> they held the Old Debentures. The bankruptcy court, by finding
> that the exchange created new OID, reduced LTV's liabilities
> based on an exchange which, because it was a face value
> exchange, caused no such reduction on LTV's balance sheet. . . .
> Such an exchange does not change the character of the underlying
> debt, but reaffirms and modifies it.

*Id.* (emphasis added). The court also noted that tax cases are not determinative on the issue because the "tax treatment of a transaction . . . need not determine the bankruptcy treatment." *Id.*

at 383.  In particular, the tax treatment of debt-for-debt exchanges is based on the tax laws' focus

on realization events, and the "same reasoning simply does not apply in the bankruptcy context."

*Id.*

In *In re Pengo Industries, Inc*., 962 F.2d 543 (5th Cir. 1992), decided shortly after

*Chateaugay*, the Fifth Circuit followed the Second Circuit's reasoning and held that face value

exchanges do not generate disallowable OID.  It too focused on policy reasons and explained that

the bankruptcy court's decision in *Chateaugay* "translated, in general terms, into the rule that

when a financially troubled company exchanges new debt for old debt of equal face value,

exchanging holders 'will have a lower claim than those who did not [exchange], even though the

overall debt obligation of the company has not been altered.'"  *Id.* at 548 (citation omitted).

However, the court stated that "we express no opinion as to whether a fair market value

exchange creates OID not allowed under § 502(b)(2)."  *Id.* at 550.

### 1.    *Parties' Arguments*

Both parties here agree that the exchange creating the Junior Secured Notes was a fair

market value exchange and that the issue whether a fair market value exchange generates

disallowable OID is a matter of first impression.  In its Motion, UMB first argues that the notion

of unmatured interest is wholly inapplicable here—in the cases where a portion of OID is

disallowed as unmatured interest, it is because a company received less cash at the time the

bonds were issued than the face amount of the bonds being issued.  Here, however, ResCap

extinguished $1,000 of unsecured bonds by providing exchanging bondholders with $800 of new

secured bonds.  UMB claims that it does not follow that the generation of OID, for tax purposes,

results in unmatured interest for bankruptcy purposes.  *See* Mot. at 19 (citing *Chateaugay*, 962

F.2d at 550).  However, as recognized by the Second Circuit in *Chateaugay,* the general rule is

24

that OID, if generated, constitutes unmatured interest under section 502(b)(2) and must be disallowed. UMB additionally argues that the policy reasons articulated in *Chateaugay* should lead the Court to conclude that OID was not generated by the exchange. Otherwise, lenders will be discouraged from participating in exchange offers involving distressed companies and would punish creditors that seek to assist an economically troubled company with an out-of-court restructuring.

The Committee argues that because the Court is deciding a motion to dismiss, it must take as true the Committee's allegation that at least $377 million of OID remained as of the Petition Date from the issuance of the Junior Secured Notes. It explains that the basis for the creation of OID was the difference between the face amount of the notes upon issuance and the issue price of the notes under nonbankruptcy law. The only issue therefore is whether there is a definitive basis, as a matter of law, to override the otherwise "plain and straight-forward application of applicable tax law and the Bankruptcy Code," and it argues that there is not.

The Committee differentiates *Chateaugay* because it involved a face value exchange. Here, the character of the underlying debt was dramatically altered—the maturities were extended, the overall indebtedness was reduced, and collateral was granted. The Old Notes became lien subordinated and structurally subordinated to the New Notes. The Committee argues that holders of new bonds received in a fair market value exchange have claims in bankruptcy only equal to the cash value of the old bonds that were tendered, discounted for OID, because exchange of the old bonds was economically equivalent to a cash purchase. A creditor's participation in a fair market value exchange is a function of more incentives and penalties than the mere potential for the creation and disallowance of OID in a subsequent bankruptcy.

25

2.    *UMB's Motion to Dismiss Count XIII is Denied*

The record, at this point in the case, is insufficient for the Court to determine, as a matter of law, that the exchange at issue could not have generated OID. The law is unclear whether a fair market value exchange of debt generates OID. On the one hand, the reasoning set forth in *Chateaugay* may indicate that such an exchange does not generate OID for purposes of section 502(b)(2)—"[i]n the absence of unambiguous statutory guidance, we will not attribute to Congress an intent to place a stumbling block in front of debtors seeking to avoid bankruptcy with the cooperation of their creditors." *Chateaugay*, 961 F.2d at 383.

However, the general rule is that OID is disallowable in bankruptcy, and there are significant factual differences between this case and *Chateaugay* that prevents the exception articulated in *Chateaugay* from being determinative at this point in the case. For instance, the *Chateaugay* court disagreed with the bankruptcy court's conclusion because it essentially reduced LTV's liabilities even though there was no such reduction on LTV's balance sheet. Here, however, the Exchange involved, among other things, a reduction in the debtor's overall debt obligations, meaning there was a corresponding reduction on the debtor's balance sheet.

Moreover, and importantly, the *Chateaugay* court was concerned with the illogical result that creditors holding old bonds would be entitled to larger claims in bankruptcy than creditors (who cooperated in an out-of-court restructuring) holding new bonds in the same principal amount. Here, however, the Old Notes differed greatly from the Junior Secured Notes—the Junior Secured Notes, though they had a lower principal amount than the Old Notes, were secured. The JSNs, who are sophisticated investors, made the decision to exchange their Old Notes for the Junior Secured Notes; holders of the Old Notes had the option to otherwise retain their Old Notes or receive cash in exchange for the Old Notes. At the hearing, the Committee

explained that holders of the Old Notes who declined the Exchange Offer retained a $1,000

unsecured claim in the bankruptcy case, and they stand to recover $360 on that claim.  Holders

who participated in the Exchange Offer, however, now stand to recover $658 plus potential post-

petition interest.  Overall, the fair market value exchange that occurred in this case differs

significantly from the face value exchange that occurred in *Chateaugay*.  The record is

insufficient for the Court to determine as a matter of law that the Exchange did not generate

disallowable OID.

### III.    CONCLUSION

It is clear that the Court would benefit from a fuller evidentiary record with respect to

Counts I, IV and XIII, and therefore UMB's Motion is **DENIED** without prejudice with respect

to these Counts.  With respect to Count V, UMB's Motion is **GRANTED** with prejudice.

**IT IS SO ORDERED.**

Dated: August 13, 2013
New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge

27